IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLAN D. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:06-cv-00225-KAJ |
| v. | ) | |
| | ) | |
| DELOITTE & TOUCHE, LLP, | ) | |
| and DELOITTE & TOUCHE, USA, LLP, | ) | Trial By Jury Demanded |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Sheldon N. Sandler (No. 245)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
ssandler@ycst.com
Attorneys for Defendants

DATED:  May 5, 2006

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS......................................................................................... i

TABLE OF AUTHORITIES ............................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

SUMMARY OF ARGUMENT ........................................................................... 2

STATEMENT OF FACTS .................................................................................. 3

ARGUMENT ...................................................................................................... 4

I.      STANDARD OF REVIEW ..................................................................... 4

II.     COUNT II OF THE COMPLAINT, WHICH IS BASED ON THE
        DELAWARE DISCRIMINATION STATUTE, MUST BE
        DISMISSED. .......................................................................................... 5

A.      This Court Does Not Have Jurisdiction Over DDEA Claims,
        Which Must Be Filed In Delaware Superior Court, And By Filing
        Suit In This Court, Plaintiff Has Elected To Pursue His Federal
        Remedy. ................................................................................................. 5

B.      The DDEA Should Not be Applied Retroactively.................................. 8

C.      Plaintiff Failed To Exhaust His Administrative Remedies.................... 10

III.    THE COURT SHOULD NOT ACCEPT SUPPLEMENTAL
        JURISDICTION OVER PLAINTIFF'S COMMON LAW
        IMPLIED COVENANT OF GOOD FAITH AND BREACH OF
        CONTRACT CLAIMS............................................................................ 11

IV.     THE GENERAL ASSEMBLY EXPRESSED ITS INTENT THAT
        THE AMENDMENT TO THE DELAWARE DISCRIMINATION
        STATUTE PREEMPTED THE FIELD. ................................................. 14

CONCLUSION.................................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

Cases

Bundy v. Corrado Brothers,
  No. 97A-06-007, 1998 Del. Super. LEXIS 184,
  (March 25, 1998 ......................................................................................... 9

Comer v. Getty Oil Co.,
  Del. Super., 438 A.2d 1239 (1981) .............................................................. 8

Conneen v. MBNA Am. Bank, N.A.,
  334 F.3d 318 (3d Cir. 2003) ...................................................................... 14

D.P. Enter. Inc. v. Bucks County Cmty. Coll.,
  725 F.2d 943 (3d Cir. 1984) ........................................................................ 4

DeRasmo v. Hospitality Franchise Systems, Inc.,
  1995 U.S. Dist. LEXIS 6349,
  (D. N.J. May 8, 1995) ................................................................................ 12

E.I. DuPont de Nemours and Co. v. Pressman,
  679 A.2d 436 (Del. 1996) .......................................................................... 14

EEOC v. Avecia, Inc.,
  2005 U.S. App. LEXIS 22157,
  (3d Cir. Oct. 13, 2005) .............................................................................. 14

Ex parte McNeil,
  80 U.S. 236 (1872) ....................................................................................... 8

Finch v. Hercules, Inc.,
  809 F. Supp. 309 (D. Del. 1992) ................................................................ 15

First Transit, Inc. v. City of Racine,
  359 F. Supp. 2d 782 (D. Wis. 2005) ............................................................ 8

Lettich v. Kenway,
  590 F. Supp. 1225 (D. Mass. 1984) ........................................................... 12

Lord v. Souder,
  748 A.2d 393 (Del. 2000) .......................................................................... 15

Lyon v. Whisman & Associates, P.A.,
  45 F.3d 758 (3d Cir. 1995) .................................................................. 11, 12

*Mondzelewski v. Pathmark Stores, Inc.,*
  No. 96-359 MMS, 2000 U.S. Dist. LEXIS 6956,
  (D. Del. 2000) ......................................................................................... 9

*Morse v. Lower Merion Sch. Dist.,*
  132 F.3d 902 (3d Cir. 1997) .................................................................... 4

*Nicol v. Imagematrix, Inc,*
  767 F. Supp. 744 (E.D.Va. 1991) ........................................................... 11

*Pen. Ben. Guar. Corp. v. White Consol. Indus.,*
  998 F.2d 1192 (3rd Cir. 1993),
  *cert. denied,* 510 U.S. 1042 (1984 ........................................................ 4

*Rogers v. Exxon Research & Engineering Co.,*
  550 F.2d 834 (3d Cir. 1977) .................................................................... 7

*Shuster v. Derocili,*
  775 A.2d 1029 (Del. 2001) ........................................................... 5, 14, 15

*Wehr v.* Burroughs *Corp.,*
  619 F.2d 276 (3d Cir. 1980) .................................................................... 7

*Wilson v. Triangle Oil Co.,*
  Del. Super., 566 A.2d 1016 (1989).......................................................... 8


Other Authorities

29 U.S.C. § 626(b) ......................................................................................... 7

42 U.S.C. § 1981a(b)(3)................................................................................. 7

Delaware Discrimination In Employment Act ("DDEA"),
  19 Del. C. Chapter 7, §710 et seq ..................................................... passim

Fair Labor Standards Act ("FLSA"),
  29 U.S.C. § 207(a), ................................................................................ 11

Title VII of the Civil Rights Act of 1964
  42 U.S.C. § 2000e et seq........................................................................... 7

DB02:5303914.1                                    064406.1002

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, a citizen of Massachusetts and a former partner in Defendants' accounting firms, filed suit in this Court alleging that his termination violated the federal Age Discrimination In Employment Act and the Delaware Discrimination In Employment Act, and constituted a breach of the Delaware common law implied covenant of good faith and fair dealing and a breach of agreements concerning his partnerships. Defendants have filed a motion to dismiss all but the federal claim pursuant to FRCP 12(b)(1) and (6). This is Defendants' opening brief in support of their motion.

064406.1002

## SUMMARY OF ARGUMENT

1.    DDEA lawsuits can only be filed in Delaware Superior Court.

2.    By filing suit in this court, Plaintiff has elected the federal remedy for his age discrimination claim.

3.    Plaintiff was terminated before the DDEA was amended, and the General Assembly did not intend for the amended law to be applied retroactively.

4.    Plaintiff failed to exhaust his administrative remedies under the DDEA by filing a charge of discrimination with the Delaware Department of Labor.

5.    Plaintiff was required to obtain a right to sue letter before he could file his DDEA suit, and he has not alleged that he did so.

6.    Plaintiff's age discrimination claim and his common law claims do not share a common nucleus of operative facts and therefore, the Court should not exercise supplemental jurisdiction over the common law claims contained in Counts III and IV.

7.    The Delaware General Assembly, in amending the DDEA, reaffirmed that the exclusive remedy for discrimination claims is statutory.

2

## STATEMENT OF FACTS

Plaintiff, Alan D. Paul (whose first name is misspelled in the Complaint as "Allan") was one of several hundred former partners of the Arthur Andersen accounting firm, Complaint, ¶9, who were offered partnerships by Defendants in 2002. Complaint, ¶¶9-12. Plaintiff accepted the partnership offer and became a member of Defendants' partnerships, working as a partner in the Boston, Massachusetts office. Complaint, ¶¶14-15. He further alleges that he was provided certain protection from removal as a partner for two years after the closing. Complaint, ¶16.

Plaintiff was terminated from the partnerships by letter dated April 22, 2004 due to his failure to meet performance expectations. Complaint, ¶¶20, 28, 33-34. Plaintiff's birth date is June 2, 1949 and at the time of his termination he was 54 years old. Complaint, ¶8. He alleges that he filed charges of age discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on December 13, 2004. Complaint, ¶7. He does not allege that he filed a charge with the Delaware Department of Labor.

Plaintiff filed suit in this Court on April 6, 2006, alleging that venue in this Court is proper because his partnership agreements require that all litigation occur in Delaware and that Defendants reside in Delaware. Complaint, ¶6.

3

## **ARGUMENT**

### I.   **STANDARD OF REVIEW**

When considering a motion to dismiss, the court accepts "as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom," viewing them "in the light most favorable to the plaintiff." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Although a court will accept the plaintiff's factual allegations as true, a motion to dismiss should be granted when "it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Id.* (quoting *D.P. Enter. Inc. v. Bucks County Cmty. Coll.*, 725 F.2d 943 (3d Cir. 1984).

In particular, a court should not consider or regard as true "conclusory allegations of law, unsubstantiated conclusions, and/or unwarranted factual inferences." *Morse*, 132 F.3d at 906. Moreover, in deciding a motion to dismiss, the court may consider the Complaint, exhibits attached to the Complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *Pen. Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3rd Cir. 1993), *cert. denied*, 510 U.S. 1042 (1984).

4

## II.    COUNT II OF THE COMPLAINT, WHICH IS BASED ON THE DELAWARE DISCRIMINATION STATUTE, MUST BE DISMISSED.

Regardless of the substantive merit (or lack of merit) of his state law discrimination claim, Plaintiff may not pursue it in this Court. For the reasons discussed in more detail below, Count II should be dismissed.

### A.    This Court Does Not Have Jurisdiction Over DDEA Claims, Which Must Be Filed In Delaware Superior Court, And By Filing Suit In This Court, Plaintiff Has Elected To Pursue His Federal Remedy.

Plaintiff's Complaint alleges that he was terminated by letter dated April 22, 2004, effective May 27, 2004. Complaint, ¶34. Six months later, the Delaware General Assembly enacted the current version of the Delaware Discrimination In Employment Act ("DDEA"), 19 Del. C. Chapter 7, §710 et seq. It became effective on September 10, 2004.

The synopsis to the Delaware Senate Bill states that it created a right to sue in Delaware Superior Court after the exhaustion of administrative remedies. Delaware Bill Summary, 2004 Reg. Sess. S.B. 154 (attached as Exhibit A). The synopsis explained:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Shuster v. Derocili*, 775 A.2d 1029 (Del. 2001). ... Sections 712, 714 and 715 have been repealed in their entirety and rewritten to accomplish the goals of initially pursuing informal methods of resolution through mediation and conciliation and then permitting civil actions in Superior Court.

Id.

Several provisions of the DDEA make it clear that the General Assembly intended DDEA claims to be pursued exclusively in Delaware Superior Court and, further, that the General Assembly intended to require claimants to make a choice between any available federal remedies and the remedy provided by the DDEA. First, 19 *Del. C.* § 714(a) states: "(a) A charging party may file a civil action **in Superior Court,** after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same." (emphasis added). Second, 19 *Del. C.* § 715(a) states: **"Superior Court shall have jurisdiction over all proceedings brought by the charging party pursuant to § 714 of this title."** (emphasis added). Third, 19 *Del. C.* § 715(b) states: **"Superior Court shall have the authority** to provide the following relief ...." (emphasis added).

Finally, 19 *Del. C.* § 714(c) states:

> (c) The charging party shall **elect a Delaware or federal forum** to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A charging party is **barred by this election of remedies** from filing cases in both Superior Court and the federal forum. If the charging party files in Superior Court and in a federal forum, the respondent may file a motion to dismiss the Superior Court action under this election of remedies provision.

(Emphasis added).

If the General Assembly had intended to allow DDEA claims to be pursued in federal court simultaneously with similar claims under federal law, it would not have so plainly stated that such claims must be brought in Superior Court, nor would it have explicitly required an election of remedies. Just as the Superior Court must dismiss a DDEA claim filed in that court when a lawsuit is also filed in federal court

6

making a parallel federal claim, this Court should reject Plaintiff's effort to circumvent the desires of the Delaware General Assembly by filing his DDEA claim in this Court.

The question whether Plaintiff may simultaneously pursue claims under both the Age Discrimination In Employment Act ("ADEA") and the DDEA is more than just procedural. The remedies provided under the two statutes are different. Under the DDEA, the Superior Court is authorized to award the same types of damages as are provided under Title VII of the Civil Rights Act of 1964 ("Title VII"):

> **Superior Court shall have the authority** to … Order the payment of compensatory damages, including but not limited to general and special damages, punitive damages when appropriate, **not to exceed the damage awards allowable under Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e et seq.], as amended**, provided that for the purposes of this subchapter, employers with 4-14 employees shall be treated under Title VII's damage award as an employer with under 50 employees.[1]

19 *Del. C.* § 715(b). In contrast, under the ADEA, lost wages and liquidated damages are available but not compensatory or punitive damages. 29 U.S.C. § 626(b); *Wehr v.* Burroughs *Corp.*, 619 F.2d 276 (3d Cir. 1980); *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834 (3d Cir. 1977).

Because Plaintiff is attempting to pursue both state and federal law claims and because the DDEA requires him to choose one or the other and he has filed his claim in this federal court, Count II of the Complaint must be dismissed. Nothing in the statute suggests that the General Assembly was attempting to confer jurisdiction in federal court for state law claims. Indeed, the Delaware General Assembly could not, even if it wished to do so, confer jurisdiction in federal court over a state law claim. It is fundamental to

---

[1] Title VII includes caps on compensatory and punitive damages awards that increase with the number of the defendant's employees. 42 U.S.C. § 1981a(b)(3).

DB02:5303914.1                                                                              064406.1002

American jurisprudence that federal courts are courts of limited jurisdiction. They may only hear cases in which jurisdiction is conferred upon them by the Constitution or an act of Congress. It has, therefore, long been held that states cannot confer jurisdiction on federal courts. *Ex parte McNeil*, 80 U.S. 236, 243 (1872); ("A State law cannot give jurisdiction to any Federal court. . ."); *First Transit, Inc. v. City of Racine*, 359 F. Supp. 2d 782, 785 (D. Wis. 2005) ("federal law controls this court's subject matter jurisdiction, and state law cannot expand or contract that grant of jurisdiction."). Plaintiff's claim under the DDEA should, therefore, be dismissed.

**B.    The DDEA Should Not be Applied Retroactively.**

The DDEA became effective nearly six months after Plaintiff's partnerships ended. The enactment of the DDEA made sweeping changes to the prior law. It not only created a private cause of action for the first time, it also greatly expanded the penalties to which an employer could be subjected if a violation were found. Therefore, the DDEA should not be given retroactive application absent a clear legislative intent to do so, which is lacking here.

Delaware law does not favor retroactive application of a statute. It is well settled in Delaware that "absent a clear legislative intent, Delaware courts will not infer an intention to make an act retroactive." *Wilson v. Triangle Oil Co.*, Del. Super., 566 A.2d 1016, 1018 (1989). *See also Chrysler Corp. v. State,* Del. Supr., 457 A.2d 345, 351 (1982) ("It is a time-honored principle that this Court 'will not infer an intention to make an act retrospective,' and that 'to give an act a retrospective operation would be contrary to well settled principles of law applicable to the construction of statutes unless it be plainly and unmistakably so provided by the statute.'"); and *Comer v. Getty Oil Co.,* Del. Super., 438 A.2d 1239, 1242 (1981) ("it is generally recognized that a statute will not be

8

given retroactive application which affects substantive rights, at least in the absence of language showing a clear legislative intent to give retroactive effect."). *See also, Bundy v. Corrado Brothers*, No. 97A-06-007, 1998 Del. Super. LEXIS 184, *3 (March 25, 1998) ("It is a general rule of statutory interpretation that legislation is to be accorded prospective effect unless the General Assembly makes its intention clear to give it retroactive effect. Here, there is no such clear intention.")

In *Mondzelewski v. Pathmark Stores, Inc.*, No. 96-359 MMS, 2000 U.S. Dist. LEXIS 6956, *57-*58 (D. Del. 2000), a case involving the retaliation amendment to the Delaware Worker's Compensation Act, Judge Schwartz pointed out that, as in the instant case, the allegedly retaliatory conduct took place before the passage of the act and all of the allegedly retaliatory acts had occurred before the effective date of the amendment. The court found that, as a result, the plaintiff "cannot claim relief under this section." *Id.* The court observed that "Delaware courts have recognized the general principle that statutes will not be retroactively applied unless there is a clear legislative intent to do so." *Id.* (citations omitted).

In this case, the DDEA contains no clear declaration of retroactivity. Section 714(a) of the amended Act merely allows an aggrieved party under the amended Act to sue in Superior Court: "[A] Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right To Sue Notice acknowledging the same." 19 *Del. C.* § 714(a) (2005). Nothing in the language of Section 714(a) states or even implies that the General Assembly intended for the statute to be applied retroactively to fact situations that had arisen before the amendment was enacted.

9

Since all of the facts relied upon by Plaintiff in his Complaint occurred under the prior law and the DDEA does not clearly provide for retroactive application, for that additional reason Count II of Plaintiff's Complaint should be dismissed.

**C.      Plaintiff Failed To Exhaust His Administrative Remedies.**

The Delaware statute that Plaintiff has invoked requires that a charge of discrimination be filed. *19 Del. C. §712 (c)(1).* The charge must be filed "within 120 days of the alleged unlawful employment practice or its discovery . . ." *Id.* Once the prescribed administrative process is completed, the Department of Labor "may grant a Delaware Right to Sue Notice to a charging party." *19 Del. C. §712(c)(5).* The Complaint contains no allegation that Plaintiff filed a charge of discrimination with the Delaware Department of Labor, and far more than 120 days has passed.[2] Nor does the Complaint contain an averment that Plaintiff has been issued a Delaware Right to Sue Notice, which the statute requires as a precondition to filing suit. For these reasons, also, Count II should be dismissed.

---

[2] Plaintiff says he filed a charge of age discrimination with the Massachusetts analogue to the Delaware Department of Labor on December 13, 2004. Complaint, ¶7. But even if one measures the 120 day statute of limitations under the DDEA from the effective date of his termination, May 27, 2004, rather than from the April 27, 2004 date Plaintiff received notice of his termination, Complaint, ¶34, that filing would have been untimely under the DDEA, which required that a charge be filed within 120 days, i.e., by September 25, 2004.

064406.1002

III.    **THE COURT SHOULD NOT ACCEPT SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S COMMON LAW IMPLIED COVENANT OF GOOD FAITH AND BREACH OF CONTRACT CLAIMS.**

The Third Circuit, in *Lyon v. Whisman & Associates, P.A.*, 45 F.3d 758 (3d Cir. 1995), held that the mere fact that several claims being asserted arise from the employment relationship is insufficient justification for the exercise of supplemental jurisdiction. The facts of *Lyon* are instructive. Plaintiff filed a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a), alleging that the defendant employer failed to pay her overtime as required by the FLSA. She also brought state law contract and tort claims for an alleged failure to pay a bonus. A jury trial in this Court resulted in a verdict for the plaintiff on all counts. On appeal, the Third Circuit, *sua sponte*, found that the District Court lacked jurisdiction over the state law claims. The court pointed out that the issue raised constitutional questions under Article III. Supplemental jurisdiction was not present because the claims did not arise out of a common nucleus of operative facts. The court noted that the general employer-employee relationship was not sufficient to establish supplemental jurisdiction. Id. at 763.

In *Lyon*, the court discussed several cases in which supplemental jurisdiction was held to be inappropriate where, as in this case, the Plaintiff raised federal employment discrimination claims and attempted to bootstrap federal jurisdiction for state common law claims based on supplemental jurisdiction. Id. at 763-64. The court observed that:

> [i]n declining to entertain state contract and fraud claims in a sexual discrimination suit, *Nicol [v. Imagematrix, Inc,* 767 F. Supp. 744 (E.D. Va. 1991)] pointedly noted that the sole common fact between the state and federal claims was the employment relationship. . . . District courts similarly have found that they did not have supplemental jurisdiction

11

> to entertain a variety of state claims in age discrimination cases. In *Mason v. Richmond Motor Co.* the court concluded it could not exercise supplemental jurisdiction over a state law breach of contract claim (based on an oral promise that the defendant would never fire the plaintiff) in an ADEA wrongful discharge suit. . . . 625 F. Supp. at 888.

*Lyon, id.*, 45 F.3d at 763.

In *DeRasmo v. Hospitality Franchise Systems, Inc.*, 1995 U.S. Dist. LEXIS 6349, (D. N.J. May 8, 1995), the court noted that "the Third Circuit views the exercise of supplemental jurisdiction as proper only in those cases where the state and federal claims 'are merely alternative theories of recovery based on the same act.'"(citation omitted), *26. *DeRasmo* was an ADEA case in which the court dismissed all state law claims, including breach of contract and implied covenant claims, because they "present entirely different elements of proof and theories of recovery." *Id.* at *28.

In *Lettich v. Kenway*, 590 F. Supp. 1225 (D. Mass. 1984), a suit against a law firm partnership and certain individuals under the ADEA, the court declined to exercise supplemental jurisdiction over an implied covenant of good faith claim and other state law claims because "trial of plaintiff's state law claims would involve complex and difficult issues of fact and law, and would go far beyond the scope of the detailed and comprehensive statutory scheme of the ADEA" and would create jury confusion. In addition, "the ADEA appears to be an exclusive remedy." 590 F. Supp at 1226.

The allegations of Counts III and IV are factually independent of the allegations necessary to prove an age discrimination claim. Plaintiff's implied covenant claim asserts that he was removed from the partnerships to prevent him from obtaining the fruits of his partnership agreements. Complaint, ¶¶44-45. The allegations related to Plaintiff's breach of contract claim consist of one incomplete and unclear sentence.

Complaint, ¶47. The facts concerning those two claims can have nothing to do with Plaintiff's age discrimination allegations, which consist of purported comparisons with the performance of younger partners, Complaint, ¶¶28-29, and are unrelated to the supposedly "fraudulent" actions designed to deprive Plaintiff of the benefits of his contracts. Under the rationale set out by the Third Circuit in *Lyon*, there is no justification for this Court to retain jurisdiction over the common law claims, and Counts III and IV should be dismissed.

