IN THE UNTIED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALAN D. PAUL,                          )
                                       )
            Plaintiff,                 )
                                       )        C.A. No.: 06-225-KAJ
      v.                               )
                                       )        Trial By Jury Demanded
DELOITTE & TOUCHE, LLP,                )
and DELOITTE & TOUCHE, USA, LLP,  )
                                       )
            Defendants                 )


**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS OR ALTERNATIVELY SUMMARY JUDGMENT**
**(Massachusetts Discrimination Statute)**


                              GARY W. ABER (DSB #754)
                              Aber, Goldlust, Baker & Over
                              First Federal Plaza, Suite 600
                              702 King Street, P.O. Box 1675
                              Wilmington, DE  19899
                              302-472-4900
DATED:  August 1, 2006        Attorney for Plaintiff

## TABLE OF CONTENTS

**Page No.**

NATURE AND STAGE OF THE PROCEEDINGS      4

SUMMARY OF ARGUMENT      5

ARGUMENT

     THE PARTNERSHIP AGREEMENTS BETWEEN THE
     PARTIES DO NOT PRECLUDE APPLICATION OF
     MASSACHUSETTS DISCRIMINATION LAW      6

CONCLUSION      12

## TABLE OF CITATIONS

**Page No.**

Burnett v. Physicians' Online, Inc.
　　1997 WL 470136 (S.D.N.Y. 1997)　　　　　　　　　8

Gloucester Holding Corp. v. U.S. Tape and Sticky Products LLC
　　832 A.2d 116 (Del.Ch. 2003)　　　　　　　　　7, 8, 11

Olinick v. BMG Entertainment
　　42 Cal.Rptr.3d 268 (2006)　　　　　　　　　　10

Oregon v. Byron, et.al.
　　C.A. No.: 05-867 (JJF) (D.Del. 6/5/06)　　　　7, 8, 11
　　　　(Defendant's Exhibit "C")

Plimack v. Copley Pharmaceutical, Inc.
　　1995 WL 606272 (S.D.N.Y. 1995 at p. 5)　　　　10

Robinson v. Ladd Furniture, Inc.
　　995 F.2d 1064 (4th Cir. 1993);
　　1993 WL 211309 (4th Cir. 1993)　　　　　　　9, 10

## NATURE AND STAGE OF PROCEEDINGS

A complaint in this matter was filed on April 6, 2006 (Dk-1). As of the date of this brief, the defendants have not filed an answer to the Federal Claims ("ADEA") in this matter, although this Court clearly has jurisdiction to hear such a claims, 28 U.S.C. §1331 and 1332. Rather, the defendants have filed multiple motions to dismiss other portions of the complaint. [1]

The initial complaint in this matter asserted as a means of recovery the Delaware Statute prohibiting age discrimination. By agreement of the parties, that claim was dismissed since the Delaware Statute was enacted before the wrongful conduct alleged in the complaint (Dk-1). The plaintiff then, pursuant to the provisions of Rule 15(a), Federal Rules of Civil Procedure, amended his complaint asserting the Massachusetts State Statute prohibiting age discrimination applicable to the site of the wrongful conduct of this matter. [2]

Specifically in this matter the defendants have filed a motion to dismiss the amended complaint (Dk-5), seeking to apply the law of the state where the alleged wrongful conduct took place, the Massachusetts discrimination statues (Dk-12 and 13). This is the Plaintiff's Answering Brief in Opposition to the Motion to Dismiss.

---

[1] Presently pending before the Court is the defendants' first motion to dismiss, as to the assertions of supplemental jurisdiction over the Delaware State Law claim applicable through the interpretation of the agreements between the parties (Dk-5, ¶¶6, 9, and 11).
[2] The Motion to Amend also contained a correction of a typographical error as to the name of the plaintiff eliminating one "L" from the plaintiff's name and restated the plaintiff's name as "Alan D. Paul". The defendant has not objected or opposed that amendment. (Dk-7 and 8).

## SUMMARY OF ARGUMENT

The partnership agreements signed and entered into by the plaintiff and defendants have two separate provisions, which govern this matter.[3] Those agreements provide that any litigation arising under or relating to the agreements, or relating to the partnerships or their business shall be brought only in the Courts of the State of Delaware (Deloitte & Touche, LLP, §13.02; Deloitte & Touche, USA, LLP, §14.02). By contrast, the governing law provisions of those agreements, Deloitte & Touche, LLP§13.02 and Deloitte & Touche, USA, LLP §14.02, require that the law of the State of Delaware shall govern as to the agreements themselves, as signed by the parties. The "Governing Law" sections do not require and do not contain the broader language contained in the "Situs of Litigation" sections, §§13.04, 14.04, which require the matters relating to the agreement or to the partnership to be litigated in Delaware. Accordingly, the "Governing Law" provisions of the agreements do not foreclose claims which are not based upon the agreement itself from being brought in Delaware, and applying Delaware Conflict of law rules, and there by applying the statutes of the state where the wrongful conduct occurred.

---

[3] There are two agreements since there are two defendants, Deloitte & Touche, LLP, and Deloitte & Touche, USA, LLP. (Defendant's Exhibit A & B)

## ARGUMENT

## THE PARTNERSHIP AGREEMENTS BETWEEN THE PARTIES DO NOT PRECLUDE APPLICATION OF MASSACHUSSETTS DISCRIMINATION LAW.

The partnerships between the plaintiff and the defendants contain two separate and distinct sections which apply to this litigation.  The venue sections, denoted "Situs of Litigation" is a much broader section that the "Governing Law" sections.  The venue sections provides as follows:

> "Situs of Litigation -  Any claims (a) relating to the partnership (b) involving any Partnership or Parties or the respective executors, administrators, heirs, legatees, devisees, trustees, receivers, or other personal representatives and any other person claiming by, through. or under such person (i) arising under or relating to this agreement, (ii) **relating to the partnership or its business**, or (iii) relating to any other agreement between the partnership or any other person or persons listed above in this clause (b) (including persons claiming by, through, or under any Parties or any other person or persons), shall be brought only in the Courts of the State of Delaware or Federal Courts sitting in the State of Delaware and not in any other State or Federal Court in the United States of America, or any Court in any other country." Deloitte & Touche, LLP, §13.04; Deloitte & Touche, USA, LLP §14.04. (Emphasis Added).

The language of the venue section clearly and unequivocally states that any litigation regarding the relationship between the plaintiff and the partnership must be brought in the State of Delaware.  Following those requirements, the plaintiff brought this claim, alleging among other things, a violation of 29 U.S.C. §621 et.seq. ("ADEA" Claim), in this, the Delaware District Court

By contrast, in the amended complaint, the plaintiff has asserted a claim under the "Massachusetts Fair Employment Practices Act", M.G.L. c 151B, Section 4(1). Such a claim is permitted under the "Governing Law" provisions of the partnership agreements.  Those provisions provide:

"Governing Law - **This agreement** shall be deemed to be executed in the City of Wilmington, State of Delaware, regardless of the domiciles of the several parties hereto or where it is in fact executed, and shall be governed and **construed in accordance with the laws of Delaware**, without giving effect to its conflict of law rules..." Deloitte & Touche, LLP §13.02, and Deloitte & Touche, USA, LLP §14.02 (Emphasis Added).

As can be clearly seen, the "Governing Law" provisions of the partnership agreements, limit the application of Delaware Law to disputes involving the agreements themselves.   They do not contain the more expansive language contained in §13.04 and §14.04, which relate to the relationship of the partnerships.

The sole judicial decision relied upon by the defendants, Oregon v. Byron, et.al., C.A. No.: 05-867-JJF (D. Del. 6/5/06)(Defendant's Exhibit "C") makes this very same distinction.  In rejecting the plaintiff's reliance, in Oregon, supra, on Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC, 832 A.2d 116 (Del.Ch. 2003), the Court found that the choice of law clause relied upon by the Delaware Chancery Court was not as broad as the clause considered in Oregon. The Court noted in Gloucester "...the clause expressed a limited reach to the 'rights of the parties derived from the contract' (citing to Gloucester, supra, at p. 124)" Oregon v. Byron, supra, at p. 8.   In Gloucester the Court found that since the choice of laws provision restricted itself to the "rights of the parties derived from the contract", and that such language was not sufficiently broad enough to cover tort claims, including claims for fraud and inducement.   Thus, the Gloucester Court held that the choice of law provisions which required the application of Delaware Law to any rights derived from the contract, would not apply to tort law. The Oregon Court acknowledged that the Delaware Court's rely upon the Restatement 2d, Conflict of Laws provisions in interpreting such disputes as here presented. Oregon, supra, at p. 9.   The Gloucester  Court specifically relied upon the Restatement 2d,

Conflict of Laws, §145(1), which states that the local laws of the state where a tort occurred would provide the governing law.  Thus, since the provision of the contract involved in  Gloucester  was "insufficiently broad" Oregon, supra, at p.8  the Gloucester Court held that the tort law of Massachusetts would apply.

Other Courts faced with a choice of law provisions in contracts, have similarly ruled that where the contract language is not so broad as to cover all claims, it is limited only to the claims contained in the contract itself.  This is especially true with regards to discrimination claims.  In Burnett v. Physicians' Online, Inc., 1997 WL 470136 (S.D.N.Y. 1997)(Attached hereto as Exhibit "1"), the case was originally filed in California, and later transferred to the Southern District of New York.  The action included various claims, including, fraud, negligent misrepresentation, breach of employment agreement and securities fraud.  The complaint also contained a claim (the 9th claim) for "gender based discrimination in violation of the California Fair Employment and Housing Act". Interpreting the agreement between the parties the New York Court held that the choice of law provisions applied only to "...disputes arising out of the contract..." Burnett, supra, at p. 12.  As cited by the Court, the contract language there was:

> "This agreement shall be governed and construed in accordance with the laws of the State of New York." Id.

The Court went on to explain that the claim of the violation of California's Discrimination statute, did not arise out of the agreement between the parties, but relied upon state statutory law.  The Court thus concluded that the choice of law provision did not preclude a cause of action based upon California law, although the action was being brought in New York, and would apply New York law as to the agreement itself.

Similarly, in an unreported decision by the Fourth Circuit Court of Appeals, Robinson v. Ladd Furniture, Inc., 995 F.2d 1064 (4th Cir. 1993); 1993 WL 211309 (4th Cir. 1993)(Exhibit No. 2 attached hereto), the Court was faced with a claim for age discrimination based upon "California's Fair Employment and Housing Act".  There the action was brought in North Carolina pursuant to a choice of law provision in a sales agreement.   The plaintiff there was an independent contractor and the agreement between the plaintiff and defendant stated that the agreement was governed by North Carolina Law and any disputes under the agreement were to be resolved in North Carolina courts.   This is similar to §§13.02,13.04, 14.02 and 14.04 of the agreements between the plaintiff, and the Deloitte & Touche entities, which required that the agreement would be construed in accordance to the Laws of the State of Delaware, and any disputes relating to the relationship between the parties would be litigated in Delaware Courts.   The Court in Robinson stated that the key question to be decided, was whether the claims for age discrimination, under California Law, involved the interpretation of the sales agreement.   The Court found that the claims for age discrimination but did not arise out of the agreement, but arose out of the state statute itself and stated:

> "As such, the liability imposed is *ex delicto* rather then *ex contracto* and the contractual choice of law provision governs only if the issue of contractual instruction interpretation or enforceability is raised. Robinson v. Ladd Furniture, Inc., 1993 WL 211309 at p. 4.

