IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALAN D. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 06-225-KAJ |
| v. | ) | |
| | ) | Trial By Jury Demanded |
| DELOITTE & TOUCHE LLP, | ) | |
| and DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT
(MASSACHUSETTS DISCRIMINATION STATUTE)**

Sheldon N. Sandler (No. 245)
Margaret M. DiBianca (No. 4539)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
ssandler@ycst.com
Attorney for Defendants

DATED:    August 21, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

ARGUMENT ...................................................................................................................... 1

I.     UNDER THE PROPER ANALYSIS, DELAWARE LAW MUST
GOVERN, AND COUNT V, A CONTRACT CLAIM BROUGHT
UNDER THE LAWS OF A FOREIGN STATE, MUST BE DISMISSED........................ 1

II.    THE GOVERNING LAW PROVISION IS VALID AND EFFECTIVE
AND REQUIRES THE APPLICATION OF DELAWARE LAW..................................... 3

      A.    The Delaware Choice of Law Statute Expressly Requires the
Application of Delaware Law Without Regard to a Conflict of Laws
Analysis.................................................................................................................... 3

      B.    The Governing Law Provision Is Effective Even Without the
Delaware Choice of Law Statute ........................................................................... 6

      C.    Even if the Relationship Between the State and the Parties' Dispute
Was Not Substantial Enough to Trigger § 187, Application of §
145(1) to Plaintiff's Contract-Based Claim Would Still Be Improper ................... 9

CONCLUSION.................................................................................................................. 12

# TABLE OF AUTHORITIES

**Cases**

Abry Partners V, L.P. v. F&W Acquisition LLC,
    891 A.2d 1032 (Del. Ch. 2006) ................................................................................... 4

AIC Ltd. v. Mapco Petro., Inc.,
    711 F. Supp. 1230 (D. Del. 1989)............................................................................... 6

Brown v. Trustees of Boston Univ.,
    C.A. No. 81-2589-S, 1987 U.S. Dist. LEXIS 14446 (D. Mass. March 9, 1987)...................... 9

Edelist v. MBNA Amer. Bank,
    790 A.2d 1249 (Del. Super. 2001) ......................................................................... 5, 8

Hionis Int'l Enterps., Inc. v. Tandy Corp.,
    867 F. Supp. 268 (D. Del. 1994)............................................................................... 6

Klaxon Co. v. Stentor Mfg. Co.,
    423 U.S. 3 (1975).................................................................................................... 4

Kolb v. Goldring, Inc.,
    694 F.2d 869, 871-72 (1st Cir. 1982) ....................................................................... 9

Kreider v. F. Shumacher & Co.,
    816 F. Supp. 957 (D. Del. 1993)............................................................................... 4

Lloyd v. MBNA Am. Bank, N.A.,
    No. 01-1752, 2002 U.S. App. LEXIS 1027, (3d Cir. Jan. 7, 2002)........................... 4

Oliver B. Cannon & Son v. Dorr-Oliver,
    394 A.2d 1160 (Del. 1978) ...................................................................................... 1

Rogers v. Exxon Res. & Engineering Co.,
    550 F.2d 834, 838 (3d Cir. 1977), cert. denied, 434 U.S. 1022 (1978) ................... 1, 9

Rosenmiller v. Bordes,
    607 A.2d 465 (Del. Ch. 1991) .................................................................................. 6

Travelers Indemn. Co. v. Lake, 594 A.2d 38, 47 (Del. 1991) ........................................ 2

Weil v. Morgan Stanley DW, Inc.,
    877 A.2d 1024,1032 (Del. Ch. 2005). ........................................................... 2, 10, 11

Weiss v. Northwest Broad., Inc.,
    140 F. Supp. 2d 336 (D. Del. 2001)......................................................................... 8

Wilmington Trust Co. v. Wilmington Trust Co.,
   24 A.2d 309, 313 (Del. 1942) ................................................................................... 7

Zavecz v. Yield Dynamics, Inc.,
   No. 05-2232, 2006 U.S. App. LEXIS 10984 (3d Cir. May 3, 2006) ......................... 2

**Statutes**
6 Del. C. § 2708 ................................................................................................... 1, 4

6 Del. C. § 2708 (2006) ........................................................................................ 1, 4

M.G.L. ch. 151B ....................................................................................................... 1

**Other Authorities**
HB 291 69 137th Gen. Assemb. Del. Laws 127 (1993) .................................................. 5

Restatement (Second) Conflict of Laws § 187 (1971)............................................. 1, 2, 6

Restatement (Second) Conflicts of Laws § 145(1)  (1971) ........................................... 1

Restatement (Second) of Conflict of Laws § 188 (1971) .............................................. 2

Roberta Romano, Empowering Investors: A Market Approach to Securities Regulation,
   107 Yale L.J. 2359 (1998) ............................................................................................. 5

**ARGUMENT**

I.    **UNDER THE PROPER ANALYSIS, DELAWARE LAW MUST GOVERN, AND COUNT V, A CONTRACT CLAIM BROUGHT UNDER THE LAWS OF A FOREIGN STATE, MUST BE DISMISSED**

At issue in the present motion is the viability of Count V of Plaintiff's Amended Complaint in which Plaintiff asserts a claim for age discrimination under the Massachusetts Fair Employment Practices Act, M.G.L. ch. 151B.  (D.I. 7 at 7-8).  It is undisputed that the Parties executed two agreements, (collectively, "the Agreements"), (D.I. 19 at 5), and that the Agreements each contain a choice of law provision entitled "Governing Law."  (D.I. 19 at 5).  It is further undisputed that Plaintiff's claim relates to "the relationship between the plaintiff and the partnership."  (D.I. 19 at 6).

In his Answering Brief, Plaintiff argues that § 145(1) of the Restatement (Second) of Conflict of Laws (1971) is dispositive.  (D.I. 19 at 8).  Section 145(1) does not control the present analysis.  A conflict of laws analysis may only be conducted when the laws of the forum do not speak directly to the issue.  Delaware law, however, explicitly provides that a contractual choice of law provision is enforceable, regardless of either the relationship of the parties to the state or the principles of conflicts of laws.  6 Del. C. § 2708 (2006).

Even without the Delaware Choice of Law Statute, the Governing Law provisions are still effective under §§ 187 and 188 of the Restatement.  Sections 187 and 188 apply to contract claims such as Plaintiffs, whereas § 145(1) applies to tort claims.  See Oliver B. Cannon & Son v. Dorr-Oliver, 394 A.2d 1160 (Del. 1978) (adopting §§ 187-88 for contract claims); and see Rogers v. Exxon Res. & Engineering Co., 550 F.2d 834, 838 (3d Cir. 1977), cert. denied, 434 U.S. 1022 (1978) (holding that a claim of age discrimination "arising out of the breach of an employment agreement is a routine contract action"); cf., Travelers Indemn. Co. v. Lake, 594

1

A.2d 38, 47 (Del. 1991) (adopting § 145(1) for tort claims).  Section 187 of the Restatement requires the court to give effect to a contractual choice of law provision unless the chosen state bears "no substantial relationship to the parties or transaction."  See Zavecz v. Yield Dynamics, Inc., No. 05-2232, 2006 U.S. App. LEXIS 10984, at *14-15 (3d Cir. May 3, 2006) (citing Restatement (Second) of Conflict of Laws § 188 (1971)).  As a signatory to the Agreements, which contain forum selection and choice of law provisions providing for the application of Delaware law, Plaintiff cannot dispute that the requisite relationship exists.  Nor can Plaintiff dispute that the partnerships, his relationship with which are at the heart of this dispute, are formed under Delaware law.  (D.I. 19 at 6) (Plaintiff's claim arises from "the relationship between the plaintiff and the partnership.").

Even if Delaware's relationship with the Parties or the dispute was insufficient to trigger § 187, an analysis under § 145(1) is still inappropriate.  Section 145(1) applies only to tort claims.  In that case, Restatement § 188 should guide the Court's analysis.  Section 188 is used to evaluate contract claims such as Plaintiff's.

Delaware case law instructs the Court to effectuate the clear intent of the Parties, as expressed in the Governing Law provisions.  See Weil v. Morgan Stanley DW, Inc., 877 A.2d 1024, 1032 (Del. Ch. 2005).  The Parties intended that Delaware law govern all disputes arising out of "the relationship of the plaintiff and the partnership."  (D.I. 19 at 6).  Plaintiff's proposed analysis under § 145(1) requires the Court to ignore this "logical conclusion."  Id.  Under no set of circumstances would Restatement § 145(1) provide for the application of Massachusetts law.  Indeed, under any of the analyses described above, Delaware law must be applied, requiring the dismissal of the Massachusetts state law claim asserted in Count V of Plaintiff's Amended Complaint.

2

064406.1002

II.    **THE GOVERNING LAW PROVISION IS VALID AND EFFECTIVE AND REQUIRES THE APPLICATION OF DELAWARE LAW**

In his Answering Brief, Plaintiff asserts that, by "applying Delaware conflict of law rules," the Court will find that the law of Massachusetts, as the "state where the wrongful conduct occurred," controls the present matter. (D.I. 19 at 5). Plaintiff goes on to conclusively assert that the appropriate "Delaware conflict of laws rule" is § 145(1) of the Restatement (Second) of Conflict of Laws, which is contained in the "Torts" section of Chapter 7 of the Restatement.

Plaintiff quotes a large portion of text from the Governing Law provisions in support of his claim that § 145(1) provides the proper analysis. (D.I. 19 at 7). Plaintiff then states that it "can be clearly seen" that the provisions "limit the application of Delaware Law to disputes involving the agreements themselves." (D.I. 19 at 7).

Omitted from the quote, however, is the portion of the Governing Law provisions that incorporates Section 2708 of Title 6 of the Delaware Code. Review of the full text of the provisions makes clear that Plaintiff's analysis is fundamentally flawed. The Parties expressly accepted Delaware law as controlling. Additionally, the Parties expressly agreed that this State's laws would be applied without application of a conflict of laws analysis. Plaintiff's attempt to characterize the present motion as a question to be resolved by a conflict of laws analysis under Section 145(1), therefore, is fundamentally flawed. Instead, the unambiguous terms of the Agreements must be given their intended effect and Delaware law must be applied.

A.    **The Delaware Choice of Law Statute Expressly Requires the Application of Delaware Law Without Regard to a Conflict of Laws Analysis**

A conflict of laws analysis, as proposed by Plaintiff, would contravene the express public policy of this State as explicitly provided under Delaware law. When attempting

3

to determine the appropriate law to apply, the federal court must look to the laws of the state in which it sits. Klaxon Co. v. Stentor Mfg. Co., 423 U.S. 3 (1975); Kreider v. F. Shumacher & Co., 816 F. Supp. 957 (D. Del. 1993). In this instance, the laws of the State of Delaware are clear. Through the enactment of Section 2708 of Chapter 6 of the Delaware Code, the Delaware General Assembly has provided explicit instruction to the courts on this State's public policy. Abry Partners V, L.P. v. F&W Acquisition LLC, 891 A.2d 1032, 1047 (Del. Ch. 2006).

