IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALAN D. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No.: 06-225-MPT |
| | ) | |
| DELOITTE & TOUCHE LLP, and | ) | Jury Trial Demanded |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Sheldon N. Sandler, Esquire (Bar I.D. 0245)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone:  (302) 571-6673
Facsimile :  (302) 576-3330
E-mail: ssandler@ycst.com
*Attorneys for Defendants*

Dated:  July 18, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

NATURE AND STAGE OF THE PROCEEDINGS .................................................. 1

SUMMARY OF THE ARGUMENT ............................................................................ 3

STATEMENT OF FACTS ............................................................................................. 4

      A.    Plaintiff's Admission As A Deloitte Partner ........................................ 4

      B.    Plaintiff's Poor Performance ...................................................................... 7

           1.    Despite Having Modest Goals For FY 2003, Plaintiff Failed To Achieve Even Minimal Success. ........................................... 9

           2.    Plaintiff Failed To Achieve His Goals Again In FY 2004. ...................... 10

      C.    Recommendation To Sever Plaintiff ................................................... 13

      D.    The Vote To Sever Plaintiff. ................................................................ 15

ARGUMENT .................................................................................................................. 17

    I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF LACKS STANDING, AND CANNOT PROVE HIS CLAIM. ............... 17

    II.    THE COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIM BECAUSE THE ADEA PROTECTS EMPLOYEES, NOT EMPLOYERS ............... 18

      A.    Plaintiff's Fiduciary Relationship And Responsibilities Are Indicative Of His Status As An Employer. ................................................... 19

           1.    A Mandatory Capital Investment Indicates Employer Status. ................. 20

           2.    The Allocation Of Benefits Indicates Employer Status. .......................... 21

           3.    Plaintiff's Tax Returns Indicate Partnership/Employer Status ................. 21

      B.    Plaintiff's Ability To Share in Profits Is Indicative Of His Employer Status. .................................................................................... 22

C.    Plaintiff's Participation in Governance And Control Are Indicative Of His Employer Status. .................................................................................. 23

III.    PLAINTIFF'S ADEA CLAIM MUST FAIL BECAUSE HE WAS PROPERLY SEVERED FOR LEGITIMATE REASONS UNRELATED TO HIS AGE. ............... 25

A.    Plaintiff Is Unable To Prove A *Prima Facie* Case. .............................................. 25

B.    Deloitte Severed Plaintiff For A Legitimate, Non-Discriminatory Reason Unrelated to Age. .................................................................................. 26

C.    Plaintiff Cannot Meet His Burden Of Persuasion To Prove That Deloitte's Proffered Reasons Were A Mere Pretext For Discrimination. .......................................................................................... 26

1.    Plaintiff Cannot Show Pretext By Disagreeing With Deloitte's Decision. ................................................................................ 29

2.    Plaintiff Cannot Show Pretext With Mere Conclusory Allegations. ............................................................................. 30

CONCLUSION ................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc.
   477 U.S. 242 (1986) ................................................................................................ 17

Bernhard v. Nexstar Broadcasting Corp.
   146 Fed. Appx. 582 (3d Cir. 2005) ................................................................. 30, 32

Billet v. CIGNA Corp.
   940 F.2d 812 (3d Cir. 1991) .............................................................................. 30

Bolton v. Scrivner, Inc.
   36 F.3d 939 (10th Cir. 1994) ............................................................................. 31

Branson v. Price River Coal Co.
   853 F.2d 768 (10th Cir. 1988) ........................................................................... 32

Bray v. L.D. Caulk Dentsply Int'l,
   No. 98-441-SLR, 2000 U.S. Dist.
   LEXIS 11062 (D. Del. July 31, 2000) ............................................................... 30

Brewer v. Quaker State Oil Ref. Corp.
   72 F.3d 326 (3d Cir. 1995) ..................................................................... 17, 18, 25

Brodsky v. Hercules, Inc.
   966 F. Supp. 1337 (D. Del. 1997) ...................................................................... 18

Bullock v. Children's Hosp. of Phila.,
   71 F. Supp. 2d 482 (E.D. Pa. 1999) ................................................................... 30

Burke v. Friedman
   556 F.2d 867 (7th Cir. 1977) ............................................................................. 22

Burton v. MBNA America Bank, N.A.
   No. 03-915 (GMS), 2005 U.S. Dist.
   LEXIS 12154 (D. Del. June 22, 2005) ............................................................... 28

Caruso v. Peat, Marwick, Mitchell & Co.
   664 F. Supp. 144 (S.D.N.Y. 1987) ..................................................................... 22

Celotex Corp. v. Catrett
   477 U.S. 317 (1986) ........................................................................................... 17

EEOC v. Sperry Corp.
   852 F.2d 503 (10th Cir. 1988) ........................................................................... 31

English v. PNC Bank Corp.
    157 Fed. Appx. 501 (3d Cir. 2005) ...................................................................... 28

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
    983 F.2d 509 3d Cir. 1992)
    cert. denied, 510 U.S. 826 (1993) ................................................................ 18, 29

Fountain v. Metcalf, Zima & Co., PA.
    925 F.2d 1398 (11th Cir. 1991) ..................................................................... 19, 24

Fuentes v. Perskie
    32 F.3d 759 (3d Cir. 1994) ................................................................ 18, 26, 27, 29

Glanzman v. Metro Mgmt. Corp.
    391 F.3d 506 (3d Cir. 2004) .............................................................................. 17

Hishon v. King & Spalding
    678 F.2d 1022 (11th Cir. 1982) ......................................................................... 21

Kautz v. Met-Pro Corp.
    412 F.3d 463 (3d Cir. 2005) ............................................................................. 31

Keller v. Orix Credit Alliance, Inc.
    130 F.3d 1101 (3d Cir. 1997) ............................................................................ 29

Maurizio v. Fox Chapel Foods, Inc.
    No. 02:04cv1168, 2006 U.S. Dist.
    LEXIS 62926 (W.D. Pa. Sept. 5, 2006) .............................................................. 32

Mauro v. S. New Eng. Telecomms.
    208 F.3d 384 (2d Cir. 2000) ............................................................................. 26

McDonnell-Douglas Corporation v. Green
    411 U.S. 792 (1973) ....................................................................................... 17

Medina-Munoz v. R.J. Reynolds Tobacco Co.
    896 F.2d 5 (1st Cir. 1990) ................................................................................ 32

Pages-Cahue v. Iberia Lineas Aereas de Espana
    82 F.3d 533 (1st Cir. 1996) .............................................................................. 32

Parcinski v. Outlet Co.
    673 F.2d 34 (2d Cir. 1982) ............................................................................... 32

Peace v. Shellhorn & Hill, Inc.
    No. 03-107 (GMS), 2005 U.S. Dist.
    LEXIS 2533 (D. Del. Feb. 18, 2005) ................................................................... 28

DB02:6934837.2                                                                                           064406.1002

Podobnik v. U.S.P.S.
    409 F.3d 584 (3d Cir. 2004).........................................................................32

Quiroga v. Hasbro, Inc.
    934 F.2d 497 (3d Cir. 1991).........................................................................30

Reeves v. Sanderson Plumbing Prods.
    530 U.S. 133 (2000) ....................................................................................17

Schoch v. First Fidelity Bancorporation,
    912 F.2d 654 (3d Cir. 1990).........................................................................30

Serapion v. Martinez
    942 F. Supp. 80 (D.P.R. 1996).....................................................................19

Serapion v. Martinez,
    199 F.3d 982 (1st Cir. 1997).......................................................19, 20, 22, 23