13

IV.    **THE GENERAL ASSEMBLY EXPRESSED ITS INTENT THAT THE AMENDMENT TO THE DELAWARE DISCRIMINATION STATUTE PREEMPTED THE FIELD.**

Common law causes of action that run parallel to statutory discrimination claims are no longer viable in Delaware following the comprehensive amendments to Delaware's employment discrimination statute to create a private state-law cause of action. *EEOC v. Avecia, Inc.*, 2005 U.S. App. LEXIS 22157, *6 (3d Cir. Oct. 13, 2005) (citing *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) and *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 442-44 (Del. 1996)).

In *Avecia*, the Third Circuit found that "in 2004 the Delaware legislature amended 19 Del. C. § 710 et seq., which prohibits discrimination in employment practices, in order to clarify that this statute was the 'sole remedy' for an aggrieved employee 'to the exclusion of **all other remedies**.'" *Avecia*, 2005 U.S. App. LEXIS 22157 at *7-8  (quoting 19 Del. C. § 712(b))(emphasis added).  The Third Circuit pointed out that "the synopsis of the Senate Bill [amending Section 712] expressly states disagreement with the Delaware Supreme Court's decision in *Schuster*, the decision that recognized a[n implied covenant] public policy claim for alleged gender bias:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A.2d 1029 (2001).

Even before the statutory amendments to the state discrimination law, the Delaware Supreme Court had made clear that it was not expanding exceptions to the employment at will doctrine.  *See Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 334 (3d Cir. 2003) (explaining that Delaware courts have been reluctant to recognize a broad

application of the implied covenant of good faith and fair dealing theory out of concern that the covenant "could swallow the doctrine of employment at will"); *Lord v. Souder*, 748 A.2d 393, 401-03 (Del. 2000) (discussing exceptions to at-will employment doctrine as "narrow and discrete" and interpreting them to "prevent further erosion" of the doctrine).

        The policy behind the pre-*Schuster* rulings in this Court, *see, e.g., Finch v. Hercules, Inc.,* 809 F. Supp. 309 (D. Del. 1992), and in state court decisions was that an implied covenant claim or other exception to employment at will should not be judicially created where there is an existing statutory remedy such as the ADEA. Given the Delaware Supreme Court's decisions limiting the expansion of common law exceptions to employment at will, and the stated policy of the legislative amendments reaffirming the prior rulings on the exclusivity of the statutory remedy, recognition of common law claims that are co-extensive with Plaintiff's statutory age discrimination claim is inapposite.

15

## CONCLUSION

For the reasons discussed, Counts II, III and IV of the Complaint should be dismissed.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler (No. 245)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
ssandler@ycst.com
Attorneys for Defendants

DATED:  May 5, 2006

16

064406.1002

## CERTIFICATE OF SERVICE

I, **Sheldon N. Sandler, Esquire**, hereby certify that on **Friday, May 5, 2006**, I electronically filed a true and correct copy of the foregoing **Defendants' Opening Brief in Support Of Their Motion to Dismiss,** which will send notification that such filing is available for viewing and downloading to the following counsel of record. A courtesy copy of such **Defendants' Opening Brief in Support Of Their Motion to Dismiss** was also hand delivered to the following counsel of record on this date.

    Gary W. Aber, Esquire
    Aber, Goldlust, Baker & Over
    702 King Street, Suite 600
    P.O. Box 1675
    Wilmington, DE 19899-1675


                YOUNG CONAWAY STARGATT & TAYLOR, LLP



                Sheldon N. Sandler, Esquire (No. 0245)
                The Brandywine Building
                1000 West Street, 17th Floor
                P.O. Box 391
                Wilmington, Delaware 19899-0391
                Telephone: (302) 571-6673
                Facsimile: (302) 576-3330
                Email: ssandler@ycst.com
                Attorneys for Defendant


DATED:    May 5, 2006

064406.1002

SPONSOR:   Sen. Marshall & Rep. Lofink

DELAWARE STATE SENATE

142nd GENERAL ASSEMBLY

SENATE BILL NO. 154

AN ACT TO AMEND TITLE 19 OF THE DELAWARE CODE RELATING TO DISCRIMINATION IN EMPLOYMENT.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE (Two-thirds of all members elected to each house thereof concurring therein):

Amend Subchapter II of Chapter 7, Title 19 of the Delaware Code, "Discrimination in Employment" by striking said Subchapter in its entirety and substituting in lieu thereof the following:

"Subchapter II. Discrimination in Employment.

§ 710. Definitions.

        For the purposes of this subchapter:

(1) 'Age' as used in this subchapter means the age of forty (40) or more years of age.

(2) 'Employee' means an individual employed by an employer, but does not include:

a. Any individual employed in agriculture or in the domestic service of any person,

b. Any individual who, as a part of that individual's employment, resides in the personal residence of the employer,

c. Any individual employed by said individual's parents, spouse or child, or

d. Any individual elected to public office in the State or political subdivision by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the merit service rules or civil service rules of the State government or political subdivision.

(3) 'Employer' means any person employing four (4) or more employees within the State at the time of the alleged violation, including the State or any political subdivision or board, department, commission or school district thereof.

(4) 'Employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

(5) 'Genetic information' for the purpose of this chapter means the results of a genetic test as defined in § 2317(a)(3) of Title 18.

(6) 'Job related and consistent with business necessity' means the condition in question renders the individual unable to perform the essential functions of the position that such individual holds or desires. This includes situations in which the individual poses a direct threat to the health

or safety of himself/herself or others in the workplace

(7) 'Labor organization' includes any organization of any kind, any agency or employee representation committee, group, association or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours or other terms or conditions of employment, any conference, general committee, joint or system board or joint council so engaged which is subordinate to a national or international labor organization.

(8) 'Person' includes 1 or more individuals, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy or receivers.

(9) 'Religion' as used in this Subchapter includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that the employer is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business

(10) 'Secretary' means the Secretary of the Department of Labor or the Secretary's designee

(11) 'Charging Party' means any individual or the Department who initiates proceedings by the filing of a verified Charge of Discrimination, and who preserves a cause of action in Superior Court by exhausting the administrative remedies pursuant to the provisions of §714.

(12) 'Respondent' means any person named in the Charge of Discrimination, including but not limited to employers, employment agencies, labor organizations, joint labor-management committees, controlling apprenticeship or other training programs including on-the-job training programs.

(13) 'Mediation' for the purposes of this chapter refers to an expedited process for settling employment disputes with the assistance of an impartial third party prior to a full investigation.

(14) 'Conciliation' for the purposes of this chapter refers to a process which requires the appearance of the parties after a full investigation resulting in a final determination of reasonable cause.

(15) 'No Cause Determination' means that the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred or is occurring. A no cause determination is a final determination ending the administrative process and provides the Charging Party with a corresponding Delaware Right to Sue Notice.

(16) 'Reasonable Cause Determination' means that the Department has completed its investigation and found reasonable cause to believe that an unlawful employment practice has occurred or is occurring. A reasonable cause determination requires the parties' good faith efforts in conciliation.

(17) 'Delaware Right to Sue Notice' for the purposes of this chapter refers to a final acknowledgement of the Charging Party's exhaustion of the administrative remedies provided herein and written notification to the Charging Party of a corresponding right to commence a lawsuit in Superior Court.

§ 711. Unlawful employment practices; employer practices

(a) It shall be an unlawful employment practice for an employer to:

(1) Fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, marital status, genetic information, color, age, religion, sex or national origin; or

(2) Limit, segregate or classify employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of such individual's race, marital status, genetic information, color, age, religion, sex or national origin.

(b) It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment or otherwise to discriminate against any individual because of race, marital status, genetic information, color, age, religion, sex or national origin or to classify or refer for employment any individual on the basis of race, marital status, genetic information, color, religion, age, sex or national origin.

(c) It shall be an unlawful employment practice for a labor organization to:

(1) Exclude or expel from its membership or otherwise to discriminate against any individual because of race, marital status, genetic

information, color, age, religion, sex or national origin;

(2) Limit, segregate or classify its membership or to classify or fail or refuse to refer for employment any individual in any way which would deprive or tend to deprive any individual of employment opportunities or would limit such employment opportunities or otherwise adversely affect the individual's status as an employee or as an applicant for employment because of such individual's race, marital status, genetic information, color, age, religion, sex or national origin; or

(3) Cause or attempt to cause an employer to discriminate against an individual in violation of this section.

(d) It shall be an unlawful employment practice for any employer, labor organization or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual because of race, marital status, genetic information, color, age, religion, sex or national origin in admission to or employment in any program established to provide apprenticeship or other training.

(e) It shall be an unlawful employment practice for an employer, employment agency, labor union or joint labor-management committee controlling apprenticeship or other training or retraining, including on the job training programs to intentionally collect, directly or indirectly, any genetic information concerning any employee or applicant for employment, or any member of their family, unless:

(1) It can be demonstrated that the information is job related and consistent with business necessity; or

(2) The information or access to the information is sought in connection with the retirement policy or system of any employer or the underwriting or administration of a bona fide employee welfare or benefit plan.

(f) It shall be an unlawful employment practice for any employer, employment agency, labor organization or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discharge, refuse to hire or otherwise discriminate against any individual or applicant for employment or membership on the basis of such person's race, marital status, color, age, religion, sex or national origin, because such person has opposed any practice prohibited by this subchapter or because such person has testified, assisted or participated in any manner in an investigation, proceeding, or hearing to enforce the provisions of this subchapter.

(g) Notwithstanding any other provision of this subchapter:

(1) It shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual or for an employer, labor organization or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program on the basis of religion, genetic information, age, sex or national origin in those certain instances where religion, genetic information, age, sex or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise; and

(2) It shall not be an unlawful employment practice for a school, college, university or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled or managed by a particular religion or by a particular religious corporation, association or society or if the curriculum of such school, college, university or other educational institution or institution of learning is directed toward the propagation of a particular religion.

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation or different terms, conditions or privileges of employment pursuant to a bona fide seniority or merit system or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, marital status, genetic information, color, age, religion, sex or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, marital status, genetic information, color, religion, age, sex or national origin.

(i) Nothing contained in this subchapter as it applies to discrimination because of age or sex shall be interpreted to affect or interfere with the retirement policy or system of any employer or the underwriting or administration of a bona fide employee welfare or benefit plan, provided that such policy, system or plan is not merely a subterfuge to evade the purpose of this subchapter.

(j)(1) Nothing in this subchapter shall be construed to prohibit compulsory retirement of any employee who has attained 65 years of age, and who, for the 2-year period immediately before retirement, is employed in a bona fide executive or a high policy-making position, if such employee is entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit sharing, savings or deferred compensation plan, or any combination of such plans, of the employer of such an employee, which equals, in the aggregate, at least $44,000

(2) In applying the retirement benefit test of paragraph (1) of this subsection, if any such retirement benefit is in a form other than a straight life annuity (with no ancillary benefits), or if employees contribute to any such plan or make rollover contributions, such benefit shall be adjusted in accordance with regulations prescribed by the Secretary, United States Department of Labor, pursuant to 29 U.S.C. § 631(c)(2), so that the benefit is the equivalent of a straight life annuity (with no ancillary benefits) under a plan to which employees do not contribute and under which no rollover contributions are made.

§ 712 Enforcement provisions; powers of the Department; administrative process.

(a) The Department of Labor is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in §§ 711, 723 and 724 of this title. In connection with the performance of its duties, the Department may:

(1) investigate employment practices by permitting the Department to enter any place of employment at reasonable times; inspect and copy records or documents in the possession of the employer, the employment agency or labor organization; administer oaths, certify to official acts, take and cause to be taken depositions of witnesses; issue subpoenas compelling the attendance and testimony of witnesses and the production of papers, books, accounts, payrolls, documents, and records;

(2) make, revise or rescind such rules or regulations necessary or appropriate to administer or enforce this chapter in accordance with the provisions of 29 Del. C. § 10161 (b) of the Delaware Code;

(3) commence civil actions in Superior Court for violations of this chapter, any published regulations or for civil penalties provided herein.

(b) The Department shall have jurisdiction over all cases arising under this chapter, affording review and oversight of employment practices in Delaware. The Department shall endeavor to eliminate unlawful discrimination in employment through its administrative process set forth below. This subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies. Upon termination of the administrative process by the Department, the Charging Party may institute a civil action in Superior Court of the State of Delaware pursuant to §§ 714, 715.

(c) The administrative process requires the following:

(1) Statute of limitation and filing procedure. Any person claiming to be aggrieved by a violation of this chapter shall first file a Charge of Discrimination within 120 days of the alleged unlawful employment practice or its discovery, setting forth a concise statement of facts, in writing, verified and signed by the Charging Party. The Department shall serve a copy of the verified Charge of Discrimination upon the named Respondent by certified mail. The Respondent may file an answer within twenty (20) days of its receipt, certifying that a copy of the answer was mailed to the Charging Party at the address provided.

(2) Preliminary findings and recommendations. The Department shall review the submissions within sixty (60) days from the date of service upon the Respondent and issue preliminary findings with recommendations. The preliminary findings may recommend: (i) dismissing the Charge unless additional information is received which warrants further investigation; (ii) referring the case for mediation requiring the parties' appearance; or (iii) referring the case for investigation.

(3) Final determinations upon completion of investigation. After investigation, the Department shall issue a Determination of either "Reasonable Cause" or "No Reasonable Cause" to believe that a violation has occurred or is occurring. All cases resulting in a "Reasonable Cause" Determination will require the parties to appear for compulsory conciliation. All cases resulting in a "No Cause" Determination will receive a corresponding Delaware Right to Sue Letter.

(4) Confidentiality of the Department's process. The Department shall not make public the charge of discrimination or information obtained during the investigation of a charge. This provision does not apply to disclosures made to the parties, their counsel, or witnesses where disclosure is deemed necessary or appropriate. Nothing said or done during and as a part of the mediation or conciliation efforts may be made public by the Department, its officers or employees or used by any party as evidence in a subsequent proceeding without the written consent of the persons concerned.

(5) End of administrative process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party.

§ 713 Civil action by the Attorney General; complaint.

(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter or subchapter III of this chapter and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the

Court of Chancery by filing with it a complaint:

(1) Signed by the Attorney General (or in the Attorney General's absence the Chief Deputy Attorney General);

(2) Setting forth facts pertaining to such pattern or practice; and

(3) Requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as the Attorney General deems necessary to insure the full enjoyment of the rights herein described.

(b) The Court of Chancery shall have jurisdiction over proceedings brought pursuant to this section.

§ 714  Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies

(a) A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

(b) The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

(c) The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum. If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

§ 715  Judicial remedies; civil penalties.

Superior Court shall have jurisdiction over all proceedings brought by the Charging Party pursuant to § 714. Superior Court may excuse a Charging Party who has complied with the compulsory conciliation provisions of this chapter from the compulsory arbitration provisions of Superior Court rule.

(a) Superior Court shall have the authority to provide the following relief, including but not limited to: (1) order the Respondent to cease and desist or modify its existing employment policies; (2) order the Respondent to hire, reinstate or promote the Charging Party; (3) order the payment of compensatory damages, including but not limited to general and special damages, punitive damages when appropriate, not to exceed the damage awards allowable under Title VII of the Civil Rights Act of 1964, as amended, provided that for the purposes of this subchapter, employers with 4-14 employees shall be treated under Title VII's damage award as an employer having under 50 employees; and (4) order the costs of litigation and reasonable attorney's fees to the prevailing party.

(b) In any action brought by the Department for violation of the retaliation provision of section 711(f), the Court shall fine the employer not less than $1,000 nor more than $5,000 for each violation, in addition to any liability for damages.

§ 716  Posting of notices; penalties.

(a) Every employer, employment agency and labor organization, as the case may be, shall post and keep posted in conspicuous places upon its premises where notices to employees, and applicants for employment are customarily posted, a notice to be prepared or approved by the Department setting forth excerpts from or summaries of the pertinent provisions of this subchapter and subchapter III of this chapter and information pertinent to the filing of a complaint.

(b) A willful violation of this section shall be punishable by a fine of not more than $100 for each separate offense.

§ 717  Veterans' special rights or preference

Nothing contained in this subchapter or subchapter III of this chapter shall be construed to repeal or modify any state or local law creating special rights or preferences for veterans.

§ 718  Short title, effective date, savings clause.

(a) This subchapter may be cited as the "Discrimination in Employment Act."

(b) This Act shall become effective sixty (60) days after its enactment into law.

(c) This Act does not affect any cause of action or the remedy provided therefor if such cause of action accrued and suit was instituted thereon prior to the effective date of this Act.

## SYNOPSIS

This bill eliminates the Equal Employment Review Board, and creates a corresponding Delaware Right to Sue in Superior Court after exhausting Administrative remedies. This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A. 2d 1029 (2001).

Some definitions have been added to section 710, specifically new terms such as "No Cause Determination"; "Reasonable Cause Determination"; "Charging Party"; "Respondent"; "Delaware Right to Sue Notice"; "Mediation"; and "Conciliation". Sections 712, 714 and 715 have been repealed in their entirety and rewritten to accomplish the goals of initially pursuing informal methods of resolution through mediation and conciliation and then permitting civil actions in Superior Court.

Author: Senator Marshall

LEXSEE 1998 DEL. SUPER. LEXIS 184

**Herney Bundy v. Corrado Brothers**

**C.A. No. 97A-06-007**

**SUPERIOR COURT OF DELAWARE, SUSSEX**

*1998 Del. Super. LEXIS 184*

**December 24, 1997, Date Submitted
March 25, 1998, Decided**

**SUBSEQUENT HISTORY:  [*1]**

Released for Publication by the Court May 29, 1998.

**DISPOSITION:**

Board's decision AFFIRMED.

**COUNSEL:** Clayton E. Bunting, Esquire, Wilson, Halbrook & Bayard, Georgetown, Delaware.

Natalie S. Wolf, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware.

**JUDGES:** T. HENLEY GRAVES, JUDGE.

**OPINIONBY:** T. HENLEY GRAVES

**OPINION:**

Herney Bundy ("Appellant") appeals the October 31, 1996 decision of the Industrial Accident Board ("Board") determining that *19 Del.C. § 2334* applied prospectively so as not to require a retroactive payment of approximately $ 63,000 to Appellant by the insurance carrier of Corrado Brothers ("Appellee"). The parties have briefed the issues presented by this appeal. This is the Court's decision thereon.

FACTS

A legal hearing took place before the Board on October 31, 1996 on Appellee's petition to terminate compensation. In effect, Appellee sought an order from the Board requiring Appellant to sign agreements as to compensation due from July 10, 1995 and ongoing reflecting the new statutory rate of $ 125.47. The Board did not take testimony and heard only arguments from the parties' counsel. n1 After its consideration of these arguments and the evidence before it,  [*2]  the Board issued the following decision:

The facts in this case are not in dispute, and the issue involved is a matter of law and one of statutory interpretation. The claimant was injured in a compensable industrial accident on September 6, 1967. He has received compensation for temporary total disability benefits since that time. The claimant received the maximum compensation rate in effect as of an agreement dated September 10, 1970. His average weekly wage at the time of injury was $ 124.00.

Effective May 21, 1971, the General Assembly approved supplemental benefits for those individuals who were totally disabled as of that date and (for purposes of this case) were presently receiving the maximum benefit amount in effect at the time of the award or agreement for compensation. The claimant was included in this class of injured employees. For unknown reasons, the claimant continued to receive his benefit amount pursuant to the 1970 agreement. It was not until 1994 (after the claimant retained legal counsel) that the carrier finally paid benefits that constituted supplemental payments in a lump sum.

On July 10, 1995, the Governor signed into law Senate Bill 168.  [*3]  This bill amended the prior provisions of section 2334 to insert a maximum benefit amount equivalent to the maximum benefit in effect as of July 1, 1975. This raised the supplemental payment for individuals such as the claimant so that their benefits

would increase from $ 75.00 per week to $ 125.47 per week. Effective July 10, 1995, the carrier started paying the claimant benefits of $ 125.47 per week.

The dispute in this case centers around an issue of retroactivity. The carrier contends that there is no indication in S.B. 168 or its legislative history that the General Assembly intended to make the supplemental payments retroactive to May of 1971. The claimant contends that the language of the statute itself indicates the payments should be made retroactive. For the following reasons, the Board concludes that the carrier's position is the correct one.

It is a general rule of statutory interpretation that legislation is to be accorded prospective effect unless the General Assembly makes its intention clear to give it retroactive effect. Here, there is no such clear intention. The Board has reviewed the statutory amendment itself, the bill's synopsis, and even the tapes **[*4]** of the rather minimal legislative debate on the bill. Nowhere does it appear that the General Assembly intended that the bill require retroactive payments to claimants back to May of 1971. To interpret the legislation as having retroactive effect would also make little sense. One would have to wonder why the General Assembly would make payments retroactive to a date that preceded the date at which it established the effective maximum benefit amount. This defies logic. Furthermore, as it appears to the Board that only the dates utilized to establish the effective maximum benefit amount were changed, that the General Assembly intended only to increase the amount of the bare minimal compensation to be paid prospectively and not to provide a retroactive payment. For these reasons, the Board concludes that the claimant's compensation rate shall be $ 125.47 effective July 10, 1995. The parties may sign agreements and receipts to this effect.

n1 The Court does not summarize counsels' arguments before the Board here since they make similar arguments in their briefs. Those arguments are addressed in more detail below.