The Court continued and concluded:

> "We believe that the choice of law provision in the agreement is
> similarly inapplicable to Robinson's age discrimination claims. The
> duty violated by the alleged age discrimination arises out of statute
> and tort, not from any provision in the sales agreement."
> Robinson v. Ladd Furniture, Inc., supra, at p. 6.[4]

An interpretation of similar language in a dispute in the District Court of New York, deciding whether or not to apply New York Law, the site of the wrongful conduct, or apply Massachusetts Law, as required under an agreement. There the applicable contractual language stated:

> "This agreement **shall be governed by and construed in accordance
> with the laws of the Commonwealth of Massachusetts**. Plymack v.
> Copley Pharmaceutical, Inc., 1995 WL 606272 (S.D.N.Y. 1995, at p.5).
> (Emphasis Added)(Attached as Exhibit No. "3")

This language is virtually identical to the language contained in the agreements between the plaintiff and the Deloitte & Touche entities, which states:

> "This agreement...**shall be governed and construed in accordance
> with the laws of the State of Delaware**." §§13.02/14.02/ Deloitte &
> Touche, LLP and Deloitte & Touche, USA, LLP.

The Plymack Court then went on to explain that the contractual choice of law provision, as cited above, did not  bind the parties with respect to non-contractual causes of

---

[4] The plaintiff is compelled to bring to the Court's attention the decision by a California Appellate Court, Olinick v BMG Entertainment, 42 Cal.Rptr.3d 268 (2006) See: Delaware Professional Rules of Conduct:  Rule 3.3 93)., which held that an employment agreement's choice of law provision required the application of New York Law under the agreement.    However, the agreement interpreted by the Olinick Court was, broader than the agreements between the parties in this matter.  There, the agreement applied to "...the resolution of all disputes arising under this agreement."   The agreements between the plaintiff and defendants, does not contain any such expansive language in §§13.02 and 14.02, but rather limits themselves to disputes involving the agreements themselves.

action.  The Court also went on to explain other authority where the contracts would be more expansive if they contained language which stated "arising out of or relating to the contract".  No such language was present in the <u>Plymack</u> case, as no such language is present in the Deloitte & Touche agreements.

Without the expansive language contained in the decision relied upon by the defendants, <u>Oregon v. Bryon</u>, supra, the choice of law provisions of the Deloitte & Touche agreements do not bar the application of the Massachusetts statute, since, that is the situs of the alleged wrongful conduct, i.e. age discrimination in this matter. (See Complaint, ¶15-17).  As was stated in <u>Gloucester Holding Corp v. U.S. Tape and Sticky Products</u>, supra, Delaware's choice of law rules would require the application of <u>Restatement 2d, Conflict of Laws</u> 145(1), which itself requires the application of the laws of the State with the most significant relationship to the occurrence, in this case Massachusetts.

One additional reason which calls for the application of Massachusetts Law in this case. The Massachusetts administrative body, which investigates discrimination claims, in the same manner as does the Delaware Department of Labor, has now dismissed the charge brought by the plaintiff, in Massachusetts, since this action has now been filed, as required by the agreement, in Delaware Courts (Exhibit No. "4", Attached).  Thus, without this Court applying applicable Massachusetts Law, the plaintiff will be denied any right to enforce Massachusetts Law.  It must be remembered that this suit has been brought in Delaware, not under the "Governing Law" provisions of the agreements, but rather under the "Sites of Litigation" provisions, Deloitte & Touche, LLP, §13.04 and Deloitte and Touche, USA, LLP §14.04.  This Court should not permit

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.                                                        Page 1

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Terrill Hill BURNETT, Plaintiff,
v.
PHYSICIANS' ONLINE, INC., Christian
MAYAUD, M.D., William J. GREENBERG, and
Steven HOCHBERG, Defendants.
**No. 94 CIV. 2731 TPG.**

Aug. 15, 1997.

*OPINION*

GRIESA, Chief Judge.
**\*1** Burnett brought this action for damages
stemming from her termination as an officer and
director of Physicians' Online ("POL"). When this
action was filed, POL had already commenced a
declaratory judgment action in New York State
Supreme Court.

Defendants filed a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6) or, in the alternative, to have
the federal court abstain pending resolution of the
state court case. The court granted the motion for
abstention and dismissed the case with leave to
reopen at the conclusion of the state court
proceedings. The Second Circuit, however,
vacated the order and remanded the action.

Defendants have now withdrawn their motion to
abstain and have requested a ruling on the merits of
their motion to dismiss.

The motion is granted in part and denied in part.

Procedural History

POL commenced an action for declaratory
judgment against Burnett in New York Supreme

Court on July 22, 1993 seeking various declarations
with respect to Burnett's employment and eventual
termination. On October 19, 1993 Burnett
commenced an action for damages in federal district
court in the Central District of California.

In December 1993 defendants filed a motion to
dismiss in the federal court action or, in the
alternative, for transfer to the Southern District of
New York. The motion to transfer was granted and
the action was transferred to the Southern District in
April 1994.

Meanwhile, the state court action was proceeding
apace. On September 27, 1994 the state court
granted summary judgment dismissing one of POL's
claims. A motion for summary judgment on
several other claims was fully submitted on
November 7, 1994.

On February 26, 1996 this court dismissed the
federal case, abstaining in view of the state court
action, with leave to reopen the federal case at the
conclusion of the state court action. Burnett
appealed and, in an opinion dated October 25,
1996, the Second Circuit remanded the action with
a direction to further consider the abstention point.

While the federal appeal was pending, the state
court issued two decisions resolving additional
claims in the state court action.

As already described, defendants seek a decision on
the merits regarding their motion to dismiss. They
no longer rely on the request for abstention.

The Complaint

Burnett filed an amended complaint in the federal
court action on November 3, 1993. The complaint
states that Burnett is a 41-year-old woman with
postgraduate degrees in business administration and
international business, and 12 years of experience in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 2

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

marketing. Defendant POL is a Delaware corporation with its principle place of business in Tarrytown, NY. The individual defendants-Christian Mayaud, Steven Hochberg, and William Greenberg-are officers and directors of POL. Mayaud is Burnett's brother-in-law.

It is alleged that Mayaud and Greenberg formed POL in 1992 for the purpose of developing a computer network for medical doctors. Since neither of the initial shareholders had any business or marketing experience, Mayaud frequently solicited advice from Burnett on business matters such as drafting a business plan.

**\*2** The complaint alleges that Mayaud soon asked Burnett to become a director of POL and to devote substantial time and effort to the fledgling company. During telephone conversations prior to July 1992 Mayaud allegedly told Burnett that she would be one of the founders of the company and also a significant shareholder. He suggested that Burnett would initially handle marketing and other work for POL from California but that soon she would move to the East Coast to work in the New York office. Mayaud allegedly told Burnett that eventually they would turn day-to-day operations over to others so that they could pursue other business ventures related to POL.

Burnett alleges that, based on Mayaud's representations, she began working for POL by revising and implementing the POL business plan and conducting extensive discussions with Mayaud and others over the phone and in person. In August 1992 Burnett spent a week in Detroit, Michigan on a "working vacation" with Mayaud. In late September Burnett traveled to New York to meet with Mayaud and Greenberg for two days.

The complaint alleges that on September 29, 1992 Mayaud telephoned Burnett to discuss the corporate structure of POL. Mayaud allegedly stated that he wanted to be president of POL but that he wanted Burnett, Greenberg and Hochberg to be equals. Mayaud also allegedly stated that Burnett would be paid an initial salary of $96,000, to be deferred until financing was in place.

The complaint alleges that in February 1993 Burnett and defendants executed a Stockholders' Agreement; that pursuant to the Stockholders' Agreement, Burnett subscribed to purchase 720 shares of POL stock for $7,200, which later split into 1,440 shares; that the Stockholders' Agreement provided that Burnett, Mayaud, Greenberg and Hochberg would be the four directors of POL and provided that they would remain directors as long as they owned stock in the company; and that the Stockholders' Agreement provided that Burnett and defendants would be officers of the corporation as follows: Mayaud chairman, president and chief executive officer; Greenberg chief technical officer and assistant secretary; Hochberg chief operating officer and treasurer; Burnett chief marketing officer ("CMO") and secretary. Regarding the right to repurchase shares, the complaint states:
It was agreed POL had a "right to repurchase" shares of the parties to the agreement if:
(i) A stockholder was found to have rendered an "ineffective performance" which "contributed materially" to the failure to attain one of the POL goals, which were: (I) POL signing a written contract with a pharmaceutical industry client or sponsor; (II) POL obtaining financing to bring the system on-line to physicians; (III) POL system available to physicians nationwide; (IV) POL operating on-line for 12 months, or "breaking even" for two consecutive months;
(ii) A stockholder was terminated from employment with POL "for cause," defined as breach of the shareholders' agreement, willful failure to follow the directive of the board of directors, knowingly acting fraudulently or dishonestly in relation with POL, for conviction of a crime involving an act of moral turpitude ....

**\*3** The complaint also alleges that the right to repurchase was limited to 100 shares times the number of goals that had not been met at the time of repurchase.

Even before the Shareholders' Agreement was reached, POL began soliciting individuals to invest in the company. The complaint alleges that Hochberg and another investor jointly bought 300 shares for $60,000 and that Burnett and another investor jointly bought 150 shares for $30,000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

The complaint alleges that in conjunction with the latter sales, Mayaud delayed the transaction with Burnett although the transaction with Hochberg went smoothly. Burnett alleges that she delivered a check for $30,000 to Mayaud on or about January 26, 1993. Although he immediately cashed the $60,000 check from Hochberg, Mayaud did not negotiate Burnett's check until mid-March. According to the complaint, Mayaud told Burnett that he had a folder of checks from investors that had not been cashed. On or about February 23, Burnett requested documentation of her purchase from Mayaud. The complaint alleges that in response Mayaud sent her a promissory note for $30,000 convertible into 120 shares of POL stock, not the 150 shares upon which they had agreed. When Burnett pointed out this discrepancy, Mayaud stated, "Steve [[Hochberg] and I talked to an attorney, and the values have changed [[for POL]" When Burnett argued that the contract of sale was binding, Mayaud relented and issued a new promissory note. Burnett and her co-investor converted the note into 150 shares of stock on or about April 28, 1993.

The complaint alleges that POL underwent a second round of financing in April 1993. Allegedly, the company raised approximately $180,000 by offering units of 100 shares of stock for $40,000 per unit.

Burnett alleges that defendants met with representatives from INVESCO Funds Group in Chicago on or about June 10, 1993. Burnett alleges that she was excluded from this meeting. INVESCO soon invested approximately $2 million in POL and the related Med-E-Mail business in exchange for POL preferred stock convertible into common stock representing approximately 34% of the outstanding shares of common stock. INVESCO also received an ownership interest in Med-E-Mail. The complaint does not indicate the relationship between POL and Med-E-Mail.

The complaint alleges that Burnett devoted substantial effort to the success of POL, including developing business and marketing plans, selecting an advertising agency, and establishing relationships with pharmaceutical companies. In addition to these services, Burnett alleges that she personally guaranteed a lease agreement for a Sun computer system which exposed Burnett to potential liability exceeding $280,000. Burnett also alleges that she took steps to move to the East Coast, including enrolling her children in summer camp in Connecticut, interviewing schools for her children, and looking for rental properties.

The complaint alleges that on April 15, 1993 after a presentation to a pharmaceutical company, Mayaud told Burnett that communications between Burnett and the other POL officers were "not working" and that no one wanted to work with Burnett. The complaint alleges that Mayaud stated, "We only gave you those 150 shares [instead of 120 shares] to keep you from crying." Mayaud allegedly became so agitated during the conversation that he threw a cup filled with coffee at Burnett's feet.

*4 Burnett alleges that a total breakdown in communications ensued. Defendants allegedly withheld all information on the company from Burnett, closed Burnett out of meetings, and refused to accept her input and advice. The complaint alleges that in May 1993 Mayaud told Burnett not to move to the East Coast.