Section 2708 of Chapter 6 of the Delaware Code, ("the Choice of Law Statute" or "the Statute"), directly addresses choice of law provisions such as the one contained in the Agreements. 6 Del. C. § 2708 (2006). The Statute specifically "permits parties to agree that their contracts be governed by Delaware law without regard to conflicts of law principles." Lloyd v. MBNA Am. Bank, N.A., No. 01-1752, 2002 U.S. App. LEXIS 1027, at *3 (3d Cir. Jan. 7, 2002). The Choice of Law Statute provides:

> The parties to any contract . . . may agree in writing that the contract . . . shall be governed by or construed under the laws of this State without regard to principles of conflicts of laws. . . *The foregoing shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State*. . . . (c) This section shall not apply to any contract . . . (ii) involving less than $100,000.
>
> [6 Del. C. § 2708(a), (c) (emphasis supplied)].

The Governing Law provisions explicitly invoke the protections of the Statute. The Governing Law provisions, like the Statute, state that the Agreements ". . . shall be governed and construed in accordance with the laws of Delaware without giving effect to its conflict of law rules . . . [that e]ach of the Parties agrees (a) that this Agreement involves at least $100,000, and (b) that each of the Parties has expressly relied upon 6 Del. C. § 2708." (D.I. 19 at 7); Agreements at § 13.02 (Deloitte & Touche LLP) and § 14.02 (Deloitte & Touche USA LLP). In

4

Edelist v. MBNA America Bank, the agreement in question contained nearly identical language,

providing that "it is governed by the laws of the State of Delaware, without regard to its conflicts

of laws principles and by any applicable federal laws." 790 A.2d 1249, 1255 (Del. Super. 2001).

In Edelist, the court recognized that the phrase, "without regard to its conflicts of laws

principles," referred to a "special Delaware statute on choice of law," 6 Del. C. § 2708(a). Id.

(declining to apply the Statute because the contract did not involve $100,000).

The Statute "guarantees enforcement of contractual choice of law provisions

regardless of standard conflicts rules, such as whether the parties have any relationship to the

state." Roberta Romano, Empowering Investors: A Market Approach to Securities Regulation,

107 Yale L.J. 2359, 2412 (1998). The synopsis of the statute explains the policy behind the

enactment of the rule:

> In many commercial transactions that may have material
> relationships with jurisdictions other than Delaware, the parties
> choose Delaware law to govern their agreements. This Bill is
> designed to give maximum effect to the principle of freedom of
> contract and the enforceability of such provisions in contracts . . .
> and to provide the parties . . . with the certainty that [Delaware]
> courts . . . will enforce such choice of law provisions. The Bill is
> intended to *supersede all Delaware common law limitations on the
> enforceability of Delaware choice of law provisions (including
> any restrictions contained in the Restatement (Second) Conflict
> of Laws)*. . .
>
> [HB 291, 137th Gen. Assemb., Del. Laws 127 (1993) (codified as
> 6 Del. C. § 2708 (1993)) (emphasis supplied)].

The intent of the General Assembly is clear. The Governing Law provision must

be given effect without any reference to the Restatement, including Section 145(1). To perform

a conflict of laws analysis directly contradicts the unequivocal intent of the Delaware General

Assembly as codified in the controlling state statute. Plaintiff's claims, therefore, are evaluated

5

under Delaware law. Count V, which is brought under Massachusetts state law, fails to state a

claim and must be dismissed.

**B.    The Governing Law Provision Is Effective Even Without the Delaware Choice of Law Statute**

"Under Delaware law, express choice of law provisions in contracts are generally

given effect." Hionis Int'l Enters., Inc. v. Tandy Corp., 867 F. Supp. 268, 271 (D. Del. 1994)

(internal quotations omitted); A.I.C. Ltd. v. Mapco Petro., Inc., 711 F. Supp. 1230, 1237 (D. Del.

1989). Restatement (Second) of Conflicts of Law § 187, as adopted in Delaware, requires that a

contractual choice of law provision be given effect unless the state whose law would otherwise

control has a "materially greater interest" in the resolution of the parties' dispute. Kreider v. F.

Schumacher & Co., 816 F. Supp. 957, 960 (D. Del. 1993) (citing Rosenmiller v. Bordes, 607

A.2d 465, 468 (Del. Ch. 1991)). Plaintiff cannot meet this heavy burden. Delaware has a

substantial relationship both to the Parties and to the dispute, as evidenced by the Agreements

and supported by Delaware case law. Because the substantial relationship requirement has been

met, the contractual choice of law provision must be given effect.

Restatement § 187, titled "Law of the State Chosen by the Parties," requires the

enforcement of a contractual choice of law provision, unless:

> (a) the chosen state has no substantial relationship to the parties or
> the transaction and there is no other reasonable basis for the
> parties' choice, or (b) application of the law of the chosen state
> would be contrary to a fundamental policy of a state which has a
> materially greater interest than the chosen state in the
> determination of the particular issue and which, under § 188,
> would be the state of the applicable law in the absence of an
> effective choice of law by the parties.

[Restatement (Second) of Conflict of Laws § 187 (1971)].

Plaintiff makes no assertion that the laws of Delaware would somehow be

contrary to the public policy of the State of Massachusetts, nor does he assert that Massachusetts

6

has any greater interest in the outcome of the dispute than Delaware.  In short, so long as there is

some "substantial relationship" between Delaware and either the Parties or the Agreements or

there is some other "reasonable basis" for choosing Delaware law, the Governing Law provision

must be enforced.  See, e.g., Wilmington Trust Co. v. Wilmington Trust Co., 24 A.2d 309 (Del.

1942).

      The District Court has previously held that the mere fact that one of the parties is

organized under Delaware law satisfies the "substantial relationship" requirement of § 187.  In

A.I.C., Ltd. v. Mapco Petroleum, Inc., the District Court upheld a similar choice of law provision

based on the fact that the defendant was a Delaware corporation.  711 F. Supp. at 1237.

Similarly, in Haft v. Dart Group Corp., the District Court found that the requisite "substantial

relationship" was "clearly present" because the defendants were incorporated in Delaware.  841

F. Supp. 549, 563 (D. Del. 1993).  Defendants are Limited Liability Partnerships organized under

Delaware law.  (D.I. 7 at ¶2).  Therefore, even under the most basic analysis, the requisite

relationship is established.

      Additional support for the conclusion that the requisite relationship exists is found

in other provisions of the Agreements.  For example,  the Governing Law provisions state that

the Agreements "shall be deemed to be executed in the City of Wilmington, State of Delaware,

regardless of the domiciles of the several parties hereto or where it is in fact executed."

(Agreements at §§ 13.02; 14.02).  By identifying Delaware both as the chosen state and as the

place of contracting, the necessary relationship between the State and the Agreements is

established.  Lloyd, 2002 U.S. App. LEXIS at *4.  The Agreements' forum selection clauses

have a similar effect.  By selecting Delaware as the designated venue for litigation between the

Parties, a substantial relationship between the State and the dispute is established.  See Edelist,

790 A.2d at 1256 (noting the significance of forum selection clause between the parties' selecting Delaware as the preferred state).

Indeed, the fact that the Parties chose Delaware law to govern the Agreements necessarily implies that the requisite relationship exists. Id. For example, in Weiss v. Northwest Broad., Inc., a contractual choice of law provision was enough to satisfy the court of the parties' intent to apply the law of the chosen state. 140 F. Supp. 2d 336, 342 (D. Del. 2001). In upholding the provision, the District Court simply stated that it could "find no reason to disturb the parties' choice." Id.

In Edelist, a choice of law analysis was required only because the agreement did not involve $100,000, as mandated by the Statute. 790 A.2d at 1256. Even then, the court pointed to the choice of law provision as support for its decision to apply Delaware law. Id. at 1255-57. The court noted that, in the agreement, Delaware was more than the pre-selected venue. Id. at 1256-57. Delaware was also the state whose law was chosen to be applied. Id. "This choice, when [the plaintiff] filed his complaint, was satisfactory to him but only later was something he sought to avoid." Id. Plaintiff may not avoid the terms of the same Agreements he seeks to enforce. Plaintiff, a sophisticated, high-earning CPA and partner, was eminently capable of negotiating the terms of the Agreements at arm's-length.

It is well-settled that Delaware has a strong interest in disputes involving Delaware business entities, including Limited Liability Partnerships. Further, the parties explicitly agreed that the Agreements were executed in the State. The selection of the State of Delaware as the proper venue further demonstrates the material connection of this State to the parties' dispute. Finally, the Governing Law provisions cannot be ignored. As contractual choice of law provisions, these sections assure the Court that the material linkage requirement is

met. Therefore, under § 187, as adopted in Delaware, the Governing Law provisions must be given effect. Delaware Law must be applied and Count V must be dismissed, as it fails to state a claim under which relief can be granted.

> **C.    Even if the Relationship Between the State and the Parties' Dispute Was Not Substantial Enough to Trigger § 187, Application of § 145(1) to Plaintiff's Contract-Based Claim Would Still Be Improper**

Plaintiff's Answering brief asserts that the present analysis is controlled by Section 145(1) of the Restatement. Plaintiff's argument assumes that Section 145(1) is applicable because Count V of Plaintiff's Amended Complaint is a claim based in tort, but fails to provide any legal precedent for such assumption. Count V, however, is a claim of age discrimination asserted under the Massachusetts state discrimination statute.

The Third Circuit has held that a claim of age discrimination "arising out of the breach of an employment agreement *is a routine contract action*." Rogers v. Exxon Res. & Engineering Co., 550 F.2d 834, 838 (3d Cir. 1977) (emphasis supplied), cert. denied, 434 U.S. 1022 (1978). Notably, the First Circuit, which includes Massachusetts, is among the other jurisdictions that have adopted this interpretation. In Kolb v. Goldring, Inc., the First Circuit followed this Circuit's precedent, holding that age discrimination claims "fall under the contract rubric." 694 F.2d 869, 871-72 (1st Cir. 1982) (distinguishing the tort plaintiff from the plaintiff suing under the ADEA); see also Brown v. Trustees of Boston Univ., C.A. No. 81-2589-S, 1987 U.S. Dist. LEXIS 14446, at *18-19 (D. Mass. March 9, 1987) ("A suit for damages consisting of back wages arising out of the breach of an employment agreement is a routine contract action") (internal citations omitted). Plaintiff's state law claim for age discrimination brought in Count V is a claim based in contract, not in tort, and, therefore, Section 145(1) does not apply.

9

Plaintiff further argues that the scope of the Governing Law provision must be "limited only to the claims contained in the contract itself." (D.I. 19 at 8). Plaintiff cites three district court opinions from outside this jurisdiction in support of his assertion that his discrimination claim did not "arise out of the [A]greements between the [P]arties." (D.I. 19 at 8). This argument, however, is based entirely on the inaccurate and unsupported assumption by Plaintiff that his age discrimination claim is a tort-based claim. Plaintiff's contract-based claim for age discrimination, unlike tort-based claims such as negligence and fraudulent misrepresentation, arise from and relate to the Agreements. The contractual choice of law provision is, therefore, controlling.