Siko v. Kassab, Archbold & O'Brien, LLP
    No. 98-402, 1998 U.S. Dist.
    LEXIS 12153 (Aug. 5, 1998)........................................................................19

Simpson v. Ernst & Young
    100 F.3d 436 (6th Cir. 1996)........................................................................24

Tenthoff v. McGraw-Hill, Inc.
    808 F. Supp. 403 (E.D. Pa. 1992)
    aff'd without op., 981 F.2d 1248 (3d Cir.)....................................................27

Verdecchia v. Douglas A. Prozan, Inc.
    274 F. Supp. 2d 712 (W.D. Pa. 2003) ..........................................................19

Visser v. Packer Eng'g Assocs., Inc.
    924 F.2d 655 (7th Cir. 1991)........................................................................32

Weaver v. United Parcel Service, Inc.
    No. 02-1401 JJF, 2007 U.S. Dist.
    LEXIS 1314 (D. Del. Jan. 30, 2004) ............................................................28

Western World Ins. Co. v. Stack Oil, Inc.
    922 F.2d 118 (2nd Cir. 1990).......................................................................32

Wheeler v. Hurdman
    825 F.2d 257 (10th Cir. 1987).............................................................20, 22, 23, 24

Yindee v. CCH, Inc.
    458 F.3d 599 (7th Cir. 2006)........................................................................30

v

**State Statutes**

19 Del. C. § 710 ................................................................................................................... 1

29 U.S.C. §§ 621-34 ........................................................................................................... 1

**Federal Rules**

Fed. R. Civ. P. 56(c) ......................................................................................................... 17

DB02:6934837.2     064406.1002

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Alan D. Paul, a former partner, filed this lawsuit against Defendants Deloitte & Touche LLP ("D&T LLP"), and Deloitte LLP f/k/a Deloitte & Touche USA LLP ("Deloitte LLP") (collectively, "Deloitte") alleging that Deloitte severed him from the Deloitte partnerships because of his age[1], in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("ADEA"), a Massachusetts discrimination statute, and the Delaware Discrimination in Employment Act, 19 Del. C. §§ 710-18 ("DDEA").  The Complaint also contained state common law claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  (D.I. 1; 7).  The lawsuit was filed in Delaware as required by Deloitte's partnership agreements.  Plaintiff subsequently dismissed his DDEA claim voluntarily.  D.I. 9 at 5.

Defendants moved to dismiss all claims except for the federal ADEA claim, and that motion was granted and the claims were dismissed.  D.I. 49.  Plaintiff then re-filed his two common law claims in Delaware Superior Court.  Plaintiff subsequently moved for partial summary judgment on the breach of contract claim in Superior Court, and on April 28, 2008, Judge Jerome O. Herlihy granted that motion.  Defendants then moved for summary judgment in the state case, contending that Plaintiff had sustained no damages.  On June 24, 2008, Judge Herlihy granted that motion and dismissed the case.  On July 3, 2008, Plaintiff filed an appeal to the Delaware Supreme Court and on July 11, 2008, Defendants filed a cross-appeal addressed to the initial grant of summary judgment to Plaintiff.

In this ADEA case, Plaintiff has taken eleven depositions, filed seven separate requests for production of documents, two sets of interrogatories, and sent countless letters and emails asking informally for additional discovery.  Defendants took Plaintiff's deposition and filed a

---

[1] Paul's birthdate is June 2, 1949.  He was a few days short of 55 at the time of his severance on May 27, 2004.  A456.

1

request for production of documents.  Defendants have today filed a motion for summary

judgment.  This is Defendants' brief in support of that motion.

## SUMMARY OF THE ARGUMENT

Alan Paul cannot establish or prove a claim of age discrimination, and, therefore, this case should be dismissed, for the following reasons:

1.      As owners of the business, Deloitte partners are the employer, not employees, and therefore, Plaintiff is not covered by the ADEA.

2.      Assuming Plaintiff could invoke the ADEA, he has not been discriminated against on the basis of age.

DB02:6934837.2                                                                                                   064406.1002

## STATEMENT OF FACTS

Deloitte LLP, a registered limited liability partnership under the laws of the State of Delaware, has several subsidiaries (including D&T LLP) that provide professional accounting, auditing, and related services to public and private clients.  Deloitte's owners are either "principals" or "partners."  "Partners" are owners who are certified public accountants ("CPA") while "Principals" are not CPAs.  Paul is a CPA who practiced in the Lead Tax Services ("LTS") section in Deloitte's Boston, Massachusetts office.  Paul had been a partner with Arthur Andersen LLP ("Andersen") and became a Deloitte partner in May 2002 along with numerous other former Andersen partners, as described below.

### A.    Plaintiff's Admission As A Deloitte Partner

In early 2002, Andersen was imploding as a result of the Enron debacle.[2]  On April 2, 2002, Deloitte LLP and Andersen entered into a "Memorandum of Understanding"[3] (the "MOU") with respect to the possible offer by Deloitte of partnerships in its tax practice to certain Andersen tax partners.  After the MOU was signed, Deloitte and Paul, who had also spoken with KPMG and Ernst & Young,[4] entered into agreements relating to his admission as a partner.[5]  On May 7, 2002, Deloitte LLP and Andersen executed the definitive agreement with respect to their transaction (the "Andersen Agreement").[6]  The Andersen Agreement stated that Deloitte had offered to each Andersen person listed on Exhibits A and B thereto admission to the Deloitte

---

[2] A457.

[3] A58-73.

[4] A458.

[5] A459-61.

[6] A260-82.

4

partnerships.  Plaintiff was one of more than 160 "Selected Tax Professionals" to whom Deloitte extended offers.

On April 19, 2002 (between the execution dates of the MOU and the Andersen Agreement), Deloitte had extended a written offer to Plaintiff to join as a partner in the tax practice.[7]  In its offer, Deloitte assigned Plaintiff 750 "units," Deloitte's term for proportions of ownership.  He negotiated for and obtained 30 more units,[8] and accepted the revised offer on April 29, 2002.  He countersigned the offer on April 30, 2002.[9]

On May 2, 2002, Deloitte sent Plaintiff an agreement confirming the terms of his admission as a partner (the "Admission Agreement").[10]  He would serve as a tax partner in the LTS section of Deloitte's Boston office; he would be credited with 780 units of ownership; he would receive an initial biweekly draw in the amount of $10,770; and his required capital investment would be $741,000.[11]  Plaintiff executed the Admission Agreement on May 24, 2002.

The Admission Agreement provided that Plaintiff's admission as a partner was contingent on several events.  One such event was the finalization of the transaction between Deloitte and Andersen, which occurred on May 7, 2002.[12]  His admission was also contingent on his acceptance and execution of two Memoranda of Agreement, one with Deloitte LLP and another with D&T LLP (collectively, the "MOAs") (collectively with the Admission Agreement, the "Partnership Agreements").[13]  Plaintiff signed the MOAs on May 8, 2002.

---

[7] A74-78.

[8] A79; A80.

[9] A81.

[10] A82-87.

[11] A464-68.

[12] A82-87; A260-82.

[13] A88-212; A213-59.