**[*5]**

STANDARD OF REVIEW

While this Court gives strong consideration to an agency's interpretation of relevant statutes, Sutherland Stat. Const. § 73.02 (5th Ed.), it reviews such questions of law *de novo. In re Beattie, Del. Super., 54 Del. 506, 180 A.2d 741, 744 (1962); Oceanport Ind. v. Wilmington Stevedores, Del. Supr., 636 A.2d 892, 899 (1994).* The question of law at issue in this appeal is whether *19 Del.C. § 2334* applies retroactively or prospectively.

SUMMARY OF THE ARGUMENTS

In its briefs filed in this matter, Appellant attacks the Board's decision on several fronts. First, he argues that the Board erred by examining legislative intent without first determining that the statute was ambiguous. Appellant argues that even if the Board was correct in contemplating the legislative intent, it erred by refusing to interpret the statute liberally in favor of expansive remedial payments to injured workers.

Second, Appellant contends that *19 Del.C. § 2334(a)* not only defines the class of workers to whom insurance carriers must pay the adjustment, but it also requires carriers to make those payments from and after the entitlement date of May 27, 1971. Furthermore, the **[*6]** Board's past practices with regard to this section estops it from drawing a different conclusion. Third, Appellant insists that Appellee did not meet its burden of proof to support its position that the amended benefit adjustment rate applies only to July 10, 1995 and thereafter.

Fourth, Appellant suggests that the Board impermissibly relied upon Appellee's argument that interpreting the statute as Appellant suggests would produce an illogical economic result. Appellant argues that Appellee's construction of the statute would lead to the illogical result of requiring claimants to repay benefits received by them prior to the July 1995 amendment. In addition, Appellant contends that Appellee's position would produce an illogical result for the further reason that, on one prior occasion, its insurance carrier retroactively paid benefits due to Appellant under *19 Del.C. § 2334* as originally enacted.

Finally, Appellant argues that its interpretation of *19 Del.C. § 2334* is consistent with Supreme Court cases holding that the statute's purpose was to remedy the effects of an inflationary economy on a totally disabled worker. *A&P Stores v. Hannigan, Del. Supr., 367 A.2d 641* **[*7]** *(1976); Price v. All American Eng'g Co., Del. Supr., 320 A.2d 336 (1974).*

Appellee, on the other hand, asks this Court to affirm the Board's interpretation of *19 Del.C. § 2334.* In particular, Appellee contends that the Board did not err in its consideration of legislative intent, because it correctly and initially determined that the matter before it warranted prospective application of the legislation, unless the legislature clearly indicated otherwise.

Furthermore, contrary to what Appellant suggests, Appellee argues that the Board did find the statute clear and unambiguous and that its consideration of legislative intent represented an "assuming, arguendo" approach to Appellant's argument regarding the retroactive application of the statute. It also contends that the absurd, albeit generous, results deriving from retroactive application of the statute, if intended, would have warranted some discussion on the legislative floor, which is noticeably absent from the legislative history. n2 In addition, Appellee insists that no burden of proof need be met by any party in cases involving statutory construction.

> n2 The absurd results to which Appellee refers are payments which exceed the maximum amount of benefits then in effect that claimants could receive; retroactive application of a present amendment, the problems of which could have been addressed during the previous 25 years if the legislature were so inclined; payments to claimants not totally disabled on the entitlement date; and large lump sum payments to each claimant entitled to benefits under *19 Del.C. § 2334.*

**[*8]**

Appellee also argues that the Board did not commit error by holding that *19 Del.C. § 2334* applies prospectively. It contends that the May 27, 1971 date only reflects the effective date of the statute and defines the class of workers eligible for benefits under the statute. Instead, Appellee contends that July 10, 1995, the date the Governor signed the bill, represents the date on which Appellant became entitled to receive the monetary benefit adjustment.

Appellee also takes issue with Appellant's characterization of Supreme Court cases interpreting *19 Del.C. § 2334. A&P Stores v. Hannigan, Del. Supr., 367 A.2d 641 (1976); Price v. All American Eng'g Co., Del. Supr., 320 A.2d 336 (1974).* It contends that the cases actually support its position that the May 27, 1971 date merely defines in the broadest way possible the class of workers eligible for the benefits provided by that section.

DISCUSSION

As stated previously, this Court must determine whether *19 Del.C. § 2334* applies retroactively or prospectively. To bring this Court to a resolution of this issue, it is necessary to review several rules of statutory construction. The Court must first determine **[*9]** whether or not the statute is clear and unambiguous on its face. Sutherland Stat. Const. § 46.04 (5th Ed.) ("courts are bound to give effect to the literal meaning without consulting other indicia of intent or meaning when the meaning of the statutory text itself is 'plain' or 'clear and unambiguous.' This rule makes it necessary to determine whether a statute has a plain meaning or is ambiguous in order to know whether other indicia of intent or meaning should be considered"). If it is clear and unambiguous, it must give to the statute its plain meaning. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd., Del. Supr., 492 A.2d 1242, 1246 (1985); Balma v. Tidewater Oil Co., Del. Supr., 59 Del. 109, 214 A.2d 560, 562 (1965).* However, if the statute is ambiguous, then the Court may look to legislative intent to aid it in its construction of the statute. *Chrysler v. State, Del. Supr., 457 A.2d 345, 351 (1983); A&P Stores v. Hannigan, Del. Supr., 367 A.2d 641, 643 (1976).*

Also important to this case are the rules involving retroactive application of statutory provisions. Courts disfavor retroactive application of legislation unless it is unmistakable on the face of **[*10]** the statute that the legislature intended such an application. *Price v. All American Eng'g Co., Del. Super., 320 A.2d 336, 341 (1974); In re Surcharge Classification 0133 by the Delaware Compensation Rating Bureau, Inc., Del. Super., 655 A.2d 295, 303 (1994),* aff'd, *Del. Supr., 655 A.2d 309 (1995).* Consequently, the Court will not infer an intention to make an act retroactive. *Chrysler Corp. v. State, supra; Distefano v. Lamborn, Del. Super., 46 Del. 195, 81 A.2d 675, 678 (1951).* Therefore, "if it is doubtful whether the statute or amendment was intended to operate retrospectively, the doubt should be resolved against such operation." *Distefano v. Lamborn, Del. Super., 46 Del. 207, 83 A.2d 300, 301 (1951); Whaley v. Allstate Ins. Co., D. Del., 595 F. Supp. 1023, 1027 (1984).*

This Court concludes that the statute is unambiguous. n3 This Court agrees with Appellee's contention that *19 Del.C. § 2334(a)* merely defines the class of individuals to whom benefits must be paid, while the dates found in subsections (b) and (c) merely define the amounts to which such eligible claimants are entitled. To interpret the statute as Appellant suggests, in this Court's view, **[*11]** "would require an unwarranted stretching of the language of the statute." *Balma, 214 A.2d at 562.* The Court will not accept Appellant's implicit invitation to do so.

n3 The Court acknowledges Appellant's argument that the Board appears to have erroneously considered legislative intent before declaring the statute ambiguous. The Court's review of the Board's decision, however, reveals that the Board omitted any discussion regarding the statute's ambiguity. Instead, it based its holding solely upon the rules governing retroactive application of legislation, which the Court discusses below. The Board's omission, however, is not fatal to its decision for two reasons: (1) the Court reviews errors of law de novo and, hence, it can correct such errors upon review; and (2) the Board properly considered the law regarding retroactive application of statutory provisions. Based on the foregoing, the Court will not reverse the Board's decision for the reasons advocated here by Appellant.

In addition, my review [*12] of the statute reveals no specific intent on its face to require retroactive application of its provisions. *Price v. All American Eng'g Co., supra.* As the Supreme Court noted in a footnote in its Price decision, the lower court correctly found that the legislature clearly intended to make the benefits awarded under *19 Del.C. § 2334* payable to a retrospective class of workers. *Price, 320 A.2d at 341, n.6.* This language in the footnote is important in that the Supreme Court determined not that the benefits themselves were payable retroactively, but that they were clearly payable to a retrospective class of workers. n4 Thus, this Court concludes that it is clear on the face of the statute that the legislature did not intend the provisions of *19 Del.C. § 2334* to apply retroactively. n5

n4 This language also negates Appellant's contention that the legislature intended for the benefits to themselves to be paid retroactively. This is especially clear in light of the Supreme Court's characterization of *19 Del.C. § 2334* as "status-oriented," suggesting that the status of the workers on May 27, 1971 determines to whom benefits must be paid. *Price, supra at 339.*

[*13]

n5 Even if the Court were to find that the legislation was unclear regarding retroactive application, it must nevertheless resolve such doubt, if it existed, against such application. *Distefano, supra.*

Even assuming that the Board improperly considered additional material other than the statute itself to support its conclusion that the legislature did not intend the statute to apply retroactively, Appellant still loses. While such consideration is inappropriate absent ambiguity under current case law, it does not demand reversal since the Board in the first instance determined that the statute expressed no clear intention to apply the provisions retroactively. Thereafter, the Board discussed legislative intent. In any event, to reverse the Board's decision on such grounds would unnecessarily waste administrative resources, because the Board reached the correct result. *Goicuria v. Kauffman's Furniture, 1997 Del. Super. LEXIS 536, *6,* Del. Super., C.A. No. 97A-03-005, Terry, J. (Oct. 30, 1997), aff'd, *Del. Supr., 706 A.2d 26, 1998 Del. LEXIS 45 (1998)* (ORDER). Therefore, assuming, arguendo, some ambiguity [*14] or confusion in the statute as may be reflected in the parties' arguments, I find legislative intent to award an inflationary increase effective July 1995. To conclude otherwise would result in awarding Appellant, and other persons similarly situated, a retroactive lump sum payment of approximately $ 63,000 AND the increase in his present monthly benefit to the maximum benefit allowed under the July 1995 amendment. This Court will avoid such an unreasonable result, Sutherland Stat. Const. § 73.02 (5th Ed.), since there is nothing to support any position other than the legislature's desire to increase payments prospectively due to inflationary erosion.

As the remaining issues are not necessary to address in light of the aforementioned, I shall not consider them.

Based on the foregoing, the Board's decision is AFFIRMED.

IT IS SO ORDERED.

T. Henley Graves

LEXSEE 1995 U.S. DIST. LEXIS 6349

**VITO J. DERASMO, et al., Plaintiffs, v. HOSPITALITY FRANCHISE SYSTEMS, INC., Defendant.**

**Civil Action No. 93-46**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*1995 U.S. Dist. LEXIS 6349*

**May 8, 1995, Decided**
**May 8, 1995, FILED**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**COUNSEL:** RICHARD E. COOPER, ESQ., McCARTER & ENGLISH, Newark, NJ, (Attorneys for Plaintiffs).

JAMES E. PATTERSON, ESQ., CARPENTER, BENNETT & MORRISSEY, Newark, NJ, (Attorneys for Defendant).

**JUDGES:** ALFRED M. WOLIN, U.S.D.J.

**OPINIONBY:** ALFRED M. WOLIN

**OPINION:**

**OPINION**

**WOLIN, District Judge**

This matter is brought before the Court on defendants motion for summary judgment. For the reasons set forth herein, defendants motion is granted and Counts One, Two, Three and Four of the complaint are dismissed with prejudice. The Court lacks supplemental jurisdiction to hear the pendent state law claims and will dismiss the remaining counts of the complaint without prejudice.

**BACKGROUND**

In 1991, plaintiff Vito J. Derasmo was employed as vice president marketing for Best Western International in Arizona. Plaintiff was earning approximately $ 124,000 per year, had a company car, a pension and a 401(k) plan. In September 1991, plaintiff was approached by a former colleague, Michael Lee of Hospital Franchise Systems, Inc. ("HFS"), with an offer of employment in New York. Lee was seeking someone to design and create a database to assist HFS sales representatives [*2] on a nationwide basis.

Plaintiff, who was fifty-five years old in 1991, was near retirement and initially declined the offer of employment from HFS. HFS, however, continued to seek out plaintiff. Plaintiff told HFS he would consider switching jobs if he could be secure his employment would last several years. Lee told plaintiff he could expect to be at the company at least five years. After a series of negotiations, plaintiff reached a written agreement with HFS that provided plaintiff would receive a base salary of $ 90,000 plus an incentive compensation component whereby plaintiff could earn up to $ 150,00 to $ 175,000. Plaintiff negotiated a severance agreement that provided plaintiff would receive nine months compensation in the event his employment was "terminated involuntarily for any reason other than cause." Neither plaintiff's employment agreement nor his severance agreement contain any provision that guarantees plaintiff a minimum of five years employment.

The terms of the offer of employment and severance agreement were confirmed by correspondence dated November 20, 1991 and December 3, 1991. Plaintiff accepted HFS' offer of employment and began working for HFS on December [*3]  6, 1991. At the time he began his employment plaintiff was fifty-five years old. Plaintiff testified by deposition that during his first year as vice president of the Franchise Marketing Department he expected to spend 75% of his time developing a database that would assist sales representatives in cultivating good sales leads. He estimated that he would spend at least 50% of his time during his second year working on this database.

On January 31, 1992, HFS acquired Days Inn. John Snodgrass, formerly president of Days Inn became president of HFS. Gregory Casserly, formerly senior vice president of franchising of Days Inn, became executive

1995 U.S. Dist. LEXIS 6349, *

vice president of franchise sales of Days Inn. Lee resigned on February 7, 1992.

After the buy-out the new management team decided to eliminate the Franchise Marketing Department. All employees, including plaintiff, in this department were terminated. Plaintiff's termination was effective March 6, 1992. n1 In accordance with the severance agreement, HFS paid plaintiff his salary for the next nine months until November 1992. Plaintiff received approximately $ 67,500 in severance pay.

> n1 Plaintiff's employment lasted only three months, from December 6, 1991 to March 6, 1992.

**[\*4]**

In February 1992, HFS had an open position at Days Inn for a vice president of marketing. Plaintiff expressed interest in this job and was interviewed for the position in March and April 1992. In June 1992 plaintiff contacted Snodgrass about the status of his application. Snodgrass advised plaintiff that he was planning to interview additional candidates before making his decision. Plaintiff told Snodgrass that he had to know immediately whether he would be offered the position. Snodgrass replied that he was not able to tell plaintiff whether or not he had the job because there were other candidates to be interviewed. Plaintiff stated he was unwilling to wait. Therefore, Snodgrass advised plaintiff that if he had to have an answer immediately the answer was "no". Shortly thereafter, plaintiff accepted a different job where he was earning $ 90,000 per year. HFS continued to interview candidates for the Days Inn job and eventually hired John D. Bonifeld, who is fifty-two years old.

On January 5, 1993, plaintiff filed his lawsuit in this Court. Plaintiff's complaint contains ten separate counts. Counts One and Three allege that HFS terminated plaintiff's employment because of his age **[\*5]** in violation of the Age Discrimination in Employment Act, *29 U.S.C. § 621*, et seq. ("ADEA") and the New Jersey Law Against Discrimination, *N.J.S.A. 10:5-1*, et seq. ("NJLAD"). Counts Two and Four alleged that HFS refused to hire plaintiff for a position at Days Inn because of his age in violation of the ADEA and NJLAD. Counts Five and Seven allege that HFS breached a contract of employment and the implied covenant of good faith and fair dealing. Count Eight alleges that HFS is promissorily estopped from terminating plaintiff's employment due to alleged representations that his employment would be "long term." Count Six alleges HFS breached a contract to pay plaintiff relocation benefits. Count Nine alleges HFS fraudulently induced plaintiff to leave his former job. Count Ten alleges that HFS tortiously interfered with plaintiff's employment relationship with his former employer by inducing him to come work for HFS.

**DISCUSSION**

**I. Summary Judgment Standard**

*Federal Rule of Civil Procedure 56* provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if **[\*6]** any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see *Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986)*. In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356-57, 89 L. Ed. 2d 538 (1987); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983),* cert. dismissed, *465 U.S. 1091, 104 S. Ct. 2144, 79 L. Ed. 2d 910 (1984).*

A dispute involving a material fact is "genuine" only "if the evidence is such that a reasonable jury would return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Whether a fact is "material" is determined by the substantive law defining the claims. *Id. at 248;* United States v. 225 Cartons, 871 F.2d 409, 419 (3d Cir. 1989).

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is **[\*7]** a genuine issue for trial." *Anderson, 477 U.S. at 249.* Summary judgment must be granted if no reasonable trier of fact could find for the nonmoving party. Id. When, as here, the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'--that is, pointing out to the District Court--that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson, 477 U.S. at 249-50.*

Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition **[\*8]** to a

motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 322-23.* "The mere existence of a scintilla of evidence will be insufficient." *Anderson, 477 U.S. at 252.* The inquiry is whether, "seen through the prism of the substantive evidentiary burden," a reasonable jury could render a verdict for the burdened non-movant. *Id. at 254-55.* Thus, in this case, once defendants make a properly supported motion for summary judgment, plaintiff must show that a reasonable jury could find he is entitled to a verdict by a preponderance of the evidence. *Id. at 252.*

In opposing summary judgment, a non-movant may not "rest upon mere allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc., 934 F.2d 497, 500* (3d Cir.), cert. denied, *502 U.S. 940, 112 S. Ct. 376, 116 L. Ed. 2d 327 (1991); Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990)* ("unsupported allegations in [a **[*9]** nonmovant's] memorandum and pleadings are insufficient to repel summary judgment"); see *Fed. R. Civ. P. 56(e).*

Although the summary judgment hurdle is a difficult one to meet, it is by no means insurmountable. "Where the evidence is so one-sided that it leaves no room for any reasonable differences of opinion as to any material fact" this Court will grant summary judgment. *Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3d Cir. 1985).* Accordingly, in Celotex, the Supreme Court concluded that "one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex, 477 U.S. at 323-324.*

HFS has moved for summary judgment on each of the ten counts in plaintiff's complaint.

**II. Age Discrimination**

Count One of the complaint alleges that defendants terminated plaintiff's employment because of his age in violation of the Age Discrimination in Employment Act, *29 U.S.C. § 621,* et seq. ("ADEA").

The presumptions and shifting burdens of production used in employment discrimination cases set **[*10]** forth in *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973),* and its progeny are familiar. A plaintiff must first establish a prima facie case of discrimination. If the plaintiff satisfies this requirement, the burden of production shifts to the defendant who is required to articulate a legitimate, non-discriminatory reason for the adverse employment

action. If the defendant articulates a legitimate, non-discriminatory reason for its action, the burden of going forward shifts back to the plaintiff, who then must prove by a preponderance of the evidence that the reason articulated by the defendant is a pretext for unlawful age discrimination. See *St. Mary's Honor Center v. Hicks, 125 L. Ed. 2d 407,     U.S.    , 113 S. Ct. 2742 (1993); Seman v. Coplay Cement Co., 26 F.3d 428 (3d Cir. 1994).* Even if the plaintiff is able to demonstrate that the reasons articulated are pretextual, he must further present evidence to provide that the adverse decision was actually motivated by discriminatory animus. *Hicks, 113 S. Ct. at 2742.*

**A. Plaintiff's Prima Facie Case**

Plaintiff's first burden under McDonnell Douglas is **[*11]** to establish a prima facie case of age discrimination. There are four types of employment discrimination cases: (1) pure discrimination; (2) pretext; (3) mixed-motives; and (4) disparate impact. n2 Plaintiff and defendant agree that this case is a pretext case.

> n2 A "pure discrimination" case arises in the rare instance when actual "direct" or "smoking gun" evidence of discrimination is available. In such a case, elements of proof are no different from any other case. A "mixed motive" case is one in which both legitimate and illegitimate factors contribute to the employment decision. To establish a "mixed motive" case the plaintiff must also present evidence of direct discrimination. A "pretext" case arises when the employer's articulated reason for the employment decision is actually a pretext for unlawful discrimination. A "disparate impact" case arises when the employer's action has a disparate impact on a protected class.

To establish a prima facie pretext text, plaintiff must demonstrate four elements **[*12]** by a preponderance of the evidence: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he was dismissed despite being qualified; and (4) that non-members of the protected class were treated more favorably, i.e., that he was replaced by persons not in the protected class. *Hicks, 113 S. Ct. at 2749.* In a reduction in workforce case, when the plaintiff is not replaced, he need only show that "similarly situated [younger] employees" were treated more favorably. *Massarsky v. General Motors Corp., 706 F.2d 111 (3d Cir. 1983),* cert. denied, *464 U.S. 937, 78 L. Ed. 2d 314, 104 S. Ct. 348 (1983).*

In this case, there is no dispute that plaintiff was in a protected class, n3 that he was qualified for the position

Case 1:06-cv-00225-MPT     Document 6-3     Filed 05/05/2006     Page 8 of 36

Page 4
1995 U.S. Dist. LEXIS 6349, *

and that he was discharged. Defendant argues that plaintiff has not introduced any evidence of the remaining elements of the prima facie case, namely that plaintiff was replaced by a younger worker or that similarly situated employees were treated more favorably.

> n3 Under the ADEA and NJLAD a plaintiff is a member of the protected class if he is over 40 years old. Plaintiff was 55 years old at the time of his termination.

**[*13]**

Plaintiff argues that he was replaced by a younger worker, Ellen Combs. However, the uncontested facts belie this assertion. During his deposition plaintiff testified that during his first year of employment he expected to devote 75% of his time to the development of a database, known as a lead generation system, that would assist sales representatives. (Certification of Andrew Schwartz, Ex. A, at 208). Plaintiff testified that the remaining 25% of his time would be spent "refreshing" collateral materials that assist sales representatives. *Id. at 209.* Plaintiff described his duties as follows:

> Q: Where would those lead sheets comes from?
>
> A: It would come from a database that we intended to build at Parsippany together with Dun & Bradstreet reports on existing independent properties or other brands in such a way that an actual internally formatted computer lead sheet would be sent to each sales person in the field on a monthly basis to point them in the direction of a viable franchisee prospect, an owner of a property, rather than wasting a lot of time making phone calls to people who either didn't exist anymore or had no decisionmaking power. That would in a real **[*14]** sense collateral material that would assist sales people in the field.