On June 22, 1993 defendants held a special meeting of the board of directors and voted to remove Burnett as CMO and Secretary. The complaint alleges that no explanation was given for the removal.

Burnett alleges that after her removal defendants refused to provide her with information about the company even though she remained a director and a shareholder.

The complaint alleges that on August 30, 1993 defendants held a meeting of the board of directors with Burnett participating by telephone. At that meeting, defendants approved the INVESCO deal and also approved resolutions amending the by-laws of POL and the certificate of incorporation. The complaint alleges that defendants also granted themselves stock options and other ownership interests that substantially diluted Burnett's interest in POL.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Based on the foregoing allegations, Burnett asserts nine claims for relief. The first three pertain to Burnett's purchase of the 1,440 shares, not the subsequent purchase of 150 shares. All the claims are against all defendants, except the seventh.
1. Sale of unregistered securities in violation of § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1).
2. Misrepresentation or omission in connection with the sale of a security in violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2).
3. Securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)

4. Common law fraud.
5. Breach of fiduciary duty.
6. Negligent misrepresentation.
7. Breach of employment agreement, against POL and Mayaud.
8. Quantum meruit.
9. Gender based discrimination in violation of the California Fair Employment and Housing Act, §§ 12900 *et seq.*

Under claims one and two, Burnett seeks "return of the consideration provided for the purchase of such shares." Under claim three, Burnett seeks damages resulting from the alleged fraud.

The State Court Action

POL's declaratory judgment action against Burnett was commenced in New York State Supreme Court on June 22, 1993. Her federal action in the Central District of California was commenced in October 1993. Since the federal action contained two claims for rescission under the Securities Act of 1933, POL sent a letter to Burnett on December 15, 1993 accepting her "proffer" of the 1,440 shares in exchange for the sale price of $7,200. On the same day, POL amended its complaint in the state court action to include a request for the court to declare the rescission binding.

Thus, the amended complaint in the state court declaratory judgment action contained requests by POL for the following nine declarations:
*5 1. POL has the right to repurchase shares from

Burnett pursuant to the January 22, 1993 stockholders' agreement.
2. Burnett was validly removed as CMO and secretary at the special board meeting on June 22, 1993.
3. Pursuant to the August 30, 1993 amendment of corporate by-laws, Burnett was validly removed as CMO and secretary on October 1, 1993.
4. Pursuant to the August 30, 1993 amendment of corporate by-laws, Burnett may be removed as a director without cause by majority vote of the directors.
5. However, there *is* cause under the January 22, 1993 stockholder's agreement to remove Burnett as a director.
6. When accepted by POL, the federal claim for rescission under the Securities Act of 1933 created an enforceable contract.
7. Burnett made intentional misrepresentations of fact to POL.
8. Burnett unlawfully retained corporate property following her termination as CMO and secretary.
9. Burnett must refund $24,000 paid to her as salary for her work as CMO.

The state court has issued decisions concerning counts 2, 3, 4 and 6. These decisions have rendered counts 1 and 5 moot. There is not information in the record concerning the remaining counts in the state action.

On September 27, 1994 the state court granted summary judgment for POL on the sixth count dealing with rescission of the sale of 1,440 shares of stock. The court held that, under federal case law, tender is implied by an action for rescission under § 12 of the Securities Act of 1933. The court found that POL had accepted the tender and that, therefore, an enforceable contract for rescission was created. As to the amount of money to be refunded, Burnett had requested $1 million in each of her 1933 Act claims in federal court. However, the state court observed that the Stockholders' Agreement made no mention of consideration other than the $7,200 paid by Burnett. The court therefore declared that Burnett was entitled only to the $7,200 actually paid for the shares. The Appellate Division affirmed on June 29, 1995, and ordered specific performance of the rescission. On

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 5

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

July 6, 1995 judgment was entered in the trial court pursuant to the Appellate Division opinion. These rulings dispose of counts 1 and 6 of the state court action.

On August 13, 1996 the state court issued an opinion concerning counts 2, 3 and 4 of the amended complaint. Regarding count 2, the court found in favor of Burnett, holding that "POL's Board of Directors improperly exercised its authority to terminate the defendant without cause from her position as CMO and Secretary on June 22, 1993." Regarding counts 3 and 4 the court declined to rule because POL had not submitted sufficient evidence that the corporate by-laws were amended by "written consent" on August 30, 1993, as required by the Stockholders' Agreement.

On October 4, 1996 the state court reconsidered its August 13 decision because POL had submitted evidence of written consent to the August 30, 1993 amendment. The court held that the by-laws had been properly amended and that the amendment allowed a majority of the board to terminate without cause any elected officer or appointed director. Based on this finding, the court ruled as follows:
*6 The application for a declaratory judgment that Burnett was validly terminated as POL's CMO and Secretary effective October 1, 1993 is granted.
The application for a declaratory judgment that Burnett was validly removed from the Board pursuant to the August 30, 1993 By-Laws Amendment is also granted.
In light of this determination the First Cause of action which claims the termination was for cause is dismissed as moot.

The reference to the first cause of action appears to be an error. The dismissal clearly refers to the fifth cause of action in the amended complaint. Burnett has informed the court that an appeal of this decision is underway.

In summary, there have been three decisions in the state court action that are relevant to this case. The September 27, 1994 decision declared that Burnett agreed to rescind the sale of the 1,440 shares of POL and that decision was affirmed on appeal. The August 13, 1996 decision declared that Burnett

was improperly terminated on June 22, 1993. There is no indication in the record that POL appealed this decision. The October 4, 1996 decision declared that Burnett was lawfully terminated on October 1, 1993. An appeal from this decision is pending.

The Present Motion to Dismiss

Defendants have briefed the motion to dismiss on three separate occasions: first in the Central District of California, second in this court prior to the abstention order, and third following remand from the Second Circuit. In these three submissions, defendants have advanced numerous arguments against the nine claims for relief in the complaint.

Regarding the two claims for securities fraud under the 1933 Act, defendants contend that the September 27, 1994 order of rescission in the state court action renders these claims moot.

Regarding the claim for securities fraud under the 1934 Act, defendants claim (1) that the complaint does not plead fraud with particularity, (2) that Burnett has not alleged fraud "in connection with" the purchase of a security, (3) that the complaint does not allege "loss causation," (4) that a merger clause in the Stockholders' Agreement precludes Burnett's allegation of reliance on the statements of defendants, and (5) that the September 27, 1994 rescission order renders the claim moot.

The argument that Burnett does not plead fraud with particularity is also advanced in opposition to the claims of common law fraud, negligent misrepresentation, and breach of fiduciary duty. Likewise, the argument that Burnett cannot prove reasonable reliance because of a merger clause in the Stockholders' Agreement is advanced against the claims of fraud and negligent misrepresentation.

With respect to breach of employment contract, defendants contend that the October 4, 1996 state court decision is res judicata on the issue of wrongful termination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 6

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Finally, defendants argue that the gender discrimination claim, brought under California Law, should be dismissed because New York applies in this action.

### Discussion

#### First and Second Claims

*7 The first and second claims for relief are brought under § 12 of the Securities Act of 1933, 15 U.S.C. § 77l (1994). Section 12(1) establishes civil liability for acts prohibited in § 5, 15 U .S.C. § 77e (1994), including the sale of unregistered securities. Section 12(2) establishes civil liability for material misrepresentations or omissions in connection with the sale of a security. Under either one of these provisions, § 12 allows a plaintiff,
to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l (1994). In other words, a plaintiff suing under § 12 automatically elects the remedy of either rescission or damages depending on whether the plaintiff still owns the securities at issue.

Defendants argue that the state court judgment ordering Burnett to exchange her 1,440 shares of POL for $7,200 renders claims one and two moot. Burnett argues that her claims are not moot because the statute provides for damages if the plaintiff no longer owns the security. Burnett contends that she no longer owns the shares because she has complied with the state court order to rescind, and that she should be allowed to amend the complaint to reflect that fact and to pursue a claim under § 12 for damages.

However, in *Wigand v. Flo-Tek, Inc.,* 609 F.2d 1028, 1035 (2d Cir.1979), the court stated: Section 12(2) is explicit in allowing the plaintiff no choice of remedy. If plaintiff owns the stock, he is entitled to rescission but not damages. If plaintiff no longer owns the stock, he is entitled to damages but not rescission.... The proper time to make the

choice between the two types of relief afforded by section 12(2) is at the time the complaint is filed.

Although *Wigand* refers to § 12(2) only, the election of remedies provision applies to both § 12(1) and § 12(2).

At the time the complaint was filed, Burnett owned the 1,440 shares and therefore automatically elected the remedy of rescission. Therefore, the only relief that the court can grant Burnett on her § 12 claims is rescission of the sale. Since the state court already ordered rescission and, indeed, the appellate division ordered specific performance of the rescission, the § 12 claims in this action are moot and are barred by res judicata. Moreover, the alternative in § 12(1) to sue for damages if the plaintiff no longer owns the security is surely not intended to apply to a situation where the reason for not owning the security is compliance with a court order for rescission.

#### Third Claim

Burnett's third claim for relief alleges a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1994). This claim is based on Burnett's allegations that defendants made false and misleading statements regarding Burnett's future at POL. According to Burnett, defendants' statements induced her to enter the Stockholders' Agreement and to purchase 1,440 shares of stock pursuant to that agreement.

*8 A claim for rescission under § 12 of the 1933 Act is not an election barring a claim for damages under the 1934 Act. *See* 15 U.S.C. § 78bb(a) (1994) ("The rights and remedies provided by [the 1934 Act] shall be in addition to any and all other rights and remedies that may exist in law or in equity.").

Defendants have advanced numerous arguments for the dismissal of Burnett's § 10(b) claim. Only two of these deserve discussion. First, defendants argue that a merger clause in the Stockholders' Agreement precludes any claim of reliance on the pre-agreement statements of defendants. Second, defendants argue that Burnett has not pleaded her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 7

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

securities fraud claim with the particularity required by Fed.R.Civ.P. 9(b).

The merger clause in the Stockholders' Agreement is not attached to any of the pleadings and defendants have not otherwise submitted its text. Instead, defendants rely on the following language from the September 27, 1994 state court decision:
Paragraph 20 [of the Stockholders' Agreement] provides that the document contains the entire agreement concerning the subject matter of the agreement, supersedes all prior agreements and may not be modified except by an agreement in writing signed by the party or parties to be charged. [Burnett] may not controvert the express provisions of the stockholders' agreement without a properly executed writing.

According to defendants, this state court decision establishes that there is a merger clause in the Stockholders' Agreement.

Burnett must plead reliance on false statements or misrepresentations in order to state a cause of action under § 10(b). Defendants argue that the merger clause, which states that the Stockholders' Agreement represents the "entire" agreement between Burnett and defendants-precludes Burnett's claim of reliance on statements made outside of the Stockholders' Agreement.

Defendants rely on *Harsco Corp. v. Segui,* 91 F.3d 337 (2d Cir.1996). But that case involved a stock purchase agreement which contained a clause disclaiming any representations not made in the agreement. The summary of the Stockholders' Agreement in the present case, contained in the state court opinion, does not have any disclaimer of *representations.* As already stated, the actual merger clause is not in the record. At least on the present record, there can be no dismissal of the third claim based on the merger clause.

More problematic for Burnett is the argument that the complaint does not satisfy the pleading requirements of Fed.R.Civ.P. 9(b). Securities fraud charges under § 10(b) are subject to Rule 9(b). *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). To satisfy the pleading

requirement, Burnett must (1) specify the statements that were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir.1993).