Even if the Court were to determine that it is a "close question" as to whether Count V is a tort or contract based claim, application of Delaware law would require the Governing Law provisions to control. In Weil v. Morgan Stanley DW, Inc., the Delaware Court of Chancery evaluated whether a valid choice of law provision controlled a claim for breach of fiduciary duty. 877 A.2d 1024,1032 (Del. Ch. 2005). The court first stated that, when attempting to determine the scope of a choice of law provision, the law of the contractually chosen state must be applied. Id. Applying this statement to the present case, Delaware law determines the scope of the Governing Law provisions. Next, the court noted that it was a "close question" as to whether a claim for breach of fiduciary duty could be said to arise from the contract. Id. The fiduciary duties, which were at the heart of the claim, "arose solely out of the relationship created by [the plaintiff's] contract with [the defendant]." Id. And, under that contract, the parties had agreed that California law would control. Id.

The present case is similar in both fact and application. Here, Plaintiff claims a breach of the duties owed in the employment context. Any duty Plaintiff may claim was owed to

10

him arose from the Agreements, which created the relationship between the Parties. As stated by Plaintiff in his Answering brief, the present litigation arises from "the relationship between the plaintiff and the partnership." (D.I. 19 at 6). The Agreements, which gave life to the Parties' relationship, also define the contours of that relationship in great detail. Everything having to do with the relationship of the Parties, as well as Plaintiff's role as a partner in the partnership, can only logically be said to arise out of the Agreements that created and controlled the partnership and Plaintiff's role in it. This can only logically mean that the Governing Law provision must be applied.

As the Court of Chancery stated, a choice of law provision "should not be interpreted in a crabbed way that creates a commercially senseless bifurcation between pure contract claims and other claims that arise solely because of the nature of the relations between the parties created by the contract." Id. As in Weil, Plaintiff entered into the Agreements as a sophisticated businessperson. Disputes arising from the Agreements "shall be governed and construed in accordance with the laws of Delaware." And, as in Weil, "the logical conclusion is that he intended that law to apply to *all* disputes arising out of the transaction or relationship." Id. at 1033 (internal citations omitted).

11

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler (Bar I.D. 245)
Margaret M. DiBianca (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
ssandler@ycst.com
Attorneys for Defendants

DATED:    August 21, 2006

DB02:5475872.1                                                                        064406.1002

## CERTIFICATE OF SERVICE

I, Sheldon N. Sandler, Esquire, hereby certify that on Monday, August 21, 2006, I electronically filed a true and correct copy of the foregoing **Defendants' Reply Brief in Support Of Their Motion to Dismiss Or, Alternatively, For Summary Judgment** which will send notification that such filing is available for viewing and downloading to the following counsel of record. A courtesy copy of such **Defendants' Reply Brief in Support Of Their Motion to Dismiss Or, Alternatively, For Summary Judgment** was also hand delivered to the following counsel of record on this date.

Gary W. Aber, Esquire
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE 19899-1675

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 0245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Email: ssandler@ycst.com
Attorneys for Defendant

DATED:       August 21, 2006

LEXSEE 1987 US DIST. LEXIS 14446

**DR. JULIA PREWITT BROWN, Plaintiff, v. TRUSTEES OF BOSTON UNIVERSITY, Defendant**

**Civil Action No. 81–2589–S**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*1987 U.S. Dist. LEXIS 14446*

**March 9, 1987, Decided; Supplemental Order July 16, 1987**

**COUNSEL:** **[\*1]**

Sandra Sue McQuay, Robert Hale, Goodwin, Procter & Hoar, Boston, MA

TRUSTEES, Michael B. Rosen, Boston, MA

Kathryn Noonan, Dahlia Rudavsky, McDonald & Noonan, Newton, MA

**OPINIONBY:**

SKINNER

**OPINION:**

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO DENY PLAINTIFF'S DEMAND FOR A JURY TRIAL

WALTER JAY SKINNER, UNITED STATES DISTRICT JUDGE

Plaintiff ("Brown") was a professor at Boston University ("BU"). She has brought suit charging that the decision of the Trustees of Boston University ("the Trustees") to deny her tenure application was motivated by sex discrimination and a desire to punish her for her union activities. The complaint now contains four counts. Count I alleges breach of contract. Brown claims that the Trustees' actions in denying her tenure violated the collective bargaining agreement ("the agreement") then in effect between the Boston University Chapter of the American Association of University Professors ("BUC–AAUP") and the Trustees. Count II alleges that the Trustees violated the covenant of good faith and fair dealing implicit in the agreement. Count III alleges that. the Trustees' sex-based denial violated Title VII of the Civil Rights Act of 1964, **[\*2]** *42 U.S.C. § 2000e* et seq. Count IV alleges a violation of M.G.L. c. 151B. The Trustees have now moved for summary judgment as to Counts I and II, and

for denial of Brown's jury demand as to all counts.

Count I – Breach of Contract

Brown alleges that the Trustees' decision to deny her tenure was motivated by both sex discrimination and a desire on the part of the Trustees to punish her for her support of strikes by BU faculty members and clerical workers. In claiming that the Trustees' action violated the agreement, she relies on two sections of the agreement. The Memorandum of Settlement which terminated the 1979 faculty strike, and which was incorporated in the agreement, states in pertinent part:

4. Recognizing that the future of Boston University depends in large part upon the mutual good will and trust of all components of the University community, the Trustees and the Chapter [the BUC–AAUP] agree that there shall be no reprisals or abuse, either institutional or personal, against any member of the University community for his/her actions during the strike.

Article XI of the agreement, entitled "No Discrimination," provides:

The Trustees, the Administration, the schools **[\*3]** and departments of Boston University, and the Chapter shall practice no unlawful discrimination on the basis of race, religion, national origin, sex, age, marital status, or physical handicap. Allegations of violations of this provision shall be directed to the appropriate governmental agency.

The basic tenure process, as set forth in Article V of the agreement, is as follows. Generally, a BU professor is considered for tenure in her sixth year at BU. A professor is to be notified by the beginning of the last semester of her fifth year that she will indeed be reviewed for tenure the following year. She is then provided with guidelines for compiling her dossier.

1987 U.S. Dist. LEXIS 14446, *3

The first evaluation is made by the tenured faculty of a candidate's department. The chairperson of the department then transmits the departmental recommendation and own personal recommendation to the dean of the school of which the department is a part, and to that school's Appointments, Promotions and Tenure Committee ("APT"). The school APT then makes its judgment and reports that judgment to the dean. If the dean approves the school APT's recommendation, he forwards that recommendation along with his own decision, and the **[*4]** reasons therefor, to the provost, who in turn forwards the decisions to the University APT, a broader group. The University APT reports its decision back to the provost.

Brown's department recommended her for tenure by a 22–0 vote, the School APT recommended her for tenure by a 9–0 vote, and the University APT recommended her for tenure by a 9–2 vote. Brown has submitted evidence that other (male) faculty members with similar support were given tenure.

In the procedure relevant to this case, if the provost disagrees with the combined judgment of the University APT and the School APT, the Provost forwards the case to an ad hoc Tenure Review Committee ("TRC"), composed of three impartial persons from outside BU, designated respectively by the provost, the University APT and through mutual agreement of the two. The provost disagreed with the recommendation that Brown be given tenure, and he duly forwarded Brown's case to a TRC. The TRC recommended that Brown be given tenure by a 2–1 vote.

The provost then transmits the TRC judgment, and his personal judgment, to the president. The provost recommended to President Silber that Brown be denied tenure. President Silber also recommended to **[*5]** the Trustees that Brown be denied tenure, and the Trustees acted on his recommendation.

The Trustees maintain that the agreement provided a grievance mechanism for complaints challenging the tenure process, and that Brown is barred from suit in this court because she failed to exhaust the grievance mechanism. Article V–C.9 provides:

Allegations that the procedures set forth in this Article have not been followed are subject to the grievance procedure. Should an arbitrator find that a procedural defect prejudices the candidate, he/she may direct that the procedural defect be corrected, but shall have no authority to grant tenure. No candidate has the right to tenure on the basis of procedural error.

The Trustees' argument is premised on *Republic Steel v. Maddox, 379 U.S. 650, 652 (1965),* in which

the Supreme Court stated. that "[a]s a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." (Footnote omitted.) Any doubt concerning whether a contract complaint must be grieved must **[*6]** be resolved in favor of requiring use of the grievance procedure. *Id., at 653* (citing *United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); Belk v. Allied Aviation Service Co., 315 F.2d 513* (2nd Cir.), cert. denied, sub nom. *Rogers v. Allied Aviation Service Co., 375 U.S. 847 (1963)).*

Brown has conceded that she did not exhaust the grievance procedures outlined in Article XXVI of the agreement, as seemingly required for tenure disputes by Article V. The BUC–AAUP filed a grievance on Brown's behalf concerning the tenure denial, but it was withdrawn at Brown's request.

Brown charcterizes Count I as challenging the substance of the final decision made by the Trustees, rather than the failure of the administration to follow the procedures set out in Article V. Brown too relies on the language of the agreement: "The decision of the Trustees shall be final and not subject to the grievance procedure." Brown argues, and I agree, that this language brings Brown's challenge to the tenure decision in this court within the exception noted in Maddox:

The federal rule would not of course preclude [plaintiff's] court suit if the parties to the **[*7]** collective bargaining agreement expressly agreed that arbitration was not the exclusive remedy.

*Maddox, supra, at 657–58.* While if there is doubt, such doubt must be resolved in favor of requiring utilization of the grievance mechanism, I see no room for doubt. Challenges to a substantive decision by the Trustees to deny tenure are not grievable. Therefore, Brown is entitled to bring her breach of contract claim in this court.

The Trustees make one further argument that applies to Brown's charge of sex discrimination. As noted, supra, Article XI, which forbids discrimination, states that "[a]llegations of violations of this provision shall be directed to the appropriate governmental agency." The Trustees suggest that this sentence denies a right of action under the contract for discrimination claims. Brown argues that the sentence does not prevent a private right of action, but rather directs initial processing of complaints of discrimination away from the grievance mechanism and towards whatever statutory administrative mechanism may have been set up for a particular complaint of discrimination. I agree with Brown's interpretation, and I

1987 U.S. Dist. LEXIS 14446, *7

hold that Brown may bring an **[*8]** action in this court for breach of Article XI of the agreement.

Brown's basic argument is one of superfluity. If Article XI does not create a right to sue for its breach, and instead is only telling complainants what they can do with their complaints, it is completely pointless, because whatever statutory discrimination remedies BU faculty members possess, they possess regardless of the contents of the agreement. The only reason to include an antidiscrimination clause in the agreement is to give the BUC–AAUP members the right to sue under the agreement when they find themselves to be victims of discrimination.

It makes perfect sense that the parties would provide for initial presentation of discrimination complaints to governmental administrative authority rather than to the grievance mechanism. As noted, Counts III and IV of the Complaint allege violations of Title VII and of M.G.L. c. 151B, respectively. Those allegations could not be brought until after plaintiff had exhausted her administrative remedies under those statutory provisions. Brown in fact brought charges of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment **[*9]** Opportunity Commission ("EEOC"). Pursuant to the work–sharing agreement between the two agencies, the EEOC investigated Brown's complaint. She did not amend her complaint in this court to include Counts III and IV until she received a right–to–sue letter from the EEOC.