5

The MOAs set forth the partnership terms, such as entity governance, required capital contributions, earnings, retirement, disability, and death benefits, and conditions of separation. The MOAs provided that a partner could be involuntarily severed in two ways. First, a partner could be severed by a vote of the Board, which had to be approved by a vote of a majority of all active parties and of active parties who held a majority of the voting interest. Second, a partner could be severed if the Board unanimously voted that the partner had engaged in certain identified conduct, with eighteen Board members required for a quorum.[14]

The Admission Agreement provided for a third method of involuntary severance. This provision was unique to the partners who, like Plaintiff, joined Deloitte in connection with the Andersen Agreement. During the first two years of their Deloitte partnerships, the former Andersen partners could be involuntarily severed by an appointed committee. Specifically, the Admission Agreement provided:

> In addition to those circumstances set forth in the second sentence of Section 7.03 of the Memorandum of Agreement of each Firm, you shall be deemed to have severed your association with each Firm…(b) as of the date specified within two years after the Effective Date[15] by a committee . . , which shall consist of three tax partners and principals of D&T USA who had been partners of [Andersen] and three tax partners and principals of D&T USA who had not been partners of [Andersen], with the leader of D&T's tax practice able to cast the deciding vote if such committee is deadlocked.[16]

This third method of involuntary severance, unique to the former Andersen partners, placed the severance decision in the hands of what became known as the Committee of 6 for a two year period. This was a logistical necessity because of the simultaneous admission of more than 160

---

[14] Id., MOA-Deloitte LLP § 7.03, MOA-D&T LLP § 7.03.

[15] The "Effective Date" referred to was May 7, 2002, the execution date of the Andersen Agreement.

[16] A82-87, at A83 (¶ 5).

new partners and principals. Given those numbers, Deloitte could not possibly have engaged in the due diligence process normally employed when considering the admission of a lateral partner, as explained by Bradley Seltzer, a member of the Committee of 6.[17] Mark Berkowitz, a former Andersen partner who joined Deloitte's Boston office with Plaintiff and considered him a close friend, described the two-year period as a "probation period."[18]

### B.    Plaintiff's Poor Performance

At the relevant time, Deloitte's tax practice was divided into nine geographic regions. Plaintiff was in the Northeast Region, which consisted of 50-60 partners. Within each region, the Defendants' tax practice was divided into separate groups, centered around office locations. Plaintiff was a partner in "Group 7," based in Boston, Massachusetts. For most of the time after Plaintiff joined Deloitte, Group 7 consisted of twelve partners headed by a Partner In Charge ("PIC"), Vincent DeGutis.[19] Two of the partners, DeGutis and Judeth Drake, did not devote full time to LTS.[20]

All Deloitte partners were assigned to one of six earnings groups ("Earnings Groups 1-6"). The Group number was linked to compensation. Thus, the partners in Groups 5 and 6 were deemed to be the most valuable partners and received the highest levels of compensation.[21]

Plaintiff was assigned to Earnings Group 5 based on his past experience, stature within the tax community, and tax expertise.[22] As a partner in Earnings Group 5, Plaintiff, among other things, was expected to work with clients whose fees ranked in the top 25% for their geographic

---

[17] A514-15; see also, A412-13; A425-27.

[18] A357, A358-60.

[19] A366-69.

[20] A417.

[21] A283-86.

[22] A331-33, at A331.

7

area and to provide those clients with a significant amount of strategic business advice. He was also expected to identify and develop services to address emerging tax trends and industry developments, and generate "significantly higher than average fees and profitability." [23]

Deloitte used a yearly performance and compensation evaluation system for its partners. First, each partner was asked to record his goals for the next fiscal year.[24] The Lead Goal Endorser ("LGE"), who was also the practice leader or PIC, in Plaintiff's case Vincent DeGutis,[25] would then approve or modify the partner's self-identified goals. As Plaintiff put it, this was "a joint effort."[26] Mid-year, the partner and his LGE would meet to assess the partner's progress toward his goals.[27] In addition to this face to face meeting, Paul and the other partners received monthly documents updating them on their performance compared to their goals and had monthly LTS partners' meetings at which this information was discussed.[28] Then, at fiscal year's end, the LGE would complete an evaluation of each partner, taking into account his experience with the partner, feedback from other partners, and the partner's self-assessment. Final performance ratings were determined in comparison with other partners and issued on a five-point scale ranging from "not achieved" to "excellent."[29] The next-lowest rating after "not achieved" was "good."

---

[23] A283-86.

[24] A287-92.

[25] A471.

[26] A486-87.

[27] A397.

[28] A535 (¶ 7).

[29] A288; A375-77.

8

### 1. Despite Having Modest Goals For FY 2003, Plaintiff Failed To Achieve Even Minimal Success.

When Plaintiff was admitted to the partnerships towards the end of fiscal year 2002, he and DeGutis set very modest performance goals for FY03 for a partner at Plaintiff's high Earnings Group level.[30] Plaintiff was expected to (i) effectively transition as many clients as possible from Andersen to Deloitte; (ii) actively pursue banking clients; and (iii) become the preferred provider for certain existing large clients.[31] His financial goals included an expected $2 million in aggregate revenue and $1 million in personal sales. They agreed that Plaintiff would be expected to have 900 chargeable hours.

Plaintiff's goals were some of the lowest for any partner in the Boston LTS section.[32] He and other former Andersen partners were given modest goals[33] since it was felt they would need an adjustment period after the demise of Andersen.[34] To further assist Plaintiff to meet his goals, he was assigned several former Andersen clients with whom he was already familiar.[35]

Despite these accommodations, Plaintiff failed to reach most of his goals. He generated only $1.4 million in aggregate revenue instead of the agreed-upon $2 million and charged 860 hours, falling short of the expected 900. As a result of these shortfalls, Plaintiff was rated "good," the second worst rating, which placed him in the bottom 5-15% of all partners.[36]

Plaintiff's 2003 performance was far below what was expected of such a highly compensated partner, and at a meeting in the Fall of 2003, DeGutis told Plaintiff he needed to

---

[30] A534 (¶ 3).

[31] A300-03, at A300-01.

[32] A400-01; A414-15.

[33] A506-07.

[34] A381-82; A362-64; A534 (¶ 3).

[35] A331, supra; A488-89.

[36] A331, supra; A303; A371-74; A438-39.

improve.[37]  For FY04, Plaintiff was permitted to remain in Earnings Group 5 but his units were

reduced from 780 to 760.[38]  Because of the rarity of unit reductions, this was a strong message to

Plaintiff that his performance was unsatisfactory, and that message was conveyed to him.[39]

Indeed, Plaintiff has acknowledged that since he did not meet his revenue goals, the rating he

received was correct and could not have been higher.[40]

### 2.  Plaintiff Failed To Achieve His Goals Again In FY 2004.

Plaintiff's performance goals were largely unchanged for the 2004 fiscal year.  He was

expected to generate $2.5 million in aggregate revenue and to charge 1,000 hours, small

increases from the previous year but still less than or equal to most other Boston LTS partners,

including five who were in much lower Earnings Groups.  His sales goal remained at $1

million.[41]  Additionally, he was expected to generate $400,000 in "comprehensive tax services"

revenue ("CTS").[42]

In the Fall of 2003, Steven Severin, one of the partners responsible for monitoring

partners' performance,[43] identified Alan Paul as one of several partners in Deloitte's Northeast

Region with "significant performance issues."[44]  Within that list, Plaintiff was placed in a

subcategory of partners who may be asked to resign.  At that time Severin told Frank Marcos, the

---

[37] A535 (¶4).

[38] A478.

[39] A479-80, A481; A506.

[40] A482-83.

[41] A348; A312-18, at A316.

[42] A385-86, A391-94; A350-353, at A351; A475-76.

[43] A518-520; A538 (¶ 1); A389-90.

[44] A297-99; A517.