*Id. at 191-192.*

Plaintiff alleges that Ellen Combs, a younger HFS employee, assumed his duties after his employment was terminated. However, Combs testified unequivocally that she had absolutely no responsibility for the development or management of the database -- the project plaintiff testified he expected to spend 75% of his time working on.

> Q: Did you do any work on the development of the a database after the buy-out?
>
> A: I don't believe I did.
>
> Q: Did Mr. Casserly or Mr. Snodgrass or anyone else in the management of HFS instruct you to do any work on the development of a database?
>
> A: I don't think so.
>
> Q: Is the answer no? To the best of your recollection no?
>
> A: To the best of my recollection, the answer is no.

(Affidavit of James E. Patterson, Ex. P, at 27). Combs testified that rather than maintain a database, Casserly simply wanted each sales representative to keep lead information on his own. Id. at 28. Moreover, Combs testified that no one was given responsibility for developing the database after plaintiff was terminated:

> Q: Did, as far **[*15]** as you know, the Franchise Marketing Department, or anyone else in the company for that matter, have any responsibility for developing a company wide database after the buy-out?
>
> A: No.
>
> Q: How do you know that?
>
> A: Because if it would have been done, I would have known about it.
>
> Q: And again, just so we're clear on the record, when you talk about a database the way we've been talking about it, you're talking about a computerized list of all hotel properties and who owns its and various information about those hotels?
>
> A: Correct.

Id. at 33.

Thus, plaintiff testified that he expected to spend 75% of his time during his first year at HFS working on

a database and Combs testified that neither she nor any-one else at HFS assumed the responsibility for creating and maintaining this database. Thus, as a matter of law, plaintiff was not replaced after his termination from HFS.

Similarly, there is absolutely no evidence that similarly situated younger employees were treated more favorably than plaintiff. Plaintiff alleges that HFS employees Ralph Garcia and Scott Deaver are younger employees who retained their jobs after he was terminated. However, neither [*16] Garcia nor Deaver worked in the Franchise Marketing Department. Similarly, neither Garcia nor Deaver were hired to create the database for which plaintiff was hire to create. Thus, as a matter of law, Garcia and Deaver are not similarly situated employees. Plaintiff's entire division was fired after the buyout; both young and old employees in the division were fired. Thus, as a matter of law, similarly situated younger employees were not treated more favorably than plaintiff.

The three cases relied on by plaintiff are distinguishable. In *Torre v. Casio, Inc., 42 F.3d 825, 830-31 (3d Cir. 1994),* the plaintiff was one of three regional sales managers in the audio-visual division at Casio. Plaintiff was transferred and then discharged while the other two regional sales managers in the same division, Olsberg and Horowitz -- aged 38 and 41, respectively, were retained. When subsequent events made it economically impossible to hire a new regional sales manager, Olsberg subsumed plaintiff's responsibilities. Thus, plaintiff introduced evidence that younger employees in his same division were retained when he was terminated and that a younger employee had replaced him. Thus, the Third [*17] Circuit held that plaintiff had presented a prima facie case of age discrimination. "The inference of age discrimination may not be overpowering but we cannot say that, as a matter of law, it is insufficient." *Id. at 831-32.*

In *White v. Westinghouse Elec. Co., 862 F.2d 56 (3d Cir. 1988),* the plaintiff introduced evidence that Westinghouse retained three members of the transportation department under 40 years of age when he was terminated. Thus, plaintiff introduced evidence that younger members of his same department were treated more favorably. As a result, the Third Circuit held that plaintiff had made out a prima facie case of age discrimination. *Id. at 60.*

In *Healy v. New York Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988),* cert. denied, *490 U.S. 1098, 104 L. Ed. 2d 1004, 109 S. Ct. 2449 (1989),* the plaintiff introduced evidence that he was replaced by a younger employee. In this case, plaintiff introduced evidence that his duties were given to an employee nine years younger. *Id. at*

*1212.* Thus, the Third Circuit held that the plaintiff had made out a prima facie case of age discrimination. *Id. at 1214.*

In each of these three cases, the plaintiff had [*18] introduced some evidence to indicate either that younger employees in the same division were treated more favorably or that plaintiff was replaced by a younger worker. However, in this case, plaintiff has failed to introduce any evidence that younger employees in the Franchise Marketing Department were treated more favorably or that he was replaced by a younger worker. Thus, as a matter of law, plaintiff has failed to introduce sufficient evidence to make out a prima facie case of age discrimination.

Because plaintiff has failed to make out a prima facie case of age discrimination the Court need not examine defendant's nondiscriminatory reason for terminating plaintiff. Likewise, the Court need not examine whether plaintiff has introduced sufficient evidence to suggest that the reasons advanced by the defendant are pretextual.

In sum, because plaintiff has failed to introduce sufficient evidence to make out a prima facie case of age discrimination, the Court will dismiss with prejudice Count One of the complaint.

**B. NJLAD Claim**

Count Three of the complaint alleges that HFS terminated plaintiff's employment because of his age in violation of the New Jersey Law Against Discrimination, [*19] N.J.S.A. 10:5-1, et seq. ("NJLAD"). Age discrimination claims under the NJLAD are governed by the same standards and burden of proof structure applicable to the ADEA. *Retter v. Georgia Gulf Corp., 755 F. Supp. 637, 638 (D.N.J. 1991),* aff'd, *975 F.2d 1551 (3d Cir. 1992); Giammario v. Trenton Board of Education, 203 N.J. Super. 356, 361, 497 A.2d 199 (App. Div. 1985),* cert. denied, *102 N.J. 336, 508 A.2d 212 (1985);* cert. denied, *475 U.S. 1141, 90 L. Ed. 2d 337, 106 S. Ct. 1791 (1986).* Therefore, because plaintiff has failed to introduce any evidence that he was replaced by a younger worker or that similarly situated younger employees were treated more favorably, he has failed to meet his burden of establishing a prima facie case under NJLAD. Thus, the Court will dismiss with prejudice Count Three of the complaint.

**II. Refusal to Hire Claim**

Counts Two and Four allege that HFS refused to hire plaintiff for a position at Days Inn because of his age in violation of the ADEA and NJLAD. This claim also is insufficient as a matter of law because plaintiff voluntar-

ily withdrew his application for the position before HFS had an opportunity to hire him or reject [*20] him.

In February 1992, HFS had an open position at Days Inn for a vice president of marketing. Plaintiff expressed interest in this job and was interviewed for the position in March and April 1992. In June 1992 plaintiff contacted Snodgrass about the status of his application. Snodgrass advised plaintiff that he was planning to interview additional candidates before making his decision. It is undisputed that plaintiff told Snodgrass that he had to know immediately whether he would be offered the position. Snodgrass replied that he was not able to tell plaintiff whether or not he had the job because there were other candidates to be interviewed. It is also undisputed that plaintiff stated he was unwilling to wait. Therefore, Snodgrass advised plaintiff that if he had to have an answer immediately the answer was "no." Shortly thereafter, plaintiff accepted a different job where he was earning $ 90,000 per year. HFS continued to interview candidates for the Days Inn job and eventually hired John D. Bonifeld, who is fifty-two years old. Thus, the undisputed facts reveal that plaintiff voluntarily withdrew his application for the Days Inn job before he could be hired or rejected by HFS. [*21]

Plaintiff's argument that continuing the application process would have been "futile" is without any factual support in the record. *Hartman v. Wick, 600 F. Supp. 361 (D.D.C. 1984)* is not analogous. In Hartman, the plaintiff, a female employee, introduced evidence that raised a material issue of fact whether the defendant had preselected a male employee to fill a position and then posted a job notice tailored to match the male employee's qualifications. Id. In this case, plaintiff has not introduced any evidence that suggests that HFS preselected a younger employee to fill the Days Inn position.

In this case there are no material issues of fact. It is undisputed that plaintiff voluntarily withdrew his application for the position before HFS had an opportunity to hire or reject him. HFS never had an opportunity to discriminate against plaintiff based on his age. Therefore, the Court will dismiss Counts Two and Four of the complaint with prejudice.

### III. Pendent Jurisdiction

The remaining counts in plaintiff's complaint allege violations of state law. Counts Five and Seven allege that HFS breached a contract of employment and the implied covenant of good faith [*22] and fair dealing. Count Eight alleges that HFS is promissorily estopped from terminating plaintiff's employment due to alleged representations that his employment would be "long term." Count Six alleges HFS breached a contract to pay plaintiff relocation benefits. Count Nine alleges HFS fraudu-

lently induced plaintiff to leave his former job. Count Ten alleges that HFS tortiously interfered with plaintiff's employment relationship with his former employer by inducing him to come work for HFS.

This Court has jurisdiction over plaintiff's ADEA claims by virtue of *28 U.S.C. § 1331* (federal subject matter jurisdiction). Plaintiff argues that this Court has supplemental jurisdiction over his state law claims. Congress has authorized district courts to exercise jurisdiction supplemental to their federal question jurisdiction in *28 U.S.C. § 1367*, which states:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States [*23] Constitution.

Section 1367 codifies the jurisdictional standard established in *United Mine Workers of America v. Gibbs, 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).* In Gibbs, the Supreme Court established a three-part test for the exercise of supplemental jurisdiction. First, "the federal claim must have substance sufficient to confer federal subject matter jurisdiction on the court." *Id. at 725.* Plaintiff's ADEA claim satisfies this standard. The other two requirements are:

> [1] The state and federal claims must derive from a common nucleus of operative facts. [2] But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issue, there is power in federal courts to hear the whole.

Id. (emphasis added) . However, even assuming the district court has the "power" to exercise its supplemental jurisdiction, it still retains the discretion to decline to exercise its supplemental jurisdiction. The Supreme Court in Gibbs held:

[The] power need not be exercised [*24] in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.

*Id. at 726.* Thus, this Court must first determine if it has the power to entertain plaintiff's state law claims. Then, if necessary, the Court will determine whether in its discretion it should exercise its supplemental jurisdiction to hear state law claims.

### A. Power to Exercise Supplemental Jurisdiction

With respect the question of whether this Court has the power to exercise supplemental jurisdiction, the issue is whether there is a "common nucleus operative facts" shared by plaintiff's ADEA claims and his state law claims. Courts are split in how they interpret this test. Some courts have held that a "loose" nexus is enough. *Frye v. Pioneer Logging Machinery Inc., 555 F. Supp. 730, 732 (D.S.C. 1983)* (refusal to employ plaintiff forms sufficient nexus between Title VII and state law breach of contract claims); *Prakash v. American University, 234 U.S. App. D.C. 75, 727 F.2d 1174 (D.C. Cir. 1984)* (employment relationship forms sufficient nexus between FLSA claims and state law breach of contract [*25] and tort claims). However, the Third Circuit has expressly rejected this loose nexus test. In *Lyon v. Whisman, 45 F.3d 758 (3d Cir. 1995),* the Third Circuit held: "There is virtually no support for this broad reading of Article III and Gibbs." *Id. at 762.* In Lyon the Third Circuit held there was no common nucleus of facts between plaintiff's claim that her employer failed to pay her overtime wages under the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 207*(a), and her state law claims for breach of contract and tort based on her employer's failure to pay a promised bonus on time or in full. The opinion is especially noteworthy because of the fact that the Third Circuit sua sponte vacated the district court opinion for erroneously exercising its supplemental jurisdiction. Neither the plaintiff nor the defendant challenged the district court's supplemental jurisdiction.

In vacating the district court's opinion, the Third Circuit held: "The only link between Lyon's FLSA and state law claims is the general employer-employee relationship between the parties." Id. The Court went on to explain:

Lyon's FLSA claim involved a very narrow, well-defined factual issue [*26] about hours worked during particular weeks. The facts relevant to her state law contract and tort claims, which involved Whisman's alleged underpayment of a bonus and its refusal to pay the bonus if Lyon started looking for another job, were quite distinct. In these circumstances it is clear that there is so little overlap between the evidence relevant to the FLSA and state claims, that there is no "common nucleus of operative fact" justifying supplemental jurisdiction over the state law claims. In fact it would be charitable to characterize the relationship of the federal and state claims as involving even a "loose" nexus. Thus, Article III bars federal jurisdiction.

*Id. at 763.* It is therefore apparent that the Third Circuit interprets section 1367 and Gibbs very narrowly. The opinion in Lyon suggests that the Third Circuit views the exercise of supplemental jurisdiction as proper only in those cases where the state and federal claims "are merely alternative theories of recovery based on the same act." *Id. at 761* (quoting *Lentino v. Fringe Employee Plans, Inc., 611 F.2d 474, 479 (3d Cir. 1979)).*

Here, plaintiffs claims under ADEA and NJLAD is an example [*27] of a case where identical facts form the basis of both federal and state law claims. Thus, the Court has exercised its supplemental jurisdiction to decide plaintiff's NJLAD claims. However, the nexus between plaintiff's remaining state law claims is far more remote.

The Court finds only one fact is common to both plaintiff's ADEA claims and the remaining state law claims: the employer/employee relationship. This fact must be proven under both the ADEA claims and the state law claims for breach of employment contract, breach of the implied covenant of good faith and fair dealing, and breach of relocation contract. Significantly, plaintiff need not prove he was an employee to recover under his claim of promissory estoppel, fraudulent inducement and tortious interference with a prior employment relationship.

With respect to his ADEA claim plaintiff must prove he was in a protected class, that he was qualified for the position and that he was discharged because of his age. Each of these facts is irrelevant, or at least immaterial, to plaintiff's state law breach of contract and tort claims.

Conversely, with respect to his state law claims, plaintiff must prove the terms of his employment [*28] and termination contract; he must prove that certain oral promises were made, he must prove that these oral promises created a binding oral contract or that he relied to his detriment on these promises; he must prove that HFS

failed to deal "fairly" with him; he must prove that HFS promised to pay relocation benefits and failed to do so. None of these facts are material to plaintiff's ADEA claim.

Thus, plaintiff's state and federal claims present entirely different elements of proof and theories of recovery. In other words, plaintiff's state and federal claims do not have a "common nucleus of operative facts." Therefore, the Court does not have the power to exercise supplemental jurisdiction over plaintiff's state law claims.

Moreover, the broad remedies available to plaintiff on his state claims make these claims the predominant elements of the lawsuit. In fact, plaintiff's brief leads off with his state law claims. Plaintiff's state law claims are pendent to his federal claims "much as a dog is pendent to its tail." *Bouchet v. National Urban League, Inc., 235 U.S. App. D.C. 37, 730 F.2d 799, 806 (D.C. Cir. 1984)* (Scalia, J.).

This Court's conclusion that plaintiff's state **[*29]** law claims are factually diverse from his ADEA claim is in accord with several other district court opinions. In *Mason v. Richmond Motor Co., Inc., 625 F. Supp. 883 (E.D. Va. 1986),* aff'd, *825 F.2d 407 (4th Cir. 1987),* District Judge Warriner held in an ADEA case very similar to this case that the court did not have the power to exercise supplemental jurisdiction over state law claims for breach of employment contract, promissory estoppel and breach of the covenant of good faith and fair dealing. Similarly, in *Nicol v. Imagematrix, Inc., 767 F. Supp. 744 (E.D. Va. 1991),* the court held its did not have supplemental jurisdiction in Title VII lawsuit alleging sexual discrimination to hear plaintiff's state law claims of breach of employment contract, wrongful discharge, intentional infliction of emotional distress, intentional interference with economic opportunity, negligent retention and fraud. The Court held that plaintiff's state law claims "share no facts with the Title VII claim other than the mere fact of plaintiff's employment." *Id. at 748.* Numerous other courts confronted with ADEA claims and state law claims for breach of contract and tort have re-

fused to exercise **[*30]** supplemental jurisdiction. See e.g., *Lettich v. Kenway, 590 F. Supp. 1225 (D. Mass. 1984); Sanders v. Duke University, 538 F. Supp. 1143 (M.D.N.C. 1982).*

Because the Court does not have the power to exercise supplemental jurisdiction over plaintiff's state law claims Counts Five, Six, Seven, Eight, Nine and Ten of the complaint will be dismissed without prejudice.

**CONCLUSION**

For the foregoing reasons, defendants motion for summary judgment on Counts One, Two, Three and Four of the complaint will be granted. Counts One, Two, Three and Four will be dismissed with prejudice. Because this Court lacks supplemental jurisdiction, the remaining counts of the complaint will be dismissed without prejudice.

An appropriate order is attached.

Dated: May 8, 1995

ALFRED M. WOLIN, U.S.D.J.

**ORDER**

In accordance with the Court's Opinion filed herewith,

It is on this 8th day of May, 1995

ORDERED that defendant's motion for summary judgment on Counts One, Two, Three and Four of the complaint is granted; and it is further

ORDERED that Counts One, Two, Three and Four of the complaint are dismissed with prejudice; and it is further

ORDERED because this Court lacks **[*31]** supplemental jurisdiction, the remaining counts of the complaint are dismissed without prejudice.

ALFRED M. WOLIN, U.S.D.J.

LEXSEE 2005 U.S. APP. LEXIS 22157

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; LISA STEPLER v. AVECIA, INC.; Lisa Stepler, Appellant**

**No. 04-3396**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*151 Fed. Appx. 162; 2005 U.S. App. LEXIS 22157*

**July 12, 2005, Argued
October 13, 2005, Filed**

**NOTICE:** **[\*\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE. Dist. Court Civil Action No. 03-CV-00320. District Judge: The Honorable Susan L. Robinson. *Stepler v. Avecia Inc., 2004 U.S. Dist. LEXIS 14955 (D. Del., July 19, 2004)*

**COUNSEL:** PHILLIP B. BARTOSHESKY (ARGUED), Biggs and Battaglia, Wilmington, Del., Counsel for Appellant.

GINGER D. SCHRODER (ARGUED), Schroder, Joseph & Associates LLP, Buffalo, N.Y.; JENNIFER C. JAUFFRET, Richards, Layton & Finger, Wilmington, DE, Counsel for Appellee.

**JUDGES:** Before: ALITO, BECKER, and GREENBERG, Circuit Judges.

**OPINION:**

**[\*163]** OPINION OF THE COURT

PER CURIAM:

Lisa Stepler, a former laboratory technician for Avecia, Inc. ("Avecia") sued Avecia for retaliation under *Title VII of the Civil Rights Act of 1964*, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law. The District Court dismissed Stepler's claim for intentional infliction of emotional distress and granted summary judgment in favor of Avecia on Stepler's retaliation and wrongful termination claims. We affirm the dismissal **[\*\*2]** of the claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of Avecia on the wrongful termination claim. However, we reverse the entry of summary judgment in favor of Avecia on the retaliation claim and remand for further proceedings.

I.

Stepler asserts that this case should have been analyzed under the framework of *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989).* n1 Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994).* This framework only applies, however, where the employee can show "*direct evidence* that an illegitimate criterion was a substantial factor in the decision." *Price Waterhouse, 490 U.S. at 276* (O'Connor, J., concurring in the judgment) (emphasis added); see also *Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997).* **[\*\*3]** We have carefully considered the evidence on which Stepler relies in this case, and while the question is close we conclude that she did not meet the "direct evidence" standard.

n1 *42 U.S.C. § 2000e-2(m)* does not reach retaliation claims. *Woodson v. Scott Paper Co., 109 F.3d 913, 934 (3d Cir.)*, cert. denied, *522 U.S. 914, 139 L. Ed. 2d 230, 118 S. Ct. 299 (1997).*

Stepler's Title VII claims must be analyzed under the burden-shifting framework established by *McDonnell*

*Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and its progeny. Under **[*164]** this framework, Stepler was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)*. If Stepler **[**4]** successfully made out a prima facie case, Avecia had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that Stepler was not discharged because of her protected activity. See *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*. If Avecia met this burden, Stepler was required to prove that unlawful retaliation was a determinative cause of her firing. See *McDonnell Douglas, 411 U.S. at 802-803*.

Stepler clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by Avecia obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a "pattern of antagonism" in the intervening period. See *Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)*; see also **[**5]** *Robinson v. Southeastern Pennsylvania Transp. Auth., 982 F.2d 892, 894-95 (3d Cir. 1993)*. A reasonable jury considering the evidence in the light most favorable to Stepler -- including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter -- could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

The general **[**6]** rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. See *Merrill v. Crothall-American, Inc., 606 A.2d 96, 103 (Del. 1992)*. The general rule does not apply, however, in the following four situations:

> (i) where the termination violated public policy;
>
> (ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";
>
> (iii) where the employer used its superior bargaining power to deprive an employee
>
> of clearly identifiable compensation related to the employee's past service; and
>
> **[*165]** (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder, 748 A.2d 393, 400 (Del. 2000)* (citing *E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996)*). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth **[**7]** category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: "(i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord, 748 A.2d at 401* (citing *Pressman, 679 A.2d at 441-42*). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in *Schuster v. Derocili, 775 A.2d 1029 (Del. 2001)*, which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But in 2004 the Delaware legislature amended *19*

151 Fed. Appx. 162, *; 2005 U.S. App. LEXIS 22157, **

*Del. C. § 710 et seq.*, which prohibits discrimination in employment practices, in order to clarify that this statute [**8] was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." *19 Del. C. § 712(b)* (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in Schuster:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili, 775 A.2d 1029 (2001).*

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "re-establishes" the pre-existing rule "put in question by" Schuster, it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume [**9] that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stepler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord, 748 A.2d at 400.* If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. See *Williams v. Caruso, 966 F. Supp. 287, 291 (D. Del. 1997)* ("Nothing in Pressman suggests an employer who gives an employee a false reason for termination [*166] is subject to liability under the implied covenant of good faith and fair dealing. Pressman only

held culpable the manufacture of grounds for dismissal, not the statement of a false reason for dismissal.") [**10] (emphasis in original); see also *Geddis v. University of Delaware, 40 Fed. Appx. 650, 654 (3d Cir. 2002)* (unpublished) (noting that the employee did not claim his supervisor "intentionally created 'fictitious negative information' about him in order to get him fired" and thus the conduct at issue did not fit the fourth Pressman category) (quoting *Schuster, 775 A.2d at 1040*).