*9 Burnett argues that the complaint identifies fraudulent statements made by Mayaud in paragraphs 10 and 14 of the complaint, by Hochberg in paragraphs 12 and 17, and by Greenberg in paragraph 12. Plaintiff's Jan. 24, 1994 Mem. of Law at 19. Paragraph 10 alleges specific statements by Mayaud as follows:
Prior to and during July, 1992, Mayaud stated to plaintiff during their telephone conversations:

...

(b) Plaintiff, Mayaud and Greenberg should work together and develop POL, which was a motivating factor to plaintiff since she desired to help her sister and Mayaud;

...

(d) Plaintiff would initially do all of the marketing and her other work for POL from her office in Los Angeles, California, and then move to the East Coast to work for POL in its New York office, and live near her sister and Mayaud, when permanent financing was in place for POL;
(e) After POL was started and financed, Mayaud and plaintiff would retain their ownership interest in the company, turn over direct operational management of the business to others, and then use the on-line POL system to develop related business ventures as subsidiaries of POL.

Paragraph 14, in contrast, contains only broad allegations that "defendants" made certain agreements with plaintiff, without specifying where or when the statements were made.

As to Hochberg and Greenberg, it is alleged in paragraph 12:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 8

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

On or about September 24 and 25, 1992, plaintiff went to Mayaud's house in New York to meet with Mayaud and Greenberg to discuss: the structure of POL; the ownership and responsibilities of the three of them as "founding shareholders"; the basic strategy for launching POL. While there, Hochberg met with plaintiff and defendants, and represented: he could obtain access to capital for POL; he could provide contacts for strategic alliances; and that he was willing to join POL as an investor and officer. Plaintiff returned to Los Angeles on September 27, 1992.

Paragraph 17 alleges:On or about January 26, 1993 plaintiff delivered a check for $30,000.00 to Mayaud for the purchase of 150 shares of POL, but did not receive a stock certificate, or any documentation of the stock purchase at that time. Mayaud immediately negotiated the $60,000.00 check from Hochberg, but accepted and did not negotiate the 30,000.00 check from plaintiff until approximately March 11, 1993, even though he had specifically represented earlier that the check had been cashed. Mayaud further represented to plaintiff that he had a folder of checks from investors for the first offering which he had not cashed.

Paragraphs 10 and 12 allege certain statements made to Burnett by both Mayaud and Hochberg. However, there is no allegation of any statements to her by Greenberg which can be considered as a basis for a claim of false statements or a claim of fraudulent omissions of information from statements by Greenberg.

With regard to the allegations of statements made to Burnett by Mayaud and Hochberg, it is necessary to examine the complaint further to determine whether there are sufficient allegations of falsity or fraudulent omissions. The only place in the complaint arguably containing such specific allegations, in contrast to purely conclusory ones, is paragraph 37.
*10 37. Plaintiff is informed, believes and based thereon alleges the statements and information provided by defendants to plaintiff, both before and at the time of her purchase of the 1,440 shares

pursuant to the stockholders agreement, were untrue, and/or defendants failed to disclose material facts necessary in order to make the statements not misleading, including, but not limited to, the fact(s):
(a) Defendants did not intend for plaintiff to remain as the marketing director of POL, but instead intended to use and take advantage of plaintiff's knowledge, skill, contacts, qualifications and reputation to start up POL;
(b) Defendants did not intend for plaintiff to remain a major, 18% owner in POL, but rather to:
(i) Take or appropriate all or a portion of plaintiff's ownership interest as a shareholder for themselves, or for their use; and/or
(ii) Dilute plaintiff's interest through issuance of stock options or stock to themselves without full or adequate consideration;
(c) Defendants did not intend for plaintiff to continue to work with the business opportunities, subsidiary, "spin-off" or related business ventures of POL;
(d) Defendants did not intend plaintiff to maintain her ownership interest as a founding shareholder.

One initial problem with paragraph 37 is that it lumps all defendants together, and makes no attempt to specify what was false or misleading about any particular statement made by any particular defendant. Moreover, if we examine the statements attributed to Mayaud in paragraph 10 of the complaint, and then examine the allegations in paragraph 37, there is a lack of any precise pleading as to how the statements in paragraph 10 were false and misleading. Taken as a whole, the pleading as to Mayaud leads to serious doubt as to whether Burnett can allege in good faith that false and misleading statements were made to her, resulting in her purchase of stock. As to Hochberg, it would appear clear that there is nothing in paragraph 37 which can be construed as specifically pointing out how any of the statements by Hochberg were false or misleading.

The court concludes that the third claim should be dismissed with leave to file an amended claim in the event that such amendment can be made properly and in good faith.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 9

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

*Fourth and Sixth Claims*

Burnett's common law fraud and negligent misrepresentation claims are based on similar allegations to what is alleged in the third claim. For this reason, the parties employ essentially the same arguments with respect to these claims as they do for the 1934 Act claim.

The court reaches the same conclusion about the fourth and sixth claims as with respect to the third claim. The fourth and sixth claims are dismissed with leave to replead.

*Fifth Claim*

Defendants argue that Burnett has not satisfied the particularity requirements of Fed.R.Civ.P. 9(b) with respect to her claim of breach of fiduciary duty. Breach of fiduciary duty must be pleaded with particularity to the extent that it depends on allegations of fraud.

**\*11** The complaint, however, does not merely piggyback the breach of fiduciary duty claim on top of the claims of fraud. Paragraph 51 of the complaint alleges:
The breaches of fiduciary duty by defendants included, but are not limited to:
(a) Nondisclosure of operating information and other data due plaintiff as a shareholder and director;
(b) Diversion of corporate opportunities by defendants to themselves;
(c) The taking or acquisition of secret profits by defendants to the detriment of the corporation and/or shareholders;
(d) The failure to pursue or seek alternative or competitive financing;
(e) The self-dealing by defendants in providing or granting to themselves, or setting up for their benefit, stock options and stock issuance;
(f) The failure to treat shareholders and investors on an equal basis with respect to opportunities, and corporate opportunities, of POL.

These are basically allegations that defendants abused their positions of trust and confidence to harm Burnett. Since the complaint alleges

breaches of fiduciary duty that are independent of the fraud allegations, the particularity requirement of Fed.R.Civ.P. 9(b) does not apply to these allegations.

Burnett has adequately pleaded breach of fiduciary duty by all defendants in the fifth claim.

*Seventh Claim*

Defendants argue that Burnett is barred from pursuing her breach of employment contract claim by decisions rendered by the state court. According to defendants, the state court's October 4, 1996 opinion precludes any claim by Burnett that she was improperly terminated as CMO and Secretary effective October 1, 1993.

Burnett's seventh claim relates to her termination on June 22, 1993. Although the state court found that Burnett was validly terminated as CMO and Secretary effective October 1, 1993, that court also found that the prior purported termination of June 22, 1993 was improper. These state court rulings were, of course, in response to POL's request for declaratory judgment.

As noted earlier, POL did not appeal from the ruling with respect to June 22. Burnett has appealed from the ruling as to October 1, and that appeal has not been decided. The state court determination with regard to June 22 opens the way for a claim for damages in this court for wrongful termination on that date. However, in the event the state court's ruling as to October 1 becomes final, such ruling will be res judicata and will need to be considered on the question of the extent of injury and damages in regard to the seventh claim.

*Eighth Claim*

Defendants have not advanced any arguments of substance for dismissal of the quantum meruit claim as a matter of pleading.

*Ninth Claim*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 10

Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Defendants argue that Burnett's claim of gender discrimination under the California Fair Employment and Housing Act must be dismissed because New York law governs this case. Defendants base their argument on the order of the federal district court in California transferring the case to this district, which states:

**\*12** [U]nder the Stockholders' Agreement, New York law applies to this dispute, and particularly to the fourth (intentional misrepresentation), fifth (breach of fiduciary duty), sixth (negligent misrepresentation), seventh (breach of employment agreement), eighth (quantum meruit), and ninth (gender discrimination) claims, all of which arise under state law.

Defendants argue that this finding is the law of the case and should be applied to preclude Burnett's ninth claim for relief.

Burnett argues in response that the choice of law provision in the Stockholders' Agreement only governs disputes arising out of the contract, not all disputes among the parties. Section 23 of the Stockholders' Agreement is quoted in one of Burnett's briefs, and states: "This Agreement shall be governed and construed in accordance with the law of the State of New York." Burnett's ninth claim does not arise out the Stockholders' Agreement, but arises out of state statutory law. Therefore, the court cannot conclude that the general choice of law provision in the Stockholders' Agreement bars a cause of action for gender discrimination under California law.

Whether California law applies under normal choice of law standards cannot be determined on the present motion.

Defendants also argue that collateral estoppel bars the gender discrimination claim because the October 4, 1996 state court decision declared that POL validly terminated Burnett following the August 30, 1993 amendment to POL's by-laws. Although the state court ruled that the August 30, 1993 amendment to POL's by-laws was legitimate and that Burnett was validly terminated pursuant to the new by-laws, the state court did not reach any gender discrimination claim. Therefore, the

October 4, 1996 state court decision does not bar Burnett's claim of gender discrimination.

Conclusion

Defendants' motion to dismiss is granted in part and denied in part. The first and second claims are dismissed with prejudice. The third, fourth, and sixth claims are dismissed with leave to replead. In all other respects, the motion to dismiss is denied.

SO ORDERED

Dated:

S.D.N.Y.,1997.
Burnett v. Physicians' Online, Inc.
Not Reported in F.Supp., 1997 WL 470136 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:94cv02731 (Docket) (Apr. 15, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2



995 F.2d 1064                                                                                                Page 1

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))
**(Cite as: 995 F.2d 1064)**

**H**
Briefs and Other Related Documents
NOTICE:   THIS   IS   AN   UNPUBLISHED
OPINION.(The Court's decision is referenced in a "
Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA4
Rule 36 for rules regarding the citation of
unpublished opinions.)
     United States Court of Appeals,Fourth Circuit.
          Sam ROBINSON, *Plaintiff-Appellant*,
                            v.
    LADD FURNITURE, INC., a North Carolina
Corporation; American Drew, a North Carolina
        Corporation, *Defendants-Appellees*.
                    **No. 92-2286.**

              Argued: April 1, 1993
              Decided: June 14, 1993

Appeal from the United States District Court for the
Middle District of North Carolina, at Greensboro.
William   L.   Osteen,   Sr.,   District   Judge.
(CA-92-273-2)

Andrew Dean Morrison, Beverly Hills, California,
for Appellant.
Louis   Whittier   Doherty,   Petree,   Stockton,
Winston-Salem, North Carolina, for Appellees.
Penni   P.   Bradshaw,   Petree,   Stockton,
Winston-Salem, North Carolina; F. Joseph Treacy,
Jr., Petree, Stockton Charlotte, North Carolina, for
Appellees.
M.D.N.C.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED.

Before RUSSELL and WILLIAMS, Circuit Judges,
and SPROUSE, Senior Circuit Judge.
PER CURIAM:

                    OPINION

*1 The claims in this case arise out of American
Drew's termination of an independent sales
representative agreement with Sam Robinson. The
district court dismissed Robinson's claims under
Federal Rule of Civil Procedure 12(b)(6), holding
that the agreement was enforceable and its terms
foreclosed Robinson's causes of action for breach of
an oral, implied-in-fact contract and for age
discrimination in violation of California law. We
agree with the district court's conclusion that the
written contract between the parties forecloses any
claim for breach of an oral contract. We differ,
however, with the district court's decision to apply
the contractual choice of law provision to
Robinson's statutory and tort claims. Accordingly,
we remand for further consideration of these claims
under North Carolina choice of law principles.

                            I.

Sam Robinson resides in California and until
October 1991, he sold furniture for American Drew
FN1 in Arizona and the southern regions of Nevada
and California. Robinson signed an independent
sales representative agreement with American Drew
which, among other things, provided that he was an
independent contractor, that the agreement was
governed by North Carolina law, that any disputes
under the agreement were to be resolved in North
Carolina courts, that all prior agreements of the
parties were revoked with the execution of the
agreement, and that the agreement could only be
modified in writing.