The requirement in Article XI that allegations of discrimination be brought to the appropriate governmental agency simply represents the parties' recognition that any person who feels that they have any action under Article XI will also feel, as did Brown, that she has a statutory remedy as well. Since the statutory remedy requires presentation of the complaint to a governmental agency initially, the parries required that Article XI claims be directed to a governmental agency rather than to the grievance mechanism in order to eliminate what would now be a duplicative step. Directing Article XI complaints to governmental agencies allows discrimination actions under the agreement to proceed congruently with the statutory process.

Finally, the Trustees appear to argue that Brown's complaint is barred because she did not exhaust her MCAD remedies. This argument fails to note that in this case MCAD and EEOC agreed that EEOC **[*10]** would process Brown's complaint (see *Isaac v. President and Fellows of Harvard University, 769 F.2d 817 (1st Cir. 1985)*), and that Brown did follow the EEOC process to the end. Given the sketchy nature of Article XI, I do not read it as requiring that Brown have waited for her right–to–sue letter, which explicitly applies only to her statutory claims, before filing her breach of contract action in this court.

Count II – Breach of the Covenant of Good Faith and Fair Dealing

Under Massachusetts law,

in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.

*Druker v. Roland Jutras Associates, Inc., 348 N.E.2d 763, 765 (Mass. 1976)* (citations omitted). Moreover, this general rule applies in particular to collective bargaining agreements. *Kerrigan v. City of Boston, 278 N.E.2d 387 (Mass. 1972).* Brown argues in Count II that the Trustees' denial of her tenure application based on her gender and her union activities violated **[*11]** this covenant.

The Trustees argue that the covenant is not actionable in situations where a plaintiff's rights are adequately protected by a collective bargaining agreement, *Price v. United Parcel Service, 601 F. Supp. 20 (D. Mass. 1984); Bertrand v. Quincy Market Cold Storage & Warehouse Co., 728 F.2d 568 (1st Cir. 1984); Azzi v. Western Elec. Co., 474 N.E.2d 1166 (Mass. App. 1985),* or by statutory mechanisms. *Grubba v. Bay State Abrasives, Dresser Industries, 803 F.2d 746 (1st Cir. 1986); Melley v. Gillette Corp., 475 N.E.2d 1227 (Mass. App. 1985),* aff'd *491 N.E.2d 252 (Mass. 1986)* (adopting the reasoning and opinion of the Appeals Court).

It is clear from the above cited cases that any implied covenant of good faith and fair dealing insofar as such a covenant would cover sex discrimination or retaliation is subsumed under express contractual provisions. Indeed, the express provision provides a potentially broader range of relief. *Giles v. Travenol Laboratories, Inc., 433 N.E.2d 103 (Mass. App. 1982): Gram v. Liberty Mutual Insurance Company, 429 N.E.2d 21 (Mass. 1981).*

Brown suggests that a different result should obtain because tenure decisions **[*12]** are by their nature so subjective. Our court of appeals has made it clear that the subjective, or judgmental or discretionary aspect of the award of tenure is not an appropriate area for judicial inquiry. *Kumar v. Bd. of Tr., U. of Mass., 774 F.2d 1 (1st Cir. 1985).*

Defendant's motion for summary judgment is ALLOWED as to Count II.

1987 U.S. Dist. LEXIS 14446, *12

## Jury Trial Demand

The Trustees have moved pursuant to Fed.R.Civ.P. 39(a) to strike Brown's jury demand as to all counts. Preliminarily, Brown argues that this motion is untimely, since it was filed five years after removal to this court, and three years after Brown amended her complaint to add the current Counts III and IV. Rule 39 provides that "[t]he trial of all issues so demanded shall be by jury, unless . . . the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist . . . ." Therefore, even if the Trustees' motion is untimely, a jury trial is not warranted if I find that no jury trial right exists.

## Count I

The Seventh Amendment to the Constitution provides that in "[s]uits at common law, where the value in controversy shall exceed twenty dollars, the right of trial [*13] by jury shall be preserved." In *Ross v. Bernhard, 396 U.S. 531, 538 n.10 (1970),* the Supreme Court provided guidance in determining when an issue is "legal":

As our cases indicate, the "legal" nature of an issue is determined by considering, first, the premerger custom with reference to such questions; second, the remedy sought: and, third, the practical abilities and limitations of juries.

The first and third considerations are not difficult in this case. The Trustees state that there was no premerger custom relating to interpretation of collective bargaining agreements because the Labor Management Relations Act was passed in 1947. However, Count I alleges a breach of the collective bargaining agreement. This is simply a kind of breach of contract action, which is legal in nature. Courts deciding this issue have found an action for breach of a collective bargaining agreement to be a contract action for purposes of determining Seventh Amendment rights. See, e.g., *Cox v. C. H. Masland & Sons, Inc., 607 F.2d 138 (5th Cir. 1979).* As to the third factor, the Trustees attempt to paint a portrait of tenure decisions as beyond the competence of jurors, almost as though tenure [*14] decisions are some kind of arcane rite incomprehensible to the lay observer. However, the contract clearly delineates the proscribed conduct. The subjective nature of tenure decisions does not render this case beyond the competence of a jury. The jurors must determine the Trustees' intent or motivation, which is a task juries perform all the time. This is just not the sort of massive, complex case which is the focus of the third factor in the Bernhard analysis.

The second factor, the type of remedy sought, is more troublesome. Under Count I, Brown requests the court to:

a) Declare that the defendant breached its Agreement governing the plaintiff's employment;

b) Order the defendant to appoint the plaintiff to the position of tenured Associate Professor and to assign her to the Department of English;

c) Order the defendant to compensate the plaintiff for lost wages and benefits that she suffered due to the defendant s breach and termination of the plaintiff's employment.

Requests (a) and (b) clearly seek injunctive relief. The question then is whether an award to compensate the plaintiff for lost wages and benefits" is best described as restitution – equitable relief, or [*15] damages – a legal remedy. I find that this relief is in the nature of damages, and that the Trustees' motion to strike the jury claim as to Count I must be denied.

In Title VII cases in which back pay is sought, no jury trial may be had, because the award of back pay is seen as restitution. *Olin v. Prudential Insurance Company of America, 798 F.2d 1 (1st Cir. 1986); Curtis v. Loether, 415 U.S. 189 (1974).* However, it is clear that the classification of back pay as restitution results directly from the particular language used in Title VII:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate.

*42 U.S.C. § 2000e–5(g).* By using the words "[i]f the court finds," Congress strongly suggested that jury trials were generally not available in Title VII actions. By [*16] using the words "the court may . . . order . . . back pay . . . , or any other equitable relief," Congress was particularly stating that, for the purposes of Title VII, back pay was to be considered an equitable remedy. In *Curtis v. Loether, supra,* a Title VIII action, the Court stated that in denying juries trials under Title VII,

the courts have relied on the fact that the decision whether to award back pay is committed to the discretion of the trial judge. There is no comparable discretion here; if a plaintiff proves unlawful discrimination and actual damages, he is entitled to judgment for that amount.

*Curtis v. Loether, supra, at 197.* Similarly, in this case,

1987 U.S. Dist. LEXIS 14446, *16

if a jury should find that the Trustees breached the agreement, and that Brown suffered damage by not receiving the salary of a tenured professor, no discretion would exist; an award of back pay must follow.

The primary objective [of Title VII] was a prophylactic one: "It was to achieve equality of employment opportunities and remove barriers . . . ." Back pay has an obvious connection with this purpose. If employers faced only the prospect of an injunctive order, they would have little incentive to shun practices [*17] of dubious legality.

*Albemarle Paper Co. v. Moody, 422 U.S. 405, 417 (1975).* Therefore, while one purpose of back pay awards in Title VII cases is to compensate plaintiffs, see, *id., at 418–21,* the primary purpose of back pay awards is to prevent employers from reaping ill-gotten gains as a result of unlawful conduct, and thereby to provide them with an incentive to behave lawfully. It is this focus on prevention of ill-gotten gains by employers – which is at the very heart of the equitable remedy of restitution – which caused Congress to characterize back pay awards as equitable in Title VII. This characterization of back pay awards under Title VII as restitution comports with the purposes behind Title VII; for the same reason, however, it does not provide any definitive indication concerning the proper characterization of Brown's back pay prayer in her breach of contract action under Count I.

Brown's prayer for back pay is clearly more in the nature of compensation to her for lost income than it is an attempt to seek disgorgement of any ill-gotten gains from the Trustees. Courts that have considered the characterization issue have

recogn[zed] that back pay is somehow [*18] dissimilar to traditional equitable remedies. Some courts have attempted to liken back pay to a form of restitution in order to characterize back pay as equitable. Such characterization appears to us to misconceive the concept of restitution.

*Setser v. Novack Investment Company, 638 F.2d 1137, 1141–42* (8th Cir.), modified on other issues, *657 F.2d 962* (8th Cir. en banc), cert. denied, *454 U.S. 1064 (1981).* As the court noted in Setser, in most cases the injured party has not conferred any benefit on the employer that would warrant restitution. Id., at 1142. That is certainly true under BU's tenure system because professors who do not receive tenure may not remain at BU indefinitely at lower, untentured salary – which would confer some benefit on the Trustees. Rather, when tenure is denied, professors must leave BU after one more year.

The notion that, outside the Title VII context, requests for awards of back pay are properly considered to be requests for legal remedy has been confirmed by other courts. "A suit for damages consisting of back wages arising out of the breach of an employment agreement is a routine contract action where the parties would be entitled [*19] to a jury under the Seventh Amendment." *Rogers v. Exxon Research & Engineering Co., 550 F.2d 834, 838 (3d Cir. 1977),* cert. denied, *434 U.S. 1022 (1978).*

A complaint which alleges a breach by an employer of a collective bargaining agreement in which the plaintiff seeks back pay states a claim for legal damages, and the plaintiff has a right to try by jury on that claim. The Trustees argue that "[w]hile Brown seeks money damages as well, the action is primarily one for employment and exemplary damages." It is irrelevant that Brown seeks primarily equitable relief under Count I. If a "legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought." *Curtis v. Loether, supra, at 196 n.11* (citing *Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 470–73 (1952)).*

Counts III and IV

As noted, supra, there is no right to a jury trial in Title VII cases. *Olin, supra.* Nor is there a right to a jury trial in cases [*20] under M.G.L. c. 151B. *Id., at 7–8.* Plaintiff points to a decision from the Massachusetts Superior Court in which the court held that there is a right to a jury trial under c. 151B. This decision may, in fact, predict how the SJC will ultimately rule on the issue. However, in taking pendent jurisdiction over Count IV, I am bound by definitive rulings of our court of appeals. Olin directly and unambiguously held that there is no right to a jury trial in c. 151B cases.

Plaintiff is therefore entitled to a jury trial on Count I, but not on Counts III or IV. Under *Curtis v. Loether, supra,* this right extends to all issues common to Count I and Counts III and IV.