Northeast Region's lead tax partner,[45] to place Paul on a performance improvement plan ("PIP"), but this was delayed until mid-February 2004. Marcos, though not recalling the specifics, thought the delay might have been to allow Paul more opportunity to demonstrate that he would be able to meet his goals.[46] DeGutis was not aware of the December PIP discussion.[47]

On February 8, 2004 Patricia Horn, a CPA who functioned as Frank Marcos' chief of staff[48] and assisted him in managing the tax practice in the Northeast Region, sent Plaintiff an email on behalf of Marcos expressing concern about Plaintiff's ability to meet his CTS revenue goal.[49] Plaintiff's mid-year evaluation or "touch point" meeting with Vincent DeGutis was held on February 16, 2004.[50] At that meeting, DeGutis raised concerns about Plaintiff's continued sub-par performance. DeGutis told Plaintiff it appeared that he might miss his revenue target by more than 30%, and counseled that his chargeable hours and total hours must increase.[51] Also, as of that time Plaintiff had accumulated only $83,000 in CTS revenue, barely 20% of the expected $400,000.[52] Significantly, as of period 10 of the fiscal year, the period during which the touch point meeting took place, of the ten full-time partners in the Boston LTS office, Plaintiff was one of the three highest compensated but one of the three lowest revenue earners,[53] as he had been the previous fiscal year.[54]

---

[45] A434-35.

[46] A437.

[47] A535 (¶ 6).

[48] A419.

[49] A308-09.

[50] A490; A535 (¶ 8).

[51] Id.; A318, supra; A491.

[52] A308-09, supra; A477.

[53] A310-11; A400-01.

[54] A307

At DeGutis' request, on February 17, the day after the touch point meeting, Plaintiff prepared an estimate of the revenue he expected to generate for the balance of the fiscal year.[55] Plaintiff surmised that he would generate an additional $800,000 by the end of the fiscal year.[56] Even with that rosy estimate, he still would have fallen far short of his revenue goal.[57]

On February 25, 2004, DeGutis put Plaintiff on a Performance Improvement Plan.[58] The PIP identified areas where Plaintiff needed to improve immediately and suggested a follow-up meeting after ninety days.[59] Plaintiff was told in no uncertain terms that he must demonstrate immediate and sustained improvement in revenue generation, targeting activities and sales, billings and collections, and client service hours.[60]

Unlike Wayne Smith, another partner who was placed on a PIP in FY04 and was cooperative,[61] Plaintiff refused to acknowledge any shortcomings or accept the issues identified in the PIP. Instead, he was strongly resistant to the efforts to improve his performance. He began to send DeGutis self-serving memoranda in which he inaccurately described and nitpicked DeGutis' attempts to help him correct his serious performance deficiencies.[62] During this time,

---

[55] A319; A492-93; A535 (¶ 8).

[56] Id.; A398-99.

[57] Not surprisingly, Plaintiff finished the year with less than $1.59 million in actual revenue, even lower than he had estimated, and over $900,000 under his revenue goal. A326. Also, by the end of the year, he had managed to add just $46,000 to his CTS revenue, finishing with just $129,500 of his $400,000 CTS goal. A351, supra.

[58] A320; A523; A293-96 (Severin had sent a sample PIP, to be used as a guide, to various people on August 26, 2003); A535-36 (¶¶ 9, 10).

[59] Id.

[60] A402-03.

[61] A536, ¶ 12.

[62] A321-22; A323; A324-25.

DeGutis and Marcos were both involved, meeting and speaking with Plaintiff several times to discuss his performance.[63]

Plaintiff claimed others were responsible for his failures.  He said he was doing his part in seeking CTS revenue by arranging meetings, and blamed others for not closing the sales.  He also asserted that the tax market was not receptive to CTS.[64]  And he repeatedly asked DeGutis to lower his revenue goals.[65]  DeGutis refused, pointing out that all of the partners had to meet the initial revenue goals on which they had agreed.[66]

It soon became apparent to DeGutis and Marcos, based on Plaintiff's revenue shortfalls and intransigence,[67] that he was not going to achieve his goals for the year once again.  Marcos bluntly described Plaintiff's revenue generation as "pathetic," and "one of the lowest in the northeast region."[68]  As a result of their assessment of Plaintiff's performance, and also considering that the two year window for severance by the Committee of 6 was going to expire in May, DeGutis and Marcos decided to recommend to the Committee of 6 that Plaintiff be severed from the partnerships.[69]

### C.    Recommendation To Sever Plaintiff

On March 26, 2004, DeGutis sent Marcos a draft severance recommendation,[70] which Marcos forwarded to Severin.  The same day, Severin replied that a more comprehensive memo

---

[63] A321-22; A324-25; A323; A495; A536 (¶¶ 11-13).

[64] Id.; A332.

[65] Id.

[66] A405-08, A409, A410.

[67] A450-51.

[68] A440, A441-42, A443-46, A447; A326; A484-85.

[69] A411, A416; A526; A436; A510-12.

[70] A328-30; A452-53; A536-37 (¶ 14).

was needed, and raised a number of questions that he felt should be answered "to build a strong convincing case" to present to the Committee of 6. He commented that this was necessary "to overcome the late, weak PIP."[71] None of Severin's questions or observations referred to Plaintiff's age but instead, were all addressed to his performance.[72]

DeGutis and Marcos then prepared a revised recommendation, which was submitted to the Committee of 6.[73] Their recommendation was based on several factors relating to Plaintiff's total performance at Deloitte. For one, he had failed to persuade many of his Andersen clients to convert to Deloitte.[74] Further, he had failed to generate sufficient fees from his new client base, many of which were former Andersen clients and considered to be a fairly receptive audience.[75] Additionally, despite having been advised to work more with other Deloitte professionals outside of the tax practice, Plaintiff had not heeded this advice. Finally, and of most significance, for the second fiscal year, Plaintiff was failing to achieve his revenue goals by a substantial margin.[76]

At the time he was recommended for severance, before the end of period 11 of the fiscal year,[77] Plaintiff was one of the worst performing partners in the Boston LTS section but also one of the most highly compensated.[78] By way of comparison, there was only one other partner in the Boston LTS section whose allocation of units placed him in Earnings Group 5, Frank Neczypor. In FY 2003, Neczypor generated more than double the revenue produced by

---

[71] A327; A536-37 (¶ 14)., id.

[72] A327, id.

[73] A331-33, supra.

[74] A378-79; A448-49, A454.

[75] A383-85; A513-14.

[76] A331-33; A387-88.

[77] A422-23.

[78] A524-25, A527-28; A452.

Plaintiff[79] and in FY2004, through period 10, Neczypor was outpacing Plaintiff by $700,000.[80]

And Mark Berkowitz, who, like Plaintiff, had joined the Boston LTS section from Andersen and

faced the same obstacles, had $2,313,000 in managed revenue in FY03, and through period 10 of

FY04, had $1,766,221, over $450,000 more than Plaintiff.[81]  Revenue data for all of the Boston

LTS partners was distributed monthly by DeGutis, so despite Paul's professed ignorance, he was

well aware of his failings.[82]

### D.    The Vote To Sever Plaintiff.

On April 8, 2004 Plaintiff was told his severance was being recommended.[83]  On April

12, 2004, the Committee of 6 met to consider DeGutis and Marcos' recommendation to sever

Plaintiff.[84]  Consistent with its practice,[85] the Committee was provided with eight documents:  (i)

Paul's FY2004 goal-setting sheet and performance evaluation; (ii) Cash Accountability Program

re: Part B Exclusions, (iii) Cash Accountability Program Part A – Final List, (iv) Cash

Accountability Program Part B – Final List, (v) Partner Revenue YTD, Period 10, (vi) CTS

Revenues, (vii) Paul's response to a revenue estimate for FY04, and (viii) the recommendation

for severance drafted by Marcos and DeGutis.[86]  Based on Plaintiff's repeated and substantial

failures in his measured production, the Committee unanimously voted to sever him from the

---

[79] A307.