IV.

Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. See *19 Del. Code Ann. § 2304* (2005). However, the Delaware Supreme Court has held that "claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." *Rafferty v. Hartman Walsh Painting Co., 760 A.2d 157, 159 (Del. 2000)* (emphasis added); see also *Showell v. Langston, 2003 Del. Super. LEXIS 95, No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del. Super. Mar. 05, 2003)* (citing Rafferty). Thus, "for a complaint [**11] to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury." *Rafferty, 760 A.2d at 160.* In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

Stepler cites Rafferty and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected Stepler's argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of Avecia on Stepler's claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of Avecia on Stepler's retaliation claim, and we remand the case for further proceedings.

LEXSEE 2000 U.S. DIST. LEXIS 6956

**JOSEPH A. MONDZELEWSKI, and REBECCA MONDZELEWSKI, Plaintiffs, v. PATHMARK STORES, INC. and SUPERMARKETS GENERAL CORP., Defendants.**

**Civil Action No. 96-359 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 6956; 11 Am. Disabilities Cas. (BNA) 1627*

**March 20, 2000, Decided
March 20, 2000, Filed**

**NOTICE:** **[\*1]**  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Judgment as to the jury's verdict of liability and damages on the workers' compensation retaliation claim vacated. In all other respects, Pathmark's motion for a new trial denied. Judgment entered for $ 300,000 compensatory damages on the ADA discrimination and retaliation claims.

**COUNSEL:** Gary W. Aber, Esq., of Heiman, Aber, Goldlust & Baker, Wilmington, Delaware, for plaintiffs.

Susan Graham Harron, Esq., White and Williams, Wilmington, Delaware, for defendants.

Debbie Rodman Sandler, Esq., Of Counsel, White and Williams, Philadelphia, Pennsylvania, for defendants.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINIONBY:** Murray M. Schwartz

**OPINION:**

**MEMORANDUM OPINION**

Submitted on Briefing
Dated: March 20, 2000
Wilmington, Delaware

Murray M. Schwartz
**Senior District Judge**

**I. INTRODUCTION**

Plaintiff Joseph Mondzelewski ("Mondzelewski") filed a complaint against Pathmark Stores, Inc. ("Path-mark") alleging unlawful discrimination and retaliation, in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq.*, and unlawful retaliation for filing a workers' compensation **[\*2]** claim, in violation of the Delaware Workers' Compensation laws, *19 Del. C. § 2365.* n1 Following an eight-day trial in this matter, the jury returned a verdict in favor of Mondzelewski, finding that Pathmark violated his rights under the ADA by both discriminating against him and retaliating against him for seeking accommodation for his disability. Docket Item ("D.I.") 116. The jury further found that Pathmark retaliated against Mondzelewski for seeking benefits under Delaware's Workers' Compensation Statute. n2 *Id.* The jury awarded Mondzelewski compensatory damages of $ 250,000 on the ADA discrimination count, $ 400,000 on the ADA retaliation count, and $ 200,000 on the workers' compensation retaliation count, for total compensatory damages of $ 850,000. The jury also awarded Mondzelewski total punitive damages of $ 3,000,000, attributing $ 500,000 to the ADA discrimination count, $ 2,000,000 to the ADA retaliation count, and $ 500,000 to the workers' compensation retaliation count. *Id.* The Court remitted $ 350,000 of the compensatory damages attributable to the ADA claims to comply with the $ 300,000 statutory damages cap for the ADA, *42 U.S.C. § 1981a* **[\*3]** (b)(3)(D), and entered judgment for compensatory damages in the amount of $ 500,000 ($ 300,000 on the ADA claims and $ 200,000 on the workers' compensation claim). D.I. 120. The Court remitted all punitive damages under the ADA due to the statutory damages cap and entered a judgment for the $ 500,000 punitive damages award apportioned by the jury to the state worker's compensation claim. *Id.*

n1 In addition, his wife, Rebecca Mondzelewski, sought damages for loss of consortium

Case 1:06-cv-00225-MPT     Document 6-3     Filed 05/05/2006     Page 17 of 36

Page 2

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

arising out of the Delaware workers' compensation retaliation claim.

n2 The jury also returned a verdict in favor of Pathmark and against Mondzelewski's wife, Rebecca, on her tort claim for loss of consortium. This claim is not the subject of any post-trial motions.

Pursuant to *Rule 50(b) of the Federal Rules of Civil Procedure*, Pathmark moves to set aside the jury verdict and asks the Court to enter Judgment as a Matter of Law for Pathmark on all counts. D.I. 152. In the alternative, pursuant to Rule 59, Pathmark asks this Court **[*4]** to grant a new trial. As a fallback position, Pathmark requests the Court to grant remittitur and reduce Mondzelewski's award substantially in all categories of damages. *Id.* For the reasons set forth below, the Court will vacate the judgment as a matter of law as to liability and damages on the workers' compensation retaliation claim, but will deny Pathmark's motion for judgment as a matter of law, for a new trial, and for remittitur.

## II. FACTUAL BACKGROUND

At trial, the following evidence was adduced, as viewed in the light most favorable to the verdict winner, Mondzelewski. n3 At the time of the events in question, Mondzelewski, who had approximately a sixth-grade education, had been employed by Pathmark for approximately thirty-five years, for most of that time as a meat cutter. Pathmark and its predecessor company had been Mondzelewski's only employer with the consequence that Mondzelewski viewed the company as family and his job as his life. Mondzelewski hurt his back twice on the job, first in March of 1992 and again in December of 1993. A-70, 99 (D.I.141). After the first injury, when Mondzelewski was released to return to work by his doctor, he was placed on **[*5]** a lifting restriction of twenty pounds by his doctor. The initial restriction was increased to forty pounds several weeks later and, thereafter, made permanent at fifty pounds. The parties agree that Pathmark accommodated Mondzelewski's physical restrictions, in conformance with company policy that workers injured on the job could return to work on light duty. The 1992 injury was not treated by Pathmark as a workers' compensation injury until Mondzelewski filed for workers' compensation in 1994, after his second injury.

n3 In a motion for judgment as a matter of law, the Court must review "the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner."

*Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992).*

In December 1993, Mondzelewski again injured his back at work while trying to move some boxes of meat. In mid-February 1994, Mondzelewski's primary care physician, Dr. Wesley Young, as well as a specialist to whom Mondzelewski had been **[*6]** referred, Dr. Otto Medinilla, released him to return to work on February 21, 1994, with a temporary twenty-five pound lifting restriction, to be increased to a fifty pound restriction after six weeks. Plaintiff's Exhibit ("PX-") 10, 11.

Despite receiving the physicians' authorizations to return to work, setting forth Mondzelewski's medical condition, limitations, and return to work date, Pathmark did not immediately return Mondzelewski to work, contending that it needed more information to determine his medical status and ability to return to work. However, the correspondence from Pathmark's workers' compensation office to Mondzelewski's treating physicians focused on obtaining additional information regarding his history of previous back injuries and their "causal relationship" to the current injury, Defendant's Exhibit ("DX-") 5, 11, information more relevant to the compensability of the injury rather than his ability to return to work. Mondzelewski repeatedly called Pathmark headquarters and the Dupont Highway store at which he worked, seeking to return to work. The delay caused him anxiety about his job and whether he would be permitted to return. Mondzelewski filed a workers' **[*7]** compensation petition on March 3, 1994. PX-33. Pathmark authorized him to return to work on March 16, 1994. Although Pathmark offered the testimony of Mondzelewski's assistant store manager, Leo Johnson, that he played no role in the delay in Mondzelewski's return to work, because such decision was in the hands of personnel at the company's corporate offices, E-157, 169 (D.I. 145), this testimony was contradicted by a log of Pathmark's disability department, which recorded Johnson as having said the Mondzelewski's restrictions were "too tight to return him" to work. E-169-172 (D.I. 145).

*Assignment to "Punishment shifts"*

Evidence was introduced at trial that meat cutters typically work early morning shifts, e.g., 5:00 a.m. or 6:00 a.m. to 1:00 p.m. or 2:00 p.m., and were randomly rotated to evening shifts, e.g., 12:00 p.m. or 1:00 p.m. to 9:00 p.m. or 10:00 p.m. Meat cutters prefer these types of early morning or evening shifts because they give the worker either mornings or afternoons free to do other things. When Mondzelewski returned to work on March 17, 1994, he was consistently assigned to shifts starting at 9:30 a.m. and ending at 6:00 p.m. Mondzelewski and several co-workers **[*8]** testified that such shifts were

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 18 of 36

Page 3

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

undesirable and generally recognized as "punishment shifts." A-113 (D.I. 141); B-244-245 (D.I. 149); D-25-27, 56-57 (D.I. 130). These undesirable shifts were assigned on occasion to meat cutters for a day or two, but were only assigned on a continual basis only when a worker had offended management. D-25-26, 50, 59 (D.I. 130); G-124 (D.I. 142). Mondzelewski was assigned to such shifts consistently for several months. n4

n4 Although the shifts were later changed to 8:00 a.m. to 5:00 p.m., there was testimony that such shifts were still considered "punishment shifts" because Mondzelewski would have neither his mornings nor his afternoons free. B-245 (D.I. 149); D-50 (D.I. 130).

Additionally, Mondzelewski was assigned to work every Saturday night after his return to work until he suffered a mental breakdown in August 1994. A-113-114; 121-22 (D.I. 141). Such shifts were considered highly undesirable and Friday and Saturday night shifts were typically rotated so that a meat cutter would [*9] usually be assigned to such shifts once every four or five weeks. A-76-77 (D.I. 141); D-23-24; D-57 (D.I. 130).

Pathmark contended that Mondzelewski's assignment to the undesirable shifts were necessary to accommodate his lifting restrictions. However, such shifts were not deemed necessary to accommodate his similar lifting restrictions after his injury in 1992. A-76-77 (D.I. 141); D-23 (D.I. 130). Moreover, such shifts were not considered necessary to accommodate his lifting restrictions when he returned to work after he had suffered a mental breakdown. B-36 (D.I. 149); G-113-114 (D.I. 142). Mondzelewski testified that when he confronted Wayne Ostafy, the store manager, about why he was being consistently assigned to work 9:30 a.m. to 6:00 p.m., Ostafy told him that was the way he wanted it. A-116-117 (D.I. 141).

Pathmark, through the testimony of meat department manager and union member Bobby Hinkle, tried to show that Hinkle, rather than store management, was responsible for Mondzelewski's assignment to the "punishment shifts." F-38 (D.I. 146). However, Hinkle's testimony was contradicted by his previous sworn testimony where Hinkle denied knowledge of how Mondzelewski was assigned [*10] to the "punishment shifts," stating that he had no recollection of it, it was not his doing, and that the schedules he drew up were sent up front where they were gone over by store management. F-46-47 (D.I. 146). Former Pathmark meat wrapper Gail Barker also testified that when she asked Hinkle why Mondzelewski was being given the "punishment shifts," Hinkle responded that he drew up the initial schedules but that

they were then left up front with store management, who changed the schedules as they saw fit. D-30 (D.I. 130). Additionally, the jury was informed that, in answers to interrogatories as to who was responsible for Mondzelewski's work schedule, Pathmark identified the store manager, Wayne Ostafy, and assistant manager, Leo Johnson, making no mention of Hinkle. F-46 (D.I. 146).

*First Disciplinary Write-up*

Shortly after Mondzelewski returned to work after his second injury, he was disciplined for the first time in his thirty-five year career at Pathmark. A-122 (D.I. 141). He was working alone on a Friday night shift on April 23, 1994. Prior to leaving that evening, the assistant meat manager, Joe Kubec, instructed Mondzelewski to grind additional meat for late night shoppers [*11] because the previous night had been unusually busy. n5 A-124 (D.I. 141). Mondzelewski followed these instructions and the next day received a write-up for leaving excessive ground meat in the case overnight. A-127-128 (D.I. 141); PX-16. The write-up, which noted that Mondzelewski had no record of prior counseling, also contained the following handwritten statement under the category of "continuing action": "Future violations will result in additional disciplinary action up to and including separation." PX-16. There was testimony that it was common for meat cutters to leave ground meat in the case overnight and to grind meat late at night in quantities similar to that ground by Mondzelewski, and that this practice did not result in disciplinary write-ups. D-36; D-42; D-61 (D.I. 130). Although Pathmark's position was that the disciplinary action was only counseling, Pathmark managers conceded that it was a write-up and thus violated the company's progressive discipline policy which required an oral warning before any formal write-up. E-85; E-174-76 (D.I. 145). The union shop steward, Bobby Taylor, also testified that it was not the norm to threaten an employee with termination in an [*12] oral warning on a first disciplinary offense. G-58 (D.I. 142). No explanation was provided as to why management violated Pathmark's progressive discipline policy in Mondzelewski's case. Mondzelewski, who had never been disciplined in his working career found this language stating that future violations could result in termination to be traumatizing, particularly because he already feared for his job because of Pathmark's delay in re-accommodating him and returning him to work. A-128 (D.I. 141).

n5 Although Pathmark introduced evidence that the store had initiated a new policy that meat cutters working late night shifts should consult with store management prior to grinding extra meat, there was conflicting testimony as to whether a meat cutter was expected to go over the

head of a meat department manager, who instructed the cutter to grind more meat, to the store manager or the assistant store manager.

### Second Write-up and Suspension: Lifting Incident

Within a week of Mondzelewski's first disciplinary action, [*13] and shortly after his lifting restriction had been increased to fifty pounds, he received a second write-up and was suspended for half a day. PX-17. On April 30, 1994, the day of the incident, Mondzelewski's meat manager, Bobby Hinkle was not working. n6 The assistant meat manager that day, Jimmy Porter, brought to Mondzelewski a cart holding five chucks of meat with no weights indicated. The type of meat at issue came in boxes that could weigh a total of 70 pounds or more. These boxes contained a large chuck and a smaller, separately packaged piece of meat called a "bolar." Mondzelewski, out of concern that he not re-injure his back, testified that it was his custom and practice since he first had restrictions to lift large pieces of meat only after determining they were within his lifting restrictions. B-8-11 (D.I. 149). He would do this by observing the weight on the box in which the pieces meat came and subtracting from that weight the known weights of the bolar and any pieces of meat that had been removed from the larger piece. B-6-10 (D.I. 149). On the day of the incident, when presented with the chucks with no associated boxes giving their weights, Mondzelewski asked Jimmy Porter [*14] to help him lift the chucks onto the table for him because he could not determine their weight. Porter responded, "Hell, no." E-131 (D.I. 145). Mondzelewski refused to lift the chucks not knowing their weight. Porter consulted with Bobby Taylor, the shop steward, about what to do and Taylor said to call the assistant store manager, Leo Johnson. Johnson ordered Mondzelewski to lift the meat, despite Mondzelewski's protestations that he did not know the actual weights and that they could be above his restrictions. B-16-18 (D.I. 149); E-185-188 (D.I. 145); F-73-74 (D.I. 146). When Mondzelewski refused, Johnson said, "I am not playing these f   g games with you. Either do your job or go home." E-163 (D.I. 145). When Mondzelewski refused to lift the chucks, he was suspended for the remainder of the day and given a second write-up which stated that future violations could result in his termination. (B-17, 20 (D.I. 149), PX-17).

n6 Hinkle testified that the incident would not have occurred if he had been working.

[*15]

In defense of the write-up and suspension of Mondzelewski for the lifting incident, Pathmark presented the testimony of the union's shop steward, Bobby Taylor, and the assistant store manager, Leo Johnson, who testified that Mondzelewski was shown the weights of the chucks that he refused to lift. G-40 (D.I. 142); E-163 (D.I. 145). Taylor testified that he had weighed out everything and showed the "ticket" to Mondzelewski with the weights of the bolars and other pieces that had been removed from the chucks. G-66 (D.I. 142). However, the jury was also presented with evidence that shed doubt on Taylor's testimony. The write-ups on Mondzelewski never showed exacts weights of the meats, nor was mention made of any weight tickets; rather, the write-up referred to "average weight." n7 PX-17. Further, the store manager, Wayne Ostafy, testified that no one knew the exact weight of the meat in question, F-73-74 (D.I. 146), and conceded that there was a possibility that it could have exceeded Mondzelewski's fifty pound lifting restriction. F-57 (D.I. 146). Moreover, Taylor's credibility generally was called into question. Taylor testified to the effect that he and Mondzelewski had worked together [*16] for a long time and had been there for one another and that the meat cutters all had back problems and helped each other out with lifting, although Taylor conceded that Mondzelewski was the only one in the department with restrictions. G-51 (D.I. 142). His testimony on this allegedly caring environment was contradicted by his explanation as to why he did not lift the chucks onto the cutting table for Mondzelewski, namely he wasn't explicitly asked. G-61-62; 72 (D.I. 142). Despite the fact Taylor was aware that Mondzelewski feared the chucks exceeded his lifting restrictions and that Jimmy Porter adamantly refused to help when asked, Taylor did not offer to help, but instead told Porter to call store management. B-15 (D.I. 149); E-132 (D.I. 145). There was also testimony by a former Pathmark meat wrapper who had been present at the time of the incident that the boxes the large pieces of meat came in, that would have had the weights of the meat, were sought from the trash area only after Mondzelewski was suspended and sent home for the day. D-32 (D.I. 130).

n7 The write-up explanation stated: "Joe was instructed to cut bone[-]in chucks. The largest one weighed 67.7 lb. Removed bolar and three ribs from each chuck. Average weight below 50 lb." PX-17.

[*17]

Several Pathmark witnesses testified that Mondzelewski bore responsibility for his own safety and ensuring that his restrictions were properly observed. E-80 (D.I. 145); F-27 (D.I. 146); G-71 (D.I. 142). The evidence adduced indicated that Mondzelewski had not previously refused a supervisor's orders, nor had there been disputes on any prior occasions about whether Mondze-

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

lewski was reasonably justified in not lifting certain items. Pathmark's Director of Human Resource Services, Edward McFeeley testified that, under such circumstance, if an employee had an honest doubt about the weight, he should either determine the weight, or if that could not be done, someone else should pick up the object. E-84-85 (D.I. 145). Nevertheless, as previously rehearsed, Mondzelewski was given a write-up that warned of possible termination the next time such an incident occurred and was suspended.

Moreover, there was testimony of several of Pathmark's witnesses conceding that Mondzelewski's write-up and suspension for the lifting incident violated a Pathmark ADA policy guidance. E-79, 82-85 (D.I. 145). The policy guidance states that, if a disabled employee is not meeting performance standards, such [*18] employee should be informed and asked if reasonable accommodation is required, and accommodation should be provided if it is reasonable. PX-34. If the employee continued to perform below standard, the ADA policy required that Pathmark's Human Resources division should be consulted prior to proceeding with documentation and progressive discipline. PX-34. Assistant store manager Leo Johnson also acknowledged that his actions violated the company's ADA policy, although he was not aware of such policy at the time he took them. E-183-184 (D.I. 145). Mondzelewski brought the violation of company ADA policy to the attention of Pathmark's corporate management in a letter to Steve Radcliffe, the Associate Relations Manager at Pathmark's corporate headquarters. PX-19. n8 Mondzelewski's letter mentioned his physician-imposed restrictions, described the lifting incident and the store manager's obscene language and Johnson's failure to follow Pathmark's ADA policy in writing him up and suspending him. PX-19 Mondzelewski never received a response to the letter from Pathmark management. C-38-39 (D.I. 129).

n8 The letter also described the delay in returning him to work after his physicians had released him with restrictions and comments by Jimmy Porter, Bobby Taylor, and store management that Mondzelewski was a "hardship." PX-19.

[*19]

Mondzelewski filed a grievance over his punishment for the lifting incident. DX-23. At the grievance proceeding, Mondzelewski's union shop steward, Bobby Taylor, took a position adverse to Mondzelewski expressing his view that Mondzelewski should have picked up the meat. G-43-44 (D.I. 142). Pathmark denied the grievance and upheld the write-up and suspension for the lifting incident. F-98 (D.I. 146).

*Additional Aggravating Incidents*

Mondzelewski testified to other harassing incidents after he returned to work following his second injury. Co-worker Jimmy Porter flashed obscene gestures at Mondzelewski and his wife while they were shopping. B-24-25 (D.I. 149). Mondzelewski was criticized for taking his break at the end of his shift even though other employees did this and no one had previously been criticized. B-22-24 (D.I. 149); D-37 (D.I. 130). Fellow meat cutters Jimmy Porter and Bobby Taylor complained that Mondzelewski was a hardship. B-27 (D.I. 149); D-38; D-59-60 (D.I. 130). Although store management was aware that other employees referred to Mondzelewski as a hardship, management did not explain the ADA's requirements for accommodation to the employees, nor were any other [*20] actions taken. B-27 (D.I. 149). Due to physical symptoms of stress from the job related actions, Mondzelewski requested to be excused from work for medical tests, B-101 (D.I. 149), but contrary to common practice, his request was initially denied. B-29-30 (D.I. 149). After Mondzelewski suffered a mental breakdown and had returned to work at a new store, the management there told him that he would not be there long, he was no longer needed, and that he would be better off pumping gas, B-40, and asked him to "shake" for him. B-41 (D.I. 149).