On September 6, 1991, American Drew exercised
its option to terminate the agreement and provided
the requisite thirty days notice. As a consequence,
Robinson's relationship with American Drew as a
sales representative ended on October 6, 1991,
when he was sixty-nine years of age. Robinson
alleged that he was replaced by a younger sales
representative.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

995 F.2d 1064                                                                                   Page 2

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))
**(Cite as: 995 F.2d 1064)**

Robinson initially filed a complaint in California state court alleging wrongful termination in violation of California public policy and breach of an oral employment agreement to terminate him only for good cause.[FN2] American Drew removed the action to California federal district court on the basis of diversity jurisdiction. American Drew then filed a motion to dismiss for lack of venue under Federal Rule of Civil Procedure 12(b)(3). The motion sought enforcement of a forum selection clause in the sales agreement which specified that any dispute arising under the agreement "shall be resolved by the courts within North Carolina." (J.A. at 102.) After briefing and a hearing, the California federal district court enforced the clause and dismissed the entire case.

Robinson then refiled his case in federal district court in North Carolina. In the North Carolina complaint, Robinson alleged a violation of California's Fair Employment and Housing Act, Cal. Govt. Code § 12941(a) (West 1992), as well as termination in violation of the public policy of California and breach of an oral employment contract.

American Drew moved to dismiss the case under Rule 12(b)(6) because the sales agreement specified that North Carolina law, rather than California law, was applicable to any claims Robinson may have, and because the breach of oral contract claim was barred by a clause in the agreement stating that all prior agreements were revoked. The district court dismissed the breach of oral contract claim with prejudice and dismissed the age discrimination claims with leave to refile under North Carolina law. Robinson appeals.

## II.

**\*2** We review de novo dismissals for failure to state a claim upon which relief can be granted. *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir. 1989). We apply the legal standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.*

*Gibson,* 355 U.S. 41, 45-46 (1957). In so doing we construe the claims in the light most favorable to the non-moving party and take its allegations as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969).

### A. Breach of Oral Contract

We first address the propriety of the dismissal of Robinson's breach of an oral contract claim. Robinson contends that in terminating his employment relationship, American Drew breached an oral, implied-in-fact employment agreement which provided that he could only be terminated for good cause. This oral contract claim is based on an alleged agreement between the parties prior to the execution of the written agreement. The key question we must resolve regarding this claim is whether the independent sales representative agreement is enforceable. The sales agreement explicitly provides that it supersedes all prior agreements, whether written or oral; therefore, if the agreement is enforceable, Robinson's claim was properly dismissed. Robinson contends that the agreement is not enforceable because it lacked consideration.

The district court concluded that the agreement was enforceable because of the collateral estoppel effect of the California district court's order dismissing the case for lack of venue. According to the district court, the California court's enforcement of the forum selection provision implicitly determined that the contract was enforceable and Robinson was precluded from relitigating the enforceability issue in the North Carolina court. Even if the California court implicitly determined that the contract was enforceable for purposes of deciding the proper forum, this determination does not preclude Robinson from challenging American Drew's motion to dismiss.

In demonstrating collateral estoppel, American Drew bore the burden of proving that: (1) Robinson had a full and fair opportunity to litigate the enforceability of the contract earlier in the case; (2) the California district court actually determined that the contract was enforceable; and (3) the California court necessarily decided that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))
**(Cite as: 995 F.2d 1064)**

contract was enforceable. *See Combs v. Richardson*, 838 F.2d 112, 114 (4th Cir. 1988). We do not believe that these elements were satisfied here.

First, Robinson did not have a full and fair opportunity to litigate the contract question because he bore the burden in the California action of proving that the court had jurisdiction, whereas in the Rule 12(b)(6) proceeding the burden of proof was on American Drew. As we stated in *Newport News Shipbuilding & Dry Dock Co. v. Director OWCP*, 583 F.2d 1273, 1279 (4th Cir. 1978), *cert. denied,* 440 U.S. 915 (1979):

**\*3** Relitigation of an issue is not precluded by the doctrine of collateral estoppel where the party against whom the doctrine is invoked had a heavier burden of persuasion on that issue in the first action than he does in the second, or where his adversary has a heavier burden in the second action than he did in the first.

Secondly, the issue was not actually determined or necessarily litigated because the determination of the enforceability of a venue provision for purposes of a Rule 12(b)(3) motion is a matter of federal law and the enforceability of a contract is a matter of state law. *Manetti-Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 513 (9th Cir. 1988). Indeed, under Ninth Circuit precedent"forum selection clauses are prima facie valid, and are enforceable absent a strong showing by the party opposing the clause that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or over-reaching." *Id.* at 514 (quoting *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972). Thus, the California court did not have to find that the entire contract was enforceable to apply the forum selection clause; it only had to find that a prima facie case of enforceability had been shown for venue determination. Here, American Drew has to prove enforceability, not merely a prima facie case, in order to prevail. For these reasons, collateral estoppel is not an appropriate basis for concluding that the agreement is enforceable.

Nevertheless, it is clear from the pleadings that the

sales agreement is enforceable under North Carolina law. Generally, for purposes of evaluating a motion to dismiss under Rule 12(b)(6) the court is limited to a review of the allegations in a complaint. However, the complaint includes any document which is attached to it as an exhibit, Fed. R. Civ. P. 10(c), or incorporated into it by reference, *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir. 1985). In this case, Robinson specifically referred to the independent sales representative agreement in discussing his breach of an oral, implied-in-fact contract claim in paragraph 26 of the complaint. Therefore, in reviewing the propriety of the district court's grant of American Drew's motion to dismiss, we will also consider the provisions of the agreement.

It is clear from the complaint itself that there is adequate consideration for the sales agreement to be enforceable. Robinson admits that he continued working for American Drew after signing the agreement. Continuance of an employment relationship is sufficient consideration for an employment agreement in North Carolina to be enforceable. *See Fraver v. North Carolina Farm Bureau Mut. Ins. Co.,* 318 S.E.2d 340, 344 (N.C. Ct. App.), *cert. denied,* 322 S.E.2d 1555 (N.C. 1984). Because the independent sales representative agreement is enforceable, we must give effect to the provision in the contract which states that the contract constitutes the entire agreement between the parties and revokes all prior agreements. Enforcement of this provision directly forecloses Robinson's breach of an oral contract claim. Because enforceability is evident from the face of the complaint, we hold that dismissal of this claim under Rule 12(b)(6) was appropriate.

**\*4** B. *California Age Discrimination Claims*

As outlined above, we agree with the district court's conclusion that the independent sales representative agreement is enforceable. At first blush, this conclusion seems to support the district court's dismissal of Robinson's California claims because it necessarily follows that the parties' choice of North Carolina law is also enforceable. Indeed, under North Carolina law if parties to a contract have agreed that a certain state's substantive law will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

995 F.2d 1064                                                                                    Page 4

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))
(Cite as: 995 F.2d 1064)

govern the interpretation of their contract, then the contractual provision will be given effect, *Tanglewood Land Co. v. Byrd,* 261 S.E.2d 655, 656 (N.C. 1980), as long as the state chosen has a substantial relationship with the parties, or the transaction, or both. *Boone v. Aeronca, Inc.,* 669 F. Supp. 1353, 1359 (W.D.N.C. 1987). Because the contract was enforceable and North Carolina courts generally enforce choice of law provisions, the district court held that the parties' contractual choice of North Carolina law foreclosed Robinson's claims under California law.

Such a conclusion, however, overlooks a fundamental step in the analysis. In this case, the contractual choice of law provision states:
This Agreement, its execution, interpretation and performance shall be governed by the laws of the State of North Carolina.

(J.A. at 94.) It is not enough simply to decide that this clause is enforceable in the abstract; we must also determine whether it is enforceable against these particular claims. The key question we must resolve is whether Robinson's claims of age discrimination in violation of the California Fair Employment and Housing Act and California public policy involve the "execution, interpretation and performance" of the sales agreement.

The sales agreement certainly delineates the parameters of the relationship between American Drew and Robinson as well as their respective rights and responsibilities. Because of this, the argument could be made that any claim which arises between American Drew and Robinson would be governed by the agreement. We do not believe, however, that under Fourth Circuit and North Carolina precedent this argument can carry the day.

Liability for Robinson's age discrimination claim under the California Fair Employment and Housing Act arises from the statute itself, Cal. Govt. Code § 12941(a), and the liability for his wrongful termination in violation of public policy claim arises from tort law, rather than contract. *See Foley v. Interactive Data Corp.,* 765 P.2d 373, 377 (Cal. 1988) (discussing the development of the tort of

wrongful termination in violation of public policy); *Coman v. Thomas Mfg. Co.,* 381 S.E.2d 445, 447 (N.C. 1989) (establishing the tort of wrongful discharge in North Carolina). As such, the liability to be imposed is *ex delicto* rather than *ex contractu* and the contractual choice of law provision governs only if an issue of contractual construction, interpretation, or enforceability is raised. *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 50 n.11 (4th Cir. 1983), *supp. op.,* 742 F.2d 170 (4th Cir. 1984) (per curiam), *cert. denied,* 469 U.S. 1215 (1985); *see also United Virginia Bank v. Air-Lift Assoc., Inc.,* 339 S.E.2d 90, 93 (N.C. Ct. App. 1986) (finding the interpretation of North Carolina law in *ITCO* persuasive).

**\*5** In *ITCO,* the plaintiff alleged that Michelin's decision not to renew its dealership agreement with it constituted anticompetitive behavior in violation of the North Carolina Unfair Trade Practices Act. *ITCO,* 722 F.2d at 45. We noted that the claims under the statute involved *ex delicto* rather than *ex contractu* liability; presented "[n]o issue of contractual construction, interpretation, or enforceability;" and were predicated upon actions " separate and distinct from the Dealer Sales Agreement." *Id.* at 50 n.11.

We reached a similar conclusion in *Glaesner v. Beck/Arnley Corp.,* 790 F.2d 384, 386 n.1 (4th Cir. 1986), with regard to claims that a distributorship agreement was wrongfully terminated in violation of South Carolina tort law and the South Carolina Unfair Trade Practices Act. We noted that the plaintiff had alleged liability in tort, rather than in contract, that the nature of liability was " *ex delicto,* not *ex contractu,*" and that "[n]o issue of contractual construction, interpretation, or enforceability" was raised in the case. *Id.* (quoting *ITCO,* 722 F.2d at 50 n.11). The argument could have been made in both *ITCO* and *Glaesner* that the terms of the dealership or distributorship agreements would be directly relevant to the wrongful termination claims, but we still declined to apply the contractual choice of law provisions in these actions.

North Carolina federal district courts have similarly rejected the application of contractual choice of law

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

995 F.2d 1064                                                              Page 5

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))
**(Cite as: 995 F.2d 1064)**

provisions to any actions which do not specifically arise out of the contract. In *United Dominion Industries, Inc. v. Overhead Door Corp.,* 762 F. Supp. 126, 127 (W.D.N.C. 1991), the plaintiff alleged that Overhead Door breached an asset purchase agreement through various misstatements, concealments, and overstatements regarding the company purchased by plaintiff. Among the causes of action alleged was a claim for damages for unfair and deceptive trade practices under a North Carolina statute. *Id.* Overhead Door argued that Texas rather than North Carolina law was applicable because of a choice of law provision stating that the contract between the parties would be governed and construed in accordance with laws of Texas applicable to the making and performance of contracts. *Id.* The court concluded that while this provision may govern the choice of law as to the interpretation and construction of the contract, it did not provide the applicable law for the statutory claim because the nature of the liability was not contractual. *Id.* at 128; *see also FDIC v. British-American Corp.,* 755 F. Supp. 1314, 1325 (E.D.N.C. 1991) ("Plaintiffs' fraudulent conveyance claim is not founded on the construction or interpretation of the contract, but rather, on whether the contract could have, by itself, caused a legal transfer ... [t]hus, the choice of law provision is irrelevant."); *Simms Inv. Co. v. E.F. Hutton & Co.,* 688 F. Supp. 193, 195 (M.D.N.C. 1988), *reconsideration granted,* 699 F. Supp. 543 (M.D.N.C. 1988) (misrepresentations and omissions of fact in order to induce plaintiff to enter a joint venture agreement were essentially actions for fraud, and the choice of law provision in the joint venture agreement was inapplicable to the fraud claims).