Conclusions

The Trustees' motion for summary judgment is DENIED as to Count I, but ALLOWED as to Count II. The Trustees' motion to strike the jury trial demand is DENIED as to Count I, but ALLOWED as to Counts III and IV. There will be a jury trial on Count I, which will extend to all issues common to Count I and Counts III and IV.

LEXSEE

**JASON LLOYD, an individual, on behalf of himself and all others similarly situated, Appellant v. MBNA AMERICA BANK, N.A.; DOES 1 THRU 100, INCLUSIVE**

**No. 01-1752**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*27 Fed. Appx. 82; 2002 U.S. App. LEXIS 1027*

**December 4, 2001, Submitted Pursuant to LAR 34.1(a)**
**January 7, 2002, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Delaware. (D.C. Civil No. 00-cv-00109). Chief District Judge: Sue L. Robinson.

*Lloyd v. MBNA Am. Bank, N.A., 2001 U.S. Dist. LEXIS 8279* (D. Del. Feb. 22, 2001)

**DISPOSITION:** Affirmed.

**JUDGES:** Before: ALITO, RENDELL, and AMBRO, Circuit Judges.

**OPINIONBY:** Thomas L. Ambro

**OPINION:** [*83] MEMORANDUM OPINION

AMBRO, Circuit Judge

In this appeal we decide whether the District Court properly granted the motion to dismiss of Appellee MBNA America Bank, N.A. ("MBNA"). We affirm.

I.

The facts of this case are known to both parties and were recited in the District Court's well reasoned memorandum opinion and order. We will not repeat them here. Jason Lloyd brought an action under the Truth in Lending Act ("TILA") on behalf of himself and those similarly situated alleging that payments were not credited on the date they were received by MBNA. It moved to dismiss or in the alternative to stay the action in favor of individual binding arbitration pursuant to § 3 of the Federal Arbitration Act ("FAA"), *9 U.S.C. § 3*, based on an arbitration provision in Lloyd's [**2] credit agreement. The District Court granted MBNA's motion to dismiss in favor of binding arbitration, and Lloyd appealed.

The District Court had jurisdiction under *28 U.S.C. § 1331.* We have jurisdiction pursuant to *28 U.S.C. § 1291.* Our standard of review of a grant of a motion to dismiss in favor of binding arbitration is plenary. *Harris v. Green Tree Fin. Corp., 183 F.3d 173, 176 (3d Cir. 1999).*

II.

The presence of an enforceable arbitration provision generally means that a court [*84] does not possess jurisdiction over the case and must refer it to arbitration pursuant to § 4 of the FAA. *Id. at 179.* The question we must answer is whether the arbitration provision present in this case is enforceable. Lloyd offers a series of objections, each of which we will address in turn.

First Lloyd posits that California, not Delaware, law governs this case. In his complaint before the District Court, however, he maintained that Delaware law governed; in fact, he asserted a claim for relief under Delaware law. He maintains, however, that the issue of choice of law is not waivable, citing *Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 646 (3d Cir. 1958).* [**3] We note that Parkway Baking applied Pennsylvania, rather than Delaware, choice of law analysis. Furthermore, the party objecting to the application of Pennsylvania law in that case merely failed to raise the issue in the trial court. Lloyd, in contrast, affirmatively asserted at trial that the law of Delaware governed.

It was logical for Lloyd to argue before the District Court that Delaware law applied, given that the credit agreement specified that it was governed by that law. While *6 Del. C. § 2708* permits parties to agree that their contracts be governed by Delaware law without regard to

conflicts of law principles, this provision does not apply to contracts "involving less than $ 100,000." *6 Del. C. § 2708(a)*, (c). We therefore conduct a conflicts of law analysis.

That analysis applies the "most significant relationship" test to determine which state's law to apply. *Edelist v. MBNA America Bank, 790 A.2d 1249, 2001 Del. Super. LEXIS 311, 2001 WL 946500*, at *5 (Del. Super. 2001). "Delaware courts will honor specific choice of law provisions so long as there is some material linkage between the chosen jurisdiction and the transaction." Id. (citations omitted). Because that [**4] linkage exists, we conclude that the choice of Delaware law is enforceable. Moreover, what the purported nationwide class shares in common is a relationship with MBNA. Because Delaware is MBNA's state of incorporation and principal place of business, the forum with the most significant contacts with the class is Delaware, not California. This is recognized by the agreement itself, which provided that the place of contracting was Delaware.

Having determined that Delaware law governs, we proceed to Lloyd's other objections. The first is that the agreement is unconscionable because it purports to bar classwide relief. Again, Lloyd did not raise this argument in the District Court, arguing instead that the agreement was unconscionable as an adhesion contract. On the merits this argument fails because of our holding in *Johnson v. West Suburban Bank, 225 F.3d 366 (3d Cir. 2000)*. There we held that the right to a class action under the TILA was "merely a procedural one, arising under *Fed. R. Civ. P. 23*, that may be waived by agreeing to an arbitration clause." *Id. at 369*. If the right to a class action under the TILA is "merely procedural," and "may be waived," [**5] an arbitration agreement barring classwide relief for claims brought under the TILA is not unconscionable.

Next Lloyd argues that MBNA could not "retroactively amend" the credit agreement to apply to claims in existence at the time of the effective date of the amendment. The credit agreement provided that MBNA could amend the agreement by complying with the notification requirements of Delaware law, which permits the addition of terms providing for arbitration. *5 Del. C. § 952(a)*. We do not agree with Lloyd that MBNA failed to comply with the provision that "any notice [*85] of an amendment sent by the bank may be included in the same envelope with a periodic statement or as part of the periodic statement or in other materials sent to the borrower." Id. The use of the word "may" ipso facto makes this provision not mandatory. Thus MBNA's separate mailing of the notice of amendment complied with Delaware's notice requirements.

As the District Court held, courts apply a "presumption of arbitrability" when construing the scope of arbitration clauses. Mem. Op. at 7 (citing *Battaglia v. McKendry, 233 F.3d 720, 725 (3d Cir. 2000)*). The arbitration clause in this case covered "any [**6] claim or dispute . . . by either [Lloyd] or [MBNA] . . . arising from or relating in any way to this Agreement." Lloyd did not exercise the opt-out right that the notice of amendment provided. He is therefore bound by the terms of the amended agreement.

Finally, Lloyd argues that the arbitration provision is unenforceable because it does not ensure that he can vindicate his rights under the TILA. He contends that, because his claim will likely amount to less than one hundred dollars the fact that he may have to pay for arbitration fees, although capped at the level of court costs in a state court with jurisdiction, effectively precludes the pursuit of a claim. As the District Court observed, the plaintiff bears the burden of proving that the claim is not suited to arbitration. Mem. Op. at 5-6 (citing *Green Tree Fin. Corp.-Al. v. Randolph, 531 U.S. 79, 92, 121 S. Ct. 513, 522, 148 L. Ed. 2d 373 (2000))*. MBNA has agreed to advance the arbitration costs if requested, and the arbitrator will determine which party will ultimately pay the fees. It may be true that, as Lloyd argues, absent the arbitration provision an attorney might represent a class on a contingent fee [**7] basis, and that no attorney would bring an arbitration claim for such a small sum as one hundred dollars for a contingent fee. But Johnson makes clear that the TILA does not provide an unwaivable right to a class action. *Johnson, 225 F.3d at 369*. Lloyd may not attempt to end-run that holding by couching his claim in terms of unvindicated rights.

* * * * *

For the foregoing reasons, the judgment of the District Court granting MBNA's motion to dismiss is affirmed.

/s/ Thomas L. Ambro

Circuit Judge

100AE9

********** Print Completed **********

Time of Request:   August 16, 2006  06:38 PM EDT

Print Number:      1861:113761230
Number of Lines:   108
Number of Pages:

Send To:  DIBIANCA, MARGARET
          YOUNG CONAWAY STARGATT & TAYLOR
          1000 N WEST ST FL 17
          WILMINGTON, DE 19899

DB02:5471211.1                                                064406.1002

LEXSEE 2006 U.S. APP. LEXIS 10984

**DONNA J. ZAVECZ, Appellant v. YIELD DYNAMICS, INC.**

**NO. 05–2232**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 10984*

**March 8, 2006, Argued**
**May 3, 2006, Opinion Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the Eastern District of Pennsylvania. (D.C. Civil Action No. 03–cv–05023). District Judge: Hon. Juan R. Sanchez. *Zavecz v. Yield Dynamics, Inc., 2004 U.S. Dist. LEXIS 23092 (E.D. Pa., Nov. 15, 2004)*

**COUNSEL:** Kevin T. Fogerty (Argued), Mill Run Office Center, Allentown, PA, Attorney for Appellant.

Jack M. Seitz (Argued), Blank Rome, Allentown, PA, Attorney for Appellee.

**JUDGES:** BEFORE: AMBRO and STAPLETON, Circuit Judges, and STAGG, * District Judge.

> * Hon. Tom Stagg, Senior United States District Judge for the Western District of Louisiana, sitting by designation.

**OPINIONBY:** STAPLETON

**OPINION:**

OPINION OF THE COURT

STAPLETON, Circuit Judge:

In May 1999, Donna Zavecz and her husband Terrence, as shareholders and officers of TEA Systems Corporation ("TEA"), entered into an "Asset Purchase Agreement" with Yield Dynamics, Inc. ("YDI"), a California company that deals in the computer market for the semi–conductor industry. In exchange for TEA's software assets, YDI agreed to transfer 100,000 shares of its company to the Zaveczs (49,000 to Donna, [*2]

51,000 to Terence), 20% of which (9,800 and 10,200 respectively) were to be held in escrow until May 31, 2002. In January 2001, YDI's stock split, doubling the number of shares for each shareholder. In May 2002, YDI released neither the escrowed shares nor the shares acquired in the stock split to Zavecz.

In August 2003, Zavecz sued YDI in Leheigh County Court. Count I of her complaint sought a declaratory judgment declaring her right to the 9,800 escrowed shares. Count II claimed that YDI was liable to Zavecz for conversion as to those shares. Count III sought a declaratory judgment that Zavecz was entitled to an additional 49,000 shares due to the stock split and Count IV claimed conversion as to those shares. YDI removed the case to federal court, filed an answer, and asserted two counterclaims against Zavecz. In the counterclaims, YDI sought damages for the failure to transfer all intellectual property interests from TEA to YDI in breach of the Asset Purchase Agreement and a declaratory judgment to the effect that it was under no obligation to issue any shares to Zavecz.

Zavecz moved for summary judgment as to Counts I and III of her complaint and Count II of YDI's counterclaims. [*3] The District Court granted summary judgment in Zavecz's favor on Counts I and III, but not as to YDI's counterclaim, holding that Zavecz "was entitled to the escrowed shares and the stock split shares" as a matter of law. App. at 4. On the eve of trial on the remaining issues, the parties reached a settlement. In exchange for Zavecz dismissing her conversion claims with prejudice, YDI released the disputed shares to her and terminated its counterclaims against Zavecz with prejudice. Both sides reserved the right to file and oppose motions for attorneys' fees.