[80] A310, supra.

[81] A310; and see, A326.

[82] A521-22, A529; A395-97; A535 (¶ 7).

[83] A494.

[84] A334; A335.

[85] A500-01.

[86] A335; A502-03, A504.

15

partnerships.[87]  Plaintiff's age was not mentioned or considered by the Committee; only Plaintiff's performance deficiencies were considered.[88]

Marcos promptly orally informed Plaintiff of the Committee's decision[89] and offered him an additional severance payment of $50,000, based upon a notice date of April 12, 2004 (and corresponding last day of May 12, 2004) in exchange for a general release.  Plaintiff initially accepted.  However, because of some delay in communication, Plaintiff received an additional two weeks' compensation (approximately $30,000), so Marcos reduced the additional severance offer to approximately $20,000.  Plaintiff declined that offer.[90]

On April 22, 2004, Deloitte LLP notified Plaintiff in writing that the Committee of 6 had voted to sever him, and gave him over one month's notice of the date his severance would be effective.[91]  The date his partnerships ended was May 27, 2004.[92]  It is undisputed that Plaintiff received the sums and accommodations to which he was entitled by his Admission Agreement, including about $215,000 in severance payments.[93]

---

[87] A336.

[88] A505-09.

[89] A345-47; A370.

[90] Id., A346 (¶4); A336; cf. A496-97.

[91] A533.

[92] A337-44.

[93] A462-63.

## ARGUMENT

**I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF LACKS STANDING, AND CANNOT PROVE HIS CLAIM.**

Here, Plaintiff's claim fails even before the *prima facie* analysis can begin.  Plaintiff is not a covered employee entitled to the protections of the ADEA.  Instead, he is a partner and, hence, the employer; therefore, he does not have standing to pursue his ADEA claim.

And even assuming, *arguendo*, that Plaintiff could overcome this jurisdictional barrier, his claim would still fail.  Plaintiff cannot establish the essential elements of a disparate-treatment claim of age discrimination under the McDonnell-Douglas Corporation v. Green standard.[94]  Summary judgment is appropriate where there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party.[95]  To avoid dismissal at this stage, Plaintiff must prove that his age "'actually motivated' and 'had a determinative influence' on [Deloitte's] decision" to terminate him.[96]

Thus, Plaintiff must first prove his *prima facie* case by a preponderance of the evidence. If he is able to do so, the burden of production shifts to Defendants to "articulate a legitimate, nondiscriminatory reason" for severing him.[97]  Deloitte's burden at this stage is extremely light;

---

[94] 411 U.S. 792 (1973) (detailing the burden-shifting framework to be used in Title VII discrimination claims); see also Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326 (3d Cir. 1995) (extending the standard to claims brought under the ADEA).

[95] Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[96] Glanzman v. Metro Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 141 (2000)).

[97] McDonnell-Douglas, 411 U.S. 792.

Deloitte need only state a non-discriminatory explanation for the action and come forward with some supporting evidence.[98]  Deloitte has done far more.

After a defendant produces a legitimate, nondiscriminatory reason, the plaintiff can defeat summary judgment by pointing to some direct or circumstantial evidence from which a fact finder could reasonably either: "(1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action."[99]

The plaintiff always bears the ultimate burden of persuasion that discriminatory reasons motivated the employment decision.[100]  If he were to reach this stage, Plaintiff must provide evidence that discrimination was the real reason for his separation or evidence that will otherwise "cast doubt on the employer's stated reasons by identifying such weaknesses, inconsistencies, incoherencies, or contradictions" in the proffered reasons that a reasonable fact finder "could rationally find them unworthy of credence."[101]

As discussed above, Defendants severed Plaintiff for serious, ongoing performance failures unrelated to age.  Because Plaintiff can point to no evidence of pretext in that decision, his claim should be dismissed.

## II.    THE COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIM BECAUSE THE ADEA PROTECTS EMPLOYEES, NOT EMPLOYERS.

Plaintiff's relationship with Deloitte was one of partnership and as such, he was an employer, not an employee.  Indeed, this dispute arises from the severance of his partnership

---

[98] Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

[99] Fuentes, 32 F.3d 759 at 764; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992), cert. denied, 510 U.S. 826, 126 L. Ed. 2d 56, 114 S. Ct. 88 (1993).

[100] See Brodsky v. Hercules, Inc., 966 F. Supp. 1337, 1344 (D. Del. 1997).

[101] Brewer, 72 F.3d at 331.

status in accordance with his Partnership Agreements. Plaintiff even filed suit in state court seeking to enforce the Partnership Agreements. As a partner, Plaintiff's interest in Deloitte was one of ownership, not employment.

Employee status is a jurisdictional requirement in an age discrimination claim.[102] "It has long been undisputed that "while employees of a partnership are protected under [the federal antidiscrimination statutes], the partners themselves are not.""[103]

The absence of jurisdiction is seen by looking to Plaintiff's relationship with Deloitte. "Textbook" factors of "management, control and ownership" will confirm that Plaintiff's relationship was one of partner and thus, he was an employer.[104] Specifically, courts look to the plaintiff's fiduciary relationship and responsibilities, ability to share in profits, and right to participate in firm governance, policymaking, and control.[105] Here, an evaluation of each of the three categories demonstrates that there can be no genuine issue with respect to Plaintiff's status as an employer. As a result, this Court is without jurisdiction to hear Plaintiff's claim, which should be dismissed.

### A.    Plaintiff's Fiduciary Relationship And Responsibilities Are Indicative Of His Status As An Employer.

The fiduciary nature of Plaintiff's relationship with and responsibilities to Deloitte provide a strong indication of his status as an employer. Providing support for this conclusion is

---

[102] Verdecchia v. Douglas A. Prozan, Inc., 274 F. Supp. 2d 712, 723 (W.D. Pa. 2003).

[103] Serapion v. Martinez, 942 F. Supp. 80, 84 (D.P.R. 1996) (internal quotations omitted); and see Fountain v. Metcalf, Zima & Co., PA., 925 F.2d 1398 (11th Cir. 1991).

[104] Fountain, at 1401.

[105] See Serapion v. Martinez, 199 F.3d 982, 990 (1st Cir. 1997). See also Siko v. Kassab, Archbold & O'Brien, LLP, No. 98-402, 1998 U.S. Dist. LEXIS 12153, *15 n.4 (Aug. 5, 1998) (listing similar indicia of partnership).

19

the fact that Plaintiff had a substantial investment in Deloitte and was at risk for the partnerships' debts and obligations. Each of these undisputed facts "indicate a proprietary role."[106]

### 1.  A Mandatory Capital Investment Indicates Employer Status.

In order to gain the rewards of ownership at Deloitte, the partners were required to make a significant capital investment. Accordingly, Paul was required to make a capital investment of $741,000 in exchange for admission to the partnerships. Conversely, employees were not subject to any such "buy-in" requirement.