*Harm Suffered by Mondzelewski*

It was uncontradicted that Mondzelewski suffered a major depressive episode in August 1994. B-99-100 (D.I. 149); C-48 (D.I. 129); G-170-71; G-183 (D.I. 142). Dr. Neil Kaye, Mondzelewski's treating psychiatrist, described the depression as "acute," C-50 (D.I. 129), and testified that it led to a chronic medical condition, C-77-78 (D.I. 129), requiring psychiatric medical supervision and counseling, C-54-56 (D.I. 129), for the remainder of Mondzelewski's life. C-78 (D.I. 129). The combination of anti-depressant and anti-anxiety medication prescribed for Mondzelewski required close psychiatric supervision since they [*21] had potentially fatal cardiac side-effects. C-51; 110-112 (D.I. 129). Although Mondzelewski's acute depression had shown improvement with intensive psychiatric treatment, medication, and counseling, this medication and therapy would be required for the rest of his life in order to maintain him in a relative status quo. C-52-54 (D.I. 129).

Mondzelewski's chronic depressive condition was attributed to the harassing incidents at work that Mondzelewski perceived to be threatening to his job, B-96 (D.I. 149); C-78 (D.I. 129), in light of Mondzelewski's lifelong employment at Pathmark which defined him as a person. C-46; C-110 (D.I. 129). There was tes-

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 21 of 36

Page 6

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

timony that Mondzelewski's reaction and suffering was reasonable under the circumstances. C-78-79 (D.I. 129). Mondzelewski testified that he could never understand "why me" with respect to the punishments he was receiving, A-120, 128 (D.I. 141), B-128 (D.I. 149), and that he felt devastated and emotionally sick, and that he felt that he was going to be fired and that Pathmark was trying to get rid of him. A-121 (D.I. 141); B-21, 44 (D.I. 149). Mondzelewski was described by his psychiatrist as a "broken" man who would never return to his old [*22] self. C-54; C-78 (D.I. 149). Mondzelewski's co-workers also described the change in him after the assignment to the "punishment shifts" and the disciplinary actions, that he was not "the old Joe," that he no longer talked to anybody. D-63-64 (D.I. 130); G-45 (D.I. 142). One co-worker described Mondzelewski looking "like he was scared to death all the time . . . so afraid to do anything that . . . they could say was wrong" for fear of being written up and possibly fired. D-39 (D.I. 130).

Mondzelewski also experienced physical manifestations of his psychiatric injury including a loss of more than fifty pounds over a few months, B-102 (D.I. 149), inability to sleep, B-31 (D.I. 149), and a stress ulcer that required medical treatment. B-97 (D.I. 149); PX-7. He also was unable to work for several months due to the severity of his psychiatric condition. PX-33.

## III. DISCUSSION

### A. Motion for Judgment as a Matter of Law

Pathmark first moves for judgment as a matter of law ("JMOL") pursuant to *Fed. R. Civ. P. 50(b)*. n9 Pathmark argues it is entitled to JMOL because Mondzelewski failed to produce sufficient evidence from which a reasonable jury could reach to following conclusions: [*23] (1) That Pathmark retaliated against Mondzelewski for requesting accommodation for his disability; (2) that Pathmark discriminated against Mondzelewski because of his disability; (3) that Pathmark retaliated against him for filing a workers' compensation claim; (4) that Mondzelewski was entitled to and/or suffered any actual damages; or (5) that Mondzelewski was entitled to punitive damages in any amount.

n9 As the rule requires, Pathmark moved for judgment as a matter of law on all counts before the submission of the case to the jury pursuant to *Fed. R. Civ. P. 50(a)*, and now renews its motion post-trial.

### 1. Legal Standard

The standard for granting JMOL is set forth in *Fed. R. Civ. P. 50(a)*, which provides:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine that issue against that party and may grant a motion for judgment as a matter of law against [*24] that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

The standard is an exacting one, "contemplating 'the court's duty to assure enforcement of the controlling law and [to not intrude] on any responsibility for factual determinations conferred on the jury.'" *Finch v. Hercules, Inc., 941 F. Supp. 1395, 1408 (D. Del. 1996)* (quoting *Fed. R. Civ. P. 50*, Advisory Committee Notes, 1991 amendment), *aff'd without opinion, 124 F.3d 186 (3d Cir. 1997)*. The Court reviews the evidence and the inferences therefrom in the light most favorable to the verdict winner. *See Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)* (en banc), *cert. denied, 521 U.S. 1129, 138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997); Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 (3d Cir. 1995); Rotondo, 956 F.2d at 438.* "The Court may not weigh the evidence, pass on the credibility of witnesses, or replace its version of the facts for that of the jury." *Finch, 941 F. Supp. at 1408* [*25] (citing *Blair v. Manhattan Life Ins. Co., 692 F.2d 296, 300 (3d Cir. 1982)*). Judgment as Matter of Law should be granted "sparingly," *Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)*, and only when, after reviewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant, "no jury could decide in that party's favor." *Woodson v. Scott Paper Co., 109 F.3d 913, 919 (3d Cir. 1996)* (citation and internal quotation marks omitted), *cert. denied, 522 U.S. 914, 139 L. Ed. 2d 230, 118 S. Ct. 299 (1997); see also, e.g., Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 (3d Cir. 1996)* (JMOL not appropriate if any rational basis for the verdict); *Danny Kresky Enterprises Corp. v. Magid, 716 F.2d 206, 209 (3d Cir. 1983)* (The Court may overturn a jury verdict in favor of a prevailing party only if the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." (citation and internal quotation marks omitted)).

### 2. Analysis of Pathmark's Arguments and the Evidence

Case 1:06-cv-00225-MPT     Document 6-3     Filed 05/05/2006     Page 22 of 36

Page 7

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

### a. Sufficiency of Evidence [*26] Supporting the ADA Retaliation Claim

The ADA retaliation provision states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." *42 U.S.C. § 12203*(a). This provision is similar to the prohibition of retaliation in Title VII of the Civil Rights Act of 1964. *See 42 U.S.C. § 2000e-3*(a). Not surprisingly, courts analyze ADA retaliation claims using the same framework employed for retaliation claims arising under Title VII. *See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).*

To establish a prima facie case for retaliation for protected conduct under the ADA, Mondzelewski had to show that (1) he engaged in protected activity; (2) he suffered an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *See id.; Woodson v. Scott Paper Co., 109 F.3d at 920.* If Mondzelewski establishes these elements, the burden of production shifts [*27] to Pathmark to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).* At this point, a presumption of discrimination "drops from the case," *Woodson, 109 F.3d at 920 n.2* (citing *Fuentes, 32 F.3d at 763*), and to prevail, Mondzelewski must carry the burden of convincing the factfinder both that Pathmark's proffered reasons for the actions were false, and that discrimination was the real reason for the actions. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2748, 2754, 125 L. Ed. 2d 407 (1993).* Subsumed within this burden, Mondzelewski has to prove that Pathmark's proffered non-discriminatory reasons were pretextual.

Pathmark first contends that there was insufficient evidence for the jury to have found that Mondzelewski established the second and third elements of his prima facie case. [*28] Second, Pathmark argues that even if he established a prima facie case, Mondzelewski failed to present competent evidence to show that Pathmark's asserted non-discriminatory reasons for its adverse actions against Mondzelewski were pretextual.

### i. Adverse actions

Pathmark argues that most of the "adverse actions" alleged by Mondzelewski fail to fall within the Supreme Court's definition of adverse employment action. *See Burlington Industries v. Ellerth, 524 U.S. 742, 118 S. Ct.*

2257, 2268, 141 L. Ed. 2d 633 (1998) (defining adverse employment actions as conduct which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") "Minor or trivial actions that merely make an employee 'unhappy' are not sufficient to qualify as retaliation under the ADA, for otherwise every action that an 'irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998)* (quoting *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)* [*29] (citation omitted)). The Third Circuit Court of Appeals held in this case that a jury could conclude that Mondzelewski's assignment to punishment shifts constitutes an adverse employment action, because "assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions." *162 F.3d at 788* (citing voluminous caselaw). Sufficient evidence was in fact presented at trial for the jury to conclude that the schedule to which Mondzelewski was assigned was undesirable, was considered "punishment," and amounted to taking away the benefits of the standard meat cutters' schedule. Therefore, there was sufficient evidence upon which the jury could have concluded that at the very least Mondzelewski's schedule change constituted a change in his terms and conditions of employment and thus was an adverse employment action. Additionally, if the jury concluded that Mondzelewski was unfairly disciplined, it could reasonably have concluded that such unfair discipline had the effect of changing his terms and conditions of employment or limited or classified him so that his opportunities or status were adversely affected. n10

> n10 Pathmark even appears to concede in its brief that the schedule change and suspension could "arguably qualify as 'adverse acts.'" D.I. 153, at 10.

[*30]

### ii. Causation

Evidence adduced at trial indicated the protected activity asserted by Mondzelewski was his request for accommodation, that is, to return to work with lifting restrictions. Mondzelewski's theory of the retaliation claim was that his return from the second injury with a lifting restriction triggered Pathmark's adverse actions against him. An exhibit introduced at trial stressed the close proximity between Mondzelewski's return to work and the asserted adverse actions. PX-33.

Pathmark argues that Mondzelewski offered no evidence linking his request for accommodation with any of the alleged adverse actions taken against him. Pathmark contends that, aside from the fact that the schedule changes and write-ups temporally followed his return to work with restrictions, there was no other evidence connecting the two events. Moreover, Pathmark maintains, there is no difference between Mondzelewski's request to return to work with restrictions after his injury in 1992 and his request to return to work with restrictions after his December 1993 injury. It was uncontested that Mondzelewski was not mistreated by Pathmark after returning to work with restrictions following his [*31] 1992 injury. Therefore, Pathmark asserts, the alleged retaliatory acts in March and April 1994 were temporally remote from Mondzelewski's return to work with accommodation in 1992 and, without more, cannot support a finding of retaliation. Pathmark argued to the jury that the fact that Pathmark did not discriminate against Mondzelewski in 1992 after he returned to work with restrictions rebutted an inference that discrimination motivated the adverse actions after Mondzelewski's return to work with restrictions following the second injury. The jury apparently did not accept this argument, and instead viewed Mondzelewski's request to return to work with accommodation after his second injury as a separate protected act under the ADA. It is not the role of this Court to second guess the jury's inferences from the evidence, *see, e.g., Finch, 941 F. Supp. at 1411,* and the following analysis therefore proceeds accepting what must have been the jury's view.

Case law in the Third Circuit Court of Appeals is "'seemingly split' on the question of whether the timing of the allegedly retaliatory action can, by itself, *ever* support a finding of causation." *Krouse, 126 F.3d at 503* [*32] (citing *Robinson, 120 F.3d 1286 at 1302)*(emphasis in original). In *Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989)* the court held the plaintiff established a prima facie case of retaliation where he was fired two days after filing an EEOC complaint. In *Woodson,* the court, relying on *Jalil,* stated in dicta that the "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." *109 F.3d at 920.* In *EEOC v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir. 1997),* the court found that the employee's protected activity and the adverse employment action, which followed two months later, were "sufficiently close together to allow a reasonable fact finder to find the required element of causation." And, in *Kachmar v. Sunguard Data Sys., Inc.,* the court stated that "temporal proximity between the employee's protected activity and the adverse employment action . . . is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [the plaintiff's] protected activity was the likely cause of

the adverse employment action." *109 F.3d 173, 177 (3d Cir. 1997)* [*33] (citation and internal quotation marks omitted). On the other hand, the Third Circuit appellate court has stated that "timing alone will not suffice to prove retaliatory motive." *Delli Santi, 88 F.3d at 199 n.10. See also Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991)* (stating that the court in *Jalil* "stopped short of creating an inference based upon timing alone"). In *Krouse,* the court stated that "even if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *126 F.3d at 503* (citing *Robinson, 120 F.3d at 1302).*

Even if timing alone is not "unusually suggestive," temporal proximity, in addition to evidence of a "pattern of antagonism" toward the plaintiff, may be sufficient to establish a causal link between protected activity and the adverse employment action. *Woodson, 109 F.3d at 920* ("[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism [*34] in the intervening period."); *Kachmar, 109 F.3d at 177* ("Circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that the adverse employment action was in retaliation for the employee's protected activity. (citing *Robinson, 982 F.2d 892 at 895)).* In this case, Mondzelewski adduced sufficient evidence for the jury to have found the close temporal proximity between his request to return to work with accommodation and the punishment shifts and other discipline was "unusually suggestive." *Krouse, 126 F.3d at 503.* Moreover, even if not sufficient on its own, the timing of the adverse employment actions, when combined with what the jury could reasonably view as a pattern of antagonism after the protected conduct, was sufficient for the jury to infer a causal relation between the protected conduct and the employer's adverse action. *See Price v. Delaware Dep't of Correction, 40 F. Supp. 2d 544, 554 (D. Del. 1999).*

Mondzelewski requested to return to work with accommodation in mid-February 1994 and returned to work on March 17, 1994. On March 21, 1994, he began [*35] to be assigned to the "punishment shifts", and on March 26, 1994 began being assigned to the Saturday night shifts. On April 23, 1994, he received the first disciplinary action in his thirty-five year career, the write-up for grinding too much meat after being told by the meat department assistance manager to grind a lot of meat. This was followed shortly thereafter, on April 30, 1994, by the write-up and suspension for refusing to lift meat that he feared exceeded his lifting restriction. Mondzelewski also was singled out for reprimand for taking his break at the end of his shift. These actions against an

Case 1:06-cv-00225-MPT     Document 6-3     Filed 05/05/2006     Page 24 of 36

Page 9

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

employee with a spotless disciplinary record were both temporally close to Mondzelewski's protected activity and could be viewed by a reasonable jury as establishing a pattern of "retaliatory animus" sufficient for the jury to find that Mondzelewski established the required causal connection. *Id.*

### iii. Pretext Showing

Pathmark next argues that Mondzelewski failed to present the jury with any evidence to rebut Pathmark's non-discriminatory explanations of its actions, to show that these explanations were pretextual. At trial, Pathmark offered explanations for each adverse **[*36]** action. Therefore, at trial, the burden shifted to Mondzelewski to present sufficient evidence to persuade the jury that Pathmark's explanations were false and that the real reason for the actions was retaliation for protected activity. *See Hicks, 509 U.S. at 512.* "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of discrimination, and . . . upon such rejection, no additional proof of discrimination is required." *Hicks, 509 U.S. at 511* (footnote and citation omitted); *see also Sheridan, 100 F.3d at 1066-67.* Mondzelewski was not required to present direct evidence of discrimination of retaliation (i.e., "a smoking gun") in order for the jury to reasonably find in his favor. *Price, 40 F. Supp. 2d at 554; see also Fuentes, 32 F.3d at 764* (plaintiff need not "adduce evidence directly contradicting the defendant's **[*37]** proffered legitimate explanations"). To discredit Pathmark's proffered reasons, Mondzelewski could demonstrate that "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes, 32 F.3d at 764* (internal quotations and citations omitted) (footnote omitted). *See also Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)* (holding the correct inquiry is "whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for [the adverse employment action] could support an inference that the employer did not act for non-discriminatory reasons" (citation and internal quotation marks omitted)).

The Third Circuit Court of Appeals has described the role of the jury in this process as follows:

> The role of determining whether the inference of discrimination is warranted must remain within the province of the jury, because a finding of discrimination **[*38]** is at bottom a determination of intent. In making that finding, the jury must perform its traditional function of assessing the weight of the evidence, the credibility of witnesses through observation of both direct testimony and cross-examination at trial, and the strength of inferences that can be drawn from the elements of the prima facie case and the evidence that undermines the employer's proffered reasons for its actions. This is uniquely the role of the factfinder, not the court. . . .

> The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . . But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer.

*Sheridan, 100 F.3d at 1071-72.* (citations omitted)

Mondzelewski presented sufficient evidence to meet this threshold requirement and to give the jury reason to disbelieve Pathmark's proffered **[*39]** non-discriminatory explanations for each of the adverse actions and to infer Pathmark's adverse employment actions were motivated by discriminatory intent.

*(1) Assignment to the "punishment shifts":* Pathmark contended that Mondzelewski's assignment to the undesirable shifts were necessary to accommodate his lifting restrictions; however, there was no written document, as would be expected under the circumstances, that Mondzelewski was being given shifts like no one else in order to accommodate his disability. Pathmark's position was undercut because it was brought out that such shifts were not deemed necessary to accommodate Mondzelewski's similar lifting restrictions after his injury in 1992, A-76-77 (D.I. 141); D-23 (D.I. 130), nor were such shifts considered necessary to accommodate his lifting restrictions when he returned to work at a different store with the same lifting restrictions after he had suffered a mental breakdown. B-36 (D.I. 149); G-113-114 (D.I. 142).

Pathmark, through the testimony of meat department manager and union member Bobby Hinkle, tried to show

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

that Hinkle, rather than store management, was responsible for Mondzelewski's assignment to the "punishment [**40] shifts." F-38 (D.I. 146). However, Hinkle's testimony suffered from memory lapses and conflicted with his previous sworn testimony where Hinkle denied knowledge of how Mondzelewski was assigned to the "punishment shifts," stating that he had no recollection of it, it was not his doing, and that the schedules he drew up were sent up front where they were gone over by store management. F-46-47 (D.I. 146).

Other testimony supported Mondzelewski's argument that he was being given "punishment shifts" by store management. Mondzelewski testified that he asked Hinkle why he was being assigned to the punishment shifts and Hinkle responded that store managers, Ostafy and Leo Johnson changed the schedules that Hinkle wrote. A-114-115 (D.I. 141). Assistant meat manager Joe Kubec also told Mondzelewski that Ostafy was setting his schedule that way. A-115-116 (D.I. 141). Mondzelewski confronted store manager Ostafy about why he was being consistently assigned to work 9:30 a.m. to 6:00 p.m., Ostafy told him that was the way he wanted it. A-116-117 (D.I. 141). Former Pathmark meat wrapper Gail Barker also testified that when she asked Hinkle why Mondzelewski was being given the "punishment shifts, [**41] " Hinkle responded that he drew up the initial schedules but that they were then left up front with store management, who changed the schedules as they saw fit. D-30 (D.I. 130). Additionally, the jury was informed that, in answers to interrogatories as to who was responsible for Mondzelewski's work schedule, Pathmark identified the store manager, Wayne Ostafy, and assistant manager, Leo Johnson, and made no mention of Hinkle. F-46 (D.I. 146). Therefore, the evidence, and reasonable inferences drawn therefrom in Mondzelewski's favor, was sufficient for the jury to conclude that Pathmark's explanation for Mondzelewski's shift assignment was pretextual and that the true reason for his assignment was as punishment for Mondzelewski's request to return to work with restrictions.

(2) Ground meat write-up: Pathmark's asserted that the write-up was justified because Mondzelewski's grinding up of too much meat resulted in excess "shrink," that the meat had to be thrown away and the store lost money. Pathmark's explanation was countered with testimony that it was common for meat cutters to leave ground meat in the case overnight, for meat cutters to grind meat late at night in quantities [**42] similar to that ground by Mondzelewski, and that this practice did not result in write-ups. A-126 (D.I. 141); D-36; D-42; D-61 (D.I. 130). There was no contradiction of Mondzelewski's testimony that he had been told by the assistant meat manager to grind a lot of meat before he left. Pathmark contended that store policy required employees to

consult store management prior to grinding a lot of meat late at night, yet another of Pathmark's witnesses testified that under the circumstances, a meat cutter would not question the department managers' orders and go over his head to the store manager before complying with such order. E-149 (D.I. 145).

Pathmark's contention that the write-up, which threatened possible termination for future occurrences, was an appropriate response was also undermined by a Pathmark manager's concession that a write-up for a first disciplinary offense violated the company's progressive discipline policy which required an oral warning before any formal write-up. E-85; E-174-76 (D.I. 145). Pathmark's witness, Bobby Taylor, the union shop steward, also testified that it was not the norm to threaten an employee with termination in an oral warning on a first disciplinary [**43] offense. G-58 (D.I. 142). No explanation was given for this divergence from policy in Mondzelewski's case. n11 The evidence, and reasonable inferences drawn therefrom in Mondzelewski's favor, was sufficient for the jury to conclude that Pathmark's explanation for the ground meat disciplinary write-up was pretextual and that the true reason for the write-up was as punishment for Mondzelewski's request to return to work with restrictions.

> n11 Pathmark also suggested Mondzelewski was treated better than other workers under similar circumstances, pointing to the testimony of Jimmy Porter that he was demoted from meat department manager because of "shrink issues." Use of the plural issues implies ongoing wastage problems in Porter's case, and there was no evidence that his situation was comparable. Porter described "shrink" as referring to loss of money generally for overproduction, overtrimming, and mishandling product. E-151-52 (D.I. 145).