**\*6** We believe that the choice of law provision in the agreement is similarly inapplicable to Robinson's age discrimination claims. The duty violated by the alleged age discrimination arises out of statute and tort, not from any provision of the sales agreement. Moreover, interpretation, application, and construction of the independent sales representative agreement is not required to determine whether American Drew's termination of the agreement constituted age discrimination. Therefore, we conclude that although the contract is

enforceable, the choice of law provision does not control with regard to Robinson's age discrimination claims. As a result, we remand for the district court to apply North Carolina choice of law principles to determine whether North Carolina law is applicable to Robinson's claims.[FN3]

American Drew also contends that Robinson's claim under the California Fair Employment and Housing Act was properly dismissed because he is an independent contractor rather than an employee. It is correct that in *Lumia v. Roper Pump Co.,* 724 F. Supp. 694, 697 (N.D. Cal. 1989), a California federal district court specifically held that California's anti-discrimination statute does not cover independent contractors.[FN4] It is also correct that paragraph 111 of the sales agreement provides that "[i]t is acknowledged and agreed that Representative [Robinson] is and shall be ... an independent contractor and not an employee or other agent of the Company." (J.A. at 92.) While this contractual provision is certainly relevant to whether Robinson is an independent contractor, this is a factual inquiry which is not appropriately resolved on a Rule 12(b)(6) motion. *See Garrett v. Phillips Mills, Inc.,* 721 F.2d 979, 981 (4th Cir. 1983) (whether an individual is an employee "is properly determined by analyzing the facts of the employment relationship"); *see also Rolick v. Collins Pine Co.,* 925 F.2d 661, 665 (3d Cir. 1991) ( " 'courts will not be controlled by the nomenclature the parties apply to their relationship' ") (citation omitted); *Judy v. Tri-State Motor Transit Co.,* 844 F.2d 1496, 1505 (11th Cir. 1988) ("the fact that a contract may characterize a worker as an independent contractor rather than as an employee is not of controlling significance"). Robinson's complaint alleges that he is an employee, and on remand he is entitled to offer evidence that while the agreement specifically delineates that he is an independent contractor, the parties' conduct demonstrates the contrary. Because dismissal of these claims under Rule 12(b)(6) was inappropriate, we reverse the dismissal of Robinson's age discrimination claims.

III.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

995 F.2d 1064    Page 6

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))
**(Cite as: 995 F.2d 1064)**

In light of the foregoing discussion, we affirm the district court's dismissal of Robinson's claim for breach of oral contract, reverse the dismissal of his age discrimination claims under California statute and public policy, and remand for further proceedings consistent with this opinion.

*\*7 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

> FN1. American Drew, a furniture manufacturer and distributor, is an unincorporated division of Ladd Furniture, Inc., a North Carolina Corporation. Both American Drew and Ladd Furniture have their offices and principal places of business in High Point, North Carolina.
>
> FN2. This initial complaint also contained a cause of action under California's Unruh Act, California Civil Code § 51, which was later dismissed by stipulation of the parties.
>
> FN3. American Drew urges us to decide that under the applicable North Carolina choice of law principles for torts, these claims would be governed by North Carolina law because it has the most significant relationship to the action. *See New England Leather Co. v. Feuer Leather Corp.,* 942 F.2d 253, 255-56 (4th Cir. 1991) (discussing North Carolina's two different approaches to determining choice of law questions with regard to tort claims). We decline to take this approach because American Drew raises these arguments for the first time on appeal. In addition, we believe remand is a more appropriate course because each party will be able to establish through affidavits or other evidence whether the place of injury is California or North Carolina or which state has the most significant relationship to this action.
>
> FN4. The court in *Lumia* also dismissed the plaintiff's common law cause of action for 'wrongful discharge' on the basis of

age discrimination on the ground that it was preempted by the California Fair Employment and Housing Act. 724 F. Supp. at 697.

C.A.4,1993.

Robinson v. Ladd Furniture, Inc.

995 F.2d 1064, 1993 WL 211309 (C.A.4 (N.C.))

Briefs and Other Related Documents (Back to top)

• 1993 WL 13124400 (Appellate Brief) Reply Brief of Appellant (Jan. 28, 1993) Original Image of this Document with Appendix (PDF)
• 1993 WL 13124399 (Appellate Brief) Appellees' (LADD Furniture, Inc. and American Drew) Brief (Jan. 11, 1993) Original Image of this Document (PDF)
• 1992 WL 12124774 (Appellate Brief) Appellant's Opening Brief (Dec. 01, 1992) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



Not Reported in F.Supp.                                                                                                          Page 1

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Marlene PLYMACK, Max Smedresman, and
Morton Rezak, Plaintiffs,
v.
COPLEY PHARMACEUTICAL, INC., Jane C.I.
Hirsh, Mark Hirsh, Steven N. Tannenbaum,
Ladenburg, Thalmann & Co., Inc., and John Does,
1-10, Defendants.
**No. 93 Civ. 2655 (KMW).**

Oct. 12, 1995.

OPINION AND ORDER
KIMBA M. WOOD, District Judge.
**\*1** Plaintiffs have raised federal securities fraud
claims and various state law claims in connection
with a November 15, 1991 securities transaction in
which defendant Copley Pharmaceutical, Inc. ("
Copley") repurchased shares originally sold to
plaintiffs in a 1988 private placement arranged by
defendant Ladenburg, Thalmann & Co, Inc. ("
Ladenburg"). Presently before the court are motions
for summary judgment on behalf of (1) defendants
Copley, Jane C.I. Hirsh ("Jane Hirsh"), Mark Hirsh
and Steven N. Tannenbaum ("Tannenbaum")
(collectively "the Copley defendants"), and (2)
defendant Ladenburg. For the reasons set forth
below, each motion is granted in part and denied in
part.

I. *BACKGROUND*

The following facts, gleaned from the statements
filed by the parties pursuant to Local Rule 3(g), are
not in dispute unless otherwise noted. Defendant
Copley is a Massachusetts-based manufacturer of
generic drugs. Plaintiffs, who are all involved in the
generic drug industry,[FN1] purchased Copley stock
in February 1988 through a private placement

arranged by defendant Ladenburg, a New York
investment advisory firm. Defendant Jane Hirsh is
the chairperson and chief executive officer of
Copley, defendant Mark Hirsh is an officer of
Copley, and defendant Tannenbaum is the chief
financial officer of Copley.

The principal outside investor in Copley at the time
that plaintiffs purchased their Copley stock was the
Harder Pharmaceutical Limited Partnership ("HPLP
"); HPLP owned approximately 23% of Copley's
stock. Plaintiffs, together with the other Copley
shareholders who purchased stock in the Ladenburg
private placement ("the Ladenburg group"), owned
approximately 6% of Copley's stock. HPLP and the
Ladenburg group were represented on the Copley
board of directors by Terrence Harder ("Harder")
and John Moroney ("Moroney"), a managing
director of Ladenburg, respectively.

In April 1991, Harder advised Copley management
and Moroney that HPLP wished to sell its interest in
Copley and that he wanted to engage Ladenburg to
find a buyer. Jane Hirsh has testified that Moroney
then stated that if HPLP sold its interest, the
Ladenburg group should sell their shares also.
Moroney and Jane Hirsh agreed to use a $40
million valuation of Copley as a basis for setting the
price to be offered to selling shareholders. In June
and July 1991, Ladenburg attempted to obtain
written authorization to represent members of the
Ladenburg group in finding a buyer for their Copley
stock. Marlene Plymack and Smedresman signed
letter    agreements    authorizing    Ladenburg    to
represent them; whether Rezak signed such an
agreement is in dispute.

In September 1991, a representative of TA
Associates ("TA"), a Boston-based investment
group, "cold-called" Jane Hirsh after seeing a *Wall
Street Journal* article that favorably mentioned
Copley. TA declined an invitation to purchase the
HPLP/Ladenburg block at Ladenburg's asking
price, and instead proposed a three-way transaction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 2

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

later memorialized in an October 1991 commitment letter between TA and Copley: TA would buy convertible, interest-bearing debentures in Copley, and Copley, using the funds injected by TA along with some of its own cash, would purchase the stock held by HPLP and the Ladenburg group. The closing of the TA-Copley debenture transaction was conditioned on Copley's purchasing all of the shares comprising the HPLP-Ladenburg group block.

**\*2** The TA-Copley debenture transaction and Copley's repurchase of the stock owned by the HPLP-Ladenburg group both closed on November 15, 1991. Moroney executed the stock sale agreement ("the Agreement") on behalf of plaintiffs pursuant to Power of Attorney and Custody Agreements ("the Powers of Attorney") that had previously been signed under oath by plaintiffs.[FN2] Both the Agreement and the Powers of Attorney explicitly reserved Copley's right to pursue a public offering of Copley stock, while representing that Copley was not at that time engaged in any discussions likely to lead to a public offering.[FN3]

Not long after the sale, Copley received approval from the Food and Drug Administration ("FDA") for two of its pending Abbreviated New Drug Applications ("ANDAs").[FN4] In April 1992, Copley filed a registration statement with the Securities and Exchange Commission in anticipation of a possible initial public offering. In October 1992, Copley ultimately made a successful initial public offering of its stock.

By letter dated March 29, 1993, Herbert Hochberg, a Ladenburg investment banker who had worked with Moroney on the sale of shares, notified plaintiffs that Ladenburg believed that Copley had provided Ladenburg with false and misleading information about Copley's financial condition and future prospects prior to closing. The letter invited plaintiffs to join Ladenburg and HPLP in a lawsuit against Copley seeking rescission of the sale of shares.

On April 22, 1993, plaintiffs filed suit in this court against the Copley defendants as well as Ladenburg. Plaintiffs' Amended Complaint alleges that defendants "omitted material information

concerning the financial condition of Copley, the status of Copley's FDA ANDA approvals, the role of TA Associates and the valuation of Copley, Copley's plans to go public, and the need for plaintiffs to sell their shares back to Copley." (Am. Compl. ¶ 144). Plaintiffs claim that, as a consequence, defendants are liable for violations of the federal securities laws, including Rule 10b-5, promulgated under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ( "§ 10(b) "), as well as common law fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, and unfair and deceptive acts and practices in violation of Massachusetts law. Plaintiffs seek rescission of the sale of shares, in addition to compensatory and punitive damages.

## II. *DISCUSSION*

Summary judgment is appropriate if the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is initially on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). This burden may be discharged by pointing to an absence of evidence in support of the nonmoving party's case. *Id.* When the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue for trial by "a showing sufficient to establish the existence of [[[every] element essential to that party's case and on which that party will bear the burden of proof at trial." *Id.* at 322. Although a court considering a motion for summary judgment must view all evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in that party's favor, *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir. 1993), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). If, based on the submissions to the court, no rational fact-finder could find in the nonmoving party's favor, there is no genuine issue of material fact, and summary judgment is appropriate. *Anderson v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### A. *The Copley Defendants*

**\*3** The Copley defendants argue that plaintiffs' Rule 10b-5 claim fails because (1) the information provided to plaintiffs about the "need" for them to sell their shares was, in fact, true, and (2) as to the other alleged misrepresentations, plaintiffs will be unable to establish reliance. Each of the plaintiffs has testified that he or she was pressured to sell his or her Copley shares by representations that the TA/Copley debenture transaction required complete participation on the part of the Ladenburg group and that if he or she did not sell the entire transaction would fall through. The Copley defendants contend that, in making such representations, they were truthfully conveying to plaintiffs the terms of the debenture transaction.