After filing this settlement with the District Court, Zavecz sought attorneys' fees in three separate categories: (1) fees related to recovering the 9,800 shares of stock, (2) fees related to obtaining the 49,000 shares, and (3) fees related to defending against YDI's counterclaim. Zavecz

2006 U.S. App. LEXIS 10984, *3

claimed to be entitled to her expenses in the first and third categories based on a provision in the Asset Purchase Agreement. In the third category of fees — expenses related to defending against YDI's counterclaim — Zavecz sought reimbursement for fees charged by attorneys in both Pennsylvania and California. In her motion, she attached [*4] two different affidavits from the two different attorneys. Her Pennsylvania attorney attested to having spent 62.70 hours, which totaled $9,578 in fees, in this category.

The District Court awarded attorneys' fees in part and denied them in part. As an initial matter, the District Court determined that California substantive law governed the issue. It applied Pennsylvania choice-of-law rules in accordance with *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)*, and found that those rules give effect to contractual choice-of-law provisions. The District Court found that the Asset Purchase Agreement contained a provision that read:

> The validity, construction and performance of this Agreement, and any Action arising out of or relating to this Agreement shall be governed by the Laws of the state of California.

App. at 45. The District Court agreed with Zavecz that the Asset Purchase Agreement provided a basis for recovering the first and third category of fees she sought. n1 The fee-shifting provision read:

> If any Action is commenced by either party concerning this agreement, the prevailing party shall recover from [*5] the losing party reasonable attorneys' fees and costs and expenses, including those of appeal and not limited to taxable costs, incurred by the prevailing party, in addition to all other remedies to which the prevailing party may be entitled.

App. at 45–46. The District Court determined that Zavecz was the prevailing party and awarded Zavecz the first category of fees she requested. The District Court described the third category of expenses — the fees related to defending against YDI's counterclaim — as fees incurred by a California attorney and disallowed them as that attorney did not represent her in the litigation. The Court did not mention the $9,578 incurred by Zavecz's Pennsylvania attorney in preparing to defend against YDI's counterclaim.

> n1 The Court rejected the second category of fees — recovering the stock split shares — finding that Zavecz had withdrawn her argument for them.

After the District Court issued its opinion, Zavecz moved for reconsideration, arguing that the Court [*6] had overlooked the fees her Pennsylvania attorney charged to prepare her defense against YDI's counterclaim. The District Court denied this motion for reconsideration without opinion. Zavecz appealed.

The District Court had diversity jurisdiction over this lawsuit under *28 U.S.C. § 1332(a)* and we have jurisdiction under *28 U.S.C. § 1291*. n2 "We review the reasonableness of a district court's award of attorneys' fees for an abuse of discretion." *County of Morris v. Nationalist Movement, 273 F.3d 527, 535 (3d Cir. 2001)*. In determining if a District Court has abused its discretion, we review factual findings for clear error and our review of legal questions is plenary. *See id.* ("The . . . question directed at the adequacy of the fee application implicates both the legal standard for evaluating the . . . application (over which we exercise plenary review), and the factual finding that certain expenses billed were excessive and unreasonable (which we review for clear error)."); *Rode v. Dellarciprete, 892 F.2d 1177, 1182–83 (3d Cir. 1990)* ("We review the reasonableness of an award of attorney's fees for [*7] an abuse of discretion. An abuse of discretion can occur when no reasonable person would adopt the district court's view. Whether the district court applied the proper standards or procedures is a question of law subject to plenary review. The district court's factual findings are reviewed under a clearly erroneous standard.") (citation omitted). n3

> n2 While this appeal does involve less than $75,000, "diversity of citizenship is assessed at the time the action is filed." *Freeport-McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 427, 111 S. Ct. 858, 112 L. Ed. 2d 951 (1991).*

> n3 YDI argues that Zavecz appeals only the District Court's denial of her motion for reconsideration in order to invoke an standard of review it seems to believe is more favorable. We interpret Zavecz's notice of appeal as challenging both orders. *See, e.g., Alston v. Parker, 363 F.3d 229, 232 (3d Cir. 2004)*. Regardless, our standard of review would not change. *See Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 673 (3d Cir. 1999)* ("We generally review the District Court's denial of reconsideration for abuse of discretion. However, to the extent that the denial of reconsideration is predicated on an issue of law, such an issue is reviewed *de novo;* to the extent that the District Court's disposition of the reconsideration motion is based upon a factual finding, it is

2006 U.S. App. LEXIS 10984, *7

reviewed for clear error.") (citation omitted).

[*8]

On appeal, Zavecz argues that she was entitled to the $9,578 the District Court failed to include in its original attorney fee award and refused to reconsider. YDI counters (1) that the District Court should have applied Pennsylvania law under which Zavecz would not be entitled to attorneys' fees and (2) that, even if California law applies, Zavecz would not be entitled to attorneys' fees incurred in defending breach of contract claims under contractual fee-shifting provisions where those claims are dismissed pursuant to settlement. While we agree with Zavecz and the District Court that California law applies, we also agree with YDI that, under California law, Zavecz would not be entitled to the fees she now seeks. Thus, the District Court's discretionary decisions to refuse fees and to refuse reconsideration of its award were not predicated on any legal error and we perceive no other abuse of discretion. n4

n4 In its original order awarding attorneys' fees, the District Court characterized the fees sought in relation to preparing to defend Zavecz against YDI's counterclaim as fees for a California attorney. *See* App. at 5. This left unclear whether the District Court's refusal to award fees was based on a factual misunderstanding about this category of fees. The record clearly reflects that Zavecz sought separate fees for expenses preparing her defense incurred by both a California attorney and her Pennsylvania attorney. The two attorneys submitted separate bills for these costs.

We are convinced, however, that the District Court's refusal to award these fees was not based on any clearly erroneous factual finding. Even though the District Court did not issue an opinion when it denied the motion to reconsider, Zavecz's motion fully clarified any factual misunderstanding the District Court may have had regarding the source of those fees.

Instead, we believe that the District Court's refusal to award fees rested on the legal question about Zavecz's entitlement to these fees under California law—a question, as we noted, we review *de novo. See Kiareldeen v. Ashcroft, 273 F.3d 542, 545 (3d Cir. 2001)* ("This court will . . . review an award of attorneys' fees *de novo* insofar as it rests on conclusions of law."); *Max's Seafood Cafe, 176 F.3d at 673* ("To the extent that the denial of reconsideration is predicated on an issue of law, such an issue is reviewed *de novo*."). No other predicate for

an abuse of discretion is argued here.

[*9]

YDI argues that the District Court erred by applying California law. YDI further insists that, under Pennsylvania law, a contractual provision awarding attorneys' fees to a "prevailing party" does not apply where parties reach stipulated settlements. *See Profit Wize Marketing v. Wiest, 2002 PA Super 380, 812 A.2d 1270, 1275–76 (Pa. Super. Ct. 2002)* ("While this definition [of "prevailing party"] encompasses those situations where a party receives less relief than was sought or even nominal relief, its application is still limited to those circumstances where the fact finder declares a winner and the court enters judgment in that party's favor. Such a pronouncement does not accompany a compromise or settlement."). Zavecz does not argue that Pennsylvania law would afford her the fees she seeks. Instead, she argues that the District Court correctly determined that a Pennsylvania court applying that state's choice-of-law rules would give effect to the contractual choice-of-law provision in the Asset Purchase Agreement and would apply California law to her claim for attorneys' fees. n5

n5 We should note that "in Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ" and "if not, no further analysis is necessary." *Highmark, Inc. v. Hosp. Serv. Ass'n of Ne. Pa., 2001 PA Super 278, 785 A.2d 93, 97 (Pa. Super. Ct. 2001)*. In this case, it is clear that California's statutory framework for attorney fee recovery under contractual fee-shifting provisions differs from Pennsylvania's approach — thus necessitating our analysis. *Compare* Kevin P. Allen, *Contractual Fee-Shifting Clauses — How to Determine "Prevailing Party" Status,* 74 Pa. B. Ass'n Q. 178 (2003) (describing Pennsylvania law) *with Santisas v. Goodin, 17 Cal. 4th 599, 71 Cal. Rptr. 2d 830, 951 P.2d 399 (Cal. 1998)* (describing California law).

[*10]

We believe that the District Court properly applied Pennsylvania choice-of-law rules to determine that California law would govern the award of attorneys' fees under the parties' contractual fee-shifting provision. Zavecz was seeking attorneys' fees based on the Asset Purchase Agreement's guarantee that the "prevailing party shall recover from the losing party reasonable attorneys' fees and costs and expenses" for "any Action . . . commenced by either party concerning this agreement." App. at 45–46. That agreement also states that "any Action

arising out of or relating to this Agreement shall be governed by the Laws of the state of California." App. at 45. "In contract disputes, Pennsylvania courts generally honor the parties' choice of law provisions." *Nationwide Mut. Ins. Co. v. West, 2002 PA Super 282, 807 A.2d 916, 920 (Pa. Super. Ct. 2002)*.

YDI does not dispute the interpretation of the choice-of-law provision in the contract or that Pennsylvania generally gives effect to such provisions. Instead, it argues that Pennsylvania courts will refuse to honor contractual choice-of-law provisions if the law chosen has no reasonable relationship to the parties or the [*11] transaction. In YDI's view, the conclusion that the parties have no reasonable relationship to California is necessitated by various statements made by Zavecz when she was arguing that Pennsylvania law should govern other issues in this case and by the District Court's conclusion that Pennsylvania law should govern Zavecz's conversion claim. In reaching this conclusion regarding the conversion claims, YDI points out that the District Court specified the numerous Pennsylvania contacts with the case and noted that "Zavecz . . . has no significant relationship with California." App. at 252.

Applying Pennsylvania's choice-of-law rules, we have recognized that "because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'" *Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006). See also Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796, 805 (Pa. 1964)* (adopting Pennsylvania's "flexible" choice-of-law approach and instructing courts to perform an "analysis of the policies and interests underlying *the particular issue* before the court") [*12] (emphasis added). We have found that "to properly apply the Second Restatement and remain true to the spirit of Pennsylvania's 'flexible approach,' we must first characterize the particular issue before the court as one of tort, contract, or corporate law — or some hybrid — in order to settle on a given section of the Restatement for guidance." *Berg Chilling, 435 F.3d at 463*.

It follows from the principle of depecage that a court's application of one state's law to one issue in a case does not preclude the court from deciding that another state's law governs another issue in the same case. In this case, the District Court applied Pennsylvania law to Zavecz's conversion claims after analyzing the case in accordance with the *Restatement (Second) of Conflicts of Laws § 145* used by Pennsylvania courts in tort disputes. *See, e.g., Troxel v. A.I. duPont Inst., 431 Pa. Super. 464, 636 A.2d 1179, 1180–81 (Pa. Super. Ct. 1994)*. When Zavecz moved for attorney fees under the contract, the District Court turned to *§ 187* and *§ 188 of the Restatement (Second) of Conflicts of Laws* [*13] employed by Pennsylvania courts in contract disputes. *See, e.g., Smith v. Commonwealth Nat'l Bank, 384 Pa. Super. 65, 557 A.2d 775, 777 (Pa. Super. Ct. 1989); Chestnut v. Pediatric Homecare of Am., Inc., 420 Pa. Super. 598, 617 A.2d 347, 350–51 (Pa. Super. Ct. 1992)*. The fact that the District Court applied a different analysis and reached a different result for the contractual issue and the tort issue raised in the case is in accordance with Pennsylvania's choice-of-law rules. *See Berg Chilling, 435 F.3d at 463*. The District Court was not precluded from finding that California law applied to the attorney fee issue by having previously chosen Pennsylvania law in the same case.