As a result of their capital investment, Deloitte partners were at risk, not only for their own actions, but also for the actions of other partners and employees. "It is no small thing to be exposed to unlimited liability, to be personally at risk for a partner's mistakes, and to have one's share of profits always potentially conditional upon the outcome of claims, suits, and obligations generated by another partner."[107] Moreover, Deloitte's size does not insulate the partners from the constant risk of a potential claim.[108] Plaintiff was very much aware of that risk – at Andersen, where he was also a partner, he had lost his capital investment.[109]

Employees faced no comparable risk. At worst, an employee stood to lose *future* income by the loss of his or her job. An employee did not stand to lose any *prior* investment and certainly not one of such significance.

---

[106] See Serapion, 199 F.3d at 990.  See also Wheeler v. Hurdman, 825 F.2d 257, 274 (10th Cir. 1987) (stating that contributions to capital is an indicia of partnership).

[107] Wheeler v. Hurdman, 825 F.2d 257, 274 (10th Cir. 1987).

[108] See Wheeler, 825 F.2d at 274 ("Partnership size . . . guarantees no safety from liability.  Nor does insurance.  Numerous partners multiply risk.  Firm size also makes a tempting litigation target."); A468-70.
[109] A465-66.

### 2.  The Allocation Of Benefits Indicates Employer Status.

Further reflective of the fiduciary relationship between Deloitte and the partners is the provision of benefits.  Deloitte LLP and Deloitte & Touche LLP absorbed the cost of workers' compensation and unemployment insurance premiums for their employees.  They also withheld their employees' portions of social security and federal, state, and local income taxes.  And they made the employer's contribution of social security taxes for their employees.

By contrast, Deloitte had no such obligations with respect to the partners. Paul, like other partners, paid for his own benefits.  Also, he had no tax withholdings taken from his draw.  Employees had tax withholdings taken from their salaries.  And Deloitte had no obligation to contribute to the social security fund on behalf of Plaintiff or other partners.[110]

### 3.  Plaintiff's Tax Returns Indicate Partnership/Employer Status.

In addition to the capital-investment requirement and the self-paid benefits, Plaintiff's own tax returns also show the fiduciary nature of his relationship with Deloitte.  Deloitte reported each partner's share of partnership income to the U.S. Internal Revenue Service ("IRS"), on a schedule entitled "Partner's Share of Income, Credits, Deductions, Etc."[111]  When filing their tax returns, Plaintiff and other Deloitte partners represented, under penalty of perjury, that they were *bona fide* partners.  They further attested that the entirety of their investments in Deloitte were at risk.  Consistent with the IRS's requirements, Paul reported his income each year as an owner/partner.[112]

---

[110] A474.

[111] See, e.g., Hishon v. King & Spalding, 678 F.2d 1022, 1028 (11th Cir. 1982) (stating that the fact that the firm operated as a partnership under state law and filed tax returns as a partnership was indicative of *bona fide* partnership), rev'd on other grounds, 467 U.S. 69 (1984).

[112] A1-28, at A14-17.; A29-57, at A52-57.

Employees, of course, did not file their tax returns based on the Partner's Share of Income schedule. Instead, their personal income was reported on a W-2 form. For the most part, an employee's income consisted exclusively of wages earned during employment. And employees would not have had any ownership investment to report.

### B.    Plaintiff's Ability To Share in Profits Is Indicative Of His Employer Status.

The factor that most strongly indicates Plaintiff's partnership status is whether his compensation was tied to Deloitte's profits.[113] "To the extent that a partner's remuneration is subject to the vagaries of the firm's economic fortunes, [his] status more closely resembles that of a proprietor."[114] Here, Plaintiff's compensation was tied directly to Deloitte's profitability.[115] Plaintiff received a biweekly draw against anticipated profits, as well as periodic distributions of profits.[116] Deloitte partners were able to share in profits only as a result of their earlier investment and ownership status. The right to receive payouts of profits, as well as the attendant risk that no profits will be generated, distinguish the partnership relationship from one of employment.

Employees' compensation is not linked directly to Deloitte's profitability. Employees are paid straight wages and wage supplements based on a prior agreement with their employer. Employees know exactly what they will receive as their base compensation. This number is unaffected by the fiscal health of the employer. In other words, employees' base compensation

---

[113] See Serapion, 119 F.3d at 990.

[114] Id. See also Caruso v. Peat, Marwick, Mitchell & Co., 664 F. Supp. 144, 149 (S.D.N.Y. 1987) ("Profit sharing is the primary attribute of partnership."); Wheeler, 825 F.2d at 274; Burke v. Friedman, 556 F.2d 867, 869 (7th Cir. 1977).

[115] Cf., Caruso, 664 F. Supp. at 150 (stating that the fact that plaintiff held a low number of units suggested that his salary varied little with the firm's profits).

[116] A109-10; A227-28, supra.

is determined *prior* to a determination of profitability, whereas a partner's compensation cannot, by definition, be determined until *after* a determination of profitability.[117]

### C.    Plaintiff's Participation in Governance And Control Are Indicative Of His Employer Status.

Plaintiff's several rights to participate in governance and control of Deloitte further indicate his partnership status. Relevant supporting factors include whether Plaintiff had (a) the right to engage in policymaking decisions; (b) voting power with which to exercise that right; (c) the right to otherwise participate in governance; and (d) and the ability to assign work and direct the activities of employees.[118] Here, Plaintiff had rights in each of these areas of governance and control. In addition to the financial rewards and risks of an owner, Deloitte partners control management, business operations, and leadership decisions. Paul was on a committee that reviewed prospective partner candidates, and was also active in hiring and evaluating employees.[119]

All of the partners elect the leaders of Deloitte LLP. Through a Nominating Committee, the scope of which is much broader than the name suggests, partners can not only propose the names of persons to serve on the Board of Directors of Deloitte LLP and in senior management positions, they can also make recommendations anonymously about management, submit complaints, and provide views as to the state of Deloitte LLP.[120] Partners can communicate with the Nominating Committee in a variety of ways, including meeting with committee members who travel to the various offices for that purpose. As many as 1200 partners a year took

---

[117] A531-32.

[118] See Serapion, 199 F.3d at 990. See also Wheeler, 825 F.2d at 274 (stating that the right to share in management is an indicia of partnership).

[119] A472-73.

[120] A428-30, A431-32.

advantage of that opportunity.[121]   The partners of Deloitte LLP have ultimate control over the

election of the Board of Directors of Deloitte LLP and its most senior leaders by their right to

vote them into and out of office.  Paul had that right.

For all of the reasons discussed, Plaintiff's status was that of an employer, not an

employee.

The court reached a similar result under similar facts in Fountain v. Metcalf.[122]  In that

case, the plaintiff, a partner in defendants' accounting firm, filed an age discrimination claim

under the ADEA against his former partners.  In holding that the plaintiff was an employer, the

Court explained that:

> Fountain shared in the firm's profits, losses, and expenses; was
> compensated on the basis of a share in the firm's profits; was liable
> for certain debts, obligations, and liabilities of the firm; and had a
> right to vote his thirty-one percent ownership on member-
> shareholders' amendments to the agreement, on admission of new
> member-shareholders, on termination of relationship with member-
> shareholders, on draws, and on distribution of profits and
> income.[123]

The indicia of Plaintiff's employer status should be considered in toto.  "There may be

many aspects of a partner's work environment in a partnership which are indistinguishable from

that of a corporate employee.  But in general the total bundle of partnership characteristics

sufficiently differentiates between the two to remove general partners from the statutory term

'employee.'"[124]  In all of the relevant documentation, Plaintiff is referred to and considered a

partner.  In fact, he referred to himself as a "partner" and his admission to Deloitte came with all

---

[121] Id. Cf., Simpson v. Ernst & Young, 100 F.3d 436 (6th Cir. 1996) (finding that plaintiff was an
employee, in part, because plaintiff had no vote for chairman or members of the firm's
management committee).