(3) Write-up and suspension for lifting incident: In defense of the write-up [**44] and suspension of Mondzelewski for the lifting incident, Pathmark presented the testimony of Bobby Taylor, Leo Johnson, and Jimmy Porter to the effect that Mondzelewski could not have reasonably believed that the chucks he refused to lift weighed more than fifty pounds. G-40 (D.I. 142); E-163 (D.I. 145). However, the jury was also presented with evidence contradicting Taylor's testimony that he weighed everything out and showed the tickets to Mondzelewski: the write-up never showed exacts weights of the meats, nor was mention made of any weight tickets and the store manager, Wayne Ostafy, admitted that no one knew the exact weight of the meat in question, and conceded that there was a possibility

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 26 of 36

Page 11

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

that it could have exceeded Mondzelewski's fifty pound lifting restriction. F-57 (D.I. 146).

Taylor's credibility generally was called into question by his assertion that the meat cutters were a caring group who helped one another out, which did not square either with his failure to assist Mondzelewski in lifting the chucks because he "wasn't asked" or his instruction to Jimmy Porter to call store management. Testimony by a former Pathmark meat wrapper Gail Barker that the boxes listing the **[*45]** meat weights were retrieved from the trash area only after Mondzelewski was suspended contradicted Pathmark's assertion that the weight of meat was known to Mondzelewski. Testimony that Jimmy Porter called Mondzelewski a hardship and flashed obscene gestures at him and his wife would provide a reasonable basis for the jury to discredit his testimony as biased. Moreover, the obscene language employed by Leo Johnson during the incident further supports an inference of animus.

The contradictions in the testimony, viewed in the light most favorable to Mondzelewski, support an inference that he had a good faith belief that he did not know whether the chuck he was being told to lift weighed more than his lifting restrictions. The jury was not compelled to accept the explanation of Pathmark, namely that Mondzelewski--who, it was uncontradicted, had never been insubordinate and was considered honest and a good worker--would for some reason suddenly choose to be insubordinate. Rather, the jury could have believed that Mondzelewski was set-up in a situation where he was ordered to lift meat for which in good faith he did not know nor could he determine the weight and forced into a the choice **[*46]** of potentially reinjuring his back or facing discipline. If follows there was sufficient evidence for the jury to conclude that Pathmark's proffered non-discriminatory explanation for the disciplinary suspension and write-up of Mondzelewski was pretextual.

The Court reiterates that for purposes of the JMOL motion, the Court must view the evidence in the light most favorable to Mondzelewski. The Court will not second guess the weight assigned to this evidence by the jury, "nor will the Court interpose its own belief as to what the evidence showed if it were different from that of the jury's." *Finch, 941 F. Supp. at 1411.* Accordingly, the Court finds the evidence presented at trial was sufficient to allow the jury to reasonably find that Mondzelewski established his prima facie case of retaliation, and to conclude that enough inconsistencies, implausibilities, and incoherences in the evidence to support an inference that Pathmark's explanations for its actions were unworthy of credence. Together, this is sufficient to support the jury's finding that Mondzelewski proved his ADA retaliation claim. *See Hicks, 509 U.S. at 511; Sheridan, 100 F.3d at 1066-67.* **[*47]**

**b. Sufficiency of Evidence Supporting the ADA Discrimination Claim**

The core anti-discrimination section of the ADA provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*42 U.S.C. § 12112.* Title VII and Age Discrimination in Employment Act ("ADEA") caselaw inform standards of causation for proving disparate treatment under the ADA. *See Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995).* "In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." *Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998)* (citing *Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998)).*

The ADA defines "disability" to mean, among **[*48]** other things, "a physical . . . impairment that substantially limits one or more of the major life activities." *42 U.S.C. § 12102*(2)(A). Pathmark does not dispute Mondzelewski's back injury is a "physical impairment." Mondzelewski contends that he is limited in the major life activity of working, which, under controlling case law in the Third Circuit, is considered to be one of the "major life activities." *See Mondzelewski, 162 F.3d at 782-83.* "Substantially limits" as applied to "working," means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id. at 784* (quoting *29 C.F.R. § 1630.2(j)(3)(i)).* Determining whether an individual is substantially limited in working thus requires "consideration of the individual's training, skills, and abilities in order to evaluate 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" *Id.* (citing *Webb v. Garelick Mfg. Co., 94 F.3d 484, 488 (8th Cir. 1996)* (citing **[*49]** *Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir. 1986))).* The Supreme Court has recently stated:

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 27 of 36

Page 12

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

To be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 2151, 144 L. Ed. 2d 450 (1999).

In *Mondzelewski*, the Third Circuit Court of Appeals held that the evidence proffered by Mondzelewski, if believed by a jury, would be sufficient to establish that he was disabled in the major life activity of working. Such sufficient evidence was presented at trial. The evidence showed that Mondzelewski had limited education, job training, and job skills and that he was an older employee. D-78-79; 86-87 (D.I. 130). Vocational expert Thomas Yohee testified that this combination of factors, coupled with his [*50] medically-imposed lifting restrictions, significantly restricted Mondzelewski's ability to find other employment. D-90 (D.I. 130). Based on an in-depth vocational analysis, Yohee concluded that Mondzelewski was restricted to medium-duty jobs, that he had virtually no transferrable skills, and that there were relatively few jobs available to him if he was not accommodated in his meat cutter job. D-75-76, 86-87, 90 (D.I. 130). He concluded that, of the jobs Mondzelewski could perform without accommodation, there were few openings, the jobs would be at substantially reduced wages, and that Mondzelewski had no substantial hope of finding jobs in Delaware or neighboring states. D-89-91 (D.I. 130). Yohee concluded that the combination of lack of education, training, skills, job history, age, and physical handicaps made Mondzelewski substantially unemployable without accommodation, that these factors disabled him from a broad range or class of jobs. D-91-92 (D.I. 130). Yohee testified that, in light of his impairments, there were no other jobs available to him that would use his skills or talents, nor were there a host of different jobs available to him. D-93 (D.I. 130). It follows that, [*51] if the jury accepted Yohee's testimony, there was sufficient evidence for it to conclude that Mondzelewski proved the first element of his prima facie case, that he was disabled in the major life activity of working.

As to the second element of the prima facie case, the parties stipulated at trial that, with accommodation, Mondzelewski was a qualified individual.

As to the third, and final, element of the prima facie case, Mondzelewski was required to show he suffered an adverse employment action because of his disability. At trial Mondzelewski appeared to argue several discrimination theories: that Pathmark assigned him to the "punishment shifts" and unfairly disciplined him because of his disability; that he was harassed because of his disability by his co-workers and Pathmark management, and, that such harassment rose to the level of a hostile working environment; and that Pathmark failed to accommodate Mondzelewski's lifting disability by taking the harassing and adverse actions against him. Pathmark contends that there was insufficient evidence to support a discrimination claim under any theory. The Court concludes that there was sufficient evidence to support a claim for discrimination, [*52] at least on the hostile work environment theory.

For harassment to rise to the level of discrimination, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (citation omitted). This standard is intended to "take[] a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993). The Third Circuit Court of Appeals has adopted a "totality of the circumstances" approach to hostile work environment claims. *See West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). *See also Harris*, 114 S. Ct. at 371 ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."). Relevant circumstances "may include the frequency of the [*53] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* In order to find liability for a hostile work environment, the plaintiff must demonstrate that the conduct was severe or pervasive enough to create an environment that a reasonable person of the same protected class would find to be hostile or abusive. *See West*, 45 F.3d at 753-54. The victim must also subjectively perceive the work environment to be hostile or abusive. *Id.* at 754.

Evidence was presented that some of Mondzelewski's co-workers referred to him as a hardship and store management was aware of this and did nothing. This alone certainly would not create an objectively hostile work environment. However, more important to the creation of the hostile environment was Pathmark's month-long delay in returning Mondzelewski to work,

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 28 of 36

Page 13

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

which led him to wonder if he would lose his job; the assignment to punishment shifts when he returned to work; and the disciplinary write-ups. When combined with the co-worker comments and gestures and the actions **[*54]** by Pathmark that a jury could reasonably construe to be retaliatory, and the impact on Mondzelewski in terms of making him fear for his job, the lifting incident and its probable impact on a reasonable person in Mondzelewski's position could be found by the jury to be severe enough to create an objectively hostile environment. n12

> n12 The parties do not dispute that Mondzelewski subjectively perceived the work environment at Pathmark to be hostile.

Mondzelewski argued to the jury that he was set up by meat cutters Jimmy Porter and Bobby Taylor. Porter presented Mondzelewski with large chucks of meat, for which the boxes with the weights had been discarded, so Mondzelewski could not follow his customary practice of weighing the smaller pieces out and subtracting the weights of those pieces from the total weight on the box to determine whether the large chuck was within his lifting restriction. The jury could have reasonably found that Mondzelewski, back injury fresh in mind, only recently increased to the fifty **[*55]** pound restrictions, had a reasonable fear of reinjuring his back when confronted with a situation where he did not know the weight of the meat. Porter adamantly refused to help when Mondzelewski requested assistance in lifting and Taylor did not offer assistance but instead recommended calling the manager. The manager in obscene language ordered Mondzelewski to lift the meat or face suspension. The jury could reasonably view this incident as meat cutters and management combining forces to send a message to Mondzelewski to stop asserting his disability-imposed restrictions, even though there was ample evidence that it was Mondzelewski's responsibility to do so. In light of the response by both union workers and the manager Leo Johnson, a jury could reasonably have concluded that the lifting incident and the punishment -- the suspension and write-up which threatened possible termination for the next occurrence -- was designed to set a precedent and let Mondzelewski know that both union member meat cutters and management wanted to send him a signal. The message was that, should Mondzelewski assert such good faith objections to requests to lift above his restriction, he faced a stark choice: **[*56]** risk his health or termination. The jury could have concluded that this action, under the circumstances, including the other retaliatory acts and harassing comments and gestures, was sufficiently severe that a reasonable person in Mondzelewski's situation would view it as altering his terms and conditions of employment by creating a hostile or abusive working environment. Clearly store management had knowledge of, in fact ultimately imposed, the draconian choice on Mondzelewski. Moreover, Mondzelewski transmitted knowledge of this incident and the no-win situation in which he was placed to Pathmark corporate personnel in his letter to Steve Radcliffe asking how to resolve such situations in the future, but received no response.

### c. Sufficiency of Evidence Supporting the Workers' Compensation Retaliation Claim

Pathmark next argues that the jury's verdict that Pathmark retaliated against Mondzelewski for exercising his rights under Delaware's workers' compensation statute, in violation of *19 Del. C. § 2365*, is not supported by sufficient evidence. The Court need not reach the merits of Pathmark's argument. Instead, the Court will vacate the jury's verdict for liability and damages **[*57]** against Pathmark on this claim, because *19 Del. C. § 2365* was not applicable during the time period when the alleged retaliatory actions relevant to this claim occurred.

The trial in this case was conducted based on an assumption by both parties and this Court that *19 Del. C. § 2365* was applicable to this case. The parties' post-trial briefing was based on the same assumption. However, § 2365 was not effective until July 12, 1994 and there was no predecessor statutory provision providing comparable rights. *See* 69 Del. Laws, c. 370, § 1 (1993 vol. II); *19 Del. Code Ann. § 2365*, Revisor's note (1995 Repl.).

Because the acts alleged as retaliation for Mondzelewski filing his workers' compensation retaliation claim occurred prior to the enactment of § 2365, he cannot claim relief under this section. n13 Mondzelewski filed for workers' compensation on March 3, 1994. The alleged retaliatory acts occurred primarily in March and April 1994: Mondzelewski's assignment to "punishment shifts" started soon after his return to work on March 17, 1994; n14 the disciplinary write-up for allegedly leaving too much ground meat in the case on April 23, 1994; and the write-up and suspension **[*58]** for Mondzelewski's refusal to lift a piece of chuck that he thought weighed more than his 50 pound restrictions on April 30, 1994. n15 PX-33. The final denial of Mondzelewski's grievance by the store manager regarding the two write-ups was made in June 1994. PX-33. Because the statutory provision upon which Mondzelewski relies for his state workers' compensation retaliation claim was not enacted until July 12, 1994, after the claimed retaliatory acts occurred, it is inapplicable as a matter of law. n16

> n13 "Delaware courts have recognized the general principle that statutes will not be retroac-

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

tively applied unless there is a clear legislative in-tent to do so." *Hubbard v. Hibbard Brown & Co., 633 A.2d 345, 354 (Del. 1993)* (citing, *e.g., Chrysler Corp. v. State, 457 A.2d 345, 351 (Del. 1983))*. The Court has found nothing to indicate the Delaware General Assembly intended to ret-roactively apply the statute at issue here.

n14 The record is unclear as to precisely how long the "punishment shifts" were imposed. Mondzelewski testified variously that the Satur-day night shifts were imposed for 25 or 30 weeks or 30 or 40 weeks in a row, A-122 (D.I. 141), B-244 (D.I. 149), which would more than cover the time period between Mondzelewski's return to work in March and his disability leave due to his mental breakdown, beginning August 8, 1994. Viewing the facts in the light most favorable to Mondzelewski, Pathmark continued to assign him to undesirable shifts for approximately four weeks after *19 Del. C. § 2365* was enacted. However, the Court concludes as a matter of law that the assignment to four weeks of undesirable schedules in July and August 1994, standing alone, would not be sufficient evidence to estab-lish that Pathmark retaliated against Mondze-lewski by assigning him such undesirable shifts because he filed for workers' compensation on March 3, 1994.

[*59]

n15 To the extent that any delay in returning Mondzelewski to work could also be considered a retaliatory act, the relevant actions took place in February and March 1994.

n16 At trial, evidence was presented that the bonus pay of managers at Pathmark stores could be adversely affected by the filing of workers' compensation claims by store employees. Mondzelewski's counsel argued that managers at the Pathmark Dupont Highway store, where Mondzelewski worked at the time he was injured in December 1993 and filed the workers' com-pensation, retaliated against him because filing the workers' compensation claim hurt their chances for bonuses. Although there was testi-mony of harassment of Mondzelewski after he re-turned to work following extended disability leave for his mental breakdown, these acts oc-curred at the new Pathmark store to which Mondzelewski was transferred and could not be considered retaliation for filing for workers' com-pensation under Mondzelewski's theory.

The only possible argument for upholding the work-ers' compensation retaliation verdict in the absence of statutory authority [*60] would be if the Delaware Su-preme Court had recognized a cause of action for work-ers' compensation retaliation under, for example, a public policy exception to the employment-at-will doctrine. The Court has been unable to locate any Delaware Supreme Court case that addresses this issue. Moreover, it is highly improbable the Delaware Supreme Court would have recognized such a cause of action for workers' compensation retaliation at common law because the Delaware judiciary has a long-standing practice of defer-ring to the Delaware General Assembly when it comes to declaring the public policy of the state. n17 *See, e.g., Moss Rehab v. White, 692 A.2d 902, 909 (Del. 1997); Wright v. Moffitt, 437 A.2d 554, 556 (Del. 1981); State ex rel. State Board of Pension Trustees v. Dineen, 409 A.2d 1256, 1260 (Del. Ch. 1979); Justice v. Gatchell, 325 A.2d 97, 102-03 (Del. 1974)*. Not surprisingly, given the traditional deference given by the Delaware judiciary to the legislature, the only Delaware case this Court could find directly addressing the issue declined to rec-ognize a public policy exception to the employment-at-will doctrine [*61] on the ground of retaliatory dis-charge for filing a workers' compensation claim. *See Emory v. Nanticoke Homes, Inc., 1985 Del. Super. LEXIS 1063*, at *11, C.A. No. 82 C-MR-14 (Kent) (Del. Super. July 19, 1985). There being no viable basis to sustain the jury's liability verdict and corresponding damages awarded to Mondzelewski on the state workers' compensation retaliation claim, that portion of the jury verdict will be overturned.

n17 The issue whether the Delaware Su-preme Court would have recognized a common law cause of action for workers' compensation re-taliation prior to July 12, 1994 is not an appropri-ate question for certification by this Court under Delaware Supreme Court Rule 41. Rule 41 states that a United States District Court may certify a question to the Delaware Supreme Court "prior to the entry of final judgment if there is an impor-tant and urgent reason for an immediate determi-nation of such question . . . ." Del. Sup. Ct. R. 41(a)(ii). Because a final judgment has been en-tered, the issue is not appropriate for certification by this Court under Rule 41. *See Federal Deposit Ins. Corp. v. Blue Rock Shopping Ctr., Inc., 599 F. Supp. 684, 686-87 (D. Del. 1984); cf. Rales v. Blasband, 626 A.2d 1364, 1366 (Del. 1993)* (in granting certification, noting "[a] final judgment has also not been entered in this matter by the Delaware District Court"). Moreover, arguably, certification of a question of law is inappropriate

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 30 of 36

Page 15
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

in cases, such as this one, where such question of law is not likely to recur. *See Fiat Motors of North America, Inc. v. City of Wilmington, 619 F. Supp. 29, 34 (D. Del. 1985)* (citing *Hatfield v. Bishop Clarkson Mem. Hosp., 701 F.2d 1266, 1268 (8th Cir. 1983))*.

[*62]

**d. Sufficiency of Evidence Supporting Award of Any Actual Damages**

Pathmark next argues there was insufficient evidence to support the jury's award of any compensatory damages to Mondzelewski, because there was insufficient evidence to support a jury finding that Mondzelewski's depression was caused by Pathmark's actions. Viewing the facts in the light most favorable to Mondzelewski, *see, e.g., Starceski, 54 F.3d at 1095,* the Court concludes there was sufficient evidence for a reasonable jury to conclude that Mondzelewski's mental breakdown, his mental and physical pain and suffering that accompanied his acute depression, and the associated medical costs were attributable to the adverse actions Mondzelewski was experiencing at work, rather than some other cause. Dr. Kaye, Dr. Young, and Pathmark's initial examining physician in this matter, Dr. Raskin (used during workers' compensation proceedings) agreed that Mondzelewski's acute depression was brought on by the events at work.

As to any claim that Mondzelewski did not suffer injury, the jury received evidence that Mondzelewski had past medical expenses of $ 5,630 for Dr. Kaye and $ 10,675 for his psychiatric [*63] counselor, Kathryn Poppitti, PX-29, 30. Additionally, Dr. Kaye testified to Mondzelewski's need for medication and treatment for the rest of Mondzelewski's life. C-53-58, 78 (D.I. 129). Mondzelewski's economic expert testified that, based on Mondzelewski's estimated life expectancy of twenty-two years, the present value of an award to provide for Mondzelewski's future medical expenses was $ 74,618. F-8-13 (D.I. 146). Thus, the jury received evidence of special damages totaling approximately $ 91,000.

Regarding emotional damages, "there is 'no legal yardstick by which to measure accurately' reasonable compensation for pain and suffering." *Rush v. Scott Specialty Gases, Inc., 930 F. Supp. 194, 199 (E.D. Pa. 1996)* (quoting *McDonald v. United States, 555 F. Supp. 935, 971 (M.D. Pa. 1983)), rev'd and remanded on other grounds, 113 F.3d 476 (3d Cir. 1997).* A jury may not, however, base damages "on sheer speculation." *Jackson & Coker, Inc. v. Lynam, 840 F. Supp. 1040, 1052 (E.D. Pa. 1993), aff'd without op., 31 F.3d 1172 (3d Cir. 1994).* The Third Circuit appellate court has held that if the only evidence [*64] of emotional distress is plain-

tiff's own testimony of depression and humiliation, and there is no evidence of physical suffering, the need for medical care, or the like, then there is no "reasonable probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred as a result of" the wrongful act. *Spence v. Board of Educ., 806 F.2d 1198, 1201 (3d Cir. 1986)* (citation and internal quotation marks omitted). By contrast, where a plaintiff has corroborated his or her own testimony with testimony of friends, family, and expert witnesses and has proffered evidence that he or she has needed or will need professional care, such evidence can support a compensatory damages award. *Bolden v. SEPTA, 21 F.3d 29, 33 (3d Cir. 1994); Rush, 930 F. Supp. at 199.* In this case, Mondzelewski's extensive testimony regarding his emotional injuries was corroborated by testimony of his wife and co-workers as well as his physicians. The testimony indicated that Mondzelewski's depression was "acute", C-50 (D.I. 129), and that Mondzelewski at times was suicidal. B-100 (D.I. 149), C-92 (D.I. 129), PX-7. There also was testimony [*65] from Mondzelewski and his doctors regarding the physical manifestation of his injury, including rapid weight loss, sleep disruption, and an ulcer. There was also testimony supporting past and future medical expenses attributable to Mondzelewski's injuries. Such evidence is sufficient to support a substantial award for pain and suffering. n18

n18 As to Pathmark's contention that the compensatory damages were nonetheless excessive, the Court addresses this argument in section III.C. *infra.* Regarding Pathmark's claim that the jury's compensatory damages award erroneously included compensation for Mondzelewski's inability to work since 1997 for reasons unrelated to his claims in this case, see section III.B.c *infra.*

Pathmark also asserts the jury's award of distinct amounts of compensatory damages for each of the claims, $ 250,000 for the ADA discrimination claim, $ 400,000 for the ADA retaliation claim, and $ 200,000 for the workers' compensation retaliation claim, was "overlapping" and cannot be supported [*66] based on the evidence because there was no rational basis for such a division. Pathmark contends Mondzelewski offered alternative theories of liability but that there was only one indivisible injury, Mondzelewski's acute depressive episode. The Court agrees that much of the evidence supporting the ADA retaliation and ADA discrimination claims was overlapping. n19 However, the Court discussed with the jury the issue of overlapping proof for the different claims and the jury was instructed that, if it found Pathmark both retaliated and discriminated against Mondzelewski, and that those actions caused the same

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 31 of 36

Page 16

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

damages, the jury should account for those damages only once in its total compensatory damages figure. n20 D.I. 116, at 3 (Verdict Form). The jury was told that, because of the overlapping proof issue, the total award could be less than the sum of the compensatory damage awards for the three claims, unless you decide that you can separate out the damages." I-5 (D.I. 144). The Court presumes that the jury followed the instructions given and, apparently, the jury, following the instructions, was able to separate out or apportion damages among the various counts. n21

n19 Because the Court has concluded that Mondzelewski's cannot recover on the workers' compensation retaliation claim and, accordingly, will vacate the corresponding damages awards, the Court's discussion of compensatory damages treats only the remaining ADA claims.