It is undisputed that it was a condition *at the time of the closing of the TA/Copley debenture transaction* that Copley purchase all of the shares comprising the HPLP-Ladenburg group. I agree with plaintiffs, however, that whether this was a condition of the transaction *at the time that the representations were made to plaintiffs* is a material fact in dispute. The October 22, 1991 commitment letter from TA to Jane Hirsh made no mention of a requirement that all the shares of the HPLP-Ladenburg be repurchased. The commitment letter did state that the proceeds of the TA financing would be used "to acquire 1,783,212 shares of common stock currently held by private investors." At that time, the shares held by the HPLP-Ladenburg group amounted to well over 2,000,000 shares. Thus, it was not contemplated that the TA investment would provide sufficient funds to purchase all the shares of the HPLP-Ladenburg group. Robert Daly of TA testified that the reason for the discrepancy was that Copley wanted to use some of its own cash to repurchase the remaining shares. (Daly Depo. at 253-54, 272-73.)

The Copley defendants argue that although it was not contemplated that TA would invest sufficient funds to purchase all the shares of the HPLP-Ladenburg group, it is nevertheless clear

from the commitment letter that it was important to TA that Copley repurchase all those shares. The commitment letter states that "it is understood that there will be 6,816,907 shares outstanding fully diluted after the transaction contemplated and that the Convertible Debenture will be convertible into 18.48% of the ownership of the company." According to the Copley defendants, this language " required Copley to reduce the number of outstanding shares through a buyback so as to ensure that TA's debentures would convert to the required percentage ownership." However, as plaintiffs point out, the Copley defendants have produced no evidence to show that it was a condition of the transaction that Copley reduce the number of outstanding shares through a buyback of plaintiffs' shares rather than by an alternate means, such as retiring some of the stock held by defendants Mark and Jane Hirsh.

Plaintiffs have introduced evidence in support of their contention that, as early as April 1991, Jane Hirsh had determined that she wanted to sell the HPLP/Ladenburg group shares as a block and did not want any small shareholders left over. The evidence leaves open the possibility that the Copley defendants may have represented that it was a *firm condition* of the TA/ Copley transaction that all the HPLP/Ladenburg group shares be repurchased when, in fact, it was only their *desire* that no small shareholders remain. I find, therefore, that there exists a genuine issue of material fact as to whether the Copley defendants misrepresented the terms of the TA/Copley debenture transaction in order to induce plaintiffs to sell their shares. Consequently, summary judgment is inappropriate on plaintiffs' 10b-5 claim against the Copley defendants. [FN5] This dispute of material fact also precludes summary judgment on plaintiffs' claim for common law fraud against the Copley defendants, and their claims for breach of fiduciary duty and negligent misrepresentation against Jane Hirsh, Steven Tannenbaum and Mark Hirsh.

**\*4** Plaintiffs' claim of breach of contract against Copley is based on paragraph 4(b) of the November 15, 1991 stock sale agreement which states in part:
The Seller, hereby acknowledges that (i) John J. Moroney has served as a member of the Board of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 4

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Directors of the Company [Copley] and as such received regular financial statements, which the Company represents and warrants fairly presented the financial condition of the Company as of their respective dates ....

Plaintiffs assert that Copley breached this contract, stating that "Copley made the representation and warranty that the financial statements furnished to Ladenburg fairly presented Copley's financial condition as of their dates, which representation and warranty was false." (Am. Compl. ¶ 178.) I agree with the Copley defendants that plaintiffs have failed to present any evidence in support of this claim.

The terms of the contract are unambiguous, warranting only that the financial statements supplied to Ladenburg provided a true picture of Copley's financial condition *as of their dates.* To withstand the Copley defendants' motion for summary judgment on the breach of contract claim, plaintiffs must supply evidence that these unambiguous terms were breached. *See Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 970 F.2d 1138, 1147 (2d Cir. 1992) ("Where the language of a contract is clear, summary judgment is appropriate, and the fact that one party may have a different interpretation of the language does not make it any less plain."), *cert. denied,* 113 S. Ct. 1585 (1993). Plaintiffs' arguments in support of the breach of contract claim that the financial reports did not present a true financial picture of Copley at the time of the stock sale are beside the point. Because plaintiffs have failed to present evidence that the warranty, as written, was false, the breach of contract claim cannot stand.

Plaintiffs also allege that the Copley defendants engaged in unfair and deceptive acts or practices in violation of Chapter 93A of the General Laws of the Commonwealth of Massachusetts. Mass. Gen. L. ch. 93A, §§ 2, 11. I agree with defendants that Massachusetts law does not apply to plaintiffs' non-contractual claims. A federal court adjudicating pendent state law claims applies the choice of law rules of the forum state. *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir. 1989). Plaintiffs' Chapter 93A claim is similar to their fraud claims and,

hence, this court will apply New York choice of law rules for tort claims. *See Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 11 (1st Cir. 1994) ("[W]hen a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered a tort for choice-of-law purposes.") In considering a fraud claim where the parties have different domiciles, the locus of the fraud (the place where the injury was inflicted) is the primary consideration under New York choice-of-law analysis. *Rosenberg v. Pillsbury Co.,* 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989). Defendants assert, and plaintiffs have not disputed, that plaintiffs suffered the alleged injury at their places of residence in New York and New Jersey.

*5 Plaintiffs argue, nevertheless, that Massachusetts law should apply in this case based on the choice-of-law provision in the Agreement which states: "This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." A contractual choice-of-law provision, however, does not bind the parties with respect to non-contractual causes of action. *Fustok v. Conticommodity Servs., Inc.,* 618 F. Supp. 1082, 1089 (S.D.N.Y. 1985). Plaintiffs cite *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309-10 (2d Cir. 1994), in which the Second Circuit Court of Appeals held that tort claims were encompassed by a contractual choice-of-law provision. However, in *Turtur,* the court repeatedly stressed, as the basis for its decision, the broad language in the choice-of-law provision at issue which stated that New York law would govern any controversy "arising out of or relating to" the contract. *Id.* No such broad language is included in the Agreement in the instant case. I find that Massachusetts law does not apply to this action, and, consequently, that summary judgment for defendants on plaintiffs' Chapter 93A claim is warranted.

Finally, I note that plaintiffs cannot prevail on their claims that Copley aided and abetted Ladenburg, and that Ladenburg aided and abetted Copley, in allegedly violating § 10(b) and Rule 10b-5. Since plaintiffs filed their complaint, the Supreme Court has expressly held that there is no private aiding and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 5

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

abetting liability under § 10(b) or Rule 10b-5. *Central Bank v. First Interstate Bank,* 114 S. Ct. 1439 (1994).

### B. *Ladenburg*

Plaintiffs have submitted evidence in support of their assertions that Ladenburg did not conduct an adequate investigation prior to arriving at its $40 million valuation of Copley and that Ladenburg's " due diligence" prior to entering into the Agreement was inadequate. In particular, this evidence tends to show that Ladenburg did not review the most recent information pertaining to Copley's condition and prospects prior to the sale of shares, despite having received conflicting reports and projections from Copley. Ladenburg does not claim, for the purposes of the instant motion, that its due diligence was sufficient, but rather argues that plaintiffs' showing supports no more than a finding of its negligence which, even if proven, could not support any of plaintiffs' causes of action.

Plaintiffs' third claim alleges that Ladenburg violated § 10(b) and Rule 10b-5 by "recklessly fail[ing] to ascertain relevant and accurate information regarding Copley, and, as a consequence, ma[king] fraudulent misrepresentations and omissions regarding Copley to plaintiffs including misrepresentations regarding Copley's financial condition, the valuation of Copley and its shares, Copley's prospects for ANDA approvals and Copley's plans for a public share offering." (Am. Compl. ¶ 157.) Ladenburg argues that plaintiffs have failed to establish a triable issue of fact with respect to three essential elements of a § 10(b) claim: "(1) a material misstatement or omission by Ladenburg, (2) indicating Ladenburg's intent to deceive or defraud (scienter), and (3) upon which the plaintiff detrimentally relied." (Ladenburg's Mem. Law at 11.) Ladenburg also argues that plaintiffs' claim is barred by the statute of limitations. Because I agree that plaintiffs have failed to establish a triable issue of fact with respect to Ladenburg's scienter, I do not reach Ladenburg's other arguments.

*6 In order to recover under § 10(b) or Rule 10b-5,

plaintiffs must show that Ladenburg possessed " either intent to defraud, knowledge of falsity, or reckless disregard for the truth." *Friedman v. Arizona World Nurseries Ltd.,* 730 F. Supp. 521, 529-30 (S.D.N.Y. 1990), *aff'd without opinion,* 927 F.2d 594 (2d Cir. 1991). Plaintiffs admit that Ladenburg was given, and relied on, false, misleading, or incomplete information from Copley. Plaintiffs contend, however, that Ladenburg behaved recklessly and was wilfully blind to the truth, and that this satisfies the scienter requirement. FN6

The Second Circuit Court of Appeals has stated that "recklessness is a form of scienter *in appropriate circumstances.*" *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039 (1978) (emphasis added). In *In re Fischbach Corp. Securities Litigation,* 89 Civ. 5826, 1992 WL 8715 (S.D.N.Y. Jan. 15, 1992), this court concluded that "appropriate circumstances" include those in which defendant shows evidence of intentional conduct by remaining wilfully blind to the facts. *Id.* at *5-*6. Thus, a § 10(b) or Rule 10b-5 claim premised on recklessness cannot stand where plaintiffs have not established facts leading to an inference of wilful blindness, and, in particular, where defendant had no apparent motive "for deliberately shutting [its] eyes" to the truth. *Id.* at *3, *6.

Plaintiffs allege that Ladenburg accepted false information from Copley in circumstances where Ladenburg had "storm warnings" that something was amiss. This amounts to nothing more than an allegation of recklessness, which cannot, in and of itself, meet the scienter requirement. In support of their assertion that Ladenburg was, in addition, wilfully blind, plaintiffs argue that Ladenburg had two motives for ignoring the true state of affairs. Plaintiffs allege: (1) that Ladenburg sought to earn a substantial commission from the consummation of the sale of shares; (2) that Ladenburg sought "to curry favor with Copley with an expectation of being considered as an underwriter when Copley did go public." (Pl. Mem. Opp. Ladenburg at 16.)

Plaintiffs' allegations of motive are insufficient to withstand summary judgment. It can be surmised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 6

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

that Ladenburg wished to earn a commission in connection with the sale of shares and to participate as an underwriter should a company with which it had a close business relationship go public. However, it is undisputed that Ladenburg and its personnel sold their own holdings in Copley at the same time as plaintiffs. Had Ladenburg and its personnel retained their shares, they would have earned almost four times as much at the public offering than Ladenburg and its personnel earned in commissions and revenue from the sale of shares. [FN7] While Ladenburg did participate as an underwriter in the public offering of Copley, its participation was minor. (Ladenburg Reply Mem. at 19 n.11.) If plaintiffs' allegations of fraud are correct, Ladenburg "had no interest in remaining ignorant that [it was] being defrauded, and thus, obviously had no interest in remaining ignorant that [it was] in the process of being defrauded." *Fischbach,* 1992 WL 8715, at *7.