Nor was Zavecz estopped from invoking California law. It also follows from the idea of depecage that a litigant in a single case can invoke different states' laws to govern different issues in the case without fear of estoppel. In fact, in the parties' dispute about whether Pennsylvania or California law governed Zavecz's conversion claim, YDI advocated California law on the basis the choice-of-law provision in the Asset Purchase Agreement that it now argues [*14] should not be honored. Both sides have switched choice-of-law positions and neither were estopped from doing so.

YDI points to the language used by the District Court when it concluded that Pennsylvania law applied to Zavecz's conversion claim — that Zavecz had "no significant relationship with California" — to argue that this necessitates a finding that the parties do not have enough of a relationship with the state to validly designate that law to govern their contract disputes. But its logic is flawed. The District Court was applying the standard from *§ 145*, not *§ 187, of the Restatement (Second) of Conflicts of Laws* when it made the "no significant relationship" finding. *Section 145(1)* instructs courts for tort issues to apply the law of "the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in *§ 6*." *Section 187(2)(a)* — governing contractual choice-of-law provisions — instructs courts to honor the "law of the state chosen by the parties" regarding issues that could not have been resolved by the contract unless "the chosen state has no substantial [*15] relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." The "no substantial relationship . . . and no other reasonable basis" test of *§ 187 of the Restatement* is more permissive than the "most significant relationship" test under *§ 145 of the Restatement*. This is precisely because courts may select only one of the competing states' laws to govern tort issues presented while, under *§ 187(2)*, contracting parties may have enough of a relationship with two states (or more) — for example, with both Pennsylvania and California — that they may

designate the law of either state to govern future disputes.

Furthermore, the commentary to the Restatement makes clear that the standard of *§ 187* is a minimal standard:

> Requirement of reasonable basis for parties' choice. The forum will not apply the chosen law to determine issues . . . if the parties had no reasonable basis for choosing this law. The forum will not, for example, apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge. Situations of this sort do not arise in practice. Contracts are entered **[*16]** into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so. When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is that where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business.

*Restatement (Second) Conflicts of Laws § 187, cmt. f.* One of the parties to the contract — YDI — is a California corporation. Thus, the contracting parties had a reasonable basis for choosing California law. YDI's contention that the choice–of–law provision in this contract is invalid in incorrect.

Under California law, however, we agree with YDI that Zavecz is not entitled to the fees she seeks: fees defending a counterclaim that was dismissed pursuant to a settlement. Zavecz's precise request is for attorney fees she incurred defending against a breach of contract counterclaim that was dismissed pursuant to settlement. Both parties cite and discuss *Jackson v. Homeowners Assoc. Monte Vista Estates–East, 93 Cal. App. 4th 773, 113 Cal.Rptr. 2d 363 (Cal. Ct. App. 2001)* **[*17]** on this question. *Jackson*, it seems, is the tip of a giant iceberg of California law on contractual fee–shifting provisions.

The Supreme Court of California has observed that the California law governing the award of attorneys' fees under contractual fee–shifting provisions involves both "the language of the contractual provision" as well as "the complex interaction of several statutes that affect a party's contractual right to attorney's fees." *Scott Co. of Cal. v. Blount, Inc., 20 Cal. 4th 1103, 86 Cal. Rptr. 2d 614, 979 P.2d 974, 975 (Cal. 1999)*. Under the California Civil Code, "except as otherwise expressly provided by

statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." *See Cal. Civ. Code § 1032(b).* Those costs include attorneys' fees authorized by contract, statute or law. *Cal. Civ. Code § 1032(a)(10). Section 1717 of the California Civil Code* provides:

> (a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing **[*18]** party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . . Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void.

> (b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section.

> (2) *Where an action has been voluntarily dismissed or dismissed pursuant to a settlement of the case, there shall be no prevailing party for purposes of this section.*

*Cal. Civ. Code § 1717(a), (b)* **[*19]** (emphasis added).

YDI argues that the plain language of *§ 1717(b)(2)* precludes an award of attorneys' fees incurred in defending a contact action that was voluntarily dismissed pursuant to a settlement. We agree, but not because that provision is "free from ambiguity," "clear on its face," and a "model of clarity and simplicity" as YDI contends. *See* Br. Appellee at 20. The plain language of *§ 1717(b)(2)* declaring that there is no prevailing party "for purposes of this section" does not indicate whether this provision is the *exclusive* vehicle by which a party may recover attorneys' fees or whether a party not prevailing under *§*

1717(b)(2) might, in the alternative, seek attorneys' fees under contract law. The plain language of this statute does not answer whether *§ 1717(b)(2)* is a default, waivable provision, or whether it is mandatory.

The Supreme Court of California, however, has answered that question. In 1998, the Court considered a claim for attorneys' fees expended defending against a claim brought by aggrieved buyers of real estate that was eventually voluntarily dismissed. *Santisas v. Goodin, 17 Cal. 4th 599, 71 Cal. Rptr. 2d 830, 951 P.2d 399, 402 (Cal. 1998).* The **[*20]** Court observed that, while *§ 1717* was originally enacted to ensure "mutuality of remedy for attorney fee claims under contractual attorney fee provisions," amendments made in 1981, including the addition of *subdivision (b)(2)*, meant that "*Section 1717* applies to contracts containing reciprocal as well as unilateral attorney fee provisions." *Id. at 409.* The Supreme Court specifically rejected the argument that *§ 1717* merely offered an alternative to traditional contract law as a source of authority to recover attorneys' fees:

> Defendants argue that . . . *[§ 1717]* operates only to *permit* recovery of attorney fees that would not otherwise be recoverable as a matter of contract law and never to *bar* recovery of attorney fees that would otherwise be recoverable as a matter of contract law. We reject this construction . . . *[inter alia*, as inconsistent with legislative history of amending *§ 1717* reflecting] legislative intent to establish uniform treatment of fee recoveries in actions on contracts containing attorney fee provisions and to eliminate distinctions based on whether recovery was authorized by statute or by contract. . . . [The language of *§ 1717(b)(2)*] **[*21]** should be construed as barring recovery of attorney fees in pretrial dismissal cases whether those fees are sought on the basis of the contractual provision or under *Section 1717*.

*Id. at 410.* The *Santisas* Court concluded:

> We construe subdivision *(b)(2) of section 1717* . . . as overriding or nullifying conflicting contractual provisions, such as provisions expressly allowing recovery of attorney fees in the event of voluntary dismissal or defining 'prevailing party' as including parties in whose favor a dismissal has been entered. When a plaintiff files a complaint containing causes of action within the scope of

*section 1717* (that is, causes of action sounding in contract . . . ), and the plaintiff thereafter voluntarily dismisses the action, *section 1717* bars the defendant from recovering attorney fees incurred in defending those causes of action, even though the contract on its own terms authorizes recovery of those fees.

*Santisas, 951 P.2d at 411.* n6 While one justice wrote separately to urge "legislative reconsideration" of the issue presented, the *Santisas* opinion was an opinion joined by a majority of the Court. *Id. at 414–15* **[*22]** (Mosk, J., concurring). n7 Since this decision, the Supreme Court has reminded that the effect of the 1981 amendments to the Civil Code was that "attorney's fees [are] to be seen as allowed by statute, rather than by contract" in California. *PLCM Group v. Drexler, 22 Cal. 4th 1084, 95 Cal. Rptr. 2d 198, 997 P.2d 511, 515 (Cal. 2000)* (quoting *Sears v. Baccaglio, 60 Cal. App. 4th 1136, 70 Cal.Rptr.2d 769, 775 (Cal. Ct. App. 1998)).* Intermediate appellate courts have consistently applied *Santisas* to refuse to honor attempts to waive or avoid *§ 1717(b)(2)*'s prohibition on attorneys' fees for settled contract claims through contractual provisions. *See, e.g., Exxess Electronixx v. Heger Realty Corp., 64 Cal. App. 4th 698, 75 Cal.Rptr.2d 376, 382–83 (Cal. Ct. App. 1998)* ("We realize that . . . the lease contemplated an award of attorneys' fees . . . [for claims] dismissed as a result of a settlement. Nevertheless, the definition of 'prevailing party' in Civil Code *section 1717* is mandatory and cannot be altered or avoided by contract. Contractual provisions that conflict with the 'prevailing party' definition under *section 1717* are void.") **[*23]** (citation omitted); *Del Cerro Mobile Estates v. Proffer, 87 Cal. App. 4th 943, 105 Cal.Rptr.2d 5, 7–8 (Cal. Ct. App. 2001)* (finding *Santisas* to bar fees incurred related to contractual claims, despite language of the fee-shifting clause declaring that "a party shall be deemed a prevailing party if the judgment is rendered in his favor or where the litigation is dismissed in his favor prior to or during the trial, unless the parties otherwise agree in the settlement or compromise").

> n6 The *Santisas* Court went on to decide that attorneys' fees incurred pursuing *non–contractual* claims were not barred by *§ 1717(b)(2)*. *See Santisas, 951 P.2d at 409.* The Court found that the language of *§ 1717(b)(2)* referred only to claims made "on the contract" and "to enforce that contract." *Id.* The Court instructed that "if an action asserts both contract and tort or other noncontract claims, *section 1717* applies only to attorney fees incurred to litigate the contract claims." *Id.* This is

2006 U.S. App. LEXIS 10984, *23

significant for an issue not raised by YDI on this appeal. Zavecz would, under this reasoning, not have been barred by § 1717(b)(2) from recovering attorneys' fees incurred pursuing her conversion claims since those fees were incurred pursuing tort claims. By contrast, the fees at issue on this appeal were incurred defending against a breach of contract counterclaim.

[*24]

n7 Three of the seven justices dissented on this point, arguing that *Section 1717* only applied to make unilateral contractual fee-shifting provisions reciprocal. *Santisas, 951 P.2d at 417* (Baxter, J., dissenting). They concluded that:

> When a party relies upon *Section 1717* to establish a reciprocal right to attorney fees, the restriction set forth in *subdivision (b)(2)* will preclude recovery if the action has been voluntarily dismissed prior to trial. Conversely, when the contract itself establishes mutuality of remedy for all parties to an action on the contract, the restriction has no application and the 'measure and mode of compensation of attorneys . . . is left to the agreement . . . of the parties.'

*Id.* (citing *Cal. Civ. Proc. Code § 1021*). This view was not controlling. *See id. at 415* (Mosk, J., concurring) ("I am persuaded that Civ. Code. *section 1717* applies without regard to whether the attorney fee provision is drafted as a nonreciprocal or reciprocal agreement.").