[122] Fountain v. Metcalf, Zima & Co., PA., 925 F.2d 1398 (11th Cir. 1991)

[123] Fountain, at 1401.

[124] Wheeler, 825 F.2d at 276.

the trappings of partnership. He made a substantial capital contribution at the time of his admission and was placed in a highly compensated earnings group. He filed tax returns which reported his income as an employer/owner. Pursuant to the terms of the MOAs, he had a vote in Deloitte's management and governance.

Plaintiff was a *bona fide* partner and, therefore, an employer who does not have standing to sue under the ADEA. Because his claim is without jurisdictional basis, Defendants' motion for summary judgment should be granted.

## III. PLAINTIFF'S ADEA CLAIM MUST FAIL BECAUSE HE WAS PROPERLY SEVERED FOR LEGITIMATE REASONS UNRELATED TO HIS AGE.

Even assuming, *arguendo*, that Plaintiff has standing to pursue a federal age discrimination claim, he is still unable to satisfy the elements of a claim brought pursuant to the ADEA. It is doubtful that Plaintiff can even establish a *prima facie* case of age discrimination. But even if he could, Deloitte certainly has met the burden of articulating a nondiscriminatory reason for severing him. Finally, Plaintiff can provide no evidence that the proffered reason for his severance—his continual poor performance relative to his high compensation—was not the actual reason. Lacking even a scintilla of evidence to support a finding of pretext, Plaintiff's claim should be dismissed.

### A. Plaintiff Is Unable To Prove A *Prima Facie* Case.

In a case such as this, involving a severance, Plaintiff must make out a *prima facie* case by proving by a preponderance of the evidence that he (1) was 40 years old or older; (2) was qualified for the job; (3) was discharged; and (4) was replaced by an individual significantly younger.[125] Plaintiff fails to meet his *prima facie* burden on the fourth prong. Plaintiff can not point to a significantly younger person who became his replacement. He has admitted that he

---

[125] Brewer v. Quaker State, 72 F.3d 326 (3d Cir. 1995).

has no knowledge of a replacement, and volunteered that "most of that work disappeared from Deloitte."[126]

### B.    Deloitte Severed Plaintiff For A Legitimate, Non-Discriminatory Reason Unrelated to Age.

Even assuming, *arguendo*, that Plaintiff could meet his burden in the *prima facie* phase of the analysis, his claim must still be dismissed because Deloitte is able to demonstrate that Plaintiff was severed for a reason that was nondiscriminatory, his deficient performance for a person being compensated at his high level, and Plaintiff is unable to rebut that reason.[127] Summary judgment for the defendants is appropriate where the plaintiff cannot raise genuine questions about the legitimacy of the employer's articulated reason.[128]

As discussed above, Plaintiff was severed when he failed to meet the performance expectations of a partner in Earnings Group 5.  He was one of the highest compensated partners in Deloitte's Boston LTS practice, yet he significantly under-performed most other partners in the same practice area, even those who were in lower earnings groups.

### C.    Plaintiff Cannot Meet His Burden Of Persuasion To Prove That Deloitte's Proffered Reasons Were A Mere Pretext For Discrimination.

Because Deloitte has identified a legitimate nondiscriminatory reason for the severance, the burden of production returns to Plaintiff, who must show that his separation was because of

---

[126] A498.

[127] See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (describing the burden-shifting framework).

[128] See Mauro v. S. New Eng. Telecomms., 208 F.3d 384, 388 (2d Cir. 2000).

26

age.  Since Plaintiff cannot prove that the decision was merely a pretext to discriminate against him based on age, the case should be dismissed.[129]

As a general rule, pretext can be shown by producing evidence that the employer's reason was false,[130] evidence that ageist comments were made by relevant decisionmakers, or comparative evidence tending to show that younger persons were treated more favorably.  None of these reasons are present in this case.

Plaintiff was treated in a similar manner to all other nonperforming partners.  Two other former Andersen tax partners in the Northeast Region were severed in FY04, Michael Fichera and Edward (Bud) Gartland.  Fichera was 39 and Gartland was 41.  Gartland's units had been reduced in FY04 from 550 to 500, a reduction even more severe than Plaintiff's.[131]

Also, the Committee of 6 process was not the only way Deloitte addressed the problem of nonperforming partners.  Traditionally, Deloitte asked nonperforming partners to resign as partners.  During FY03 and FY04, five partners and principals in the Northeast Region resigned at the request of Deloitte, in addition to the three who were severed by the Committee of 6.  One person was two years older than Plaintiff at the time of his severance, and all of the others were significantly younger at the time of their separations, with ages ranging from 39 to 52.[132]

---

[129] Tenthoff v. McGraw-Hill, Inc., 808 F. Supp. 403 (E.D. Pa. 1992), aff'd without op., 981 F.2d 1248 (3d Cir.) (finding plaintiff failed to prove age discrimination where he failed to show that company's performance-based reasons for discharge were pretextual).

[130] "However, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is shrewd, prudent, or competent."  Fuentes v. Perskie, 32 F.3d  at 765.

[131] A541 (¶ 4); A354-55; A326; A349.

[132] A538-39 (¶ 2).

In addition to Plaintiff, ten other Northeast Region tax group partners received "good" ratings in FY03.[133]  Their ages were 36, 39 (2), 40, 41, 45 (2), 47, 52 and 58.  Of that group, the oldest remained a partner until his recent retirement.  Of the others, all of whom were younger than Plaintiff, four were asked to resign and did so, one was severed by the Committee of 6, and two resigned their partnerships and are now employees of Deloitte.  The other two remain partners.[134]

Likewise, of the sixteen people in Northeast Region Tax who were listed by Mr. Severin in September 2003 as having "significant performance problems," ten were younger than Plaintiff; two were in their 30s and six were in their forties.[135]  Thus, there is strong evidence that Defendants acted for a nondiscriminatory reason having nothing to do with Plaintiff's age.[136]

Plaintiff must be able to demonstrate that his chosen comparators are similarly situated in "all material aspects."[137]  Plaintiff is unable to carry this burden.  Plaintiff should not be allowed to selectively choose comparators from a larger universe.[138]

---

[133] A541 (¶ 5).

[134] Id.

[135] A297-99; A539 (¶ 3).

[136] Peace v. Shellhorn & Hill, Inc., No. 03-107 (GMS), 2005 U.S. Dist. LEXIS 2533, at *23 (D. Del. Feb. 18, 2005),

[137] See Weaver v. United Parcel Service, Inc., No. 02-1401 JJF, 2007 U.S. Dist. LEXIS 1314, *12 (D. Del. Jan. 30, 2004) (stating that for an alleged comparator to be considered similarly situated, a plaintiff must present evidence that the individuals with whom he or she wishes to be compared are similarly situated in all material aspects).

[138] See, e.g., English v. PNC Bank Corp., 157 Fed. Appx. 501, 504 (3d Cir. 2005) (finding that plaintiff could not simply choose to compare herself to people who help her case and ignore those who do not); Burton v. MBNA America Bank, N.A., No. 03-915 (GMS), 2005 U.S. Dist. LEXIS 12154, *24 (D. Del. June 22, 2005) (dismissing plaintiff's complaint and stating that the court has a duty to prevent the plaintiff from "cherry picking" the best evidence in an effort to distort the record).