[*67]

n20 The relevant portion of the jury verdict sheet states as follows:

4A. IF your answer to Question 1 was YES [finding liability for ADA discrimination], what amount of actual and compensatory damages has Mr. Mondzelewski shown were caused to Mr. Mondzelewski by Pathmark's discrimination?
If any, write the dollar amount; if none, write 0.00. $

4B. IF your answer to Question 2 was YES [finding liability for ADA retaliation], what amount of actual and compensatory damages has Mr. Mondzelewski shown were caused to Mr. Mondzelewski by Pathmark's retaliation for asserting his rights under the Americans with Disabilities Act?
If any, write the dollar amount; if none, write 0.00. $

4C. IF your answer to Question 3 was YES [finding liability for workers' compensation retaliation claim], what amount of actual and compensatory damages has Mr. Mondzelewski shown were caused to Mr. Mondzelewski by Pathmark's retaliation for filing a workers' compensation claim?
If any, write the dollar amount; if none, write 0.00. $

. . .

5. What is the total amount of actual and compensatory damages, if any, you award to Mr. Mondzelewski?
If any, write the dollar amount; if none, write 0.00. $

NOTE: You should not arrive at the answer to Question 5 simply by adding the total of Questions 4A, 4B, and 4C. *If you have found that Pathmark both discriminated and retaliated against Mr. Mondzelewski and/or retaliated against Mr. Mondzelewski both because he asserted his rights under the Americans with Disabilities Act and because he asserted his rights under the workers' compensation statute and that those actions caused the same damages, you should only account for those damages once in you answer to Question 5.* Any damages caused solely by discriminatory conduct, any damages caused solely by retaliatory conduct for Mr. Mondzelewski asserting his rights under the Americans with Disabilities Act, and any damages caused solely by retaliatory conduct for Mr. Mondzelewski filing a workers' compensation claim should be added into this total as well.

D.I. 116, at 2-3 (emphasis added).

[*68]

n21 Pathmark appears to be raising, for the first time, a contention that the jury instructions and interrogatories on compensatory damages were erroneous. Pathmark's brief states: "The jury was given no guidance in distinguishing from among these overlapping "harms," and their verdict reflects that fact. Allowing the jury to come up with three separate figures without any factual basis for doing so is akin to giving them a dartboard and three arrows to shoot while blindfolded." D.I. 153 at 22. To the extent that Pathmark is now arguing that the damages interrogatories were erroneous, the Court notes that Pathmark made no objection to the jury verdict form or the method used by the Court in that form. Jury Prayer Conference, 7/19/99, at 36-37. Even after the jury requested by note assistance in arriving at the damages award, Pathmark voiced no objection to the Court's additional instruction in response to that note. I-6 (D.I. 144), 10, 17-19. Having failed to object at trial to the jury instructions and verdict form on the grounds now pressed, Pathmark has waived this argument. *See Inter Med. Supplies, Ltd. v. E.I. Med. Sys., Inc., 181 F.3d 446, 463 (3d Cir. 1999).*

[*69]

Moreover, to the extent the jury may have double counted damages that were caused by both the ADA retaliation and ADA discrimination, as a practical matter, it would have no effect. The total compensatory damages awarded for the ADA retaliation and discrimination claims was $ 650,000, of which the ADA retaliation claim award was $ 400,000. Due to the ADA statutory damages cap, the Court has already remitted this award to $ 300,000, less than half the sum of the combined awards and $ 100,000 less than the ADA retaliation award alone. Thus, as a practical matter, any possible double counting is negated by the effect of the damages cap.

**e. Sufficiency of Evidence Supporting Award of Punitive Damages in Any Amount**

Pathmark further argues that insufficient evidence was adduced at trial to support an award of punitive damages in any amount. The Court need not address this argument for two reasons. First, the Court remitted all punitive damages on the ADA claims prior to the imposition of judgment after trial due to the $ 300,000 statutory damages cap of the 1991 Civil Rights Act. *See* D.I. 120. Second, because any acts by Pathmark that could have been construed by the jury as [*70] retaliation for filing a workers' compensation claim occurred before the enactment of the relied-upon statutory provision, *19 Del. C. § 2365*, Mondzelewski is not entitled to any damages on that claim. *See supra*, section III.A.2 c.

**B. Motion for New Trial**

Pathmark argues that, if the Court decides it is not entitled to JMOL under Rule 50(b), it is nonetheless entitled to a new trial under *Fed. R. Civ. P. 59(a)* for several reasons. First, Pathmark maintains the great weight of the evidence is contrary to the jury's finding of liability on the ADA discrimination claim and the ADA retaliation claim. n22 Second, Pathmark asserts it is entitled to a new trial because the Court made the following errors in the jury charge that were sufficiently prejudicial to Pathmark to constitute reversible error mandating a new trial: (1) instructing the jury as to the meaning of the "major life activity of working" by quoting Equal Employment Opportunity Commission ("EEOC") regulations that define the term, notwithstanding Pathmark's objection that the EEOC regulations are invalid as a result of the Supreme's Court's reasoning in *Sutton v. United Air Lines, Inc., supra;* (2) [*71*] overruling Pathmark's objections to the jury instruction concerning respondeat superior liability; and (3) not clarifying the difference between Mondzelewski's total and permanent disability status established in December 1997 and his claim of disability under the ADA. Finally, Pathmark

contends the jury's damages awards was so excessive as to demonstrate that it was the result of passion or prejudice, requiring a new trial. n23

n22 Pathmark further contends the great weight of the evidence is contrary to the jury's finding of liability on the retaliation claim under the Delaware worker's compensation statute, and the finding of malice or reckless conduct by Pathmark sufficient to warrant punitive damages. Because Mondzelewski is not entitled to punitive damages for reasons stated *supra,* section III.A.2.e, the Court need not address these contentions.

n23 Pathmark further contends that it is entitled to relief from the punitive damages award because the Court abused its discretion by permitting Mondzelewski to re-open his case-in-chief after failing to offer any evidence of Pathmark's net worth, as required by law, and by permitting Mondzelewski to offer hearsay evidence of Pathmark's net worth. Because Mondzelewski is not entitled to punitive damages for the reasons stated *supra*, section III.A.2.e, the Court need not address this claim.

[*72]

**1. Weight of the Evidence**

The authority to grant a new trial rests in the sound discretion of the trial court and will not be disturbed absent an abuse of such discretion. *See Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).* Pathmark must meet a high standard to prevail on a motion for a new trial on the ground that the verdict is against the weight of the evidence. "[A] district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)* (citations omitted). "When the district court grants a motion for a new trial based on the weight of the evidence, the court has:

to some extent at least, substituted [its] judgment of the facts and the credibility of witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts. . . .

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

*Id.* (quoting *Lind v. Schenley Indus., Inc., 278 F.2d 79, 90* **[*73]** *(3d Cir.) (en banc), cert. denied, 364 U.S. 835, 5 L. Ed. 2d 60, 81 S. Ct. 58 (1960)); see also Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993).* Therefore, a trial judge should exercise caution and grant a new trial because the verdict is against the weight of the evidence only where a jury's verdict results in a "miscarriage of justice," "cries out to be overturned," or "shocks [the] conscience." *Williamson, 926 F.2d at 1353* (citing *EEOC v. Delaware Dep't of Health & Soc. Servs., 865 F.2d 1408, 1413 (3d Cir. 1989)).*

For reasons similar to those set forth in the Court's discussion of the evidence as applied to Pathmark's motion for JMOL, the Court finds that the jury's verdict did not result in a miscarriage of justice, nor cry out to be overturned, nor did it shock the conscience. *Id.* The Court will not grant Pathmark's motion for a new trial on the ground that the jury's verdict was against the weight of the evidence.

**2. Asserted Errors in Jury Instructions**

Pathmark also asserts a new trial is warranted because the Court's jury charge was erroneous in several respects. Erroneous jury instructions **[*74]** may serve as the basis for a new trial. *See Waldorf v. Shuta, 896 F.2d 723, 730 (3d Cir. 1990). Federal Rule of Civil Procedure 59(a)* n24 is the procedural authority under which a trial court may consider a motion for a new trial. *See Finch, 941 F. Supp. at 1413.* "In evaluating a motion for a new trial on the basis of trial error, the Court's inquiry is two-fold: (1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be 'inconsistent with substantial justice.'" *Id. at 1414* (quoting *Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989)* (quoting *Fed. R. Civ. P. 61), aff'd, 922 F.2d 184 (3d Cir. 1990), cert. denied, 501 U.S. 1217, 115 L. Ed. 2d 997, 111 S. Ct. 2827 (1991)).*

n24 This rule provides in pertinent part:

(a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . .

*Fed. R. Civ. P. 59(a).*

**[*75]**

**a. Major Life Activity of Working**

Pathmark contends the Court erred in instructing the jury concerning the definition of disability and of the "major life activity of working" under the ADA. n25 First, Pathmark contends it was error for the Court to incorporate EEOC guidelines into its disability instructions. Second, Pathmark argues that Mondzelewski should not have been allowed to proceed on the theory that "working" is one of the "major life activities" under the ADA.

n25 The court instructed the jury on the definition of disability and the major life activity of working as follows:

. . . A person is disabled if he has a physical or mental impairment that substantially limits one or more of the major life activities of that person.

In this case, the parties agree that Mr. Mondzelewski's back injury is a physical impairment. However, a physical impairment standing alone is not necessarily a disability as defined by the ADA. Instead, it has to be an impairment which substantially limits a major life activity of that person.

The only disability Mr. Mondzelewski is claiming to suffer from is in connection with the major life activity of working. Therefore, if Mr. Mondzelewski was substantially limited in the major life activity of working, he was disabled.

In order to be disabled in the major life activity of working, an individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training[,] skills[,] and ability.

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 34 of 36

Page 19
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

There is no requirement that Mr. Mondzelewski demonstrate he is totally disabled. To be substantially limited in the major life activity of working, then, Mr. Mondzelewski must show he is precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing Mr. Mondzelewski's skills, but perhaps not his unique talents, are available, then he is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, he is not precluded from a broad range of jobs. In evaluating the evidence, your examination must be an individualized one comparing Mr. Mondzelewski, with his physical impairment, to other workers who have comparable training, education, skills, abilities and age, but who do not have his physical impairment.

H-24-25 (D.I. 143).

[*76]

On July 2, 1999, Pathmark's counsel wrote a letter to the Court objecting, based on the Supreme Court's recent decision in *Sutton*, to the Court's proposed disability instructions, which were based on regulations and interpretive guidance promulgated by the Equal Employment Opportunity Commission ("EEOC"). In *Sutton*, the Supreme Court determined that, although the EEOC has the authority to promulgate regulations for employment-related provisions of the ADA, no federal agency had been given statutory authority to issue regulations implementing the generally-available provisions of the ADA, in particular, that "no agency has been delegated authority to interpret the term 'disability.'" *119 S. Ct. at 2145.* Relying on this language in *Sutton*, Pathmark asked the Court to avoid reliance on EEOC regulations and confine its instructions on disability to the language found in the statute itself. n26

n26 In the July 2, 1996 letter, Pathmark further requested the Court to change the instruction regarding the major life activity of working "to reflect the Supreme Court's guidance, as expressed in *Sutton*, that 'if jobs utilizing an individual's skills (but perhaps not his or her unique

talents) are available, one is not precluded from a broad range of jobs.'" This the Court did. H-25 (D.I. 143). The Court's jury instruction on "substantially limited in the major life activity of working" incorporated the following language from *Sutton*, which includes the language requested by Pathmark's attorney practically verbatim:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*119 S. Ct. at 2151.*

[*77]

Had the Court complied with Pathmark's request to limit its jury charge on the definition of disability to the statutory language itself, it would have left the jury to fend entirely for itself in trying to interpret a statute about which Pathmark has said, "Dante himself would no doubt be impressed with the circularity and impenetrability of the statute." D.I. 153 at 28. Therefore, prudence and a sense of duty demanded the Court provide the jury with some further explanation of the statutory language.

The Court concludes its instructions to the jury on disability, including the major life activity of working, were not in error. Contrary to Pathmark's suggestion, *Sutton* does not require or counsel eliminating all reliance on EEOC Regulations and Interpretive Guidance. In *Sutton*, the Court explicitly declined to rule on whether or not the EEOC's Regulations or Interpretive Guidelines were valid or due any sort of deference. *119 S. Ct. at 2145.* Furthermore, the *Sutton* Court went on to use EEOC guidance in determining whether the plaintiffs in that case were "regarded as" disabled because the parties had agreed that the regulations applied. *Id.* at 2150-52. Thus, [*78] the Court may see some role for the EEOC Regulations, even if they are not due the extreme deference once given them. Moreover, to this point, controlling caselaw on the ADA from the Third Circuit Court of Appeals incorporates the EEOC's Regulations and Inter-

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 35 of 36

Page 20

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

pretive Guidelines. *See, e.g., Mondzelewski, 162 F.3d at 782-86.* It follows it was not error for this Court to incorporate the EEOC Regulations and Interpretive Guidelines into its instructions on disability.

Second, in its motion for a new trial, Pathmark now appears to argue that it was improper for the case to be tried to the jury on the theory that Mondzelewski was disabled because he was substantially limited in the major life activity of working. Pathmark's contention is based on some dicta in *Sutton* which suggests the Supreme Court may have some conceptual difficulty with "working" being included among "major life activities." *See* D.I. 153 at 29 (citing *Sutton, 119 S. Ct. at 2151).* The cited dicta in *Sutton* does not alter controlling case law in this jurisdiction, and this case in particular, that working is included among the major life activities under the ADA's definition [*79] of disability. *See Mondzelewski, 162 F.3d at 782-86.* Therefore, the Court did not err in instructing the jury that working was included among the major life activities.

Moreover, at trial, the only major life activity in which Mondzelewski claimed he was substantially limited, to support his claim that he was an individual with a disability, was working. The trial was conducted based on an acceptance by both parties and the Court that the term "major life activities" included "working." Having not previously raised an objection or argument that working is not among the major life activities to the Court before or during trial, and Pathmark having not objected to the Court's final instructions on disability at the jury instruction conference, D.I. 137, at 15, Pathmark cannot now assign error to the Court's disability instructions on this basis. *See Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc., 180 F.3d 542, 549 (3d Cir. 1999); Fed. R. Civ. P. 51.*

**b. Respondeat Superior**

Pathmark also contends the court committed reversible error in its instructions on respondeat superior liability relating to the definition of "manager." The Court [*80] instructed the jury as follows:

> Pathmark is responsible for the conduct of its managers, that is management personnel. A manager is an employee who, while not necessarily the top management, directors or officers of the company, is important to the company. In making your determination as to whether a particular individual is a manager, you should consider the type of authority Pathmark has given to the employee, the amount of discretion the employee has in

what is done and how he or she actually accomplishes what is done. In determining whether a Pathmark employee is a manager, you should consider the function of the employee in the company, not his or her title.

H-21 (D.I. 143). Pathmark objects to the instruction based on a concern that the second sentence, particularly the word "important," is vague. D.I. 137, at 10-12, 14. This language is derived from the Supreme Court's opinion in *Kolstad v. American Dental Ass'n, 527 U.S. 526, 119 S. Ct. 2118, 2128, 144 L. Ed. 2d 494 (1999)* ("The examples in the Restatement of Torts suggest that an employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' [*81] to be acting 'in a managerial capacity.'" (citations omitted)). Because the Court finds nothing vague about the word "important," the Court finds no error in its instruction.

**c. Pathmark's Request for Clarification to the Jury Regarding Mondzelewski's Period of Disability**

Next, Pathmark argues that the Court erred by failing to clarify to the jury that Mondzelewski's permanent back disability, which rendered him unable to work after December 1997, was not relevant to a determination regarding whether Mondzelewski was disabled within the meaning of the ADA during the relevant time period. Prior to the Court charging the jury, counsel for Pathmark expressly raised this concern and asked the Court to make a clarifying instruction. H-6-9 (D.I. 143). Before the Court made any definitive ruling as to whether the jury charge would be altered in light of Pathmark's request, Mondzelewski's counsel represented that in his closing he would "tell the jury there is no claim for disability beyond the point when [Mondzelewski] retired." H-9 (D.I. 143). Counsel for Pathmark agreed that this would be an acceptable solution to her concern. *Id.* During summation, however, Mondzelewski's [*82] counsel failed to make the clarification. Counsel for Pathmark did not raise any objections or request the Court to make such a clarification at the time. Having failed to preserve the objection by bringing it to the Court's attention at the conclusion of summation, Pathmark cannot now assign error to the Court's failure to give a clarifying instruction. *See, e.g., Cooper Distribution Co., 180 F.3d at 549.*

**3. Assertion that Jury was Swayed by Passion and Prejudice**

Finally, Pathmark asserts it is entitled to a new trial on the ground that the jury's verdict in this case was so excessive that it inherently demonstrates that the jury was swayed by passion or prejudice, citing *Auster Oil &*

Case 1:06-cv-00225-MPT    Document 6-3    Filed 05/05/2006    Page 36 of 36

Page 21

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

*Gas, Inc. v. Stream, 835 F.2d 597, 603 (5th Cir. 1988).* A new trial is the proper remedy if it is shown that a jury verdict was the result of passion or prejudice. *Inter Med. Supplies, Ltd. v. E.I. Med. Sys., Inc., 181 F.3d 446, 464 (3d Cir. 1999)* (citing *Dunn v. HOVIC, 28 V.I. 467, 1 F.3d 1371, 1383 (3d Cir. 1993)*(en banc)). However, the Third Circuit Court of Appeals has "rejected the argument that 'the size of the award alone **[\*83]** is enough to prove prejudice and passion.'" *Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 114 (3d Cir. 1999)* (citing *Dunn, 1 F.3d at 1383), cert. denied 145 L. Ed. 2d 663, 120 S. Ct. 786 (2000); see also Inter Med. Supplies, 181 F.3d at 464* (rejecting argument that $ 100,600,000 punitive damage award that was remitted to $ 50,000,000 was so excessive as to indicate the jury's decision was the product of passion or prejudice). Because Pathmark's "only evidence of jury prejudice and passion is the amount of the [] damage award itself . . . [Pathmark's] argument cannot prevail." *Hurley, 174 F.3d at 114.*

### C. Motion for Remittitur or New Trial on Damages

As a fallback position, Pathmark moves for remittitur of Mondzelewski's award in all categories of damages, or for a new trial on the issue of damages, pursuant to *Fed. R. Civ. P. 59(a)*. If a court concludes a jury verdict is "clearly unsupported" by the evidence and/or "excessive," it may deny a motion for a new trial on the condition that the plaintiff accept a remittitur of the jury's verdict. *Starceski, 54 F.3d at 1101; Spence, 806 F.2d at 1201.* **[\*84]** Alternatively, the Court may grant a new trial on damages because the jury's award is so entirely disproportionate to the injury to the plaintiff that it "cries out to be overturned or shocks [the] conscience" of the Court. *Williams, 926 F.2d at 1353.* A trial court's decision to grant or withhold remittitur or order a new trial on damages lies within the discretion of that court and "cannot be disturbed absent a manifest abuse of [such] discretion." *Starceski, 54 F.3d at 1100.*

Pathmark contends that both the Jury's verdict of $ 3.85 million and the judgment of $ 1,000,000 entered by the Court are grossly excessive and disproportionate to

Mondzelewski's injury and contrary to the great weight of the evidence presented. As already set forth *supra*, the judgment for Mondzelewski on the workers' compensation retaliation claim, and the corresponding $ 700,000 in combined compensatory and punitive damages for that claim, will be vacated. Thus, Mondzelewski will receive only $ 300,000 compensatory damages for his ADA claims due to the statutory damages cap. Much of Pathmark's remittitur argument is addressed to the punitive damages award and, therefore, **[\*85]** is moot.

With respect to the compensatory damages, evidence was presented at trial regarding Mondzelewski's past and projected future medical expenses totaling approximately $ 91,000. There was also substantial testimony that Mondzelewski experienced extensive emotional and long-lasting psychiatric damages, accompanied by physical manifestations, and the jury apparently concluded that such damages were the result of Pathmark's conduct toward him. Based on this evidence, the Court concludes that a total award of $ 300,000 to Mondzelewski, including approximately $ 209,000 for pain and suffering, is "neither excessive as a matter of law nor 'clearly unsupported' by the record." *Starceski, 54 F.3d at 1101* (citing *Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 178 (5th Cir. 1992)* ("A verdict is excessive as a matter of law if shown to exceed 'any rational appraisal or estimate of the damages that could be based upon the evidence before the jury.'" (quotation omitted)). Therefore, the Court will not grant further remittitur of the jury verdict or grant a new trial on damages on the ground that the verdict was excessive.

### IV. CONCLUSION

For the **[\*86]** reasons set forth, the Court will vacate the Judgment as to the jury's verdict of liability and damages on the workers' compensation retaliation claim. In all other respects, Pathmark's motion will be denied. Judgment will be entered for $ 300,000 compensatory damages on the ADA discrimination and retaliation claims.