*7 Plaintiffs, while acknowledging that Ladenburg lost money, insist that Ladenburg was acting with scienter and simply "misjudged" the extent of its undervaluation of Copley, while simultaneously overvaluing the amount it would obtain as an underwriter when Copley went public. (Pl. Mem. Opp. Ladenburg at 15.) This speculation as to Ladenburg's miscalculation, however, is unsupported by any evidence and cannot preclude summary judgment. Plaintiffs, thus, have failed to meet their burden of establishing a triable issue of fact with respect to Ladenburg's scienter. Ladenburg's motion for summary judgment on the § 10(b) and Rule 10b-5 claim is granted. Similarly, Ladenburg is entitled to summary judgment on plaintiffs' claim for common law fraud. Under New York law, fraud "requires proof that plaintiff justifiably relied on a false representation of material fact made by defendant with intent to deceive, and that plaintiff was damaged thereby." *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir. 1991). A showing that Ladenburg acted with reckless disregard for the truth would suffice to satisfy the "falsity" element, however, plaintiffs would still have to establish Ladenburg's " intent to deceive." *Geler v. National Westminster Bank USA,* 770 F. Supp. 210, 212-13 (S.D.N.Y.

1991). Plaintiffs have failed to introduce evidence of such intent.

Ladenburg argues that the remaining state law claims must also be dismissed because plaintiffs' evidence fails to support a finding of gross negligence. Ladenburg is correct that plaintiffs' claim for breach of contract, based on an implied covenant of good faith and fair dealing in the Power of Attorney and Custody Agreement between each plaintiff and Ladenburg, requires a showing of, at a minimum, gross negligence. *Smith Barney, Harris Upham & Co. v. Liechtensteinische Landesbank,* 92 Civ. 2528, 1993 WL 97286, at *5 (S.D.N.Y. Mar. 31, 1993). With respect to plaintiffs' claims for negligent misrepresentation, breach of fiduciary duty, and violation of Chapter 93A of the General Laws of the Commonwealth of Massachusetts, Ladenburg argues that "[t]o the extent that ... these claims are based on simple negligence, they must be dismissed in view of plaintiffs' agreement to indemnify and hold Ladenburg harmless against any liability arising out of simple negligence." (Ladenburg Mem. Law at 26.)

I disagree, however, that Ladenburg is entitled to summary judgment on the issue of whether it acted in a grossly negligent fashion. Ladenburg argues that, at best, plaintiffs have introduced evidence to show that its due diligence prior to the sale was insufficient and that, as a matter of law, such a showing could sustain a finding of ordinary negligence, but not gross negligence or recklessness. However, plaintiffs have also introduced evidence to support their claim that Ladenburg failed to pursue its investigation despite " storm warnings" that the information supplied by Copley was false or incomplete. Although plaintiffs have failed to introduce sufficient evidence of motive, leading to an inference of intent, to withstand summary judgment on their claims under the federal securities laws, the evidence that they have introduced does raise a triable issue of fact as to whether Ladenburg acted with such "disregard for the rights ... of others" as to constitute gross negligence. *Federal Ins. Co. v. Honeywell, Inc.,* 641 F. Supp. 1560, 1563 (S.D.N.Y. 1986) (quoting N.Y. Pattern Jury Instructions 2:10A (Supp. 1986)); *see also Ford Pageant Inc. v. Consolidated Edison Co.,*

Not Reported in F.Supp.                                                                                      Page 7

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

429 N.E.2d 738, 740 (N.Y. 1981) (question of whether conduct constituted gross negligence is generally for the jury to decide).

**\*8** Because plaintiffs have met their burden of showing that there is a triable issue of fact with respect to whether Ladenburg was grossly negligent, summary judgment on plaintiffs' remaining state law claims will not be granted for the reasons urged by Ladenburg. However, I note that plaintiffs' Chapter 93A claim against Ladenburg fails because, as with the similar claim against the Copley defendants discussed *supra*, Massachusetts law does not apply to plaintiffs' suit.

### III. *CONCLUSION*

For the reasons set forth above, the Copley defendants' motion for summary judgment is granted with respect to plaintiffs' claims for (1) aiding and abetting Ladenburg in violations of federal securities laws, (2) breach of contract, and (3) violation of Chapter 93A of the General Laws of the Commonwealth of Massachusetts; the motion is otherwise denied. Ladenburg's motion for summary judgment is granted with respect to plaintiffs' claims for (1) aiding and abetting Copley in violations of federal securities laws, (2) violations of federal securities laws, (3) common law fraud, and (4) violation of Chapter 93A of the General Laws of the Commonwealth of Massachusetts; the motion is otherwise denied. The parties shall submit a proposed scheduling order to the court, providing for the case to be trial ready by January 31, 1996, within fifteen days of the date of this Opinion and Order.

So Ordered.

FN1. Max Smedresman ("Smedresman") has been involved in the generic drug industry since 1945, and has held and sold interests in several privately-held generic drug companies. Morton Rezak ("Rezak") has served as an executive in the generic pharmaceutical industry since the 1960's. Marlene Plymack bought and sold the

Copley stock held in her name at the direction of her husband, Edward Plymack. Edward Plymack founded a generic pharmaceutical company and has served as the chairman of the National Association of Pharmaceutical Manufacturers, the trade association of the generic drug industry.

FN2. Plaintiffs dispute that Marlene Plymack and Rezak signed the Powers of Attorney under oath based on their deposition testimony that they did not recall doing so. However, defendants have submitted copies of the signed and notarized documents.

FN3. For example, the Powers of Attorney state:
The undersigned hereby acknowledges that from time-to-time Copley has received indications of interest from possible acquirers, joint venture partners and investment banking firms interested in undertaking additional rounds of financings, including a possible public offering of Copley ("Financing Transactions"). While Copley has not entered into any agreement in principle or definitive agreement regarding any possible Financing Transactions (except for a financing to be provided by TA Associates, Inc., the proceeds of which shall be applied to the purchase of the Sale Shares) and is not currently engaged in any discussions which it believes in good faith are likely to lead to any agreement in principle or otherwise regarding Financing Transactions, the undersigned acknowledges that such transactions have been and are being considered by Copley on an ongoing basis as part of Copley's strategic planning process and Copley's obligation to consider the financial impact of any such proposal on its stockholders. The undersigned acknowledges that Copley, in the future, may enter into one or more Financing Transactions which could result in a valuation for the Sale Shares which is higher of [sic] lower than the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8

Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

purchase price being paid by Copley for the Shares. The undersigned hereby acknowledges that he is entering into this Power of Attorney and Custody Agreement with the full understanding of this possibility.
The Agreement contains similar language.

FN4. A letter from the FDA dated November 22, 1991 notified Copley that its ANDAs for albuterol sulfate tablets had been approved. A letter from the FDA dated November 27, 1991 notified Copley that its ANDA for albuterol sulfate solution had been approved.

FN5. The Copley defendants also argue that plaintiffs' 10b-5 claim is barred by the statute of limitations which requires that the claim be brought within one year after discovery of the facts constituting the alleged fraud. Defendants' argument, however, is based entirely on the premise that plaintiffs had actual or constructive notice of defendants' failure to disclose that certain ANDA approvals were imminent at the time of the sale of shares. I need not, and do not, reach the issue of whether plaintiffs could withstand a summary judgment motion if their 10b-5 claim were based solely on this alleged nondisclosure. The Copley defendants have not established, or argued, that a 10b-5 claim based on misrepresentation of the conditions of the TA/Copley debenture transaction, with respect to which plaintiffs have submitted sufficient evidence to withstand summary judgment, is barred by the statute of limitations. For the same reason, the Copley defendants' motion for summary judgment on plaintiffs' rescission claim, on the basis that plaintiffs delayed for too long before seeking that remedy, must be denied.

FN6. Plaintiffs allege, in addition, that there are genuine issues of material fact with respect to Ladenburg's actual knowledge of Copley's financial condition

and prospects and with respect to a possible conspiracy between Copley and Ladenburg to defraud plaintiffs. I disagree. The strongest conclusion plaintiffs' evidence supports is that Ladenburg failed to pursue accurate information concerning Copley's financial condition, despite indications that it was relying on inadequate information in connection with the sale of shares.

FN7. Ladenburg asserts, and plaintiffs do not dispute, that Ladenburg and its personnel received $645,000 for their shares and warrants and $399,500 in commissions as a result of the sale of shares. Had Ladenburg and its personnel sold their shares at the public offering, they would have received $4,175,000. (Ladenburg Mem. Law at 15 n.9.).

S.D.N.Y.,1995.
Plymack v. Copley Pharmaceutical, Inc.
Not Reported in F.Supp., 1995 WL 606272 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:93cv02655 (Docket) (Apr. 22, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a contract, which was clearly a contract in adhesion, between the parties, to allow the defendants to deprive the plaintiff, by a Massachusetts citizen from asserting his rights under Massachusetts law, by the defendants insisting on applying an agreement concerning the place of the litigation, to a non-contractual claim.


## CONCLUSION

For the reasons stated herein, the Defendant's Motion to Dismiss the Amended Complaint concerning Count V, applying Massachusetts Discrimination Statutes should be denied.



Respectfully Submitted,


_____/s/ Gary W. Aber_____
Gary W. Aber (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED:  August 1, 2006

# EXHIBIT 4



received
JUN 2 9 , 4~

JUN 2 9 2006

### The Commonwealth of Massachusetts
### Commission Against Discrimination
### One Ashburton Place, Boston, MA 02108
### Phone:  (617) 994-6000 Fax:  (617) 994-6024

- **DISMISSAL and NOTIFICATION of RIGHTS -** 6/23/06

| To: | Lawrence J. Casey, Esq. | **Case:** Alan D. Paul v. Deloitte & Touche USA, LLP, |
|---|---|---|
| | Perkins, Smith & Cohen LLP | Vince DeGutis, Frank Marcos |
| | One Beacon Street, 30th Fl. | **MCAD Docket Number:** 04BEM03555 |
| | Boston, MA 02108 | **EEOC Number:** 16C-2005-00663 |
| | | **Investigator:** Geraldine A. Fasnacht |

Your complaint has been dismissed for the following reasons:

[ ]    The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ] .    Respondent employs less than the required number of employees.

[ ]    Your complaint was not timely filed with the Commission, i.e. you waited too
long after the date(s) of the alleged discrimination to file.  Because it was filed outside the time limit
prescribed by law, the Commission cannot investigate your allegations.

[ ]    You failed to provide requested information, failed or refused to appear or to be available for necessary
interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been
unable to resolve your complaint.  You have had more than 30 days in which to respond to our written
request.

[ ]    The Commission's efforts to locate you have been unsuccessful.  You have had at
least 30 days in which to respond to a notice sent to your last known address.

[ ]    The Respondent has made a reasonable settlement, offering full relief for the
harm you alleged.  30 days have expired since you received actual notice of this settlement offer.

[ ]    The Commission issues the following determination.  Based upon the
Commission's investigation, the Commission is unable to conclude that the information obtained
establishes a violation of the statutes.  This does not certify that the Respondent is in compliance with the
statutes.  No finding is made as to any other issues that might be construed as having been raised by this
complaint.

[XX]    Other: **Complainant filed a private right of action in civil court.**

Walter J. Sullivan Jr.                                    Date   6/13/06
Investigating Commissioner

Cc:    Ella Solomons, Esq
Deputy General Counsel
Deloitte & Touche
1633 Broadway St, 37 Floor
New York, NY 10019

MCAD Docket Number 04BEM03555, Dismissal and Notification of Rights without Appeal Rights

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two copies of the attached pleading were

hand delivered to the following counsel on August 2, 2006:

Sheldon N. Sandler, Esquire
Young, Conaway, Stargatt & Taylor
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899

Melissa A. Chionchio
Secretary to Gary W. Aber, Esquire

13