Given this understanding of § 1717(b)(2), Zavecz [*25] is not entitled to the attorneys' fees she seeks in this appeal under California law. Zavecz is seeking attorneys' fees incurred defending against YDI's counterclaim for breach of contract — an "action on a contract" — under a contractual fee-shifting provision where this counterclaim was "voluntarily dismissed . . . pursuant to a settlement of the case." Under § 1717(b)(2) of the California Civil Code — the exclusive, mandatory, non-waivable, statutory vehicle for such awards for contract claims according to the Supreme Court of California — "there shall be no prevailing party" for the purposes of that claim.

Zavecz argues that an opinion of an intermediate appellate court, *Jackson v. Homeowners Assoc. Monte Vista Estates–East, 93 Cal. App. 4th 773, 113 Cal.Rptr.2d 363*

*(Cal. Ct. App. 2001)*, opens up an exception to this general rule under California law. In *Jackson*, plaintiff homeowners brought an action to challenge certain covenants and restrictions adopted by the defendant homeowners' association. *Id. at 364–65*. After plaintiffs succeeded on appeal, the parties reached a settlement. *Id. at 365*. However, because the parties were unable to agree [*26] on the issue of attorneys' fees, the parties expressly provided in the settlement agreement that the trial court would determine the attorneys' fees issue before they dismissed their claims. *Id. at 366*. The *Jackson* Court held that "the parties could validly waive *Section 1717, subdivision (b)(2)* in order to submit the question to the trial court for resolution." *Id. at 368*. *Jackson* attempted to distinguish *Santisas*:

> It is, of course, true that *Santisas* concludes that 'in voluntary pretrial dismissal cases . . . . § 1717* bars recovery of attorney fees incurred in defending contract claims . . . .' But this is not a voluntary pretrial dismissal case. Although the same principle would apply to a case in which the action was voluntarily dismissed pursuant to a settlement, the parties here contemplated that the case would not be dismissed until *after* the trial court had determined the attorney fees issue. The principles applicable to dismissal after settlement are therefore inapplicable to the situation here.

*Id. at 370*. The *Jackson* Court distinguished other cases that had reiterated the holding of *Santisas* by finding that in the case [*27] it considered "there was no dismissal *before* the determination of the attorney fee issue." *Jackson, 113 Cal.Rptr.2d at 371*.

Zavecz would have us find that the parties in this case, like the parties in *Jackson*, expressly reserved the issue of attorneys' fees in their settlement agreement. Zavecz argues that YDI "waived" its right to invoke § 1717(b)(2) just as the homeowners' association did in *Jackson*. YDI argues that *Jackson* did not hold that the parties waived § 1717(b)(2) but rather that the section was found inapplicable on the facts of that case because the parties had not yet voluntarily dismissed their claims when the Court considered the fee request.

If we interpret the Court in *Jackson* as holding that parties may "waive" their right to invoke § 1717(b)(2), n8 we face two issues: (1) whether the Supreme Court of California would follow *Jackson* to find that § 1717(b)(2) may be waived and (2) if so, whether YDI and Zavecz would be considered to have waived it.

n8 YDI's interpretation of that decision conflicts

2006 U.S. App. LEXIS 10984, *27

with the plain language of that decision, where the court states: "We find that the parties could validly waive *Section 1717, subdivision (b)(2)* in order to submit the question to the trial court for resolution." *Jackson, 113 Cal.Rptr.2d at 368*. We find it difficult to interpret this decision differently.

**[*28]**

In applying state law in a diversity case, our task is one of predicting how the highest court of the state would apply the law. *Paolella v. Browning–Ferris, Inc., 158 F.3d 183, 189 (3d Cir. 1998)* ("When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue."). We have found that *Vandemark v. Owens–Illinois Glass Co., 311 U.S. 538, 61 S. Ct. 347, 85 L. Ed. 327 (1941)*, requires us "to apply the current, definitive statement of [state] law" by the highest court in that state. *Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 110 (3d Cir. 1994).* "Absent a definitive statement of the applicable law by the state's highest court, a district court may also consider the decisions of state intermediate appellate courts in order to facilitate its prediction." *Paolella, 158 F.3d at 189*. In making that prediction, "we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Covington v. Cont'l Gen. Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004)*. **[*29]** However, "the decision of an intermediate state court is . . . not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.*

On the question of whether *§ 1717 (b)(2)* may be waived by the parties, we find it difficult to conclude that we lack the kind of "definitive statement of the applicable law by the state's highest court" that would cause us to look to intermediate courts for guidance as to the status of this issue. The Supreme Court of California in *Santisas* specifically found that litigants' rights to attorneys' fees are statutory and mandatory and interpreted *§ 1717(b)(2)*'s bar on attorneys' fees for settled contract claims "as over-riding or nullifying conflicting contractual provisions." *See Santisas, 951 P.2d at 411*. While *Jackson* found that this decision did not control the case before it, we cannot conclude that the California Supreme Court would follow this decision were it to decide Zavecz's case. While the Supreme Court has neither overruled nor approved of *Jackson*, no other published case has followed *Jackson* to find *§ 1717(b)(2)* waivable. **[*30]** One secondary source has characterized the case as an outlier. *See* 1 Charles Crompton et al., *MB Practice Guide: California Contract Litigation* § 12.06 (citing *Jackson* to describe that "despite

the ruling in *Santisas*, courts apparently still construe CC *§ 1717* to allow parties broad latitude in making attorney's fee arrangements"). All of this — but most importantly the opinion of *Santisas* itself — convinces us to apply the law as it has been enunciated so far by the highest court in California.

But even if we were to find that *Jackson* did create an exception to the rule in *Santisas*, we cannot conclude that Zavecz would satisfy it. *Jackson* created a specific order that the parties needed to follow in order to avoid the effect of *§ 1717(b)(2)*. The *Jackson* Court found that the settling parties had come to mutual agreement on all but one issue:

> The parties were not able to agree on the issue of attorney fees. Accordingly, the settlement agreement provides: "The Parties have agreed to reserve the issue of any award of costs and attorneys fees to Plaintiffs, as requested by Plaintiffs in their respective Complaints, for consideration **[*31]** by this Court upon Plaintiffs filing the necessary Motion and/or Memorandum of Costs with the Court." Although not clearly reflected in the settlement agreement, the parties also agreed on the record that the action would not be dismissed until the trial court had resolved the attorney fee issue.

*Jackson, 113 Cal.Rptr.2d at 365–66*. Thus, the Court was able to conclude that, although *§ 1717(b)(2)* would bar attorneys' fees for contract claims dismissed pre–trial and "although the same principle would apply to a case in which the action was voluntarily dismissed pursuant to a settlement, the parties here contemplated that the case would not be dismissed until *after* the trial court had determined the attorney fees issue." *Id. at 370*. In the view of the *Jackson* Court, this specific order of conduct undertaken by the parties — coming to an agreement about all outstanding issues, expressly reserving one final issue (attorneys' fees) for consideration by a court in a written agreement, agreeing to wait to dismiss their claims until that final issue was resolved, and seeking fees without dismissing their claims — indicated that the settlement was not **[*32]** final when the trial court determined the attorneys' fees question. This allowed the *Jackson* Court to find that the parties had "waived" *§ 1717(b)(2)*'s protection by submitting the issue to the court to resolve.

The conduct of the parties in this case — YDI and Zavecz — does not indicate that their settlement remained unfinalized and contingent upon the final issue being resolved when the attorneys' fees issue was considered

2006 U.S. App. LEXIS 10984, *32

by the District Court. On November 19, 2004, YDI and Zavecz executed a written settlement agreement. Though they reserved the right to "file a motion" for attorneys' fees, each party agreed to dismiss its claims with prejudice:

> 2. Upon receipt of [the contested] Share Certificates, [Zavecz] will terminate and discontinue with prejudice [Zavecz's] claims for conversion . . .; **provided, however,** this termination is without prejudice to [Zavecz's] right to file a motion seeking attorneys fees and costs — that right being expressly reserved under this settlement—, which Motion [YDI] may oppose.
>
> 3. [YDI's] counterclaim shall be terminated with prejudice; this termination is without prejudice to [YDI's] right to file a motion [*33] seeking attorneys fees and costs — that right being expressly reserved under this settlement—, which Motion [Zavecz] may oppose.

App. at 66–67. YDI delivered the disputed shares to Zavecz on or about November 22, 2004. The parties jointly filed this stipulated settlement with the District Court on December 13, 2004. After it was filed, Zavecz moved to collect attorneys' fees under the Asset Purchase Agreement. This conduct does not evince that the parties sought to reserve the issue and submit it to the District Court before finalizing their settlement. We believe that the parties reached a final settlement, after which Zavecz sought attorneys' fees. Essentially, we do not believe that YDI "waived" the statutory bar to attorneys' fees for settled contract claims in *§ 1717(b)(2)* as the homeowners' association did in *Jackson*. n9 Thus, even if *Jackson* can be said to create an exception to the rule that parties may not "prevail" and receive attorneys' fees for contract claims dismissed pursuant to settlement — a rule codified in the California Civil Code and explicated by the highest state court in California — we cannot find that these parties would be found to [*34] have avoided that rule in accordance with *Jackson*. n10

> n9 The parties vigorously dispute whether the parties' claims were dismissed when the Court made its attorneys' fees determination — a question that turns on whether the parties' claims were dismissed when the joint stipulation was filed on

December 13, 2004, *see Fed. R. Civ. P. 41(a)(1)* ("An action may be dismissed by the plaintiff without order of court . . . by filing a stipulation of dismissal signed by all parties who have appeared in the action."), or whether they were dismissed when the Court entered the order approving the settlement and dismissing the claims on April 12, 2005. We find it unnecessary to resolve this dispute. All indications from the conduct of these two parties were that the settlement agreement was final and not contingent on any remaining unresolved issues when the District Court considered the attorneys' fee award.

> n10 YDI also argues that, even if Zavecz would be considered to be the "prevailing party," the District Court is given broad discretion by *§ 1717(b)(1)* to refuse attorneys' fees even to a prevailing party. As we find no abuse of discretion by the District Court's refusal to consider Zavecz a prevailing party for purposes of the contract claim dismissed pursuant to settlement, we have no occasion to decide whether an order without opinion would satisfy *§ 1717(b)(1)*'s instruction that the trial court "shall determine who is the party prevailing on the contract for purposes of this section." *See Cal. Civ. Code § 1717(b)(1)*.

[*35]

In sum, we conclude that the District Court properly applied Pennsylvania choice-of-law rules to determine that California law would govern the award of attorneys' fees under the fee-shifting provision in this agreement. We find that California statutory law, as interpreted by the highest court in that state, bars awards of attorneys' fees for contractual claims dismissed pursuant to settlements. We hold that the California Supreme Court would apply that rule to bar the attorneys' fees at issue in this appeal. Even if we found that the intermediate appellate court's decision that this statutory right could be waived or avoided by parties if they expressly reserve the issue for a court to decide, these two parties did not follow the procedure outlined in that case. We see no abuse of discretion in the District Court's refusal to award any attorneys' fees incurred defending Zavecz against YDI's breach of contract counterclaim that was eventually dismissed pursuant to settlement. We will affirm the order of the District Court.