Nor can Plaintiff "cherry-pick" numbers and ignore his total performance. In early 2004, Deloitte implemented a program to monitor and improve collections, called the Cash Accountability Program ("CAP"). Plaintiff's name appeared on the list of partners with collection problems.[139] Plaintiff apparently will claim that his CAP numbers were at the high end of those on the list, but the fact that he was on the list at all is significant. Only low performers, those in the bottom twenty percent, were listed.[140]

Plaintiff appears poised to compare himself to persons who were in lower earnings groups, and to "cherry pick" areas where he did relatively better while ignoring the evidence that his total performance fell short of his goals. An individualized decision was made by Defendants based on Plaintiff's poor performance *in toto* over two fiscal years. Defendants took account of the fact that Plaintiff was an Earnings Group 5 partner who earned far more than those in the lower earnings groups.

### 1. Plaintiff Cannot Show Pretext By Disagreeing With Deloitte's Decision.

Plaintiff cannot meet his burden of establishing pretext simply by disagreeing with Deloitte's action.[141] The question is not whether Deloitte made the best, or even a sound, business decision; it is whether the real reason for severing Plaintiff was discrimination based on his age.[142] "It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-

---

[139] A304-06.

[140] A420.

[141] Fuentes, 32 F.3d at 765; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 533 (3d Cir. 1992).

[142] Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).

fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel management receives its comeuppance in the market rather than the courts."[143]

It does not matter whether Plaintiff thought his performance was acceptable. Instead, "the inquiry into the genuineness of the employer's proffered nondiscriminatory reason for terminating the employee is limited to whether the employer's belief was honestly held."[144] Plaintiff's opinion about his performance is irrelevant. "The fact that an employee disagrees with an employer's evaluation of him does not prove pretext."[145]

### 2. Plaintiff Cannot Show Pretext With Mere Conclusory Allegations.

Plaintiff's conclusory allegations of differential treatment are insufficient to show that he was severed because of his age.[146] As this Court has noted, "speculation alone cannot establish a *prima facie* case of discrimination."[147] Plaintiff's conclusory allegations are inadequate substitutes for the required proof.[148] Further, the non-movant may not "rest upon mere allegations, general denials, or . . . vague statements."[149]

---

[143] <u>Yindee v. CCH, Inc.</u>, 458 F.3d 599 (7th Cir. 2006) (internal citations omitted).

[144] <u>Id.</u> (affirming summary judgment for employer on ADEA claim and confirming that the "honest belief" rule is supported by adequate precedent).

[145] <u>Bernhard v. Nexstar Broadcasting Corp.</u>, 146 Fed. Appx. 582 (3d Cir. 2005), at 584 (<u>citing Billet v. CIGNA Corp.</u>, 940 F.2d 812, 825 (3d Cir. 1991)).

[146] <u>Quiroga</u>, 934 F.2d at 500 (3d Cir. 1991); <u>see also</u> <u>Bullock v. Children's Hosp. of Phila.</u>, 71 F. Supp.2d 482, 490 (E.D. Pa. 1999) (holding that mere evidence of performance criticisms were insufficient to establish an inference of discrimination).

[147] <u>Bray v. L.D. Caulk Dentsply Int'l</u>, No. 98-441-SLR, 2000 U.S. Dist. LEXIS 11062, at *15 (D. Del. July 31, 2000).

[148] <u>Id.</u>

[149] <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991); <u>Schoch v. First Fidelity Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a non-movant's] memorandum and pleadings are insufficient to repel summary judgment").

Plaintiff is unable to point to any evidence that the Committee of 6, or DeGutis and Marcos, were subjectively motivated by discriminatory animus toward him based on his age, nor any evidence that would support a reasonable inference of pretext.[150]

Of note, on May 19, 2004, after Plaintiff knew he had been severed, he prepared a self-serving file memo reviewing his various legal contentions. His only mention there of alleged age discrimination was a conclusory assertion about "the careless treatment of me and my career, and my age at the time of the scheduled termination" and a comment that Frank Marcos' supposed explanation that he was being terminated because he was too highly compensated "is clearly a code phrase for being too old."[151]   "Careless treatment," even if true, can occur at any age. And being highly compensated while producing little revenue compared to one's peers does not equate to age discrimination.[152]   Plaintiff's surmise has been flatly rejected by the Supreme Court and the Third Circuit.

> Bernhard next argues that "high salary" is not a legitimate, non-discriminatory reason for terminating an employee. That argument is undermined by Hazen Paper Co. v. Biggins, 507 U.S. 604, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993). There, the Supreme Court noted that "an employee's age is analytically distinct from his years of service" and that employers therefore can take one factor into account while ignoring the other. Id. at 611. Thus, the Court held that a termination based on a factor related to length of service does not violate the ADEA because it is not necessarily "age-based." Id. Here, Bernhard's salary

---

[150] Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (holding that plaintiff's burden is to proffer evidence "contradicting the core facts put forward by the employer as the legitimate reason for its decision").

[151] A346-47.

[152] Bolton v. Scrivner, Inc., 36 F.3d 939 (10th Cir. 1994), cert. denied, 115 S. Ct. 1104 (1995)("a reasonable jury could not infer that cost savings alone indicates an intent to discriminate on the basis of age."). See also, EEOC v. Sperry Corp., 852 F.2d 503, 511 (10th Cir. 1988).

> is analytically [**7] distinct from his age, and therefore,
> could serve as a legitimate reason for terminating him
> under the Hazen Paper analysis.[153]

Plaintiff also says that Deloitte would not consider reducing his units as an alternative to severance, but this is not evidence of age discrimination. "Such a finding would require the court to encroach too far into areas which should be left to the company's legitimate management."[154]

Plaintiff can produce no evidence to demonstrate that Deloitte made the decision to sever him from the partnerships for any reason other than his performance. Instead, he appears poised to rely upon his own "unsupported assertions, conclusory allegations, or mere suspicions," all of which are insufficient to withstand summary judgment.[155] Thus, any purported "evidence" offered by Plaintiff will simply be inadmissible conjecture or speculation.[156] Therefore, under the McDonnell-Douglas test, Defendants are entitled to summary judgment.

---

[153] Bernhard v. Nexstar Broadcasting Corp., 146 Fed. Appx. 582 at 584 (emphasis added).

[154] Pages-Cahue v. Iberia Lineas Aereas de Espana, 82 F.3d 533, 538 (1st Cir. 1996); see also, Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982) (employer has no obligation to offer lower echelon jobs to older employees).

[155] Maurizio v. Fox Chapel Foods, Inc., No. 02:04cv1168, 2006 U.S. Dist. LEXIS 62926, at *25 (W.D. Pa. Sept. 5, 2006) (citing Podobnik v. U.S.P.S., 409 F.3d 584, 594 (3d Cir. 2004)).

[156] See, e.g., Visser v. Packer Eng'g Assocs., Inc., 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (holding that summary judgment was appropriate where the inferences plaintiff sought to draw from evidence were akin to "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience"); Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2nd Cir. 1990) ("The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts or defeat the motion through mere speculation or conjecture.") (citations and internal quotations omitted); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."); Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").

**CONCLUSION**

Plaintiff, as a partner, was the employer and has no standing to bring an ADEA claim.

And in any event, Plaintiff was properly severed from the partnerships due to his continual poor

performance, not his age.  Defendants' motion for summary judgment should be granted.

Respectfully Submitted,

/s/ Sheldon N. Sandler
Sheldon N. Sandler, Esquire (Bar I.D. 0245)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone:  (302) 571-6673
Facsimile:  (302) 576-3330
E-mail: ssandler@ycst.com
Attorneys for Defendants

DATED:  July 18, 2008

33