IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALAN D. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No.: 06-225-MPT |
| | ) | |
| DELOITTE & TOUCHE LLP, and | ) | JURY TRIAL DEMANDED |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO DEFENDANTS' OPENING BRIEF**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**VOLUME 1**

Sheldon N. Sandler, Esquire (Bar I.D. 0245)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-6673
Facsimile : (302) 576-3330
E-mail: ssandler@ycst.com
*Attorneys for Defendants*

July 18, 2008

# TABLE OF CONTENTS

Page

**VOLUME 1:**

Alan Paul 1065 Tax form dated 2000.......A1

Alan Paul 1065 Tax form dated 2001.......A29

Memorandum of Understanding dated April 2, 2002.......A58

Barry Salzberg Letter to Alan Paul dated April 19, 2002.......A74

E-mails between Alan Paul and Mike Burton dated April 19, 2002 through April 29, 2002 ....A79

Alan Paul Partnership Units and Capital.......A80

Alan Paul Signed Agreement Page dated April 30, 2002.......A81

Letter to Alan Paul dated May 2, 2002.......A82

Memorandum of Agreement of Deloitte & Touche USA LLP dated December 28, 2003........A88

Memorandum of Agreement of Deloitte & Touche LLP dated December 28, 2003..............A213

**VOLUME 2:**

Letter Agreement dated May 7, 2002.......A260

Fiscal 2004 Tax Earnings Group Criteria.......A283

Memo from Chet Wood dated May 13, 2003.......A287

E-mails re: Partner Performance Process dates August 26, 2003.......A293

E-mail from Steve Severin to Frank Marcos dated September 4, 2003.......A297

FY 2003 Partner/Principal/Director Goal Setting and Evaluation.......A300

Accounts Receivable By Billing Partner.......A304

Chart, Boston LTS Partners FY 2003.......A307

E-mails between Patricia Horn, Frank Marcos, and Alan Paul
dated February 8, 2004 through February 13, 2004.......A308

Managed Revenue By Partner, FY 2004 YTD Period 10 ....................................................A310

FY 2004 Partner/Principal/Director Goal Setting and Evaluation ........................................A312

Email from Alan Paul to Vince DeGutis dated February 17, 2004........................................A319

Memo from Vince DeGutis to Alan Paul dated February 25, 2004.......................................A320

Memo from Alan Paul to Vince DeGutis dated March 6, 2004 ............................................A321

Emails between Vince DeGutis and Alan Paul dated March 8, 2004 ....................................A323

Memo from Alan Paul to Vince DeGutis dated March 15, 2004...........................................A324

Chart, Northeast AA Partners, Managed Revenue,
Goal versus Actual Results for FY 2003 and FY 2004 .........................................................A326

Emails between Frank Marcos and Steve Severin dated March 26, 2004..............................A327

Memo from Frank Marcos and Vince DeGutis to Steve Severin dated March 30, 2004.........A331

Emails re: Alan Levinson and Alan Paul dated April 7, 2004...............................................A334

Email from Steve Severin re: Committee of 6 dated April 7, 2004 .......................................A335

Email from Barbara Van Bogart to Julie Salzman dated April 12, 2004 ...............................A336

Letter to Alan Paul dated April 22, 2004...............................................................................A337

Letter from Alan Paul dated May 19, 2004 ..........................................................................A345

Boston Partners Revenue Goals and Hours Chart.................................................................A348

FY 2004 Partner Managed Revenue Details by Period Chart ...............................................A349

FY 2004 Revenues By Partner Chart ....................................................................................A350

Employee Data Chart.............................................................................................................A354

Excerpts from the Deposition Transcript of Mark Berkowitz
dated May 21, 2008 ...............................................................................................................A356

Excerpts from the Deposition Transcript of Michael Burton
dated April 15, 2008 ..............................................................................................................A361

Excerpts from the Deposition Transcript of Vincent M. DeGutis dated December 19, 2007 .......... A365

Excerpts from the Deposition Transcripts of Patricia Horn dated March 11, 2008 and May 21, 2008 .......... A418

Excerpts from the Deposition Transcript of Raymond L. Lewis dated December 11, 2007 .......... A424

Excerpts from the Deposition Transcript of Frank M. Marcos dated April 1, 2008 .......... A433

Excerpts from the Deposition Transcript of Alan D. Paul dated November 1, 2007 .......... A455

Excerpts from the Deposition Transcript of Bradley M. Seltzer dated December 14, 2007 .......... A499

Excerpts from the Deposition Transcript of Steven L. Severin dated March 11, 2008 .......... A516

Excerpts from the Deposition Transcript of Andrew N. Wells, Esquire dated March 13, 2008 .......... A530

Affidavit of Vincent DeGutis dated July 15, 2008 .......... A534

Affidavit of Steven L. Severin dated July 16, 2008 .......... A539

Affidavit of Patricia Horn dated July 17, 2008 .......... A540

SCHEDULE K-1 (Form 1065)
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2000 or tax year beginning September 1, 2000, and ending August 31 2001

OMB No. 1545-0099

2000

Partner's identifying number ▶ [redacted]
Partner's name, address, and ZIP code

ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's identifying number ▶ [redacted]
Partnership's name, address, and ZIP code

ARTHUR ANDERSEN LLP
c/o JOHN E. COLE
225 NORTH MICHIGAN AVENUE
CHICAGO, IL 60601-7600

A This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member

B What type of entity is this partner? ▶ *Individual*

C Is this partner a ☑ domestic or a ☐ foreign partner?

D Enter partner's percentage of: (i) Before change or termination / (ii) End of year

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | *see footnote* % | % |
| Loss sharing | % | % |
| Ownership of capital | % | % |

E IRS Center where partnership filed return: Kansas City, MO

F Partner's share of liabilities (see instructions):
Nonrecourse . . . $ *see footnote*
Qualified nonrecourse financing . . . $
Other . . . $

G Tax shelter registration number ▶ *Not Applicable*

H Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) ☐

I Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 352,475 | 331,433 | 1,370,539 | ( 1,370,539 ) | 683,908 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 1,073,450 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | 79,885 | Sch. B, Part I, line 1 |
| | b | Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | (6,530) | Sch. D, line 5, col. (f) |
| | e | Net long-term capital gain (loss): | | | |
| | | (1) 28% rate gain (loss) | 4e(1) | | Sch. D, line 12, col. (g) |
| | | (2) Total for year | 4e(2) | (1,997) | Sch. D, line 12, col. (f) |
| | f | Other portfolio income (loss) (attach schedule) | 4f | | Enter on applicable line of your return. |
| | 5 | Guaranteed payments to partner | 5 | 750 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | 316,775 | |
| | 7 | Other income (loss) (attach schedule) | 7 | | Enter on applicable line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | 17,985 | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income (attach schedule) | 10 | | |
| | 11 | Other deductions (attach schedule) *See footnote* | 11 | 34,500 | |
| Credits | 12 a | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships for property placed in service before 1990 | 12a(1) | | Form 8586, line 5 |
| | | (2) Other than on line 12a(1) for property placed in service before 1990 | 12a(2) | | |
| | | (3) From section 42(j)(5) partnerships for property placed in service after 1989 | 12a(3) | | |
| | | (4) Other than on line 12a(3) for property placed in service after 1989 | 12a(4) | | |
| | b | Qualified rehabilitation expenditures related to rental real estate activities | 12b | | |
| | c | Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | d | Credits related to other rental activities | 12d | | |
| | 13 | Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2000

JXB
F 11/30/00

ALAN D PAUL

Schedule K-1 (Form 1065) 2000 Page 2

| Section | (a) Distributive share item | Line | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Investment Interest | 14 a Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f | 14b(1) | 79,885 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15 a Net earnings (loss) from self-employment | 15a | 1,074,200 | Sch. SE, Section A or B |
| | b Gross farming or fishing income | 15b | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income | 15c | | |
| Adjustments and Tax Preference Items | 16 a Depreciation adjustment on property placed in service after 1986 | 16a | (3,410) | See Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss | 16b | | |
| | c Depletion (other than oil and gas) | 16c | | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e Other adjustments and tax preference items (attach schedule) | 16e | | |
| Foreign Taxes | 17 a Name of foreign country or U.S. possession ▶ Various | | | |
| | b Gross income sourced at partner level | 17b | | |
| | c Foreign gross income sourced at partnership level: | | | |
| | (1) Passive | 17c(1) | | |
| | (2) Listed categories (attach schedule) | 17c(2) | | |
| | (3) General limitation | 17c(3) | 92,125 | Form 1116, Part I |
| | d Deductions allocated and apportioned at partner level: | | | |
| | (1) Interest expense | 17d(1) | 28,638 | |
| | (2) Other | 17d(2) | | |
| | e Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | (1) Passive | 17e(1) | | |
| | (2) Listed categories (attach schedule) | 17e(2) | | |
| | (3) General limitation | 17e(3) | 66,135 | |
| | f Total foreign taxes (check one): ▶ ☑ Paid ☐ Accrued | 17f | 6,647 | Form 1116, Part II |
| | g Reduction in taxes available for credit and gross income from all sources (attach schedule) | 17g | | See Instructions for Form 1116. |
| Other | 18 Sec 59(e)(2) expend: a Type ▶ | | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Amount | 18b | | |
| | 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 Other tax-exempt income | 20 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses | 21 | 40,782 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | 1,371,289 | |
| | 23 Distributions of property other than money | 23 | | |
| | 24 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

*D. The profit and loss of the partner is determined in accordance with the provisions of the partnership agreement. Full details are available in the offices of the partnership.*

*F. The share of liabilities will not affect the tax liability of this partner since the partner has a positive capital balance. Information as to share of liabilities is available in the offices of the partnership.*

*11. Keogh 24,000*
*401k 10,500*
*Total: 34,500*

*17. Other Foreign Tax Information*

| | |
|---|---|
| *Total Assets Generating Foreign Source General Limitation Income* | *65,512* |
| *Total Assets Generating Foreign Source Passive Income* | *0* |
| *Total Assets* | *1,123,193* |
| *Total Gross Income from Partnership* | *5,824,580* |

F 11/30/00 Schedule K-1 (Form 1065) 2000

## ALAN D PAUL

**Reconciliation of Partner's Tax Capital Account**
**Schedule K-1, Page 1, Line J**
**For the Fiscal Year Ended August 31, 2001**

| | | | Capital Account Line * |
|---|---|---|---|
| **Beginning Balance** | | 352,475 | J(a) |
| **Capital contributed during the year** | | | |
| Partner paid-in-capital | 69,388 | | |
| Accenture Settlement paid-in-capital | 262,045 | 331,433 | J(b) |
| **Partner's share of :** | | | |
| Ordinary taxable income | 1,073,450 | | |
| Separately stated amounts | 363,501 | | |
| Non-deductible expenses | (40,782) | | |
| Operating Negative Spread (ONS) | (25,630) | 1,370,539 | J(c) |
| **Withdrawals and distributions** | | | |
| Regular and Final Distributions | (1,108,494) | | |
| Accenture Capital distribution | (262,045) | (1,370,539) | J(d) |
| **Ending balance** | | 683,908 | J(e) |

*** See Form K-1, Page 1, Line J**

## ALAN D PAUL

**Reconciliation of Cash Income to Ordinary Income**
**For the Fiscal Year Ended August 31, 2001**

| | |
|---|---|
| Regular and Final Distributions | $854,000 |
| PM 98 Contributions Distribution | 6,000 |
| Distributable Per Unit Earnings | 860,000 |
| AWP Interest on Paid-in-Capital | 37,455 |
| Special Tax Reimbursement - 2000 Final Settlement | 5,091 |
| Additional Capital Plan Payment | 205,948 |
| **Total Distributable Income** | **$1,108,494** |

| | Line on K-1 Form 1065 | |
|---|---|---|
| Ordinary Income | 1 | $1,073,450 |
| Interest Income | 4a | 79,885 |
| Dividend Income | 4b | 0 |
| Net Short-Term Capital Gain (Loss) | 4d | (6,530) |
| Net Long-Term Capital Gain (Loss) | 4e | (1,997) |
| Section 1231 Gain (Loss) | 6 | 316,775 |
| Charitable Contributions | 8 | (17,985) |
| Interest Expense on Investment Debts | 14a | 0 |
| Foreign Taxes | 17f | (6,647) |
| Disallowed Meals, Entertainment And Other Expenses | 21 | (40,782) |
| Subtotal | | $1,396,169 |
| Less | | |
| Accenture Negative Spread (ANS) | | (262,045) |
| Operating Negative Spread (ONS) | | (25,630) |
| **Total Distributable Income** | | **$1,108,494** |

**Allowances, Moving Expenses, and Other Amounts
Actually Paid During the Fiscal Year Ended August 31, 2001**

| | |
|---|---|
| Expatriate Allowances: See attached schedule if applicable | 0 |
| Moving Expense Reimbursements, Allowances, and any Related Tax Reimbursements: See attached schedule if applicable | 0 |
| Imputed Income-Tax Services: | |
| Centrally Prepared Combined Nonresident State Tax Returns | 250 |
| Local Office Services as Reported by Local Office: | |
| Preparation or Review of Federal and State Income Tax Return | 500 |
| **Total** | **$750** |

**ALAN D PAUL**

February 06, 2002
Page 6

**Other Supplemental Information**
**For the Fiscal Year Ended August 31, 2001**

| | |
|---|---|
| Medical/Dental Insurance Premiums | 8,093 |

4856
3237
60%
40%

Paul196

A6

February 06, 2002
Page 7
INCL

**ALAN D PAUL**

[REDACTED]

**Arthur Andersen LLP - FEIN: [REDACTED]**
**State Income Tax Summary For 2001**

| City/State Income Taxes | | Gross Income | Date Paid | Amount Paid |
|---|---|---|---|---|
| Alabama | | 3,527 | 12/31/01 | 176 |
| Arizona | | 31,598 | 12/31/01 | 686 |
| Arkansas | | 2,962 | 12/31/01 | 239 |
| California | | 151,301 | 12/31/01 | 13,720 |
| Colorado | | 25,720 | 12/31/01 | 1,162 |
| Connecticut | | 25,506 | 12/31/01 | 1,148 |
| Delaware | | 753 | 12/31/01 | 45 |
| Georgia | | 73,766 | 12/31/01 | 4,132 |
| Hawaii | | 1,979 | 12/31/01 | 168 |
| Idaho | | 1,338 | 12/31/01 | 0 |
| Illinois | | 157,659 | 12/31/01 | 4,730 |
| Indiana | | 11,209 | 12/31/01 | 381 |
| Kansas | | 1,102 | 12/31/01 | 68 |
| Kentucky | | 5,077 | 12/31/01 | 134 |
| Louisiana | | 5,970 | 12/31/01 | 358 |
| Maine | | 259 | 12/31/01 | 22 |
| Maryland | | 13,321 | 12/31/01 | 233 |
| Michigan | | 25,451 | 12/31/01 | 1,059 |
| Minnesota | | 25,872 | 12/31/01 | 1,982 |
| Mississippi | | 1,606 | 12/31/01 | 80 |
| Missouri | | 23,657 | 12/31/01 | 1,419 |
| Montana | | 101 | 12/31/01 | 11 |
| Nebraska | | 3,092 | 12/31/01 | 198 |
| New Jersey | | 25,317 | 12/31/01 | 1,613 |
| New Mexico | | 3,887 | 12/31/01 | 299 |
| New York | | 174,476 | 12/31/01 | 11,653 |
| North Carolina | | 22,466 | 12/31/01 | 1,445 |
| North Dakota | | 41 | 12/31/01 | 2 |
| Ohio | | 41,300 | 12/31/01 | 2,883 |
| Oklahoma | | 5,147 | 12/31/01 | 34 |
| Oregon | | 10,444 | 12/31/01 | 631 |
| Pennsylvania | | 48,135 | 12/31/01 | 1,348 |
| Rhode Island | | 373 | 12/31/01 | 35 |
| South Carolina | | 11,557 | 12/31/01 | 446 |
| Utah | | 4,567 | 12/31/01 | 272 |
| Vermont | | 1,297 | 12/31/01 | 78 |
| Virginia | | 44,297 | 12/31/01 | 2,290 |
| West Virginia | | 166 | 12/31/01 | 11 |
| | State Total | 986,296 | | 55,191 |
| Detroit, MI | | 12,234 | 12/31/01 | 142 |
| Flint, MI | | 9 | 12/31/01 | 0 |
| Grand Rapids, MI | | 1,877 | 12/31/01 | 0 |
| Philadelphia, PA | | 12,254 | 12/31/01 | 503 |
| | City Total | 26,374 | | 645 |
| | | | Grand Total | $55,836 |

Arthur Andersen LLP has filed combined nonresident income tax returns with the cities and states shown above. Income was reported and taxes paid for you in the amount shown.

John E. Cole, Director U.S. Taxes

## ALAN D PAUL

February 06, 2002
Page 8
EXCL

Excluded from Combined Non-Resident Returns

| Ineligible City/State | Gross Income |
|---|---|
| Massachusetts | 34,588 |

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2001 or tax year beginning September 1, 2001, and ending August 31, 2002

OMB No. 1545-0099

**2001**

Partner's identifying number ▶ [redacted]

Partner's name, address, and ZIP code
ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's identifying number ▶ [redacted]

Partnership's name, address, and ZIP code
ARTHUR ANDERSEN LLP
c/o JOHN E. COLE, MRC 1819
33 WEST MONROE STREET
CHICAGO, IL 60603-5385

A This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member
B What type of entity is this partner? ▶ *Individual*
C Is this partner a ☑ domestic or a ☐ foreign partner?

D Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | *see footnote* % | % |
| Loss sharing | % | % |
| Ownership of capital | % | % |

E IRS Center where partnership filed return: Ogden, UT

F Partner's share of liabilities (see instructions):
Nonrecourse $ *None*
Qualified nonrecourse financing $ *None*
Other $ *None*

G Tax shelter registration number ▶ *Not Applicable*

H Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) ☐

I Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 683,908 | | 319,491 | ( 440,030 ) | 563,369 |

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 1 | 929,328 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 Net income (loss) from rental real estate activities | 2 | | |
| | 3 Net income (loss) from other rental activities | 3 | | |
| | 4 Portfolio income (loss): | | 16,930 | |
| | a Interest | 4a | | Sch. B, Part I, line 1 |
| | b Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c Royalties | 4c | | Sch. E, Part I, line 4 |
| | d Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e (1) Net long-term capital gain (loss) | 4e(1) | | Sch. D, line 12, col. (f) |
| | (2) 28% rate gain (loss) | 4e(2) | | Sch. D, line 12, col. (g) |
| | (3) Qualified 5-year gain | 4e(3) | | Line 4 of worksheet for Sch. D, line 29 |
| | f Other portfolio income (loss) *(attach schedule)* | 4f | | Enter on applicable line of your return. |
| | 5 Guaranteed payments to partner | 5 | 250 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | (79,039) | |
| | 7 Other income (loss) *(attach schedule)* *Net Long Term Capital Gain - See footnote* | 7 | 222,944 | Enter on applicable line of your return. |
| Deductions | 8 Charitable contributions (see instructions) *(attach schedule)* | 8 | 7,621 | Sch. A, line 15 or 16 |
| | 9 Section 179 expense deduction | 9 | | See pages 7 and 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 Other deductions *(attach schedule)* | 11 | | |
| Credits | 12a Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | (2) Other than on line 12a(1) | 12a(2) | | |
| | b Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d Credits related to other rental activities | 12d | | |
| | 13 Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2001

ISA
STF FED3405F.1

# ALAN D PAUL

March 28, 2003
Page 3

**Reconciliation of Partner's Tax Capital Account**
**Schedule K-1, Page 1, Line J**
**For the Fiscal Year Ended August 31, 2002**

| | | | Capital Account Line * |
|---|---|---|---|
| **Beginning balance** | | 683,908 | J(a) |
| **Capital contributed during the year** | | | |
| Partner paid-in-capital | 0 | 0 | J(b) |
| **Partner's share of :** | | | |
| Ordinary taxable income | 929,328 | | |
| Separately stated amounts | 151,136 | | |
| Non-deductible expenses | (12,981) | | |
| Surplus Taxable Income | (767,483) | | |
| Operating Negative Spread (FY01) | 19,491 | 319,491 | J(c) |
| **Withdrawals and distributions** | | | |
| Regular and Final Distributions | (300,000) | | |
| Accenture Negative Spread - Partner Tax Distribution | (120,539) | | |
| Operating Negative Spread - Partner Tax Distribution | (19,491) | (440,030) | J(d) |
| **Ending balance** | | 563,369 | J(e) |

*** See Form K-1, Page 1, Line J**

**ALAN D PAUL**

March 28, 2003
Page 5

**Allowances, Moving Expenses, and Other Amounts Actually Paid During the Fiscal Year Ended August 31, 2002**

| | | |
|---|---|---|
| Expatriate Allowances: See attached schedule if applicable | | 0 |
| Moving Expense Reimbursements, Allowances, and any Related Tax Reimbursements: See attached schedule if applicable | | 0 |
| Imputed Income-Tax Services: | | |
| Centrally Prepared Combined Nonresident State Tax Returns | | 250 |
| | **Total** | **$250** |

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2002 or tax year beginning September 1, 2002, and ending December 31, 2002

OMB No. 1545-0099

**2002**

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code

ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code

ARTHUR ANDERSEN LLP
c/o JOHN E. COLE, MRC 1819
33 WEST MONROE STREET
CHICAGO, IL 60603-5385

A This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member

B What type of entity is this partner? ▶ Individual

C Is this partner a ☑ domestic or a ☐ foreign partner?

D Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | see footnote % | % |
| Loss sharing | % | % |
| Ownership of capital | % | % |

E IRS Center where partnership filed return: Ogden, UT

F Partner's share of liabilities (see instructions):

Nonrecourse $ None
Qualified nonrecourse financing $ None
Other $ None

G Tax shelter registration number ▶ Not Applicable

H Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) ☐

I Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 563,369 | | | ( ) | 563,369 |

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 1 | (410,865) | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 Net income (loss) from rental real estate activities | 2 | | |
| | 3 Net income (loss) from other rental activities | 3 | | |
| | 4 Portfolio income (loss): | | | |
| | a Interest | 4a | 2,415 | Sch. B, Part I, line 1 |
| | b Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c Royalties | 4c | | Sch. E, Part I, line 4 |
| | d Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e (1) Net long-term capital gain (loss) | 4e(1) | | Sch. D, line 12, col. (f) |
| | (2) 28% rate gain (loss) | 4e(2) | | Sch. D, line 12, col. (g) |
| | (3) Qualified 5-year gain | 4e(3) | | Line 5 of worksheet for Sch. D, line 29 |
| | f Other portfolio income (loss) (attach schedule) | 4f | | Enter on applicable line of your return. |
| | 5 Guaranteed payments to partner | 5 | | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | (85,744) | |
| | 7 Other income (loss) (attach schedule) Net Long Term Capital Gain - See footnote | 7 | 1,633 | Enter on applicable line of your return. |
| Deductions | 8 Charitable contributions (see instructions) (attach schedule) | 8 | | Sch. A, line 15 or 16 |
| | 9 Section 179 expense deduction | 9 | | See pages 7 and 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 Deductions related to portfolio income (attach schedule) | 10 | | |
| | 11 Other deductions (attach schedule) | 11 | | |
| Credits | 12a Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | (2) Other than on line 12a(1) | 12a(2) | | |
| | b Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d Credits related to other rental activities | 12d | | |
| | 13 Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2002

ISA
TF FED3405F.1

# ALAN D PAUL

March 26, 2003
Page 3

**Reconciliation of Partner's Tax Capital Account**
**Schedule K-1, Page 1, Line J**
**For the Four Months Ended December 31, 2002**

| | | | Capital Account Line * |
|---|---|---|---|
| **Beginning balance** | | 563,369 | J(a) |
| **Capital contributed during the year** | | | |
| Partner paid-in-capital | 0 | 0 | J(b) |
| **Partner's share of :** | | | |
| CY02 ordinary taxable income | (410,865) | | |
| Separately stated amounts | (81,696) | | |
| Non-deductible expenses | (897) | | |
| Partial reversal of FY02 Surplus Taxable Income | 493,458 | 0 | J(c) |
| **Withdrawals and distributions** | | | |
| Regular and Final Distributions | 0 | 0 | J(d) |
| **Ending balance** | | 563,369 | J(e) |

* See Form K-1, Page 1, Line J

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2003 or tax year beginning , and ending

OMB No. 1545-0099

**2003**

**Partner's identifying number** ▶ [redacted]

Partner's name, address, and ZIP code Partner #: 1494
ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

**Partnership's identifying number** ▶ [redacted]

Partnership's name, address, and ZIP code
ARTHUR ANDERSEN LLP
C/O JOHN E. COLE
1405 NORTH FIFTH AVENUE - WOODLANDS
FINANCE
ST. CHARLES, IL 60174-1264

**A** This partner is a [X] general partner [ ] limited partner [ ] limited liability company member
**B** What type of entity is this partner? ▶ Individual
**C** Is this partner a [X] domestic or a [ ] foreign partner?
**D** Enter partner's percentage of: (i) Before change or termination (ii) End of year
Profit sharing . . . . . . . . . . . . ______ ______
Loss sharing . . . . . . . . . . . . . ______ ______
Ownership of capital . . . . . . . . . ______ ______
**E** IRS Center where partnership filed return: Ogden

**F** Partner's share of liabilities (see instructions):
Nonrecourse . . . . . . . . . . . . . . . $
Qualified nonrecourse financing . . . . . $
Other . . . . . . . . . . . . . . . . . . $
**G** Tax shelter registration number ▶
**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . . . . . . [ ]
**I** Check applicable boxes: **(1)** [ ] Final K-1 **(2)** [ ] Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 563,369 | | | | 563,369 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | (169,599) | See pages 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest income | 4a | 4,596 | Form 1040, line 8a |
| | b | (1) Qualified dividends | 4b(1) | | Form 1040, line 9b |
| | | (2) Total ordinary dividends | 4b(2) | | Form 1040, line 9a |
| | c | Royalty income | 4c | | Sch. E, Part I, line 4 |
| | d | (1) Net short-term capital gain (loss) (post-May 5, 2003) | 4d(1) | 269 | Sch. D, line 5, col. (g) |
| | | (2) Net short-term capital gain (loss) (entire year) | 4d(2) | 553 | Sch. D, line 5, col. (f) |
| | e | (1) Net long-term gain (loss) (post-May 5, 2003) | 4e(1) | (626) | Sch. D, line 12, col. (g) |
| | | (2) Net long-term gain (loss) (entire year) | 4e(2) | (3,641) | Sch. D, line 12, col. (f) |
| | f | Other portfolio income (loss) *(attach schedule)* | 4f | | See pages 6 and 7 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 5 | Guaranteed payments to partner | 5 | | |
| | 6a | Net section 1231 gain (loss) (post-May 5, 2003) | 6a | 4,329 | |
| | b | Net section 1231 gain (loss) (entire year) | 6b | (5,434) | |
| | 7 | Other income (loss) *(attach schedule)* | 7 | | |
| Deductions | 8 | Charitable contributions (see instructions) *(attach schedule)* | 8 | | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 | Other deductions *(attach schedule)* | 11 | | |
| Credits | 12a | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | | (2) Other than on line 12a(1) | 12a(2) | | |
| | b | Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d | Credits related to other rental activities | 12d | | |
| | 13 | Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065. Partner #1494 Schedule K-1 (Form 1065) 2003

4/1/04 19:29

Schedule K-1 (Form 1065) 2003 Partner #: 1494 ALAN D.PAUL Page 2

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Investment Interest | 14a Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b(2), 4c, and 4f | 14b(1) | 4,596 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15a Net earnings (loss) from self-employment | 15a | (169,599) | Sch. SE, Section A or B |
| | b Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income | 15c | | |
| Adjustments and Tax Preference Items | 16a Depreciation adjustment on property placed in service after 1986 | 16a | (927) | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss | 16b | (5,064) | |
| | c Depletion (other than oil and gas) | 16c | | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e Other adjustments and tax preference items (attach schedule) | 16e | | |
| Foreign Taxes | 17a Name of foreign country or U.S. possession ▶ | | | |
| | b Gross income from all sources | 17b | | Form 1116, Part I |
| | c Gross income sourced at partner level | 17c | | |
| | d Foreign gross income sourced at partnership level: | | | |
| | (1) Passive | 17d(1) | | |
| | (2) Listed categories (attach schedules) | 17d(2) | | |
| | (3) General limitation | 17d(3) | | |
| | e Deductions allocated and apportioned at partner level: | | | |
| | (1) Interest expense | 17e(1) | | |
| | (2) Other | 17e(2) | | |
| | f Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | (1) Passive | 17f(1) | | |
| | (2) Listed categories (attach schedules) | 17f(2) | | |
| | (3) General limitation | 17f(3) | | |
| | g Total foreign taxes (check one) ▶ ☐ Paid ☐ Accrued | 17g | | Form 1116, Part II |
| | h Reduction in taxes available for credit sources (attach schedule) | 17h | | Form 1116, Line 12 |
| Other | 18 Section 59(e)(2) expenditures: a Type ▶ | | | See page 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Amount | 18b | | |
| | 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 Other tax-exempt income | 20 | | See page 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses | 21 | 581 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | | |
| | 23 Distributions of property other than money | 23 | | |
| | 24 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

SEE PARTNER FOOTNOTE SCHEDULE

ARTHUR ANDERSEN LLP
SCHEDULE K-1 SUPPORTING SCHEDULES — Partner #1494 — ALAN D PAUL

**RECONCILIATION OF PARTNER'S TAX CAPITAL ACCOUNT**
SCHEDULE K-1, PAGE 1, LINE J
FOR THE YEAR ENDED DECEMBER 31, 2003

| | | | CAP ACCT LINE |
|---|---|---|---|
| BEGINNING BALANCE | | 563,369 | J(a) |
| CAPITAL CONTRIBUTED DURING THE YEAR | | | |
| PARTNER PAID-IN-CAPITAL | - | - | J(b) |
| PARTNER'S SHARE OF: | | | |
| CY03 ORDINARY TAXABLE INCOME | (169,599) | | |
| SEPARATELY STATED AMOUNTS | (3,926) | | |
| NON-DEDUCTIBLE EXPENSES | (581) | | |
| PARTIAL REVERSAL OF FY02 SURPLUS TAXABLE INCOME | 174,106 | - | J(c ) |
| WITHDRAWALS AND DISTRIBUTIONS | | | |
| REGULAR AND FINAL DISTRIBUTIONS | - | - | J(d) |
| ENDING BALANCE | | 563,369 | J(e) |

*SEE FORM K-1, PAGE 1, LINE J

**RECONCILIATION OF CASH INCOME TO ORDINARY INCOME**
FOR THE YEAR ENDED DECEMBER 31, 2003

| | LINE ON K-1 FORM 1065 | |
|---|---|---|
| ORDINARY INCOME | 1 | (169,599) |
| INTEREST INCOME | 4a | 4,596 |
| NET SHORT-TERM CAPITAL GAIN (LOSS) | 4d2 | 553 |
| NET LONG-TERM CAPITAL GAIN (LOSS) | 4e2 | (3,641) |
| SECTION 1231 GAIN (LOSS) | 6b | (5,434) |
| NONDEDUCTILBE EXPENSES | 21 | (581) |
| SUBTOTAL | | (174,106) |
| LESS: | | |
| PARTIAL REVERSAL OF FY02 SURPLUS TAXABLE INCOME | | 174,106 |
| TOTAL DISTRIBUTABLE INCOME | | - |

ARTHUR ANDERSEN LLP
SCHEDULE K-1 SUPPORTING SCHEDULES Partner #1494 ALAN D PAUL

**PARTNER FOOTNOTES**

D. THE PROFIT AND LOSS OF THE PARTNER IS DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE PARTNERSHIP AGREEMENT. FULL DETAILS ARE AVAILABLE IN THE OFFICES OF THE PARTNERSHIP.

J. PURSUANT TO IRS NOTICE 89-35, ALL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP AFTER AUGUST 31, 1987 HAVE BEEN ALLOCATED SOLELY TO TRADE OR BUSINESS EXPENDITURES THAT ARE NOT CAPITALIZABLE. ACCORDINGLY, ALL INTEREST EXPENSE ON DEBT INCURRED BY PARTNERS TO MAKE SUCH CAPITAL CONTRIBUTIONS IS INTEREST THAT IS PAID OR ACCRUED ON INDEBTEDNESS PROPERLY ALLOCABLE TO A TRADE OR BUSINESS (OTHER THAN THE TRADE OR BUSINESS OF PERFORMING SERVICES AS AN EMPLOYEE) AS DEFINED IN SECTION 163(h)(2)(A) OF THE INTERNAL REVENUE CODE.

6511

Final K-1 | Amended K-1 | OMB No. 1545-0099

**Schedule K-1 (Form 1065)** **2004**

Department of the Treasury
Internal Revenue Service

Tax year beginning 01/01, 2004 and ending 12/31, 2004

## Partner's Share of Income, Deductions, Credits, etc.

See back of form and separate instructions.

### Part I Information About the Partnership

A Partnership's employer identification number

[redacted]

B Partnership's name, address, city, state, and ZIP code

ARTHUR ANDERSEN LLP
C/O JOHN E. COLE
1405 NORTH FIFTH AVENUE - WOODLANDS FINANCE
ST. CHARLES, IL 60174-1264

C IRS Center where partnership filed return

OGDEN

D [ ] Check if this is a publicly traded partnership (PTP)

E [ ] Tax shelter registration number, if any

F [ ] Check if Form 8271 is attached

### Part II Information About the Partner

G Partner's identifying number 1494

[redacted]

H Partner's name, address, city, state, and ZIP code

ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052

I [X] General partner or LLC member-manager [ ] Limited partner or other LLC member

J [X] Domestic partner [ ] Foreign partner

K What type of entity is this partner? INDIVIDUAL

L Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | SEE STMT % | SEE STMT % |
| Loss | SEE STMT % | SEE STMT % |
| Capital | SEE STMT % | SEE STMT % |

M Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ NONE |
| Qualified nonrecourse financing | $ NONE |
| Recourse | $ NONE |

N Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 563,369. |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ 563,369. |

[ ] Tax basis [ ] GAAP [ ] Section 704(b) book
[X] Other (explain) SEE STATEMENT

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Line | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | -91,235. |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 4,237. |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | -50. |
| 9a | Net long-term capital gain (loss) | -247. |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | -1,044. |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| 14 | Self-employment earnings (loss) A | -91,235. |
| 15 | Credits & credit recapture | |
| 16 | Foreign transactions | |
| 17 | Alternative minimum tax (AMT) items A | -2,105. |
| 17 | B | 568. |
| 18 | Tax-exempt income and nondeductible expenses C | 65. |
| 19 | Distributions | |
| 20 | Other information A | 4,237. |

*See attached statement for additional information.

For IRS Use Only

For Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2004

JSA
4P1200 2.000

65795B 1143 V04-4.4 5312

**This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.**

1. **Ordinary business income (loss).** You must first determine whether the income (loss) is passive or nonpassive. Then enter on your return as follows:

| | *Enter on* |
|---|---|
| Passive loss | See the Partner's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |
| 2. **Net rental real estate income (loss)** | See the Partner's Instructions |
| 3. **Other net rental income (loss)** | |
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Partner's Instructions |
| 4. **Guaranteed payments** | Schedule E, line 28, column (j) |
| 5. **Interest income** | Form 1040, line 8a |
| 6a. **Ordinary dividends** | Form 1040, line 9a |
| 6b. **Qualified dividends** | Form 1040, line 9b |
| 7. **Royalties** | Schedule E, line 4 |
| 8. **Net short-term capital gain (loss)** | Schedule D, line 5, column (f) |
| 9a. **Net long-term capital gain (loss)** | Schedule D, line 12, column (f) |
| 9b. **Collectibles (28%) gain (loss)** | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| 9c. **Unrecaptured section 1250 gain** | See the Partner's Instructions |
| 10. **Net section 1231 gain (loss)** | See the Partner's Instructions |
| 11. **Other income (loss)** | |
| *Code* | |
| A Other portfolio income (loss) | See the Partner's Instructions |
| B Involuntary conversions | See the Partner's Instructions |
| C Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D Mining exploration costs recapture | See Pub. 535 |
| E Cancellation of debt | Form 1040, line 21 or Form 982 |
| F Other income (loss) | See the Partner's Instructions |
| 12. **Section 179 deduction** | See the Partner's Instructions |
| 13. **Other deductions** | |
| A Cash contributions (50%) | Schedule A, line 15 |
| B Cash contributions (30%) | Schedule A, line 15 |
| C Noncash contributions (50%) | Schedule A, line 16 |
| D Noncash contributions (30%) | Schedule A, line 16 |
| E Capital gain property to a 50% organization (30%) | Schedule A, line 16 |
| F Capital gain property (20%) | Schedule A, line 16 |
| G Deductions - portfolio (2% floor) | Schedule A, line 22 |
| H Deductions - portfolio (other) | Schedule A, line 27 |
| I Investment interest expense | Form 4952, line 1 |
| J Deductions - royalty income | Schedule E, line 18 |
| K Section 59(e)(2) expenditures | See Partner's Instructions |
| L Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 31 |
| M Educational assistance benefits | See the Partner's Instructions |
| N Dependent care benefits | Form 2441, line 12 |
| O Preproductive period expenses | See the Partner's Instructions |
| P Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| Q Penalty on early withdrawal of savings | Form 1040, line 33 |
| R Pensions and IRAs | See the Partner's Instructions |
| S Reforestation expense deduction | See the Partner's Instructions |
| T Other deductions | See the Partner's Instructions |

14. **Self-employment earnings (loss)**

**Note:** *If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.*

| | |
|---|---|
| A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| B Gross farming or fishing income | See the Partner's Instructions |
| C Gross non-farm income | See the Partner's Instructions |
| 15. **Credits & credit recapture** | |
| A Low-income housing credit (section 42(j)(5)) | Form 8586, line 5 |
| B Low-income housing credit (other) | Form 8586, line 5 |
| C Qualified rehabilitation expenditures (rental real estate) | Form 3468, line 1 |
| D Qualified rehabilitation expenditures (other than rental real estate) | Form 3468, line 1 |
| E Basis of energy property | Form 3468, line 2 |
| F Qualified timber property | Form 3468, line 3 |
| G Other rental real estate credits | See the Partner's Instructions |
| H Other rental credits | See the Partner's Instructions |

| *Code* | *Enter on* |
|---|---|
| I Undistributed capital gains credit | Form 1040, line 69, box a |
| J Work opportunity credit | Form 5884, line 3 |
| K Welfare-to-work credit | Form 8861, line 3 |
| L Disabled access credit | Form 8826, line 7 |
| M Empowerment zone and renewal community employment credit | Form 8844, line 3 |
| N New York Liberty Zone business employee credit | Form 8884, line 3 |
| O New markets credit | Form 8874, line 2 |
| P Credit for employer social security and Medicare taxes | Form 8846, line 5 |
| Q Backup withholding | Form 1040, line 63 |
| R Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| S Recapture of low-income housing credit (other) | Form 8611, line 8 |
| T Recapture of investment credit | See Form 4255 |
| U Other credits | See the Partner's Instructions |
| V Recapture of other credits | See the Partner's Instructions |
| 16. **Foreign transactions** | |
| A Name of country or U.S. possession | Form 1116, Part I |
| B Gross income from all sources | Form 1116, Part I |
| C Gross income sourced at partner level | Form 1116, Part 1 |
| *Foreign gross income sourced at partnership level* | |
| D Passive | Form 1116, Part 1 |
| E Listed categories | Form 1116, Part 1 |
| F General limitation | Form 1116, Part 1 |
| *Deductions allocated and apportioned at partner level* | |
| G Interest expense | Form 1116, Part I |
| H Other | Form 1116, Part I |
| *Deductions allocated and apportioned at partnership level to foreign source income* | |
| I Passive | Form 1116, Part I |
| J Listed categories | Form 1116, Part I |
| K General limitation | Form 1116, Part I |
| *Other information* | |
| L Total foreign taxes paid | Form 1116, Part II |
| M Total foreign taxes accrued | Form 1116, Part II |
| N Reduction in taxes available for credit | Form 1116, line 12 |
| O Foreign trading gross receipts | Form 8873 |
| P Extraterritorial income exclusion | Form 8873 |
| Q Other foreign transactions | See the Partner's Instructions |
| 17. **Alternative minimum tax (AMT) items** | |
| A Post-1986 depreciation adjustment | See the Partner's Instructions and the Instructions for Form 6251 |
| B Adjusted gain or loss | |
| C Depletion (other than oil & gas) | |
| D Oil, gas, & geothermal - gross income | |
| E Oil, gas, & geothermal - deductions | |
| F Other AMT items | |
| 18. **Tax-exempt income and nondeductible expenses** | |
| A Tax-exempt interest income | Form 1040, line 8b |
| B Other tax-exempt income | See the Partner's Instructions |
| C Nondeductible expenses | See the Partner's Instructions |
| 19. **Distributions** | |
| A Cash and marketable securities | See the Partner's Instructions |
| B Other property | See the Partner's Instructions |
| 20. **Other information** | |
| A Investment income | Form 4952, line 4a |
| B Investment expenses | Form 4952, line 5 |
| C Fuel tax credit information | Form 4136 |
| D Look-back interest - completed long-term contracts | Form 8697 |
| E Look-back interest - income forecast method | Form 8866 |
| F Dispositions of property with section 179 deductions | See the Partner's Instructions |
| G Recapture of section 179 deduction | |
| H Special basis adjustments | |
| I Section 453(l)(3) information | |
| J Section 453A(c) information | |
| K Section 1260(b) information | |
| L Interest allocable to production expenditures | |
| M CCF nonqualified withdrawals | |
| N Information needed to figure depletion - oil and gas | |
| O Reforestation costs | |
| P Unrelated business taxable income | |
| Q Other information | |

ARTHUR ANDERSEN LLP
SCH K-1 SUPPORTING SCHEDULES PARTNER # 1494 ALAN D PAUL ▉▉▉▉▉

===========================================================================
ITEM N - RECONCILIATION OF INCOME
===========================================================================

TOTAL INCOME PER SCHEDULE K-1                                    -88,339.

LESS:  EXPENSES RECORDED ON BOOKS, NOT INCLUDED ON SCH. K-1:
       NONDEDUCTIBLE EXPENSES                                         65.

PLUS:  OTHER INCREASES TO PARTNER'S CAPITAL
       INCOME IN EXCESS OF PTR. DISTRIB. RIGHTS                   88,404.
                                                                ---------------
          TOTAL INCOME PER ITEM N, CURRENT YEAR INCR(DECR)
                                                                ===============


PARTNER FOOTNOTES ASSOCIATED W/SCH. K-1, CURRENT YEAR INC(DEC)
===========================================================================
RECONCILIATION OF TAXABLE INCOME TO DISTRIBUTABLE
                                        INCOME
FOR THE YEAR ENDED DECEMBER 31, 2004

                            LINE ON K-1 FORM 1065
        ORDINARY INCOME                  1                       -91,235.
        INTEREST INCOME                  5                         4,237.
        NET SHORT TERM CAPITAL GAIN (LOSS)  8                        -50.
        NET LONG TERM CAPITAL GAIN (LOSS)   9A                     -247.
        SECTION 1231 GAIN (LOSS)        10                       -1,044.
        NONDEDUCTIBLE EXPENSES          18C                         -65.
   SUBTOTAL                                                      -88,404.
   LESS:
        PARTIAL REVERSAL-FY02 SURPLUS TAXABLE INCOME             88,404.
   TOTAL DISTRIBUTABLE INCOME                                       NONE

PARTNER FOOTNOTES ASSOCIATED W/ SCHEDULE K-1
===========================================================================
ITEM N - PARTNER'S TAX CAPITAL ACCOUNT
METHOD: PER AGREEMENT
SCHEDULE K-1, ITEM N
FOR THE YEAR ENDED DECEMBER 31, 2004

   BEGINNING BALANCE                                             563,369.
   CAPITAL CONTRIBUTED DURING THE YEAR                              NONE
   PARTNER'S SHARE OF:
      CY04 ORDINARY TAXABLE INCOME                               -91,235.
      SEPARATELY STATED AMOUNTS                                    2,896.
      NON-DEDUCTIBLE EXPENSES                                        -65.
      PARTIAL REVERSAL-FY02 SURPLUS TAXABLE INCOME               88,404.
   SUBTOTAL                                                         NONE
   WITHDRAWALS AND DISTRIBUTIONS                                    NONE
   ENDING BALANCE                                                563,369.


                                                      STATEMENT #1

4P9000 1.000
        65795B    1143                    V04-4.4                  5314

A20

ARTHUR ANDERSEN LLP
SCH K-1 SUPPORTING SCHEDULES PARTNER # 1494 ALAN D PAUL

PARTNER FOOTNOTES

THE PROFIT AND LOSS OF THE PARTNER IS DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE PARTNERSHIP AGREEMENT. FULL DETAILS ARE AVAILABLE IN THE OFFICES OF THE PARTNERSHIP.

N. PURSUANT TO IRS NOTICE 89-35, ALL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP AFTER AUGUST 31, 1987 HAVE BEEN ALLOCATED SOLELY TO TRADE OR BUSINESS EXPENDITURES THAT ARE NOT CAPITALIZABLE. ACCORDINGLY, ALL INTEREST EXPENSE ON DEBT INCURRED BY PARTNERS TO MAKE SUCH CAPITAL CONTRIBUTIONS IS INTEREST THAT IS PAID OR ACCRUED ON INDEBTEDNESS PROPERLY ALLOCABLE TO A TRADE OR BUSINESS (OTHER THAN THE TRADE OR BUSINESS OF PERFORMING SERVICES AS AN EMPLOYEE) AS DEFINED IN SECTION 163(H)(2)(A) OF THE INTERNAL REVENUE CODE.

STATEMENT #2

651105

Final K-1 ☐ Amended K-1 ☐ OMB No. 1545-0099

**Schedule K-1 (Form 1065)** **2005**

For calendar year 2005, or tax year beginning ________, 2005 ending ________, 20__

Department of the Treasury Internal Revenue Service

## Partner's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

### Part I Information About the Partnership

A Partnership's employer identification number

[redacted]

B Partnership's name, address, city, state, and ZIP code

ARTHUR ANDERSEN LLP
1405 NORTH FIFTH AVENUE - WOODLANDS FINANCE
ST. CHARLES, IL 60174-1264

C IRS Center where partnership filed return

OGDEN

D ☐ Check if this is a publicly traded partnership (PTP)

E ☐ Tax shelter registration number, if any

F ☐ Check if Form 8271 is attached

### Part II Information About the Partner

G Partner's identifying number 1494

[redacted]

H Partner's name, address, city, state, and ZIP code

ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

I ☒ General partner or LLC member-manager ☐ Limited partner or other LLC member

J ☒ Domestic partner ☐ Foreign partner

K What type of entity is this partner? INDIVIDUAL

L Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | SEE STMT % | SEE STMT % |
| Loss | SEE STMT % | SEE STMT % |
| Capital | SEE STMT % | SEE STMT % |

M Partner's share of liabilities at year end:

Nonrecourse . . . $ NONE
Qualified nonrecourse financing . . . $ NONE
Recourse . . . $ NONE

N Partner's capital account analysis:

Beginning capital account . . . $ 563,369.
Capital contributed during the year . . $
Current year increase (decrease) . . . $ -41,950.
Withdrawals & distributions . . . $ ( )
Ending capital account . . . $ 521,419.

☐ Tax basis ☐ GAAP ☐ Section 704(b) book
☒ Other (explain) SEE STATEMENT

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Line | Item | Amount | Line | Item | Amount |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | -56,209. | 15 | Credits & credit recapture | |
| 2 | Net rental real estate income (loss) | | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions | |
| 4 | Guaranteed payments | | | | |
| 5 | Interest income | 4,914. | | | |
| 6a | Ordinary dividends | | | | |
| 6b | Qualified dividends | | | | |
| 7 | Royalties | | | | |
| 8 | Net short-term capital gain (loss) | -6. | | | |
| 9a | Net long-term capital gain (loss) | -128. | 17 | Alternative minimum tax (AMT) items | A -1,728. |
| 9b | Collectibles (28%) gain (loss) | | | | B -6. |
| 9c | Unrecaptured section 1250 gain | | | | |
| 10 | Net section 1231 gain (loss) | -5. | 18 | Tax-exempt income and nondeductible expenses | |
| 11 | Other income (loss) | | | | C 8,170. |
| 12 | Section 179 deduction | | 19 | Distributions | |
| 13 | Other deductions | | 20 | Other information | |
| | | | | | A 4,914. |
| 14 | Self-employment earnings (loss) | A -56,209. | | | |

*See attached statement for additional information.

For IRS Use Only

For Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065. Schedule K-1 (Form 1065) 2005

JSA
5P1200 2.000

47534J 1143 5671

**This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.**

1. **Ordinary business income (loss).** You must first determine whether the income (loss) is passive or nonpassive. Then enter on your return as follows:

| | *Enter on* |
|---|---|
| Passive loss | See the Partner's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |
| 2. Net rental real estate income (loss) | See the Partner's Instructions |
| 3. Other net rental income (loss) | |
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Partner's Instructions |
| 4. Guaranteed payments | Schedule E, line 28, column (j) |
| 5. Interest income | Form 1040, line 8a |
| 6a. Ordinary dividends | Form 1040, line 9a |
| 6b. Qualified dividends | Form 1040, line 9b |
| 7. Royalties | Schedule E, line 4 |
| 8. Net short-term capital gain (loss) | Schedule D, line 5, column (f) |
| 9a. Net long-term capital gain (loss) | Schedule D, line 12, column (f) |
| 9b. Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| 9c. Unrecaptured section 1250 gain | See the Partner's Instructions |
| 10. Net section 1231 gain (loss) | See the Partner's Instructions |
| 11. Other income (loss) | |
| *Code* | |
| A Other portfolio income (loss) | See the Partner's Instructions |
| B Involuntary conversions | See the Partner's Instructions |
| C Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D Mining exploration costs recapture | See Pub. 535 |
| E Cancellation of debt | Form 1040, line 21 or Form 982 |
| F Other income (loss) | See the Partner's Instructions |
| 12. Section 179 deduction | See the Partner's Instructions |
| 13. Other deductions | |
| A Cash contributions (50%) | See the Partner's Instructions |
| B Cash contributions (30%) | See the Partner's Instructions |
| C Noncash contributions (50%) | See the Partner's Instructions |
| D Noncash contributions (30%) | See the Partner's Instructions |
| E Capital gain property to a 50% organization (30%) | See the Partner's Instructions |
| F Capital gain property (20%) | See the Partner's Instructions |
| G Cash contributions (100%) | See the Partner's Instructions |
| H Investment interest expense | Form 4952, line 1 |
| I Deductions - royalty income | Schedule E, line 18 |
| J Section 59(e)(2) expenditures | See the Partner's Instructions |
| K Deductions - portfolio (2% floor) | Schedule A, line 22 |
| L Deductions - portfolio (other) | Schedule A, line 27 |
| M Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| N Educational assistance benefits | See the Partner's Instructions |
| O Dependent care benefits | Form 2441, line 12 |
| P Preproductive period expenses | See the Partner's Instructions |
| Q Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| R Pensions and IRAs | See the Partner's Instructions |
| S Reforestation expense deduction | See the Partner's Instructions |
| T Domestic production activities information | See Form 8903 instructions |
| U Qualified production activities income | See Form 8903, line 7 |
| V Employer's W-2 wages | See Form 8903, line 13 |
| W Other deductions | See the Partner's Instructions |

14. **Self-employment earnings (loss)**

**Note:** *If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.*

| | |
|---|---|
| A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| B Gross farming or fishing income | See the Partner's Instructions |
| C Gross non-farm income | See the Partner's Instructions |

15. **Credits & credit recapture**

| | |
|---|---|
| A Low-income housing credit (section 42(j)(5)) | Form 8586, line 4 |
| B Low-income housing credit (other) | Form 8586, line 4 |
| C Qualified rehabilitation expenditures (rental real estate) | Form 3468, line 1 |
| D Qualified rehabilitation expenditures (other than rental real estate) | Form 3468, line 1 |
| E Basis of energy property | See the Partner's Instructions |
| F Other rental real estate credits | See the Partner's Instructions |
| G Other rental credits | See the Partner's Instructions |
| H Undistributed capital gains credit | Form 1040, line 70; check box a |
| I Credit for alcohol used as fuel | Form 6478, line 4 |

| *Code* | *Enter on* |
|---|---|
| J Work opportunity credit | Form 5884, line 3 |
| K Welfare-to-work credit | Form 8861, line 3 |
| L Disabled access credit | Form 8826, line 7 |
| M Empowerment zone and renewal community employment credit | Form 8844, line 3 |
| N Credit for increasing research activities | Form 6765, line 42 |
| O New markets credit | Form 8874, line 2 |
| P Credit for employer social security and Medicare taxes | Form 8846, line 5 |
| Q Backup withholding | Form 1040, line 64 |
| R Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| S Recapture of low-income housing credit (other) | Form 8611, line 8 |
| T Recapture of investment credit | See Form 4255 |
| U Other credits | See the Partner's Instructions |
| V Recapture of other credits | See the Partner's Instructions |
| 16. Foreign transactions | |
| A Name of country or U.S. possession | Form 1116, Part I |
| B Gross income from all sources | Form 1116, Part I |
| C Gross income sourced at partner level | Form 1116, Part I |
| *Foreign gross income sourced at partnership level* | |
| D Passive | Form 1116, Part I |
| E Listed categories | Form 1116, Part I |
| F General limitation | Form 1116, Part I |
| *Deductions allocated and apportioned at partner level* | |
| G Interest expense | Form 1116, Part I |
| H Other | Form 1116, Part I |
| *Deductions allocated and apportioned at partnership level to foreign source income* | |
| I Passive | Form 1116, Part I |
| J Listed categories | Form 1116, Part I |
| K General limitation | Form 1116, Part I |
| *Other information* | |
| L Total foreign taxes paid | Form 1116, Part II |
| M Total foreign taxes accrued | Form 1116, Part II |
| N Reduction in taxes available for credit | Form 1116, line 12 |
| O Foreign trading gross receipts | Form 8873 |
| P Extraterritorial income exclusion | Form 8873 |
| Q Other foreign transactions | See the Partner's Instructions |
| 17. Alternative minimum tax (AMT) items | |
| A Post-1986 depreciation adjustment | See the Partner's Instructions and the Instructions for Form 6251 |
| B Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| C Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| D Oil, gas, & geothermal - gross income | See the Partner's Instructions and the Instructions for Form 6251 |
| E Oil, gas, & geothermal - deductions | See the Partner's Instructions and the Instructions for Form 6251 |
| F Other AMT items | See the Partner's Instructions and the Instructions for Form 6251 |
| 18. Tax-exempt income and nondeductible expenses | |
| A Tax-exempt interest income | Form 1040, line 8b |
| B Other tax-exempt income | See the Partner's Instructions |
| C Nondeductible expenses | See the Partner's Instructions |
| 19. Distributions | |
| A Cash and marketable securities | See the Partner's Instructions |
| B Other property | See the Partner's Instructions |
| 20. Other information | |
| A Investment income | Form 4952, line 4a |
| B Investment expenses | Form 4952, line 5 |
| C Fuel tax credit information | Form 4136 |
| D Look-back interest - completed long-term contracts | Form 8697 |
| E Look-back interest - income forecast method | Form 8866 |
| F Dispositions of property with section 179 deductions | See the Partner's Instructions |
| G Recapture of section 179 deduction | See the Partner's Instructions |
| H Special basis adjustments | See the Partner's Instructions |
| I Section 453(l)(3) information | See the Partner's Instructions |
| J Section 453A(c) information | See the Partner's Instructions |
| K Section 1260(b) information | See the Partner's Instructions |
| L Interest allocable to production expenditures | See the Partner's Instructions |
| M CCF nonqualified withdrawals | See the Partner's Instructions |
| N Information needed to figure depletion - oil and gas | See the Partner's Instructions |
| O Amortization of reforestation costs | See the Partner's Instructions |
| P Unrelated business taxable income | See the Partner's Instructions |
| Q Other information | See the Partner's Instructions |

ARTHUR ANDERSEN LLP
SCH K-1 SUPPORTING SCHEDULES PARTNER # 1494 ALAN D PAUL

ITEM N - RECONCILIATION OF INCOME

| | |
|---|---|
| TOTAL INCOME PER SCHEDULE K-1 | -51,434. |
| LESS: EXPENSES RECORDED ON BOOKS, NOT INCLUDED ON SCH. K-1: NONDEDUCTIBLE EXPENSES | 8,170. |
| PLUS: OTHER INCREASES TO PARTNER'S CAPITAL INCOME IN EXCESS OF PTR. DISTR. RIGHTS | 17,654. |
| TOTAL INCOME PER ITEM N, CURRENT YEAR INCR(DECR) | -41,950. |

PARTNER FOOTNOTES ASSOCIATED W/SCH. K-1, CURRENT YEAR INC(DEC)

RECONCILIATION OF TAXABLE INCOME TO CURRENT YEAR DECREASE IN PARTNER CAPITAL
FOR THE YEAR ENDED DECEMBER 31, 2005

| | LINE ON K-1 FORM 1065 | |
|---|---|---|
| ORDINARY INCOME | 1 | -56,209. |
| INTEREST INCOME | 5 | 4,914. |
| NET SHORT TERM CAPITAL GAIN (LOSS) | 8 | -6. |
| NET LONG TERM CAPITAL GAIN (LOSS) | 9A | -128. |
| SECTION 1231 GAIN (LOSS) | 10 | -5. |
| NONDEDUCTIBLE EXPENSES | 18C | -8,170. |
| SUBTOTAL | | -59,604. |
| LESS: | | |
| PARTIAL REVERSAL-FY02 SURPLUS TAXABLE INCOME | | 11,515. |
| REVERSAL-FY01 OPERATING NEGATIVE SPREAD | | 6,139. |
| TOTAL CURRENT YEAR DECREASE IN PARTNER CAPITAL | | -41,950. |

PARTNER FOOTNOTES ASSOCIATED W/ SCHEDULE K-1

ITEM N - PARTNER'S TAX CAPITAL ACCOUNT
METHOD: PER AGREEMENT
SCHEDULE K-1, ITEM N
FOR THE YEAR ENDED DECEMBER 31, 2005

| | |
|---|---|
| BEGINNING BALANCE | 563,369. |
| CAPITAL CONTRIBUTED DURING THE YEAR | NONE |
| PARTNER'S SHARE OF: | |
| CY05 ORDINARY TAXABLE INCOME | -56,209. |
| SEPARATELY STATED AMOUNTS | 4,775. |
| NON-DEDUCTIBLE EXPENSES | -8,170. |
| PARTIAL REVERSAL-FY02 SURPLUS TAXABLE INCOME | 11,515. |
| REVERSAL-FY01 OPERATING NEGATIVE SPREAD | 6,139. |
| WITHDRAWALS AND DISTRIBUTIONS | NONE |
| ENDING BALANCE | 521,419. |

STATEMENT #1

ARTHUR ANDERSEN LLP
SCH K-1 SUPPORTING SCHEDULES PARTNER # 1494 ALAN D PAUL

PARTNER FOOTNOTES

THE PROFIT AND LOSS OF THE PARTNER IS DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE PARTNERSHIP AGREEMENT. FULL DETAILS ARE AVAILABLE IN THE OFFICES OF THE PARTNERSHIP.

N. PURSUANT TO IRS NOTICE 89-35, ALL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP AFTER AUGUST 31, 1987 HAVE BEEN ALLOCATED SOLELY TO TRADE OR BUSINESS EXPENDITURES THAT ARE NOT CAPITALIZABLE. ACCORDINGLY, ALL INTEREST EXPENSE ON DEBT INCURRED BY PARTNERS TO MAKE SUCH CAPITAL CONTRIBUTIONS IS INTEREST THAT IS PAID OR ACCRUED ON INDEBTEDNESS PROPERLY ALLOCABLE TO A TRADE OR BUSINESS (OTHER THAN THE TRADE OR BUSINESS OF PERFORMING SERVICES AS AN EMPLOYEE) AS DEFINED IN SECTION 163(H)(2)(A) OF THE INTERNAL REVENUE CODE.

STATEMENT #2

651106

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0099

**Schedule K-1 (Form 1065)** **2006**

Department of the Treasury
Internal Revenue Service

For calendar year 2006, or tax year beginning ________, 2006 ending ________, 20__

## Partner's Share of Income, Deductions, Credits, etc.

▶ See back of form and separate instructions.

### Part I Information About the Partnership

A Partnership's employer identification number

[redacted]

B Partnership's name, address, city, state, and ZIP code

ARTHUR ANDERSEN LLP
1405 NORTH FIFTH AVENUE - WOODLANDS FINANCE
ST. CHARLES, IL 60174-1264

C IRS Center where partnership filed return

OGDEN

D ☐ Check if this is a publicly traded partnership (PTP)

E ☐ Tax shelter registration number, if any ________

F ☐ Check if Form 8271 is attached

### Part II Information About the Partner

G Partner's identifying number 1494

[redacted]

H Partner's name, address, city, state, and ZIP code

ALAN D PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

I [X] General partner or LLC member-manager ☐ Limited partner or other LLC member

J [X] Domestic partner ☐ Foreign partner

K What type of entity is this partner? INDIVIDUAL

L Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | SEE STMT % | SEE STMT % |
| Loss | SEE STMT % | SEE STMT % |
| Capital | SEE STMT % | SEE STMT % |

M Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ NONE |
| Qualified nonrecourse financing | $ NONE |
| Recourse | $ NONE |

N Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 521,419. |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ -64,551. |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ 456,868. |

☐ Tax basis ☐ GAAP ☐ Section 704(b) book
[X] Other (explain) SEE STMT

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Line | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | -68,089. |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 4,845. |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | -116. |
| 9a | Net long-term capital gain (loss) | -964. |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | -154. |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| 14 | Self-employment earnings (loss) | A -68,089. |
| 15 | Credits | |
| 16 | Foreign transactions | |
| 17 | Alternative minimum tax (AMT) items | A -842. |
| | | B -171. |
| 18 | Tax-exempt income and nondeductible expenses | C 73. |
| 19 | Distributions | |
| 20 | Other information | A 4,845. |

*See attached statement for additional information.

For IRS Use Only

For Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065. Schedule K-1 (Form 1065) 2006

JSA
6P1200 2.000
47534J 1143 4516

**This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the Partner's Instructions for Schedule K-1 and the instructions for your income tax return.**

**1. Ordinary business income (loss).** You must first determine whether the income (loss) is passive or nonpassive. Then enter on your return as follows:

| | Report on |
|---|---|
| Passive loss | See the Partner's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |
| **2. Net rental real estate income (loss)** | See the Partner's Instructions |
| **3. Other net rental income (loss)** | |
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Partner's Instructions |
| **4. Guaranteed payments** | Schedule E, line 28, column (j) |
| **5. Interest income** | Form 1040, line 8a |
| **6a. Ordinary dividends** | Form 1040, line 9a |
| **6b. Qualified dividends** | Form 1040, line 9b |
| **7. Royalties** | Schedule E, line 4 |
| **8. Net short-term capital gain (loss)** | Schedule D, line 5, column (f) |
| **9a. Net long-term capital gain (loss)** | Schedule D, line 12, column (f) |
| **9b. Collectibles (28%) gain (loss)** | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| **9c. Unrecaptured section 1250 gain** | See the Partner's Instructions |
| **10. Net section 1231 gain (loss)** | See the Partner's Instructions |

**11. Other income (loss)**

| Code | | Report on |
|---|---|---|
| A | Other portfolio income (loss) | See the Partner's Instructions |
| B | Involuntary conversions | See the Partner's Instructions |
| C | Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D | Mining exploration costs recapture | See Pub. 535 |
| E | Cancellation of debt | Form 1040, line 21 or Form 982 |
| F | Other income (loss) | See the Partner's Instructions |

**12. Section 179 deduction** — See the Partner's Instructions

**13. Other deductions**

| Code | | Report on |
|---|---|---|
| A | Cash contributions (50%) | See the Partner's Instructions |
| B | Cash contributions (30%) | See the Partner's Instructions |
| C | Noncash contributions (50%) | See the Partner's Instructions |
| D | Noncash contributions (30%) | See the Partner's Instructions |
| E | Capital gain property to a 50% organization (30%) | See the Partner's Instructions |
| F | Capital gain property (20%) | See the Partner's Instructions |
| G | Investment interest expense | Form 4952, line 1 |
| H | Deductions-royalty income | Schedule E, line 18 |
| I | Section 59(e)(2) expenditures | See the Partner's Instructions |
| J | Deductions-portfolio (2% floor) | Schedule A, line 22 |
| K | Deductions-portfolio (other) | Schedule A, line 27 |
| L | Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| M | Educational assistance benefits | See the Partner's Instructions |
| N | Dependent care benefits | Form 2441, line 12 |
| O | Preproductive period expenses | See the Partner's Instructions |
| P | Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| Q | Pensions and IRAs | See the Partner's Instructions |
| R | Reforestation expense deduction | See the Partner's Instructions |
| S | Domestic production activities information | See Form 8903 Instructions |
| T | Qualified production activities income | Form 8903, line 7 |
| U | Employer's W-2 wages | Form 8903, line 13 |
| V | Other deductions | See the Partner's Instructions |

**14. Self-employment earnings (loss)**

Note: *If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.*

| Code | | Report on |
|---|---|---|
| A | Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| B | Gross farming or fishing income | See the Partner's Instructions |
| C | Gross non-farm income | See the Partner's Instructions |

**15. Credits**

| Code | | Report on |
|---|---|---|
| A | Low-income housing credit (section 42(j)(5)) | See the Partner's Instructions |
| B | Low-income housing credit (other) | See the Partner's Instructions |
| C | Qualified rehabilitation expenditures (rental real estate) | See the Partner's Instructions |
| D | Other rental real estate credits | See the Partner's Instructions |
| E | Other rental credits | See the Partner's Instructions |
| F | Undistributed capital gains credit | Form 1040, line 70; check box a |
| G | Credit for alcohol used as fuel | See the Partner's Instructions |
| H | Work opportunity credit | See the Partner's Instructions |
| I | Welfare-to-work credit | See the Partner's Instructions |
| J | Disabled access credit | See the Partner's Instructions |
| K | Empowerment zone and renewal community employment credit | Form 8844, line 3 |
| L | Credit for increasing research activities | See the Partner's Instructions |
| M | New markets credit | See the Partner's Instructions |
| N | Credit for employer social security and Medicare taxes | See the Partner's Instructions |
| O | Backup withholding | Form 1040, line 64 |
| P | Other credits | See the Partner's Instructions |

**16. Foreign transactions**

| Code | | Report on |
|---|---|---|
| A | Name of country or U.S. possession | Form 1116, Part I |
| B | Gross income from all sources | Form 1116, Part I |
| C | Gross income sourced at partner level | Form 1116, Part I |
| | *Foreign gross income sourced at partnership level* | |
| D | Passive | Form 1116, Part I |
| E | Listed categories | Form 1116, Part I |
| F | General limitation | Form 1116, Part I |
| | *Deductions allocated and apportioned at partner level* | |
| G | Interest expense | Form 1116, Part I |
| H | Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| I | Passive | Form 1116, Part I |
| J | Listed categories | Form 1116, Part I |
| K | General limitation | Form 1116, Part I |
| | *Other information* | |
| L | Total foreign taxes paid | Form 1116, Part II |
| M | Total foreign taxes accrued | Form 1116, Part II |
| N | Reduction in taxes available for credit | Form 1116, line 12 |
| O | Foreign trading gross receipts | Form 8873 |
| P | Extraterritorial income exclusion | Form 8873 |
| Q | Other foreign transactions | See the Partner's Instructions |

**17. Alternative minimum tax (AMT) items**

| Code | | Report on |
|---|---|---|
| A | Post-1986 depreciation adjustment | See the Partner's Instructions and the Instructions for Form 6251 |
| B | Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| C | Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| D | Oil, gas, & geothermal - gross income | See the Partner's Instructions and the Instructions for Form 6251 |
| E | Oil, gas, & geothermal - deductions | See the Partner's Instructions and the Instructions for Form 6251 |
| F | Other AMT items | See the Partner's Instructions and the Instructions for Form 6251 |

**18. Tax-exempt income and nondeductible expenses**

| Code | | Report on |
|---|---|---|
| A | Tax-exempt interest income | Form 1040, line 8b |
| B | Other tax-exempt income | See the Partner's Instructions |
| C | Nondeductible expenses | See the Partner's Instructions |

**19. Distributions**

| Code | | Report on |
|---|---|---|
| A | Cash and marketable securities | See the Partner's Instructions |
| B | Other property | See the Partner's Instructions |

**20. Other information**

| Code | | Report on |
|---|---|---|
| A | Investment income | Form 4952, line 4a |
| B | Investment expenses | Form 4952, line 5 |
| C | Fuel tax credit information | Form 4136 |
| D | Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| E | Basis of energy property | See the Partner's Instructions |
| F | Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| G | Recapture of low-income housing credit (other) | Form 8611, line 8 |
| H | Recapture of investment credit | Form 4255 |
| I | Recapture of other credits | See the Partner's Instructions |
| J | Look-back interest - completed long-term contracts | Form 8697 |
| K | Look-back interest - income forecast method | Form 8866 |
| L | Dispositions of property with section 179 deductions | See the Partner's Instructions |
| M | Recapture of section 179 deduction | See the Partner's Instructions |
| N | Interest expense for corporate partners | See the Partner's Instructions |
| O | Section 453(l)(3) information | See the Partner's Instructions |
| P | Section 453A(c) information | See the Partner's Instructions |
| Q | Section 1260(b) information | See the Partner's Instructions |
| R | Interest allocable to production expenditures | See the Partner's Instructions |
| S | CCF nonqualified withdrawals | See the Partner's Instructions |
| T | Information needed to figure depletion - oil and gas | See the Partner's Instructions |
| U | Amortization of reforestation costs | See the Partner's Instructions |
| V | Unrelated business taxable income | See the Partner's Instructions |
| W | Other information | See the Partner's Instructions |

6P1300 1.000

47534J 1143 4517

ARTHUR ANDERSEN LLP 36-0732690
SCH K-1 SUPPORTING SCHEDULES PARTNER # 1494 ALAN D PAUL

PARTNER FOOTNOTES ASSOCIATED W/SCH. K-1, CURRENT YEAR INC(DEC)

RECONCILIATION OF TAXABLE INCOME TO CURRENT YEAR DECREASE IN PARTNER CAPITAL
FOR THE YEAR ENDED DECEMBER 31, 2006

| | LINE ON K-1 FORM 1065 | |
|---|---|---|
| ORDINARY INCOME | 1 | -68,089. |
| INTEREST INCOME | 5 | 4,845. |
| NET SHORT TERM CAPITAL GAIN (LOSS) | 8 | -116. |
| NET LONG TERM CAPITAL GAIN (LOSS) | 9A | -964. |
| SECTION 1231 GAIN (LOSS) | 10 | -154. |
| NONDEDUCTIBLE EXPENSES | 18C | -73. |
| TOTAL CURRENT YEAR DECREASE IN PARTNER CAPITAL | | -64,551. |

PARTNER FOOTNOTES ASSOCIATED W/ SCHEDULE K-1

ITEM N - PARTNER'S TAX CAPITAL ACCOUNT
METHOD: PER AGREEMENT
SCHEDULE K-1, ITEM N
FOR THE YEAR ENDED DECEMBER 31, 2006

| | |
|---|---|
| BEGINNING BALANCE | 521,419. |
| CAPITAL CONTRIBUTED DURING THE YEAR | |
| PARTNER'S SHARE OF: | |
| 2006 ORDINARY TAXABLE INCOME | -68,089. |
| SEPARATELY STATED AMOUNTS | 3,611. |
| NON-DEDUCTIBLE EXPENSES | -73. |
| WITHDRAWALS AND DISTRIBUTIONS | |
| ENDING BALANCE | 456,868. |

PARTNER FOOTNOTES

L. THE PROFIT AND LOSS OF THE PARTNER IS DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE PARTNERSHIP AGREEMENT. FULL DETAILS ARE AVAILABLE IN THE OFFICES OF THE PARTNERSHIP.

N. PURSUANT TO IRS NOTICE 89-35, ALL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP AFTER AUGUST 31, 1987 HAVE BEEN ALLOCATED SOLELY TO TRADE OR BUSINESS EXPENDITURES THAT ARE NOT CAPITALIZABLE. ACCORDINGLY, ALL INTEREST EXPENSE ON DEBT INCURRED BY PARTNERS TO MAKE SUCH CAPITAL CONTRIBUTIONS IS INTEREST THAT IS PAID OR ACCRUED ON INDEBTEDNESS PROPERLY ALLOCABLE TO A TRADE OR BUSINESS (OTHER THAN THE TRADE OR BUSINESS OF PERFORMING SERVICES AS AN EMPLOYEE) AS DEFINED IN SECTION 163(H)(2)(A) OF THE INTERNAL REVENUE CODE.

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2001 or tax year beginning May 08, 2001, and ending Jun 01, 20 02

OMB No. 1545-0099

**2001**

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code
DELOITTE & TOUCHE LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

**A** This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member

**B** What type of entity is this partner? ▶ Individual

**C** Is this partner a ☑ domestic or a ☐ foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | VARIOUS % | VARIOUS % |
| Loss sharing | VARIOUS % | VARIOUS % |
| Ownership of capital | VARIOUS % | VARIOUS % |

**E** IRS Center where partnership filed return: OGDEN, UT

**F** Partner's share of liabilities (see instructions):
Nonrecourse . . . $
Qualified nonrecourse financing . $
Other . . . $

**G** Tax shelter registration number . ▶

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . ☐

**I** Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

**J Analysis of partner's capital account:**

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| | | 45,112 | ( 19,384 ) | 25,728 |

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 1 | 18,445 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 Net income (loss) from rental real estate activities | 2 | | |
| | 3 Net income (loss) from other rental activities | 3 | | |
| | 4 Portfolio income (loss): | | | |
| | a Interest | 4a | 2 | Sch. B, Part I, line 1 |
| | b Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c Royalties | 4c | | Sch. E, Part I, line 4 |
| | d Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e (1) Net long-term capital gain (loss) | 4e(1) | (85) | Sch. D, line 12, col. (f) |
| | (2) 28% rate gain (loss) | 4e(2) | | Sch. D, line 12, col. (g) |
| | (3) Qualified 5-year gain | 4e(3) | | Line 4 of worksheet for Sch. D, line 29 |
| | f Other portfolio income (loss) *(attach schedule)* | 4f | | Enter on applicable line of your return. |
| | 5 Guaranteed payments to partner | 5 | | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | | |
| | 7 Other income (loss) *(attach schedule)* | 7 | | Enter on applicable line of your return. |
| Deductions | 8 Charitable contributions (see instructions) *(attach schedule)* | 8 | 10 | Sch. A, line 15 or 16 |
| | 9 Section 179 expense deduction | 9 | | See pages 7 and 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 Other deductions *(attach schedule)* | 11 | 4,286 | |
| Credits | 12a Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | (2) Other than on line 12a(1) | 12a(2) | | |
| | b Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d Credits related to other rental activities | 12d | | |
| | 13 Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065. Cat. No. 11394R Schedule K-1 (Form 1065) 2001

DELOITTE & TOUCHE LLP

Schedule K-1 (Form 1065) 2001 PAUL, ALAN D.

Page 2

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Investment Interest | 14a | Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f | 14b(1) | 2 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15a | Net earnings (loss) from self-employment | 15a | 18,445 | Sch. SE, Section A or B |
| | b | Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Gross nonfarm income | 15c | 18,445 | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | (42) | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b | Adjusted gain or loss | 16b | (27) | |
| | c | Depletion (other than oil and gas) | 16c | | |
| | d | (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e | Other adjustments and tax preference items *(attach schedule)* | 16e | | |
| Foreign Taxes | 17a | Name of foreign country or U.S. possession ▶ VARIOUS | | | Form 1116, Part I |
| | b | Gross income from all sources | 17b | 290,944 | |
| | c | Gross income sourced at partner level | 17c | | |
| | d | Foreign gross income sourced at partnership level: | | | |
| | | (1) Passive | 17d(1) | | |
| | | (2) Listed categories *(attach schedule)* | 17d(2) | | |
| | | (3) General limitation | 17d(3) | 4,069 | |
| | e | Deductions allocated and apportioned at partner level: | | | |
| | | (1) Interest expense | 17e(1) | | |
| | | (2) Other | 17e(2) | | |
| | f | Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | | (1) Passive | 17f(1) | | |
| | | (2) Listed categories *(attach schedule)* | 17f(2) | | |
| | | (3) General limitation | 17f(3) | 1,755 | |
| | g | Total foreign taxes (check one): ▶ ☒ Paid ☐ Accrued | 17g | 17 | Form 1116, Part II |
| | h | Reduction in taxes available for credit *(attach schedule)* | 17h | | Form 1116, line 12 |
| Other | 18 | Section 59(e)(2) expenditures: a Type ▶ | | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Amount | 18b | | |
| | 19 | Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 | Other tax-exempt income | 20 | | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 | Nondeductible expenses | 21 | 1,104 | |
| | 22 | Distributions of money (cash and marketable securities) | 22 | 19,384 | |
| | 23 | Distributions of property other than money | 23 | | |
| | 24 | Recapture of low-income housing credit: | | | |
| | a | From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b | Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner *(attach additional schedules if more space is needed)*:

Schedule K-1 (Form 1065) 2001

Deloitte & Touche

**INCOME TO BE REPORTED IN VARIOUS STATE INCOME TAX RETURNS**

03/21/2003

PAUL, ALAN D.
BOS

SSN: XXX-XX-2877

The amounts listed below represent your distributive share of the firm's fiscal year 2002 taxable income to be reported in nonresident state income tax returns.

| STATE | DISTRIBUTIVE SHARE OF TAXABLE INCOME | APPORTIONMENT PERCENT |
|---|---|---|
| ARIZONA | 335 | 0.6578 % |
| GEORGIA | 1,289 | 2.5152 % |
| ILLINOIS | 2,967 | 6.8547 % |
| MINNESOTA | 786 | 1.7962 % |
| NEW YORK | 8,606 | 16.8545 % |
| OHIO | 2,223 | 4.3616 % |
| VIRGINIA | 926 | 1.8060 % |

The above is combined information from both Deloitte & Touche LLP and Deloitte & Touche USA LLP



Deloitte & Touche

04/14/2003

Combined

XXX-XX-2877

PAUL, ALAN D.

BOS

# ANALYSIS OF DEFERRED TAXABLE INCOME

| | MoRE CAPITAL | ACCRUAL METHOD CAPITAL (A) | TAX COST BASIS | DEFERRED TAXABLE INCOME | MoRE DTI |
|---|---|---|---|---|---|
| **Fiscal Year 2002 Activity** | | | | | |
| Balance June 03, 2001 | 0 | 0 | 0 | 0 | 0 |
| Invested Capital (Other than MoRE Capital) | | 0 | 0 | | |
| Operating Results June 01, 2002: | | 51,023 | 50,107 | 916 | 0 |
| Units Earnings (B) | | 0 | 0 | | 0 |
| Guaranteed Payments | 0 | | | | |
| Interest Earned On MoRE Capital | | (19,385) | (19,385) | | |
| Distribution of Earnings | | | (1,408) | 1,408 | |
| Current Year Non-Deductible Expenditures | | | | 1,490 | |
| Merger Adjustments Charged to Book Income | | | | | |
| Balance June 01, 2002 | 0 | 31,638 | 29,314 | 3,814 | 0 |
| FY2002 MoRE Capital (C) | 0 | | 0 | | |
| Adjusted Balance June 01, 2002 including MoRE Capital | 0 | 31,638 | 29,314 | 3,814 | 0 |
| Post June 01, 2002 Distribution of FY2002 Earnings | | (31,639) | (31,639) | | |
| Adjusted Balance June 01, 2002 | 0 | (1) | (2,325) | 3,814 | 0 |

(A) Includes Required Capital, Additional Capital, and Accrual Earnings.

(B) Includes portfolio income and expense, Capital Gains (Losses), 1231 Gains(Losses), contributions, foreign taxes.

(C) MoRE Capital includes contributions for FY2002 regardless of when the actual contribution was made.

Page 1

Paul222

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2001 or tax year beginning May 08, 2001, and ending Jun 01, 20 02

OMB No. 1545-0099

**2001**

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code
DELOITTE & TOUCHE USA LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

**A** This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member

**B** What type of entity is this partner? ▶ Individual

**C** Is this partner a ☑ domestic or a ☐ foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | VARIOUS % | VARIOUS % |
| Loss sharing | VARIOUS % | VARIOUS % |
| Ownership of capital | VARIOUS % | VARIOUS % |

**E** IRS Center where partnership filed return: OGDEN, UT

**F** Partner's share of liabilities (see instructions):
Nonrecourse . . . $
Qualified nonrecourse financing . . $
Other . . . $

**G** Tax shelter registration number . ▶

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . ☐

**I** Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| | | 5,911 | ( ) | 5,911 |

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 1 | 31,575 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 Net income (loss) from rental real estate activities | 2 | | |
| | 3 Net income (loss) from other rental activities | 3 | | |
| | 4 Portfolio income (loss): | | | |
| | a Interest | 4a | 255 | Sch. B, Part I, line 1 |
| | b Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c Royalties | 4c | | Sch. E, Part I, line 4 |
| | d Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e (1) Net long-term capital gain (loss) | 4e(1) | 21 | Sch. D, line 12, col. (f) |
| | (2) 28% rate gain (loss) | 4e(2) | | Sch. D, line 12, col. (g) |
| | (3) Qualified 5-year gain | 4e(3) | | Line 4 of worksheet for Sch. D, line 29 |
| | f Other portfolio income (loss) *(attach schedule)* | 4f | | Enter on applicable line of your return. |
| | 5 Guaranteed payments to partner | 5 | | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | | |
| | 7 Other income (loss) *(attach schedule)* | 7 | | Enter on applicable line of your return. |
| Deductions | 8 Charitable contributions (see instructions) *(attach schedule)* | 8 | 71 | Sch. A, line 15 or 16 |
| | 9 Section 179 expense deduction | 9 | | See pages 7 and 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 Other deductions *(attach schedule)* | 11 | 7,336 | |
| Credits | 12a Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | (2) Other than on line 12a(1) | 12a(2) | | |
| | b Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d Credits related to other rental activities | 12d | | |
| | 13 Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065. Cat. No. 11394R Schedule K-1 (Form 1065) 2001

DELOITTE & TOUCHE USA LLP

Schedule K-1 (Form 1065) 2001 PAUL, ALAN D. Page 2

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Investment Interest | 14a Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f | 14b(1) | 255 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15a Net earnings (loss) from self-employment | 15a | 31,575 | Sch. SE, Section A or B |
| | b Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income | 15c | 31,575 | |
| Adjustments and Tax Preference Items | 16a Depreciation adjustment on property placed in service after 1986 | 16a | 7 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss | 16b | (1) | |
| | c Depletion (other than oil and gas) | 16c | | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e Other adjustments and tax preference items *(attach schedule)* | 16e | | |
| Foreign Taxes | 17a Name of foreign country or U.S. possession ▶ VARIOUS | | | Form 1116, Part I |
| | b Gross income from all sources | 17b | 76 | |
| | c Gross income sourced at partner level | 17c | | |
| | d Foreign gross income sourced at partnership level: | | | |
| | (1) Passive | 17d(1) | | |
| | (2) Listed categories *(attach schedule)* | 17d(2) | | |
| | (3) General limitation | 17d(3) | 62 | |
| | e Deductions allocated and apportioned at partner level: | | | |
| | (1) Interest expense | 17e(1) | | |
| | (2) Other | 17e(2) | | |
| | f Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | (1) Passive | 17f(1) | | |
| | (2) Listed categories *(attach schedule)* | 17f(2) | | |
| | (3) General limitation | 17f(3) | 22 | |
| | g Total foreign taxes (check one): ▶ ☒ Paid ☐ Accrued | 17g | 8 | Form 1116, Part II |
| | h Reduction in taxes available for credit *(attach schedule)* | 17h | | Form 1116, line 12 |
| Other | 18 Section 59(e)(2) expenditures: a Type ▶ | | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Amount | 18b | | |
| | 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 Other tax-exempt income | 20 | | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses | 21 | 304 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | | |
| | 23 Distributions of property other than money | 23 | | |
| | 24 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner *(attach additional schedules if more space is needed)*:

Schedule K-1 (Form 1065) 2001

Deloitte & Touche

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K-1 FOR THE FISCAL YEAR ENDED JUNE 1, 2002**

03/15/2003

DELOITTE & TOUCHE USA LLP EIN: 13-5133500

PAUL, ALAN D SSN: XXX-XX-2877

| SCHEDULE K-1 | ORDINARY INCOME | LINE 1 |
|---|---|---|
| UNIT INCOME | | 31,575 |
| LESS MoRE CONTRIBUTIONS | | 0 |
| TOTAL UNIT INCOME | | 31,575 |

| SCHEDULE K-1 | CHARITABLE CONTRIBUTIONS | LINE 8 |
|---|---|---|
| CHARITABLE CONTRIBUTIONS SUBJECT TO 50% LIMIT | (Enter on Schedule A) | 71 |

| SCHEDULE K-1 | OTHER DEDUCTIONS | LINE 11 |
|---|---|---|
| PROFIT SHARING PLAN (KEOGH) | (Enter on Form 1040 - Page 1, Line 31) | 5,010 |
| 401(K) CONTRIBUTION | (Enter on Form 1040 - Page 1, Line 31) | 2,326 |
| TOTAL OTHER DEDUCTIONS | | 7,336 |

| SCHEDULE K-1 | ADJUSTED GAIN OR LOSS | LINE 16b |
|---|---|---|
| ADJUSTED GAIN OR LOSS | (See Form 1040 instructions) | (1) |

| SCHEDULE K-1 | NONDEDUCTIBLE EXPENSES | LINE 21 |
|---|---|---|
| MEALS & ENTERTAINMENT EXPENSE | | 267 |
| OTHER NONDEDUCTIBLE (TAX-EXEMPT) ITEMS | | 37 |
| TOTAL NONDEDUCTIBLE EXPENSES | | 304 |

SCHEDULE K-1 (Form 1065)
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2002 or tax year beginning June 02, 2002, and ending May 31, 20 03

OMB No. 1545-0099

2002

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code

PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code

DELOITTE & TOUCHE LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

**A** This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member

**B** What type of entity is this partner? ▶ Individual

**C** Is this partner a ☑ domestic or a ☐ foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | VARIOUS % | VARIOUS % |
| Loss sharing | VARIOUS % | VARIOUS % |
| Ownership of capital | VARIOUS % | VARIOUS % |

**E** IRS Center where partnership filed return: Ogden, UT

**F** Partner's share of liabilities (see instructions):
Nonrecourse . . . $
Qualified nonrecourse financing . $
Other . . . $

**G** Tax shelter registration number ▶

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) ☐

**I** Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

**J Analysis of partner's capital account:**

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 25,728 | 210,600 | 651,466 | ( 442,563 ) | 445,231 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 234,225 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | 26 | Sch. B, Part I, line 1 |
| | b | Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e | (1) Net long-term capital gain (loss) | 4e(1) | | Sch. D, line 12, col. (f) |
| | | (2) 28% rate gain (loss) | 4e(2) | | Sch. D, line 12, col. (g) |
| | | (3) Qualified 5-year gain | 4e(3) | | Line 5 of worksheet for Sch. D, line 29 |
| | f | Other portfolio income (loss) *(attach schedule)* | 4f | | Enter on applicable line of your return. |
| | 5 | Guaranteed payments to partner | 5 | 12,335 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | | |
| | 7 | Other income (loss) *(attach schedule)* | 7 | | Enter on applicable line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) *(attach schedule)* | 8 | 168 | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See pages 7 and 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 | Other deductions *(attach schedule)* | 11 | 16,762 | |
| Credits | 12a | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | | (2) Other than on line 12a(1) | 12a(2) | | |
| | b | Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d | Credits related to other rental activities | 12d | | |
| | 13 | Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065. Cat. No. 11394R Schedule K-1 (Form 1065) 2002

DELOITTE & TOUCHE LLP

Schedule K-1 (Form 1065) 2002    PAUL, ALAN D.    ██████████    Page **2**

| (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|
| **Investment Interest** 14a Interest expense on investment debts | 14a | | Form 4952, line 1 |
| b (1) Investment income included on lines 4a, 4b, 4c, and 4f | 14b(1) | 26 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| (2) Investment expenses included on line 10 | 14b(2) | | |
| **Self-employment** 15a Net earnings (loss) from self-employment | 15a | 246,560 | Sch. SE, Section A or B |
| b Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| c Gross nonfarm income | 15c | 246,560 | |
| **Adjustments and Tax Preference Items** 16a Depreciation adjustment on property placed in service after 1986 | 16a | (6,168) | |
| b Adjusted gain or loss | 16b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| c Depletion (other than oil and gas) | 16c | | |
| d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| e Other adjustments and tax preference items (attach schedule) | 16e | | |
| **Foreign Taxes** 17a Name of foreign country or U.S. possession ▶ VARIOUS | | | |
| b Gross income from all sources | 17b | 3,768,235 | |
| c Gross income sourced at partner level | 17c | | |
| d Foreign gross income sourced at partnership level: | | | |
| (1) Passive | 17d(1) | | |
| (2) Listed categories (attach schedule) | 17d(2) | | |
| (3) General limitation | 17d(3) | 70,918 | Form 1116, Part I |
| e Deductions allocated and apportioned at partner level: | | | |
| (1) Interest expense | 17e(1) | | |
| (2) Other | 17e(2) | | |
| f Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| (1) Passive | 17f(1) | | |
| (2) Listed categories (attach schedule) | 17f(2) | | |
| (3) General limitation | 17f(3) | 41,104 | Form 1116, Part II |
| g Total foreign taxes (check one): ▶ ☒ Paid ☐ Accrued | 17g | 630 | Form 1116, line 12 |
| h Reduction in taxes available for credit (attach schedule) | 17h | | |
| **Other** 18 Section 59(e)(2) expenditures: a Type ▶ | | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| b Amount | 18b | | |
| 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| 20 Other tax-exempt income | 20 | | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| 21 Nondeductible expenses | 21 | 11,671 | |
| 22 Distributions of money (cash and marketable securities) | 22 | 442,563 | |
| 23 Distributions of property other than money | 23 | | |
| 24 Recapture of low-income housing credit: | | | |
| a From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| b Other than on line 24a. | 24b | | |

25 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

**Supplemental Information**

LINE 4B    DIVIDENDS - NON QUALIFIED

LINE 4E(1)  NET L/T CAP GAIN(LOSS) - PRE MAY 6
LINE 4E(1)  NET L/T CAP GAIN(LOSS) - POST MAY 5
LINE 4E(3)  QUALIFIED 5 YR GAIN(LOSS) - PRE MAY 6
LINE 4E(3)  QUALIFIED 5 YR GAIN(LOSS) - POST MAY 5

Schedule K-1 (Form 1065) 2002

A37

Deloitte.

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K-1**
**FOR THE FISCAL YEAR ENDED MAY 31, 2003**

02/15/2004

**DELOITTE & TOUCHE LLP**

**PAUL, ALAN D.**

**EIN:** [redacted]
**PID: 204459**
**SSN: XXX-XX-2877**

| SCHEDULE K-1 | ORDINARY INCOME | LINE 1 |
|---|---|---|
| UNIT INCOME | | 234,225 |
| LESS MoRE CONTRIBUTIONS | | 0 |
| TOTAL UNIT INCOME | | 234,225 |

| SCHEDULE K-1 | GUARANTEED PAYMENTS | LINE 5 |
|---|---|---|
| RETURN ON INVESTMENT | | 7,941 |
| INTEREST-UNDISTRIBUTED EARNINGS | | 304 |
| INTEREST-OTHER | | 40 |
| CLUB DUES | | 2,800 |
| TAX PREPARATION | | 1,250 |
| TOTAL GUARANTEED PAYMENTS | | 12,335 |

| SCHEDULE K-1 | CHARITABLE CONTRIBUTIONS | LINE 8 |
|---|---|---|
| CHARITABLE CONTRIBUTIONS SUBJECT TO 50% LIMIT | (Enter on Schedule A) | 168 |

| SCHEDULE K-1 | OTHER DEDUCTIONS | LINE 11 |
|---|---|---|
| PROFIT SHARING PLAN (KEOGH) | (Enter on Form 1040 - Page 1, Line 30) | 15,964 |
| 401(K) CONTRIBUTION | (Enter on Form 1040 - Page 1, Line 30) | 798 |
| TOTAL OTHER DEDUCTIONS | | 16,762 |

| SCHEDULE K-1 | NONDEDUCTIBLE EXPENSES | LINE 21 |
|---|---|---|
| MEALS & ENTERTAINMENT EXPENSE | | 16,547 |
| OTHER NONDEDUCTIBLE (TAX-EXEMPT) ITEMS | | (4,876) |
| TOTAL NONDEDUCTIBLE EXPENSES | | 11,671 |

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2002 or tax year beginning June 02, 2002, and ending May 31, 20 03

OMB No. 1545-0099

**2002**

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code
DELOITTE & TOUCHE USA LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

A This partner is a ☑ general partner ☐ limited partner ☐ limited liability company member
B What type of entity is this partner? ▶ Individual
C Is this partner a ☑ domestic or a ☐ foreign partner?

D Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | VARIOUS % | VARIOUS % |
| Loss sharing | VARIOUS % | VARIOUS % |
| Ownership of capital | VARIOUS % | VARIOUS % |

E IRS Center where partnership filed return: Ogden, UT

F Partner's share of liabilities (see instructions):
Nonrecourse . . . $
Qualified nonrecourse financing . $
Other . . . $

G Tax shelter registration number ▶

H Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . ☐

I Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

J **Analysis of partner's capital account:**

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 5,911 | 491,400 | 105,547 | ( 106,341 ) | 496,517 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 352,701 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | 3,197 | Sch. B, Part I, line 1 |
| | b | Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e | (1) Net long-term capital gain (loss) | 4e(1) | 2,117 | Sch. D, line 12, col. (f) |
| | | (2) 28% rate gain (loss) | 4e(2) | | Sch. D, line 12, col. (g) |
| | | (3) Qualified 5-year gain | 4e(3) | 2,141 | Line 5 of worksheet for Sch. D, line 29 |
| | f | Other portfolio income (loss) *(attach schedule)* | 4f | | Enter on applicable line of your return. |
| | 5 | Guaranteed payments to partner | 5 | 18,530 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net section 1231 gain (loss) (other than due to casualty or theft) | 6 | | |
| | 7 | Other income (loss) *(attach schedule)* | 7 | | Enter on applicable line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) *(attach schedule)* | 8 | 830 | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See pages 7 and 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 | Other deductions *(attach schedule)* | 11 | 25,238 | |
| Credits | 12a | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | | (2) Other than on line 12a(1) | 12a(2) | | |
| | b | Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d | Credits related to other rental activities | 12d | | |
| | 13 | Other credits | 13 | | |

For Paperwork Reduction Act Notice, see Instructions for Form 1065. Cat. No. 11394R Schedule K-1 (Form 1065) 2002

DELOITTE & TOUCHE USA LLP

Schedule K-1 (Form 1065) 2002 PAUL, ALAN D.

Page 2

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Investment Interest | 14a Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f | 14b(1) | 3,197 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15a Net earnings (loss) from self-employment | 15a | 371,231 | Sch. SE, Section A or B |
| | b Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income | 15c | 371,231 | |
| Adjustments and Tax Preference Items | 16a Depreciation adjustment on property placed in service after 1986 | 16a | (358) | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss | 16b | | |
| | c Depletion (other than oil and gas) | 16c | | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e Other adjustments and tax preference items *(attach schedule)* | 16e | | |
| Foreign Taxes | 17a Name of foreign country or U.S. possession ▶ VARIOUS | | | Form 1116, Part I |
| | b Gross income from all sources | 17b | 2,321 | |
| | c Gross income sourced at partner level | 17c | | |
| | d Foreign gross income sourced at partnership level: | | | |
| | (1) Passive | 17d(1) | | |
| | (2) Listed categories *(attach schedule)* | 17d(2) | | |
| | (3) General limitation | 17d(3) | 2,321 | |
| | e Deductions allocated and apportioned at partner level: | | | |
| | (1) Interest expense | 17e(1) | | |
| | (2) Other | 17e(2) | | |
| | f Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | (1) Passive | 17f(1) | | |
| | (2) Listed categories *(attach schedule)* | 17f(2) | | |
| | (3) General limitation | 17f(3) | 237 | |
| | g Total foreign taxes (check one): ▶ ☑ Paid ☐ Accrued | 17g | 65 | Form 1116, Part II |
| | h Reduction in taxes available for credit *(attach schedule)* | 17h | | Form 1116, line 12 |
| Other | 18 Section 59(e)(2) expenditures: a Type ▶ | | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Amount | 18b | | |
| | 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 Other tax-exempt income | 20 | | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses | 21 | 4,304 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | 106,341 | |
| | 23 Distributions of property other than money | 23 | | |
| | 24 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner *(attach additional schedules if more space is needed)*:

LINE 4B DIVIDENDS - NON QUALIFIED

| | |
|---|---|
| LINE 4E(1) NET L/T CAP GAIN(LOSS) - PRE MAY 6 | 2,117 |
| LINE 4E(1) NET L/T CAP GAIN(LOSS) - POST MAY 5 | |
| LINE 4E(3) QUALIFIED 5 YR GAIN(LOSS) - PRE MAY 6 | 2,141 |
| LINE 4E(3) QUALIFIED 5 YR GAIN(LOSS) - POST MAY 5 | |

Deloitte.

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K-1**
**FOR THE FISCAL YEAR ENDED MAY 31, 2003**

02/15/2004

**DELOITTE & TOUCHE USA LLP**

**PAUL, ALAN D.**

**EIN:** [redacted]
**PID: 204459**
**SSN: XXX-XX-2877**

| SCHEDULE K-1 | ORDINARY INCOME | LINE 1 |
|---|---|---|
| UNIT INCOME | | 352,701 |
| LESS MoRE CONTRIBUTIONS | | 0 |
| TOTAL UNIT INCOME | | 352,701 |

| SCHEDULE K-1 | GUARANTEED PAYMENTS | LINE 5 |
|---|---|---|
| RETURN ON INVESTMENT | | 18,530 |
| TOTAL GUARANTEED PAYMENTS | | 18,530 |

| SCHEDULE K-1 | CHARITABLE CONTRIBUTIONS | LINE 8 |
|---|---|---|
| CHARITABLE CONTRIBUTIONS SUBJECT TO 50% LIMIT | (Enter on Schedule A) | 830 |

| SCHEDULE K-1 | OTHER DEDUCTIONS | LINE 11 |
|---|---|---|
| PROFIT SHARING PLAN (KEOGH) | (Enter on Form 1040 - Page 1, Line 30) | 24,036 |
| 401(K) CONTRIBUTION | (Enter on Form 1040 - Page 1, Line 30) | 1,202 |
| TOTAL OTHER DEDUCTIONS | | 25,238 |

| SCHEDULE K-1 | NONDEDUCTIBLE EXPENSES | LINE 21 |
|---|---|---|
| MEALS & ENTERTAINMENT EXPENSE | | 3,883 |
| OTHER NONDEDUCTIBLE (TAX-EXEMPT) ITEMS | | 421 |
| TOTAL NONDEDUCTIBLE EXPENSES | | 4,304 |

Deloitte.

**MISCELLANEOUS INFORMATION**
**FOR THE FISCAL YEAR ENDED MAY 31, 2003**

02/15/2004

SSN: XXX-XX-2877

PAUL, ALAN D. PID: 204459

| | | |
|---|---|---|
| NUMBER OF UNITS AS OF MAY 31, 2003 | | 780.00 |
| ORDINARY INCOME SHOWN ON SCHEDULE K-1's, LINE 1 | | |
| UNIT INCOME | $ | 586,926 |
| LESS MoRE CONTRIBUTIONS | | 0 |
| TOTAL | $ | 586,926 |
| CALENDAR YEAR WITHHOLDINGS | | |
| UNITED WAY CONTRIBUTIONS (WITHHELD)* | $ | 0 |
| HEALTH INSURANCE PREMIUMS (WITHHELD) | $ | 8,133 |
| * If you paid United Way directly (other than withholding from your biweekly draw), that amount is not included above. | | |
| APPORTIONMENT PERCENTAGE FOR CALIFORNIA | | 16.59% |
| ADJUSTMENT TO FEDERAL INCOME FOR STATE PURPOSES | | |
| UNALLOWABLE INCOME TAXES PAID BY THE PARTNERSHIP * | $ | 4,535 |
| * (State and local taxes deducted in determining federal taxable income.) | | |
| CALENDAR YEAR TOTAL INTEREST ON FIRM SPONSORED CAPITAL FINANCING LOANS (INCLUDING MoRE CAPITAL LOANS) | $ | 23,341 |
| TOTAL STATE COMPOSITE TAXES AND WITHHOLDINGS DEDUCTIBLE ON 2003 FORM 1040 | $ | 12,777 |

The above is combined information from both Deloitte & Touche LLP and Deloitte & Touche USA LLP

Deloitte.

STATE TAX ELECTIONS FOR THE CALENDAR YEAR OF 2003

02/15/2004

PAUL, ALAN D.

PID: 204459

**2003 State Composite (Group) Returns have been prepared based on your elections below:**

RESIDENT STATE AT May 31, 2003

**(You will be filing your own 2003 state return)**

MASSACHUSETTS

NON-JOINER STATES

**(You will be filing your own 2003 return(s) for the following state(s))**

CALIFORNIA

JOINER STATES

**(You are included in the firm's 2003 composite (group) return(s) for the following states)**

ALABAMA
ARKANSAS
CONNECTICUT
GEORGIA
IDAHO
INDIANA
KANSAS
LOUISIANA
MARYLAND
MINNESOTA
MISSOURI
NEBRASKA
NEW JERSEY
NEW YORK
OHIO
OREGON
RHODE ISLAND
UTAH
VIRGINIA

ARIZONA
COLORADO
DELAWARE
HAWAII
ILLINOIS
IOWA
KENTUCKY
MAINE
MICHIGAN
MISSISSIPPI
MONTANA
NEW HAMPSHIRE
NEW MEXICO
NORTH CAROLINA
OKLAHOMA
PENNSYLVANIA
SOUTH CAROLINA
VERMONT
WEST VIRGINIA

YEAR **2002**

# Partner's Share of Income, Deductions, Credits, etc.

CALIFORNIA SCHEDULE **K-1 (565)**

For calendar year 2002 or fiscal year beginning month June day 2 year 2002, and ending month May day 31 year 2003

Partner's identifying number [redacted]

Partnership's FEIN [redacted]

Secretary of State file number

Partner's name, address, state, and ZIP Code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, state, and ZIP Code
DELOITTE & TOUCHE LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

A Is this partner a: (1) ☑ general partner; or (2) ☐ limited partner?

B What type of entity is this partner?
(1) ☑ Individual (2) ☐ S Corporation (3) ☐ Estate/Trust (4) ☐ C Corporation (5) ☐ General Partnership (6) ☐ Limited Partnership (7) ☐ LLP (8) ☐ LLC (9) ☐ IRA/Keogh/SEP (10) ☐ Exempt Organization

C Is this partner a foreign partner? ☐ Yes ☑ No

D Enter partner's percentage (without regard to special allocations) of: (i) Before decrease or termination (ii) End of year
Profit sharing ____% ____%
Loss sharing ____% ____%
Ownership of capital ____% ____%

E Partner's share of liabilities:
Nonrecourse $ ____
Qualified nonrecourse financing $ ____
Other $ ____

F Tax shelter registration number ____

G (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) ☐
(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ☐

H Check here if this is: (1) ☐ A final Schedule K-1 (565) (2) ☐ An amended Schedule K-1 (565)

I Is this partner a nonresident of California? ☑ Yes ☐ No

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of line 3, line 4, and line 7, Form 565, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| 25,728 | 210,600 | 651,466 | ( 442,563 ) | 445,231 |

Caution: Refer to Partner's Instructions for Schedule K-1 (565) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 234,225.00 | 7,668.00 | 241,893 | 40,130 |
| | 2 Net income (loss) from rental real estate activities | | | | |
| | 3 Net income (loss) from other rental activities | | | | |
| | 4 Portfolio income (loss): a Interest | 26.00 | | 26 | 4 |
| | b Dividends | | | | |
| | c Royalties | | | | |
| | d Net capital gain (loss) | | | | |
| | e Other portfolio income (loss). Attach schedule | | | | |
| | 5 Guaranteed payments to partners | 12,335.00 | | 12,335 | 2,046 |
| | 6 Net gain (loss) under IRC Section 1231 (other than due to casualty or theft) | | | | |
| | 7 Other income (loss). Attach schedule | | | | |
| Deductions | 8 Charitable contributions | 168.00 | | 168 | 28 |
| | 9 Expense deduction for recovery property (R&TC Sections 17267.2, 17267.6, 17268, and IRC Section 179). Attach schedule | | | | |
| | 10 Deductions related to portfolio income. Attach schedule | | | | |
| | 11 Other deductions. Attach schedule | 16,762.00 | | 16,762 | 2,781 |

K156502104130

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Investment Interest | 12 a Interest expense on investment debts ... | | | | |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4e ........... | 26.00 | | 26 | 4 |
| | (2) Investment expenses included on line 10 | | | | |
| Credits | 13 a (1) Withholding on partnership allocated to all partners .................. | | | | |
| | (2) Partnership withholding on nonresident partners ............. | | | | |
| | (3) Total withholding (equals amount on Form 592-B if calendar year partnership) .................... | | | | |
| | b Low-income housing credit ........... | | | | |
| | c Credits other than line 13b related to rental real estate activities. Attach schedule ... | | | | |
| | d Credits related to other rental activities. See instructions. Attach schedule ...... | | | | |
| | e Nonconsenting nonresident member's tax | | | | |
| | 14 Other credits. Attach required schedules or statements ........................ | | | | |
| Adjustments and Tax Preference Items | 15 a Depreciation adjustment on property placed in service after 1986 .......... | (6,168.00) | 55.00 | (6,113) | (1,014) |
| | b Adjusted gain or loss ............... | | | | |
| | c Depletion (other than oil and gas) ...... | | | | |
| | d (1) Gross income from oil, gas, and geothermal properties ............ | | | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties ............ | | | | |
| | e Other adjustments and tax preference items. Attach schedule ............... | | | | |
| Other | 16 a Total expenditures to which an IRC Section 59(e) election may apply ... | | | | |
| | b Type of expenditures | | | | |
| | 17 Tax-exempt interest income ............. | | | | |
| | 18 Other tax-exempt income .............. | | | | |
| | 19 Nondeductible expenses ............... | 11,671.00 | | 11,671 | 1,936 |
| | 20 Distributions of money (cash and marketable securities) ................. | 442,563.00 | | 442,563 | |
| | 21 Distributions of property other than money | | | | |

22 Supplemental information required to be reported separately to each partner. Attach additional schedules. See instructions. $ 3,768,235.00

**Table 1** — Partner's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the partner):

Interest $ ____ Sec. 1231 Gains/Losses $ ____ Capital Gains/Losses $ ____
Dividends $ ____ Royalties $ ____ Other $ ____

FOR USE BY APPORTIONING UNITARY PARTNERS ONLY – See instructions.

**Table 2** — Partner's share of distributive items.

A. Partner's share of the partnership's business income. See instructions. $____

B. Partner's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

Capital Gains/Losses $____ Rents/Royalties $____
Sec. 1231 Gains/Losses $____ Other $____

C. Partner's distributive share of the partnership's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property: Beginning | $ | $ |
| Ending | $ | $ |
| Annual Rent Expense | $ | $ |
| Payroll | $ | $ |
| Sales | $ | $ |

 K156502204130

Deloitte.

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K-1
FOR THE FISCAL YEAR ENDED MAY 31, 2003**

02/15/2004

**DELOITTE & TOUCHE LLP**

**PAUL, ALAN D.**

**EIN:** [redacted]
**PID: 204459**
**SSN: XXX-XX-2877**

| CA SCHEDULE K-1 | CHARITABLE CONTRIBUTIONS | LINE 8 |
|---|---|---|
| CHARITABLE CONTRIBUTIONS SUBJECT TO 50% LIMIT | | 168 |

| CA SCHEDULE K-1 | OTHER DEDUCTIONS | LINE 11 |
|---|---|---|
| PROFIT SHARING PLAN (KEOGH) | | 15,964 |
| 401(K) CONTRIBUTION | | 798 |
| TOTAL OTHER DEDUCTIONS | | 16,762 |

| CA SCHEDULE K-1 | AGGREGATE GROSS RECEIPTS FOR AMT EXCLUSION | LINE 22 |
|---|---|---|
| GROSS RECEIPTS | | 3,768,235 |

YEAR 2002

# Partner's Share of Income, Deductions, Credits, etc.

CALIFORNIA SCHEDULE **K-1 (565)**

For calendar year 2002 or fiscal year beginning month June day 2 year 2002, and ending month May day 31 year 2003

**Partner's identifying number** [redacted]

Partner's name, address, state, and ZIP Code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

**Partnership's FEIN** [redacted]

**Secretary of State file number**

Partnership's name, address, state, and ZIP Code
DELOITTE & TOUCHE USA LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

A Is this partner a: (1) ☑ general partner; or (2) ☐ limited partner?

B What type of entity is this partner?
(1) ☑ Individual (2) ☐ S Corporation (3) ☐ Estate/Trust (4) ☐ C Corporation (5) ☐ General Partnership (6) ☐ Limited Partnership (7) ☐ LLP (8) ☐ LLC (9) ☐ IRA/Keogh/SEP (10) ☐ Exempt Organization

C Is this partner a foreign partner? ☐ Yes ☑ No

D Enter partner's percentage (without regard to special allocations) of: (i) Before decrease or termination (ii) End of year
Profit sharing ______% ______%
Loss sharing ______% ______%
Ownership of capital ______% ______%

E Partner's share of liabilities:
Nonrecourse $ ______
Qualified nonrecourse financing $ ______
Other $ ______

F Tax shelter registration number ______

G (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) ☐
(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ☐

H Check here if this is: (1) ☐ A final Schedule K-1 (565) (2) ☐ An amended Schedule K-1 (565)

I Is this partner a nonresident of California? ☑ Yes ☐ No

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of line 3, line 4, and line 7, Form 565, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| 5,911 | 491,400 | 105,547 | ( 106,341 ) | 496,517 |

**Caution:** Refer to Partner's Instructions for Schedule K-1 (565) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 352,701.00 | (9.00) | 352,692 | 58,512 |
| | 2 Net income (loss) from rental real estate activities | | | | |
| | 3 Net income (loss) from other rental activities | | | | |
| | 4 Portfolio income (loss): | | | | |
| | a Interest | 3,197.00 | | 3,197 | 530 |
| | b Dividends | | | | |
| | c Royalties | | | | |
| | d Net capital gain (loss) | 2,117.00 | | 2,117 | 351 |
| | e Other portfolio income (loss). Attach schedule | | | | |
| | 5 Guaranteed payments to partners | 18,530.00 | | 18,530 | 3,074 |
| | 6 Net gain (loss) under IRC Section 1231 (other than due to casualty or theft) | | | | |
| | 7 Other income (loss). Attach schedule | | | | |
| Deductions | 8 Charitable contributions | 830.00 | | 830 | 138 |
| | 9 Expense deduction for recovery property (R&TC Sections 17267.2, 17267.6, 17268, and IRC Section 179). Attach schedule | | | | |
| | 10 Deductions related to portfolio income. Attach schedule | | | | |
| | 11 Other deductions. Attach schedule | 25,238.00 | | 25,238 | 4,187 |

K156502104130

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Investment Interest | 12 a Interest expense on investment debts | | | | |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4e | 3,197.00 | | 3,197 | 530 |
| | (2) Investment expenses included on line 10 | | | | |
| Credits | 13 a (1) Withholding on partnership allocated to all partners | | | | |
| | (2) Partnership withholding on nonresident partners | | | | |
| | (3) Total withholding (equals amount on Form 592-B if calendar year partnership) | | | | |
| | b Low-income housing credit | | | | |
| | c Credits other than line 13b related to rental real estate activities. Attach schedule | | | | |
| | d Credits related to other rental activities. See instructions. Attach schedule | | | | |
| | e Nonconsenting nonresident member's tax | | | | |
| | 14 Other credits. Attach required schedules or statements | | | | |
| Adjustments and Tax Preference Items | 15 a Depreciation adjustment on property placed in service after 1986 | (358.00) | 9.00 | (349) | (58) |
| | b Adjusted gain or loss | | | | |
| | c Depletion (other than oil and gas) | | | | |
| | d (1) Gross income from oil, gas, and geothermal properties | | | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | | | | |
| | e Other adjustments and tax preference items. Attach schedule | | | | |
| Other | 16 a Total expenditures to which an IRC Section 59(e) election may apply | | | | |
| | b Type of expenditures_____ | | | | |
| | 17 Tax-exempt interest income | | | | |
| | 18 Other tax-exempt income | | | | |
| | 19 Nondeductible expenses | 4,304.00 | | 4,304 | 714 |
| | 20 Distributions of money (cash and marketable securities) | 106,341.00 | | 106,341 | |
| | 21 Distributions of property other than money | | | | |

22 Supplemental information required to be reported separately to each partner. Attach additional schedules. See instructions. $ 2,321.00

**Table 1** — Partner's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the partner):

Interest $ _____ Sec. 1231 Gains/Losses $ _____ Capital Gains/Losses $ _____
Dividends $ _____ Royalties $ _____ Other $ _____

FOR USE BY APPORTIONING UNITARY PARTNERS ONLY – See instructions.

**Table 2** — Partner's share of distributive items.

A. Partner's share of the partnership's business income. See instructions. $_____

B. Partner's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

Capital Gains/Losses $_____ Rents/Royalties $_____
Sec. 1231 Gains/Losses $_____ Other $_____

C. Partner's distributive share of the partnership's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property: Beginning | $ | $ |
| Ending | $ | $ |
| Annual Rent Expense | $ | $ |
| Payroll | $ | $ |
| Sales | $ | $ |

Deloitte.

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K-1 FOR THE FISCAL YEAR ENDED MAY 31, 2003**

02/15/2004

**DELOITTE & TOUCHE USA LLP**

**EIN:** [redacted]

**PID: 204459**

**PAUL, ALAN D.**

**SSN: XXX-XX-2877**

| CA SCHEDULE K-1 | CHARITABLE CONTRIBUTIONS | LINE 8 |
|---|---|---|
| CHARITABLE CONTRIBUTIONS SUBJECT TO 50% LIMIT | | 830 |

| CA SCHEDULE K-1 | OTHER DEDUCTIONS | LINE 11 |
|---|---|---|
| PROFIT SHARING PLAN (KEOGH) | | 24,036 |
| 401(K) CONTRIBUTION | | 1,202 |
| TOTAL OTHER DEDUCTIONS | | 25,238 |

| CA SCHEDULE K-1 | AGGREGATE GROSS RECEIPTS FOR AMT EXCLUSION | LINE 22 |
|---|---|---|
| GROSS RECEIPTS | | 2,321 |

Deloitte.

**STATE TAX BALANCE STATEMENT**
**FOR THE CALENDAR YEAR OF 2003**

02/15/2004

PAUL, ALAN D.
BOS

SSN: XXX-XX-2877
PID: 204459

| | | | | |
|---|---|---|---|---|
| BEGINNING BALANCE DUE TO PARTNER | | | $ | (1,289) |
| FINAL 2003 STATE TAX LIABILITY PER COMPOSITE RETURNS AS FILED ON YOUR BEHALF BY THE FIRM | | | | 17,772 |
| TOTAL DUE | | | | 16,483 |
| *ESTIMATED TAX PAYMENTS REFUNDED TO / (RECEIVED FROM) PARTNER* | | | | |
| 04/15/2003 | PERIODIC DISTRIBUTION | 1,289 | | |
| 09/15/2003 | FINAL UNIT EARNINGS | (13,383) | | |
| 12/15/2003 | FINAL UNIT EARNINGS | (683) | | |
| | | | | (12,777) |
| 12/31/03 BALANCE DUE FROM PARTNER | | | $ | 3,706 |
| **TOTAL STATE TAX DEDUCTIBLE ON 2003 FORM 1040** | | | $ | 12,777 |

**NOTE: ENDING BALANCE WILL BE DEDUCTED FROM THE APRIL DISTRIBUTION**

The above is combined information from both Deloitte & Touche LLP and Deloitte & Touche USA LLP

**DETAIL OF STATE TAX PAYMENTS AND WITHHOLDINGS**

Deloitte.

12/19/2003

ALAN D. PAUL
135 PINE STREET
MEDFIELD, MA 02052-0000

PID: 204459

| Nonresident State Taxes paid on your behalf (Composite Returns) | 2003 | 2004 |
|---|---|---|
| | 12,777 | 0 |

| Nonresident State Tax withholdings (States you have elected to file individual returns) | 2003 | 2004 |
|---|---|---|

Amounts paid in 2003 include withholding from distributions paid in April 2003, September 2003, and December 2003.

6511

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2003 or tax year beginning 06/01, 2003, and ending 05/29, 2004

OMB No. 1545-0099

**2003**

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code
DELOITTE & TOUCHE LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

**A** This partner is a ☒ general partner ☐ limited partner ☐ limited liability company member

**B** What type of entity is this partner? ▶ Individual

**C** Is this partner a ☒ domestic or a ☐ foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | Various % | Various % |
| Loss sharing | Various % | Various % |
| Ownership of capital | Various % | Various % |

**E** IRS Center where partnership filed return: Ogden, UT

**F** Partner's share of liabilities (see instructions):
Nonrecourse . . . $
Qualified nonrecourse financing . $
Other . . . $

**G** Tax shelter registration number . ▶

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . ☐

**I** Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 445,231 | | 311,168 | ( 638,504 ) | 117,895 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 269,060 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest income | 4a | | Form 1040, line 8a |
| | b | (1) Qualified dividends | 4b(1) | | Form 1040, line 9b |
| | | (2) Total ordinary dividends | 4b(2) | | Form 1040, line 9a |
| | c | Royalty income | 4c | | Sch. E, Part I, line 4 |
| | d | (1) Net short-term capital gain (loss) (post-May 5, 2003) | 4d(1) | | Sch. D, line 5, col. (g) |
| | | (2) Net short-term capital gain (loss) (entire year) | 4d(2) | | Sch. D, line 5, col. (f) |
| | e | (1) Net long-term capital gain (loss) (post-May 5, 2003) | 4e(1) | | Sch. D, line 12, col. (g) |
| | | (2) Net long-term capital gain (loss) (entire year) | 4e(2) | | Sch. D, line 12, col. (f) |
| | f | Other portfolio income (loss) *(attach schedule)* | 4f | | See pages 6 and 7 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 5 | Guaranteed payments to partner | 5 | 487,339 | |
| | 6a | Net section 1231 gain (loss) (post-May 5, 2003) | 6a | | |
| | b | Net section 1231 gain (loss) (entire year) | 6b | | |
| | 7 | Other income (loss) *(attach schedule)* | 7 | | |
| Deductions | 8 | Charitable contributions (see instructions) *(attach schedule)* | 8 | | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 | Other deductions *(attach schedule)* | 11 | | |
| Credits | 12a | Low-income housing credit: (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | | (2) Other than on line 12a(1) | 12a(2) | | |
| | b | Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d | Credits related to other rental activities | 12d | | |
| | 13 | Other credits | 13 | | |

6512

Schedule K-1 (Form 1065) 2003 Page 2

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Investment Interest | 14a | Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b | (1) Investment income included on lines 4a, 4b(2), 4c, and 4f | 14b(1) | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15a | Net earnings (loss) from self-employment | 15a | 756,399 | Sch. SE, Section A or B |
| | b | Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Gross nonfarm income | 15c | 756,399 | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | (284) | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b | Adjusted gain or loss | 16b | | |
| | c | Depletion (other than oil and gas) | 16c | | |
| | d | (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e | Other adjustments and tax preference items *(attach schedule)* | 16e | | |
| Foreign Taxes | 17a | Name of foreign country or U.S. possession ▶ | | | Form 1116, Part I |
| | b | Gross income from all sources | 17b | 3,282,731 | |
| | c | Gross income sourced at partner level | 17c | | |
| | d | Foreign gross income sourced at partnership level: | | | |
| | | (1) Passive | 17d(1) | | |
| | | (2) Listed categories *(attach schedule)* | 17d(2) | | |
| | | (3) General limitation | 17d(3) | | |
| | e | Deductions allocated and apportioned at partner level: | | | |
| | | (1) Interest expense | 17e(1) | | |
| | | (2) Other | 17e(2) | | |
| | f | Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | | (1) Passive | 17f(1) | | |
| | | (2) Listed categories *(attach schedule)* | 17f(2) | | |
| | | (3) General limitation | 17f(3) | | |
| | g | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17g | | Form 1116, Part II |
| | h | Reduction in taxes available for credit *(attach schedule)* | 17h | | Form 1116, line 12 |
| Other | 18 | Section 59(e)(2) expenditures: a Type ▶ | | | See page 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Amount | 18b | | |
| | 19 | Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 | Other tax-exempt income | 20 | | See page 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 | Nondeductible expenses | 21 | | |
| | 22 | Distributions of money (cash and marketable securities) | 22 | 638,504 | |
| | 23 | Distributions of property other than money | 23 | | |
| | 24 | Recapture of low-income housing credit: | | | |
| | a | From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b | Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner *(attach additional schedules if more space is needed)*:

Schedule K-1 (Form 1065) 2003

Deloitte.

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K1**
**FOR THE FISCAL YEAR ENDED MAY 29, 2004**

02/23/2005

DELOITTE & TOUCHE LLP
PAUL, ALAN D.

EIN: [redacted]
PID: 204459
SSN: XXX-XX-2877

| SCHEDULE K-1 | ORDINARY INCOME | LINE 1 |
|---|---|---|
| UNIT INCOME | | 269,060 |
| LESS MoRE CONTRIBUTIONS | | 0 |
| TOTAL UNIT INCOME | | 269,060 |

| SCHEDULE K-1 | GUARANTEED PAYMENTS | Line 5 |
|---|---|---|
| RETURN ON INVESTMENT | | 10,627 |
| INCOME TO FORMER PARTNERS | | 445,231 |
| SUPPLEMENTAL COMPENSATION | | 23,926 |
| INTEREST-UNDISTRIBUTED EARNINGS | | 2,994 |
| INTEREST-OTHER | | 61 |
| CI UB DUES | | 3,000 |
| . PREPARATION | | 1,500 |
| TOTAL GUARANTEED PAYMENTS | | 487,339 |

6511

**SCHEDULE K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2003 or tax year beginning 06/01, 2003, and ending 05/29, 2004

OMB No. 1545-0099

**2003**

Partner's identifying number ▶ [redacted]

Partnership's identifying number ▶ [redacted]

Partner's name, address, and ZIP code
PAUL, ALAN D.
135 PINE STREET
MEDFIELD, MA 02052-0000

Partnership's name, address, and ZIP code
DELOITTE & TOUCHE USA LLP
4022 SELLS DRIVE
HERMITAGE, TN 37076-0000

**A** This partner is a ☒ general partner ☐ limited partner ☐ limited liability company member

**B** What type of entity is this partner? ▶ Individual

**C** Is this partner a ☒ domestic or a ☐ foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | Various % | Various % |
| Loss sharing | Various % | Various % |
| Ownership of capital | Various % | Various % |

**E** IRS Center where partnership filed return: Ogden, UT

**F** Partner's share of liabilities (see instructions):
Nonrecourse $
Qualified nonrecourse financing $
Other $

**G** Tax shelter registration number ▶

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) ☐

**I** Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 496,517 | | 443,119 | ( 476,675 ) | 462,961 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 422,478 | See page 6 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest income | 4a | 810 | Form 1040, line 8a |
| | b | (1) Qualified dividends | 4b(1) | | Form 1040, line 9b |
| | | (2) Total ordinary dividends | 4b(2) | | Form 1040, line 9a |
| | c | Royalty income | 4c | | Sch. E, Part I, line 4 |
| | d | (1) Net short-term capital gain (loss) (post-May 5, 2003) | 4d(1) | (4) | Sch. D, line 5, col. (g) |
| | | (2) Net short-term capital gain (loss) (entire year) | 4d(2) | (4) | Sch. D, line 5, col. (f) |
| | e | (1) Net long-term capital gain (loss) (post-May 5, 2003) | 4e(1) | (38) | Sch. D, line 12, col. (g) |
| | | (2) Net long-term capital gain (loss) (entire year) | 4e(2) | (38) | Sch. D, line 12, col. (f) |
| | f | Other portfolio income (loss) *(attach schedule)* | 4f | | See pages 6 and 7 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 5 | Guaranteed payments to partner | 5 | (247,673) | |
| | 6a | Net section 1231 gain (loss) (post-May 5, 2003) | 6a | (1,561) | |
| | b | Net section 1231 gain (loss) (entire year) | 6b | (1,561) | |
| | 7 | Other income (loss) *(attach schedule)* | 7 | | |
| Deductions | 8 | Charitable contributions (see instructions) *(attach schedule)* | 8 | 522 | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See page 8 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income *(attach schedule)* | 10 | | |
| | 11 | Other deductions *(attach schedule)* | 11 | | |
| Credits | 12a | Low-income housing credit: (1) From section 42(j)(5) partnerships | 12a(1) | | Form 8586, line 5 |
| | | (2) Other than on line 12a(1) | 12a(2) | | |
| | b | Qualified rehabilitation expenditures related to rental real estate activities | 12b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | | |
| | d | Credits related to other rental activities | 12d | | |
| | 13 | Other credits | 13 | | |

6512

| Section | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Investment Interest | 14a Interest expense on investment debts | 14a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b(2), 4c, and 4f | 14b(1) | 810 | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | (2) Investment expenses included on line 10 | 14b(2) | | |
| Self-employment | 15a Net earnings (loss) from self-employment | 15a | 174,805 | Sch. SE, Section A or B |
| | b Gross farming or fishing income | 15b | | See page 9 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income | 15c | 174,805 | |
| Adjustments and Tax Preference Items | 16a Depreciation adjustment on property placed in service after 1986 | 16a | (6,288) | See pages 9 and 10 of Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss | 16b | | |
| | c Depletion (other than oil and gas) | 16c | | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | | |
| | e Other adjustments and tax preference items *(attach schedule)* | 16e | | |
| Foreign Taxes | 17a Name of foreign country or U.S. possession ▶ | | | Form 1116, Part I |
| | b Gross income from all sources | 17b | 76,096 | |
| | c Gross income sourced at partner level | 17c | | |
| | d Foreign gross income sourced at partnership level: | | | |
| | (1) Passive | 17d(1) | | |
| | (2) Listed categories *(attach schedule)* | 17d(2) | | |
| | (3) General limitation | 17d(3) | 76,096 | |
| | e Deductions allocated and apportioned at partner level: | | | |
| | (1) Interest expense | 17e(1) | | |
| | (2) Other | 17e(2) | | |
| | f Deductions allocated and apportioned at partnership level to foreign source income: | | | |
| | (1) Passive | 17f(1) | | |
| | (2) Listed categories *(attach schedule)* | 17f(2) | | |
| | (3) General limitation | 17f(3) | 47,699 | |
| | g Total foreign taxes (check one): ▶ ☒ Paid ☐ Accrued | 17g | 2,624 | Form 1116, Part II |
| | h Reduction in taxes available for credit *(attach schedule)* | 17h | | Form 1116, line 12 |
| Other | 18 Section 59(e)(2) expenditures: a Type ▶ | | | See page 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Amount | 18b | | |
| | 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 Other tax-exempt income | 20 | | See page 10 of Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses | 21 | 19,104 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | 476,675 | |
| | 23 Distributions of property other than money | 23 | | |
| | 24 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 24a | | Form 8611, line 8 |
| | b Other than on line 24a | 24b | | |

**Supplemental Information**

25 Supplemental information required to be reported separately to each partner *(attach additional schedules if more space is needed):*

Deloitte.

**DETAILS OF THE AMOUNTS REPORTED ON THE SCHEDULE K1**
**FOR THE FISCAL YEAR ENDED MAY 29, 2004**

02/23/2005

DELOITTE & TOUCHE USA LLP

PAUL, ALAN D.

EIN: [redacted]

PID: 204459

SSN: XXX-XX-2877

| SCHEDULE K-1 | ORDINARY INCOME | LINE 1 |
|---|---|---|
| UNIT INCOME | | 422,478 |
| LESS MoRE CONTRIBUTIONS | | 0 |
| TOTAL UNIT INCOME | | 422,478 |

| SCHEDULE K-1 | GUARANTEED PAYMENTS | Line 5 |
|---|---|---|
| RETURN ON INVESTMENT | | 24,487 |
| INCOME TO FORMER PARTNERS | | -272,252 |
| INTEREST-CAPITAL | | 92 |
| TOTAL GUARANTEED PAYMENTS | | -247,673 |

| SCHEDULE K-1 | CHARITABLE CONTRIBUTIONS | LINE 8 |
|---|---|---|
| CHARITABLE CONTRIBUTIONS SUBJECT TO 50% LIMIT | (Enter on Schedule A) | 522 |

| SCHEDULE K-1 | NONDEDUCTIBLE EXPENSES | Line 21 |
|---|---|---|
| NONDED MEALS/ENTERTAINMENT | | 20,099 |
| NONDED EXPENSES-OTHER | | -995 |
| TOTAL NONDEDUCTIBLE EXPENSES | | 19,104 |

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU"), dated April 2, 2002, by and between Deloitte & Touche USA LLP ("D&T USA") and Arthur Andersen LLP ("Arthur Andersen") sets forth the mutual understanding of the parties with respect to, if such parties determine in their sole discretion to proceed with a transaction, the possible offer by D&T USA to certain partners and other employees of Arthur Andersen's U.S. tax practice of either the opportunity to become a partner or principal of D&T USA and Deloitte & Touche LLP ("ATR") or the opportunity to be employed by ATR, and certain possible business arrangements related thereto (collectively, the "Proposed Transaction").

1. Proposed Transaction/Definitive Agreements. D&T USA and Arthur Andersen shall use their commercially reasonable efforts to negotiate as expeditiously as practicable the terms of the Proposed Transaction based upon the principles set forth on Exhibit A hereto. If D&T USA and Arthur Andersen are able to negotiate mutually acceptable terms of a Proposed Transaction and each determines in its sole discretion to proceed with such a Proposed Transaction, such terms shall be reflected in definitive agreements between D&T USA or its affiliates, on the one hand, and Arthur Andersen, its partners, its other personnel or its affiliates, on the other hand, which agreements shall contain such covenants and such other terms and conditions as are mutually acceptable to the parties thereto.

2. Due Diligence. Arthur Andersen shall afford D&T USA and its Representatives (as defined below) reasonable access to all books, records, personnel, facilities and information of Arthur Andersen and its member firms relating to the personnel of the Restricted Practice (as defined below), accounts receivable, billing procedures and other financial information related to the Restricted Practice and other matters related to the Restricted Practice in order to negotiate the matters set forth on Exhibit A. As used in this MOU, the term "Representative" means, as to any Person, such Person's affiliates and its and their directors, officers, shareholders, member firms, members, partners, principals, employees, agents, advisors (including, without limitation, financial advisors, counsel and accountants) and controlling Persons and any of such Persons' Representatives. As used in this MOU, the term "Person" shall mean an individual, corporation, association, trust, limited liability company, limited partnership, limited liability partnership, partnership, unincorporated organization or other entity.

3. Exclusivity. (a) Subject to paragraph 3(b), Arthur Andersen agrees that from the date hereof until midnight on April 14, 2002 (the "Exclusivity Period"), that the Administrator of Arthur Andersen, the members of the Administrative Board of Arthur Andersen and the persons listed on Exhibit B hereto (the "Restricted Persons") shall not directly, and shall not instruct any other Person to, (i) pursue, solicit, encourage, initiate, or otherwise facilitate (including by way of furnishing information) any inquiries, proposals or offers from any Person (other than D&T USA and its Representatives) relating to any direct or indirect (A) business arrangement or venture with respect to that portion of Arthur Andersen's U.S. tax practice carried on in the offices set forth on Schedule A of Exhibit A (the "Restricted Practice"), (B) hiring of any Arthur Andersen partners engaged in the Restricted Practice, or (C) other transaction which is conditioned

upon the termination of the discussions and negotiations herein contemplated or could reasonably be expected to frustrate the transactions contemplated hereby (any such inquiry, proposal or offer other than that made by D&T USA or its Representatives being referred to as an "Alternative Transaction"), or (ii) engage in negotiations or discussions concerning, or provide any information to any Person relating to or which could reasonably be expected to lead to, or enter into any agreement relating to, an Alternative Transaction, provided, however, that (i) Arthur Andersen and its Representatives may engage in the foregoing restricted activities solely with respect to an Alternative Transaction (A) between Arthur Andersen, on the one hand, and one or more Permitted Persons, on the other hand, (B) involving solely offices not listed on Schedule A, Arthur Andersen's Valuation Services Group or the non-tax portion of Arthur Andersen's Human Capital Services Group, or (C) involving a management buyout by the partners and principals of the Restricted Practice (each such transaction being a "Permitted Alternative Transaction"), and (ii) the foregoing restrictions shall not limit any partner, principal or employee of Arthur Andersen from (A) discussing with any Person (a "Third Party Employer") the possibility of employment of such Person (and only such Person) by such Third Party Employer or (B) accepting employment with such Third Party Employer. A "Permitted Person" shall mean any Person other than one of the other "big five" accounting firms or their Representatives.

(b) Notwithstanding anything to the contrary herein, D&T USA agrees and understands that (i) one or more Restricted Persons have been and will be pursuing, initiating and otherwise facilitating inquiries, proposals and offers from Persons relating to multiple potential sales of assets other than the Restricted Practice; (ii) the sales described in the preceding clause (i) may involve clients of the Restricted Practice (because, among other things, clients of the Arthur Andersen's tax practice may also be clients of its attest or other practices) and that the applicable purchasers will acquire knowledge of the tax ideas and other work product of the Restricted Practice; and (iii) Arthur Andersen's partners, principals and/or employees and other Persons (not including the Restricted Persons) have engaged, and after the date hereof, may independently (without instruction by the Restricted Persons) continue to engage in activities that might be considered to violate the terms of paragraph 3(a).

4. Efforts to Maintain. During the term of this MOU Arthur Andersen shall use its commercially reasonable efforts to, and shall cause its member firms to use their commercially reasonable efforts to, (i) maintain the client relationships of the Restricted Practice, and (ii) cause the partners and other employees of Arthur Andersen who are engaged in the Restricted Practice to refrain from leaving Arthur Andersen and its member firms, in each case subject to paragraph 3(b).

5. Publicity. None of Arthur Andersen or its Representatives, on the one hand, or D&T USA or its Representatives, on the other hand, will, without the prior written consent of the other party, make any public announcement or statement regarding, the fact that this MOU has been entered into or the matters contemplated by this MOU.

6. Fees, Costs and Expenses. Each of D&T USA, Arthur Andersen and their respective member firms shall pay their own fees, costs and expenses incurred in connection with this MOU and the transactions contemplated hereby

7. Non-Binding Nature. D&T USA and Arthur Andersen understand and agree that this MOU merely constitutes a statement of D&T USA's and Arthur Andersen's mutual intentions, does not reflect all matters upon which agreement must be reached in order for the Proposed Transaction to be consummated, and does not obligate D&T USA or Arthur Andersen or any of their respective affiliates to execute or consummate any definitive agreement concerning the Proposed Transaction if either party determines, in its sole discretion, not to do so for any reason. This MOU is not intended to be and is not binding upon the parties hereto, other than paragraphs 2 through 14. A binding commitment with respect to the Proposed Transaction or any related transaction will result only from the execution of one or more definitive agreements with respect thereto, subject to any conditions expressed therein, and such commitment will be binding solely with respect to such matters expressly set forth in such definitive agreement. For purposes of clarity, D&T USA or Arthur Andersen may, at any time and for any reason (as either determines in its sole discretion), determine not to (i) pursue the transactions contemplated herein or (ii) enter into definitive agreements with respect to the matters contemplated herein. For D&T USA, such reasons may include, without limitation, the non-exclusive reasons set forth in paragraph 16 of Exhibit A. Each of the parties hereto are sophisticated parties represented by counsel and intend that the understanding between them be only as specifically described herein. Neither the discussions or negotiations between the parties hereto nor this MOU is intended to, and they do not, create any fiduciary or other special duties or other obligations between the parties hereto in any respect, including any implied covenant of good faith or fair dealing.

8. Termination. This MOU shall terminate upon the earliest to occur of (i) the mutual agreement of D&T USA and Arthur Andersen, (ii) the execution of definitive agreements concerning the Proposed Transaction, (iii) written notice by D&T USA to Arthur Andersen that D&T USA is no longer interested in proceeding with the Proposed Transaction and (iv) the written notice by Arthur Andersen to D&T USA following the Exclusivity Period that Arthur Andersen is no longer interested in proceeding with the Proposed Transaction. In addition, D&T USA may terminate this MOU by written notice to Arthur Andersen in the event of a breach of paragraph 3. If this MOU terminates other than pursuant to clause (ii) above then the provisions of paragraphs 5, 6, 7, 8, 10(b), 11, 12, 13 and 14 shall survive such termination and continue in full force and effect.

9. Antitrust Filing. If a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (collectively, the "HSR Act") is required in connection with the Proposed Transaction, promptly following execution of this MOU, the parties shall make a confidential filing under the HSR Act. In order to enable the parties to promptly consummate the Proposed Transaction if definitive agreements are entered into, the parties will use their commercially reasonable efforts to obtain early termination of the waiting period under the HSR Act.

Confidential

10. Certain Actions; Other Transactions. (a) In furtherance of the Proposed Transaction, Arthur Andersen shall use all commercially reasonable efforts to facilitate D&T USA's making of offers to Arthur Andersen's U.S. tax partners and other U.S. tax personnel and will work with D&T USA towards ensuring adequate access to such persons. Arthur Andersen hereby grants permission for D&T USA and its Representatives to immediately begin negotiations with and enter into agreements and other arrangements with Arthur Andersen's U.S. tax partners and other U.S. tax personnel in connection with the Proposed Transaction.

(b) Nothing set forth herein shall in any manner limit or otherwise affect the ability of D&T USA or its affiliates or any of their respective partners, principals or employees to enter into discussions or negotiations with, or enter into any transaction with, (i) any current or former client of Arthur Andersen or its affiliates or their respective partners or principals, or (ii) any current or former partner, principal or employee of Arthur Andersen or its affiliates.

(c) Notwithstanding the foregoing Section 10(b), from the date hereof until expiration of the Exclusivity Period, D&T USA will not, except in connection with the Proposed Transaction, enter into or agree upon an admit agreement with, or offer employment to, any partner, principal or employee of Arthur Andersen in the Restricted Practice.

11. Notices. All notices given or made pursuant to this MOU shall be in writing and shall be deemed to have been duly given or made if delivered personally (on the date of delivery), sent by overnight courier (on the date of delivery) or sent by facsimile with evidence of confirmation of receipt (on the date the facsimile is sent), in either case to the parties at the following addresses:

If to D&T USA:

Deloitte & Touche USA LLP
1633 Broadway
New York, NY 10019
Facsimile: (212) 492-4288
Attention: Philip R. Rotner, Esq.

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Facsimile: (212) 735-2000
Attention: Eileen T. Nugent, Esq.

If to Arthur Andersen:

Arthur Andersen LLP
33 West Monroe
Chicago, Illinois 60603
Facsimile: (312) 462-3711
Attention: Administrator

with a copy to:

Mayer, Brown, Rowe & Maw
190 South La Salle Street
Chicago, Illinois 60603
Facsimile: (312) 701-7711
Attention: John Noell, Esq.

12. Governing Law. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York excluding any conflicts of law rule or principle that might otherwise refer construction or interpretation of this MOU to the substantive law of another jurisdiction. D&T USA and Arthur Andersen irrevocably consent to personal jurisdiction in that State and voluntarily submit to the jurisdiction of the courts of that State in any action or proceeding with respect to this MOU, including the federal district courts located in that State.

13. Entire Agreement. This MOU and the Confidentiality Agreement, dated as of April 2, 2002, constitute the entire agreement with respect to the subject matter hereof and thereof and shall supercede all prior agreements and understandings, both written and oral, between the parties and their respective member firms and other affiliates with respect to the subject matter hereof and thereof.

14. Counterparts. This MOU may be executed by facsimile and in counterparts, all of which for purposes shall be deemed to be an original and all of which shall, taken together, constitute the same instrument.

* * *

MAY-10-2007 08:16 D&T USA LLP NO LEGAL 212 653 3475 P.07/17

IN WITNESS WHEREOF, the parties have caused this MOU to be execute as of the date first above written.

DELOITTE & TOUCHE USA LLP

By:____________________
Name:
Title:

ARTHUR ANDERSEN LLP

By:____________________
Name:
Title:

6

610894.11-New York Server 7A - MSW

D00066

Confidential

A63

MAY-10-2007 08:16 D&T USA LLP NO LEGAL 212 653 3475 P.08/17

**Exhibit A – Guiding Principles Term Sheet**

Attached

7

610894.11-New York Server 7A - MSW

D00067

Confidential

A64

MAY-10-2007  08:16      D&T USA LLP NO LEGAL            212  653 3475   P.09/17

**Schedule A**

Boston, MA
New York Metropolitan Area
New Jersey
Philadelphia, PA
Washington, DC
Richmond, VA
Atlanta, GA
Miami, FL
Chicago, IL
Milwaukee, WI
Minneapolis, MN
St. Louis, MO
Kansas City, MO
Dallas, TX
Denver, CO
Los Angeles, CA
Orange County, CA
San Diego, CA
San Francisco, CA
San Jose, CA

613239.05-New York Server 7A - MSW          8

D00068

Confidential

A65

**EXHIBIT A**

**GUIDING PRINCIPLES TERM SHEET**

This Term Sheet sets forth the guiding principles established by Deloitte & Touche USA LLP ("D&T USA") and Arthur Andersen LLP ("Arthur Andersen") with respect to, if such parties determine in their sole discretion to proceed with a transaction, the possible offer by D&T USA to certain partners and other employees of Arthur Andersen's U.S. tax practice of either the opportunity to become a Partner or Principal (either, a "Member") of D&T USA and Deloitte & Touche LLP ("ATR") or the opportunity to be employed by ATR, and certain possible business arrangements related thereto.

Potential Hiring of Arthur Andersen Tax Professionals

1. D&T USA will offer Membership positions with D&T USA and ATR to up to 300 selected Arthur Andersen partners currently engaged in its U.S. tax practice ("Selected Tax Members"). The Selected Tax Members shall come from a group of Arthur Andersen partners currently engaged in its U.S. tax practice identified by D&T USA and shall come primarily from those offices of Arthur Andersen set forth on Schedule A. Arthur Andersen shall use all commercially reasonable efforts to facilitate D&T USA's making of the offer to such Selected Tax Members and will work with D&T USA towards ensuring adequate access to such persons. Any Selected Tax Members who accept D&T USA's offer shall have been released from any notice requirements to leave Arthur Andersen and any non-competition or other restrictive covenants under which they may be bound by Arthur Andersen or its affiliates.

2. D&T USA will offer employment, on behalf of ATR, to up to 3,000 Arthur Andersen client service professionals in its U.S. tax practice (the "Selected Professionals"). The Selected Professionals shall come from a group of Arthur Andersen client service professionals in its U.S. tax practice identified by D&T USA with the assistance of the Selected Tax Members. Arthur Andersen shall use all commercially reasonable efforts to facilitate D&T USA's making of the offer to such Selected Professionals and will work with D&T USA towards ensuring access to such persons. Any Selected Professionals who accept D&T USA's offer shall have been released from any notice requirements to leave Arthur Andersen and any non-competition or other restrictive covenants under which they may be bound by Arthur Andersen or its affiliates.

   To the extent D&T USA determines, in its sole discretion, that in connection with the hiring of Selected Tax Members and Selected Professionals it requires the services of additional administrative personnel, D&T USA will

Confidential

consider hiring current Arthur Andersen personnel to fill such positions subject to their meeting D&T USA's hiring qualifications for such positions.

3. The Selected Tax Members and the Selected Professionals may include personnel engaged in tax, ERISA or compensation and benefits consulting practices within Arthur Andersen's Human Capital group, but will not include any personnel working in Arthur Andersen's Valuation group.

4. Each Selected Tax Member who becomes a Member of D&T USA will be assigned a number of D&T USA Membership units equal to (i) such Selected Tax Member's Unit Factor, divided by (ii) $1,050, rounded to the nearest unit level which is a multiple of 10 (the "Initial Membership Units"). Initial compensation for such Selected Tax Members shall be based on such Selected Tax Member's Initial Membership Units. Each Selected Tax Member's number of D&T USA Membership units shall be adjusted thereafter in accordance with D&T USA's Member compensation program.

For purposes of this Term Sheet the following terms shall have the following meanings:

"2001 Base Compensation" shall mean, with respect to a Selected Tax Member, the compensation that such Selected Tax Member received from Arthur Andersen in its fiscal year 2001 (ending August 31, 2001), less (i) an amount equal to any payments received by such Selected Tax Member in connection with the separation of Accenture and (ii) any amount in respect of return on such Selected Tax Member's capital.

"Unit Factor" shall mean, with respect to a Selected Tax Member, such Selected Tax Member's 2001 Base Compensation less an amount equal to the lesser of (i) $50,000 and (ii) 5% of such Selected Tax Member's 2001 Base Compensation. The foregoing formula reflects an adjustment that is designed to reflect the pension arrangements that will be made available to such Member in D&T USA.

Notwithstanding the foregoing on a case-by-case basis D&T USA will consider making appropriate adjustments to the Initial Membership Units of any individual Selected Tax Member to take into account exceptional increases or decreases in (i) the number of partnership units assigned by Arthur Andersen with respect to its fiscal year 2002 to such Selected Tax Member or (ii) the annual base compensation that such Selected Tax Member is receiving from Arthur Andersen in its fiscal year 2002 as of the date of this Term Sheet; provided, however, that the aggregate Initial Membership Units assigned to all Selected Tax Members will not exceed the aggregate which would result from the application of the foregoing formula.

Confidential

5. As a condition to becoming a Member of D&T USA and ATR, each Selected Tax Member who accepts D&T USA's offer will be required to enter into an Admit Agreement (based upon the current form of D&T USA Admit Agreement) that, among other things, will include (i) representations and warranties with respect to certain matters, including representations and warranties with respect to such Selected Tax Member's solvency, professional licensing and business and other activities for the prior five year period and (ii) conditions to admission, including independence with respect to attest clients (restricted entities of D&T USA).

6. As a condition to becoming a Member of D&T USA and ATR, each Selected Tax Member will be required to make a capital contribution to D&T USA equal to the product of (i) such Selected Tax Member's Initial Membership Units and (ii) $950 (such amount being the "Capital Obligation"). D&T USA expects to arrange financing for each Selected Tax Member who joins D&T USA to fund 90% of his or her required Capital Obligation. Except as provided below, each such Selected Tax Member who joins D&T USA must pay the remaining 10% of such Capital Obligation in cash to D&T USA upon admission. At the sole discretion of D&T USA, certain Selected Tax Members may be permitted to obtain capital financing to fund 100% of his or her Capital Obligation. Such exceptions may be made, for example, for junior-level Selected Tax Members or Selected Tax Members encountering extraordinary circumstances.

7. D&T USA, in its sole discretion, may provide financing to certain Selected Tax Members who are obligated to Arthur Andersen under certain notes to repay amounts with respect to such Selected Tax Member's required capital contribution to Arthur Andersen.

8. Each Selected Professional will be offered employment with ATR at compensation amounts equal to their current compensation amounts with Arthur Andersen, excluding any amounts received by such Selected Professionals as bonuses (except for the bonuses payable to 60 persons not to exceed $300,000 in the aggregate which Arthur Andersen is contractually obligated to pay as of the date of this Term Sheet). Selected Professionals who become employees of ATR will be considered as new employees with respect to their eligibility to receive pensions and other employee benefits.

9. Any Selected Tax Members or other Selected Professionals who join D&T USA shall be excluded from voting on or participating in any proceeds from the separation of D&T USA's consulting business. There may be additional matters upon which Selected Tax Members will be excluded from voting on, which exclusions, if any, will be reflected in one or more definitive agreements.

Confidential

10. For a period of two years after the closing date, any Selected Tax Members who join D&T USA and ATR as Members may be removed as Members of D&T USA and ATR upon a majority vote of a committee comprised of (i) three Selected Tax Members who joined D&T USA as Members, and (ii) three tax Members of D&T USA that are not Selected Tax Members. The committee will report to the head of D&T USA's U.S. tax practice who will cast the deciding vote on issues which the committee is unable to resolve. If such committee votes to remove such Selected Tax Member, then D&T USA will give such Member one month notice of such removal and four months of Member compensation continuance, such Member compensation continuance to be based on D&T USA's Member compensation continuance policy approved by D&T USA's board of directors during the fiscal year in which such Selected Tax Member is removed. If a Selected Tax Member is so removed, such Selected Tax Member shall be released from his or her non-compete obligations to D&T USA and ATR.

11. Upon becoming Members of D&T USA and ATR, Selected Tax Members will be eligible to receive as retirement benefits the "D&T Benefit" pursuant to the Memorandum of Agreement (the "MOA") of D&T USA. The years of service vesting requirement under the MOA will be modified or waived by D&T USA with respect to Selected Tax Members over the age of 50 years at closing.

<u>Accounts Receivable</u>

12. In exchange for the transfer to D&T USA of the billed and unbilled accounts receivable as of the closing date ("A/R") as to which the Selected Tax Members who become Members of D&T USA and ATR are the "billing" partner of Arthur Andersen, D&T USA will pay Arthur Andersen the following amounts:

    (i) With respect to such A/R that have been billed to the appropriate client of Arthur Andersen as of the closing date, D&T USA will pay (A) 70% of A/R that have been outstanding for less than 60 days, (B) 50% of A/R that have been outstanding for at least 60 days, but less than 90 days, and (C) 20% of A/R that have been outstanding for 90 or more days.

    (ii) With respect to such A/R that have not been billed to the appropriate client of Arthur Andersen as of the closing date, D&T USA will pay 40% of such A/R.

    (iii) To the extent D&T USA collects during the one year period after the closing an aggregate amount with respect to billed

A/R referred to in (i) in excess of the total amount paid by D&T USA for such billed A/R, Arthur Andersen and D&T USA will share such excess on a 50/50 basis and D&T USA will provide Arthur Andersen a monthly statement on collection realizations during such one year period.

Furthermore, Selected Tax Members who become Members of D&T USA shall be provided access to Arthur Andersen's billing system with respect to Arthur Andersen's tax-related business for a transition period to enable such Selected Tax Members to bill the appropriate client with respect to unbilled A/R. All clients to which A/R relate (whether billed or unbilled) will be instructed by Arthur Andersen to pay such amounts directly to D&T USA. Arthur Andersen agrees that any funds received by it in respect of such A/R (both billed and unbilled) are the property of D&T USA and will be held in trust for D&T USA and turned over promptly to D&T USA.

Real Estate

13. D&T USA and Arthur Andersen will use their respective commercially reasonable efforts to arrange the sublease of all or a portion of the property, as is required by D&T USA and determined in D&T USA's sole discretion, currently leased or owned by Arthur Andersen that is used as of the closing date by the Selected Tax Members and Selected Professionals who agree to join D&T USA and/or ATR. The maximum term of any such sublease shall be two years. Such commercially reasonable efforts shall include the obtaining of any required consents of lessors of such properties, provided, however, that D&T USA shall not be obligated to expend any funds in connection therewith. For purposes of clarity, D&T USA will not be required to assume any leases or sublease any property unless otherwise agreed to in definitive agreements.

Release and Other Assets

14. D&T USA will pay Arthur Andersen $25 million in exchange for (i) the release of any Selected Tax Members and Selected Professionals who join D&T USA and/or ATR from any notice requirements to leave Arthur Andersen and any non-competition or other restrictive covenants under which they may be bound by Arthur Andersen or its affiliates, (ii) the transfer to D&T USA of certain assets to be agreed upon related to Arthur Andersen's tax practice, including any and all client (existing or former) information for those clients who are or were clients of the Selected Tax Members or Selected Professionals who join D&T USA and/or ATR (subject to any required consent of the applicable client), copies of work papers of the Selected Tax Members or Selected Professionals who join D&T USA and/or ATR, tax data bases, tax training materials, and all tax products and ideas of

Confidential

the Arthur Andersen tax practice and (iii) the use of specified hardware and software for a transition period.

Other Matters

15. If a closing with respect to the transactions contemplated by this Term Sheet occurs, such closing is targeted to occur upon completion of due diligence, receipt of any applicable governmental consents or approvals and execution of one or more definitive agreements between the applicable parties with respect to the matters contemplated herein.

16. This Term Sheet is non-binding and merely constitutes a statement of D&T USA's and Arthur Andersen's intentions, does not reflect all matters upon which agreement must be reached in order for the transaction to be consummated, and does not obligate D&T USA or Arthur Andersen to execute or consummate any definitive agreement concerning the matters set forth herein. A binding commitment with respect to the matters set forth herein will result only from the execution of one or more definitive agreements with respect thereto, subject to any terms and conditions expressed therein, and such commitment will be binding solely with respect to such matters expressly set forth in such definitive agreement. For purposes of clarity, D&T USA or Arthur Andersen may, at any time and for any reason (as either determines in its sole discretion), determine not to (i) pursue the transactions contemplated by this Term Sheet or (ii) enter into definitive agreements with respect to the matters contemplated by this Term Sheet. For D&T USA, such reasons may include, without limitation, the following:

a. At least 200 Selected Tax Members shall not have (i) accepted D&T USA's offer to become Members of D&T USA and ATR and (ii) signed Admit Agreements;

b. At least 2000 Selected Professionals shall not have accepted D&T USA's offer of employment to be employed by ATR;

c. Arthur Andersen shall not have received an opinion of Gleacher Partners, in form and substance satisfactory to D&T USA in its sole discretion;

d. If applicable, the waiting period under HSR shall not have expired or been terminated;

e. All applicable consents and approvals, including applicable Board, partner and third party consents and approvals, shall not have been obtained;

Confidential

MAY-10-2007  08:19        D&T USA LLP NO LEGAL              212 653 3475   P.16/17

f.    An injunction shall have been issued or threatened; and

g.    D&T USA shall not be satisfied, in its sole discretion, with its due
      diligence review.

613239.05-New York Server 7A - MSW                    7

D00075

Confidential

A72

MAY-10-2007 08:19 D&T USA LLP NO LEGAL 212 653 3475 P.17/17

**Exhibit B – Restricted Persons**

Richard Spivak
Peter Corcoran
Tom Aiello
John Mott
Randy Robason
Bill Curlee
Bruce Benesh
Tony Brown
Warren White
Herb Jansen
Tom Balestreire
Joe Norville
Dennis Krock
Rob Wright
Lee Riordan
Mac Gajek
Brian Ruez
Al Cappelloni Jr.
Cesar Clavero
Ted McElroy
George Massaro
Lou Salvatore
Carl Berquist
Steve Rogers
Mike Blount
Lou Grabowsky
Larry Gorrell
Doug Neve
Scott Ozanus
Eugene Frauenheim
John Niemann
Larry Varellas
Terry Hatchett

8

610894.11-New York Server 7A - MSW

TOTAL P.17

D00076

Confidential

A73

Deloitte & Touche LLP
1633 Broadway
New York, NY 10019-6754

Tel: (212) 492-4063
Fax: (212) 655-6400

Deloitte & Touche

**Personal and Confidential**

April 19, 2002

Mr. Alan Paul
Arthur Andersen
225 Franklin Street

Boston, MA 02110

Dear Mr. Paul:

This will constitute a formal offer for you to join our Firm as a member (Partner or Principal depending on the license you hold) in our tax practice and as such, become a signatory to our partnership Memorandum of Agreement (MOA), subject to approval by our Board of Directors; normal credit and independence verifications; and the terms and conditions contained in the Memorandum of Understanding dated April 2, 2002 ("MOU") between Deloitte & Touche USA LLP (D&T) and Arthur Andersen. This letter does not contain all matters upon which agreement must be reached in order for you to be admitted to the Firm, but is intended solely as an outline of certain material provisions. Your admission to the Firm is therefore subject to the execution and delivery of an admission agreement and the execution of a definitive agreement between D&T and Arthur Andersen pursuant to the MOU.

**Partnership Earnings**

Our offer is for you to join the Firm with partnership units as reflected on the attached schedule. Earnings on these units will be based upon the Firm's performance during our fiscal year beginning June 2, 2002 and ending May 31, 2003, and are currently anticipated to be planned at approximately $1,000 per unit. (If your start date is after June 2, 2002, unit earnings will be prorated.) Unit allotments, if any, beyond fiscal 2003 will be determined annually based on a process that assesses current and sustained performance.

If you join the Firm prior to June 2, 2002, partnership earnings for the period beginning with your start date and ending June 1, 2002 will be calculated on a prorated basis using

the units reflected on the attached schedule and the Firm's actual earnings for the year ending June 1, 2002.

**Cash Distributions**

Your annual earnings advance, as reflected on the attached schedule will be payable in bi-weekly installments. (If your start date is before or after June 2, 2002, the annual earnings advance for such fiscal year will be prorated.) Partnership earnings, to the extent in excess of the annual earnings advance, are distributed in a periodic manner during the current and subsequent fiscal year.

**Capital**

Consistent with the Firm's capital structure requiring each partner to contribute $950 per unit, the amount of your initial capital requirement, and the amount up to which we expect can be financed by a third-party bank through the Firm's capital financing program are reflected on the attached schedule. Terms of such financing generally include 12-year amortization with interest.

**Retirement Benefits**

You will be eligible to receive retirement benefits pursuant to the D&T MOA and the MOU.

**Other Matters**

To the extent your previous Andersen Finance capital loan balance is called, we will promptly advance you funds to satisfy the balance. This will be in the form of a non-interest bearing loan that will be forgiven pro rata in five annual installments. Forgiveness would occur at the end of each fiscal year commencing on May 31, 2003. Should you leave the Firm, the remaining loan balance will become immediately due and payable.

* * * * * *

All of us at Deloitte & Touche are extremely impressed with your accomplishments. We have the utmost confidence in your capability to contribute to our tax practice, and to progress in the Firm. We are delighted with the prospect of having you as a member of the Firm.

Please indicate your acceptance by responding to this e-mail and by signing this letter and returning it to us via facsimile at (212) 655-6400 no later than 9 a.m. EDT, April 22, 2002. Also, please indicate if you are a CPA, and if so, the state in which you are currently licensed and practice.

As always, please call me anytime with any questions you may have about the offer or the Firm.

Sincerely,

*Deloitte & Touche*

By: Barry Salzberg
National Managing Partner
Tax

Accepted and Agreed to:

______________________________
Alan Paul

______________________________
Date

* * * * * *

Currently Licensed CPA [Yes] ___ [No] ___

State of License: ______________________________

State of Practice: ______________________________

**Biweekly Advance:**

The amount of each member's annual earnings distribution through biweekly advances is based on unit range. The amount of the advance by unit range is:

| Unit Range | Advance |
|---|---|
| 100 - 149 | $ 100,000 |
| 150 - 199 | $ 135,000 |
| 200 - 299 | $ 150,000 |
| 300 - 399 | $ 175,000 |
| 400 - 499 | $ 200,000 |
| 500 - 599 | $ 225,000 |
| 600 - 699 | $ 250,000 |
| 700 - 799 | $ 280,000 |
| 800+ | Advance increases by $30,000 for each additional 100-unit range. |

## Partnership Units and Capital

| | Units | Initial Capital Requirement | Potential Bank Capital Financing |
|---|---|---|---|
| Paul, Alan D | 750 | $ 712,500 | $ 712,000 |

CONFIDENTIAL D01106

A78

-----Original Message-----
From: Burton, Mike (US - Boston)
Sent: Monday, April 29, 2002 3:14 PM
To: Wood, Chet (US - Stamford)
Cc: Salzberg, Barry (US - New York); Horn, Patricia (US - Boston)
Subject: FW: Strictly Confidential - From Deloitte & Touche

fyi - alan has accepted. as discussed i offered to increase his offer from 750 to 780 units (the formula amount). berkowitz has accepted as well. you should be receiving his info today.

boston now is back up to 4 plus a director (tax partner jack lutz). we're making progress, but not easy.

-----Original Message-----
From: alan.d.paul@us.andersen.com [mailto:alan.d.paul@us.andersen.com]
Sent: Monday, April 29, 2002 2:21 PM
To: Naleman
Cc: Mburton
Subject: Re: Strictly Confidential - From Deloitte & Touche

I hereby accept the offer to be a partner in Deloitte & Touche, with one modification concerning the number of units, as discussed with Mike Burton a few minutes ago. Due to the modification please forward a revised version for me to sign.

To: Alan D. Paul@ANDERSEN WO
cc:
Date: 04/19/2002 10:20 PM
From: naleman@deloitte.com
Subject: Strictly Confidential - From Deloitte & Touche

The attached Word and Excel documents are being sent on behalf of Barry Salzberg. Please read and respond as soon as possible by fax and by using the response buttons above. To open the Word document click "Options", then
click "Remove Data/Header Source".

<<APaul..doc>>
<<PaulA.xls>>

- This message (including any attachments) contains confidential information
intended for a specific individual and purpose, and is protected by law. -
If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

(See attached file: C.htm)
(See attached file: APaul..doc)
(See attached file: PaulA.xls)

## Partnership Units and Capital

| | Units | Initial Capital Requirement | Potential Bank Capital Financing |
|---|---|---|---|
| **Paul, Alan D** | 780 | $ 741,000 | $ 741,000 |

D00099

Confidential

A80

As always, please call me anytime with any questions you may have about the offer or the Firm.

Sincerely,

Deloitte & Touche

By: Barry Salzberg
National Managing Partner
Tax

Accepted and Agreed to:

Alan Paul

Alan Paul

4/30/02

Date

******

Currently Licensed CPA [Yes] ✓ [No] ___

State of License: MASS, R.I.

State of Practice: MASS

Confidential

Deloitte & Touche LLP
200 Berkeley Street
Boston, Massachusetts 02116-5022

Tel: (617) 437 2000
Fax: (617) 437 2111
www.us.deloitte.com

**Deloitte & Touche**

May 2, 2002

Mr. Alan D. Paul
135 Pine Street
Medfield, MA 02052

Dear Alan:

I am pleased to confirm to you the terms of your admission as a partner of each of (a) Deloitte & Touche USA LLP ("D&T USA") and (b) Deloitte & Touche LLP ("D&T"), in each case effective as of the date (the "Effective Date") that D&T USA and Arthur Andersen ("AA") enter into definitive agreements, as contemplated by the Memorandum of Understanding, dated April 2, 2002, between D&T USA and AA. D&T USA and D&T are collectively referred to herein as the "Firms." In addition to being subject, except as expressly set forth herein, to the provisions of the Memorandum of Agreement of each Firm, your services with the Firms will involve the following particulars:

1. You will initially serve as a tax partner in D&T's Boston office. You will, except as otherwise provided herein, receive all benefits and rights enjoyed by other partners of the Firms.

2. Your initial compensation and capital contribution will be as follows:

   a. You will initially have 780 units. Your initial biweekly draw from the Firms will be an aggregate of $10,769.24. If the Effective Date occurs on or before June 1, 2002, and if you remain a partner of the Firms for the entire period from the Effective Date through June 1, 2002, the Firms will make distributions after the Effective Date with respect to your compensation for the fiscal year ending June 1, 2002 at the same times and in the same proportions as made to other partners and principals of the Firms generally, prorated for the portion of such fiscal year during which you will be a partner of the Firms. If the Effective Date occurs after June 1, 2002, and if you remain a partner of the Firms for the entire period from the Effective Date through May 31, 2003, the Firms will make distributions after the Effective Date with respect to your compensation for the fiscal year ending May 31, 2003 at the same times and in the same proportions as made to other partners and principals of the Firms generally, prorated for the portion of such fiscal year during which you will be a partner of the Firms.

   b. Your initial aggregate capital requirement in the Firms will be $741,000. The Firms will assist you in financing all of your initial capital requirement through the Firms' capital loan program, if you so desire and

if you meet the applicable lender's eligibility requirements. In accordance with the Memorandum of Agreement of each Firm, your capital requirement may change from time to time.

3. Upon admission to D&T USA, you will begin to accrue Partner Service Years (as defined in Section 6.04 of the Memorandum of Agreement of D&T USA) towards a D&T Benefit (as defined in Section 6.011 of the Memorandum of Agreement of D&T USA); provided that, you will be entitled to retire and receive a D&T Benefit based on the number of Partner Service Years that you have on the date that you sever your association with D&T USA, even if you do not then have at least ten Partner Service Years.

4. You shall not be eligible to receive any proceeds from the separation of D&T and Deloitte Consulting. In the event that you receive any such proceeds, you shall promptly return such proceeds to the Firms. If you fail to do so, the Firms may, among other actions, offset from any amounts owed to you by the Firms the aggregate amount of such proceeds or (if other than cash) the fair market value thereof, together, in each case, with interest thereon.

5. In addition to those circumstances set forth in the second sentence of Section 7.03 of the Memorandum of Agreement of each Firm, you shall be deemed to have severed your association with each Firm (a) as of the date specified by the Board of Directors of each Firm, respectively, as a result of the determination by the vote of the Board of Directors of each Firm, respectively, specified therein, that (i) you have breached any of your representations and warranties in paragraph 6 below, (ii) your resignation from AA was not effective prior to the Effective Date, (iii) your conduct or association shall have resulted in a person (including, without limitation, a governmental agency or instrumentality) other than the Firms imposing a restriction on your right to perform services consistent with your position or a restriction on the right of the Firms to perform, either generally or with respect to any particular client or location, all or any portion of the services normally performed by the Firms, (iv) within 180 days after the Effective Date, the Firms have discovered information which reflects negatively on your background, character, general reputation, mode of living, credit worthiness, or prior job performance or (v) you have not satisfied your initial capital requirement in the Firms as contemplated by the first sentence of paragraph 2(b) above, and (b) as of the date specified within two years after the Effective Date by a committee appointed by the Managing Partner of D&T and approved by the Chief Executive Officer of D&T USA and by the Board of Directors of D&T USA, which committee shall consist of three tax partners and principals of D&T USA who had been partners of AA and three tax partners and principals of D&T USA who had not been partners of AA, with the leader of D&T's tax practice able to cast the deciding vote if such committee is deadlocked. If your association with each Firm is severed pursuant to clause (b) of this paragraph 5, the Firms shall (x) give you one month's notice of such severance, (y) pay you severance payments equal to four months' compensation, payable in approximately equal biweekly installments over a period of four months following such severance and (z)

release you from your obligations pursuant to Section 9.061 of the Memorandum of Agreement of each Firm.

6. You hereby represent and warrant to each Firm that

a. you are solvent, i.e., that the fair value of your assets exceeds your liabilities and that you can pay your debts as they mature;

b. you have filed timely all federal, state and local tax returns required of you for 2001 and prior years and paid all taxes which are due and payable by you;

c. there is no basis for anyone to deem your association with either Firm to be severed following your admission for conduct described in Sections 7.031 through 7.033 of the Memorandum of Agreement of each Firm;

d. you are a citizen of the United States or have a current alien registration for permanent residence and work;

e. you are currently licensed to practice public accountancy under the laws of the State of Massachusetts and you know of no reason why such license might be suspended or revoked;

f. if any other license is required for the services which you currently perform and are to perform for the Firms, you currently hold such license and you know of no reason why such license might be suspended or revoked;

g. you are a member in good standing of the American Institute of Certified Public Accountants;

h. except as disclosed on the questionnaires attached hereto or in discussions with representatives of the Firms related thereto, there is, and during the preceding five years there has been, no claim (including an ethics complaint) or threat of a claim against you arising out of the performance of professional services, or against any entity with which you have been associated (i) relating to the clients to whom you have provided professional services and (ii) involving transactions or matters that directly involved your professional services, and you have no knowledge of facts or circumstances which might reasonably give rise to such a claim;

i. you are not under any contractual or other restriction or obligation to AA, any of its clients, or any other person which is inconsistent with the execution or performance of this agreement or your becoming, and serving as, a partner of each Firm;

j. except as provided in paragraph 7 below, you are not under any contractual or other restriction (including, without limitation, a

governmental restriction) or obligation which imposes or will impose limitations on your professional activities and you know of no reason why such a restriction might be imposed;

k. you have not been involved in providing services in connection with disputes that have not been finally resolved and as to which it would be difficult or impossible for you to be replaced as the expert witness or litigation consultant;

l. you have never been convicted of any crime, other than a traffic violation; and

m. all of your responses to the questionnaires attached hereto were true, complete and accurate when given and are true, complete and accurate as of the date hereof.

7. We have discussed with you the limitations on your activities arising out of your being a partner of AA. So long as any shall be applicable, each Firm insists that you honor each such commitment made to AA and its clients fully as a partner of each Firm and you hereby agree that you will do so.

8. Your admission as a partner of each Firm is subject to the following conditions:

a. Your being independent of the Firms' clients under the Firms' policies relating to independence and outside activities based upon the independence sign-off form (a copy of which, together with the related Independence and Ethics Manual and Code of Professional Conduct, is enclosed with this letter) to be completed and submitted by you;

b. No negative findings regarding your background, character, general reputation, mode of living, credit worthiness or prior job performance were procured as a result of the investigative consumer report authorized by you;

c. After satisfactory completion of the foregoing conditions, your signing (i) the signature page to the Memorandum of Agreement of D&T USA; (ii) the signature page to the Memorandum of Agreement of D&T; and (iii) an agreement to be bound by the Department of Defense Security Agreement (DD Form 441) to which D&T USA is a party;

d. Your resignation from AA being effective prior to the Effective Date;

e. Your surviving to the Effective Date; and

f. The Effective Date having occurred on or before December 31, 2002.

9. You understand that neither Firm will assume or be liable for or indemnify you on account of any obligation or liability of any kind that you may now or in the

future have, whether or not arising out of any prior association or employment (including, without limitation, your relationship with AA and any of its clients), and that each Firm has expressly excluded such coverage from the Firms' professional indemnity insurance policies, except that each Firm will, upon your admission as a partner of such Firm, defend and indemnify you, in accordance with and to the extent provided by such Firm's then existing policies, with respect to authorized acts within the scope of your being a partner of such Firm.

10. You will promptly satisfy D&T USA's requirements concerning a physical examination by health care providers selected by D&T USA. Please call the office of D&T USA's Administrative Director-Benefits Administration in Wilton, Connecticut at (203) 761-3239 to schedule an appointment for your physical examination. You understand and acknowledge that (a) until you satisfy such requirements, D&T USA will not provide you with any disability or death benefits pursuant to Sections 6.09 and 6.10, respectively, of the Memorandum of Agreement of D&T USA and (b) after you satisfy such requirements, D&T USA will provide you with disability and death benefits pursuant to Sections 6.09 and 6.10, respectively, of the Memorandum of Agreement of D&T USA only if your disability or death results predominantly from a cause which was not identified as a pre-existing condition in the report of such examination.

11. If, for any reason, you do not become a partner of each Firm, you will promptly return to the Firms all confidential information of or concerning the Firms which the Firms provided to you (including, without limitation, the Memorandum of Agreement of each Firm) and all copies, reproductions, summaries, analyses or extracts thereof or based thereon, in your (or your agent's or representative's, if any) possession or within your (or your agent's or representative's, if any) control.

12. You understand that you may obligate either Firm to perform any services for any person or entity (whether or not you previously performed services for such person or entity), only in compliance with the Firms' policies and procedures for the acceptance of clients and engagements.

13. Recognizing the confidentiality of the information contained herein, you will not, except as otherwise required by law, directly or indirectly disclose the terms of this agreement to any person, firm, corporation or other entity, except that you may disclose the terms of this agreement to your spouse and your attorney and as necessary to enforce your rights hereunder; provided that, (a) any direct or indirect disclosure of the terms of this agreement by your spouse or your attorney following such disclosure by you to one or both of them shall be deemed to be disclosure by you and (b) prior to such disclosure by you to your spouse or your attorney you shall direct the respective recipient to abide by the terms of this paragraph 13.

14. This agreement will survive your entering into the Memorandum of Agreement of each Firm.

We look forward to a successful and enjoyable professional relationship with you.

Sincerely,

DELOITTE & TOUCHE USA LLP

By: [signature]
Alexander Schillaci, Jr.
Secretary to the Board

DELOITTE & TOUCHE LLP

By: [signature]
Alexander Schillaci, Jr.
Secretary to the Board

Accepted and Agreed to:

[signature]
Alan D. Paul

5-4-02
Date

411448.01-New York Server 4A - MSW

D00083

Confidential

A87

Composite Copy Reflecting Amendments Adopted Through November 17, 2003 and Effective December 28, 2003

---

# MEMORANDUM OF AGREEMENT

# OF

# DELOITTE & TOUCHE USA LLP

---

418272.10-New York Server 3A - MSW

TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ..... 2

ARTICLE 2. THE BUSINESS ..... 4
2.01. Name ..... 4
2.02. Certain Limitations on Actions of Active Principals ..... 4
2.03. Authority to Sign Documents ..... 4
2.04. Registered Agent and Registered Office ..... 4

ARTICLE 3. GOVERNANCE ..... 4
3.01. Board of Directors; Function ..... 4
3.02. Size, Qualifications, Membership of the Board and Term ..... 5
3.03. Action by the Board ..... 5
3.04. US Senior Partner ..... 8
3.05. US Chief Executive Officer ..... 9
3.06. Managing Partner ..... 10
3.07. Chairman of the Board ..... 11
3.08. Vice Chairman ..... 12
3.09. Election of the US Chief Executive Officer, Chairman of the Board and Board Members; Removal ..... 12
3.10. Nominating Committee; Selection of Nominees ..... 12
3.11. Voting By Parties ..... 14
3.12. Vacancies ..... 16
3.13. Extraordinary Board Meetings ..... 17

ARTICLE 4. EARNINGS OR DEFICIT ..... 17
4.01. Determination of Earnings or Deficit ..... 17
4.02. Units of Net Earnings or Deficit or Net Assets ..... 17
4.03. Deficit ..... 17
4.04. Reports to Active Parties ..... 18

ARTICLE 5. CAPITAL ..... 18
5.01. Required Capital; Capital Loans ..... 18
5.02. Supplemental Capital; Supplemental Capital Loans ..... 19
5.03. Voluntary Capital Loans ..... 19
5.04. Distributions on Capital and Capital Loans ..... 19
5.05. Subordination to Claims of Creditors; Priority ..... 20
5.06. Reserved Capital ..... 20
5.07. Capital Account Maintenance and Certain Regulatory Allocations ..... 20
5.08. Liquidation in Accordance with Positive Capital Account Balances ..... 20
5.09. Limited Deficit Restoration Obligation ..... 20

5.10. Qualified Income Offset ....22
5.11. Certain Allocations ....22

ARTICLE 6. RETIREMENT, DISABILITY AND DEATH ....24
6.01. Status; Categories of Benefits ....24
6.02. Election of Retirement; Months; Accounting Period; Notice of Election; Waiver of Notice; Request to Retire Other Than at Year End; Mandatory Retirement Date; Term Certain ....25
6.03. Retirement Base Income; Retirement Income Percentage ....26
6.04. Partner Service Years ....27
6.05. Normal Retirement ....27
6.06. Early Retirement ....28
6.07. 50/54 Retirement ....30
6.08. Special Retirement ....30
6.09. Disability ....31
6.10. Death During Active Service ....31
6.11. Optional Forms of Payment and Deferred Payment of Benefits ....33
6.12. Cost of Living Adjustment ....37
6.13. Manner and Time of Payments of Benefits ....40
6.14. Designation of Beneficiaries ....40
6.15. General Conditions ....41
6.16. Retirement, Disability or Death Benefits Under Prior Agreements ....41
6.17. General Limitation on Benefits ....41
6.18. Allocation and Recovery of Reduction in Benefits; Prospective Reduction ....43
6.19. Effect of Dissolution ....44
6.20. Integration of Benefits Payments with Benefits under the Deloitte & Touche Employees' Pension Plan ....44
6.21. Integration of Benefits Payments with Active Party Benefits under the Deloitte & Touche Employees' Pension Plan ....45

ARTICLE 7. RESIGNATION, WITHDRAWAL AND INVOLUNTARY TERMINATION; LEAVE OF ABSENCE ....46
7.01. Resignation ....46
7.02. Withdrawal ....46
7.03. Involuntary Termination ....46
7.04. Leave of Absence ....47
7.05. Severing Association with the Firms ....47

ARTICLE 8. PAYMENT OF CAPITAL, NET EARNINGS AND OTHER AMOUNTS UPON RETIREMENT, DISABILITY, DEATH, RESIGNATION, WITHDRAWAL OR INVOLUNTARY TERMINATION ....47
8.01. General ....47

8.02. Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans, Voluntary Capital Loans and Distributions ..... 48
8.03. Net Earnings ..... 49
8.04. Other Amounts ..... 49
8.05. Intervening Death ..... 49
8.06. Deductions ..... 50

ARTICLE 9. CERTAIN ACTIVITIES, CONDUCT AND RIGHTS OF PARTIES DURING AND AFTER SEVERING ASSOCIATION WITH THE PARTNERSHIP ..... 50
9.01. General ..... 50
9.02. Activities of Active Parties ..... 50
9.03. Activities of Other Parties ..... 51
9.04. Confidentiality of Information; Trade Secrets ..... 52
9.05. Certain Proscribed Conduct and Rights of Parties ..... 53
9.06. Limitations on Certain Competitive Activities In Connection With Severing Association with the Partnership ..... 56
9.07. Compliance; Remedies ..... 57
9.08. Severability ..... 58
9.09. Survival of Provisions ..... 58

ARTICLE 10. INDEMNIFICATION OF PARTIES ..... 58
10.01. Parties ..... 58
10.02. Heirs and Legal Representatives ..... 60
10.03. Defense of a Claim or Action ..... 60
10.04. Retroactive Effect ..... 60

ARTICLE 11. INTERNATIONAL ORGANIZATION ..... 60
11.01. International Organization ..... 60
11.02. Affiliated International Organizations ..... 61

ARTICLE 12. ADMINISTRATIVE MATTERS ..... 61
12.01. Banking and Financial Authority ..... 61
12.02. Certification of Authority ..... 62
12.03. Filings ..... 62

ARTICLE 13. NOTICES; MISCELLANEOUS; TRANSITION ..... 63
13.01. Notices ..... 63
13.02. Partnership Name; Interest of Parties in the Name and Other Assets ..... 63
13.03. Controlling Provisions ..... 63
13.04. Deloitte Firm Senior Notes ..... 64
13.05. Merger Transition Provisions ..... 64

ARTICLE 14. INTERPRETIVE MATTERS ..... 65
14.01. Interpretation by the Board ..... 65

14.02. Governing Law ....................65
14.03. Captions and Headings ....................65
14.04. Situs of Litigation ....................65
14.05. Submission to Jurisdiction; Appointment of Agent for Service of Process....................65
14.06. No Third Party Beneficiaries; Enforcement ....................66

ARTICLE 15. ADMISSION OF ADDITIONAL PARTIES; TERMINATION AND DISSOLUTION; COMBINATION....................66
15.01. Admission with Approval of Parties....................66
15.02. Admission by Board ....................66
15.03. Termination and Dissolution....................66
15.04. Combination....................68

ARTICLE 16. AMENDMENT....................68
16.01. Action Required to Amend ....................68
16.02. Procedures for Amendment ....................68
16.03. Restatement and Re-Execution of this Agreement ....................69

ARTICLE 17. EXECUTION; CERTIFICATION ....................69
17.01. Counterparts....................69
17.02. Undertakings....................69
17.03. Certification. ....................70

**MEMORANDUM OF AGREEMENT**

**OF**

**DELOITTE & TOUCHE USA LLP**

Memorandum of Agreement dated as of December 3, 1989, as amended, among the Active Partners, Active Principals, and Firms (each as hereinafter defined) who have signed this Memorandum of Agreement in their respective capacities and all persons who subsequently sign a counterpart of this Memorandum of Agreement as initially adopted on the date hereof or as it may be amended from time to time.

The CPA Partners and the Non-CPA Partners of Touche Ross & Co., a partnership (the Touche Firm), and the Touche Firm joined with the Active Partners and Active Directors of Deloitte Haskins & Sells, a partnership (such partnership and any affiliated firms previously a part thereof being hereinafter called the Deloitte Firm), and the Deloitte Firm, to continue the Deloitte Firm under the name Deloitte & Touche LLP pursuant to the terms of this Memorandum of Agreement. The parties who signed the Memorandum of Agreement dated as of December 3, 1989 desired to facilitate the combination of their practices, to assure continued maintenance of the highest professional standards, to arrange for the conduct of the practices of the respective Firms, and to provide for the pooling and distribution of net earnings of the Firms.

The present parties hereto desire to continue the partnership under Delaware law, without dissolution or interruption, as a form of general partnership known as a registered limited liability partnership under the Delaware Revised Uniform Partnership Act, 6 Del. C. § 15-101, et seq. (all references to such Act are intended to include such Act as amended from time to time and all successor statutes to such Act), and this Agreement, under the name Deloitte & Touche USA LLP, such partnership to function as a holding company for operating entities, and to engage in such other activities as shall be determined from time to time by the Board, as hereinafter defined.

The present parties hereto desire to provide for the governance of Deloitte & Touche USA LLP as a general partnership subject to the provisions of such Act, and to set forth in detail their respective rights, duties, obligations and liabilities relating to such partnership.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the parties hereto hereby mutually covenant and agree as follows:

418272.10-New York Server 3A - MSW

D00118

## ARTICLE 1. DEFINITIONS

1.01. Active Partner - any Partner whose association with the Partnership shall not have been severed as provided in this Agreement.

1.02. Active Party - any one of the Active Partners or Active Principals.

1.03. Active Principal - any Principal whose association with the Partnership shall not have been severed as provided in this Agreement.

1.04. Board of Directors or Board - the governing body created pursuant to 3.01.

1.05. Board Member(s) - an Active Party currently serving on the Board of Directors.

1.06. Chairman of the Board or Chairman - the Active Party elected to and holding the office created under 3.07.

1.07. Deloitte Firm – an associated group of firms inlcuding the Partnership and each Deloitte Operating Entity.

1.08. Deloitte Operating Entity - a general or limited partnership, a limited liability company or any other entity, except the Partnership, (a) in which Partners or Principals participate as partners, principals, members or individuals with similar status and which conducts business in the United States under the name "Deloitte" or "Deloitte & Touche" or (b) which is designated as such by the Board.

1.09. Effective Date - December 3, 1989.

1.10. Estate - the person or persons who succeed to the interest of any deceased Party, other than a spouse with survivor's rights under Article 6 or a beneficiary designated pursuant to Article 6.

1.11. Firms - The Deloitte Firm and the Touche Firm.

1.12. Managing Partner - the Active Partner holding the office created under 3.06.

1.13. National Office - the office or combination of offices from which the management of the Partnership is conducted as designated from time to time by the Board of Directors.

1.14. Partner - a person who signs this Agreement as a Partner and is a certified public accountant.

1.15. Partnership - Deloitte & Touche USA LLP, the partnership formed and continuing pursuant to this Agreement.

1.16. Party - a Partner or Principal who signs this Agreement, pursuant to Article 16 or Article 17.

1.17. Principal - a person who signs this Agreement as a Principal and is not a certified public accountant.

1.18. US Chief Executive Officer - the Active Partner holding the office created under 3.05.

1.19. US Senior Partner - the Active Partner holding the office created under 3.04.

1.20. Vice Chairman of the Board or Vice Chairman - the Board Member elected to and holding the office created under 3.08.

1.21. Year(s) - the fiscal year ending on the Saturday nearest to May 31 or such other fiscal year as fixed by the Board of Directors.

1.22. Other Terms - For the terms indicated below refer to the provisions of this Agreement as set opposite those terms below.

Capital Loans - 5.01

Connected Entity - 9.061d

Continuing Connected Entity - 9.061d

Entire Board - 3.02

Executive Committee - 3.02

Global Organization - 3.041

Management Committee - 3.02

Nominating Committee - 3.10

Required Capital - 5.01

Reserved Capital - Schedule 13.05H

Supplemental Capital - 5.02

Supplemental Capital Loans - 5.02

Voluntary Capital Loans - 5.03

Voting Interests - 3.112

## ARTICLE 2. THE BUSINESS

2.01. Name - The Partnership shall conduct its business under the name of Deloitte & Touche USA LLP.

2.02. Certain Limitations on Actions of Active Principals - An Active Principal is prohibited from:

2.021. being held out or holding oneself out to the public as a certified public accountant or as a Partner (an Active Principal shall not be referred to in such things as business cards, directories, press releases and other publications of the Partnership as a Partner or certified public accountant); or

2.022. serving or acting in any capacity which, pursuant to this Agreement, is reserved to a Partner.

2.03. Authority to Sign Documents - Except as provided in Article 12 and as specifically or customarily reserved to the Board of Directors or other officers of the Partnership, any Active Party is authorized in the ordinary course of Partnership business to sign and deliver agreements and similar documents in the name of and on behalf of the Partnership and to implement and carry out the terms and conditions of such agreements or documents.

2.04. Registered Agent and Registered Office - The name of the registered agent for service of process on the Partnership in the State of Delaware is Corporation Service Company. The address of such registered agent and the address of the registered office of the Partnership in the State of Delaware is c/o Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware 19805. At any time or from time to time the Board may change the registered agent or the registered office.

## ARTICLE 3. GOVERNANCE

3.01. Board of Directors: Function - There shall be a Board of Directors which shall have general authority and supervision over the management, practice and affairs of the Partnership and shall establish the Partnership's various policies; provided, however that the Board may delegate responsibilities associated with its duties to others in accordance with this Article 3. Directors of the Partnership are expected to exercise their business judgment based upon their assessment of the best interests of the Deloitte Firm. Further, the Board's general authority and supervision shall not include:

3.011. the responsibility to directly supervise any individual Party or employee; or

3.012. the responsibility to supervise any particular professional engagement undertaken by the Partnership.

3.02. Size, Qualifications, Membership of the Board and Term - The Entire Board shall consist of twenty-one Active Parties, except that in the event of the US Senior Partner being a member of the Board pursuant to 3.04, the Entire Board shall consist of twenty-two Active Parties. At least two-thirds of the Entire Board shall be Active Partners. Subject to the foregoing, the US Senior Partner, if any, the US Chief Executive Officer, the Managing Partner, the Chairman of the Board and eighteen other Active Parties elected or appointed as hereinafter provided shall constitute the Board. Board Members, other than the US Senior Partner, if any, the US Chief Executive Officer, the Managing Partner and the Chairman of the Board, shall serve for a term of three years or until their successors are duly elected and take office, but may not serve for more than two consecutive terms without ceasing to be a Board Member for at least one year. Board Members, other than the US Senior Partner, if any, the US Chief Executive Officer, the Managing Partner and the Chairman of the Board, shall be divided into three classes of six Board Members each. An individual serving as a member of one of the three classes of elected Board Members shall be deemed to have resigned as a member of the applicable class at such time as such individual becomes US Senior Partner, US Chief Executive Officer, Managing Partner or Chairman. An individual may serve a maximum of three terms in the offices of the US Senior Partner, US Chief Executive Officer, Managing Partner and Chairman of the Board but no more than two terms in any one of the four offices, except for interim or other service to fill a vacancy and except for interim service as US Chief Executive Officer or Managing Partner pending the individual elected to serve as US Chief Executive Officer becoming the US Senior Partner as contemplated by 3.04. It is the intention that no more than four (or, if there is no US Senior Partner, five) Board Members (in addition to the US Senior Partner, if any, the US Chief Executive Officer and the Managing Partner) shall also be members of such Management Committee or Executive Committee (or a committee or body successor or comparable to either) of the Partnership as may be appointed.

3.03. Action by the Board - Except as otherwise expressly provided in this 3.03, all actions of the Board shall be approved by at least two-thirds of the Entire Board, which actions include but are not limited to:

3.031. the admission of Parties with the approval of two-thirds of the Active Parties and two-thirds of the holders of the Voting Interests, in accordance with the provisions of 15.01 and 15.02;

3.032. mergers, acquisitions or other combinations of professional practices with and into or by the Partnership or affiliates of the Partnership, in accordance with the provisions of 15.04, including but not limited to multinational or multifunctional mergers;

3.033. submission of matters to a vote of the Parties not otherwise required by this Agreement;

3.034. approving significant management appointments;

3.035. borrowing on behalf of the Partnership or securing any borrowing with assets, rights, earnings or other property of the Partnership and approval of borrowing on behalf of any Deloitte Operating Entity or securing any borrowing with assets, rights, earnings or other property of any Deloitte Operating Entity;

3.036. arrangements with any Party severing such Party's association with the Partnership which vary in a material manner from the provisions of this Agreement, provided that all other arrangements be reported to the Board at its next meeting, and approval of arrangements with any Party under the organizational document of a Deloitte Operating Entity severing such Party's association with such Deloitte Operating Entity which vary in a material manner from the provisions of the organizational document of such Deloitte Operating Entity;

3.037. determination of the Required Capital, Capital Loans and other determinations under Article 5 and determination of Required Capital, Capital Loans and other determinations under Article 5 of the organizational document of each Deloitte Operating Entity;

3.038. approvals of the allocation of units and additional amounts of net earnings and the manner of distribution thereof under Article 4 and approvals of the allocation of units and additional amounts of net earnings and the manner of distribution thereof under Article 4 of the organizational document of each Deloitte Operating Entity;

3.039. approval of the members of the Nominating Committee and selection or approval of nominees for US Chief Executive Officer, Managing Partner and Chairman of the Board pursuant to 3.10, approval of the removal of the US Chief Executive Officer pursuant to 3.04, approval of the removal of the Managing Partner pursuant to 3.05 and election of the Vice Chairman pursuant to 3.08;

3.0310. appointment or approval of an interim Board Member, US Senior Partner, US Chief Executive Officer, Chairman of the Board or Managing Partner pursuant to 3.12;

3.0311. designation of an office or combination of offices as the National Office;

3.0312. delegation of authority of the Board to any committee of Board Members or Active Parties, or to Parties, employees or other persons (collectively, "Delegatees") that the Board reasonably believes to be reliable and competent in the matters delegated, provided that all action by any such Delegatees be reported promptly to the Board. In the event matters are delegated to any such Delegatees pursuant to this provision, the Board is entitled to rely on the information, statements, presentations, reports, other data or recommendations prepared or presented to the Board by the Delegatees with respect to the matters so delegated, unless the Board receives actual notice that it should not so rely;

3.0313. until the earlier to occur of (x) the effectiveness of both the restructuring with respect to the tax services business function conducted by Deloitte & Touche LLP and the restructuring with respect to the dispute consulting, reorganization and forensic services business functions conducted by Deloitte & Touche LLP and (y) such earlier date as the Board may determine, appointment and removal of persons to serve on the Board of Directors of Deloitte & Touche LLP;

3.0314. approving financial aspects of business plans of each Deloitte Operating Entity and approving any material changes to such plans, to the extent that such plans, in either case, involve financial commitments from the Partnership or any of its affiliates;

3.0315. [intentionally left blank];

3.0316. review of fairness of financial and other relationships among and between the Partnership and its affiliates;

3.0317. approval of (a) amendments, modifications, restatements or other supplementation of the organizational document of each Deloitte Operating Entity and (b) admission and involuntary termination of partners, principals, members or individuals with similar status with regard to each Deloitte Operating Entity;

3.0318. approval of the creation of positions that can be held by Active Parties who are not partners, principals, members or individuals with similar status of any Deloitte Operating Entity;

3.0319. establishment of the rules and procedures with respect to the exercise of the authority conferred upon the Board by this Agreement and the manner in which the Board operates, including the form and manner of meetings and voting by Board Members;

3.0320. determination of compensation for the US Senior Partner, if any, the US Chief Executive Officer (if there is not then a US Senior Partner) and the Chairman of the Board; and

3.0321. approval of any appointment and approval of any removal and replacement of the chairman and chief executive officer of each Deloitte Operating Entity.

Notwithstanding the foregoing, appointment of an interim Board Member pursuant to 3.12, other than the US Senior Partner, if any, the US Chief Executive Officer, the Chairman of the Board and the Managing Partner, may be approved by two-thirds of the Board Members at the time in office.

3.04. US Senior Partner

3.041. Office; Responsibilities - In the event that the US Chief Executive Officer is elected to the office of chief executive officer of the international organization of firms using the name "Deloitte & Touche", "Deloitte Touche Tohmatsu" or related names (the "Global Organization"), then at the time such person takes office with the Global Organization such person shall automatically cease to hold office as US Chief Executive Officer and shall in lieu thereof take office as the US Senior Partner. The US Senior Partner shall be a member of the Board. Subject to the authority of the Board, the US Senior Partner shall have management authority to commit the Partnership and its resources to the Global Organization and will have final management authority with respect to the most significant matters affecting the Partnership and will engage in activities which ensure and further the mutuality of interests and actions between the Partnership and the Global Organization. Subject to the authority of the Board, the US Senior Partner shall also have primary management responsibility for overseeing the Partnership's performance by providing direction, oversight and guidance to the US Chief Executive Officer and, subject to the approval of the Board, for evaluating the performance and determining the compensation of the US Chief Executive Officer and for the removal of the US Chief Executive Officer and the appointment pursuant to 3.12 of a replacement of the US Chief Executive Officer.

3.042. Term; Tenure; Qualifications – The US Senior Partner shall be an Active Partner and shall serve for a term of 4 years concurrent with the terms of the US Chief Executive Officer, the Chairman of the Board and the Managing Partner, except for interim or other service to fill a vacancy; no US Senior Partner shall serve in the office of US Senior Partner for a period of time in excess of the length of two terms, except for interim or other service to fill a vacancy, and no Active Partner shall take office as US Senior Partner if the Mandatory Retirement Date of such Active Partner would occur prior to the scheduled expiration date of such term.

3.043. Other Procedures – If the US Chief Executive Officer shall automatically cease to hold such office because such person becomes US Senior Partner as contemplated by this 3.04, the person identified to serve as Managing Partner in the ballot submitted to the Active Parties for the election of the US Chief Executive Officer shall automatically cease to hold office as Managing Partner and shall in lieu thereof take office as the US Chief Executive Officer. In such case, the person who is identified in such ballot as the person to serve as Managing Partner in the event there shall be a US Senior Partner shall take office as Managing Partner. A person who takes office as the US Chief Executive Officer because another person becomes US Senior Partner shall serve the full term of the person originally elected to take office as US Chief Executive Officer concurrent with the terms of the US Senior Partner and the Chairman of the Board. Persons who take office as US Chief Executive Officer or Managing Partner as contemplated by this 3.04 shall not be considered to have filled a vacancy under 3.12.

3.05. US Chief Executive Officer

3.051. Office; Responsibilities - There shall be a US Chief Executive Officer who shall be the chief executive officer of the Partnership and who shall be a member of the Board. Subject to the authority of the Board and of the US Senior Partner, if any, the US Chief Executive Officer shall have overall executive authority and responsibility for the leadership and management of the Partnership. The US Chief Executive Officer will be specifically responsible for designing and developing the Partnership's strategy (which shall be aligned with the global strategy) and for the oversight of its execution and for promoting synergy among all functions of the Partnership. The US Chief Executive Officer shall lead the international activities of the Partnership so as to further the mutuality of interests and actions between the Partnership and the Global Organization and represent the Partnership with government, professional and civic organizations and similar constituencies. The US Chief Executive Officer

shall also be responsible for leading the US Strategic Client Program, for maintaining relationships with principal clients and prospective clients of the Partnership, and for obtaining key clients. Subject to the authority of the Board and of the US Senior Partner, if any, the US Chief Executive Officer shall be primarily responsible for providing direction, oversight and guidance to the Managing Partner and, subject to the approval of the Board and the US Senior Partner, if any, for evaluating the performance and determining the compensation of the Managing Partner and for the removal of the Managing Partner, and the appointment pursuant to 3.12 of a replacement of the Managing Partner. Together with the Managing Partner, the US Chief Executive Officer shall be responsible for partner development and succession planning. The US Chief Executive Officer shall also be responsible for carrying out such other responsibilities as are assigned by the Board or the US Senior Partner, if any, from time to time or specified in this Agreement. The US Chief Executive Officer shall be responsible also for communications to the Parties with respect to the responsibilities conferred upon the US Chief Executive Officer pursuant to this 3.051. The US Chief Executive Officer may delegate specific authority to Active Parties responsible to the US Chief Executive Officer; the US Chief Executive Officer shall notify the US Senior Partner and the Board, as appropriate, of any such delegation.

3.052. Term; Tenure; Qualifications - The US Chief Executive Officer shall be an Active Partner and shall serve for a term of 4 years (or until his or her successor is duly elected and takes office) concurrent with the terms of the US Senior Partner, if any, the Chairman of the Board and the Managing Partner, except for interim or other service to fill a vacancy; no US Chief Executive Officer shall serve in the office of US Chief Executive Officer for a period of time in excess of the length of two terms, except for interim or other service to fill a vacancy, and no Active Partner shall be elected to serve a term as US Chief Executive Officer if the Mandatory Retirement Date of such Active Partner would occur prior to the scheduled expiration date of such term.

3.06. Managing Partner

3.061 Office; Responsibilities - There shall be a Managing Partner who shall be a member of the Board and, subject to the authority of the US Chief Executive Officer, shall be primarily responsible for directing and managing the Partnership. Subject to the authority of the US Chief Executive Officer, the Managing Partner shall be primarily responsible for chairing the Management Committee and the Executive Committee; for setting the organizational structure of the Partnership and appointments of

Parties to management responsibilities, deployments of all Parties, business and profit plans, allocation of units or other amounts of net earnings for the Parties and admission of Active Parties; implementing strategic plans; in coordination with the US Chief Executive Officer for maintaining relationships with principal clients and prospective clients of the Partnership and for obtaining key clients; promotion of synergy among all functions of the Partnership; together with the US Chief Executive Officer, for partner development and succession planning; and carrying out such other responsibilities as are assigned by the US Chief Executive Officer from time to time or specified in this Agreement. The Managing Partner shall be responsible also for communications to the Parties with respect to the responsibilities conferred upon the Managing Partner pursuant to this 3.061. The Managing Partner may delegate specific authority to Active Parties responsible to the Managing Partner; the Managing Partner shall notify the US Chief Executive Officer of any such delegation.

3.062 Term; Tenure; Qualifications - The Managing Partner shall be an Active Partner and shall serve for a term of 4 years (or until his or her successor is duly appointed and takes office) concurrent with the terms of the US Senior Partner, if any, the US Chief Executive Officer and the Chairman, except for interim or other service to fill a vacancy; no Managing Partner shall serve in the office of Managing Partner for a period of time in excess of the length of two terms, except for interim or other service to fill a vacancy, and no Active Partner shall take office as Managing Partner if the Mandatory Retirement Date of such Active Partner would occur prior to the scheduled expiration date of such term.

3.07. Chairman of the Board

3.071. Office; Responsibilities - There shall be a Chairman of the Board who shall preside and vote at all meetings of the Board and the Partnership. Subject to the authority of the Board, the Chairman shall be primarily responsible for leading the governance process of the Partnership and the Board, including creating the agenda for meetings of the Board and leading the Board with respect to US Chief Executive Officer succession planning, and for carrying out such other responsibilities as are assigned by the Board from time to time, as are delegated to the Chairman by the US Chief Executive Officer with the approval of the Board or as are specified in this Agreement. The Chairman shall be the designee of the Partnership on the governance committee of the Global Organization and a designee of the Partnership on the board of directors of the Global Organization. The Chairman of the Board shall be responsible also for

communications to the Parties with respect to the responsibilities conferred upon the Chairman pursuant to this 3.071. The Chairman may delegate specific authority to Active Parties responsible to the Chairman; the Chairman shall notify the Board of any such delegation.

3.072. Term; Tenure; Qualifications - The Chairman of the Board shall be an Active Party and shall serve for a term of 4 years (or until his or her successor is duly elected and takes office) concurrent with the terms of the US Senior Partner, if any, the US Chief Executive Officer and the Managing Partner, except for interim or other service to fill a vacancy; no Chairman of the Board shall serve in the office of Chairman of the Board for a period of time in excess of the length of two terms, except for interim or other service to fill a vacancy, and no Active Party shall be elected to serve a term as Chairman of the Board if the Mandatory Retirement Date of such Active Party would occur prior to the scheduled expiration date of such term.

3.08. Vice Chairman. There shall be a Vice Chairman of the Board, elected each year by the Board from among its members other than the US Senior Partner, if any, the US Chief Executive Officer, the Managing Partner, the Chairman of the Board or any member of the Management Committee or the Executive Committee. The Vice Chairman shall assume the duties of the Chairman whenever the Chairman is unable to perform them and shall be responsible for such other duties as are assigned by the Board from time to time or as may be specified in this Agreement.

3.09. Election of the US Chief Executive Officer, Chairman of the Board and Board Members; Removal - The US Chief Executive Officer, the Chairman of the Board and the other elected Board Members shall be elected by vote of not less than two-thirds of the Active Parties and of holders of not less than two-thirds of the Voting Interests (as hereafter defined) of the Active Parties, provided that a person who takes office pursuant to 3.12 or takes office as US Chief Executive Officer pursuant to 3.043 shall hold such office as provided therein. Except for special elections pursuant to 3.12 and except as contemplated by 3.043, the US Chief Executive Officer and the Chairman of the Board shall be elected every fourth year; one class of Board Members shall be elected every year. The US Senior Partner, if any, the US Chief Executive Officer (if there is then no US Senior Partner) and the Chairman of the Board or any other Board Member, other than the US Chief Executive Officer (if there is then a US Senior Partner) and the Managing Partner, may be removed by vote of not less than two-thirds of the Active Parties and of holders of not less than two-thirds of the Voting Interests of the Active Parties.

3.10. Nominating Committee; Selection of Nominees - In each year, on or prior to May 1 or such other date as shall be specified by the Chairman with the approval of the Board, the Chairman shall, with the advice and approval of the Board, appoint six

Active Parties to serve on a Nominating Committee for that year. No more than two members of the Nominating Committee shall be Board Members. The Nominating Committee shall recommend to the Active Parties the nominees for the class of Board Members whose term ends in that year and nominees to fill the remainder of the terms of Board Members of any other class as provided in this Agreement. The nominees for new Board Members in any year shall be submitted for vote to the Active Parties between August 15 and September 15 or during such other period in such year as shall be specified by the Chairman with the approval of the Board. In each year in which the terms of the US Chief Executive Officer and Chairman of the Board end, the Nominating Committee shall, on or prior to August 10 or such other date in such year as shall be specified by the Chairman with the approval of the Board, recommend to the Board up to three nominees for US Chief Executive Officer and for Chairman of the Board. The Board may select and conditionally approve a nominee from among the nominee or nominees recommended for US Chief Executive Officer and may select and approve a nominee from among the nominee or nominees recommended for Chairman of the Board or, in each case, may reject the same. In the event the nominee or nominees for US Chief Executive Officer or for Chairman of the Board are rejected by the Board, the Nominating Committee shall recommend other nominees as soon as practicable. The nominee for US Chief Executive Officer conditionally approved by the Board shall, after consultation with the Nominating Committee, propose a nominee for Managing Partner to the Board for approval which proposal shall also specify the name of the person to serve as Managing Partner in the circumstances contemplated by 3.043. Following receipt of the proposal for Managing Partner, the Board may approve or reject any nominee for US Chief Executive Officer or for Managing Partner and, in the event of a rejection, the process for determining nominees shall be reinstituted. A ballot for the nominee for US Chief Executive Officer as finally approved by the Board shall be submitted for vote to the Active Parties together with the ballot for the nominee for Chairman of the Board and any other pending nominees for Board Members for that year. The Active Parties shall be notified of the name of the Managing Partner proposed by the nominee for US Chief Executive Officer as well as the name of the person proposed to serve as Managing Partner in the circumstances contemplated by 3.043 and, in each case, approved by the Board. In the event that the Active Parties approve the nominated Chairman, the nominated US Chief Executive Officer and the other nominated Board Members on the first ballot, the new Chairman, US Chief Executive Officer and Managing Partner and the other new Board Members shall be announced on or about September 15 or such other date as shall be specified by the Chairman with the approval of the Board and shall take office on the date that the Board shall have set but in no event later than December 15 of that same year. In the event that one or more of the candidates is not approved by the Active Parties as provided in this Agreement, the Nominating Committee shall be reconvened and shall recommend other nominees who shall be submitted for such approval as soon as practicable. In the event that the nominated US Chief Executive Officer or the nominated Chairman

of the Board or both are not approved by the Active Parties, none of the new Board Members shall take office until each of the new US Chief Executive Officer and the new Chairman of the Board takes office, provided that if the nominated US Chief Executive Officer is approved and the nominated Chairman of the Board is not approved, the new US Chief Executive Officer, the new US Senior Partner (if any) and the new Managing Partner shall take office. In the event that the nominees who were not approved by the Active Parties were not candidates for US Chief Executive Officer or Chairman of the Board, and the nominated US Chief Executive Officer and the nominated Chairman of the Board were approved by the Active Parties, the new US Chief Executive Officer, the new US Senior Partner (if any), the new Chairman of the Board and the new Managing Partner shall take office, but the other new Board Members shall not take office until a full slate of new Board Members takes office. If necessary, the process described above shall be repeated until the required approvals have been obtained. No person shall be selected (other than by the Board to fill a vacancy pursuant to 3.12) as a Board Member or as US Chief Executive Officer (if there is then no US Senior Partner) or Chairman of the Board who has not been recommended by the Nominating Committee except the US Chief Executive Officer (if there is then a US Senior Partner) and the Managing Partner. The Nominating Committee may not recommend any of its members for election as a Board Member, including US Chief Executive Officer or Chairman of the Board. The Nominating Committee shall submit its report and recommendations to the Board and to the Active Parties not later than 30 days prior to the time such nominated individuals, if approved by the Active Parties, will take office. In addition to its recommendations as to nominees, the Nominating Committee shall also provide its insights to the Board with regard to the state of the Partnership and the performance of the Partnership's leadership, including the Board, from the perspective of the Active Parties, and shall make appropriate recommendations. The Nominating Committee shall establish its procedures for consulting with any of the Active Parties on the subject matter of its responsibilities.

3.11. Voting By Parties

3.111. Procedures - All voting by Active Parties for US Chief Executive Officer, Chairman of the Board, other Board Members, a proposed combination or other matters which in the Board's judgment require confidential treatment, shall be by secret ballot or written consent and votes shall be tallied and reported upon in accordance with 3.113. A vote by a majority or by two-thirds of the Active Parties and Voting Interests shall be a vote within the prescribed period by a majority or two-thirds of those Active Parties who are entitled to vote and cast votes and holders of at least a majority or two-thirds of the Voting Interests who are entitled to vote and cast votes, respectively, provided that at least a majority (where a majority vote is required) or at least two-thirds (where a two-thirds vote is

required) of Active Parties and holders of Voting Interests who are entitled to vote cast votes on the matter within the prescribed period. Whenever a matter is submitted for vote by the Active Parties, the Board shall determine the form and content of ballot or consent, the record date for determining Active Parties entitled to vote which shall not be later than, nor more than 10 days before, the date the matter is first submitted to the Active Parties, the period of time during which votes on any matter will be received, which may be extended by the Board, but in any event the period shall not be less than 10 nor more than 60 days after the matter is first submitted for vote by the Active Parties and any other provisions regarding the vote not inconsistent with this Agreement which the Board deems appropriate in the circumstances. Any Active Party who will have or has severed association with the Partnership on or before the last date for receiving votes on any matter shall not be entitled to vote on that matter and such Active Party shall be disregarded for all purposes of the vote.

3.112. Voting Interests - As to each Active Party entitled to vote on any matter, Voting Interests shall be one vote for each full $100 of the aggregate amount of (i) Required Capital or Capital Loans of such Active Party determined pursuant to 5.01 and (ii) if such Active Party is a partner, principal, member or individual with similar status of any Deloitte Operating Entity, Required Capital or Capital Loans (as such terms are defined in the organizational document of such Deloitte Operating Entity) of such Active Party in each such Deloitte Operating Entity, in each case determined as of the record date or as of the end of the month preceding the submission of the matter to the Active Parties, if no record date is set. As to any other Party the Voting Interest shall be as equitably determined by the Board in the circumstances.

3.113. Vote Tallying - With respect to matters which require confidential treatment as provided in 3.111, the votes shall be counted by an outside person selected by the Board (the "Counter"). The Counter shall submit to the Chairman (and simultaneously to the Chairman of the Nominating Committee, in the case of votes as to the election of Board Members, including votes as to the election of the US Chief Executive Officer and the Chairman) or to such other person(s) designated by the Board a written report setting forth only the numbers of Parties and Voting Interests "for" and such numbers "against" the proposal submitted for action, differentiating as may be consistent with this Agreement among those groups required to separately vote on the proposal, but in no circumstances shall the Counter disclose to any person the name of any Party voting or not voting on any matter. The Counter may, if requested, give a preliminary

oral report to the Chairman or other person(s) designated by the Board prior to the end of the period fixed for voting which indicates as at that time only the information as would be included in the Counter's written report, except in the case of votes as to the election of Board Members (including votes as to the election of the US Chief Executive Officer and the Chairman), in which case such a preliminary oral report may be given only to the Chairman of the Nominating Committee. The Chairman shall cause the Counter to be furnished with a list of the Parties and their Voting Interests entitled to vote on the matter, the last date as of which votes shall be received and counted by the Counter, the name of the person or persons to whom the Counter's report (including any oral report) should be submitted and a copy of 3.11 of this Agreement. All ballots or consents and all information relating thereto, other than information to be disclosed in the reports, shall be kept in confidence by the Counter and shall be destroyed not less than 60 days after the last date as of which votes could be received on the matter, except that the Counter may retain a copy of the written report. With respect to matters which the Board determines do not require confidential treatment, the Board will determine the procedures for tallying and reporting the vote.

3.12. Vacancies - Vacancies occurring in the Board (other than the US Senior Partner, if any, the US Chief Executive Officer (if there is then a US Senior Partner) or the Managing Partner) or the offices of US Chief Executive Officer (if there is then no US Senior Partner) or Chairman shall be filled by interim appointment by the Board. A vacancy occurring in the office of the US Senior Partner shall not be filled unless the person then holding office as the US Chief Executive Officer takes office as the chief executive officer of the Global Organization, in which case such person shall cease to be the US Chief Executive Officer. A vacancy occurring in the office of the US Chief Executive Officer (if there is then a US Senior Partner) shall be filled by interim appointment by the US Senior Partner, with the approval of the Board. A vacancy occurring in the office of Managing Partner shall be filled by interim appointment by the US Chief Executive Officer, with the approval of the Board and the US Senior Partner, if any. Except in the case of the US Chief Executive Officer (if there is then a US Senior Partner) and the Managing Partner, no interim appointment shall continue beyond 12 months from the date of appointment or the date on which nominees at the next annual election shall take office, whichever occurs sooner. The Board may call a special election to fill the remainder of the term with respect to any vacancy of an elected position on the Board by vote or consent of the Active Parties, in which event the procedures and vote for the election shall be consistent with those set forth in 3.09, 3.10 and 3.11, except that the Board shall also fix the relevant dates.

3.13. Extraordinary Board Meetings - The Chairman (or as provided in 3.08, the Vice Chairman) shall convene a meeting of the Board within three weeks of the receipt of a written request for such a meeting submitted by any six Board Members or by the Vice Chairman and any two other Board Members.

## ARTICLE 4. EARNINGS OR DEFICIT

4.01. Determination of Earnings or Deficit - The books and records of the Partnership for determining earnings or deficit shall be maintained on a cash basis. The Board may specify the manner in which net earnings are determined for various purposes of this Agreement. The Board may provide also for the maintenance of such supplemental books and records as it deems appropriate for the purposes of this Agreement and the Partnership.

4.02. Units of Net Earnings or Deficit or Net Assets

4.021. Units and Distribution of Net Earnings - The respective interests of each of the Active Parties in the net earnings of the Partnership for any Year shall be based upon an allocation of units or of such other amounts, in each case determined and distributed pursuant to such reasonable plan and criteria as shall be approved by the Board from time to time. The allocation of any such units or other amounts to any Active Party for any Year shall be approved by the Board but shall not establish any rights in or to any property or assets of the Partnership other than the net earnings or other amounts in respect of the Year to which such units or other amounts relate.

4.022. Distribution of Net Assets - The Board may distribute to Active Parties for any Year shares of any net assets (net of liabilities and obligations or amounts allocated for distribution or otherwise by the Board) of the Partnership determined on such basis as the Board shall specify and allocated and distributed pursuant to such reasonable plan and criteria as shall be approved by the Board from time to time.

4.023. Consideration of Deloitte Operating Entities - For purposes of evaluating any plan or criteria relating to the allocation of net earnings or the distribution of net assets for any Year, the Board shall take into account in such manner as the Board considers appropriate allocations of net earnings and distributions of net assets by any Deloitte Operating Entity in respect of such Year.

4.03. Deficit - Any deficit for any Year shall be charged in the order of priority as follows:

4.031. First Level - that portion of the aggregate deficit which does not exceed the aggregate of advances on units of all Active Parties for such Year shall be charged against the Active Parties in the same proportion that their respective advances on units bear to the aggregate of such advances;

4.032. Second Level - any remaining deficit, but only to the extent of the aggregate of the Partnership's Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans, shall be charged against each Active Party in the same proportion that an Active Partner's Required Capital and Supplemental Capital and an Active Principal's Capital Loans and Supplemental Capital Loans bear to the aggregate of such Partnership capital accounts; and

4.033. Third Level - any remaining deficit in excess of advances and aggregate capital shall be charged against the Active Partners in proportion to the aggregate of the distributions made to them under 4.02 in the Year preceding the Year in which the deficit occurs.

4.034. Reallocation - The foregoing provisions of this 4.03 to the contrary notwithstanding, all or any portion of the aggregate deficit, for any Year, may be reallocated among persons who were Active Parties in such Year in such manner as the Board shall approve in order to take into account in such manner as the Board considers appropriate allocations of deficit by any Deloitte Operating Entity in respect of such Year.

Such charges may be effected initially against such amounts maintained by a Party with the Partnership or due to a Party from the Partnership as may be determined pursuant to rules or procedures established by the Board which shall be of uniform application to Parties similarly situated.

4.04. Reports to Active Parties - The Board shall report annually to the Active Parties with respect to the financial and other operations of the Partnership. Each financial statement and each determination of the net earnings per unit and the amount of Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans of each Party shall, upon approval of the Board, be binding upon each Party and the Estate and representatives of each Party.

## ARTICLE 5. CAPITAL

5.01. Required Capital; Capital Loans - Each Active Partner shall maintain with the Partnership an amount of Required Capital, determined under such reasonable formula of uniform application to all Active Partners similarly situated, as may be approved from time to time by the Board, provided that any such formula shall take

into account in such manner as the Board considers appropriate the amounts, if any, that Active Parties are required to maintain as capital or capital loans with any Deloitte Operating Entity. Each Active Principal shall make a Capital Loan to the Partnership in an amount equal to and on the same basis as Required Capital maintained by an Active Partner. Required Capital and Capital Loans, including any increases therein, shall be paid in to the Partnership at such time or times as specified by the Board. Notices of any decreases in Required Capital or Capital Loans of an Active Party shall be given promptly by the Partnership to the affected Party who shall have a reasonable time to elect prompt repayment or to elect to have the amounts remain with the Partnership as may be permitted pursuant to this Agreement.

5.02. Supplemental Capital; Supplemental Capital Loans - Each Active Partner or Active Principal to whom there is allotted any amount of net earnings determined on a basis other than that specified in the first sentence of 4.01 or to whom there is distributed any amount of net assets of the Partnership may be required to maintain with or make to the Partnership such amount of Supplemental Capital or Supplemental Capital Loans, respectively, if any, determined under such reasonable formula of uniform application to all Active Partners or Active Principals, respectively, similarly situated, as may be approved from time to time by the Board, including the creation of differing classes of Supplemental Capital and Supplemental Capital Loans, provided that any such formula shall take into account in such manner as the Board considers appropriate the amounts, if any, that Active Parties are required to maintain as capital or capital loans with any Deloitte Operating Entity. Supplemental Capital and Supplemental Capital Loans, including any increases therein, shall be paid in to the Partnership at such time or times as specified by the Board. Notice of any decreases in Supplemental Capital or Supplemental Capital Loans required to be maintained with the Partnership by an Active Party shall be given promptly by the Partnership to the affected Active Party who shall have a reasonable time to elect prompt repayment or to elect to have the amounts remain with the Partnership as may be permitted pursuant to this Agreement.

5.03. Voluntary Capital Loans - Pursuant to rules and procedures approved by the Board, any Active Party may make Voluntary Capital Loans to the Partnership, subject to 5.05, for such periods and at such rates as the Board shall determine.

5.04. Distributions on Capital and Capital Loans - Each Active Party shall receive with respect to such Party's Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans or Voluntary Capital Loans distributions credited and paid periodically and at a rate (which rate may be different for Voluntary Capital Loans than for the other forms of capital), all as fixed from time to time by the Board, which terms shall be of uniform application to all Active Parties similarly situated, provided that such terms shall take into account in such manner as the Board considers appropriate the terms for distributions, if any, on capital and capital loans

maintained by Active Parties with any Deloitte Operating Entity. Such distributions shall not reduce the balances of such capital or capital loans and shall be in addition to units of earnings or other amounts pursuant to 4.02.

5.05. Subordination to Claims of Creditors: Priority - Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans and Voluntary Capital Loans together with unpaid distributions thereon under 5.04 in each case shall be subordinate to the claims of all creditors of the Partnership, but Voluntary Capital Loans shall rank prior to Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans which shall rank on a parity with each other, in each case together with unpaid distributions thereon under 5.04.

5.06. Reserved Capital - There is also Reserved Capital as described in Schedule 13.05H.

5.07. Capital Account Maintenance and Certain Regulatory Allocations - The Partnership shall determine and maintain a separate capital account for each Party in accordance with Treas. Reg. § 1.704-1(b)(2)(iv) (each, a "Capital Account"). The provisions of Treas. Reg. § 1.704-1(b)(2)(iv), Treas. Reg. § 1.704-2, and Treas. Reg. § 1.704-3 are hereby incorporated into this Agreement by this reference.

5.08. Liquidation in Accordance with Positive Capital Account Balances - Notwithstanding any provision of this Agreement to the contrary, upon the liquidation of the Partnership (or any Party's interest in the Partnership), liquidating distributions shall in all cases be made in accordance with the positive Capital Account balances of the Parties, as determined after taking into account all Capital Account adjustments for the Year during which such liquidation occurs (other than those made pursuant to this 5.08 and 5.09, below), by the end of the Year (or, if later, within 90 days after the date of such liquidation).

For purposes of this 5.08, the liquidation of a Party's interest in the Partnership means the termination of a Party's entire interest in the Partnership (other than such Party's rights, if any, to payments pursuant to Article 6) by means of a distribution, or series of distributions, to the Party by the Partnership, regardless of whether the series of distributions are made in one year or in more than one year. Where a Party's interest in the Partnership is to be liquidated by a series of distributions, the interest will not be considered as liquidated until the final distribution has been made (other than payments, if any, made or to be made pursuant to Article 6).

5.09. Limited Deficit Restoration Obligation - If, on the liquidation of the Partnership, a Party has a deficit balance in such Party's Capital Account, or if, on the liquidation of a Party's interest in the Partnership, such Party has a deficit balance in such Party's Capital Account, in each case as determined after taking into account all Capital Account adjustments for the Year during which such liquidation occurs (other than those made pursuant to this 5.09), each relevant Party shall be unconditionally obli-

gated to restore to the Partnership by the end of such Year (or, if later, within 90 days after the date of such liquidation) such Party's deficit balance to the extent it does not exceed such Party's Qualified Deficit Balance, which amount shall, upon liquidation of the Partnership, be paid to creditors of the Partnership or be distributed (in accordance with 5.08) to other Parties in accordance with their positive Capital Account balances.

For purposes of this 5.09, the following terms shall have the meanings ascribed to them below:

"Code" means the Internal Revenue Code of 1986, as amended.

"Minimum Gain" means an amount computed for each Year for each Party pursuant to Treas. Reg. § 1.704-2(g) and Treas. Reg. § 1.704-2(i)(5).

"Net Income" means an amount, computed for each Year for each Party, equal to the excess, if any, of (i) the items of income and gain allocated to such Party's Capital Account for such Year *over* (ii) the items of deduction and loss allocated to such Party's Capital Account for such Year.

"Net Loss" means an amount, computed for each Year for each Party, equal to the excess, if any, of (i) the items of deduction and loss allocated to such Party's Capital Account for such Year *over* (ii) the items of income and gain allocated to such Party's Capital Account for such Year.

"Qualified Deficit Balance" means, with respect to each Party:

The excess of (X) the sum of (a) the aggregate amount of cash and the fair market value of any property (net of liabilities that are secured by such property that are assumed or taken subject to for purposes of Code § 752) distributed by the Partnership to such Party for all periods from the date of such Party's admission to the Partnership through the end of the Year in which the liquidation of the Partnership or such Party's interest in the Partnership, as the case may be, occurs plus (b) the Qualified Net Loss allocated by the Partnership to the Party for all periods from the date of such Party's admission to the Partnership through the end of the Year in which such liquidation occurs, *over* (Y) the sum of (c) the aggregate amount of cash and the fair market value of any property (net of liabilities that are secured by such property that are assumed or taken subject to for purposes of Code § 752) contributed by such Party to the Partnership for all periods from the date of such Party's admission to the Partnership through the end of the Year in which such liquidation occurs plus (d) the Net Income allocated by the Partnership to the Party for all periods from the date of such Party's admission to the Partnership through the end of the Year in which such liquidation occurs plus (e) such Party's share of Minimum Gain at the time such Qualified Deficit Balance is determined.

"Qualified Net Loss" means a Net Loss allocated to a Party's Capital Account *but only if and to the extent that* the Party to whose Capital Account the Net Loss would be allocated has previously consented in writing to such allocation.

"Liquidation of a Party's interest in the Partnership" (or words of similar import) shall have the same meaning ascribed to such words in 5.08.

5.10. Qualified Income Offset - If a Party unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Partnership income and gain shall be specially allocated to each such Party in an amount and manner sufficient to eliminate, to the extent required by Treas. Reg. § 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Party created by such adjustments, allocations or distributions as quickly as possible; *provided* that an allocation by the Partnership pursuant to this 5.10 shall be made if and only to the extent that such Party would have an Adjusted Capital Account Deficit after all other allocations made or to be made by the Partnership for the relevant Year have been tentatively made as if this 5.10 were not in this Agreement. This 5.10 is intended to comply with the qualified income offset requirement in Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

For purposes of this 5.10, the term "Adjusted Capital Account Deficit" means, with respect to any Party, the deficit balance, if any, in such Party's Capital Account as of the end of the relevant Year, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amounts which such Party is actually obligated to restore pursuant to this Agreement or by operation of law or is deemed to be obligated to restore pursuant to the penultimate sentences of Treas. Reg. §§ 1.704-2(g)(1) or 1.704-2(i)(5); and

(b) Debit to such Capital Account the items described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

5.11. Certain Allocations

5.111. In connection with the liquidation of a Party's interest in the Partnership, the Partnership shall allocate to such Party such amounts of income or loss (or items thereof) as may be necessary to ensure that such Party's Capital Account equals such Party's Target Liquidation Amount; provided, that, after any Qualified Deficit Balance of such Party has been eliminated, the

Partnership shall take into account the period over which such Party receives distributions in liquidation of such Party's interest in the Partnership.

5.112. On the final liquidation of the Partnership, the Partnership shall allocate to Parties with Qualified Deficit Balances in their Capital Accounts an amount of income and gain equal to such Qualified Deficit Balances, pro rata in accordance with the amount of such Qualified Deficit Balances.

5.113. After the application of the provisions of 5.112 above, on the final liquidation of the Partnership, the Partnership shall allocate to each Party such amounts of income or loss (or items thereof) as may be necessary to ensure that there is equality between each Party's Capital Account and such Party's Target Liquidation Amount; provided, that if there are insufficient amounts of such items, or an excess of such items, amounts of such items shall be allocated among the Parties in such proportions as the Partnership determines to be appropriate to achieve, as closely as is practicable, such equality.

5.114. Except as provided in the next sentence of this 5.114, the Partnership shall not allocate income or loss (or items thereof) to the Parties' Capital Accounts with respect to any Year (the "Relevant Year") until such time (the "Allocation Date") during the immediately succeeding Year as the Partnership has earned gross income (as determined for federal income tax purposes) in an amount equal to the greater of (i) the total amount of Qualified Deficit Balances of all Parties with Qualified Deficit Balances and (ii) the excess, if any, of the total amount of Target Liquidation Amounts of all Parties over the total amount of the Capital Accounts of all Parties, excluding for purposes of all such calculations the Capital Accounts and Target Liquidation Amounts of those Parties with Capital Accounts in excess of their Target Liquidation Amounts, with all such amounts determined as of the end of the Relevant Year as if the Partnership had allocated its taxable income or loss and made distributions as of such date. If the Allocation Date has not occurred by the time (including available extensions) the Partnership must file its federal income tax return on Form 1065 with respect to the Relevant Year (the "Filing Date"), the Partnership shall allocate income or loss (or items thereof) with respect to the Relevant Year as provided in 5.112 and 5.113 above; provided, that in allocating such income or loss (or items thereof) pursuant to the preceding portion of this sentence, the Partnership shall, as it deems appropriate, take into account such amounts of gross income that the Partnership has earned as of the Filing Date.

"Liquidation of a Party's interest in the Partnership" (or words of similar import) shall have the same meaning ascribed to such words in 5.08.

"Qualified Deficit Balance" shall have the same meaning ascribed to such words in 5.09.

"Reserved Capital" shall have the same meaning ascribed to such words in 5.06.

"Target Liquidation Amount" means, with respect to each Party, the sum of the following amounts, to the extent determined to be payable with respect to such Party pursuant to this Agreement (other than Article 6 of this Agreement): such Party's Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans, Voluntary Capital Loans and related amounts. To the extent that some amount of Reserved Capital is determined to be payable to a particular Party, such sum should also be included in such Party's Target Liquidation Amount.

## ARTICLE 6. RETIREMENT, DISABILITY AND DEATH

6.01. Status: Categories of Benefits - Upon retirement or death an Active Party shall be deemed to have severed such Party's association with the Partnership and upon disability shall have the status as specified in 6.09-2 of Schedule 6.09. In any such event a Party shall be entitled to a D&T Benefit, a D Benefit, a T Benefit or a Special Benefit, in each circumstance payable out of amounts determined by the Board of Directors to be earnings under 4.01 for any Year, based upon the terms and conditions set forth in this Article 6. All references in this Article 6 to earnings of the Partnership under 4.01 and to distributions under 4.02 and 5.04 shall be deemed to include earnings of and distributions by, respectively, in the aggregate, the Partnership, each Deloitte Operating Entity, and of such other Connected Entities as may be specified from time to time by the Board, combined in accordance with accounting principles approved by the Board, provided that references in 6.031 to distributions to an Active Party under 4.02 and 5.04 shall be deemed to mean the distributions made to such Active Party during the relevant period by (i) the Partnership under 4.02 and 5.04 of this Agreement, (ii) any Deloitte Operating Entity under provisions similar to 4.02 and 5.04 of this Agreement and (iii) such other Connected Entities as may be specified from time to time by the Board so as to accomplish the intent of these provisions. References in this Agreement and in the schedules to this Agreement to Article 6 shall include the schedules to this Article 6.

6.011. D&T Benefit - a retirement, death or disability benefit as set forth in 6.014 through 6.19 applicable to an individual who became an Active Party on or after December 3, 1989 and who is not entitled to a benefit under 6.012, 6.013 or 6.014.

6.012. D Benefit - a retirement, death or disability benefit as set forth in Schedule 6.012 to this Agreement applicable to an individual who became an Active Party as of December 3, 1989 and who immediately prior thereto had been a partner or director of the Deloitte Firm.

6.013. T Benefit - a retirement, death or disability benefit as set forth in Schedule 6.013 to this Agreement applicable to an individual who became an Active Party as of December 3, 1989 and who immediately prior thereto had been a Partner (CPA or Non-CPA) of the Touche Firm.

6.014. Special Benefit - a retirement, death or disability benefit applicable to a Party on such terms and conditions as are determined and approved by the Board of Directors to be in the best interests of the partnership.

6.02. Election of Retirement; Months; Accounting Period; Notice of Election; Waiver of Notice; Request to Retire Other Than at Year End; Mandatory Retirement Date; Term Certain

6.021. Election of Retirement - Subject to prior notice in accordance with 6.023, an Active Party may elect to retire pursuant to 6.05, 6.06 or 6.07 effective at the close of business on the last day of any Year which is prior to such Party's Mandatory Retirement Date. In such event retirement shall commence as of the first day of the month following the end of such Year (unless the Chairman consents to another date pursuant to 6.023 which is prior to such Party's Mandatory Retirement Date), and the Party shall receive the benefits to which such Party is entitled under this Article 6.

6.022. Month(s); Accounting Period - Month or months for these purposes shall be a calendar month or months except that the month of May shall be deemed to end on the last day of a Year and the month of June shall be deemed to begin on the following day. Accounting period for purposes of this Article 6 shall be the period forming a portion of a Year as approved from time to time by the Board of Directors for accounting purposes such that the first day of the first accounting period for any Year shall begin on the first day of such Year and the last day of the last accounting period for any Year shall end on the last day of such Year. For purposes of calculation or payment of any amount the first day of any month shall be deemed to be the first day of the first accounting period beginning during such month. The relationship between months and accounting periods shall be interpreted so as to assure that any Party entitled to benefits shall receive full benefits on an annual basis.

6.023. Notice of Election; Request to Retire Other Than at Year End; Effective Date of Retirement; Waiver of Notice - An Active Party shall make an

Confidential

election under 6.021 by giving at least 180 days' prior written notice to the Chairman of the Board, which notice shall set forth the last day of a Year as provided in 6.021. An Active Party may request that such Party retire at the close of business on the last day of a month other than the last day of a Year and, if the Chairman of the Board consents in writing to such other date, then such Active Party shall retire effective at the close of business on the day specified in such consent. The Chairman of the Board or the Board of Directors may waive such prior notice requirement.

6.024. Mandatory Retirement Date - An Active Party's Mandatory Retirement Date is the close of business of the last day of the Year in which such Active Party reaches age 62, unless deferred by the Board of Directors as provided in 6.084.

6.025. Term Certain - A term certain is a fixed number of months for which benefits payments are made pursuant to this Article 6 whether or not the Party or other person to whom the payments relate survives during the months in which such payments are made.

6.03. Retirement Base Income: Retirement Income Percentage

6.031. Retirement Base Income - Retirement Base Income shall be the average of an Active Party's distributions under 4.02 (except as provided in this 6.031) for the 5 Qualifying Years in which such distributions to such Active Party were the highest, or if an Active Party has less than 5 Years as an Active Party, the average of such distributions for such lesser number of Years or portions of a Year. Distributions under 4.02 for purposes of this 6.031 shall not include any

6.031a. distribution on Capital or Capital Loans under 5.04,

6.031b. distribution on Reserved Capital (including Unallocated Capital of an individual who prior to December 3, 1989 had been a partner (CPA or Non-CPA) of the Touche Firm) under Schedule 13.05H,

6.031c. payment of Reserved Capital (including Unallocated Capital of an individual who prior to December 3, 1989 had been a partner (CPA or Non-CPA) of the Touche Firm) under Schedule 13.05H,

6.031d. other payments which are not a distribution made generally to Active Parties and which are paid to or for an Active Party, except as otherwise provided by the Board of Directors, and

6.031e. distribution under 4.022 which the Board of Directors determines shall not be treated as a distribution for these purposes.

Qualifying Years shall be the 10 consecutive Years (or such number of consecutive Years equal to or greater than 5 but less than 10 if an Active Party has less than 10 consecutive Years as such) ending with the Year in which the effective date of retirement occurs. Distributions under 4.02 to an Active Party for any partial Year shall be annualized for purposes of determining Retirement Base Income. For any Year or partial Year in which such distributions will not be determinable until a date later than the date for commencement of payment of a Party's retirement benefits, an estimate of such annualized distributions of an Active Party shall be made for purposes of Retirement Base Income, and such Retirement Base Income based upon such estimate and any retirement benefits based upon such estimate shall be retroactively adjusted (without interest) to actual distributions on an annualized basis for such Year.

6.032. Retirement Income Percentage - The Retirement Income Percentage shall be 1% (one percent) for each full Partner Service Year at retirement plus a fraction, if any, of 1% (one percent) for any partial Partner Service Year determined by dividing the number of months in the partial Partner Service Year by 12.

6.04. Partner Service Years - Partner Service Years shall be the number, not in excess of 25, determined by dividing the number of consecutive months during which an Active Party serves as such by 12. A leave of absence granted pursuant to 7.04 shall not be considered a break in consecutive months of service.

6.05. Normal Retirement

6.051. Effective Date - Normal Retirement shall be effective at such Active Party's Mandatory Retirement Date or such earlier date, which is after such Active Party reaches age 62, to which the Chairman of the Board has consented in accordance with 6.023.

6.052. Benefit; Duration - Normal Retirement Income for each 12-month period for a Party shall be such Party's Retirement Base Income multiplied by such Party's Retirement Income Percentage. Such Normal Retirement Income shall be payable for a term certain commencing at retirement of 120 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional retirement payment under 6.11.

6.06. Early Retirement

6.061. Effective Date; General - Early Retirement shall be effective at the election of an Active Party at the close of business on the last day of any Year which occurs between the date such Active Party reaches age 55 and prior to the date such Active Party reaches age 62. If the Chairman of the Board has consented in accordance with 6.023 to the last day of another month which must be after the date such Active Party reaches age 55 but prior to the date such Active Party reaches age 62, such retirement shall be effective at the date specified in such consent. Early Retirement shall entitle such Party to Early Retirement Income pursuant to 6.062, 6.063, 6.064 or 6.065, whichever is applicable.

6.062. Benefit for an Active Party Retiring at or After Age 60 and Prior to Age 62; Duration - Early Retirement Income for an Active Party retiring at or after age 60 and prior to age 62 shall be the amount determined by multiplying such Party's Retirement Base Income by such Party's Retirement Base Percentage. Such Early Retirement Income shall be payable for a term certain commencing at retirement of 120 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under 6.11.

6.063. Benefit for an Active Party with at least 15 Partner Service Years and Retiring at or After Age 55 and prior to Age 60; Duration - Early Retirement Income for each 12-month period for a Party with at least 15 Partner Service Years at retirement and who retires at or after age 55 and prior to age 60 shall be the amount determined by

(i) multiplying such Party's Retirement Base Income by such Party's Retirement Income Percentage and then

(ii) subtracting from the product determined in (i) .5% (.5 percent) thereof for each month from and after the effective date of retirement through the end of the month in which such Party would reach age 60.

Such Early Retirement Income shall be payable for a term certain commencing at retirement of that number of months set opposite the age of such Party at retirement in Schedule 6.063 attached to this Agreement and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under 6.11.

6.064. Benefit for an Active Party with at least 10 or more but less than 15 Partner Service Years and Retiring at or After Age 57 and prior to Age 60; Duration - Early Retirement Income for each 12-month period for an Active Party with at least 10 or more but less than 15 Partner Service Years at retirement and who retires at or after age 57 and prior to age 60 shall be the amount determined by

(i) multiplying such Party's Retirement Base Income by such Party's Retirement Income Percentage and then

(ii) subtracting from the product determined in (i) .3333% (.3333 percent) thereof for each month from and after the effective date of retirement through the end of the month in which such Party would reach age 62.

Such Early Retirement Income shall be payable for a term certain commencing at retirement of that number of months set opposite the age of such Party at retirement in Schedule 6.064 attached to this Agreement and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under 6.11.

6.065. Benefit for an Active Party with at least 10 or more but less than 15 Partner Service Years and Retiring at or After Age 55 and prior to Age 57; Duration - Early Retirement Income for each 12-month period for an Active Party with at least 10 or more but less than 15 Partner Service Years at retirement and who retires at or after age 55 and prior to age 57 shall be the amount determined by

(i) multiplying such Party's Retirement Base Income by such Party's Retirement Income Percentage,

(ii) multiplying the product determined in (i) by 80% (80 percent), and then

(iii) reducing on an actuarial basis the product determined in (ii) from age 57 to the age of the Party at the effective date of retirement.

Such Early Retirement Income shall be payable for a term certain commencing at retirement of 150 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under 6.11.

6.07. 50/54 Retirement

6.071. Definition; Effective Date - Any Active Party who has at least 10 Partner Service Years and is between the ages of 50 and 55 is eligible for retirement which shall be referred to as 50/54 Retirement. 50/54 Retirement shall be effective at the election of an Active Party as of the last day of any Year which occurs between the date such Active Party reaches age 50 and prior to the date such Active Party reaches age 55. If the Chairman of the Board has consented in accordance with 6.023 to the last day of another month which must be after the date such Active Party reaches age 50 but prior to the date such Active Party reaches age 55, such retirement shall be effective at the date specified in such consent.

6.072. Benefit; Duration - 50/54 Retirement Income for each 12-month period shall be the amount determined by

(i) calculating Early Retirement Income under 6.065 for such Active Party as if age 55 but with such Party's actual Partner Service Years, and then

(ii) reducing on an actuarial basis the amount determined in (i) from age 55 to the age of such Party at the effective date of retirement.

Such 50/54 Retirement Income shall be payable for a term certain commencing at retirement of 150 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under 6.11.

6.08. Special Retirement

6.081. Definition; Effective Date - Special Retirement is any retirement which is not Normal Retirement, Early Retirement or 50/54 Retirement determined and approved by the Board of Directors as being in the best interest of the Partnership. Special Retirement may be effective at any time as determined by the Board of Directors. With respect to an involuntary retirement under 6.083 such retirement shall be effective as of the date specified in the vote pursuant to 7.02 or 7.03.

6.082. Benefit; Duration - Special Retirement Income shall be such amount (which may include a Cost of Living Adjustment, if so provided, which may be limited) payable in a lump sum or for such period of time and in such manner and commencing on such date as approved by the Board of Directors as being in the best interests of the Partnership.

6.083. Involuntary Retirement - Upon the approval by the Board of Directors, an Active Party who shall have severed association with the Partnership by vote as provided in 7.02 or 7.03 shall be deemed to have involuntarily retired effective as of the date specified by such vote, in which event such Party may receive Special Retirement Income, if any, as determined under 6.082. Such Special Retirement Income, including a determination by the Board of Directors that no Special Retirement Income shall be paid, shall be in lieu of any other retirement benefit which such Party would otherwise be entitled to receive under this Article 6.

6.084. Deferred Retirement - In unusual or special circumstances determined by the Board of Directors to be in the best interests of the Partnership and with the consent of an Active Party, such Active Party's retirement may be deferred with the approval of the Board of Directors to a date subsequent to such Active Party's Mandatory Retirement Date which in no event shall be later than the end of the Year in which such Active Party would reach age 65. In the event of such a deferral, the Party shall receive Special Retirement Income as determined under 6.081 and 6.082.

6.09. Disability - The Board of Directors may make a determination in accordance with the provisions of Schedule 6.09 regarding the disability of an Active Party and upon making such a determination that a disability exists the rights of and obligations with respect to such Active Party shall be determined in accordance with Schedule 6.09. The provisions of this 6.09 are intended to supersede and replace the provisions of subsections (7)(ii) and (7)(iii) of Section 15-601 of the Act.

6.10. Death During Active Service

6.101. Commencement - A Death Benefit shall commence as of the first day of the month following the month in which the death of an Active Party occurs. Death for these purposes shall be deemed to have occurred on the date set forth on the death certificate of an Active Party or upon a final legal determination as to the date that an Active Party died.

6.102. Benefit for an Active Party who Dies Before the Special Eligibility Date; Duration - The Death Benefit for an Active Party who dies before the date (the "Special Eligibility Date") which is the earlier of (a) the first date on which such Active Party has reached age 50 and has at least 10 Partner Service Years and (b) the date on which such Active Party has reached age 60 shall be an amount equal to Normal Retirement Income determined for such Active Party as if such Active Party had continued in active service to such Active Party's Mandatory Retirement Date. The Death Benefit shall be payable for a term of 120 months commencing with the month following the month in which death occurs.

6.103. Benefit for an Active Party who Dies On or After the Special Eligibility Date; Duration - Unless a valid election to receive a Pre-Retirement Death Benefit is made under 6.104, the Death Benefit for an Active Party who dies on or after the Special Eligibility Date shall be the Death Benefit determined in accordance with 6.102, except that such Death Benefit determined in accordance with 6.102 shall be paid to such Active Party's spouse, if any, in the absence of a designation by such Active Party of a beneficiary under 6.14.

6.104. Pre-Retirement Death Benefit - A Pre-Retirement Death Benefit shall be an elective death benefit available to an Active Party between such Active Party's Special Eligibility Date and the effective date of retirement or disability of such Active Party. Upon the death of an Active Party while the Pre-Retirement Death Benefit is so available, such Active Party's designated beneficiary under 6.14 (if such designated beneficiary is only one person and is a natural person), or in the absence of designation of a beneficiary under 6.14 by such Active Party, the spouse, if any, of such Active Party, may elect to receive the Pre-Retirement Death Benefit as provided hereby. Such Pre-Retirement Death Benefit shall be determined as if the Party had elected the 100% Joint and Survivor Benefit under 6.111a with respect to such electing person and had retired on the date such Party's death occurs and before receiving any benefits payments, except that the term certain for a Pre-Retirement Death Benefit shall be 120 months. Payment of such Pre-Retirement Death Benefit shall commence with the month following the month in which death occurs. The Partnership shall provide to each person entitled to make such an election reasonable information with respect to the options available to such person under this 6.104. Rules established by the Board of Directors shall govern the form of such election and all other matters which the Board of Directors deems appropriate in connection with such benefit.

No costs shall be imposed for the Pre-Retirement Death Benefit in respect of the period commencing on November 3, 2002. All elections in respect of a Pre-Retirement Death Benefit made prior to November 3, 2002 by a person who is an Active Party on such date shall become null and void on such date and cease to have any further effect, except that, in accordance with such elections, the retirement, disability or death benefit otherwise payable pursuant to this Article 6 with respect to any Active Party who made such an election shall be reduced by .3% for each year (pro rated for any portion of a year) that such election was in effect.

6.105. Special Death Benefit - A Special Death Benefit shall be such amount (which may include a Cost of Living Adjustment, if so provided, which

may be limited) payable in a lump sum or for such period of time, in such manner and effective at such date as determined and approved by the Board of Directors as being in the best interests of the Partnership.

6.11. Optional Forms of Payment and Deferred Payment of Benefits

6.111. Joint and Survivor Benefits - An Active Party may elect prior to retirement or disability and prior to commencement of benefits to have Normal Retirement Income, Early Retirement Income, 50/54 Retirement Income, Disability Benefits for a Party who is at least age 50 at the time of disability (unless otherwise provided by the Board of Directors) or, if it is authorized by the Board of Directors, Special Retirement Income paid in the form of actuarially equivalent reduced joint and survivor amounts which are a 100% Joint and Survivor, a 75% Joint and Survivor or a 50% Joint and Survivor Benefit as described in 6.111a through 6.111c and subject to 6.111d and 6.111e.

6.111a. a 100% Joint and Survivor Benefit is amounts payable for the longer of the term certain for payment of a Party's benefits or such Party's life and after the death of such Party payable in an equal amount to the Party's survivor, if then living, during the balance, if any, of such term certain and continuing for so long as such survivor survives and after such term certain for the life of such survivor.

6.111b. a 75% Joint and Survivor Benefit is amounts payable for the longer of the term certain for payment of a Party's benefits or such Party's life and after the death of such Party payable in an equal amount to the Party's survivor, if then living, during the balance, if any, of such term certain and continuing for so long as such survivor survives and after such term certain for the life of such survivor in an amount equal to 75% of the amount of the benefit as of the end of such term certain.

6.111c. a 50% Joint and Survivor Benefit is amounts payable for the longer of the term certain for payment of a Party's benefits or such Party's life and after the death of such Party payable in an equal amount to the Party's survivor, if then living, during the balance, if any, of such term certain and continuing for so long as such survivor survives and after such term certain for the life of such survivor in an amount equal to 50% of the amount of the benefit as of the end of such term certain.

6.111d. for purposes of 6.111a through 6.111c a Party's survivor shall be the one natural person designated (by written instrument addressed to and received by the Chairman of the Board and in form satisfactory to the Chairman or the Chairman's designee) at the time of such Party's election of a Joint and Survivor Benefit hereunder as such Party's survivor for such purposes.

6.111e. if a Party and such Party's survivor die during the term certain for payment of benefits under any of 6.111a through 6.111c, payments for the balance of the term certain shall be made to such Party's Estate unless a beneficiary or beneficiaries have been designated under 6.14.

6.112. Additional Optional Forms for Payment - The Board of Directors from time to time may make available to Parties or others entitled to receive payments of retirement, disability or death benefits such additional optional forms of payment of such benefits as such Board shall deem appropriate, provided that any such forms for payment of benefits shall not increase the cost of such benefits to the Partnership (cost being determined on such basis as such Board shall deem appropriate).

6.113. Deferred Payment of Benefits

6.113a. An Active Party may elect prior to retirement to have the commencement of payment of Early Retirement Income, 50/54 Retirement Income or, if it is authorized by the Board of Directors, Special Retirement Income deferred to any month following the effective date of retirement up to and including the month following the month in which such Party reaches age 62. For a Party electing deferred payment of benefits the notice under 6.023 shall set forth also the month and year in which payment of the retirement income shall commence and such Party's determination as to whether the election under 6.113c shall or shall not be applicable with respect to such Party's retirement. The first day of the month in which payment of retirement income is to commence is the Payment Date. By similar written notice given not less than 60 days prior to the Payment Date, any such Party may change a Payment Date to a later date or may change whether or not the election under 6.113c shall be applicable with respect to such Party's retirement. The Chairman of the Board or the Board of Directors may waive the prior notice requirement but not the content of the notice. For a person desiring to elect deferred payment of the Pre-Retirement Death Benefit such person shall

specify as part of the election under 6.104 the month and year (up to and including the month following the month in which the applicable Party would have reached age 62) to which commencement of payment of such Party's Pre-Retirement Death Benefit shall be deferred. The first day of the month in which payment of the deferred Pre-Retirement Death Benefit is to commence is the Payment Date for such Benefit.

6.113b. If a Party or other person elects deferred payment of retirement income or the Pre-Retirement Death Benefit under 6.113a, the retirement income or Pre-Retirement Death Benefit, as applicable, for each 12-month period shall be determined under that provision of 6.05, 6.06, 6.07 or 6.104 as would be applicable if the applicable Party had retired or died, as applicable, on the Payment Date (at the retiring Party's age on the Payment Date or in the case of the Pre-Retirement Death Benefit at what the deceased Party's age would have been at the Payment Date), but with the Party's Retirement Base Income and Partner Service Years, in each case at the date of the Party's retirement or the Party's death, as applicable. Such retirement income shall be paid to a retired Party or such Pre-Retirement Death Benefit shall be paid to a Party's survivor (or to such Party's Estate or the designated beneficiary or beneficiaries) for the period as provided in the applicable provisions of 6.05, 6.06, 6.07, or 6.104 pursuant to which the retirement income or Pre-Retirement Death Benefit is determined under this 6.113b.

6.113c. If a Party has stated in such Party's election pursuant to 6.113a that this provision shall be applicable with respect to such Party's retirement, then, in the event of the death of the Party following retirement but at least 5 months before such Party's Payment Date, the person or persons who, or the Estate or other entity which, would have been entitled to receive such payments of retirement income if the Party had died immediately following the first payment of such deferred payment of retirement income (assuming for these purposes that such payment was made on the day of the Party's death) shall be entitled to make a single election, binding upon such person or persons or Estate or other entity, by written notice to the Chairman of the Board, in form and substance satisfactory to such Chairman and received by such Chairman not more than 6 months following the date of death of the Party, to

change the Payment Date selected by the Party to the first day of the month following the month in which the death of the Party occurred or of any subsequent month prior to the Payment Date selected by the Party. In special circumstances the Chairman of the Board may extend the 6 months period during which the election may be made, or, if the Payment Date is less than 6 months following the date of death, at the request of the person or persons, the Estate or other entity entitled to make the election, the Chairman may authorize that the Payment Date be accelerated, but not prior to the first day of the month following the month in which the death of the Party occurred, on such basis as the Chairman deems appropriate in the circumstances. If the person or persons or Estate or other entity claiming the right to make the election under this 6.113c does not satisfy the Chairman of the Board as to any matter relating to such election, such Chairman may declare the right to an election under this 6.113c to have been waived with respect to the payments and such payments shall thereupon be made commencing with the Payment Date selected by the Party.

6.113d. If an election is made under 6.113c to change the Payment Date, then based upon the new Payment Date the retirement income shall be redetermined in accordance with 6.113b and the duration of benefits shall be redetermined in accordance with 6.113b, in each case as if the Party had initially selected the new Payment Date. No interest or other amount will accrue on any payments which are deferred pending the receipt and acceptance by the Chairman of the Board as satisfactory of any election under 6.113a or 6.113c and payment in accordance with that election.

6.114. Actuarial Determinations - The actuarial determinations for purposes of 6.06, 6.07, 6.11 and any other provision of this Article 6 shall be made on the basis of such assumptions as to the mortality or other factors which shall be set forth in rules or procedures approved from time to time by the Board of Directors and which shall be of uniform application as to all persons similarly situated.

6.115. Written Election; Revocation - Election of any benefit pursuant to 6.111 (or 6.112 if the Board of Directors provides for any additional optional forms of payment under that provision) or revocation or change of any election shall be by written instrument addressed to and received by the

Chairman of the Board or the Chairman's designee. The Board of Directors shall approve from time to time rules and procedures with respect to elections pursuant to 6.11 which may establish the terms and conditions upon which an election is made, changed or revoked. Unless otherwise specified in such rules, an election shall become effective with the first payment of a benefit pursuant to this Article 6.

6.12. Cost of Living Adjustment

6.121. Retirement Income Subject to Adjustment - The following benefits shall be adjusted annually for changes in the cost of living, if earned by the Partnership, measured by the Cost of Living Adjustment, as provided in this 6.12:

(i) Normal Retirement Income,

(ii) Early Retirement Income,

(iii) 50/54 Retirement Income,

(iv) Special Retirement Income, if and to the extent such Cost of Living Adjustment is so provided for by the Board of Directors,

(v) Death Benefits (excluding Special Death Benefits except to the extent such Cost of Living Adjustment is provided for by the Board of Directors) and with respect to Pre-Retirement Death Benefits under 6.104 after reduction for the costs, if any, imposed for such Benefits hereunder,

(vi) Disability Benefits pursuant to 6.09-3a of Schedule 6.09 and if and to the extent such Cost of Living Adjustment is so provided for by the Board of Directors, other Disability Benefits,

(vii) any of the foregoing benefits paid as joint and survivor forms of payment under 6.111,

(viii) any of the foregoing benefits paid as deferred payments under 6.113, and

(ix) if and to the extent such Cost of Living Adjustment is so provided for by the Board of Directors, any benefits paid as additional optional forms of payment under 6.112.

6.122. Definitions

6.122a. The Cost of Living Adjustment for any Year shall be the amount (positive, negative or zero) obtained by multiplying the amount of the applicable benefit referred to in 6.121 payable as of the beginning of any Year (including any Cost of Living Adjustment under this 6.122a for any prior Year or Years) by the lesser of the Cost of Living Factor for the Year (which may be positive, negative or zero) and the Earnings Factor for such Year; provided that, if the Earnings Factor for such Year is zero or a negative percentage, the Earnings Factor for such Year for purposes of this 6.122a shall be zero. The Cost of Living Adjustment shall be made during the period of 120 months commencing at retirement, death or disability (unless otherwise provided with respect to any Special Retirement, Special Death or Disability Benefits) or commencing at the Payment Date for deferred payments under 6.133. The Cost of Living Adjustment for each month of any partial Year shall be the Cost of Living Adjustment for such Year divided by 12.

6.122b. The Cost of Living Factor for any Year shall be the percentage increase or decrease, if any, of the Index for such Year over or from the Index for the preceding Year.

6.122c. The Index shall be the Personal Consumption Expenditure Deflator as published by the Bureau of Labor Statistics of the United States government or such other index published by the United States Government or an agency thereof or other entity as the Board of Directors shall select from time to time in its sole discretion as being the index which most nearly reflects the effects of inflation on retired Parties and the Index for any Year shall be the average of the indices for each of the publication periods (but not more frequently than monthly) contained in a Year.

6.122d. The Earnings Factor for any Year (which may be positive, negative or zero) shall be the average of the percentage increases or decreases from Year to Year of the Average Annual Earnings Attributable to Active Parties for each of the 5 Years ending with such Year.

6.122e. The Average Annual Earnings Attributable to Active Parties for any Year shall be the aggregate of the distributions under 4.02 and 5.04 (except for distributions on Voluntary Capital

Loans) to Active Parties for such Year (but, unless otherwise provided by the Board of Directors, shall not include any of the amounts described in 6.031b, 6.031c and 6.031e) divided by the number of Active Parties for such Year. For purposes of determining the number of Active Parties for any Year any Party who held units participating in such distributions for less than a full Year shall be included in such number of Active Parties as a fraction determined by dividing the number of full months for which such Party held such units by 12. With respect to Years ending prior to June 3, 1990, such Average Annual Earnings Attributable to Active Parties shall be determined on such pro forma basis as the Board of Directors shall determine to be appropriate in the circumstances.

6.123. COLA Deficit; Recovery of COLA Deficit in 3 Succeeding Years - If the Cost of Living Factor is a positive percentage for any Year and exceeds the Earnings Factor for such Year, then the cost of living increase for such Year was not earned. The amount of Cost of Living Adjustment not earned (and therefore not payable) for any Year, which is referred to as the COLA Deficit is computed by multiplying the amount of the applicable benefit referred to in 6.121 payable as of the beginning of the such Year (including any Cost of Living Adjustment under 6.122a for any prior Year or Years) by the excess of the Cost of Living Factor over the Earnings Factor, which Earnings Factor if less than zero shall be deemed to be zero for this purpose. The COLA Deficit for any Year may be recovered and therefore become payable in the first succeeding, the second succeeding or the third succeeding Year following the Year in which the COLA Deficit occurred and in that order of priority, if and to the extent, if any, that the Earnings Factor for such first, second or third succeeding Year, respectively, exceeds the Cost of Living Factor for such first, second or third Year, respectively. The amount of COLA Deficit, if any, which is recovered and which therefore becomes payable for such first, second or third succeeding Year (together with any additional adjustment to the COLA Deficit so recovered due to increases in the cost of living in intervening Years which have been earned is referred to as Supplemental COLA Income for such Year.

6.124. Recovery of Overpayment of Benefits; Prospective Reduction - If the Cost of Living Factor decreases between a Year and the first succeeding Year (the Reduction Year), the amount of the applicable benefit referred to in 6.121 for the Reduction Year shall be reduced. The amount of the reduction for any Reduction Year shall be computed by multiplying the amount of the applicable benefit referred to in 6.121 payable as of the beginning of

the Reduction Year (including any Cost of Living Adjustment under 6.122a for any prior Year or Years) by the percentage decrease in the Cost of Living Factor for the Reduction Year. The amount of such reduction for the Reduction Year shall be recovered from the person or persons receiving such benefit as provided in 6.182; person or persons for purposes of this 6.124 shall have the meaning set forth in 6.17. In the event that the Board of Directors determines either prior to or during any Year that such Year will be a Reduction Year, the Board of Directors may estimate the amount of the reduction and may provide for the recovery of such reduction during the Reduction Year or thereafter in such manner and amount as such Board shall deem appropriate in the circumstances.

6.125. Additional Provisions - Additional provisions regarding the Cost of Living Adjustment and Supplemental COLA Income are set forth in Schedule 6.12 to this Agreement.

6.13. Manner and Time of Payments of Benefits

6.131. General - Normal Retirement Income, Early Retirement Income, 50/54 Retirement Income, Special Retirement Income, Disability Benefits and Death Benefits shall be payable for any Year out of amounts determined as provided in 6.01.

6.132. Periodic Payments - All such benefits (unless otherwise provided with respect to Special Retirement, Disability or Special Death Benefits) shall be paid in approximately equal bi-weekly, monthly or other periodic payments during each Year as determined by the Board of Directors from time to time.

6.133. Cost of Living Adjustment - Cost of Living Adjustment for any Year shall be paid (i) for that Year as soon as practicable following the end of that Year to which it relates and (ii) for the Year first succeeding such Year and subsequent Years as an addition to the periodic payments.

6.134. Supplemental COLA Income - Supplemental COLA Income for any Year shall be payable in the same manner and at the same time as the Cost of Living Adjustment for the Year for which it is earned.

6.14. Designation of Beneficiaries - A Party may designate (consistent with any election pursuant to 6.104 or 6.11) one or more beneficiaries to receive the amounts to become due and payable to such Party under this Article 6 by written instrument addressed to and received by the Chairman of the Board and in form satisfactory to the Chairman or the Chairman's designee. The Board of Directors shall establish rules regarding the type and nature of designation of beneficiaries which will be acceptable, when

such designation of beneficiaries may be made, the right to change any such designation, the number of beneficiaries which may be named, the manner in which payments may be divided among the beneficiaries and other rules which limit the responsibility and administrative burden upon the Partnership in dealing with designations of beneficiaries and with beneficiaries. Such rules may permit the designation of a beneficiary or beneficiaries by an individual who is not a Party but who is entitled to receive benefits under this Article 6. No designation of a beneficiary shall confer upon any such beneficiary any rights in the Partnership or under the Partnership Agreement and any such beneficiary and the benefits otherwise due to such beneficiary shall be subject to all claims of or upon the Partnership and to all limitations applicable to the Party or retired Party who made the designation with respect to such payments under the Partnership Agreement and all rights, if any, of such Party or retired Party under the Partnership Agreement shall remain in such Party or retired Party, as the case may be, and shall not inure or transfer to any such beneficiary.

6.15. General Conditions

6.151. Partial Year - in the event a benefit provided under this Article 6 becomes payable for any period which is less than a full Year, the benefit to be paid for such partial Year shall be that portion of a full Year benefit which the number of whole months in the partial Year bears to the number 12.

6.152. Death after Commencement of Benefits - in the event any person receiving benefits under this Article 6 dies prior to the end of the applicable term certain for benefits, unless payments are due to a Party's survivor under 6.11, then all remaining payments of benefits shall be made to the person's estate or to such person or persons, if any, designated in accordance with 6.14 to receive such benefits in such circumstances.

6.16. Retirement, Disability or Death Benefits Under Prior Agreements - Retirement, disability or death benefits determined and paid in accordance with the prior partnership agreements of the Deloitte Firm or of the Touche Firm or in accordance with other agreements entered into by either of such Firms shall continue to be determined and paid in accordance with such agreements, unless otherwise provided in this Article 6.

6.17. General Limitation on Benefits

6.171. Determination of Limitation - Notwithstanding the foregoing provisions, the aggregate amount paid or payable by the Partnership for any Year to all persons

(i) pursuant to this Article 6 and the Schedules thereto,

(ii) severing association with the Partnership between December 3, 1989 and January 1, 1991 or pursuant to agreements entered into between those dates, and

(iii) receiving payments as a result of obligations incurred by the Deloitte Firm or the Touche Firm prior to December 3, 1989

for retirement, disability or death benefits shall be limited to 17 ½% of the net earnings of the Partnership for such Year under 4.01 as determined on a consistent basis from Year to Year before any reduction of such retirement, disability or death benefits but after any

6.171a. distribution on Capital or Capital Loans under 5.04,

6.171b. distribution on Reserved Capital (including Unallocated Capital of an individual who immediately prior to December 3, 1989 had been a Partner (CPA or Non-CPA) of the Touche Firm) under Schedule 13.05H,

6.171c. distribution under 4.02 which the Board of Directors determines shall not be treated as a distribution of net earnings for these purposes.

Person or persons for purposes of 6.17 and 6.18 shall include all individuals, estates, trusts or other entities receiving retirement, disability or death benefits for such Year.

6.172. Determination of Reduction - The aggregate amount of the reduction required for any Year as a result of the limitation set forth in 6.171 shall be the excess of

(i) the aggregate amount paid or payable for such Year to all persons described in 6.171 for retirement, disability or death benefits, over

(ii) 17 ½% of the net earnings of the Partnership for such Year determined in accordance with 6.171.

6.173. Adjustment of Reduction - For any Year in which a reduction would otherwise be required the Board of Directors may provide for such Year that

(i) the amount under 6.172 (i) shall be determined without regard to all or some portion of the amounts paid for such Year to all persons described in either or both of 6.171 (ii) or 6.171 (iii),

(ii) all or some portion of the amount determined under 6.172 which would otherwise be allocated to all persons described in either or both of 6.171 (ii) or 6.171 (iii) shall not be allocated to such persons under 6.181 and the manner, if any, in which the amount not allocated to such persons shall adjust the amount of the reduction to be allocated to all other persons, or

(iii) all or some portion of the amount determined under 6.172 shall be specifically allocated under 6.181 to the persons as a group receiving a D&T Benefit, a D Benefit or a T Benefit.

6.18. Allocation and Recovery of Reduction in Benefits: Prospective Reduction

6.181. Allocation of Reduction - Any reduction in benefits determined under 6.172 for any Year shall be charged to each person receiving any retirement, disability or death benefits for that Year in that proportion which the amount of benefits paid or payable to each such person for such Year bears to the amount determined for 6.172 (i).

6.182. Recovery of Reduction - Any reduction in benefits determined under 6.172 for any Year charged to any person shall be recovered from such person first by reducing the benefits payable to such person for the first succeeding Year following the Year for which the reduction is made in such manner as the Board of Directors shall determine. If for any reason no benefits or benefits in an amount less than the amount to be recovered are payable to such person for such first succeeding Year, any unrecovered reduction shall be recovered by reducing any other payments due to such person from the Partnership or shall be recovered directly from such person or the estate of any deceased individual in such manner as the Board of Directors shall determine. Notwithstanding, the Board of Directors may defer recovery of any unrecovered reduction to a Year or Years following such first succeeding Year and may obtain recovery in such manner as the Board of Directors shall determine.

6.183. Prospective Reduction - Notwithstanding 6.181, in the event that the Board of Directors determines either prior to or during any Year that reduction in benefits will be required for such Year pursuant to 6.17, the Board of Directors may estimate the amount of that reduction for purposes of 6.17 and may allocate the amount of such reduction to each person receiving any retirement, disability or death benefits for that Year in that proportion which the amount of benefits paid or payable to each such person for such Year bears to the estimate, as determined by such Board, of the amount described in 6.172 (i). In making any estimate or allocation under this 6.183 the provisions of 6.17, 6.181 and 6.182 shall be

applicable as and to the extent the Board of Directors shall deem appropriate in the circumstances.

6.19. Effect of Dissolution - In the event the Partnership is dissolved and its practice is not continued by any successor firm or firms, the payments otherwise due under this Article 6 shall thereupon cease.

6.20. Integration of Benefits Payments with Benefits under the Deloitte & Touche Employees' Pension Plan - The aggregate D&T Benefit determined under this Article 6 (before any reduction under this 6.20) and otherwise payable with respect to any Party for each 12 months shall be reduced by offset against the D&T Benefit otherwise payable under this Article 6 by the amount by which the benefits payable to such Party for such 12 months pursuant to the Deloitte & Touche Employees' Pension Plan (such benefits being referred to as Plan Benefits and such plan being referred to as the Plan) as amended on November 21, 1996, effective as of January 1, 1997, exceed the benefits which would have been payable to such Party for such 12 months pursuant to the Plan if it had not been so amended. The amount of the reduction under this 6.20 against the D&T Benefit otherwise payable under this Article 6 for any Year shall be determined in accordance with rules adopted from time to time by the Board of Directors which take into account, among other matters, the various forms of payment of Plan Benefits, provided that such rules shall be of uniform application with respect to all Parties (unless otherwise provided with respect to a Special Retirement, Disability or Special Death Benefit) similarly situated and shall not result in reduction in benefits pursuant to this 6.20 which would exceed a Party's available or allocated share of Plan Benefits. Without limiting the generality of the preceding sentence for purposes of determining the availability or value of Plan Benefits for purposes of the first sentence of this 6.20 or any allocation of a share of Plan Benefits, the rules adopted by the Board of Directors pursuant to the preceding sentence may include such assumptions as to exercise or non-exercise of options relating to Plan Benefits (which may apply regardless of whether such options, in fact, are or are not exercised) and such assumptions as to actuarial matters, as the Board of Directors may reasonably determine. Where a Party through the designation of one or more beneficiaries under 6.14 has divided the benefits determined under Article 6 (before reduction under this 6.20) to which such Party was otherwise entitled, then for purposes of determining the amount of any reduction under this 6.20 the amount of Plan Benefits shall be allocated to or among such beneficiary or beneficiaries or such beneficiary or beneficiaries and such retired Party (or the estate of such retired Party, if deceased) in such equitable manner as the Board of Directors shall determine under rules established by the Board from time to time, which rules shall be of uniform application with respect to persons similarly situated, unless some other allocation has been made pursuant to the rules established by the Board of Directors with reference to the designation of such beneficiaries under 6.14.

6.21. Integration of Benefits Payments with Active Party Benefits under the Deloitte & Touche Employees' Pension Plan - The aggregate benefits determined under this Article 6 (before any reduction under this 6.21) and otherwise payable with respect to any Party for each 12 months shall be reduced by offset against the benefits otherwise payable under this Article 6 by the amount of benefits payable to such Party for such 12 months pursuant to the Deloitte & Touche Employees' Pension Plan, as amended from time to time, solely in respect of the period following May 30, 1998 during which such Party was an Active Party (such benefits in respect of such period being referred to as Active Party Plan Benefits and such plan being referred to as the Plan), provided that no such reduction by offset shall be made to the extent that Active Party Plan Benefits so payable to a Party were funded by such Party rather than the Partnership. The amount of the reduction under this 6.21 against the benefits otherwise payable under this Article 6 for any Year shall be determined in accordance with rules adopted from time to time by the Board of Directors which take into account, among other matters, the various forms of payment of benefits pursuant to the Plan (such benefits being referred to as Plan Benefits), provided that such rules shall be of uniform application with respect to all Parties (unless otherwise provided with respect to a Special Retirement, Disability or Special Death Benefit) similarly situated and shall not result in reduction in benefits pursuant to this 6.21 which would exceed a Party's available or allocated share of Plan Benefits. Without limiting the generality of the preceding sentence for purposes of determining the availability or value of Active Party Plan Benefits for purposes of the first sentence of this 6.21 or any allocation of a share of Plan Benefits (including Active Party Plan Benefits), the rules adopted by the Board of Directors pursuant to the preceding sentence may include such assumptions as to exercise or non-exercise of options relating to Plan Benefits (which may apply regardless of whether such options, in fact, are or are not exercised) and such assumptions as to actuarial matters, as the Board of Directors may reasonably determine. Where a Party through the designation of one or more beneficiaries under 6.14 has divided the benefits determined under Article 6 (before reduction under this 6.21) to which such Party was otherwise entitled, then for purposes of determining the amount of any reduction under this 6.21 the amount of Plan Benefits (including Active Party Plan Benefits) shall be allocated to or among such beneficiary or beneficiaries or such beneficiary or beneficiaries and such retired Party (or the estate of such retired Party, if deceased) in such equitable manner as the Board of Directors shall determine under rules established by the Board from time to time, which rules shall be of uniform application with respect to persons similarly situated, unless some other allocation has been made pursuant to the rules established by the Board of Directors with reference to the designation of such beneficiaries under 6.14.

## ARTICLE 7. RESIGNATION, WITHDRAWAL AND INVOLUNTARY TERMINATION; LEAVE OF ABSENCE

7.01. Resignation - Any Active Party may sever such Active Party's association with the Partnership effective at the close of business on any date by written resignation given to the Chairman. Such written resignation may specify a later date on which such resignation is to take effect, or if no date is specified will be effective upon the date received by the Partnership. The Chairman may declare the resignation effective at a date earlier than that specified. In addition to the other obligations of the Parties hereunder, each Party agrees to cooperate fully with the Partnership and to take all such actions as the Partnership may reasonably request in order to effect an orderly transition following such Party's dissociation from the Partnership, all during the 45 day period commencing on the date such Party gives such Party's written resignation to the Chairman.

7.02. Withdrawal - Any Active Party shall have severed such Active Party's association with the Partnership by withdrawing therefrom as of a date determined by the Board as the date on which such Active Party ceased to actively participate in the business and affairs of the Partnership without having retired, resigned, become disabled subject to being determined to be disabled, died, been granted a leave of absence, or been absent due to an illness or injury confirmed to the satisfaction of the Partnership or to a vacation within the policy of the Partnership. Such determination of withdrawal shall be made by unanimous vote of the Board with at least 18 Board Members voting, based upon such information as the US Chief Executive Officer can obtain on behalf of the Board after reasonable inquiry and only following reasonable notice from the US Chief Executive Officer to such Active Party directing such Active Party to resume participation. The Chairman shall give written notice to such Active Party of any determination that such Active Party is deemed to have withdrawn, specifying the reason for such determination and the effective date of such withdrawal.

7.03. Involuntary Termination - Any Active Party shall be deemed to have severed such Active Party's association with the Partnership as of the date specified by vote of the Board and approved by vote of a majority of all Active Parties and of Active Parties holding a majority of the Voting Interests. In addition, any Active Party shall be deemed to have severed such Active Party's association with the Partnership as of the date specified by the Board as a result of the determination by unanimous vote of the Board with at least 18 Board Members voting that the Active Party's conduct shall have resulted in or shall consist of

7.031. the Active Party's insolvency or bankruptcy or criminal conviction involving dishonesty or moral turpitude or the creation and continuation of a charging order (within the meaning of Section 15-504 of the Act) in respect of such Active Party's economic interest in the Partnership;

7.032. the imposition by others than the Partnership or its clients of a restriction on the Active Party's right to perform services consistent with such Active Party's position or a restriction on the right of the Partnership to perform, either generally or with respect to any particular client or location, all or any portion of the services normally performed by it; or

7.033. abuse of controlled substances or chemical dependencies (such as intoxicants or drugs) to an extent that such Active Party is unable to perform properly such Active Party's duties.

Notice of such action specifying the effective date signed by the Chairman shall be delivered to the Active Party deemed involuntarily resigned or mailed by registered mail to such Active Party's last known address and thereupon such resignation shall become effective automatically as of the effective date. The provisions of 7.02 and of this 7.03, and the related provisions of 6.083, are intended to supersede and replace the provisions of subsections (6), (7)(ii) and (7)(iii) of Section 15-601 of the Act.

7.04. Leave of Absence - Based on a written request from an Active Party, the Board may grant a leave of absence from the Partnership on such terms and conditions as the Board shall determine, including the terms on which the Active Party may return to active status. A leave of absence shall not be deemed a severing of association with the Partnership for purposes of this Agreement.

7.05. Severing Association with the Firms - Any Party who shall have severed such Party's association with the Partnership, whether by resignation, withdrawal or involuntary termination, shall be deemed also to have simultaneously severed such Party's association with both of the Firms and with any Deloitte Operating Entity, and any subsidiaries thereof, as applicable. Except as otherwise agreed by the Board, any Party who shall have severed such Party's association with any Deloitte Operating Entity, or any other Connected Entity (as defined in section 9.061d) specified from time to time by the Board, whether by resignation, withdrawal or involuntary termination, shall be deemed to have simultaneously severed such Party's association with the Partnership.

## ARTICLE 8. PAYMENT OF CAPITAL, NET EARNINGS AND OTHER AMOUNTS UPON RETIREMENT, DISABILITY, DEATH, RESIGNATION, WITHDRAWAL OR INVOLUNTARY TERMINATION

8.01. General - Except for amounts payable upon retirement, disability or death as provided in Article 6 and except for indemnification as provided in Article 10, upon retirement, disability, death, resignation, withdrawal or involuntary termination an Active Party shall be entitled to payment of only the amounts as provided in this Article 8 at the times indicated, which amounts as paid shall be in full payment for the interest of the

Active Party in the Partnership and the Firms and in full satisfaction of all obligations of the Partnership and the Firms to the Active Party. The provisions contained in Articles 6, 10 and this Article 8 are intended to supersede and replace the provisions of Section 15-701 of the Act.

8.02. Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans, Voluntary Capital Loans and Distributions

8.021. Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans - Upon severance of association with the Partnership by reason of retirement, disability or death, an Active Party's Required Capital and Supplemental Capital or Capital Loans and Supplemental Capital Loans shall, subject to compliance with the terms of this Agreement, be repaid in two approximately equal installments, the first installment to be paid within 60 days following such severance of association and the second installment to be paid not later than the end of the Year following the Year in which such severance occurs provided, however, that, in the alternative, any such Active Party whose severance of association with the Partnership occurs by reason of retirement or disability may elect to be repaid in either two, three, four, five, six, seven, eight, nine or ten approximately equal installments, the first installment to be paid not later than March 15 of the Year immediately following the Year in which such severance occurs and each subsequent installment to be paid not later than March 15 of the year immediately following the year in which the prior installment was paid. Such election must be made in writing and submitted to the US Chief Executive Officer within 30 days following such severance, but not later than the last day of the Year in which such severance occurs, or such subsequent date as the US Chief Executive Officer deems appropriate in the circumstances, shall be irrevocable and, with respect to any such election of any Active Party who is a partner, principal, member or individual with similar status of a Deloitte Operating Entity, must be consistent with such Active Party's election in respect of the repayment of Required Capital and Supplemental Capital or Capital Loans and Supplemental Capital Loans (as such terms are defined in the organizational document of such Deloitte Operating Entity). In accordance with policies recommended by the Chairman and approved by the Board, the US Chief Executive Officer may recommend to the Board for the Board's approval that such payments be made in whole or in part at such earlier times as the US Chief Executive Officer deems appropriate in the circumstances. Upon any other severing of association with the Partnership, an Active Party's Required Capital and Supplemental Capital or Capital Loans and Supplemental Capital Loans shall, subject to compliance with the terms of this Agreement, be repaid in

three installments, the first installment of 50% of the total to be paid within 60 days following such severance and each of the remaining installments of approximately 25% of the total to be paid 9 months and 18 months, respectively, following the first installment. Distributions on Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans shall continue to be made on the same basis as for Active Parties until such amounts are repaid in full, except that such distributions may be accumulated and paid with the installments in such manner as the US Chief Executive Officer may determine. In accordance with policies recommended by the Chairman and approved by the Board, the US Chief Executive Officer may recommend to the Board for the Board's approval that payments be made in whole or in part at such earlier times as the US Chief Executive Officer deems appropriate in the circumstances.

8.022. Voluntary Capital Loans - Voluntary Capital Loans shall, subject to compliance with the terms of this Agreement, be repaid in accordance with the terms and conditions of such Loans.

8.03. Net Earnings - Any Active Party who has severed association with the Partnership shall, subject to compliance with the terms of this Agreement, be entitled to receive (a) the balance of any net earnings for any preceding Year to which such Active Party may be entitled pursuant to 4.02, payable at such time and in such amounts as it would have been paid had such Active Party not severed association, (b) the balance of any Draw or Advances, prorated to the date of severance of association, payable promptly thereafter and (c) the balance, if any, of additional net earnings or other amounts scheduled or approved to be paid to such Active Party pursuant to 4.02 for the current Year, prorated to the date of severance of association, payable at the times and in the proportions substantially similar to those which would have occurred had such Active Party not severed association. In accordance with policies recommended by the Chairman and approved by the Board, the US Chief Executive Officer may recommend to the Board for the Board's approval that any payments pursuant to clauses (a) and (c) of the preceding sentence be made in whole or in part at such earlier times as the US Chief Executive Officer deems appropriate in the circumstances.

8.04. Other Amounts - Any Active Party who has severed association with the Partnership shall be paid such other amounts which that Active Party is entitled to receive pursuant to 4.02 at such times as may be determined by the Board.

8.05. Intervening Death - In the event that a Party who has severed association with the Partnership dies prior to receiving any or all of the above payments, the Party's Estate, or such beneficiary or beneficiaries as may be designated by the Party pursuant to Article 6, shall receive the same payments at the same times that the Party would have otherwise received them.

8.06. Deductions - The Partnership shall have the right to deduct from any of the payments due under 8.02, 8.03 and 8.04 all amounts due from a Party with respect to premiums for continuing insurance or benefits coverage, state, local or other taxes paid or payable by the Partnership on behalf of a Party for the preceding or current Year, loans to a Party made or guaranteed by the Partnership or subject to any commitment given to a lender by the Partnership, balances due to the Partnership under advance/expense reimbursement practices or policies of the Partnership or similar amounts due to the Partnership in connection with the severing of association by a Party, retirement, disability or death of a Party. In addition, the Partnership shall have the right to offset against any such payments any other amounts due to the Partnership from such Party unless provision for the payment of such amounts due to the Partnership is made in a manner satisfactory to the Partnership.

## ARTICLE 9. CERTAIN ACTIVITIES, CONDUCT AND RIGHTS OF PARTIES DURING AND AFTER SEVERING ASSOCIATION WITH THE PARTNERSHIP

9.01. General - Each Party expressly recognizes and acknowledges that the terms and conditions of this Article 9 are necessary to protect the professional practice, confidential information, trade secrets and other legitimate interests of the Partnership, are reasonable as to time, area and scope, are not harmful to the public and are not unduly burdensome to any Party. In addition, each Party expressly recognizes and acknowledges that money damages alone would not adequately compensate the Partnership for failure of any Party to abide by the terms and conditions of this Article 9.

9.02. Activities of Active Parties - Each Active Party shall be just and faithful to the Partnership and the other Active Parties in all actions and in respect of the business and reputation of the Partnership; shall devote that Active Party's entire professional time, attention, efforts and influence to and for the benefit of the business and interests of the Partnership or a Continuing Connected Entity; shall not accept employment on a salary, commission, or contingent or other basis from, or (except for charitable, not-for-profit and similar organizations with which the Partnership customarily expects Active Parties to be associated) become associated with or allow such Party's name to be used by, any individual, partnership, corporation, government agency or other organization other than the Partnership or a Continuing Connected Entity; shall not render (other than on behalf of the Partnership or a Continuing Connected Entity) any professional services (as defined in 9.061c); and, except with the prior written consent of the Chairman within standards established from time to time by the Board, shall not engage in any other profession or business (including the holding of political or legislative office) and shall not fail to comply with the rules relating to outside activities as adopted from time to time by the Board. Each Active Party agrees that such Active Party will

9.021. not engage in any conduct or activity nor commit to hold or hold any property or rights nor refuse to take any action or to enter into any agreement protective of the interests of the Partnership or a Continuing Connected Entity if such action or refusal is contrary or inconsistent with the letter or spirit of the rules relating to independence and conflicts of interest;

9.022. accept and be bound by the decisions of the Board, after promptly being afforded an opportunity to be heard, with respect to matters relating to independence and conflicts of interest and take within the time specified whatever action is recommended by the Board in the circumstances, including, without limitation, the cessation or termination of any rights or the entering into or implementation of any agreements protective of the interests of the Partnership or a Continuing Connected Entity;

9.023. submit to the Partnership at least annually as requested a written report signed by such Active Party setting forth such information as the Board may deem appropriate to ascertain compliance by such Active Party with the rules relating to independence, outside activities and conflicts of interest, and in addition, submit such special written reports on such matters as the Board may request from such Active Party; and

9.024. notify the Chairman promptly in writing if such Active Party becomes a defendant or is subjected to a counterclaim in any judicial or administrative action or proceeding involving in any manner the professional practice of such Active Party or if such Active Party shall become a defendant or is subjected to a counterclaim in any judicial or administrative action or proceeding which might result in liability in an amount which is material to the net worth of such Active Party.

9.03. Activities of Other Parties - Each Party agrees that after ceasing to be an Active Party:

9.031. except with the prior written consent of the Chairman, such Party will comply with the provisions of 9.021 through 9.024 to the extent such requirements are applicable to such a Party;

9.032. except with the prior written consent of the Chairman, while receiving payments under Article 6 or Schedule 13.05D such Party will not accept employment on a salary, commission or contingent or other basis from, or become associated with or permit such Party's name to be used by any individual, partnership, corporation, government agency or other organization, other than the Partnership or a Continuing Connected Entity; or recommend, support, counsel or otherwise directly or indirectly assist any other person or entity engaged in, or engage in, rendering, other than for the Partnership or a Continuing Connected Entity, any professional services as defined in 9.061c; provided, that consent under 9.032 will not be denied unless the Chairman considers such activities detrimental to the interests of the Partnership or a Continuing Connected Entity and that a Party denied consent may request that the Board approve or deny the consent sought by such Party;

9.033. such Party will not disparage the professional reputation of the Partnership or a Continuing Connected Entity nor disparage the professional or personal reputation of any Party, provided that this provision shall not be deemed to restrict any person from providing information to any organization regulating professional conduct or before a court of competent jurisdiction or as otherwise required by law; and

9.034. such Party will cooperate fully with the Partnership in connection with any threat of or actual legal proceeding or claim arising out of any matters with or of which such Party had contact or knowledge while an Active Party.

9.04. Confidentiality of Information; Trade Secrets - Each Party shall keep secret and confidential and shall not disclose to others, except to Active Parties, professional staff and other employees (in each case who need to know), except to others in the proper conduct of the business of the Partnership and except as required by law, the names of any clients of the Partnership or a Connected Entity, information regarding the services rendered to any such clients or the financial, business or other affairs of such clients, financial or other information relating to the past, present or projected operations of the Partnership or a Connected Entity, information relating to the past, present or future plans of the Partnership or a Connected Entity, trade secrets and information relating to technical and non-technical systems, methodologies, services, products, client development information, programs, procedures, policies and practices utilized by the Partnership or a Connected Entity; provided that the foregoing shall not restrict the use of information which is in the public domain other than as a result of a breach of this or any similar confidentiality covenant for the benefit of the Partnership or a Connected Entity. Each Party acknowledges and agrees that all manuals, training materials, technical materials, product and service

information and other technical materials prepared by or for the Partnership or a Connected Entity and all directories, client files and records used in connection with the management and operation of the Partnership or a Connected Entity, in whatever form, are the proprietary property of the Partnership or a Connected Entity. Upon severing association with the Partnership, no Active Party shall retain or remove from the control of the Partnership, without the express written consent of the US Chief Executive Officer or the US Chief Executive Officer's designee, any of such proprietary property or other information described in this 9.04 and such Party shall return promptly to the Partnership any such proprietary property or other information so retained or removed.

9.05. Certain Proscribed Conduct and Rights of Parties - Each of the Parties makes the following agreements with and commitments to the Partnership:

9.051. Risk Undertakings - Except as authorized pursuant to this Agreement, an Active Party will not become a general partner in a partnership or a proprietor or major owner of any operating business without first obtaining the written consent of the Chairman; nor will an Active Party (a) subscribe to any bonds or undertakings or otherwise become surety, guarantor or bondsman for any person or persons, or (b) sign or endorse any note, or accept, sign or endorse any draft or bill of exchange or assume any other liability, either in the Active Party's name or, except as authorized by the Board, in the name of the Partnership or any of the Firms, for the accommodation of any person or entity or (c) engage in speculation, gambling or extra hazardous risk which might result in liability in an amount which is material to the net worth of the Active Party; provided, however, that notwithstanding the foregoing, an Active Party need not obtain such written consent but may engage in such Active Party's name and individual capacity (but not on behalf of the Partnership) in any of the acts set forth in (a) and (b) above if the aggregate obligation of such Active Party with respect to all such acts set forth in (a) and (b) above at any time does not exceed 25% of such Active Party's net worth.

9.052. Books and Records of the Partnership - The Partnership and each Active Party shall provide the Parties and the legal representative of a deceased Party or a Party under a legal disability and their agents and attorneys the rights with respect to access to the books and records of the Partnership and other information and documents concerning the Partnership as specified in Section 15-403 of the Act, upon reasonable demand, for any purpose reasonably related to the demanding Party's interest in the Partnership. The Partnership and any Active Party from whom such access is sought may impose reasonable standards (including standards governing what information and documents are to be furnished at what

time and location and at whose expense) with respect to exercise of the right of access. The Partnership and each Active Party shall have the right to keep confidential from the Parties and their respective legal representatives, agents and attorneys, for such period of time as the Partnership deems reasonable, any information and documents which the Partnership reasonably believes to be in the nature of trade secrets or other information and documents the disclosure of which the Partnership in good faith believes is not in the best interest of the Partnership or could damage the Partnership or its business or affairs or which the Partnership is required by law or by agreement with a third party to keep confidential. Any demand by or on behalf of a Party under this 9.052 shall be in writing and shall state the purpose of such demand. Each Party, on behalf of such Party, such Party's spouse, their respective Estates, and any beneficiaries designated under Article 6, hereby agrees that no such person will have any right of access to the books and records of the Partnership or other information and documents concerning the Partnership except as expressly authorized in this 9.052.

9.053. Right to an Accounting - No Party nor any Party's spouse, Estate or any beneficiaries designated under Article 6 shall have any right to an accounting either during the term of the Partnership or on dissolution or liquidation or upon severance of any Party's association with the Partnership for any reason whatsoever, including a breach of this Agreement by the Partnership and each Party, on behalf of such Party, the Party's spouse, the Party's estate and any beneficiaries designated under Article 6 hereby expressly waives any and all rights to an accounting for any reason whatsoever which may be conferred upon the Party by the law of the State of Delaware or by any other law and further agrees that the financial information furnished by the Partnership shall be binding and conclusive upon such Party, the Party's spouse, the Party's Estate and any beneficiaries designated under Article 6, both as to the accounts of the Partnership and as to the Party's balances with them.

9.054. Will Provisions; Community Property Rights Provision - As further confirmation of each Party's commitment under 9.052 and 9.053, each Party agrees that so long as such Party is entitled to receive any payments from the Partnership such Party will keep in effect a valid will containing such provisions as the Board shall approve in furtherance of 9.052 and 9.053, and if such Party resides or at any time has resided or shall reside in a state under the laws of which such Party's spouse acquired, acquires or may acquire any community property or comparable rights in such Party's interests in the Partnership, such Party shall cause the Party's spouse to execute and deliver to the Partnership an agreement as the Board shall

approve in furtherance of 9.052 and 9.053. Evidence of compliance with this provision shall be furnished to the Chairman as often and in such form as the Chairman shall require.

9.055. Assignment or Encumbrance of Partnership Capital or Interest - No Party shall transfer, assign, pledge, grant a security interest or other lien upon, grant any rights in or to, or otherwise encumber such Party's Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans or Voluntary Capital Loans or any distribution payable under 5.04 or the Party's rights to receive any amount pursuant to 4.02 or the Party's right to receive any amount pursuant to Article 6 or any other interest in the Partnership or any of the Firms, except and only to the extent specifically permitted pursuant to this Agreement. If a Party's association with the Partnership has been severed and a charging order (within the meaning of Section 15-504 of the Act) in respect of such Party's economic interest in the Partnership has been created and is continuing, the Partnership may, in its sole discretion, elect to redeem such interest. In any such case, the redemption price for such interest shall be the value thereof as determined by the Partnership based upon such reasonable assumptions and procedures as shall be approved by the Board and each Party hereby consents to each such redemption.

9.056. Power of Attorney - Each Active Party hereby irrevocably appoints the Chairman of the Board and the US Chief Executive Officer, and each of them, acting singly or jointly, the true and lawful attorney-in-fact of such Active Party to take any and all action which any of such persons may deem appropriate in the circumstances for and in the name of such Active Party, as if such Active Party were personally present and acting, including the signing of such Active Party's name, as may be necessary or advisable to comply with any law, statute, rule, regulation or other statement of governmental or professional authority governing the activities of the Partnership or of such Active Party, including but not limited to registration and renewal of registration as a registered limited liability partnership under the laws of the State of Delaware (including but not limited to the execution of any and all applications and renewal applications under such laws) and any other applications, certificates, statements, instruments and documents as may be necessary or appropriate in any jurisdiction in connection with or incidental to any such registration or renewal, registration of the Partnership as a partnership of accountants, registration under "fictitious name" statutes and registration or filing for the purpose of engaging in the professional practice as a partnership.

9.06. Limitations on Certain Competitive Activities In Connection With Severing Association with the Partnership

9.061. Client Related Activities

9.061a. A Party not eligible to receive payments under Article 6 (including any person, firm, corporation or other entity with which such Party is associated) shall not, prior to or for a period of two years following severance of such Party's association with the Partnership, directly or indirectly solicit, assist others in obtaining as a client or accept an engagement to perform or perform any professional services (as defined in 9.061c), other than on behalf of the Partnership or a Continuing Connected Entity, for any person, firm, corporation or other entity (a) for whom such Party (in any capacity on behalf of the Partnership or a Connected Entity) or any office of the Partnership or a Connected Entity located within seventy-five miles of any office with which such Party has been associated (including such associated office) has performed any professional services or maintained a client relationship on behalf of the Partnership or a Connected Entity during the three years prior to such severance of association or (b) with whom any such office, to the knowledge of such Party, is negotiating or proposing for the provision of any professional service at the time of such severance of association.

9.061b. A Party eligible to receive payments under Article 6, whether or not such Party has elected to begin receiving such payments, shall not, for a period beginning on the date of severance of such Party's association with the Partnership and ending two years after the termination of the Party's eligibility to receive such payments, directly or indirectly solicit, assist others in obtaining as a client or accept an engagement to perform or perform any professional services, other than on behalf of the Partnership or a Continuing Connected Entity, for any person, firm, corporation or other entity for whom the Partnership or a Connected Entity has performed any professional services during the two years prior to such solicitation, assistance, engagement or performance. A Party for purposes of this 9.061b shall include any person, firm, corporation or other entity with which such Party is associated.

9.061c. Professional services as used in 9.061 shall include public accountancy, auditing, tax, management consulting or

advisory, systems, expert testimony, litigation support, budget, actuarial and other services performed by the Partnership or a Connected Entity.

9.061d. Connected Entity as used in this Agreement shall mean any corporation, partnership, limited liability company or other entity owned directly or indirectly, in whole or in part, by the Partnership, or in which any Party participated on behalf of the Partnership or carried out any duties with respect to the affairs of the Partnership. Continuing Connected Entity as used in this Agreement on any date shall mean any corporation, partnership, limited liability company or other entity which is, on such date, owned directly or indirectly, in whole or in part, by the Partnership, or in which, on such date, any Party participates on behalf of the Partnership or carries out any duties with respect to the affairs of the Partnership.

9.062. Personnel - A Party (including any person, firm, corporation or other entity with which such Party is associated) shall not, prior to or for a period of two years following severance of association with the Partnership, directly or indirectly solicit or induce any other Active Party, employee or agent of the Partnership or a Connected Entity to leave the Partnership or a Connected Entity.

9.07. Compliance: Remedies - It is intended that the foregoing provisions of this Article 9 be complied with. If, however, any Party shall breach or violate any such provision, in view of the uncertainty and difficulty in ascertaining the damages resulting to the Partnership from any breach or violation, the following remedies shall be available:

9.071. the foregoing provisions of this Article 9 shall be specifically enforceable by injunction or any other similar remedy;

9.072. notwithstanding any provision of this Agreement and in addition to all other remedies available to the Partnership, including the right to compel specific performance, as and for liquidated damages a Party breaching or violating any of the foregoing provisions of this Article 9 shall waive the right to receive any amounts payable by the Partnership to such Party on or after the date of such breach or violation, including the right, if any, of a Party to receive payments under Article 6 or Schedule 13.05D; and

9.073. as and for additional liquidated damages for breach or violation by any Party of any provision of 9.061, such Party shall pay to the Partnership an amount equal to 50% of all fees received by such Party (or any person or entity with which such Party is associated in connection with such breach

or violation) for services performed for any person or entity in breach or violation of such provision during the two years following the severance of such Party's association with the Partnership.

9.08. Severability - The provisions of this Article 9 shall be severable. In the event any particular provision or portion of a provision shall be adjudicated or otherwise determined to be invalid or unenforceable or declared null and void or denied enforcement by any court of competent jurisdiction, this Article 9 shall be deemed amended to delete therefrom the portion adjudicated or otherwise determined to be invalid or unenforceable, but only with respect to the operation of this Article 9 in the particular jurisdiction in which such adjudication or determination is made and not with respect to any other jurisdiction; provided, however, that if such court of competent jurisdiction determines that a restriction which is more limited in some manner would be enforceable, it is the intent of all Parties and the Partnership that this Article 9 shall be deemed amended in the particular jurisdiction in which such determination is made to give effect to the more limited restriction in lieu of the restriction as to which enforcement was denied. No other portion of this Article 9 or of this Agreement shall be affected by the adjudication of amendment referred to in the preceding sentence and all other provisions shall survive both in the jurisdiction of adjudication and in all other jurisdictions.

9.09. Survival of Provisions - The provisions of this Article 9 shall survive and remain in full force and effect with respect to each Party following such Party's severance of association with the Partnership.

## ARTICLE 10. INDEMNIFICATION OF PARTIES

10.01. Parties - To the fullest extent permitted by Delaware law as the same exists or may hereafter be in effect, the Partnership shall, subject to 10.03, indemnify and hold harmless each Party from and against any and all expenses (including reasonable attorneys' fees), judgments, fines, penalties, losses, claims, damages, liabilities, interest incurred or amounts paid in settlement (where there is no admission or judicial finding of liability), arising from any proceeding or investigation, whether civil, criminal or administrative, or any arbitration or any threatened proceeding or investigation, whether civil, criminal or administrative, or any threatened arbitration, whether joint or several, whether from within, on behalf of or from without the Partnership, incurred by such Party and arising from or in connection with, all actions taken by the Party in good faith (including the Party's own negligence) while the Party was an Active Party or employee of the Partnership, in the conduct of the business of the Partnership or of any corporation, partnership, other entity or undertaking in which the Party participated on behalf of the Partnership or in connection with the exercise of any authority or the carrying out of any duties or responsibilities with respect to the affairs of the Partnership undertaken by the Party

under or pursuant to the terms of this Agreement (all such matters hereinabove described, the "Covered Matters"). Further, the Partnership shall reimburse each such Party for all expenses, including reasonable attorneys' fees, incurred by the Party in any successful claim, action or proceeding brought by the Party to enforce the right to indemnification under this Article 10 and for all additional taxes paid by the Party solely by reason of such Party's participation in any such corporation, partnership, other entity or undertaking on behalf of the Partnership. Further, (a) in the case of Covered Matters which (i) occurred during the time a Party was a Board Member and (ii) relate to such Party's conduct as a Board Member, the Partnership shall, and (b) in the case of all other Covered Matters, with the approval of the Board the Partnership may, in either case upon receipt of an undertaking by or on behalf of the Party to repay such amount if it shall be ultimately determined by a court that the Party is not entitled to indemnification, advance to the Party all expenses, including reasonable attorneys' fees, incurred by the Party in connection with any proceeding or investigation, whether civil, criminal or administrative, any arbitration, any threatened proceeding or investigation, whether civil, criminal or administrative, or any threatened arbitration, whether from within, on behalf of or from without the Partnership, subject to 10.03. The Partnership may, at the option of the Board, reimburse a Party not entitled to indemnification under this Article 10 in connection with any claim, action or proceeding, whether from within, on behalf of or from without the Partnership. Notwithstanding the foregoing:

10.011. no Party shall be entitled to indemnification under this Article 10 for any expenses, judgments, fines, penalties, losses, claims, damages, liabilities, interest incurred or amounts paid in settlement arising from the Party's own willful acts or omissions undertaken or omitted in bad faith or in reckless disregard of the law or of the rules of practice or ethical conduct of the Partnership or of the profession.

10.012. no Party shall be entitled to indemnification under this Article 10 if the Party refuses or fails to cooperate fully with the Partnership in connection with the threat of any claim, action or proceeding or the defense of any claim, action or proceeding against the Partnership or the Party in any circumstances in which the Party had contact with the matters out of which the claim, action or proceeding arose while an Active Party or employee of the Partnership, provided, however, that this 10.012 shall not apply in the case of claims, actions or proceedings brought on behalf of the Partnership, nor in the case of claims, actions or proceedings brought by a Party to enforce such Party's right to indemnification under this Article 10.

10.013. no Party shall be entitled to indemnification under this Article 10 unless in circumstances in which the Partnership would not reasonably be expected

to have received notice of an event, such Party gives prompt written notice to the Partnership of any such event which might reasonably be subject to indemnification under this Article 10;

10.014. nothing in this Article 10 shall be construed as requiring any payments made by the Partnership under this Article 10 to be allocated on a different basis than would be applicable to the expenses of the Partnership; and

10.015. the obligations of the Partnership under this Article 10 shall be and are hereby made without recourse to any Party, past, present or future, as such, under any rule of law, statute or constitution or by the enforcement of any assessment or penalty or equitable proceeding or otherwise, and each Party agrees that no personal liability whatever shall attach to, or be incurred by, any Party, as such, by reason of the indemnification provisions of this Article 10, and that any such personal liability of every kind and nature, and any and all such claims against any Party, as such, whether arising in common law or in equity or created by rule of law, statute, constitution or otherwise, are expressly released and waived.

10.02. Heirs and Legal Representatives - The provisions of 10.01 shall inure to the benefit of and be binding upon the heirs and legal representatives of persons who were or otherwise would have been entitled to indemnification under 10.01.

10.03. Defense of a Claim or Action - Notwithstanding 10.01, the Partnership may require, as a condition of indemnification under 10.01 or 10.02, that it be permitted to undertake the defense of any claim, action or proceeding by counsel of its own choosing, in which case it shall have no responsibility with respect to any other legal fees and expenses incurred in connection therewith, provided, however, that this 10.03 shall not apply in the case of claims, actions or proceedings brought on behalf of the Partnership, nor in the case of claims, actions or proceedings brought by a Party to enforce such Party's right to indemnification under this Article 10.

10.04. Retroactive Effect - The amendments to this Article 10 adopted in 2000 shall be applicable to all claims, actions or proceedings in existence prior to the date of the adoption thereof, whether known or unknown at such date.

## ARTICLE 11. INTERNATIONAL ORGANIZATION

11.01. International Organization - The Board is authorized to cause the Partnership to be a member of, or participate in, an international organization, and in furtherance of such membership

11.011. to take all actions which the Board deems advisable to carry out the purposes of that organization and to discharge the duties and responsibilities of the Partnership as a member of such organization; and

11.012. if any Active Party is elected or appointed to serve for, in or on behalf of such organization, to make such Active Party available for such time as may reasonably be necessary to enable such Active Party to perform the duties and responsibilities assigned to such Active Party and to take into account any compensation received by such Active Party from such organization in establishing the amount of compensation to which such Active Party is entitled under this Agreement and the amounts of other payment to which such Active Party may be entitled upon severing association with the Partnership.

11.02. Affiliated International Organizations - The Board may make such arrangements or affiliations with organizations outside the United States as it shall deem appropriate and in the best interests of the Partnership.

## ARTICLE 12. ADMINISTRATIVE MATTERS

12.01. Banking and Financial Authority - The US Chief Executive Officer, the Managing Partner and such other Active Party or Active Parties or employees as may be designated by the Board, or any one or more of them, but only such Active Parties or employees and no other persons, shall have authority on behalf of the Partnership from time to time:

12.011. to designate the banks or other financial institutions in which the Partnership shall keep its accounts for deposits and other purposes or with which the Partnership shall make other banking or financial arrangements, to take appropriate action for the opening of such accounts or the commencement of such arrangements or the closing of such accounts or the termination of such arrangements and to designate the Active Party or Active Parties or employee or employees of the Partnership who are authorized to sign checks or other instruments in the name of the Partnership against or with respect to such accounts, including the use of facsimile signatures, and who are authorized to act on behalf of the Partnership with respect to such other banking or financial arrangements;

12.012. to rent such safe deposit boxes or make such custodial arrangements as such person may deem necessary and to designate the Active Party or Active Parties or employee or employees of the Partnership who are to be granted access to such safe deposit boxes or to act on behalf of the Partnership with respect to such custodial arrangements;

12.013. to make such borrowings on behalf of the Partnership and to secure such borrowings with such assets, rights, earnings or properties of the Partnership as the Board may approve and to designate the Active Party or Active Parties who are to execute and deliver on behalf of the Partnership the borrowing agreements or other documents granting an interest in such assets, rights, earnings or properties of the Partnership to secure such borrowings;

12.014. to make investments of the Partnership's surplus funds in high quality debt instruments, commercial paper or certificates of deposit and to sell or otherwise dispose of such investments and any other investment assets which the Partnership otherwise may acquire, and for such purposes to open investment accounts or enter into investment arrangements in the name of the Partnership;

12.015. to sell, transfer, exchange, convert or otherwise deal with or in any stocks, bonds, notes or other securities, or any rights or options therein, registered in the name of or otherwise held by the Partnership and in furtherance thereof to execute and deliver on behalf of and in the name of the Partnership such stock or bond powers, other instruments of assignment, transfer, tender, exchange, conversion or other agreements or documents as they may deem appropriate in the circumstances;

provided, however, that the authority of any Active Party or employee to take any such action shall be subject to such limitations, if any, as may be imposed by the Board or by the exercising authority granted by the Board.

12.02. Certification of Authority - The Board shall adopt rules or procedures regarding certification or proof of authority of Active Parties to act on behalf of the Partnership.

12.03. Filings - Neither the Board nor the Partnership shall have any duty to provide to any Party copies of any statements or certificates filed with the Secretary of State of the State of Delaware or with any other governmental office or authority.

## ARTICLE 13. NOTICES; MISCELLANEOUS; TRANSITION

13.01. Notices

13.011. Notices to the Partnership. - Unless otherwise specified in this Agreement or by agreement with the Partnership, notices to the Partnership shall be addressed to the Chairman of the Board, the US Chief Executive Officer or the Managing Partner, in each case at the National Office of the Partnership. Any such notice shall be deemed given either when received at such office by delivery, by non-postal carrier or when mailed by registered or certified mail, return receipt requested, addressed to any such individual in a sealed container, postage prepaid.

13.012. Notices and other Communications from Partnership to Parties. - Notices from the Partnership to any Party shall be deemed given, and other communications required by this Agreement shall be deemed sent, when mailed, delivered to a non-postal carrier or otherwise sent to the Party in an appropriate container, postage, delivery or other transmittal fee prepaid, addressed to such Party either at the Party's last known home address as shown on the official books and records of the Partnership or, in the case of an Active Party at the office of the Partnership to which such Active Party is currently assigned (in which case such notice or communication may be forwarded with other documents for such office for delivery by Partnership personnel of that office).

13.02. Partnership Name; Interest of Parties in the Name and Other Assets - The interest and rights of the Partnership in the name "Deloitte & Touche USA LLP" or any of the names of either of the Firms (or any other name or names which the Partnership may then be using or have used), whether any portion of any such names is used separately or in combination with other names in the United States or in any foreign country, shall belong to the Partnership and shall not be sold or disposed of so long as the Partnership shall continue in existence; provided that, with the approval of the Board, the Partnership may enter into agreements with other members of the international organization referred to in 11.01 relating to the protection and disposition of any such name. Upon severing of association with the Partnership by any Party, neither any such Party nor any person claiming by, through or under such Party shall have or acquire any interest in any of the foregoing names or the goodwill, property, accounts, assets, books of account or records, all of which belong to the Partnership, and shall have no right to receive any payment therefor.

13.03. Controlling Provisions - The terms and conditions of the partnership agreements of the Firms, as amended from time to time and as heretofore in effect, which govern certain rights and interests of the persons who have been parties to those agreements, shall in all respects be subject to the provisions of this Agreement which shall be

controlling in matters affecting this Partnership, except to the extent otherwise specifically provided in this Agreement. Except as otherwise specifically required by provisions of the Act that may not be varied by agreement, relations among the Parties and between the Parties and the Partnership are governed by the provisions of this Agreement and the provisions of this Agreement shall supersede and replace any contrary or additional provisions of the Act relating to the subject matter of this Agreement.

13.04. Deloitte Firm Senior Notes - The Partnership shall be obligated to carry out the obligations contained in the Deloitte Firm 9% Senior Notes due January 1, 1997 and the related Note Agreement dated February 13, 1987. Each Party who was not a partner or director of the Deloitte Firm on February 13, 1987 and who has not previously expressly, in writing, assumed liability as a general partner for such obligations of the Deloitte Firm hereby assumes such liability.

13.05. Merger Transition Provisions - Attached to this Agreement as Schedules 13.05A through 13.05J are the transition provisions in connection with the combination of the practices of the Firms, which provisions relate to the subjects indicated below and which provisions are part of this Agreement but will expire and be deemed stricken from this Agreement at the times set forth in those Schedules, unless any such provision is extended by vote of the Board, and upon the expiration of the last of those provisions this 13.05 shall be deemed stricken from this Agreement:

| SCHEDULE | SUBJECT MATTER |
|---|---|
| 13.05A | Governance |
| 13.05B | Units of Earnings (Compensation) |
| 13.05C | Capital Requirements |
| 13.05D | Retirement, Disability and Death Benefits |
| 13.05E | Rights and Obligations of Parties who Sever Association with the Partnership and Firms |
| 13.05F | Continuation of Certain Policies and Practice of the Firms |
| 13.05G | Responsibilities for Liabilities and Expenses |
| 13.05H | Allocation of Unallocated Accrual Earnings or Capital and Reserved Capital |
| 13.05I | Insurance Matters |

13.05J Costs of Existing Partner Level Retirement, Disability and Death Benefits of Each of the Firms.

## ARTICLE 14. INTERPRETIVE MATTERS

14.01. Interpretation by the Board - If any question shall arise in regard to the interpretation of any provision of this Agreement, the decision of the Board as to its interpretation shall be conclusive as to all Parties or other persons claiming by, through or under any of them.

14.02. Governing Law - This Agreement shall be deemed to be executed in the City of Wilmington, State of Delaware, regardless of the domiciles of the several parties hereto or where it is in fact executed, and shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to its conflict of law rules, except that with respect to 9.06, the laws in accordance with which such provisions shall be governed and construed shall be the laws of the jurisdiction in which was located the office of the Partnership with which the Party was associated at the time of severing association. Each of the Parties agrees (a) that this Agreement involves at least $100,000, and (b) that each of the Parties has expressly relied upon 6 Del. C. § 2708.

14.03. Captions and Headings - The captions and headings in this Agreement are for convenience only and shall not be considered in the interpretation of this Agreement.

14.04. Situs of Litigation - Any claims (a) relating to the Partnership or (b) involving the Partnership or any Parties or their respective executors, administrators, heirs, legatees, devisees, trustees, receivers, other personal representatives and any other person claiming by, through or under such persons: (i) arising under or relating to this Agreement, (ii) relating to the Partnership or its business, or (iii) relating to any other agreement between the Partnership and any Parties or any other person or persons listed above in this clause (b) (including persons claiming by, through or under any Parties or any such person or persons), shall be brought only in the courts of the State of Delaware or federal courts sitting in the State of Delaware and not in any other state or federal court in the United States of America or any court in any other country.

14.05. Submission to Jurisdiction: Appointment of Agent for Service of Process - Each Party hereby irrevocably and unconditionally agrees (i) to be subject to the jurisdiction of the courts of the State of Delaware and of the federal courts sitting in the State of Delaware, and (ii) (A) to the extent such Party is not otherwise subject to service of process in the State of Delaware, to appoint and maintain an agent in the State of Delaware as such Party's agent for acceptance of legal process, and (B) that service of process may also be made on such Party by prepaid certified mail with a proof of

mailing receipt validated by the United States Postal Service constituting evidence of valid service, and that service made pursuant to (ii) (A) or (B) above shall have the same legal force and effect as if served upon such Party personally within the State of Delaware. For purposes of implementing the Parties' agreement to appoint and maintain an agent for service of process in the State of Delaware, each such Party does hereby appoint Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware 19805, as such agent.

14.06. No Third Party Beneficiaries; Enforcement - Anything in this Agreement to the contrary notwithstanding, no term or provision of this Agreement is intended to create, nor shall any such term or provision be construed as creating or evidencing an intent to create, any rights on the part or benefit in favor of any person or group of persons other than the Parties and their successors to the extent (but only to the extent) expressly provided herein.

## ARTICLE 15. ADMISSION OF ADDITIONAL PARTIES; TERMINATION AND DISSOLUTION; COMBINATION

15.01. Admission with Approval of Parties - The Board shall approve the admission of any person as a Partner or Principal, with the approval of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests, except for the situations specified in 15.02. As a condition to the admission of any person as a Partner or Principal, such person shall sign and return a signature page to the Chairman of the Board in accordance with 17.02 and thereby become a Party hereto and bound by all the terms and provisions hereof.

15.02. Admission by Board - The Board may, without requesting the approval of the Active Parties, during each Year approve the admission of any person as a Partner or Principal, up to the number of persons equal to 3% of the number of Active Parties at the beginning of such Year.

15.03. Termination and Dissolution

15.031. Required Vote - The Partnership shall continue until terminated by affirmative written consent or vote of three-fourths of the Active Parties and the holders of three-fourths of the Voting Interests of the Active Parties, except as otherwise specifically required by provisions of the Act that may not be varied by agreement.

15.032. Effect of an Active Party Severing Association with the Partnership, Bankruptcy of an Active Party or Admission of an Active Party - Neither the severing of association with the Partnership by, or bankruptcy (or insolvency under state laws) of, an Active Party nor the admission of an

Active Party shall terminate or dissolve the Partnership or be deemed the creation of a new partnership, and the Agreement shall continue in full force and effect, except that the Partnership may be deemed dissolved as to any Active Party who has severed association with the Partnership or become bankrupt (or insolvent under state laws) but only as to such Active Party, and any such deemed dissolution shall not require an accounting or other action by the continuing Partnership with respect to such Active Party, except as expressly provided in this Agreement.

15.033. Disposition of Business and Assets - Upon affirmative consent or vote in accordance with 15.031 the Board shall undertake to cause the dissolution and winding up of the affairs of the Partnership, including the disposition of or liquidation of the business and assets (subject to 15.034) of the Partnership. The Board shall cause a full and general account of the assets, liabilities and transactions of the Partnership to be taken and may appoint one or more Active Parties with authority on behalf of the Partnership to carry out such disposition or liquidation and winding up as so approved.

15.034. Name of the Partnership - Subject to prior commitments made pursuant to 13.02, upon termination and dissolution the interest of the Partnership in the name "Deloitte & Touche USA LLP" (or any of the names of either of the Firms or any other name or names which the Partnership may then be using or have used) shall be disposed of in such manner and upon such terms as the Board, with the approval of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests, shall determine.

15.035. Payment or Provision for Liabilities; Distribution to Parties - Out of the proceeds of the disposition or liquidation of the business and assets of the Partnership the Board or the Active Party or Parties appointed by the Board pursuant to 15.033 shall pay or make adequate provision, including the purchase of insurance or other arrangements with third parties, for the payment of all liabilities of the Partnership, other than liabilities to Parties, and thereafter shall, subject to 5.08, pay or apply any remaining proceeds in the following order of priorities as such amounts are shown on the books and records of the Partnership;

15.035a. to the payment of all liabilities (except liabilities provided for in 15.035b) owing to Parties;

15.035b. to the repayment of all Voluntary Capital Loans owing to Parties and to the payment of any unpaid distribution on such Loans;

Confidential

15.035c. to the repayment of all Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans of Parties and the payment of any unpaid distribution on such capital; and

15.035d. to the payment of any remaining proceeds to the Parties who were Active Parties at the time of the approval by Active Parties of the termination or dissolution in proportion to the respective Required Capital and Supplemental Capital of Parties who were Active Partners at such time and the Capital Loans and Supplemental Capital Loans of Parties who were Active Principals at such time.

The provisions of this 15.035 are intended to supersede and replace the provisions of subsections (a) and (b) of Section 15-807 of the Act.

15.036. Disposition of Books and Records - Upon termination and dissolution of the Partnership the books of account, records and files of the Partnership shall be disposed of in such manner and upon such terms as the Board shall determine.

15.04. Combination - A proposed combination of the practice of the Partnership or a Connected Entity with the practice of another firm, which in the judgment of the Board is material in size and significant in relation to the practice of the Partnership and the Connected Entities on a combined basis, shall be approved by vote of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests.

## ARTICLE 16. AMENDMENT

16.01. Action Required to Amend - This Agreement may be amended in accordance with the procedures set forth in 16.02 with the written consent or by vote of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests then outstanding, except that no amendment to 2.02, the portion of 3.02 requiring two-thirds of Board Members to be Active Partners, or this 16.01 shall be made without, in addition, the favorable written consent or vote of two-thirds of the Active Partners and holders of two-thirds of the Voting Interests held by Partners.

16.02. Procedures for Amendment - Any amendment to this Agreement shall be effected only in accordance with the following procedures.

16.021. Each proposed amendment shall first be presented to the Board for its approval;

16.022. If the Board approves such proposed amendment, the Board will submit the proposed amendment to a vote by Parties in accordance with 3.11 specifying the effective date of the proposed amendment.

16.023. Any amendment approved by requisite consent or vote shall be set forth in an amendatory or supplemental document which shall be filed at the National Office of the Partnership with the records of the original of this Agreement. Such amendatory or supplemental document shall be accompanied by the certification of the Chairman to the effect that such approval has been received and by the written report of the Counter provided for in 3.113. The amendment, if approved, shall be effective as of the date specified therein.

16.03. Restatement and Re-Execution of this Agreement - The Board may cause this Agreement and all amendments thereto as of the date of submission to Parties to be restated in a single document which shall be in substitution for such Agreement and amendments and as so restated it may be submitted to all affected Parties for re-execution, which may be required by the Board. Action taken in accordance with this provision shall not require compliance with any other provision of this Article 16.

## ARTICLE 17. EXECUTION; CERTIFICATION

17.01. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

17.02. Undertakings. Each person who, on the Effective Date, is a Partner or Director of the Deloitte Firm or a CPA Partner or a Non-CPA Partner of the Touche Firm and each Firm shall become a party to this Agreement in such person's or Firm's appropriate status, as of the Effective Date, by signing and returning to the Chairman a signature page in the form attached to this Agreement as appropriate to such person's or Firm's status, which signature page when filed at the National Office of the Partnership with a counterpart of this Agreement certified by the Chairman as contemplated in 17.03, shall be conclusive evidence as against all persons of the execution by such person or Firm of the counterpart so certified. Any Active Party who becomes such on or after the Effective Date shall evidence such Active Party's undertaking to be bound by this Agreement and become a party hereto by signing and returning to the Chairman a signature page in the form attached to this Agreement (or in such other form as shall be approved by the Board) which, when filed at the National Office of the Partnership with a counterpart of this Agreement certified by the Chairman as contemplated in 17.03, shall be conclusive evidence as against all persons of the execution by such Active Party of the counterpart so certified.

17.03. Certification. The Chairman shall certify approval of this Agreement, in the form set forth below, on a counterpart, which shall be deemed to be the original, and shall cause the same to be filed at the National Office of the Partnership, together with appropriate evidence of such approval that this Agreement shall become effective as of the Effective Date.

Certification

The undersigned, Chairman of the Board of Deloitte & Touche USA LLP, does hereby certify that (i) a true, correct and complete copy of this Agreement has been delivered to each Active Party; (ii) this Agreement has been approved by the requisite vote of the parties hereto; and therefore (iii) this Agreement has become effective as of the Effective Date in accordance with its terms.

____________________________________
Chairman of the Board

**SIGNATURE PAGE**

The undersigned hereby approves and becomes a party to the Memorandum of Agreement (including all schedules thereto) of Deloitte & Touche USA LLP as of the effective date set forth below, the receipt of a copy of which is hereby acknowledged, and agrees that this signature page, when signed and filed in the National Office of the Partnership, shall constitute and shall be for all purposes conclusive evidence of, such individual's execution of the Agreement so certified and filed by the Chairman of the Board of Directors as contemplated by 17.03 thereof.

______________________ ______________________

Effective Date

**SCHEDULE 13.05A**

**TRANSITION PROVISIONS REGARDING GOVERNANCE - ARTICLE 3.**

Notwithstanding any provisions of Article 3 to the contrary, the following provisions shall apply from the Effective Date until the election of Board Members, Chairman and Managing Partner is held in 1994:1.

1. The Chairman of the Board shall be J. Michael Cook or such other person, including any person selected to fill a vacancy in that office, as shall be selected in accordance with the provisions of the Memorandum of Agreement of the Deloitte Firm dated May 31, 1987 by the persons who were Partners of the Deloitte Firm and who became Partners of the Partnership on the Effective Date (such selection process being referred to as "Deloitte Selected").

2. The Managing Partner shall be Edward A. Kangas or such other person, including any person selected to fill a vacancy in that office, as shall be selected in accordance with the provisions of the Partnership Agreement of the Touche Firm dated September 1, 1988 by the persons who were CPA Partners or Non-CPA Partners of the Touche Firm and who became Partners of the Partnership on the Effective Date (such selection process being referred to as "Touche Selected").

3. No Nominating Committee shall be appointed under 3.09 prior to 1994. The Nominating Committee appointed in 1994 shall be composed of 3 Active Parties who had been Partners or Directors of the Deloitte Firm and 3 Active Parties who had been CPA Partners or Non-CPA Partners of the Touche Firm.

4. The Board shall consist of the Chairman and nine Board Members (Group A Board Members) who are initially Deloitte Selected plus the Managing Partner and nine Board Members (Group B Board Members) who are initially Touche Selected. The terms of the initial Group A Board Members (other than the Chairman), as well as changes in the composition of Group A Board Members and their terms, shall be as recommended by the Chairman and approved by the Group A Board Members. The terms of the initial Group B Board Members (other than the Managing Partner), as well as changes in the composition of Group B Board Members and their terms, shall be as recommended by the Managing Partner and the former Chairman of the Board of the Touche Firm and approved by the Group B Board Members. By the time of the election for Board Members in 1994, Group A and Group B Board Members will be placed in 3 classes of 6 members each (composed equally of Group A and Group B Board Members) with terms expiring in 1994, 1995, and 1996. Board Members elected in 1994 and thereafter will be nominated and elected using the process described in 3.09, 3.10 and 3.11.

5.    The initial representative of the Partnership to the international organization shall be Edward A. Kangas.

6.    It is the intention that after 1994 not more than one-third of the Board Members or members of such Partnership management committee as may be appointed by the Board will also be members of the other.

S-2

418272.10-New York Server 3A - MSW

D00190

Confidential

A165

**SCHEDULE 13.05B**

**TRANSITION PROVISIONS REGARDING UNITS OF NET EARNINGS**

The net earnings of the Partnership for the first fiscal period of the Partnership shall be allocated to the DH&S Partners and the TR Partners (as those terms are defined in Schedule 13.05G 1 and 2) by allocating income units for role, experience and performance. Partners and Principals will be treated as DH&S Partners or TR Partners in accordance with Schedule 13.05G 3 (i) and (ii).

The aggregate number of role and experience units allocated at the beginning of the period to the DH&S Partners and to the TR Partners will be as follows: 50.01% of such aggregate units will be allocated to the DH&S Partners and 49.99% to the TR Partners. The units allocated to the DH&S Partners will be re-allocated to each individual DH&S Partner by the Deloitte Firm Operating Committee as constituted prior to the Effective Date and approved by the Deloitte Firm Board of Directors, in accordance with the Deloitte Firm compensation system and process. The units allocated to the TR Partners will be re-allocated to each individual TR Partner by the Touche Firm Management Committee as constituted prior to the Effective Date and approved by the Touche Firm Board of Directors, in accordance with the Touche Firm compensation system and process. For the first fiscal period, 50.01% of the aggregate amounts of performance units, special event awards and other distributions of earnings will be allocated to DH&S Partners and 49.99% of such units, awards and other distributions to TR Partners.

With respect to the allocation of units to the TR Partners for the first fiscal period the Group B Board Members (as defined in Schedule 13.5A 4) will assure that the total number of units allocated to each TR Partner by the Partnership will result in a number of units which is not less than 90% of the adjusted units assigned to each TR Partner by the Touche Firm for its 1990 fiscal year. Any units which must be reallocated under this transitional provision will be deducted from the units of TR Partners who received unit increases.

With respect to the allocation of units to the DH&S Partners for the first fiscal period, the Group A Board Members (as defined in Schedule 13.05A 4) will assure that the total number of units allocated to each DH&S Partner will result in a number of units which is not less than 90% of the sum of

(1) the number of Deloitte Firm income shares allocated to such Partner for role and experience for the Deloitte Firm fiscal 1990 year, and

(2) the average number of Deloitte Firm income shares allocated to such Partner for performance for fiscal 1989, 1988 and 1987,

multiplied by a ratio of the accrual earnings per income share for the Deloitte Firm for fiscal 1989 to the value of $1,000. Any units reallocated under this transitional provision will be

deducted from the unit earnings of DH&S Partners who have increases in units, in proportion to the amounts of such increases.

S-4

418272.10-New York Server 3A - MSW

D00192

Confidential

A167

**SCHEDULE 13.05C**

**TRANSITION PROVISIONS REGARDING CAPITAL AND OTHER PROVISIONS OF ARTICLE 5**

The total capital of the Partnership, as of the effective date and thereafter for so long as the Board shall determine, shall be so established that DH&S Partners (as the term is defined in Schedule 13.05G 1) shall have approximately but not less than 50.01% of such capital and the TR Partners (as the term is defined in Schedule 13.05G 2) shall have approximately but not more than 49.99% of such capital, to be effected as follows:

1. The Paid-in Capital and the Accumulated Capital of the DH&S Partners shall become Required Capital or Capital Loans, as appropriate, of the Partnership as of the Effective Date. To the extent such capital attributable to a DH&S Partner exceeds the Required Capital or Capital Loans which such person must maintain as determined by the Board of the Partnership, such person will be provided with the option either to leave such excess as Required Capital or Capital Loans or to transfer such excess to Voluntary Capital Loans which will be subject to withdrawal by such person.

2. a. The Stated Capital and Capital Loans of the TR Partners shall become Required Capital or Capital Loans, as appropriate, of the Partnership as of the Effective Date. The Supplemental Capital and the Supplemental Capital Loans of the TR Partners shall also become Required Capital or Capital Loans, as appropriate, of the Partnership as of the Effective Date. Should it be determined that the total capital being contributed by the TR Partners on the Effective Date exceeds 49.99% of the total capital of the Partnership, capital shall be returned to the TR Partners, in accordance with procedures to be adopted by the Board of the Partnership, so that the TR Partners shall not have more than 49.99% of total capital.

   b. To the extent the capital attributable to a TR Partner exceeds that which such person must maintain as determined by the Board of the Partnership, such person will be provided with the option either to leave such excess as Required Capital or Capital Loans or to transfer such excess to Voluntary Capital Loans which will be subject to withdrawal by such person.

3. All forms of the foregoing capital shall receive a distribution of earnings at a rate intended to be 1% over the prime rate, except that Voluntary Capital Loans may receive a distribution at a rate approved by the Board.

See Schedule 13.05H for Allocation of Unallocated Accrued Earnings or Capital.

**SCHEDULE 13.05D**

**TRANSITION PROVISIONS REGARDING RETIREMENT, DISABILITY AND DEATH ARTICLE 6**

The provisions governing retirement, disability and death in the Memorandum of Agreement (including the Annex thereto) of the Deloitte Firm and in the Partnership Agreement of the Touche Firm, each as in effect on the Effective Date shall continue in effect under this Agreement until other provisions with regard to such matters are approved by vote of the Parties as provided in Article 6. To the extent not prohibited by applicable law, all policies and practices with respect to such matters of each such Firm shall be continued in effect while the foregoing provisions continue in effect under this provision. Such provisions in the Memorandum of Agreement (including the Annex thereto) of the Deloitte Firm together with the policies and practices with respect thereto shall apply to Parties admitted to the Partnership after the Effective Date.

**SCHEDULE 13.05E**

**TRANSITION PROVISION WITH RESPECT TO RIGHTS AND OBLIGATIONS OF PARTIES WHO SEVER ASSOCIATION WITH THE PARTNERSHIP AND THE FIRMS ON OR BEFORE SEPTEMBER 1, 1990 AND, WITH RESPECT TO CERTAIN PARTNERS OF THE TOUCHE ROSS FIRM, AFTER SEPTEMBER 1, 1990**

A. Notwithstanding any other provisions of the Agreement, any provision adopted by vote of Parties pursuant to Article 6 or Schedule 13.05D, any Party who severs association with the Partnership and the Firms on or before September 1, 1990 shall have the following rights and obligations to the Partnership and the Firms:

1. Any Party who immediately prior to the Effective Date is a CPA Partner or a Non-CPA Partner of the Touche Firm shall be subject to and entitled to all rights under the terms and conditions of the Partnership Agreement of the Touche Firm as in effect immediately prior to the Effective Date with respect to all matters relating to retirement, disability, death, resignation, withdrawal or involuntary resignation or retirement; provided, however, that this provision shall not apply to any such Party who elects in accordance with Schedule 13.05H to have retirement, disability and death benefits determined pursuant to the Agreement. To the extent not prohibited by applicable law, all policies and practices of the Touche Firm with respect to such matters shall be continued in effect while the foregoing terms and conditions continue in effect under this provision.

2. Any Party who immediately prior to the Effective Date is a Partner or a Director of the Deloitte Firm shall be subject to and entitled to all rights under the terms and conditions of the Memorandum of Agreement of the Deloitte Firm as in effect immediately prior to the Effective Date with respect to all matters relating to retirement, disability, death, or severing association with the Deloitte Firm and its affiliated firms except that capital shall be repaid in accordance with 8.021. To the extent not prohibited by applicable law, all policies and practices of the Deloitte Firm with respect to such matters shall be continued in effect while the foregoing terms and conditions continue in effect under this provision.

B. Notwithstanding any other provisions of the Agreement, of Schedule 13.05D or any provision adopted by vote of Parties pursuant to Article 6 (except to the extent agreed to by a Party as provided below), any Party who (i) immediately prior to the Effective Date is a CPA Partner or a Non-CPA Partner of the Touche Firm and elects to become subject to the retirement benefit provisions of the Partnership Agreement of the Touche Firm in accordance with Schedule 13.05H and (ii) severs association with the Partnership by retiring after September 1, 1990 and within 36 months of the Effective Date, shall, unless otherwise agreed, receive retirement benefits determined in accordance with the provi-

sions of this Agreement (including all policies and practices relating thereto) in effect on the date of such Party's retirement as are applicable to any such Party, but including, retroactive to the date of such Party's retirement, the amendments, if any, to this Agreement effective after such Party's retirement but within 36 months of the Effective Date made to provide a new retirement program for such Parties who were CPA Partners or Non-CPA Partners of the Touche Firm; provided, that if any retroactive amendment results in a reduction in the amount of retirement payments theretofore made to a Party, the reduction will be recovered by the Partnership against future retirement payments to such Party over a period of time to be determined by the Board of the Partnership. Retirement benefits under this paragraph B are included in the costs of benefits to Partners of the Touche Firm (as therein defined) for purposes of Schedule 13.05J.

SCHEDULE 13.05F

## TRANSITION PROVISION REGARDING POLICIES OR PRACTICES

Where policies and practices are not otherwise provided for in this Agreement, the policies and practices of the Deloitte Firm shall continue in effect with respect to the Partners and Directors of the Deloitte Firm and the former employees of the Deloitte Firm, in each case on the Effective Date, and the policies and practices of the Touche Firm shall continue in effect with respect to the CPA Partners and the Non-CPA Partners of the Touche Firm and the former employees of the Touche Firm, in each case on the Effective Date. Any of such policies or practices shall continue until superseded by policies or practices adopted by the Partnership.

**SCHEDULE 13.05G**

**TRANSITION PROVISION REGARDING RESPONSIBILITIES FOR LIABILITIES AND EXPENSES**

Notwithstanding any other provisions of this Agreement, the following provisions will govern responsibility for liabilities and expenses as set forth therein until all such liabilities and expenses are paid or otherwise provided for:

1. Responsibility of Partners and Directors of the Deloitte Firm. The persons who were Partners and Directors of the Deloitte Firm immediately prior to the Effective Date and became Partners or Principals on the Effective Date (hereinafter "DH&S Partners") shall be responsible for and shall bear, and the Partnership and TR Partners (as defined herein) shall not be responsible for, any and all losses, claims, damages, punitive (including statutory or multiple) damage awards, liabilities or expenses of any amount, including, without limitation, any legal or other expenses and interest reasonably incurred in connection with investigating, defending or settling any action or claim, whether for professional, administrative, personnel, or any other matters (collectively referred to herein as "liabilities and expenses"), to which the Partnership shall have been held liable or which it shall have paid or to which any TR Partner shall have become subject insofar as the liabilities and expenses (or actions in respect thereof) shall arise out of or shall be based upon any act or omission which shall have occurred prior to the Effective Date and for which the Deloitte Firm or any of the DH&S Partners (in their capacities as Partners or Directors of the Deloitte Firm) would have been responsible, directly or indirectly, if the combinations of the Touche Firm and the Deloitte Firm had not taken place, in each case to the extent that the liabilities and expenses in respect thereof shall exceed:

   (i) the aggregate of all proceeds, if any, from professional liability or other insurance in effect prior or subsequent to the Effective Date covering such liabilities and expenses; and

   (ii) the balance, if any, remaining in the Deloitte Firm Claims Reserve Account;

   any such excess being hereinafter referred to as a "DH&S Excess".

2. Responsibility of TR Partners. The persons who were CPA and Non-CPA Partners of the Touche Firm immediately prior to the Effective Date and became Partners or Principals on the Effective Date (the "TR Partners") shall be responsible for and shall bear, and the Partnership and DH&S Partners shall not be responsible for, liabilities and expenses to which the Partnership shall have been held liable or which it shall have paid or to which any DH&S Partner shall have become subject insofar as the liabilities and expenses (or actions in respect thereof) shall arise out of or shall be based upon any act or omission which shall have occurred prior to the Effective Date and for which the Touche Firm or

Confidential

any of the TR partners (in their capacities as CPA Partners or Non-CPA Partners of the Touche Firm) would have been responsible, directly or indirectly, if the combination of the Touche Firm and the Deloitte Firm had not taken place, in each case to the extent that the liabilities and expenses in respect thereof shall exceed:

(i) the aggregate of all proceeds, if any, from professional liability or other insurance in effect prior or subsequent to the Effective Date covering such liabilities and expenses; and

(ii) the balance, if any, remaining in the Touche Firm Claims Reserve Account;

any such excess being hereinafter referred to as a "TR Excess".

3. Determination of Partners. For the purpose of this Schedule 13.05G:

(i) any person admitted as a Partner or Principal of the Partnership on the Effective Date who was a TR Partner or a DH&S Partner immediately prior to the Effective Date shall be deemed to be a TR Partner or a DH&S Partner, as the case may be; and

(ii) any person admitted as a Partner or Principal of the Partnership on the Effective Date who was not immediately prior thereto a TR Partner or a DH&S Partner and any person admitted as Partner or Principal after the Effective Date (whether or not such person was previously an employee of either the Deloitte Firm or the Touche Firm) shall be deemed to be 50% a TR Partner and 50% a DH&S Partner; provided, however, that in certain situations where a two-thirds vote of the Entire Board shall determine it to be appropriate to achieve the equities intended by this Schedule 13.05G (such as, for example, in the case of a person previously a DH&S Partner or a TR Partner prior to the Effective Date who is subsequently re-admitted as a Partner or Principal of the Partnership) such a person shall, with that person's written approval, be deemed a full DH&S Partner or a full TR Partner, as the case may be.

4. In view of (i) the delays involved in determining exact amounts of insurance proceeds and the sufficiency of Claims Reserve Accounts, (ii) the intent and purpose of this Schedule, and (iii) the desire to make any assessments which may be required as soon as reasonably possible, the Board shall by a two-thirds vote of the entire Board make an annual determination (based among other things on the information and advice it can obtain from legal counsel for the Partnership, the Partnership's insurance brokers and underwriters, and the Transition Advisory Group) of the DH&S Excess or the TR Excess, if any, attributable to the acts or omissions of either the Deloitte Firm or the Touche Firm pursuant to sub-paragraph 1 or 2 above. In making its annual determinations, the Board is authorized and instructed, where necessary, to apportion liabilities and expenses between pre- and post-Effective Date acts or omissions -- such as, for example, where

pre-Effective Date auditing acts or omissions result in a post-Effective Date audit report upon which a lawsuit is based -- and to make such other judgments as the Board by a two-thirds vote of the entire Board shall find to be appropriate to achieve the equities intended by this Schedule. Each and every annual determination by the Board shall be final and binding upon each person becoming a Partner or Principal of the Partnership at any time.

5. In determining the amount of insurance proceeds available to offset liabilities and expenses pursuant to subparagraphs 1(i) or 2(i) hereof:

(i) self-insured aggregate annual retentions for policies of the Partnership in effect subsequent to the Effective Date shall be absorbed first by liabilities and expenses arising from acts or omissions subsequent to the Effective Date (including the amount of any liabilities and expenses apportioned to post-Effective Date acts or omissions by the Board in accordance with subparagraph 4 above);

(ii) to the extent such aggregate annual retentions shall not be fully absorbed by liabilities and expenses arising from acts or omissions subsequent to the Effective Date, they will be absorbed by the liabilities and expenses attributable to the DH&S Partners and to the TR Partners under subparagraphs 1 and 2 above in direct proportion to the aggregate amount of the liabilities and expenses (before reduction by insurance proceeds or Claims Reserve Accounts) of each group in such year; provided that if either group has insufficient liabilities and expenses to fully absorb its portion of the retention, any unabsorbed portion will be absorbed by the other group;

(iii) self-insured "each and every" retentions shall be attributed to claims in the manner determined by the Partnership's insurance brokers or underwriters, and to the extent it is necessary for the Partnership to make any such determination, it shall be made by the Board as part of its annual determination under this Schedule; and

(iv) it is intended that the fullest limits of the insurance policies of the Partnership shall apply to provide coverage for liabilities and expenses of the Partnership arising from acts or omissions subsequent to the Effective Date; accordingly, if there is a limited amount of coverage for differing claims -- such as by reason of the inability of a commercial or mutual carrier to pay, a step-down in coverage, a limited number of applications or reinstatements, etc. -- the maximum amount of coverage shall apply to post-Effective Date acts or omissions rather than pre-Effective Date acts or omissions.

6. If and when the Board determines that a DH&S Excess or a TR Excess exists, such Excess shall be allocated among the persons deemed to be DH&S Partners or TR

Partners, as the case may be, as follows (using a DH&S Excess for illustrative purposes only):

(i) determine the aggregate total earnings which would have been earned, in the year for which the DH&S Excess was determined, by those persons who were DH&S Partners and shared in DH&S Reserved Capital, but for the determination of the DH&S Excess (such amount referred to herein as "X");

(ii) determine the aggregate total earnings which would have been earned, in the year for which the DH&S Excess was determined, by those persons who are deemed to be 50% DH&S Partners, but for the determination of the DH&S Excess (such amount referred to herein as "Y");

(iii) determine the aggregate total earnings which would have been earned, in the year for which the DH&S Excess was determined, by those persons who were DH&S Partners but did not share in DH&S Reserved Capital, but for the determination of the DH&S Excess (such amount referred to herein as "Z");

(iv) multiply the fraction $\frac{2X}{2X + Y + 2Z}$ times the DH&S Excess and the result will be the amount of the DH&S Excess to be allocated among the persons who were DH&S Partners and shared in DH&S Reserved Capital;

(v) multiply the fraction $\frac{Y}{2X + Y + 2Z}$ times the DH&S Excess and the result will be the amount of the DH&S Excess to be allocated among the persons who were deemed to be 50% DH&S Partners;

(vi) multiply the fraction $\frac{2Z}{2X + Y + 2Z}$ times the DH&S Excess and the result will be the amount of the DH&S Excess to be allocated among the persons who were DH&S Partners but did not share in DH&S Reserved Capital;

(vii) the amount obtained in subparagraph (v) shall be allocated to the individual members of the group of 50% DH&S Partners in the same proportion that their individual total earnings in the year for which the DH&S Excess was determined, but for the DH&S Excess, bears to Y (the aggregate of such earnings); and

(viii) the amount obtained in subparagraph (vi) shall be allocated to the individual DH&S Partners who did not share in DH&S Reserved Capital in the same proportion that their individual total earnings in the year for which the DH&S Excess was determined, but for the DH&S Excess, bears to Z (the aggregate of such earnings).

7. The portion of the Excess allocated to persons who were DH&S Partners or TR Partners and shared in Reserved Capital -- the portion calculated in subparagraph 6(iv) in the example above -- shall be discharged first by reducing remaining Reserved Capital attributed to the Firm having the Excess. If Reserved Capital of such Firm shall be extinguished, any remaining portion of the Excess shall be allocated among the individual persons who were the Partners of such Firm at the time the Reserved Capital was created and in the manner originally determined by such Firm (in the case of the Deloitte Firm, it is based upon the Partners' total share earnings and ROI for fiscal 1989; in the case of the Touche Firm, it is based upon each Partner's proportionate share of the Reserved Capital as allocated to such Partner) and re-allocating, in the same manner, for any Partners who have previously terminated their Reserved Capital interest. The amounts so allocated to such individuals shall be discharged first by reducing their earnings, if any, for the year for which the Excess was determined and thereafter by reducing any of their remaining capital accounts. Any amounts not discharged -- such as in the case of Partners or Principals who withdrew from the Partnership subsequent to the Effective Date but prior to the determination of the Excess and have insufficient capital to discharge their allocations -- shall be re-allocated to and discharged by, in the same manner, those Partners who remain in the Partnership.

8. The portion of the Excess allocated to persons who are deemed to be 50% Partners -- the portion calculated in subparagraph 6(vii) in the example above -- shall be discharged by reducing their earnings for the year for which the Excess was determined.

9. The portion of the Excess allocated to persons who were DH&S Partners or TR Partners but did not share in Reserved Capital -- the portion calculated in subparagraph 6(viii) in the example above -- shall be discharged by reducing their earnings for the year for which the Excess was determined.

10. At the time the Board determines that there will be no more Excesses and that the procedures set forth in this Schedule shall be terminated, any amounts remaining in the DH&S Claims Reserve or the TR Claims Reserve shall be credited to the Reserved Capital for such Firm.

**SCHEDULE 13.05H**

**TRANSITION PROVISION FOR ALLOCATION OF UNALLOCATED ACCRUAL EARNINGS OR CAPITAL AND RESERVED CAPITAL**

**THE TOUCHE FIRM**

With respect to the Touche Firm, the net amount remaining after certain adjustments to conform the accounting methods of the Deloitte Firm and the Touche Firm plus an amount to recognize certain assets being transferred by the Touche Firm to the Partnership plus a portion of the Unallocated Capital as described below represent Reserved Capital. The accumulated difference between total accrual basis earnings and earnings distributed since the inception of the Touche Firm represents Unallocated Capital. The Unallocated Capital and the Reserved Capital will be allocated to the CPA Partners and Non-CPA Partners of the Touche Firm (TR Partners) identified below in the manner set forth below and will be contributed to and held by the Partnership for application for the benefit of each such individual in the manner set forth below.

1. The TR Partners who will participate in the allocations of Reserved Capital and Unallocated Capital shall be those persons who were TR Partners at any time during the period June 5, 1989 through August 31, 1989, except for those TR Partners who retire or resign and elect not to participate in such allocations.

2. The amount required for Reserved Capital will be determined by the Board of Directors of the Touche Firm based upon its estimate as of the Effective Date of the uninsured and unaccrued costs of "liabilities and expenses" with respect to the Touche Firm as described in Schedule 13.05G (the TR Claims). To the extent that the aggregate of the net amount remaining after conforming accounting methods plus the amount of certain assets recognized as being transferred to the Partnership is less than such estimate of the TR claims, the short fall will be transferred from Unallocated Capital to Reserved Capital. The Reserved Capital determined will be allocated to the TR Partners on the basis of the average balance of their Stated Capital or Capital Loan accounts with the Touche Firm over the 3 years ending August 31, 1989. Distributions will be accrued on the Reserved Capital at a rate approximating that for high quality investment grade intermediate term bonds, but will not be payable until the Reserve Capital is paid, if at all, to TR Partners. Amounts required to discharge the TR Claims will be charged to the Reserved Capital of TR Partners in proportion to each TR Partner's share of the Reserved Capital as allocated to such Partner. Similarly, any shortfall in the Reserved Capital in relation to the actual TR Claims will be charged to TR Partners in proportion to each TR Partner's share of the Reserved Capital as allocated to such Partner. Any excess in the Reserved Capital will be credited to each TR Partner or distributed to each such Partner at some future date not prior to the time the Board of the Partnership determines that there will be no more

Excesses and that the procedures set forth in Schedule 13.05G shall be terminated. TR partners leaving the Partnership for any reason will not be paid their Reserved Capital until payment is made to all TR Partners, except that in circumstances in which a TR Partner must be paid out in full to maintain the Partnership's independence, such a Partner will waive such Partner's right to repayment of Reserved Capital and be relieved of that Partner's obligation with respect to the TR Claims. With respect to any TR Partner who severs such Partner's association with the Partnership prior to the time, if any, when the remaining Reserved Capital can be distributed to TR Partners entitled thereto, the Board of Directors of the Touche Firm may provide options (including options with respect to the election of certain retirement, disability and death benefits for any such Partner who may become eligible therefor) for any such TR Partner to be relieved of any further obligation with respect to the TR Claims and to be indemnified against the TR Claims by the remaining TR Partners in exchange for such TR Partner (i) either waiving such Partner's right to any remaining Reserved Capital and such Partner's right to any allocation of Unallocated Capital (as described in paragraph 3 below) or (ii) retaining such TR Partner's obligation with respect to the TR Claims and interest in Reserved Capital and leaving at interest in escrow as security for payment of such Partner's share of TR Claims in excess of such Partner's Reserved Capital an amount as determined by the Board of Directors of the Touche Firm which is not less than 28.6% of such Partner's Reserved Capital (subject to equitable adjustment in such circumstances as such Board may determine), such amount to remain in escrow until determined by the Board of the Partnership that it can be repaid. Any Reserved Capital or Unallocated Capital waived by a TR Partner who severs association with the Partnership shall be reallocated among the remaining TR Partners with responsibility for the TR Claims.

3. The Unallocated Capital will be allocated to the Partners of the Touche Firm on the basis of the average balance of their Stated Capital or Capital Loan accounts with the Touche Firm over the 10 years ending August 31, 1989. The Unallocated Capital will be held by the Partnership and applied against any unpaid amounts of a TR Partner's Required Capital or Capital Loans. Any portion of the amount of Unallocated Capital which has been allocated to a TR Partner and which is not required for such Partner's Required Capital or Capital Loans shall be applied for the benefit of or paid to such TR Partner as shall be determined by the Board of Directors of the Touche Firm.

**THE DELOITTE FIRM**

With respect to the Deloitte Firm, the net credit amount resulting from certain adjustments to conform the accounting methods of the Deloitte Firm and the Touche Firm and from certain combination adjustments to record as assets certain prepaid expenses represents Reserved Capital. This Reserved Capital will be held by the Partnership.

Payments to discharge the portion of the DH&S Excess allocated to DH&S Partners pursuant to Schedule 13.05G 6 (iv) and 7 will be charged to the Deloitte Reserved Capital account.

Interest will accrue on the Reserved Capital but will not be allocable or payable until the Reserved Capital is distributed. An estimate will be made of the portion of Reserved Capital that may reasonably be expected to be required to cover any DH&S Excess. Interest will accrue on this portion of the Reserved Capital at a rate approximating that for high quality investment grade, intermediate term bonds. Interest will accrue on the remaining portion of the Reserved Capital at 1% over the prime rate.

At the time the Board determines that there will be no more Excesses and that the procedures set forth in Schedule 13.05G shall be terminated (the "Termination Date"), the Reserved Capital, including interest accrued, shall be paid out to those persons who were Partners and Directors of the Deloitte Firm immediately prior to the Effective Date and became Partners or Principals on the Effective Date, except (i) those admitted as Partners or Directors in the Deloitte Firm on or after June 4, 1989, (ii) those DH&S Partners severing association with the Partnership prior to the Termination Date and joining organizations (including government agencies) with respect to which the Partnership must be independent, who will forfeit any claim to Reserved Capital as consideration for being released from any liability for any further DH&S Excess, and (iii) those DH&S Partners severing association with the Partnership prior to the Termination Date who select alternative (a) below.

Each DH&S Partner severing association with the Partnership after the Effective Date and prior to the Termination Date (or the legal representative of such DH&S Partner) shall select, in writing delivered to the Chairman not later than the date on which such severance takes effect (or within 60 days after death where that is the cause of severance), one of the following alternatives with respect to Reserved Capital: (a) to be released from any liability for any further DH&S Excess and to forfeit any claim whatever to Reserved Capital or (b) retain a claim for Reserved Capital and leave on deposit as Supplemental Capital or Supplemental Capital Loans an amount equal to 20% of such DH&S Partner's total fiscal 1989 share earnings and return on investment (ROI) to be available to cover any liability for DH&S Excess that would be allocated to such DH&S Partner; provided, however, that any DH&S Partner by or for whom a selection has not been made within the required time shall be deemed to have selected alternative (a).

Any balance remaining in the Deloitte Reserved Capital at the Termination Date will be distributed to remaining DH&S Partners eligible to share in Reserved Capital, in the proportion that their individual total fiscal 1989 share earnings and ROI bears to the aggregate of such fiscal 1989 share earnings and ROI for all such remaining eligible DH&S Partners.

In the event that any DH&S Excess to be charged to the Deloitte Reserved Capital account exceeds the balance in the account, including interest accrued on the account, such amount shall be allocated to and discharged by remaining eligible DH&S Partners in accordance with Schedule 13.05G 7.

**SCHEDULE 13.05I**

## TRANSITION PROVISION FOR INSURANCE PREMIUMS

Procedures will be implemented, with the assistance of the insurance broker for the two Firms, to determine whether any portion of increase in the annual premiums for the Partnership's professional indemnity insurance can be traced to the claims experience in respect of acts or omissions prior to the Effective Date of the Deloitte Firm or the Touche Firm. To the extent any portions can be so traced and those portions attributable to one of the Firms are disproportionate to those of the other, such disproportionate amounts will be borne by the DH&S partners or the TR partners, whichever Firm was responsible. Post-combination Partners and Principals will be deemed to have been 50% partners as set forth in Schedule 13.05G 3(ii).

SCHEDULE 13.05J

**COSTS OF EXISTING PARTNER LEVEL RETIREMENT, DISABILITY AND DEATH BENEFITS OF EACH OF THE FIRMS**

There are many differences in the Partner level retirement, disability and death benefits and related costs of the two Firms. References herein to "Partners" shall mean Partners as determined in paragraph 3 of Schedule 13.05G. The costs of the programs include but are not limited to the following:

1. Payments to Partners from respective nonqualified plans.

2. Costs of benefits to Partners of the Touche Firm from its qualified plan.

3. Amortization of prepaid pension expense attributed to Partners of the Touche Firm. (Prepaid pension expense represents the portion of the Touche Firm pension plan assets in excess of the present value of accrued benefits attributable to Partners.)

4. Special contractual retirement, disability and death benefit arrangements with certain Partners of each of the Firms.

Other differences may be identified as the respective programs are compared in detail. The costs of any such additional programs will be allocated to the respective Partners of the Firms as well as to the new Partners and Principals of the Partnership. For these purposes, new Partners admitted to the Partnership after the Effective Date will be treated as 50% members of each Firm.

In allocating income to the Partners of the Deloitte Firm, allocable income before Partner retirement, disability and death benefit costs shall be reduced by: (1) payments to retired Partners (including Directors) of the Deloitte Firm under the continuing DH&S pension plan; (2) payments to certain Partners of the Deloitte Firm under individual contractual retirement, disability and death benefit arrangements; and (3) the costs of any other retirement programs necessary to equitably allocate to Partners of the Deloitte Firm the cost of retirement benefits paid pursuant to the DH&S plans.

In allocating income to the Partners of the Touche Firm, allocable income before Partner retirement, disability and death benefit costs shall be reduced by: (1) payments to retired CPA and Non-CPA Partners (or equivalent) of the Touche Firm under the continuing Touche Ross nonqualified pension plan; (2) contributions to the Touche Ross Retirement Plan on behalf of the Partners; (3) amortization of prepaid pension expense for the benefit of Partners of the Touche Firm; (4) payments to certain Partners of the Touche Firm under individual contractual retirement, disability and death benefit arrangements; and (5) the costs of any other retirement

programs necessary to equitably allocate to Partners of the Touche Firm the cost of retirement benefits paid pursuant to the TR plans.

At the time the Board of Directors of Deloitte & Touche LLP determines that no significant differences remain in the cost of retirement, disability and death benefits for Partners of the respective Firms, no further accounting for such differences shall be made and no further adjustments of allocable income shall be made.

S-20

418272.10-New York Server 3A - MSW

D00208

Confidential

A183

**SCHEDULE 6.012**

**D BENEFITS**

**RETIREMENT, DEATH AND DISABILITY BENEFITS APPLICABLE TO AN INDIVIDUAL WHO BECAME AN ACTIVE PARTY AS OF DECEMBER 3, 1989 AND WHO IMMEDIATELY PRIOR THERETO HAD BEEN A PARTNER OR DIRECTOR OF THE DELOITTE FIRM**

D Benefits are the retirement, death or disability benefits described below.

D1.01. Election of Retirement; Notice of Election; Waiver of Notice; Request to Retire Other Than At Year End; Mandatory Retirement Date; Term Certain - The provisions of 6.02 (except 6.022) of the Memorandum of Agreement shall be applicable.

D1.02. Definitions - For purposes of this Schedule 6.012 the terms set forth below shall have the meanings set forth below.

D1.021. Annual Income of an Active Party - For any Year commencing on or after June 3, 1990 an amount equal to such Party's distributions of net earnings under 4.02 of the Memorandum of Agreement as determined for purposes of 6.031 of the Memorandum of Agreement. For the fiscal year ended June 2, 1990 an amount determined by combining (i) share earnings, transition adjustment (if any) and special event awards allotted to such Party by the Deloitte Firm for the period June 4, 1989 through December 2, 1989 pursuant to paragraph (A) of Article 3 of the Memorandum of Agreement of the Deloitte Firm as in effect during such period and any supplemental distribution allocated to such Party pursuant to Article 5 of the Memorandum of Agreement of the Deloitte Firm as in effect during such period and designated by the Chairman of the Deloitte Firm as being includable in the Annual Income of the Party for such period, and (ii) unit earnings, special recognition awards and any pre-combination adjustment allotted to such Party by the Partnership for the period December 3, 1989 through June 2, 1990. For the fiscal year of the Deloitte Firm ended May 31, 1986 and for each such subsequent fiscal year through June 3, 1989, an amount equal to the sum of (x) share earnings, transition adjustment (if any) and special event awards allotted to such party for such fiscal year pursuant to paragraph (A) of Article 3 of the Memorandum of Agreement of the Deloitte Firm as in effect during any such fiscal year and (y) any supplemental distribution allocated to such Party pursuant to Article 5 of the Memorandum of Agreement of the Deloitte Firm as in effect during any such fiscal year and designated by the Chairman of the Deloitte Firm

as being includable in the Annual Income of the Party for such fiscal year. For any such fiscal year prior to such year ended May 31, 1986 an amount equal to the sum of unit income, fixed distribution, special distribution and supplemental compensation determined in accordance with the applicable provisions of the Memorandum of Agreement of the Deloitte Firm or the Director Agreements as in effect during any such fiscal year. Annual Income of a Party for any partial Year shall be determined by annualizing such Party's Income for such partial Year. For any such partial Year in which such Income will not be determinable until a date later than the commencement date for the payment of benefits an estimate of such annualized Income shall be made for purposes of determining the Party's Annual Income for such Year and any retirement benefits based upon such estimate shall be retroactively adjusted (without interest) to actual Income on an annualized basis for such Year.

D1.022. Average Annual Earnings Attributable to Active Parties - the amount determined as such pursuant to 6.122 of the Memorandum of Agreement as modified by D1.102.

D1.023. Base Amount - shall be the Base Amount of the Deloitte Firm as of June 3, 1990 and thereafter, as of the last day of each Year, shall be adjusted by multiplying the Base Amount then in effect by the fraction the numerator of which is the Aggregate Five Year Average ending with such Year and the denominator of which is the Aggregate Five Year Average ending with the Preceding Year.

D1.024. Aggregate Five Year Average - the aggregate of the Average Annual Earnings Attributable to Active Parties for each of 5 consecutive Years.

D1.025. Mandatory Retirement Date - 6.024 of the Memorandum of Agreement shall be applicable.

D1.026. Month(s); Accounting Period - Month or months for these purposes shall be a calendar month or months except that the month of May shall be deemed to end on the last day of a Year and the month of June shall be deemed to begin on the following day. Accounting Period for purposes of this Schedule 6.012 shall be the period forming a portion of a Year as approved from time to time by the Board of Directors for accounting purposes such that the first day of the first accounting period for any Year shall begin on the first day of such Year and the last day of the last accounting period for any Year shall end on the last day of such Year. For purposes of calculation or payment of any amount the first day of any month shall be deemed to be the first day of the first accounting period beginning during such month. The relationship between months and

accounting periods shall be interpreted so as to assure that any Party entitled to benefits shall receive full benefits on an annual basis.

D1.027. Partner Service Years - as defined in 6.04 of the Memorandum of Agreement.

D1.028. Retirement Benefit Base

D1.028a. For the period of 12 months commencing with the first day of a Party's retirement (a Retirement Year) and for each of such Party's subsequent Retirement Years, the Retirement Benefit Base shall be the amount computed (i) by determining the Annual Income of such Party as an Active Party for each of the 5 Qualifying Years as defined in 6.031 of the Memorandum of Agreement in which such Annual Income to such Active Party was the highest, (ii) dividing the sum of the 5 highest amounts so determined by 5, (iii) multiplying the result so obtained by the following percentages: 28% of the portion of such result which is not more than the Base Amount; and 14% of the portion of such result which is more than the Base Amount and (iv) adding the result of the calculations so made. In the event a Party has been an Active Party for less than 5 Years preceding the date of retirement, then the number of Qualifying Years for purposes of clause (i) above and the divisor for purposes of clause (ii) above shall be such lesser number of Years for which such Party had Annual Income.

D1.028b. For each Active Party entitled to a D Benefit a determination has been made as of June 2, 1990 of the present value at age 60 of each such Active Party's retirement benefits under the Memorandum of Agreement of the Deloitte Firm as in effect on December 2, 1989 (Old Base) and under the provisions of this Schedule 6.012 (New Base). If the ratio of the New Base divided by the Old Base was less than 98%, a Benefit Adjustment Factor was computed to bring this ratio to 98%. This Benefit Adjustment Factor will be communicated to each Active Party to whom it is applicable on or before January 1, 1991. For each such Party the Retirement Benefit Base, computed pursuant to D1.028a at retirement, will be adjusted by multiplying it by such Benefit Adjustment Factor. Such Benefit Adjustment Factor will not be adjusted for any reason by events that occurred after June 2, 1990.

D1.029. Year(s) - the fiscal year ending on the Saturday nearest to May 31 or such other fiscal year as fixed by the Board of Directors and for purposes of this Schedule 6.012 where the context requires the fiscal year of the Deloitte Firm for periods prior to June 4, 1989 and the period June 4, 1989 through June 2, 1990.

D1.03. Normal Retirement

D1.031. Effective Date - Normal Retirement shall be effective at such Active Party's Mandatory Retirement Date or such earlier date, which is after such Active Party reaches age 62, to which the Chairman of the Board has consented in accordance with D1.01.

D1.032. Benefit; Duration - Normal Retirement Income for an Active Party shall be such Active Party's Retirement Benefit Base at retirement. Such Normal Retirement Income shall be payable for a term certain commencing at retirement of 120 months and shall continue thereafter only for so long as such Party survives unless such Party has elected an optional retirement payment under D1.09.

D1.04. Early Retirement

D1.041. Effective Date; General - Early Retirement shall be effective at the election of an Active Party at the close of business on the last day of any Year which occurs between the date such Active Party reaches age 55 and prior to the date such Active Party reaches age 62. If the Chairman of the Board has consented in accordance with D1.01 to the last day of another month which must be after the date such Active Party reaches age 55 but prior to the date such Active Party reaches age 62, such retirement shall be effective at the date specified in such consent. Early Retirement shall entitle such Party to Early Retirement Income pursuant to D1.043, D1.044 or D1.045, whichever is applicable. Years of service as used in D1.044 and D1.045 all shall include service of an Active Party as such and as an Active Party, Director and employee of the Deloitte Firm.

D1.042. Benefit For an Active Party at or after Age 60 but before Age 62; Duration - Early Retirement Income for an Active Party retiring at or after age 60 but before age 62 shall be the Active Party's Retirement Benefit Base at retirement. Such Early Retirement Income shall be payable for a term certain commencing at retirement of 120 months and shall continue thereafter only for so long as such Party survives, unless such Party elects an optional or deferred retirement payment under D1.09.

D1.043. Benefit for an Active Party with at Least 10 Partner Service Years but less than 15 Years of Service and Retiring at or After Age 57 and prior to Age 60; Duration - Early Retirement Income for each 12-month period for an Active Party with at least 10 Partner Service Years but less than 15 Years of service at retirement and who retires at or after age 57 and prior to age 60 shall be the amount determined by

(i) multiplying such Active Party's Retirement Benefit Base by the fraction the numerator of which is the number of Years (including fractions thereof) of such Active Party's service at retirement and the denominator of which is the number (not in excess of 15) equal to the number of Years (including fractions thereof) of service which such Active Party would have had if such Party had continued in service to age 60; and

(ii) reducing the amount determined in (i) .3333% (.3333 percent) thereof for each month from and after the effective date of retirement through the end of the month in which such Party would reach age 62.

Such Early Retirement Income shall be payable for a term certain commencing at retirement of that number of months set opposite the age of such Party at retirement in Schedule 6.064 attached to this Agreement and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under D1.09.

D1.044. Benefit for an Active Party with At Least 10 Partner Service Years but less than 15 Years of Service and Retiring at or After Age 55 and prior to Age 57; Duration - Early Retirement Income for each 12- month period for an Active Party with at least 10 Partner Service Years but less than 15 Years of service at retirement and who retires at or after age 55 and prior to age 57 shall be the amount determined by

(i) multiplying such Active Party's Retirement Benefit Base by the fraction the numerator of which is the number of years (including fractions thereof) of such Active Party's service at retirement and the denominator of which is the number (not in excess of 15) equal to the number of Years (including fractions thereof) of service which such Active Party would have had if such Party had continued in service to age 60; and

(ii) reducing the amount determined in (i) by 20%, and then

(iii) reducing on an actuarial basis the product determined in (ii) from age 57 to the age of the Party at the effective date of retirement.

Such Early Retirement Income shall be payable for a term certain commencing at retirement of 150 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under D1.09.

D1.045. Benefit for an Active Party with at least 15 Years of Service at retirement and who retires at or after age 55 but prior to age 60; Duration - Early Retirement Income for an Active Party with at least 15 Years of service at retirement and who retires at or after age 55 but prior to age 60 shall be the amount determined by subtracting from such Active Party's Retirement Benefit Base at retirement .5% (.5 percent) thereof for each month from and after the effective date of retirement through the end of the month in which such Party would reach age 60. Such Early Retirement Income shall be payable for a term certain commencing at retirement of that number of months set opposite the age of such Active Party at retirement in Schedule 6.063 and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under D1.09.

D1.05. D50/54 Retirement

D1.051. Definition; Effective Date - An Active Party who has at least 10 Partner Service Years and is between the ages of 50 and 55 is eligible for retirement which shall be referred to as D50/54 Retirement. D50/54 Retirement shall be effective at the election of an Active Party as of the last day of any Year which occurs between the date such Active Party reaches age 50 and prior to the date such Active Party reaches age 55. If the Chairman of the Board has consented in accordance with D1.01 to the last day of another month which must be after the date such Active Party reaches age 50 but prior to the date such Active Party reaches age 55, such retirement shall be effective at the date specified in such consent.

D1.052. Benefit; Duration - D50/54 Retirement Income for each 12-month period shall be the amount determined by

(i) calculating Early Retirement Income under D1.045 for such Active Party as if age 55 but with such Party's actual Years of service, and then

(ii) reducing on an actuarial basis the amount determined in (i) from age 55 to the age of such Party at the effective date of retirement.

Such D50/54 Retirement Income shall be payable for a term certain commencing at retirement of 150 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional or deferred retirement payment under D1.09.

D1.06. Special Retirement - The provisions of 6.08 of the Memorandum of Agreement shall be applicable.

D1.07. Disability - The provisions of 6.09 of the Memorandum of Agreement shall be applicable.

D1.08. Death During Active Service - The provisions of 6.10 of the Memorandum of Agreement shall be applicable, except that the reference to Normal Retirement Income shall be deemed to be the term as used in this Schedule 6.012 and the reference to 6.111a shall be as modified by D1.09.

D1.09. Optional Forms of Payment and Deferred Payment of Benefits - The provisions of 6.11 of the Memorandum of Agreement shall be applicable, except that the references to Normal Retirement Income, Early Retirement Income and Pre-Retirement Death Benefit shall be deemed to be those terms as used in or modified by this Schedule 6.012, the reference to 50/54 Retirement Income shall be deemed to be D50/54 Retirement Income, the reference to Retirement Base Income in 6.113b of the Memorandum of Agreement shall be deemed to be Retirement Benefit Base and the reference to Partner Service Years in 6.113b of the Memorandum of Agreement shall be deemed to be both Partner Service Years and Years of service.

D1.10. Cost of Living Adjustment - The provisions of 6.12 of the Memorandum of Agreement and Schedule 6.012 shall be applicable, except that

D1.101. the references to Normal Retirement Income and Early Retirement Income shall be deemed to be those terms as used in or modified by this Schedule 6.012 and the reference to 50/54 Retirement Income shall be deemed to be D50/54 Retirement Income and

D1.102. Average Annual Earnings Attributable to Active Parties for purposes of 6.122d of the Memorandum of Agreement and Schedule 6.012

D1.102a. for the Years ended prior to June 4, 1989 shall be deemed to be the "Average Annual Income of the Active Parties" of the Deloitte Firm,

D1.102b. for the period June 4, 1989 through June 2, 1990 (the Deloitte Fiscal Year 1990) shall be such amount, based upon the distributions to partners and directors of the Deloitte Firm for such Deloitte Fiscal Year 1990, as the Board of Directors shall approve as comparable to the "Average Annual Income of the Active Parties" of the Deloitte Firm for the fiscal year ended June 3, 1989, for the purpose of determining the increase or decrease between such fiscal year ended June 3, 1989 and the Deloitte Fiscal Year 1990, and

D1.102c. for the Deloitte Fiscal Year 1990 shall be such amount determined in D1.102b or such pro forma amount as the Board of Directors shall approve as comparable to the Average Annual Earnings Attributable to Active Parties of the Partnership for the purpose of determining the increase or decrease between the Deloitte Fiscal Year 1990 and the Year (of the Partnership) ending June 1, 1991.

D1.11. Manner and Time of Payment of Benefits - The provisions of 6.13 of the Memorandum of Agreement shall be applicable, except that the references to Normal Retirement Income and Early Retirement Income shall be deemed to be those terms as used in or modified by this Schedule 6.012 and the reference to 50/54 Retirement Income shall be deemed to be D50/54 Retirement Income.

D1.12. Designation of Beneficiaries - The provisions of 6.14 of the Memorandum of Agreement shall be applicable.

D1.13. General Conditions - The provisions of 6.15 of the Memorandum of Agreement shall be applicable.

D1.14. General Limitations on Benefits - The provisions of 6.17 of the Memorandum of Agreement shall be applicable.

D1.15. Allocation and Recovery of Reduction of Benefits - The provisions of 6.18 of the Memorandum of Agreement shall be applicable.

D1.16. Effect of Dissolution - The provisions of 6.19 of the Memorandum of Agreement shall be applicable.

D1.17. Special Election to Retain Existing Benefits

D1.171. Party Eligible to Make the Election - Any Party to whom the D Benefit is applicable pursuant to 6.012 of the Memorandum of Agreement and who will be at least 55 years of age on June 1, 1991 (an Eligible Party) shall be eligible to make the election under this D1.17.

D1.172. The Election - Each Eligible Party shall have the right to make an irrevocable election

(i) to accept the D Benefits as provided for in this Schedule 6.012, or

(ii) to reject the D Benefits provided for in this Schedule 6.012 and to retain the retirement and disability benefits available under the Memorandum of Agreement of the Deloitte Firm dated as of May 31, 1987 and the annex thereto dated the same date, both as in effect on December 2, 1989, but subject to such adjustments, if any, to those retirement and disability benefits of the Deloitte Firm as the Board of Directors determines may be necessary to equitably retain such benefits in view of changes made as a result of the creation of this Partnership and subject to the limitation on benefits as provided in 6.17 and 6.18 of the Memorandum of Agreement of this Partnership.

D1.173. Election Procedure - The Chairman of the Board shall determine the period during which the election under D1.172 shall be made and shall cause to be furnished to each Eligible Party an election form approved by the Chairman of the Board setting forth the election to be made in accordance with D1.172. To make an election an Eligible Party must complete and return such election form to the Chairman of the Board so that it is received at the office of the Chairman of the Board on or before the last day of the period specified. In circumstances in which the Chairman of the Board deems appropriate the Chairman of the Board may extend the period in which an Eligible Party might make the election for such reasonable period as the Chairman of the Board deems appropriate. Each Eligible Party who shall fail to make a timely election in accordance with the foregoing procedure shall be deemed to have elected to accept the D Benefits as provided in this Schedule 6.012.

D1.18 Integration of Benefits Payments with Active Party Benefits under the Deloitte & Touche Employees' Pension Plan - The provisions of 6.21 of the Memorandum of Agreement shall be applicable.

**SCHEDULE 6.013**

**T BENEFITS**

**RETIREMENT, DEATH AND DISABILITY BENEFITS APPLICABLE TO AN INDIVIDUAL WHO BECAME AN ACTIVE PARTY AS OF DECEMBER 3, 1989 AND WHO IMMEDIATELY PRIOR THERETO HAD BEEN A PARTNER (CPA OR NON-CPA) OF THE TOUCHE FIRM**

T Benefits are the retirement, death or disability benefits described below.

T1.01. Election of Retirement; Notice of Election; Waiver of Notice; Request to Retire Other Than at Year End; Mandatory Retirement Date; Term Certain - The provisions of 6.02. (except 6.022) of the Memorandum of Agreement shall be applicable.

T1.02. Definitions - For purposes of this Schedule 6.013 the terms set forth below shall have the meanings set forth below.

T1.021. Month(s); Accounting Period - Month or months for these purposes shall be a calendar month or months except that the month of May shall be deemed to end on the last day of a Year and the month of June shall be deemed to begin on the following day. Accounting Period for purposes of this Schedule 6.013 shall be the period forming a portion of a Year as approved from time to time by the Board of Directors for accounting purposes such that the first day of the first accounting period for any Year shall begin on the first day of such Year and the last day of the last accounting period for any Year shall end on the last day of such Year. For purposes of calculation or payment of any amount the first day of any month shall be deemed to be the first day of the first accounting period beginning during such month. The relationship between months and accounting periods shall be interpreted so as to assure that any Party entitled to benefits shall receive full benefits on an annual basis.

T1.022. Partner Service Years - as defined in 6.04 of the Memorandum of Agreement, except that the terms "Year" or "Years" as used therein shall have the meaning in T1.026.

T1.023. Retirement Base Income - Retirement Base Income shall have the meaning set forth in 6.031 of the Memorandum of Agreement, except that (i) for Years prior to September 1, 1989 an Active Party's distributions

under 4.02. shall deemed to be such Active Party's Total Compensation (which amount does not include any return on investment) as a Partner or Principal of the Touche Firm in accordance with the Partnership Agreement of the Touche Firm as in effect during any such Year, (ii) for the Touche Fiscal Year 1990 an Active Party's Total Compensation shall be the number of units assigned to such Active Party as a Touche Partner for such Fiscal Year multiplied by $1,000, (iii) all Years ending prior to June 3, 1990 (including the Touche Fiscal Year 1990) shall be Qualifying Years, and (iv) the Touche Fiscal Year 1990, as such, shall not be treated as a partial Year. Retirement Base Income of an Active Party for any partial Year in which retirement is effective other than on the last day of a Year shall be determined by annualizing such Party's distributions under 4.02. for such partial Year. For any such Partial Year in which such distributions will not be determinable until a date later than the commencement date for the payment of benefits, an estimate of such annualized distributions of an Active Party shall be made for purposes of Retirement Base Income, and such Retirement Base Income based upon such estimate and any retirement benefits based upon such estimate shall be retroactively adjusted (without interest) to actual distributions on an annualized basis for such Year.

T1.024. Touche Partner - a Party who had been a CPA Partner or a Non-CPA Partner or had held an equivalent position with the Touche Firm.

T1.025. Touche Partnership Agreement - the partnership agreement of the Touche Firm as in effect on December 2, 1989 and as further amended to add 50/56 Retirement effective March 1, 1990, except as 50/56 Retirement is modified by T1.05.

T1.026. Year; Touche Fiscal Year 1990 - for periods after June 2, 1990 Year shall have the meaning set forth in the Memorandum of Agreement. For periods prior to September 1, 1989 Year shall mean a fiscal year of the Touche Firm commencing on September 1 and ending on the following August 31. The period beginning September 1, 1989 and ending June 2, 1990 shall be a full Year and shall be referred to as the Touche Fiscal Year 1990.

T1.027. Years of Service - unless otherwise determined by the Board of Directors, the number of consecutive Years of service of an Active Party as such, as a Touche Partner and as an employee of the Touche Firm. Years of Service shall also include as a full Year any partial Year of Service resulting from an Active Party's electing retirement commencing as of the beginning of the month following the anniversary of the Active Party's

birth but prior to the month following the end of the Year in which such anniversary occurs.

T10.3. Normal Retirement

T1.031. Effective Date - Normal Retirement shall be effective at a Touche Partner's Mandatory Retirement Date or such earlier date, which is after such Active Party reaches age 62, to which the Chairman of the Board has consented in accordance with T1.01.

T1.032. Normal Retirement Income - For an Active Party who became a Touche Partner before September 1, 1975 and continued as such (except for leaves of absence for any reason) until retirement, Normal Retirement Income for each 12-month period is 40% of such Partner's Retirement Base Income as determined pursuant to T1.023. For a person who became a Touche Partner on or after September 1, 1975 Normal Retirement Income shall be the amount determined under the preceding sentence multiplied by a fraction, the numerator of which is the number of consecutive full Years of Service (but not in excess of 32 such Years) and the denominator of which shall be 32.

T1.033. Duration of Benefits - Normal Retirement Income shall be payable for a term certain commencing at retirement of 120 months and shall continue thereafter only for so long as such Party survives, unless such Party has elected an optional retirement payment under T1.09.

T1.04. Early Retirement

T1.041. Effective Date - Early Retirement shall be effective at the election of a Touche Partner at the close of business on the last day of any Year which occurs between the date such Active Party reaches age 57 and prior to the date such Active Party reaches age 62. If the Chairman of the Board has consented in accordance with T1.01. to the last day of another month which must be after the date such Active Party reaches age 57 but prior to the date such Active Party reaches age 62, such retirement shall be effective at the date specified in such consent.

T1.042. Early Retirement Income - Early Retirement Income for each 12-month period shall be determined in the same manner as Normal Retirement Income under T1.032 except that the 40% specified in T1.032 shall be reduced by .1333 percentage points for each month from and after the effective date of retirement through the end of the month in which the Touche Partner would reach age 62, provided such reduction shall not exceed an aggregate of 8 percentage points.

T1.043. Duration of Benefits - Early Retirement Income shall be paid to a retired Touche Partner for a term certain of that number of months set opposite the age of the Touche Partner at the time of retirement in Schedule 6.013A attached to the Memorandum of Agreement and shall continue thereafter only for so long as the retired Touche Partner survives, unless such Party has elected an optional or deferred retirement payment under T1.09.

T1.05. 50/56 Retirement

T1.051. Definition; Effective Date - Any Touche Partner who has at least 10 Partner Service Years and is between the ages of 50 and 57 is eligible for retirement which is referred to as 50/56 Retirement. 50/56 Retirement shall be effective at the election of an Active Party at the close of business on the last day of any Year which occurs between the date such Active Party reaches age 50 and prior to the date such Active Party reaches age 57. If the Chairman of the Board has consented in accordance with T1.01. to the last day of another month which must be after the date such Active Party reaches age 50 but prior to the date such Active Party reaches age 57, such retirement shall be effective at the date specified in such consent.

T1.052. Benefit; Duration - 50/56 Retirement Income for each 12-month period shall be the amount determined by

(i) calculating Early Retirement Income under T1.042 for such Touche Partner as if age 57, but whether or not such Touche Partner became a Touche Partner before or after September 1, 1975, in determining Early Retirement Income for purposes of this T1.052 the second sentence of T1.032 shall apply using such Partner's Years of Service, and then

(ii) reducing on an actuarial basis the amount determined in (i) from age 57 to the age of such Touche Partner at the effective date of retirement.

Such 50/56 Retirement Income shall be payable for a term certain commencing at retirement of 150 months and shall continue thereafter only for so long as such Touche Partner survives, unless such Partner has elected an optional or deferred retirement payment under T1.09.

T1.06. Special Retirement - The provisions of 6.08 of the Memorandum of Agreement shall be applicable.

T1.07. Disability - The provisions of 6.09 of the Memorandum of Agreement shall be applicable.

T1.08. Death During Active Service - The provisions of 6.10 of the Memorandum of Agreement shall be applicable, except that the reference to Normal Retirement Income shall be deemed to be the term as used in this Schedule 6.013 and the reference to 6.111a shall be as modified by T1.09.

T1.09. Optional Forms of Payment and Deferred Payment of Benefits - The provisions of 6.11 of the Memorandum of Agreement shall be applicable, except that the references to Normal Retirement Income, Early Retirement Income and Pre-Retirement Death Benefit shall be deemed to be those terms as used in or modified by this Schedule 6.013 and the reference to 50/54 Retirement Income shall be deemed to be 50/56 Retirement Income.

T1.10. Cost of Living Adjustment - The provisions of 6.12 of the Memorandum of Agreement and Schedule 6.12 shall be applicable, except that

T1.101. the references to Normal Retirement Income and Early Retirement Income shall be deemed to be those terms as used in or modified by this Schedule 6.013 and the reference to 50/54 Retirement Income shall be deemed to be 50/56 Retirement Income; and

T1.102. in determining the Earnings Factor for purposes of the T Benefit, the Average Annual Earnings Attributable to Active Parties for purposes of 6.122d of the Memorandum of Agreement and Schedule 6.12

T1.102a. for the Years ended prior to September 1, 1989 shall be deemed to be the average of the "Adjusted Earnings of the Partnership" of the Touche Firm per Touche Partner for each such Year as approved by the Board of Directors, and

T1.102b. for the Touche Fiscal Year 1990 shall be such pro forma amount based upon the distributions to Touche Partners for the Touche Fiscal Year 1990 as the Board of Directors shall approve as comparable to the average of the "Adjusted Earnings of the Partnership" of the Touche Firm per Touche Partner for the purpose of determining the increase or decrease between the Year ending August 31, 1989 and the Touche Fiscal Year 1990, and

T1.102c. for the Touche Fiscal Year 1990 shall be such amount determined in T1.102b or such pro forma amount as the Board of Directors shall approve as comparable to the Average Annual Earnings Attributable to Active Parties of the Partnership, for the purpose of determining the increase or decrease between

the Touche Fiscal Year 1990 and the Year (of the Partnership) ending June 1, 1991.

T.1.11. Manner and Time of Payment of Benefits - The provisions of 6.13 of the Memorandum of Agreement shall be applicable, except that the references to Normal Retirement Income and Early Retirement Income shall be deemed to be those terms as used in or modified by this Schedule 6.013 and the reference to 50/54 Retirement Income shall be deemed to be 50/56 Retirement Income.

T1.12. Designation of Beneficiaries - The provisions of 6.14 of the Memorandum of Agreement shall be applicable.

T1.13. General Conditions - The provisions of 6.15 of the Memorandum of Agreement shall be applicable.

T1.14. General Limitations on Benefits - The provisions of 6.17 of the Memorandum of Agreement shall be applicable.

T1.15. Allocation and Recovery of Reduction of Benefits - The provisions of 6.18 of the Memorandum of Agreement shall be applicable.

T1.16. Treatment of Benefits Offsets for Purposes of the General Limitation on Benefits - With respect to any reductions required pursuant to T1.14 and T1.15 the aggregate amount paid or payable by the Partnership with respect to the Touche Partners for any Year for purposes of 6.171 or 6.172 of the Memorandum of Agreement and the portion of the aggregate reduction to be allocated with respect to Touche Partners for purposes of 6.18 of the Memorandum of Agreement shall be the net amounts so paid or payable after giving effect to all reductions under T1.17 applicable to such Year.

T1.17. Integration of Benefits Payments with Benefits under the Touche Ross Retirement Plan and with the Partnership Profit Sharing Plan

T1.171. Reduction Based upon Integration - The aggregate benefits determined under this Schedule 6.013 (before any reduction under this T1.17) and otherwise payable with respect to any Touche Partner for each 12 months shall be reduced by offset against the benefits otherwise payable under this Article 6 by

T1.171a. the amount of benefits under the Touche Ross Retirement Plan (TRR Plan), as may be amended effective as of December 2, 1989 to provide that no further benefits shall accrue under the TRR Plan as of that date with respect to Touche Partners and as may be further amended, as in effect at the date of the commencement of a Touche Partner's retirement or disability

or of such Partner's death, as the case may be (such benefits being referred to as TRR Plan Benefits), which are available at that time for each 12 months with respect to such Touche Partner, plus

T1.171b. the amount of the payments for each 12 months which a Touche Partner would be entitled to receive

(i) if such Touche Partner had created through contributions (whether or not such Touche Partner, if eligible to do so, had in fact made such contributions for the Year or Years for which such Touche Partner was eligible to do so) to the Partners Profit Sharing Plan (PPS Plan) an accumulated fund as determined pursuant to T1.172 (the Accumulated Profit Sharing Fund) and

(ii) such Accumulated Profit Sharing Fund were to be paid out commencing at the date of the commencement of a Touche Partner's retirement or disability or of such Partner's death, as the case may be (such payments being referred to as PPS Plan Payments), on the basis of a term certain of 120 months and continuing thereafter only for so long as such Partner survives, using an assumed investment return of 8.5% (8.5 percent) per annum in determining the amount of such PPS Plan Payments for each 12 months, but the amount of such PPS Plan Payments for purposes of this provision shall be subject to adjustment as provided in T1.173.

T1.172. Accumulated Profit Sharing Fund; Qualified Earnings; Mandatory Contribution

T1.172a. Accumulated Profit Sharing Fund - The Accumulated Profit Sharing Fund for a Touche Partner is an amount equal to the aggregate for all of the years of the PPS Plan for which such Touche Partner is eligible to make a contribution (which is not forfeited or, if forfeited, is otherwise compensated for) to such PPS Plan (the Contribution Years) of

(i) an average over a period of years of 3.6% of such Touche Partner's Qualified Earnings for each of the Contribution Years for purposes of making a contribution to the PPS Plan, plus

(ii) an assumed investment return at the rate of 8.5% (8.5 percent) per annum on the amount determined in (i) for each such Contribution Year compounded annually until the effective date of such Touche Partner's retirement or disability or of the date of such Partner's death, as the case may be.

Any determinations required for purposes of ascertaining the Accumulated Profit Sharing Fund shall be made in accordance with such equitable rules adopted from time to time by the Board of Directors, provided that such rules shall be of uniform application with respect to all Touche Partners similarly situated.

T1.172b. Qualified Earnings - Such Touche Partner's qualified earnings as defined in the PPS Plan for each of the Contribution Years for purposes of making a contribution to the PPS Plan; provided that, such Qualified Earnings shall be reduced for purposes of T1.172 in such manner and amount as the Board of Directors shall deem advisable for any Contribution Year to reflect any limitation under the Internal Revenue Code or other law which would reduce the percentage portion or other amount of such Qualified Earnings for such Contribution Year which such Touche Partner could contribute to the Accumulated Profit Sharing Fund to a percentage or other amount which is less than 4% of such Qualified Earnings if determined without regard to such limitation. Internal Revenue Code or other law shall include any regulations or rules promulgated thereunder.

T1.172c. Mandatory Contribution - Each Touche Partner shall make contributions to the PPS Plan in accordance with such rules and procedures as the Board of Directors shall approve so as to achieve contributions averaging 4% for each of the Contribution Years so as to achieve the Accumulated Profit Sharing Fund as contemplated in T1.172a during the period of such Touche Partner's service as an Active Party.

T1.173. Further Conditions; Partners Profit Sharing Plan

T1.173a. Rules Relating to Reduction under T1.171a - The amount of the reduction under T1.171a against benefits otherwise payable under this Schedule 6.013 for any Year shall be determined in

accordance with rules adopted from time to time by the Board of Directors which take into account, among other matters, the various forms of payment of TRR Plan Benefits, provided that such rules shall be of uniform application with respect to all Touche Partners (unless otherwise provided with respect to a Special Retirement, Disability or Special Death Benefit) similarly situated and shall not result in reduction in benefits pursuant to T1.171a which would exceed a Touche Partner's available or allocated share of TRR Plan Benefits.

T1.173b. Rules Relating to Reduction Under T1.171b - The amount of the reduction under T1.171b against benefits otherwise payable under this Schedule 6.013 for any Year shall be determined in accordance with rules adopted from time to time by the Board of Directors which take into account, among other matter, the various forms of payment of PPS Plan Payments and of benefits under this Schedule 6.013, provided that such rules shall be of uniform application with respect to all Touche Partners (unless otherwise provided with respect to a Special Retirement, Disability or Special Death Benefit) similarly situated and shall not result in reduction in benefits pursuant to T1.171b which would exceed on an actuarially equivalent or comparable basis a Touche Partner's available PPS Plan Payments on the basis set forth in T1.171a.

T1.173c. Additional Rules - Without limiting the generality of 1.173a or 1.173b for purposes of determining the availability or value of TRR Plan Benefits or of PPS Plan Payments for purposes of T1.171 or any allocation of a share of either, the rules adopted by the Board of Directors pursuant to either 1.173a or 1.173b may include such assumptions as to exercise or non-exercise of options relating to the TRR Plan Benefits or PPS Plan Payments (which may apply regardless of whether such options, in fact, are or are not exercised) and such assumptions as to actuarial matters, as the Board of Directors may reasonably determine. Where a Touche Partner or retired Touche Partner through the designation of one or more beneficiaries under T1.12 has divided the benefits determined under this Schedule 6.013 (before reduction under this T1.17) to which such Touche Partner was otherwise entitled, then for purposes of determining the amount of any reduction under this T1.17 the amount of TRR Plan Benefits or PPS Plan Payments shall be allocated to or among such beneficiary or beneficiaries or such

beneficiary or beneficiaries and such retired Touche Partner (or the estate of such retired Touche Partner, if deceased) in such equitable manner as the Board of Directors shall determine under rules established by the Board from time to time, which rules shall be of uniform application with respect to persons similarly situated, unless some other allocation has been made pursuant to the rules established by the Board of Directors with reference to the designation of such beneficiaries under T1.12.

T1.174. Partners Profit Sharing Plan - The Partners Profit Sharing Plan shall be such profit sharing plan adopted by the Partnership and as amended from time to time to which a Touche Partner is entitled to make contributions at least sufficient to create the Accumulated Profit Sharing Fund as contemplated in T1.172.

T1.18. Effect of Dissolution - The provisions of 6.19 of the Memorandum of Agreement shall be applicable.

T1.19. Integration of Benefits Payments with Active Party Benefits under the Deloitte & Touche Employees' Pension Plan - The provisions of 6.21 of the Memorandum of Agreement shall be applicable. No reduction by offset under T1.171a shall be made with respect to Active Party Plan Benefits.

SCHEDULE 6.013A

## TABLE OF NUMBER OF MONTHS OF THE TERM CERTAIN FOR EARLY RETIREMENT

| Retirement Age | | Number of Months | Retirement Age | | Number of Months |
|---|---|---|---|---|---|
| Years | Months* | of Term Certain | Years | Months* | of Term Certain |
| 57 | 0 | 150 | 60 | 0 | 130 |
| | 1 | 149 | | 1 | 130 |
| | 2 | 149 | | 2 | 129 |
| | 3 | 148 | | 3 | 129 |
| | 4 | 148 | | 4 | 129 |
| | 5 | 147 | | 5 | 128 |
| | 6 | 146 | | 6 | 128 |
| | 7 | 146 | | 7 | 127 |
| | 8 | 145 | | 8 | 127 |
| | 9 | 145 | | 9 | 126 |
| | 10 | 144 | | 10 | 126 |
| | 11 | 143 | | 11 | 125 |
| 58 | 0 | 143 | | 0 | 125 |
| | 1 | 142 | | 1 | 125 |
| | 2 | 142 | | 2 | 124 |
| | 3 | 141 | | 3 | 124 |
| | 4 | 141 | | 4 | 123 |
| | 5 | 140 | | 5 | 123 |
| | 6 | 140 | | 6 | 122 |
| | 7 | 139 | | 7 | 122 |
| | 8 | 138 | | 8 | 122 |
| | 9 | 138 | | 9 | 121 |
| | 10 | 137 | | 10 | 121 |
| | 11 | 137 | | 11 | 120 |
| 59 | 0 | 136 | 62 | 0 | 120 |
| | 1 | 136 | | | |
| | 2 | 135 | | | |
| | 3 | 135 | | | |
| | 4 | 134 | | | |
| | 5 | 134 | | | |
| | 6 | 133 | | | |
| | 7 | 133 | | | |
| | 8 | 132 | | | |
| | 9 | 132 | | | |
| | 10 | 131 | | | |
| | 11 | 131 | | | |

* For purposes of applying this table, a Party is deemed to reach a specified age as of the first day of the month succeeding the month in which the Party actually reaches that age.

418272.10-New York Server 3A - MSW

SCHEDULE 6.063

**TABLE OF NUMBER OF MONTHS OF THE TERM CERTAIN FOR EARLY RETIREMENT**

| Retirement Age Years | Months* | Number of Months of Term Certain |
|---|---|---|
| 55 | 0 | 150 |
| Through | | |
| 56 | 11 | 150 |
| 57 | 0 | 150 |
| | 1 | 148 |
| | 2 | 146 |
| | 3 | 144 |
| | 4 | 143 |
| | 5 | 142 |
| | 6 | 141 |
| | 7 | 140 |
| | 8 | 140 |
| | 9 | 139 |
| | 10 | 138 |
| | 11 | 137 |
| 58 | 0 | 136 |
| | 1 | 136 |
| | 2 | 135 |
| | 3 | 134 |
| | 4 | 133 |
| | 5 | 132 |
| | 6 | 132 |
| | 7 | 131 |
| | 8 | 130 |
| | 9 | 130 |
| | 10 | 129 |
| | 11 | 128 |
| 59 | 0 | 128 |
| | 1 | 127 |
| | 2 | 126 |
| | 3 | 126 |
| | 4 | 125 |
| | 5 | 124 |
| | 6 | 124 |
| | 7 | 123 |
| | 8 | 122 |
| | 9 | 122 |
| | 10 | 121 |
| | 11 | 121 |
| 60 | 0 | 120 |

* For purposes of applying this table, a Party is deemed to reach a specified age as of the first day of the month succeeding the month in which the Party actually reaches that age.

418272.10-New York Server 3A - MSW

SCHEDULE 6.064

**TABLE OF NUMBER OF MONTHS OF THE TERM CERTAIN FOR EARLY RETIREMENT**

| Retirement Age Years | Retirement Age Months* | Number of Months of Term Certain |
|---|---|---|
| 55 | 0 | 150 |
| Through | | |
| 56 | 11 | 150 |
| 57 | 0 | 150 |
| | 1 | 140 |
| | 2 | 135 |
| | 3 | 135 |
| | 4 | 134 |
| | 5 | 134 |
| | 6 | 133 |
| | 7 | 133 |
| | 8 | 132 |
| | 9 | 132 |
| | 10 | 131 |
| | 11 | 131 |
| 58 | 0 | 130 |
| | 1 | 130 |
| | 2 | 129 |
| | 3 | 129 |
| | 4 | 129 |
| | 5 | 128 |
| | 6 | 128 |
| | 7 | 127 |
| | 8 | 127 |
| | 9 | 126 |
| | 10 | 126 |
| | 11 | 125 |
| 59 | 0 | 125 |
| | 1 | 125 |
| | 2 | 124 |
| | 3 | 124 |
| | 4 | 123 |
| | 5 | 123 |
| | 6 | 122 |
| | 7 | 122 |
| | 8 | 122 |
| | 9 | 121 |
| | 10 | 121 |
| | 11 | 120 |
| 60 | 0 | 120 |

* For purposes of applying this table, a Party is deemed to reach a specified age as of the first day of the month succeeding the month in which the Party actually reaches that age.

SCHEDULE 6.09

**DETERMINATION OF DISABILITY AND RIGHTS AND OBLIGATIONS WITH RESPECT TO DISABILITY**

6.09-1. Determination of Disability - Upon a determination in good faith by the Board of Directors on the basis of such information as it shall deem appropriate in the circumstances, including examinations of an Active Party or consultations with an Active Party's medical doctors as provided in 6.09-5, an Active Party may, as of the first day of the month specified by the Board, be deemed

6.09-1a. totally and permanently disabled if due to illness, injury or physical, mental or other incapacity it appears that such Active Party is unable to perform such Active Party's assigned duties or to perform other duties reasonably appropriate for such Active Party and such incapacity is reasonably expected to continue for the foreseeable future as determined by the Board; or

6.09-1b. temporarily or otherwise disabled if due to illness, injury or physical, mental or other incapacity it appears that such Active Party is unable to perform such Active Party's assigned duties.

6.09-2. Status of Disabled Active Party - Unless the Board of Directors determines otherwise an Active Party who shall be determined to be disabled (i) as described under 6.09-1a shall be on disability retirement as of the date of disability specified by the Board, (ii) as described under 6.09-1b shall have such status as of the date of disability as the Board shall specify.

6.09-3. Disability Benefits - An Active Party shall receive the following disability payments upon a determination that such Active Party is disabled:

6.09-3a. If totally and permanently disabled, Normal Retirement Income for an Active Party at Mandatory Retirement Age commencing as of the commencement date of disability payable for the same periods as if such Active Party had elected such retirement as of the date of disability specified by the Board, except that the term certain for the payment of benefits shall be 120 months and shall commence at the end of the Year in which the disabled Party reaches age 62 or at death, whichever shall occur first; or

6.09-3b. If temporarily or otherwise disabled, no disability payments are required but in the discretion of the Board of Directors, taking into account such

factors as the Board deems appropriate in the circumstances, the Board may provide for such disability payments payable in such manner and at such times as the Board shall determine.

The amounts determined under 6.09-3a and 6.09-3b, if any, above shall be reduced by the amount of any benefit which the Party is entitled to receive as a participant under the group long term disability insurance made available to Active Parties or to which the Active Party would have been entitled under such insurance had the Active Party who was eligible to participate been a participant in such insurance.

6.09-4. Disability during a Year - Notwithstanding anything in the Memorandum of Agreement to the contrary, if an Active Party is determined to be disabled for part of any Year, the Board of Directors may revise such Active Party's distribution of earnings under 4.02 for such Year and the amount such Active Party's Retirement Base Income for such Year taking into account, among other considerations, the amount such Active Party is entitled to receive (or would have been entitled to receive had such Party who was eligible to participate been a participant) under the group long term disability insurance made available to such Active Party.

6.09-5. Reevaluation; Medical Information - The Board of Directors may reevaluate any determination made under 6.09-1, 6.09-2 or 6.09-3 from time to time and may consider changed circumstances or conditions or new information and may change any determination of disability previously made and may increase or decrease or suspend or terminate or otherwise modify any disability payments theretofore approved or paid by the Board. In considering an initial determination that an Active Party is disabled or in reevaluating any determination previously made, the Board of Directors may require that any person receiving or being considered for disability benefits make available to a medical doctor or doctors selected by the Board medical records of such person and authorize such person's medical doctor or doctors to consult fully with such medical doctor or doctors selected by the Board and, in addition, may require that such person submit promptly to an examination or examinations by a medical doctor or doctors selected by the Board. The Board of Directors may require that such person undertake such treatment, therapy or other procedures as such medical doctors selected by the Board may reasonably recommend or take such other action as the Board may reasonably recommend. The Board of Directors may make compliance with its requirements or recommendations a condition for the commencement or continuation of disability benefits. The expense of all such medical doctors or services, whether for review of medical records, consultation, examination, treatment, therapy or other procedures, and all incidental expenses incurred by such person, in each case to the extent not reimbursed by insurance, shall be paid, or reimbursed to the extent approved in advance, by the Partnership.

6.09-6. Notice of Determinations - Written notice of any determination that an Active Party is disabled or any determination resulting from a reevaluation shall be given to such Party by the Chairman of the Board.

6.09-7. Duplication of Benefits - No person shall be entitled to receive both disability and retirement benefits under the provisions of Article 6 of the Memorandum of Agreement. Therefore, in furtherance of the foregoing, the Board of Directors shall have the authority (i) to terminate any disability benefits with respect to any person eligible to elect retirement benefits, (ii) to defer or modify the right of any person to receive retirement benefits, or (iii) to recover from any person any overpayment of benefits, including the authority in either (i) or (ii) to make provision that a person shall receive payments of disability and retirement benefits for a single term certain only.

Confidential

SCHEDULE 6.12

**ADDITIONAL PROVISIONS REGARDING THE COST OF LIVING ADJUSTMENT AND SUPPLEMENTAL COLA INCOME**

6.12-1. Cost of Living Factor - The Cost of Living Factor for any Year shall be computed by subtracting the Index for the preceding Year from the Index for the Year, and then dividing the difference so obtained by the Index for the preceding Year; provided that, if the Index for the preceding Year is greater than the Index for the Year, then the cost of Living Factor for the Year shall be a negative percentage.

6.12-2. Earnings Factor - The Earnings Factor for any full Year shall be computed by

(i) subtracting the Average Annual Earnings Attributable to Active Parties for the preceding Year from the Average Annual Earnings Attributable to Active Parties for such Year and then dividing the difference so obtained by the Average Annual Earnings Attributable to Active Parties for the preceding Year; provided that, if the Average Annual Earnings Attributable to Active Parties for the preceding Year is greater than the Average Annual Earnings Attributable to Active Parties for the Year, then the Earnings Factor shall be a negative percentage;

(ii) by repeating the percentage calculation in (i) for each of the 4 Years preceding the Year for which the calculation was made in (i); and then

(iii) by adding the percentages, whether positive or negative, determined in each of the five calculations under (i) and (ii) and dividing such sum by 5, which resulting percentage may be positive, negative or zero.

6.12-3. The Average Annual Earnings Attributable to Active Parties for any Year may be adjusted for purposes of 6.12 of the Memorandum of Agreement and this Schedule 6.12 in special circumstances in such manner as the Board of Directors reasonably may determine in order to place the same on comparable basis with such Average Annual Earnings Attributable to Active Parties for other Years.

6.12-4. Supplemental COLA Income

6.12-4a. A calculation of Supplemental COLA Income shall be made for any Year which is a Year first succeeding (the First Year) a Year in which a COLA Deficit occurred, in any Year which is a Year second succeeding (the Second Year) the Year in which a COLA Deficit occurred if the COLA Deficit was not recovered in full from earnings during such First Year and in any Year which is a Year third succeeding (the Third Year) the Year in

which a COLA Deficit occurred if the COLA Deficit was not recovered in full from earnings during such First Year and such Second Year. Year or Years for purposes of calculating Supplemental COLA Income shall include the 3 Years following the last Year for which a Cost of Living Adjustment could be made pursuant to 6.122a of the Memorandum of Agreement.

6.12-4b. The amount of the Supplemental COLA Income for any Year shall be the sum of the amounts, if any, determined under 6.12-4c and 6.12-4d. The Supplemental COLA Income for each month of any partial Year shall be the Supplemental COLA Income for such Year divided by 12.

6.12-4c. The first portion of Supplemental COLA Income for any Year shall be computed as follows:

(i) If the Earnings Factor for such Year is greater than the Cost of Living Factor for such Year, then the Cost of Living Factor shall be subtracted form the Earnings Factor with the difference expressed in percentage points and the calculation set forth in (ii) below shall be made; if the Cost of Living Factor for such Year is greater than the Earnings Factor for the Year, then no further calculation of Supplemental COLA Income shall be made for such Year but a further calculation of Supplemental COLA Income shall be made for the Second Year, if any, or for the Third Year, if any.

(ii) The percentage points calculated in (i) above shall be multiplied times the amount of the applicable benefit referred to in 6.121 (including any Cost of Living Adjustment under 6.122a of the Memorandum of Agreement for any prior Year or Years) payable as of the beginning of the Year for which the COLA Deficit occurred. If the amount resulting from the calculation in the first sentence equals or is greater than the COLA Deficit, then Supplemental COLA Income for the Year shall be the amount of the COLA Deficit. If the amount resulting from the calculation in the first sentence is less than the COLA Deficit, then (A) Supplemental COLA Income for the Year shall be the amount calculated in the first sentence, (B) a revised COLA Deficit shall be determined which shall be the amount of the excess of the COLA Deficit prior to the calculation over the amount resulting from the calculation in the first sentence and (C) the revised COLA Deficit shall be utilized for any computation of Supplemental COLA Income to be made in the Second Year or Third Year, if any, following the Year in which such determination is made.

6.12-4d. An additional amount of Supplemental COLA Income, if any, shall be computed for any Year for which Supplemental COLA Income is computed under 6.12-4c. by multiplying the amount of Supplemental COLA Income computed for such Year under 6.12-4c. by the lesser of the Cost of Living Factor (which may be positive, negative or zero) and the Earnings Factor for each Year (an Intervening Year) after the COLA Deficit occurred and up to and including the Year for which the calculation of Supplemental COLA Income is made; provided that, if the Earnings Factor for an Intervening Year is zero or a negative percentage, the Earnings Factor for such Year for purposes of this 6.12-4d. shall be zero.

6.12-4e. If the Year for which the calculation of Supplemental COLA Income is made is the Second Year or the Third Year with respect to a COLA Deficit and such Year is also the First Year or the Second Year with respect to another COLA Deficit, the amount calculated under the first sentence of 6.12-4c. (ii) shall first be applied with respect to the COLA Deficit from the earliest Year before applying any part of the amount determined under the first sentence of 6.12-4c. (ii) against the COLA Deficit for a later Year.

6.12-4f. For purposes of determining whether under 6.12 of the Memorandum of Agreement or this Schedule 6.12 a Factor or percentage is greater than another Factor or percentage, a lower negative number is greater than a higher negative number and zero is greater than a negative number. For example, -2 is greater than -4 and zero is greater than -1.

6.12-4g. Notwithstanding the foregoing, for purposes of the computation of Supplemental COLA Income any Year for which no retirement, disability or death benefits were payable shall be disregarded.

6.12-5. Notwithstanding any other provision, Supplemental COLA Income shall be paid to such person who at the time such payment becomes due is entitled to receive the benefits to which the Supplemental COLA Income relates or if there is no such person so entitled at that time, to the person (or that person's Estate) last entitled to receive such benefits.

**CERTIFICATION OF APPROVAL OF AMENDMENT**

**TO THE MEMORANDUM OF AGREEMENT**

The undersigned, Chairman of the Board of Deloitte & Touche, does hereby certify that the amendment to Article 6 of the Memorandum of Agreement of Deloitte & Touche LLP, a true copy of which is set forth in this Supplement to such Memorandum of Agreement, has been approved by the requisite vote of the Active Parties entitled to vote thereon in accordance with Article 16 of such Memorandum of Agreement effective as of January 1, 1991 as provided in the ballot for the amendment and that the written report of the Counter of the ballots as provided for in 3.103 of such Memorandum of Agreement is attached to this certification.

J. Michael Cook,
Chairman of the Board

Composite Copy Reflecting Amendments Adopted Through November 17, 2003 and Effective December 28, 2003

---

# MEMORANDUM OF AGREEMENT

# OF

# DELOITTE & TOUCHE LLP

---

427288.03-New York Server 3A - MSW

TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ..... 1

ARTICLE 2. THE PRACTICE ..... 3
2.01. Name ..... 3
2.02. Certain Limitations on Actions of Active Principals ..... 3
2.03. Authority to Sign Documents ..... 4
2.04. Registered Agent and Registered Office ..... 4

ARTICLE 3. GOVERNANCE ..... 4
3.01. Board of Directors; Function ..... 4
3.02. Size, Qualifications, Membership of the Board and Term ..... 4
3.03. Action by the Board ..... 4
3.04. Chief Executive Officer ..... 6
3.05. Managing Partner ..... 7
3.06. Chairman of the Board ..... 8
3.07. Vice Chairman ..... 8
3.08. Appointment of the Chief Executive Officer, the Chairman of the Board, the Managing Partner and Board Members; Removal; Vacancies ..... 8
3.09. Voting By Parties ..... 9
3.10. Extraordinary Board Meetings ..... 10

ARTICLE 4. EARNINGS OR DEFICIT ..... 10
4.01. Determination of Earnings or Deficit ..... 10
4.02. Units of Net Earnings or Deficit or Net Assets ..... 11
4.03. Deficit ..... 11
4.04. Reports to Active Parties ..... 12

ARTICLE 5. CAPITAL ..... 13
5.01. Required Capital; Capital Loans ..... 13
5.02. Supplemental Capital; Supplemental Capital Loans ..... 13
5.03. Voluntary Capital Loans ..... 13
5.04. Distributions on Capital and Capital Loans ..... 14
5.05. Subordination to Claims of Creditors; Priority ..... 14
5.06. Capital Account Maintenance and Certain Regulatory Allocations ..... 14
5.07. Liquidation in Accordance with Positive Capital Account Balances ..... 14
5.08. Limited Deficit Restoration Obligation ..... 15
5.09. Qualified Income Offset ..... 16
5.10. Certain Allocations ..... 17

ARTICLE 6. RETIREMENT, DISABILITY AND DEATH ........ 18

ARTICLE 7. RESIGNATION, WITHDRAWAL AND INVOLUNTARY TERMINATION; LEAVE OF ABSENCE ........ 18
7.01. Resignation ........ 18
7.02. Withdrawal ........ 18
7.03. Involuntary Termination ........ 19
7.04. Leave of Absence ........ 20
7.05. Severing Association with Deloitte & Touche USA ........ 20

ARTICLE 8. PAYMENT OF CAPITAL, NET EARNINGS AND OTHER AMOUNTS UPON RETIREMENT, DISABILITY, DEATH, RESIGNATION, WITHDRAWAL OR INVOLUNTARY TERMINATION ........ 20
8.01. General ........ 20
8.02. Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans, Voluntary Capital Loans and Distributions ........ 20
8.03. Net Earnings ........ 21
8.04. Other Amounts ........ 22
8.05. Intervening Death ........ 22
8.06. Deductions ........ 22

ARTICLE 9. CERTAIN ACTIVITIES, CONDUCT AND RIGHTS OF PARTIES DURING AND AFTER SEVERING ASSOCIATION WITH THE PARTNERSHIP ........ 22
9.01. General ........ 22
9.02. Activities of Active Parties ........ 23
9.03. Activities of Other Parties ........ 24
9.04. Confidentiality of Information; Trade Secrets ........ 24
9.05. Certain Proscribed Conduct and Rights of Parties ........ 25
9.06. Limitations on Certain Competitive Activities In Connection With Severing Association with the Partnership ........ 28
9.07. Compliance; Remedies ........ 30
9.08. Severability ........ 30
9.09. Survival of Provisions ........ 31

ARTICLE 10. INDEMNIFICATION OF PARTIES ........ 31
10.01. Parties ........ 31
10.02. Heirs and Legal Representatives ........ 33
10.03. Defense of a Claim or Action ........ 33
10.04. Retroactive Effect ........ 33

ARTICLE 11. ADMINISTRATIVE MATTERS ........ 33
11.01. Banking and Financial Authority ........ 33
11.02. Certification of Authority ........ 34
11.03. Filings ........ 34

ARTICLE 12. NOTICES; MISCELLANEOUS; TRANSITION ..... 35
12.01. Notices ..... 35
12.02. Partnership Name; Interest of Parties in the Name and Other Assets ..... 35
12.03. Controlling Provisions ..... 35

ARTICLE 13. INTERPRETIVE MATTERS ..... 36
13.01. Interpretation by the Board ..... 36
13.02. Governing Law ..... 36
13.03. Captions and Headings ..... 36
13.04. Situs of Litigation ..... 36
13.05. Submission to Jurisdiction; Appointment of Agent for Service of Process ..... 36
13.06. No Third Party Beneficiaries; Enforcement ..... 37

ARTICLE 14. ADMISSION OF ADDITIONAL PARTIES; TERMINATION AND DISSOLUTION; COMBINATION ..... 37
14.01. Admission with Approval of Parties ..... 37
14.02. Admission by Board ..... 37
14.03. Termination and Dissolution ..... 38
14.04. Combination or Reorganization ..... 39

ARTICLE 15. AMENDMENT ..... 40
15.01. Action Required to Amend ..... 40
15.02. Procedures for Amendment ..... 40
15.03. Restatement and Re-Execution of this Agreement ..... 40
15.04. Ratification ..... 41

ARTICLE 16. EXECUTION; CERTIFICATION ..... 41

**MEMORANDUM OF AGREEMENT**

**OF**

**DELOITTE & TOUCHE LLP**

Memorandum of Agreement, made as of the Effective Date (as such term is defined below), among the Active Parties (as hereinafter defined) who have signed this Memorandum of Agreement and all Persons who subsequently sign a counterpart of this Memorandum of Agreement as initially adopted on the Effective Date or as it may be amended from time to time.

The present parties hereto desire to provide for the governance of Deloitte & Touche LLP under Delaware law as a form of general partnership known as a registered limited liability partnership under the Delaware Revised Uniform Partnership Act, 6 Del. C. § 15-101, et seq. (the "Act") (all references to such Act are intended to include such Act as amended from time to time and all successor statutes to such Act), and this Agreement, subject to the provisions of such Act, and to set forth in detail their respective rights, duties, obligations and liabilities relating to such partnership.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the parties hereto hereby mutually covenant and agree as follows:

**ARTICLE 1. DEFINITIONS**

1.01. Active Partner - any Partner whose association with the Partnership shall not have been severed as provided in this Agreement.

1.02. Active Party - any one of the Active Partners, Active Principals or Deloitte & Touche USA.

1.03. Active Principal - any Principal whose association with the Partnership shall not have been severed as provided in this Agreement.

1.04. Board of Directors or Board - the governing body created pursuant to 3.01.

1.05. Board Member(s) - an Active Party currently serving on the Board of Directors.

1.06. Capital Loans - as described in 5.01.

1.07. Chairman of the Board - the Active Partner appointed to and holding the office created under 3.06.

1.08. Chief Executive Officer - the Active Partner appointed to and holding the office created under 3.04.

1.09. Connected Entity - as described in 9.061d.

1.10. Continuing Connected Entity - as described in 9.061d.

1.11. Deloitte & Touche Firm - an associated group of firms including the Partnership, Deloitte & Touche USA and their respective subsidiaries.

1.12. Deloitte & Touche USA - Deloitte & Touche USA LLP, a Delaware registered limited liability partnership.

1.13. Effective Date - the initial date on which this Agreement shall become effective as determined by the Board of Directors of Deloitte & Touche USA pursuant to the Enabling Agreement, dated as of December 1, 1996, among the Consulting Members listed on Schedule A attached thereto, the Persons listed on Schedule B attached thereto, Deloitte & Touche USA, Deloitte & Touche Consulting Group Holding LLC, Deloitte & Touche Consulting Group LLC and the Partnership.

1.14. Entire Board - as described in 3.02.

1.15. Estate - the Person or Persons who succeed to the interest of any deceased Party, other than a spouse with survivor's rights, or a beneficiary designated, in either case under Article 6 of the Deloitte & Touche USA Memorandum of Agreement.

1.16. Executive Committee - as described in 3.04.

1.17. Global Organization - the international organization of firms using the name "Deloitte & Touche", "Deloitte Touche Tohmatsu" or related names.

1.18. Management Committee - as described in 3.05.

1.19. Managing Partner - the Active Partner appointed to and holding the office created under 3.05.

1.20. Mandatory Retirement Date - as described in 6.024 of the Memorandum of Agreement of Deloitte & Touche USA.

1.21. National Office - the office or combination of offices from which the management of the Partnership is conducted as designated from time to time by the Board of Directors.

1.22. Partner - a person who signs this Agreement as a Partner and is a certified public accountant.

1.23. Partnership - Deloitte & Touche LLP, the partnership formed and continuing pursuant to this Agreement.

1.24. Party - a Partner or Principal who signs this Agreement, pursuant to Article 15 or Article 16 or Deloitte & Touche USA.

1.25. Person - a corporation, an association, a partnership, a limited liability company, any other entity or an individual.

1.26. Principal - a person who signs this Agreement as a Principal and is not a certified public accountant.

1.27. Vice Chair of the Board or Vice Chair - the Board Member elected to and holding the office created under 3.07.

1.28. Required Capital - as described in 5.01.

1.29. Supplemental Capital - as described in 5.02.

1.30. Supplemental Capital Loans - as described in 5.02.

1.31. US Senior Partner - the Deloitte & Touche USA US Senior Partner.

1.32. Voluntary Capital Loans - as described in 5.03.

1.33. Voting Interests - as described in 3.092.

1.34. Year(s) - the fiscal year ending on the Saturday nearest to May 31 or such other fiscal year as fixed by the Board of Directors.

## ARTICLE 2. THE PRACTICE

2.01. Name - The Partnership shall conduct its practice under the name of Deloitte & Touche LLP.

2.02. Certain Limitations on Actions of Active Principals - An Active Principal is prohibited from:

2.021. signing the Partnership name on any report, engagement letter, consent, certification or other document that relates to the expression of an opinion on financial statements or otherwise engaging in activities which may be conducted under applicable law only by certified public accountants;

2.022. being held out or holding oneself out to the public as a certified public accountant or as a Partner (an Active Principal shall not be referred to in such things as business cards, directories, press releases and other publications of the Partnership as a Partner or certified public accountant); or

2.023. serving or acting in any capacity which, pursuant to this Agreement, is reserved to a Partner.

2.03. Authority to Sign Documents - Except as provided in 2.021 and in Article 11 and as specifically or customarily reserved to the Board of Directors or other officers of the Partnership, any Active Party is authorized in the ordinary course of Partnership business to sign and deliver agreements and similar documents in the name of and on behalf of the Partnership and to implement and carry out the terms and conditions of such agreements or documents.

2.04. Registered Agent and Registered Office - The name of the registered agent for service of process on the Partnership in the State of Delaware is Corporation Service Company. The address of such registered agent and the address of the registered office of the Partnership in the State of Delaware is c/o Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware 19805. At any time or from time to time the Board may change the registered agent or the registered office.

## ARTICLE 3. GOVERNANCE

3.01. Board of Directors: Function - There shall be a Board of Directors which shall have general authority and supervision over the management, practice and affairs of the Partnership and shall establish the Partnership's various policies; provided, however that the Board may delegate responsibilities associated with its duties to others in accordance with this Article 3. Directors of the Partnership are expected to exercise their business judgment based upon their assessment of the best interests of the Deloitte & Touche firm. Further, the Board's general authority and supervision shall not include:

3.011. the responsibility to directly supervise any individual Party or employee; or

3.012. the responsibility to supervise any particular professional engagement undertaken by the Partnership.

3.02. Size, Qualifications, Membership of the Board and Term - The Entire Board shall consist of such number of Active Parties as shall be specified from time to time by the Board of Directors of Deloitte & Touche USA, at least two-thirds of whom shall be Active Partners. The Chairman, the Chief Executive Officer, the Managing Partner and the other Active Parties appointed as hereinafter provided shall constitute the Board.

3.03. Action by the Board - All actions of the Board shall be approved by at least two-thirds of the Entire Board, which actions include but are not limited to:

3.031. the admission of Parties, subject to the provisions of 14.01 and 14.02;

3.032. mergers, acquisitions, consolidations or other combinations of professional practices with and into or by the Partnership or affiliates of the Partnership, and recapitalizations, reorganizations or material dispositions, subject to the provisions of 14.04;

3.033. submission of matters to a vote of the Parties not otherwise required by this Agreement;

3.034. approving significant management appointments;

3.035. borrowing on behalf of the Partnership or securing any borrowing with assets, rights, earnings or other property of the Partnership;

3.036. arrangements with any Party severing such Party's association with the Partnership which vary in a material manner from the provisions of this Agreement, provided that all other arrangements be reported to the Board at its next meeting, subject to the provisions of 7.03;

3.037. determination of the Required Capital, Capital Loans and other determinations under Article 5;

3.038. approvals of the allocation of units and additional amounts of net earnings and the manner of distribution thereof under Article 4;

3.039. designation of an office or combination of offices as the National Office;

3.0310. delegation of authority of the Board to any committee of Board Members or Active Parties, or to Parties, employees or other persons (collectively, "Delegatees") that the Board reasonably believes to be reliable and competent in the matters delegated, provided that all action by any such Delegatees be reported promptly to the Board. In the event matters are delegated to any such Delegatees pursuant to this provision, the Board is entitled to rely on the information, statements, presentations, reports, other data or recommendations prepared or presented to the Board by the Delegatees with respect to the matters so delegated, unless the Board receives actual notice that it should not so rely;

3.0311. establishment of the rules and procedures with respect to the exercise of the authority conferred upon the Board by this Agreement and the manner in which the Board operates, including the form and manner of meetings and voting by Board Members; and

3.0312. determination of compensation for the Chief Executive Officer (if there is not then a US Senior Partner) and the Chairman of the Board.

Anything contained in 3.03 to the contrary notwithstanding, the Board shall have no vote as to any matter concerning multinational or multifunctional mergers, as to which Deloitte & Touche USA shall retain sole authority.

3.04. Chief Executive Officer

3.041. Office; Responsibilities - There shall be a Chief Executive Officer who shall be the chief executive officer of the Partnership and shall be a member of the Board. Subject to the authority of the Board, the Chief Executive Officer shall have overall executive authority and responsibility for the leadership and management of the Partnership. The Chief Executive Officer will be specifically responsible for designing and developing the strategy of the Partnership (which shall be aligned with the global strategy) and for the oversight of its execution, and for promoting synergy among all functions of the Partnership. The Chief Executive Officer shall lead the international activities of the Partnership so as to further the mutuality of interests and actions between the Partnership and the Global Organization and shall represent the Partnership with government, professional and civic organizations and similar constituencies. The Chief Executive Officer shall be responsible for leading the Partnership's Strategic Client Program, for maintaining relationships with principal clients and prospective clients of the Partnership and for obtaining key clients, and will also chair the Partnership's Executive Committee. Subject to the authority of the Board, the Chief Executive Officer shall be primarily responsible for providing direction, oversight and guidance to the Managing Partner and, subject to the approval of the Board and the US Senior Partner, if any, for evaluating the performance and determining the compensation of the Managing Partner. Together with the Managing Partner, the Chief Executive Officer shall be responsible for partner development and succession planning. The Chief Executive Officer shall also be responsible for carrying out such other responsibilities as are assigned by the Board or the US Senior Partner, if any, from time to time or specified in this Agreement. The Chief Executive Officer shall be responsible also for communications to the Parties with respect to the responsibilities conferred upon the Chief Executive Officer pursuant to this 3.041. The Chief Executive Officer may delegate specific authority to Active Parties responsible to the Chief Executive Officer; the Chief Executive Officer shall notify the Board of any such delegation.

3.042. Term; Tenure; Qualifications - The Chief Executive Officer shall be an Active Partner and shall serve for a term of 4 years (or until his or her successor is duly appointed and takes office) concurrent with the terms of the Chairman of the Board and Managing Partner, except for interim or other service to fill a vacancy; no Chief Executive Officer shall serve in the office of Chief Executive Officer for a period of time in excess of the length of two terms, except for interim or other service to fill a vacancy, and no Active Partner shall be appointed to serve a term as Chief Executive Officer if the Mandatory Retirement Date of such Active Partner would occur prior to the scheduled expiration date of such term.

3.05. Managing Partner

3.051. Office; Responsibilities - There shall be a Managing Partner who shall be a member of the Board and, subject to the authority of the Chief Executive Officer, shall be primarily responsible for directing and managing the Partnership. Subject to the authority of the Chief Executive Officer, the Managing Partner shall be primarily responsible for chairing the Management Committee; for setting the organizational structure of the Partnership and appointments of Parties to management responsibilities, deployments of all Parties, business and profit plans, allocation of units or other amounts of net earnings for the Parties and admission of Active Parties; implementing strategic plans; in coordination with the Chief Executive Officer for maintaining relationships with principal clients and prospective clients of the Partnership and for obtaining key clients; promotion of synergy among all functions of the Partnership; together with the Chief Executive Officer, for partner development and succession planning; and carrying out such other responsibilities as are assigned by the Chief Executive Officer from time to time or specified in this Agreement. The Managing Partner shall be responsible also for communications to the Parties with respect to the responsibilities conferred upon the Managing Partner pursuant to this 3.051. The Managing Partner may delegate specific authority to Active Parties responsible to the Managing Partner; the Managing Partner shall notify the Chief Executive Officer of any such delegation.

3.052. Term; Tenure; Qualifications - The Managing Partner shall be an Active Partner and shall serve for a term of 4 years (or until his or her successor is duly appointed and takes office) concurrent with the terms of the Chief Executive Officer and the Chairman, except for interim or other service to fill a vacancy; no Managing Partner shall serve in the office of Managing Partner for a period of time in excess of the length of two terms, except for interim or other

service to fill a vacancy, and no Active Partner shall be appointed to serve a term as Managing Partner if the Mandatory Retirement Date of such Active Partner would occur prior to the scheduled expiration date of such term.

3.06. Chairman of the Board

3.061. Office; Responsibilities - There shall be a Chairman of the Board who shall preside and vote at all meetings of the Board and the Partnership. Subject to the authority of the Board, the Chairman shall be primarily responsible for leading the governance process of the Partnership and the Board, including creating the agenda for meetings of the Board, and for carrying out such other responsibilities as are assigned by the Board from time to time, as are delegated to the Chairman by the Chief Executive Officer with the approval of the Board, or as are specified in this Agreement. The Chairman of the Board shall be responsible also for communications to the Parties with respect to the responsibilities conferred upon the Chairman pursuant to this 3.061. The Chairman may delegate specific authority to Active Parties responsible to the Chairman; the Chairman shall notify the Board of any such delegation.

3.062. Term; Tenure; Qualifications - The Chairman of the Board shall be an Active Partner and shall serve for a term of 4 years (or until his or her successor is duly appointed and takes office) concurrent with the terms of the Chief Executive Officer and Managing Partner, except for interim or other service to fill a vacancy; no Chairman of the Board shall serve in the office of Chairman of the Board for a period of time in excess of the length of two terms, except for interim or other service to fill a vacancy, and no Active Partner shall be appointed to serve a term as Chairman of the Board if the Mandatory Retirement Date of such Active Partner would occur prior to the scheduled expiration date of such term.

3.07. Vice Chairman - There shall be a Vice Chairman of the Board, elected each year by the Board from among its members other than the Chief Executive Officer, the Managing Partner, the Chairman of the Board or any member of the Management Committee or the Executive Committee. The Vice Chairman shall assume the duties of the Chairman whenever the Chairman is unable to perform them and shall be responsible for such other duties as are assigned by the Board from time to time or as may be specified in this Agreement.

3.08. Appointment of the Chief Executive Officer, the Chairman of the Board, the Managing Partner and Board Members; Removal; Vacancies - The Chief Executive Officer, the Chairman of the Board, the Managing Partner and other

Board Members shall be appointed by the Board of Directors of Deloitte & Touche USA. The Chief Executive Officer, the Chairman of the Board and the Managing Partner shall be appointed every fourth year. Those appointed shall take office on the date specified by the Board. The Chief Executive Officer, the Chairman of the Board, and the Managing Partner or any other Board Member may be removed, or in the case of a vacancy may be replaced, only by the Board of Directors of Deloitte & Touche USA. An individual may serve a maximum of three terms in the offices of the Chief Executive Officer, Managing Partner and Chairman of the Board but no more than two terms in any one of the three offices, except for interim or other service to fill a vacancy.

3.09. Voting By Parties

3.091. Procedures - Subject to 14.04, all voting by Active Parties for a proposed combination or other matters which in the Board's judgment require confidential treatment, shall be by secret ballot or written consent and votes shall be tallied and reported upon in accordance with 3.093. A vote by a majority or by two-thirds of the Active Parties and Voting Interests shall be a vote within the prescribed period by a majority or two-thirds of those Active Parties who cast votes and holders of at least a majority or two-thirds of the Voting Interests who cast votes, respectively, provided that at least a majority (where a majority vote is required) or at least two-thirds (where a two-thirds vote is required) of Active Parties and holders of Voting Interests cast votes on the matter within the prescribed period. Whenever a matter is submitted for vote by the Active Parties, the Board shall determine the form and content of ballot or consent, the record date for determining Active Parties entitled to vote which shall not be later than, nor more than 10 days before, the date the matter is first submitted to the Active Parties, the period of time during which votes on any matter will be received, which may be extended by the Board, but in any event the period shall not be less than 10 nor more than 60 days after the matter is first submitted for vote by the Active Parties and any other provisions regarding the vote not inconsistent with this Agreement which the Board deems appropriate in the circumstances. Any Active Party who will have or has severed association with the Partnership on or before the last date for receiving votes on any matter shall not be entitled to vote on that matter and such Active Party shall be disregarded for all purposes of the vote. Anything in this Agreement to the contrary notwithstanding, the record date for determining Active Parties entitled to vote on any matter that is determined by Deloitte & Touche USA to relate to the separation from Deloitte & Touche USA of the business conducted under the name Deloitte Consulting shall be February 1, 2002.

3.092. Voting Interests - As to each Active Party entitled to vote on any matter, Voting Interests shall be one vote for each full $100 of Required Capital or Capital Loans determined pursuant to 5.01 as of the record date or as of the end of the month preceding the submission of the matter to the Active Parties, if no record date is set. As to any other Party the Voting Interest shall be as equitably determined by the Board in the circumstances.

3.093. Vote Tallying - With respect to matters which require confidential treatment as provided in 3.091, the votes shall be counted by an outside person selected by the Board (the "Counter"). The Counter shall submit to the Chairman or such other person(s) designated by the Board a written report setting forth only the numbers of Parties and Voting Interests "for" and such numbers "against" the proposal submitted for action, differentiating as may be consistent with this Agreement among those groups required to separately vote on the proposal, but in no circumstances shall the Counter disclose to any person the name of any Party voting or not voting on any matter. The Counter may, if requested, give a preliminary oral report to the Chairman or other person(s) designated by the Board prior to the end of the period fixed for voting which indicates as at that time only the information as would be included in the Counter's written report. The Chairman shall cause the Counter to be furnished with a list of the Parties and their Voting Interests entitled to vote on the matter, the last date as of which votes shall be received and counted by the Counter, the name of the person or persons to whom the Counter's report (including any oral report) should be submitted and a copy of 3.09 of this Agreement. All ballots or consents and all information relating thereto, other than information to be disclosed in the reports, shall be kept in confidence by the Counter and shall be destroyed not less than 60 days after the last date as of which votes could be received on the matter, except that the Counter may retain a copy of the written report. With respect to matters which the Board determines do not require confidential treatment, the Board will determine the procedures for tallying and reporting the vote.

3.10. Extraordinary Board Meetings - The Chairman (or as provided in 3.07, the Vice Chairman) shall convene a meeting of the Board within three weeks of the receipt of a written request for such a meeting submitted by any six Board Members or by the Vice Chairman and any two other Board Members.

## ARTICLE 4. EARNINGS OR DEFICIT

4.01. Determination of Earnings or Deficit - The books and records of the Partnership for determining earnings or deficit shall be maintained on a cash basis. Deloitte & Touche USA, with the approval of the Board, may specify

the manner in which net earnings are determined for various purposes of this Agreement. The Board may provide also for the maintenance of such supplemental books and records as it deems appropriate for the purposes of this Agreement and the Partnership.

4.02. Units of Net Earnings or Deficit or Net Assets

4.021. Units and Distribution of Net Earnings - The respective interests of each of the Active Parties in the net earnings of the Partnership for any Year shall be based upon an allocation of units or of such other amounts, in each case determined and distributed pursuant to such reasonable plan and criteria as shall be determined by Deloitte & Touche USA from time to time with the approval of the Board. The allocation of any such units or other amounts to any Active Party for any Year shall be determined by Deloitte & Touche USA and approved by the Board but shall not establish any rights in or to any property or assets of the Partnership other than the net earnings or other amounts in respect of the Year to which such units or other amounts relate.

4.022. Distribution of Net Assets - Deloitte & Touche USA, with the approval of the Board, may distribute to Active Parties for any Year shares of any net assets (net of liabilities and obligations or amounts allocated for distribution or otherwise by Deloitte & Touche USA, with the approval of the Board) of the Partnership determined on such basis as Deloitte & Touche USA, with the approval of the Board, shall specify and allocated and distributed pursuant to such reasonable plan and criteria as shall be determined by Deloitte & Touche USA, with the approval of the Board, from time to time.

4.023. Consideration of Other Allocations – For purposes of evaluating any plan or criteria relating to the allocation of net earnings or the distribution of net assets for any Year, Deloitte & Touche USA shall take into account in such manner as Deloitte & Touche USA considers appropriate allocations of net earnings and distributions of net assets of Deloitte & Touche USA in respect of such Year.

4.024. Disposition Proceeds - Anything in this Agreement to the contrary notwithstanding, the allocation and distribution of amounts arising from the sale or other disposition of assets, businesses or portions thereof shall be made in such manner as shall be determined by Deloitte & Touche USA in its sole discretion.

4.03. Deficit - Any deficit for any Year shall be charged in the order of priority as follows:

4.031. First Level - that portion of the aggregate deficit which does not exceed the aggregate of advances on units of all Active Parties for such Year shall be charged against the Active Parties in the same proportion that their respective advances on units bear to the aggregate of such advances;

4.032. Second Level - any remaining deficit, but only to the extent of the aggregate of the Partnership's Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans, shall be charged against each Active Party in the same proportion that an Active Partner's Required Capital and Supplemental Capital and an Active Principal's Capital Loans and Supplemental Capital Loans bear to the aggregate of such Partnership capital accounts; and

4.033. Third Level - any remaining deficit in excess of advances and aggregate capital shall be charged against the Active Partners in proportion to the aggregate of the distributions made to them under 4.02 in the Year preceding the Year in which the deficit occurs.

4.034. Reallocation – The foregoing provisions of this 4.03 to the contrary notwithstanding, all or any portion of the aggregate deficit for any Year may be reallocated among Persons who were Active Parties in such Year in such manner as Deloitte & Touche USA shall determine, with the approval of the Board, in order to take into account in such manner as Deloitte & Touche USA considers appropriate allocations of deficit of Deloitte & Touche USA in respect of such Year.

Such charges may be effected initially against such amounts maintained by a Party with the Partnership or due to a Party from the Partnership as may be determined pursuant to rules or procedures established by the Board which shall be of uniform application to Parties similarly situated.

4.04. Reports to Active Parties - The Board shall report annually to the Active Parties with respect to the financial and other operations of the Partnership; provided, that the form, content and timing of delivery of each such report shall be subject to the approval of Deloitte & Touche USA. Each financial statement and each determination of the allocation of the net earnings of the Partnership and the amount of Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans of each Party shall, upon approval of Deloitte & Touche USA and the Board, be binding upon each Party and the Estate and representatives of each Party.

## ARTICLE 5. CAPITAL

5.01. Required Capital: Capital Loans - Each Active Partner and Deloitte & Touche USA shall maintain with the Partnership an amount of Required Capital, determined under such reasonable formula of uniform application to all Active Partners similarly situated, as may be determined from time to time by Deloitte & Touche USA, with the approval of the Board, provided that any such formula shall take into account in such manner as Deloitte & Touche USA considers appropriate the amounts, if any, that Active Parties are required to maintain as capital or capital loans with Deloitte & Touche USA. Each Active Principal shall make a Capital Loan to the Partnership in an amount equal to and on the same basis as Required Capital maintained by an Active Partner. Required Capital and Capital Loans, including any increases therein, shall be paid in to the Partnership at such time or times as specified by Deloitte & Touche USA, with the approval of the Board. Notices of any decreases in Required Capital or Capital Loans of an Active Party shall be given promptly by the Partnership to the affected Party who shall have a reasonable time to elect prompt repayment or to elect to have the amounts remain with the Partnership as may be permitted pursuant to this Agreement.

5.02. Supplemental Capital: Supplemental Capital Loans - Each Active Party to whom there is allotted any amount of net earnings determined on a basis other than that specified in the first sentence of 4.01 or to whom there is distributed any amount of net assets of the Partnership may be required to maintain with or make to the Partnership such amount of Supplemental Capital or Supplemental Capital Loans, respectively, if any, determined under such reasonable formula of uniform application to all Active Parties, similarly situated, as may be determined from time to time by Deloitte & Touche USA, with the approval of the Board, including the creation of differing classes of Supplemental Capital and Supplemental Capital Loans, provided that any such formula shall take into account in such manner as Deloitte & Touche USA considers appropriate the amounts, if any, that Active Parties are required to maintain as capital or capital loans with Deloitte & Touche USA. Supplemental Capital and Supplemental Capital Loans, including any increases therein, shall be paid in to the Partnership at such time or times as specified by Deloitte & Touche USA, with the approval of the Board. Notice of any decreases in Supplemental Capital or Supplemental Capital Loans required to be maintained with the Partnership by an Active Party shall be given promptly by the Partnership to the affected Active Party who shall have a reasonable time to elect prompt repayment or to elect to have the amounts remain with the Partnership as may be permitted pursuant to this Agreement.

5.03. Voluntary Capital Loans - Pursuant to rules and procedures approved by the Board, any Active Party may make Voluntary Capital Loans to the Partnership, subject to 5.05, for such periods and at such rates as the Board shall determine.

5.04. Distributions on Capital and Capital Loans - Each Active Party shall receive with respect to such Party's Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans or Voluntary Capital Loans distributions credited and paid periodically and at a rate (which rate may be different for Voluntary Capital Loans than for the other forms of capital), all as fixed from time to time by Deloitte & Touche USA, with the approval of the Board, which terms shall be of uniform application to all Active Parties similarly situated, provided that such terms shall take into account in such manner as Deloitte & Touche USA considers appropriate the terms for distributions, if any, on capital and capital loans maintained by Active Parties with Deloitte & Touche USA. Such distributions shall not reduce the balances of such capital or capital loans and shall be in addition to units of earnings or other amounts pursuant to 4.02.

5.05. Subordination to Claims of Creditors; Priority - Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans and Voluntary Capital Loans together with unpaid distributions thereon under 5.04 in each case shall be subordinate to the claims of all creditors of the Partnership, but Voluntary Capital Loans shall rank prior to Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans which shall rank on a parity with each other, in each case together with unpaid distributions thereon under 5.04.

5.06. Capital Account Maintenance and Certain Regulatory Allocations - The Partnership shall determine and maintain a separate capital account for each Party in accordance with Treas. Reg. § 1.704-1(b)(2)(iv) (each, a "Capital Account"). The provisions of Treas. Reg. § 1.704-1(b)(2)(iv), Treas. Reg. § 1.704-2, and Treas. Reg. § 1.704-3 are hereby incorporated into this Agreement by this reference.

5.07. Liquidation in Accordance with Positive Capital Account Balances - Notwithstanding any provision of this Agreement to the contrary, upon the liquidation of the Partnership (or any Party's interest in the Partnership), liquidating distributions shall in all cases be made in accordance with the positive Capital Account balances of the Parties, as determined after taking into account all Capital Account adjustments for the Year during which such liquidation occurs (other than those made pursuant to this 5.07 and 5.08, below), by the end of the Year (or, if later, within 90 days after the date of such liquidation).

For purposes of this 5.07, the liquidation of a Party's interest in the Partnership means the termination of a Party's entire interest in the Partnership by means of a distribution, or series of distributions, to the Party by the Partnership, regardless of whether the series of distributions are made in one year or in more than one year. Where a Party's interest in the Partnership is to be liquidated by a series of distributions, the interest will not be considered as liquidated until the final distribution has been made.

5.08. Limited Deficit Restoration Obligation - If, on the liquidation of the Partnership, a Party has a deficit balance in such Party's Capital Account, or if, on the liquidation of a Party's interest in the Partnership, such Party has a deficit balance in such Party's Capital Account, in each case as determined after taking into account all Capital Account adjustments for the Year during which such liquidation occurs (other than those made pursuant to this 5.08), each relevant Party shall be unconditionally obligated to restore to the Partnership by the end of such Year (or, if later, within 90 days after the date of such liquidation) such Party's deficit balance to the extent it does not exceed such Party's Qualified Deficit Balance, which amount shall, upon liquidation of the Partnership, be paid to creditors of the Partnership or be distributed (in accordance with 5.07) to other Parties in accordance with their positive Capital Account balances.

For purposes of this 5.08, the following terms shall have the meanings ascribed to them below:

"Code" means the Internal Revenue Code of 1986, as amended.

"Minimum Gain" means an amount computed for each Year for each Party pursuant to Treas. Reg. § 1.704-2(g) and Treas. Reg. § 1.704-2(i)(5).

"Net Income" means an amount, computed for each Year for each Party, equal to the excess, if any, of (i) the items of income and gain allocated to such Party's Capital Account for such Year *over* (ii) the items of deduction and loss allocated to such Party's Capital Account for such Year.

"Net Loss" means an amount, computed for each Year for each Party, equal to the excess, if any, of (i) the items of deduction and loss allocated to such Party's Capital Account for such Year *over* (ii) the items of income and gain allocated to such Party's Capital Account for such Year.

"Qualified Deficit Balance" means, with respect to each Party:

The excess of (X) the sum of (a) the aggregate amount of cash and the fair market value of any property (net of liabilities that are secured by such property that are assumed or taken subject to for purposes of Code § 752) distributed by the Partnership to such Party for all periods from the date of such Party's admission to the Partnership through the end of the Year in which the liquidation of the Partnership or such Party's interest in the Partnership, as the case may be, occurs plus (b) the Qualified Net Loss allocated by the Partnership to the Party for all periods from the date of such Party's admission to the Partnership through the end of the Year in which such liquidation occurs, *over* (Y) the sum of (c) the aggregate amount of cash and the fair market value of any property (net of liabilities that are secured by such property that are assumed or taken subject to for purposes of Code § 752) contributed by such Party to the Partnership for all periods from the date of

such Party's admission to the Partnership through the end of the Year in which such liquidation occurs plus (d) the Net Income allocated by the Partnership to the Party for all periods from the date of such Party's admission to the Partnership through the end of the Year in which such liquidation occurs plus (e) such Party's share of Minimum Gain at the time such Qualified Deficit Balance is determined.

"Qualified Net Loss" means a Net Loss allocated to a Party's Capital Account *but only if and to the extent that* the Party to whose Capital Account the Net Loss would be allocated has previously consented in writing to such allocation.

"Liquidation of a Party's interest in the Partnership" (or words of similar import) shall have the same meaning ascribed to such words in 5.07.

5.09. Qualified Income Offset - If a Party unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Partnership income and gain shall be specially allocated to each such Party in an amount and manner sufficient to eliminate, to the extent required by Treas. Reg. § 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Party created by such adjustments, allocations or distributions as quickly as possible; *provided* that an allocation by the Partnership pursuant to this 5.09 shall be made if and only to the extent that such Party would have an Adjusted Capital Account Deficit after all other allocations made or to be made by the Partnership for the relevant Year have been tentatively made as if this 5.09 were not in this Agreement. This 5.09 is intended to comply with the qualified income offset requirement in Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

For purposes of this 5.09, the term "Adjusted Capital Account Deficit" means, with respect to any Party, the deficit balance, if any, in such Party's Capital Account as of the end of the relevant Year, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amounts which such Party is actually obligated to restore pursuant to this Agreement or by operation of law or is deemed to be obligated to restore pursuant to the penultimate sentences of Treas. Reg. §§ 1.704-2(g)(1) or 1.704-2(i)(5); and

(b) Debit to such Capital Account the items described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

5.10. Certain Allocations

5.101. In connection with the liquidation of a Party's interest in the Partnership, the Partnership shall allocate to such Party such amounts of income or loss (or items thereof) as may be necessary to ensure that such Party's Capital Account equals such Party's Target Liquidation Amount; provided, that, after any Qualified Deficit Balance of such Party has been eliminated, the Partnership shall take into account the period over which such Party receives distributions in liquidation of such Party's interest in the Partnership.

5.102. On the final liquidation of the Partnership, the Partnership shall allocate to Parties with Qualified Deficit Balances in their Capital Accounts an amount of income and gain equal to such Qualified Deficit Balances, pro rata in accordance with the amount of such Qualified Deficit Balances.

5.103. After the application of the provisions of 5.102 above, on the final liquidation of the Partnership, the Partnership shall allocate to each Party such amounts of income or loss (or items thereof) as may be necessary to ensure that there is equality between each Party's Capital Account and such Party's Target Liquidation Amount; provided, that if there are insufficient amounts of such items, or an excess of such items, amounts of such items shall be allocated among the Parties in such proportions as the Partnership determines to be appropriate to achieve, as closely as is practicable, such equality.

5.104. Except as provided in the next sentence of this 5.104, the Partnership shall not allocate income or loss (or items thereof) to the Parties' Capital Accounts with respect to any Year (the "Relevant Year") until such time (the "Allocation Date") during the immediately succeeding Year as the Partnership has earned gross income (as determined for federal income tax purposes) in an amount equal to the greater of (i) the total amount of Qualified Deficit Balances of all Parties with Qualified Deficit Balances and (ii) the excess, if any, of the total amount of Target Liquidation Amounts of all Parties over the total amount of the Capital Accounts of all Parties, excluding for purposes of all such calculations the Capital Accounts and Target Liquidation Amounts of those Parties with Capital Accounts in excess of their Target Liquidation Amounts, with all such amounts determined as of the end of the Relevant Year as if the Partnership had allocated its taxable income or loss and made distributions as of such date. If the Allocation Date has not occurred by the time (including available extensions) the Partnership must file its federal income

tax return on Form 1065 with respect to the Relevant Year (the "Filing Date"), the Partnership shall allocate income or loss (or items thereof) with respect to the Relevant Year as provided in 5.102 and 5.103 above; provided, that in allocating such income or loss (or items thereof) pursuant to the preceding portion of this sentence, the Partnership shall, as it deems appropriate, take into account such amounts of gross income that the Partnership has earned as of the Filing Date.

"Liquidation of a Party's interest in the Partnership" (or words of similar import) shall have the same meaning ascribed to such words in 5.07.

"Qualified Deficit Balance" shall have the same meaning ascribed to such words in 5.08.

"Target Liquidation Amount" means, with respect to each Party, the sum of the following amounts, to the extent determined to be payable with respect to such Party pursuant to this Agreement: such Party's Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans, Voluntary Capital Loans and related amounts.

## ARTICLE 6. RETIREMENT, DISABILITY AND DEATH

6.01. This Agreement shall not be construed to create any rights in any Partner, Principal or beneficiary thereof to receive any benefits arising out of or in connection with the retirement, disability or death of such Partner or Principal.

## ARTICLE 7. RESIGNATION, WITHDRAWAL AND INVOLUNTARY TERMINATION; LEAVE OF ABSENCE

7.01. Resignation - Any Active Party may sever such Active Party's association with the Partnership effective at the close of business on any date by written resignation given to the Chairman. Such written resignation may specify a later date on which such resignation is to take effect, or if no date is specified will be effective upon the date received by the Partnership. The Chairman may declare the resignation effective at a date earlier than that specified. In addition to the other obligations of the Parties hereunder, each Party agrees to cooperate fully with the Partnership and to take all such actions as the Partnership may reasonably request in order to effect an orderly transition following such Party's dissociation from the Partnership, all during the 45 day period commencing on the date such Party gives such Party's written resignation to the Chairman.

7.02. Withdrawal - Any Active Party other than Deloitte & Touche USA shall have severed such Active Party's association with the Partnership by withdrawing therefrom as of a date determined by the Board as the date on which such Active Party ceased to actively participate in the business and affairs of the

Partnership without having retired, resigned, become disabled subject to being determined to be disabled, died, been granted a leave of absence, or been absent due to an illness or injury confirmed to the satisfaction of the Partnership or to a vacation within the policy of the Partnership. Such determination of withdrawal shall be made by unanimous vote of the Board with at least eighty-five percent of the Board Members voting, based upon such information as the Chief Executive Officer can obtain on behalf of the Board after reasonable inquiry and only following reasonable notice from the Chief Executive Officer to such Active Party directing such Active Party to resume participation. The Chairman shall give written notice to such Active Party of any determination that such Active Party is deemed to have withdrawn, specifying the reason for such determination and the effective date of such withdrawal.

7.03. Involuntary Termination - Any Active Party other than Deloitte & Touche USA shall be deemed to have severed such Active Party's association with the Partnership as of the date specified by vote of the Board and approved by vote of a majority of all Active Parties and of Active Parties holding a majority of the Voting Interests and by Deloitte & Touche USA. In addition, any Active Party other than Deloitte & Touche USA shall be deemed to have severed such Active Party's association with the Partnership as of the date specified by the Board as a result of the determination by unanimous vote of the Board with at least eighty-five percent of the Board Members voting, such determination having been approved by Deloitte & Touche USA, that the Active Party's conduct shall have resulted in or shall consist of

7.031. the Active Party's insolvency or bankruptcy or criminal conviction involving dishonesty or moral turpitude or the creation and continuation of a charging order (within the meaning of Section 15-504 of the Act) in respect of such Active Party's economic interest in the Partnership;

7.032. the imposition by others than the Partnership or its clients of a restriction on the Active Party's right to perform services consistent with such Active Party's position or a restriction on the right of the Partnership to perform, either generally or with respect to any particular client or location, all or any portion of the services normally performed by it; or

7.033. abuse of controlled substances or chemical dependencies (such as intoxicants or drugs) to an extent that such Active Party is unable to perform properly such Active Party's duties.

Notice of such action specifying the effective date signed by the Chairman shall be delivered to the Active Party deemed involuntarily resigned or mailed by registered mail to such Active Party's last known address and thereupon such resignation shall become effective automatically as of the effective date.

The provisions of 7.02 and of this 7.03 are intended to supersede and replace the provisions of subsections (6), (7)(ii) and (7)(iii) of Section 15-601 of the Act.

7.04. Leave of Absence - Based on a written request from an Active Party, the Board may grant a leave of absence from the Partnership on such terms and conditions as the Board shall determine, including the terms on which the Active Party may return to active status. A leave of absence shall not be deemed a severing of association with the Partnership for purposes of this Agreement.

7.05. Severing Association with Deloitte & Touche USA - Any Party who shall have severed such Party's association with Deloitte & Touche USA, whether by resignation, withdrawal or involuntary termination, shall be deemed also to have severed such Party's association with the Partnership.

## ARTICLE 8. PAYMENT OF CAPITAL, NET EARNINGS AND OTHER AMOUNTS UPON RETIREMENT, DISABILITY, DEATH, RESIGNATION, WITHDRAWAL OR INVOLUNTARY TERMINATION

8.01. General - Except for amounts payable as indemnification as provided in Article 10, upon retirement, disability, death, resignation, withdrawal or involuntary termination an Active Party shall be entitled to payment of only the amounts as provided in this Article 8 at the times indicated, which amounts as paid shall be in full payment for the interest of the Active Party in the Partnership and in full satisfaction of all obligations of the Partnership to the Active Party. The provisions contained in Articles 6, 10 and this Article 8 are intended to supersede and replace the provisions of Section 15-701 of the Act.

8.02. Required Capital. Capital Loans. Supplemental Capital. Supplemental Capital Loans. Voluntary Capital Loans and Distributions

8.021. Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans - Upon severance of association with the Partnership by reason of retirement, disability or death, an Active Party's Required Capital and Supplemental Capital or Capital Loans and Supplemental Capital Loans shall, subject to compliance with the terms of this Agreement, be repaid in two approximately equal installments, the first installment to be paid within 60 days following such severance of association and the second installment to be paid not later than the end of the Year following the Year in which such severance occurs provided, however, that, in the alternative, any such Active Party whose severance of association with the Partnership occurs by reason of retirement or disability may elect to be repaid in either two, three, four, five, six, seven, eight, nine or ten approximately equal

installments, the first installment to be paid not later than March 15 of the Year immediately following the Year in which such severance occurs and each subsequent installment to be paid not later than March 15 of the year immediately following the year in which the prior installment was paid. Such election must be made in writing and submitted to the Chief Executive Officer within 30 days following such severance, but not later than the last day of the Year in which such severance occurs, or such subsequent date as the Chief Executive Officer deems appropriate in the circumstances, and shall be irrevocable. In accordance with policies recommended by the Chairman and approved by the Board, the Chief Executive Officer may recommend to the Board for the Board's approval that such payments be made in whole or in part at such earlier times as the Chief Executive Officer deems appropriate in the circumstances. Upon any other severing of association with the Partnership, an Active Party's Required Capital and Supplemental Capital or Capital Loans and Supplemental Capital Loans shall, subject to compliance with the terms of this Agreement, be repaid in three installments, the first installment of 50% of the total to be paid within 60 days following such severance and each of the remaining installments of approximately 25% of the total to be paid 9 months and 18 months, respectively, following the first installment. Distributions on Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans shall continue to be made on the same basis as for Active Parties until such amounts are repaid in full, except that such distributions may be accumulated and paid with the installments in such manner as the Chief Executive Officer may determine. In accordance with policies recommended by the Chairman and approved by the Board, the Chief Executive Officer may recommend to the Board for the Board's approval that payments be made in whole or in part at such earlier times as the Chief Executive Officer deems appropriate in the circumstances.

8.022. Voluntary Capital Loans - Voluntary Capital Loans shall, subject to compliance with the terms of this Agreement, be repaid in accordance with the terms and conditions of such Loans.

8.03. <u>Net Earnings</u> - Any Active Party who has severed association with the Partnership shall, subject to compliance with the terms of this Agreement, be entitled to receive (<u>a</u>) the balance of any net earnings for any preceding Year to which such Active Party may be entitled pursuant to 4.02, payable at such time and in such amounts as it would have been paid had such Active Party not severed association, (<u>b</u>) the balance of any Draw or Advances, prorated to the date of severance of association, payable promptly thereafter and (<u>c</u>) the balance, if any, of additional net earnings or other amounts scheduled or approved to be paid to such Active Party pursuant to 4.02 for the current Year,

prorated to the date of severance of association, payable at the times and in the proportions substantially similar to those which would have occurred had such Active Party not severed association. In accordance with policies recommended by the Chairman and approved by the Board, the Chief Executive Officer may recommend to the Board for the Board's approval that any payments pursuant to clauses (a) and (c) of the preceding sentence be made in whole or in part at such earlier times as the Chief Executive Officer deems appropriate in the circumstances.

8.04. Other Amounts - Any Active Party who has severed association with the Partnership shall be paid such other amounts which that Active Party is entitled to receive pursuant to 4.02 at such times as may be determined by the Board.

8.05. Intervening Death - In the event that a Party who has severed association with the Partnership dies prior to receiving any or all of the above payments, the Party's Estate, or such beneficiary or beneficiaries as may be designated by the Party pursuant to Article 6 of the Deloitte & Touche USA Memorandum of Agreement, shall receive the same payments at the same times that the Party would have otherwise received them.

8.06. Deductions - The Partnership shall have the right to deduct from any of the payments due under 8.02, 8.03 and 8.04 all amounts due from a Party with respect to premiums for continuing insurance or benefits coverage, state, local or other taxes paid or payable by the Partnership on behalf of a Party for the preceding or current Year, loans to a Party made or guaranteed by the Partnership or subject to any commitment given to a lender by the Partnership, balances due to the Partnership under advance/expense reimbursement practices or policies of the Partnership or similar amounts due to the Partnership in connection with the severing of association by a Party, retirement, disability or death of a Party. In addition, the Partnership shall have the right to offset against any such payments any other amounts due to the Partnership from such Party unless provision for the payment of such amounts due to the Partnership is made in a manner satisfactory to the Partnership.

## ARTICLE 9. CERTAIN ACTIVITIES, CONDUCT AND RIGHTS OF PARTIES DURING AND AFTER SEVERING ASSOCIATION WITH THE PARTNERSHIP

9.01. General - Each Party expressly recognizes and acknowledges that the terms and conditions of this Article 9 are necessary to protect the professional practice, confidential information, trade secrets and other legitimate interests of the Partnership, are reasonable as to time, area and scope, are not harmful to the public and are not unduly burdensome to any Party. In addition, each Party expressly recognizes and acknowledges that money damages alone would not adequately compensate the Partnership for failure of any Party to abide by the terms and conditions of this Article 9.

9.02. Activities of Active Parties - Each Active Party shall be just and faithful to the Partnership and the other Active Parties in all actions and in respect of the business and reputation of the Partnership. Each Active Party (other than Deloitte & Touche USA) shall devote that Active Party's entire professional time, attention, efforts and influence to and for the benefit of the business and interests of the Partnership and of Deloitte & Touche USA or a Continuing Connected Entity; shall not accept employment on a salary, commission, or contingent or other basis from, or (except for charitable, not-for-profit and similar organizations with which the Partnership customarily expects Active Parties to be associated) become associated with or allow such Party's name to be used by, any individual, partnership, corporation, government agency or other organization other than the Partnership or a Continuing Connected Entity; shall not render (other than on behalf of the Partnership or a Continuing Connected Entity) any professional services (as defined in 9.061c); and, except with the prior written consent of the Chairman within standards established from time to time by the Board, shall not engage in any other profession or business (including the holding of political or legislative office) and shall not fail to comply with the rules relating to outside activities as adopted from time to time by the Board. Each Active Party (other than Deloitte & Touche USA) agrees that such Active Party will

9.021. not engage in any conduct or activity nor commit to hold or hold any property or rights nor refuse to take any action or to enter into any agreement protective of the interests of the Partnership or a Continuing Connected Entity if such action or refusal is contrary or inconsistent with the letter or spirit of the rules relating to independence and conflicts of interest;

9.022. accept and be bound by the decisions of the Board, after promptly being afforded an opportunity to be heard, with respect to matters relating to independence and conflicts of interest and take within the time specified whatever action is recommended by the Board in the circumstances, including, without limitation, the cessation or termination of any rights or the entering into or implementation of any agreements protective of the interests of the Partnership or a Continuing Connected Entity;

9.023. submit to the Partnership at least annually as requested a written report signed by such Active Party setting forth such information as the Board may deem appropriate to ascertain compliance by such Active Party with the rules relating to independence, outside activities and conflicts of interest, and in addition, submit such special written reports on such matters as the Board may request from such Active Party; and

9.024. notify the Chairman promptly in writing if such Active Party becomes a defendant or is subjected to a counterclaim in any

judicial or administrative action or proceeding involving in any manner the professional practice of such Active Party or if such Active Party shall become a defendant or is subjected to a counterclaim in any judicial or administrative action or proceeding which might result in liability in an amount which is material to the net worth of such Active Party.

9.03. Activities of Other Parties - Each Party (other than Deloitte & Touche USA) agrees that after ceasing to be an Active Party:

9.031. except with the prior written consent of the Chairman, such Party will comply with the provisions of 9.021 through 9.024 to the extent such requirements are applicable to such a Party;

9.032. except with the prior written consent of the Chairman, while receiving payments under Article 6 or Schedule 13.05D of the Deloitte & Touche USA Memorandum of Agreement such Party will not accept employment on a salary, commission or contingent or other basis from, or become associated with or permit such Party's name to be used by any individual, partnership, corporation, government agency or other organization, other than the Partnership or a Continuing Connected Entity; or recommend, support, counsel or otherwise directly or indirectly assist any other person or entity engaged in, or engage in, rendering, other than for the Partnership or a Continuing Connected Entity, any professional services as defined in 9.061c; provided, that consent under 9.032 will not be denied unless the Chairman considers such activities detrimental to the interests of the Partnership or a Continuing Connected Entity and that a Party denied consent may request that the Board approve or deny the consent sought by such Party;

9.033. such Party will not disparage the professional reputation of the Partnership or a Continuing Connected Entity nor disparage the professional or personal reputation of any Party, provided that this provision shall not be deemed to restrict any person from providing information to any organization regulating professional conduct or before a court of competent jurisdiction or as otherwise required by law; and

9.034. such Party will cooperate fully with the Partnership in connection with any threat of or actual legal proceeding or claim arising out of any matters with or of which such Party had contact or knowledge while an Active Party.

9.04. Confidentiality of Information; Trade Secrets - Each Party (other than Deloitte & Touche USA) shall keep secret and confidential and shall not disclose to others, except to Active Parties, professional staff and other employees (in

each case who need to know), except to others in the proper conduct of the business of the Partnership and except as required by law, the names of any clients of the Partnership or a Connected Entity, information regarding the services rendered to any such clients or the financial, business or other affairs of such clients, financial or other information relating to the past, present or projected operations of the Partnership or a Connected Entity, information relating to the past, present or future plans of the Partnership or a Connected Entity, trade secrets and information relating to technical and non-technical systems, methodologies, services, products, client development information, programs, procedures, policies and practices utilized by the Partnership or a Connected Entity; provided that the foregoing shall not restrict the use of information which is in the public domain other than as a result of a breach of this or any similar confidentiality covenant for the benefit of the Partnership or a Connected Entity. Each Party (other than Deloitte & Touche USA) acknowledges and agrees that all manuals, training materials, technical materials, product and service information and other technical materials prepared by or for the Partnership or a Connected Entity and all directories, client files and records used in connection with the management and operation of the Partnership or a Connected Entity, in whatever form, are the proprietary property of the Partnership or a Connected Entity. Upon severing association with the Partnership, no Active Party shall retain or remove from the control of the Partnership, without the express written consent of the Chief Executive Officer or the Chief Executive Officer's designee, any of such proprietary property or other information described in this 9.04 and such Party shall return promptly to the Partnership any such proprietary property or other information so retained or removed.

9.05. Certain Proscribed Conduct and Rights of Parties - Each of the Parties (other than Deloitte & Touche USA) makes the following agreements with and commitments to the Partnership:

9.051. Risk Undertakings - Except as authorized pursuant to this Agreement, an Active Party will not become a general partner in a partnership or a proprietor or major owner of any operating business without first obtaining the written consent of the Chairman; nor will an Active Party (a) subscribe to any bonds or undertakings or otherwise become surety, guarantor or bondsman for any person or persons, or (b) sign or endorse any note, or accept, sign or endorse any draft or bill of exchange or assume any other liability, either in the Active Party's name or, except as authorized by the Board, in the name of the Partnership or any of the Firms, for the accommodation of any person or entity or (c) engage in speculation, gambling or extra hazardous risk which might result in liability in an amount which is material to the net worth of the Active Party; provided, however, that notwithstanding the foregoing, an Active Party need not obtain such written consent but may engage in such Active Party's name and individual

capacity (but not on behalf of the Partnership) in any of the acts set forth in (a) and (b) above if the aggregate obligation of such Active Party with respect to all such acts set forth in (a) and (b) above at any time does not exceed 25% of such Active Party's net worth.

9.052. Books and Records of the Partnership - The Partnership and each Active Party shall provide the Parties and the legal representative of a deceased Party or a Party under a legal disability and their agents and attorneys the rights with respect to access to the books and records of the Partnership and other information and documents concerning the Partnership as specified in Section 15-403 of the Act, upon reasonable demand, for any purpose reasonably related to the demanding Party's interest in the Partnership. The Partnership and any Active Party from whom such access is sought may impose reasonable standards (including standards governing what information and documents are to be furnished at what time and location and at whose expense) with respect to exercise of the right of access. The Partnership and each Active Party shall have the right to keep confidential from the Parties and their respective legal representatives, agents and attorneys, for such period of time as the Partnership deems reasonable, any information and documents which the Partnership reasonably believes to be in the nature of trade secrets or other information and documents the disclosure of which the Partnership in good faith believes is not in the best interest of the Partnership or could damage the Partnership or its business or affairs or which the Partnership is required by law or by agreement with a third party to keep confidential. Any demand by or on behalf of a Party under this 9.052 shall be in writing and shall state the purpose of such demand. Each Party, on behalf of such Party, such Party's spouse, their respective Estates, and any beneficiaries designated under Article 6 of the Deloitte & Touche USA Memorandum of Agreement, hereby agrees that no such person will have any right of access to the books and records of the Partnership or other information and documents concerning the Partnership except as expressly authorized in this 9.052.

9.053. Right to an Accounting - No Party nor any Party's spouse, Estate or any beneficiaries designated under Article 6 of the Deloitte & Touche USA Memorandum of Agreement shall have any right to an accounting either during the term of the Partnership or on dissolution or liquidation or upon severance of any Party's association with the Partnership for any reason whatsoever, including a breach of this Agreement by the Partnership and each Party, on behalf of such Party, the Party's spouse, the Party's estate and any beneficiaries designated under Article 6 of the Deloitte & Touche USA Memorandum of Agreement hereby expressly waives

any and all rights to an accounting for any reason whatsoever which may be conferred upon the Party by the law of the State of Delaware or by any other law and further agrees that the financial information furnished by the Partnership shall be binding and conclusive upon such Party, the Party's spouse, the Party's Estate and any beneficiaries designated under Article 6 of the Deloitte & Touche USA Memorandum of Agreement, both as to the accounts of the Partnership and as to the Party's balances with them.

9.054. Will Provisions; Community Property Rights Provision - As further confirmation of each Party's commitment under 9.052 and 9.053, each Party agrees that so long as such Party is entitled to receive any payments from Deloitte & Touche USA such Party will keep in effect a valid will containing such provisions as the Board shall approve in furtherance of 9.052 and 9.053, and if such Party resides or at any time has resided or shall reside in a state under the laws of which such Party's spouse acquired, acquires or may acquire any community property or comparable rights in such Party's interests in the Partnership, such Party shall cause the Party's spouse to execute and deliver to the Partnership an agreement as the Board shall approve in furtherance of 9.052 and 9.053. Evidence of compliance with this provision shall be furnished to the Chairman as often and in such form as the Chairman shall require.

9.055. Assignment or Encumbrance of Partnership Capital or Interest - No Party shall transfer, assign, pledge, grant a security interest or other lien upon, grant any rights in or to, or otherwise encumber such Party's Required Capital, Capital Loans, Supplemental Capital, Supplemental Capital Loans or Voluntary Capital Loans or any distribution payable under 5.04 or the Party's rights to receive any amount pursuant to 4.02 or the Party's right to receive any amount pursuant to Article 6 of the Deloitte & Touche USA Memorandum of Agreement or any other interest in the Partnership, except and only to the extent specifically permitted pursuant to this Agreement. If a Party's association with the Partnership has been severed and a charging order (within the meaning of Section 15-504 of the Act) in respect of such Party's economic interest in the Partnership has been created and is continuing, the Partnership may, in its sole discretion, elect to redeem such interest. In any such case, the redemption price for such interest shall be the value thereof as determined by the Partnership based upon such reasonable assumptions and procedures as shall be approved by the Board and each Party hereby consents to each such redemption.

9.056. Power of Attorney - Each Active Party hereby irrevocably appoints the Chairman of the Board, the Chief Executive Officer and the Managing Partner, and each of them, acting singly or jointly, the true and lawful attorney-in-fact of such Active Party to take any and all action which any of such persons may deem appropriate in the circumstances for and in the name of such Active Party, as if such Active Party were personally present and acting, including the signing of such Active Party's name, as may be necessary or advisable to comply with any law, statute, rule, regulation or other statement of governmental or professional authority governing the activities of the Partnership or of such Active Party, including but not limited to registration and renewal of registration as a registered limited liability partnership under the laws of the State of Delaware (including but not limited to the execution of any and all applications and renewal applications under such laws) and any other applications, certificates, statements, instruments and documents as may be necessary or appropriate in any jurisdiction in connection with or incidental to any such registration or renewal, registration of the Partnership as a partnership of accountants, registration under "fictitious name" statutes and registration or filing for the purpose of engaging in the professional practice as a partnership.

9.06. Limitations on Certain Competitive Activities In Connection With Severing Association with the Partnership

9.061. Client Related Activities

9.061a. A Party not eligible to receive payments under Article 6 of the Deloitte & Touche USA Memorandum of Agreement (including any person, firm, corporation or other entity with which such Party is associated) shall not, prior to or for a period of two years following severance of such Party's association with the Partnership, directly or indirectly solicit, assist others in obtaining as a client or accept an engagement to perform or perform any professional services (as defined in 9.061c), other than on behalf of the Partnership or a Continuing Connected Entity, for any person, firm, corporation or other entity (a) for whom such Party (in any capacity on behalf of the Partnership or a Connected Entity) or any office of the Partnership or a Connected Entity located within seventy-five miles of any office with which such Party has been associated (including such associated office) has performed any professional services or maintained a client relationship on behalf of the Partnership or a Connected Entity

Confidential

during the three years prior to such severance of association or (b) with whom any such office, to the knowledge of such Party, is negotiating or proposing for the provision of any professional service at the time of such severance of association.

9.061b. A Party eligible to receive payments under Article 6 of the Deloitte & Touche USA Memorandum of Agreement, whether or not such Party has elected to begin receiving such payments, shall not, for a period beginning on the date of severance of such Party's association with the Partnership and ending two years after the termination of the Party's eligibility to receive such payments, directly or indirectly solicit, assist others in obtaining as a client or accept an engagement to perform or perform any professional services, other than on behalf of the Partnership or of a Continuing Connected Entity, for any person, firm, corporation or other entity for whom the Partnership or a Connected Entity has performed any professional services during the two years prior to such solicitation, assistance, engagement or performance. A Party for purposes of this 9.061b shall include any person, firm, corporation or other entity with which such Party is associated.

9.061c. Professional services as used in 9.061 shall include public accountancy, auditing, tax, management consulting or advisory, systems, expert testimony, litigation support, budget, actuarial and other services performed by the Partnership or a Connected Entity.

9.061d. Connected Entity as used in this Agreement shall mean Deloitte & Touche USA and any corporation, partnership, limited liability company or other entity owned directly or indirectly, in whole or in part, by the Partnership or Deloitte & Touche USA, or in which any Party participated on behalf of the Partnership or Deloitte & Touche USA or carried out any duties with respect to the affairs of the Partnership or Deloitte & Touche USA. Continuing Connected Entity as used in this Agreement on any date shall mean Deloitte & Touche USA and any corporation, partnership, limited liability company or other entity which is, on such date, owned directly or indirectly, in whole or in part, by the Partnership or Deloitte & Touche USA, or in which, on such date, any Party participates on behalf of the Partnership or Deloitte & Touche USA or carries out

any duties with respect to the affairs of the Partnership or Deloitte & Touche USA.

9.062. Personnel - A Party (including any person, firm, corporation or other entity with which such Party is associated) shall not, prior to or for a period of two years following severance of association with the Partnership, directly or indirectly solicit or induce any other Active Party, employee or agent of the Partnership or a Connected Entity to leave the Partnership or a Connected Entity.

9.07. Compliance; Remedies - It is intended that the foregoing provisions of this Article 9 be complied with. If, however, any Party shall breach or violate any such provision, in view of the uncertainty and difficulty in ascertaining the damages resulting to the Partnership from any breach or violation, the following remedies shall be available:

9.071. the foregoing provisions of this Article 9 shall be specifically enforceable by injunction or any other similar remedy;

9.072. notwithstanding any provision of this Agreement and in addition to all other remedies available to the Partnership, including the right to compel specific performance, as and for liquidated damages a Party breaching or violating any of the foregoing provisions of this Article 9 shall waive the right to receive any amounts payable by the Partnership to such Party on or after the date of such breach or violation, including the right, if any, of a Party to receive payments under Article 6 or Schedule 13.05D of the Deloitte & Touche USA Memorandum of Agreement; and

9.073. as and for additional liquidated damages for breach or violation by any Party of any provision of 9.061, such Party shall pay to the Partnership an amount equal to 50% of all fees received by such Party (or any person or entity with which such Party is associated in connection with such breach or violation) for services performed for any person or entity in breach or violation of such provision during the two years following the severance of such Party's association with the Partnership.

9.08. Severability - The provisions of this Article 9 shall be severable. In the event any particular provision or portion of a provision shall be adjudicated or otherwise determined to be invalid or unenforceable or declared null and void or denied enforcement by any court of competent jurisdiction, this Article 9 shall be deemed amended to delete therefrom the portion adjudicated or otherwise determined to be invalid or unenforceable, but only with respect to the operation of this Article 9 in the particular jurisdiction in which such adjudication or determination is made and not with respect to any other jurisdiction; provided, however, that if such court of competent jurisdiction

determines that a restriction which is more limited in some manner would be enforceable, it is the intent of all Parties and the Partnership that this Article 9 shall be deemed amended in the particular jurisdiction in which such determination is made to give effect to the more limited restriction in lieu of the restriction as to which enforcement was denied. No other portion of this Article 9 or of this Agreement shall be affected by the adjudication of amendment referred to in the preceding sentence and all other provisions shall survive both in the jurisdiction of adjudication and in all other jurisdictions.

9.09. Survival of Provisions - The provisions of this Article 9 shall survive and remain in full force and effect with respect to each Party following such Party's severance of association with the Partnership.

### ARTICLE 10. INDEMNIFICATION OF PARTIES

10.01. Parties - To the fullest extent permitted by Delaware law as the same exists or may hereafter be in effect, the Partnership shall, subject to 10.03, indemnify and hold harmless each Party from and against any and all expenses (including reasonable attorneys' fees), judgments, fines, penalties, losses, claims, damages, liabilities, interest incurred or amounts paid in settlement (where there is no admission or judicial finding of liability), arising from any proceeding or investigation, whether civil, criminal or administrative, or any arbitration or any threatened proceeding or investigation, whether civil, criminal or administrative, or any threatened arbitration, whether joint or several, whether from within, on behalf of or from without the Partnership, incurred by such Party and arising from or in connection with, all actions taken by the Party in good faith (including the Party's own negligence) while the Party was an Active Party or employee of the Partnership, in the conduct of the business of the Partnership or of any corporation, partnership, other entity or undertaking in which the Party participated on behalf of the Partnership or in connection with the exercise of any authority or the carrying out of any duties or responsibilities with respect to the affairs of the Partnership undertaken by the Party under or pursuant to the terms of this Agreement (all such matters hereinabove described, the "Covered Matters"). Further, the Partnership shall reimburse each such Party for all expenses, including reasonable attorneys' fees, incurred by the Party in any successful claim, action or proceeding brought by the Party to enforce the right to indemnification under this Article 10 and for all additional taxes paid by the Party solely by reason of such Party's participation in any such corporation, partnership, other entity or undertaking on behalf of the Partnership. Further, (a) in the case of Covered Matters which (i) occurred during the time a Party was a Board Member and (ii) relate to such Party's conduct as a Board Member, the Partnership shall, and (b) in the case of all other Covered Matters, with the approval of the Board the Partnership may, in either case upon receipt of an undertaking by or on behalf of the Party to repay such amount if it shall be ultimately determined by a court that the Party is not

entitled to indemnification, advance to the Party all expenses, including reasonable attorneys' fees, incurred by the Party in connection with any proceeding or investigation, whether civil, criminal or administrative, any arbitration, any threatened proceeding or investigation, whether civil, criminal or administrative, or any threatened arbitration, whether from within, on behalf of or from without the Partnership, subject to 10.03. The Partnership may, at the option of the Board, reimburse a Party not entitled to indemnification under this Article 10 in connection with any claim, action or proceeding, whether from within, on behalf of or from without the Partnership. Notwithstanding the foregoing:

10.011. no Party shall be entitled to indemnification under this Article 10 for any expenses, judgments, fines, penalties, losses, claims, damages, liabilities, interest incurred or amounts paid in settlement arising from the Party's own willful acts or omissions undertaken or omitted in bad faith or in reckless disregard of the law or of the rules of practice or ethical conduct of the Partnership or of the profession.

10.012. no Party shall be entitled to indemnification under this Article 10 if the Party refuses or fails to cooperate fully with the Partnership in connection with the threat of any claim, action or proceeding or the defense of any claim, action or proceeding against the Partnership or the Party in any circumstances in which the Party had contact with the matters out of which the claim, action or proceeding arose while an Active Party or employee of the Partnership, provided, however, that this 10.012 shall not apply in the case of claims, actions or proceedings brought on behalf of the Partnership, nor in the case of claims, actions or proceedings brought by a Party to enforce such Party's right to indemnification under this Article 10.

10.013. no Party shall be entitled to indemnification under this Article 10 unless in circumstances in which the Partnership would not reasonably be expected to have received notice of an event, such Party gives prompt written notice to the Partnership of any such event which might reasonably be subject to indemnification under this Article 10;

10.014. nothing in this Article 10 shall be construed as requiring any payments made by the Partnership under this Article 10 to be allocated on a different basis than would be applicable to the expenses of the Partnership; and

10.015. the obligations of the Partnership under this Article 10 shall be and are hereby made without recourse to any Party, past, present or future, as such, under any rule of law, statute or constitution or by the enforcement of any assessment or penalty or equitable

proceeding or otherwise, and each Party agrees that no personal liability whatever shall attach to, or be incurred by, any Party, as such, by reason of the indemnification provisions of this Article 10, and that any such personal liability of every kind and nature, and any and all such claims against any Party, as such, whether arising in common law or in equity or created by rule of law, statute, constitution or otherwise, are expressly released and waived.

10.02. Heirs and Legal Representatives - The provisions of 10.01 shall inure to the benefit of and be binding upon the heirs and legal representatives of persons who were or otherwise would have been entitled to indemnification under 10.01.

10.03. Defense of a Claim or Action - Notwithstanding 10.01, the Partnership may require, as a condition of indemnification under 10.01 or 10.02, that it be permitted to undertake the defense of any claim, action or proceeding by counsel of its own choosing, in which case it shall have no responsibility with respect to any other legal fees and expenses incurred in connection therewith, provided, however, that this 10.03 shall not apply in the case of claims, actions or proceedings brought on behalf of the Partnership, nor in the case of claims, actions or proceedings brought by a Party to enforce such Party's right to indemnification under this Article 10.

10.04. Retroactive Effect - The amendments to this Article 10 adopted in 2000 shall be applicable to all claims, actions or proceedings in existence prior to the date of the adoption thereof, whether known or unknown at such date.

## ARTICLE 11. ADMINISTRATIVE MATTERS

11.01. Banking and Financial Authority - The Chief Executive Officer, the Managing Partner and such other Active Party or Active Parties or employees as may be designated by the Board, or any one or more of them, but only such Active Parties or employees and no other persons, shall have authority on behalf of the Partnership from time to time:

11.011. to designate the banks or other financial institutions in which the Partnership shall keep its accounts for deposits and other purposes or with which the Partnership shall make other banking or financial arrangements, to take appropriate action for the opening of such accounts or the commencement of such arrangements or the closing of such accounts or the termination of such arrangements and to designate the Active Party or Active Parties or employee or employees of the Partnership who are authorized to sign checks or other instruments in the name of the Partnership against or with respect to such accounts, including the use of facsimile signatures,

Confidential

and who are authorized to act on behalf of the Partnership with respect to such other banking or financial arrangements;

11.012. to rent such safe deposit boxes or make such custodial arrangements as such person may deem necessary and to designate the Active Party or Active Parties or employee or employees of the Partnership who are to be granted access to such safe deposit boxes or to act on behalf of the Partnership with respect to such custodial arrangements;

11.013. to make such borrowings on behalf of the Partnership and to secure such borrowings with such assets, rights, earnings or properties of the Partnership as the Board may approve and to designate the Active Party or Active Parties who are to execute and deliver on behalf of the Partnership the borrowing agreements or other documents granting an interest in such assets, rights, earnings or properties of the Partnership to secure such borrowings;

11.014. to make investments of the Partnership's surplus funds in high quality debt instruments, commercial paper or certificates of deposit and to sell or otherwise dispose of such investments and any other investment assets which the Partnership otherwise may acquire, and for such purposes to open investment accounts or enter into investment arrangements in the name of the Partnership;

11.015. to sell, transfer, exchange, convert or otherwise deal with or in any stocks, bonds, notes or other securities, or any rights or options therein, registered in the name of or otherwise held by the Partnership and in furtherance thereof to execute and deliver on behalf of and in the name of the Partnerships such stock or bond powers, other instruments of assignment, transfer, tender, exchange, conversion or other agreements or documents as they may deem appropriate in the circumstances;

provided, however, that the authority of any Active Party or employee to take any such action shall be subject to such limitations, if any, as may be imposed by the Board or by the exercising authority granted by the Board.

11.02. Certification of Authority - The Board shall adopt rules or procedures regarding certification or proof of authority of Active Parties to act on behalf of the Partnership.

11.03. Filings - Neither the Board nor the Partnership shall have any duty to provide to any Party copies of any statements or certificates filed with the Secretary of State of the State of Delaware or with any other governmental office or authority.

## ARTICLE 12. NOTICES; MISCELLANEOUS; TRANSITION

12.01. Notices

12.011. Notices to the Partnership. - Unless otherwise specified in this Agreement or by agreement with the Partnership, notices to the Partnership shall be addressed to the Chairman of the Board, the Chief Executive Officer or the Managing Partner, in each case at the National Office of the Partnership. Any such notice shall be deemed given either when received at such office by delivery, by non-postal carrier or when mailed by registered or certified mail, return receipt requested, addressed to either such individual in a sealed container, postage prepaid.

12.012. Notices and other Communications from Partnership to Parties. - Notices from the Partnership to any Party shall be deemed given, and other communications required by this Agreement shall be deemed sent, when mailed, delivered to a non-postal carrier or otherwise sent to the Party in an appropriate container, postage, delivery or other transmittal fee prepaid, addressed to such Party either at the Party's last known home address as shown on the official books and records of the Partnership or, in the case of an Active Party at the office of the Partnership to which such Active Party is currently assigned (in which case such notice or communication may be forwarded with other documents for such office for delivery by Partnership personnel of that office).

12.02. Partnership Name; Interest of Parties in the Name and Other Assets - The interest and rights of the Partnership in the name "Deloitte & Touche LLP" (or any other name or names which the Partnership may then be using or have used), whether any portion of any such names is used separately or in combination with other names in the United States or in any foreign country, shall belong to the Partnership and shall not be sold or disposed of so long as the Partnership shall continue in existence. Upon severing of association with the Partnership by any Party, neither any such Party nor any person claiming by, through or under such Party shall have or acquire any interest in any of the foregoing names or the goodwill, property, accounts, assets, books of account or records, all of which belong to the Partnership, and shall have no right to receive any payment therefor.

12.03. Controlling Provisions - Except as otherwise specifically required by provisions of the Act that may not be varied by agreement, relations among the Parties and between the Parties and the Partnership are governed by the provisions of this Agreement and the provisions of this Agreement shall supersede and replace any contrary or additional provisions of the Act relating to the subject matter of this Agreement.

## ARTICLE 13. INTERPRETIVE MATTERS

13.01. Interpretation by the Board - If any question shall arise in regard to the interpretation of any provision of this Agreement, the decision of the Board as to its interpretation shall be conclusive as to all Parties or other persons claiming by, through or under any of them.

13.02. Governing Law - This Agreement shall be deemed to be executed in the City of Wilmington, State of Delaware, regardless of the domiciles of the several parties hereto or where it is in fact executed, and shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to its conflict of law rules, except that with respect to 9.06, the laws in accordance with which such provisions shall be governed and construed shall be the laws of the jurisdiction in which was located the office of the Partnership with which the Party was associated at the time of severing association. Each of the Parties agrees (a) that this Agreement involves at least $100,000, and (b) that each of the Parties has expressly relied upon 6 Del. C. § 2708.

13.03. Captions and Headings - The captions and headings in this Agreement are for convenience only and shall not be considered in the interpretation of this Agreement.

13.04. Situs of Litigation - Any claims (a) relating to the Partnership or (b) involving the Partnership or any Parties or their respective executors, administrators, heirs, legatees, devisees, trustees, receivers, other personal representatives and any other person claiming by, through or under such persons: (i) arising under or relating to this Agreement, (ii) relating to the Partnership or its business, or (iii) relating to any other agreement between the Partnership and any Parties or any other person or persons listed above in this clause (b) (including persons claiming by, through or under any Parties or any such person or persons), shall be brought only in the courts of the State of Delaware or federal courts sitting in the State of Delaware and not in any other state or federal court in the United States of America or any court in any other country.

13.05. Submission to Jurisdiction: Appointment of Agent for Service of Process - Each Party hereby irrevocably and unconditionally agrees (a) to be subject to the jurisdiction of the courts of the State of Delaware and of the federal courts sitting in the State of Delaware, and (b) (i) to the extent such Party is not otherwise subject to service of process in the State of Delaware, to appoint and maintain an agent in the State of Delaware as such Party's agent for acceptance of legal process, and (ii) that service of process may also be made on such Party by prepaid certified mail with a proof of mailing receipt validated by the United States Postal Service constituting evidence of valid service, and that service made pursuant to (b) (i) or (ii) above shall have the same legal force and effect as if served upon such Party personally within the

State of Delaware. For purposes of implementing the Parties' agreement to appoint and maintain an agent for service of process in the State of Delaware, each such Party does hereby appoint Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware 19805, as such agent.

13.06. No Third Party Beneficiaries; Enforcement - Anything in this Agreement to the contrary notwithstanding, no term or provision of this Agreement is intended to create, nor shall any such term or provision be construed as creating or evidencing an intent to create, any rights on the part or benefit in favor of any person or group of persons other than the Parties and their successors to the extent (but only to the extent) expressly provided herein.

## ARTICLE 14. ADMISSION OF ADDITIONAL PARTIES; TERMINATION AND DISSOLUTION; COMBINATION

14.01. Admission with Approval of Parties - The Board shall approve the admission of any person as a Partner or Principal, with the approval of Deloitte & Touche USA and with the approval of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests, provided, however, that neither the Board, the Active Parties nor the holders of Voting Interests shall be required to approve the admission of any Person as a Partner or Principal in any instance in which the admission of such person is contemplated in conjunction with a multinational or multifunctional merger, in which case the approval of Deloitte & Touche USA shall be dispositive. As a condition to the admission of any person as a Partner or Principal, such person shall sign and return a signature page to the Chairman in accordance with 16.02 and thereby become a Party hereto and bound by all the terms and provisions hereof.

14.02. Admission by Board - With the approval of Deloitte & Touche USA the Board may, without requesting the approval of the Active Parties, during each year approve the admission of any person as a Partner or a Principal, provided that such Person has also been admitted as a partner or a principal of Deloitte & Touche USA pursuant to section 15.02 of the Deloitte & Touche USA Memorandum of Agreement. With the approval of Deloitte & Touche USA, the Board may also, without requesting the approval of the Active Parties, approve the admission as a Principal of an entity associated with the international organization coordinating the activities of firms using the name "Deloitte & Touche" or related names, provided, however, that, anything in this Agreement to the contrary notwithstanding, such entity shall have no rights or obligations under 7.02 (Withdrawal), 7.03 (Involuntary Termination), Article 9 (Certain Activities, Conduct and Rights of Parties During and After Severing Association with the Partnership) or Article 10 (Indemnification of Parties) of this Agreement.

14.03. Termination and Dissolution

14.031. Required Vote - The Partnership shall continue until terminated by affirmative written consent or vote of Deloitte & Touche USA and three-fourths of all other Active Parties and the holders of three-fourths of the Voting Interests of the Active Parties, except as otherwise specifically required by provisions of the Act that may not be varied by agreement.

14.032. Effect of an Active Party Severing Association with the Partnership, Bankruptcy of an Active Party or Admission of an Active Party - Neither the severing of association with the Partnership by, or bankruptcy (or insolvency under state laws) of, an Active Party nor the admission of an Active Party shall terminate or dissolve the Partnership or be deemed the creation of a new partnership, and the Agreement shall continue in full force and effect, except that the Partnership may be deemed dissolved as to any Active Party who has severed association with the Partnership or become bankrupt (or insolvent under state laws) but only as to such Active Party, and any such deemed dissolution shall not require an accounting or other action by the continuing Partnership with respect to such Active Party, except as expressly provided in this Agreement.

14.033. Disposition of Business and Assets - Upon affirmative consent or vote in accordance with 14.031 the Board shall undertake to cause the dissolution and winding up of the affairs of the Partnership, including the disposition of or liquidation of the business and assets (subject to 14.034) of the Partnership. The Board shall cause a full and general account of the assets, liabilities and transactions of the Partnership to be taken and may appoint one or more Active Parties with authority on behalf of the Partnership to carry out such disposition or liquidation and winding up as so approved.

14.034. Name of the Partnership - Subject to prior commitments made pursuant to 12.02, upon termination and dissolution the interest of the Partnership in the name "Deloitte & Touche LLP" (or any other name or names which the Partnership may then be using or have used) shall be disposed of in such manner and upon such terms as the Board, with the approval of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests and the approval of Deloitte & Touche USA, shall determine.

14.035. Payment or Provision for Liabilities; Distribution to Parties - Out of the proceeds of the disposition or liquidation of the business and assets of the Partnership the Board or the Active Party or Parties

appointed by the Board pursuant to 14.033 shall pay or make adequate provision, including the purchase of insurance or other arrangements with third parties, for the payment of all liabilities of the Partnership, other than liabilities to Parties, and thereafter shall pay or apply any remaining proceeds in the following order of priorities as such amounts are shown on the books and records of the Partnership;

14.035a. to the payment of all liabilities (except liabilities provided for in 14.035b) owing to Parties;

14.035b. to the repayment of all Voluntary Capital Loans owing to Parties and to the payment of any unpaid distribution on such Loans;

14.035c. to the repayment of all Required Capital, Capital Loans, Supplemental Capital and Supplemental Capital Loans of Parties and the payment of any unpaid distribution on such capital; and

14.035d. to the payment of any remaining proceeds to the Parties who were Active Parties at the time of the approval by Active Parties of the termination or dissolution in proportion to the respective Required Capital and Supplemental Capital of Parties who were Active Partners at such time and the Capital Loans and Supplemental Capital Loans of Parties who were Active Principals at such time.

The provisions of this 14.035 are intended to supersede and replace the provisions of subsections (a) and (b) of Section 15-807 of the Act.

14.036. Disposition of Books and Records - Upon termination and dissolution of the Partnership the books of account, records and files of the Partnership shall be disposed of in such manner and upon such terms as the Board shall determine.

14.04. Combination or Reorganization - A proposed combination of the practice of the Partnership with the practice of another firm, whether in the form of a consolidation or merger, or any proposed recapitalization or reorganization, which in the judgment of the Board is material in size and significant in relation to the practice of the Partnership, shall be approved by the Board and by Deloitte & Touche USA and shall also be approved by the vote of two-thirds of the Active Parties and the holders of two-thirds of the Voting Interests, except in the case of a proposed multinational or multifunctional merger, as to which the vote of Deloitte & Touche USA shall be dispositive and no approval of any other Person shall be required.

## ARTICLE 15. AMENDMENT

15.01. Action Required to Amend - This Agreement may be amended, modified, restated or supplemented in accordance with the procedures set forth in 15.02 with the consent of Deloitte & Touche USA and with the written consent or by vote of two-thirds of the other Active Parties and the holders of two-thirds of the Voting Interests then outstanding, provided that no amendment to 2.02, the portion of 3.02 requiring two-thirds of Board Members to be Active Partners, the portion of 3.08 providing that Board members will be appointed by Deloitte & Touche USA or this 15.01 shall be made without, in addition, the favorable written consent or vote of two-thirds of the Active Partners and holders of two-thirds of the Voting Interests held by Partners, and provided further that any amendments proposed in conjunction with a multinational or multifunctional merger shall be voted upon solely by Deloitte & Touche USA and no approval of any other Person shall be required.

15.02. Procedures for Amendment - Any amendment to this Agreement, with the exception of any amendment proposed in conjunction with a multinational or multifunctional merger, shall be effected only in accordance with the following procedures.

15.021. Each proposed amendment shall first be presented to the Board for its approval;

15.022. If the Board approves such amendment, the Board will submit the proposed amendment to the Board of Directors of Deloitte & Touche USA;

15.023. If the Board of Deloitte & Touche USA approves such proposed amendment, the Board will submit the proposed amendment to a vote by Parties in accordance with 3.09 specifying the effective date of the proposed amendment.

15.024. Any amendment approved by requisite consent or vote shall be set forth in an amendatory or supplemental document which shall be filed at the National Office of the Partnership with the records of the original of this Agreement. Such amendatory or supplemental document shall be accompanied by the certification of the Chairman to the effect that such approval has been received and by the written report of the Counter, if any, provided for in 3.093. The amendment, if approved, shall be effective as of the date specified therein.

15.03. Restatement and Re-Execution of this Agreement - The Board may cause this Agreement and all amendments thereto as of the date of submission to Parties to be restated in a single document which shall be in substitution for such Agreement and amendments and as so restated it may be submitted to all

affected Parties for re-execution, which may be required by the Board. Action taken in accordance with this provision shall not require compliance with any other provision of this Article 15.

15.04. Ratification - The execution and delivery of this Agreement shall constitute the ratification and approval of all actions taken by or on behalf of the Partnership on or prior to the Effective Date.

## ARTICLE 16. EXECUTION; CERTIFICATION

16.01. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

16.02. Any Active Party who becomes such after the Effective Date shall evidence such Active Party's undertaking to be bound by this Agreement and become a party hereto by signing and returning to the Chairman a signature page in the form attached to this Agreement which, when filed at the National Office of the Partnership with a counterpart of this Agreement certified by the Chairman as contemplated in 16.03, shall be conclusive evidence as against all persons of the execution by such Active Party of the counterpart so certified.

16.03. The Chairman shall certify approval of this Agreement on a counterpart, which shall be deemed to be the original, and shall cause the same to be filed at the National Office of the Partnership, together with appropriate evidence of such approval that this Agreement shall become effective as of the Effective Date.

**SIGNATURE PAGE**

The undersigned hereby approves and becomes a party to the Memorandum of Agreement (including all schedules thereto) of Deloitte & Touche LLP as of the effective date set forth below, the receipt of a copy of which is hereby acknowledged, and agrees that this signature page, when signed and filed in the National Office of the Partnership, shall constitute and shall be for all purposes conclusive evidence of, such individual's execution of the Agreement so certified and filed by the Chairman of the Board of Directors as contemplated by 16.03 thereof.

Deloitte & Touche USA LLP

June 1, 1997
Effective Date

Name: William A. Fowler
Title: Chief Financial Officer

427288.03-New York Server 3A - MSW

**SIGNATURE PAGE**

The undersigned hereby approves and becomes a party to the Memorandum of Agreement (including all schedules thereto) of Deloitte & Touche LLP as of the effective date set forth below, the receipt of a copy of which is hereby acknowledged, and agrees that this signature page, when signed and filed in the National Office of the Partnership, shall constitute and shall be for all purposes conclusive evidence of, such individual's execution of the Agreement so certified and filed by the Chairman of the Board of Directors as contemplated by 16.03 thereof.

______________________________ Effective Date

______________________ Name:

427288.03-New York Server 3A - MSW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALAN D. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No.: 06-225-MPT |
| | ) | |
| DELOITTE & TOUCHE LLP, and | ) | JURY TRIAL DEMANDED |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**VOLUME 2**

Sheldon N. Sandler, Esquire (Bar I.D. 0245)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-6673
Facsimile : (302) 576-3330
E-mail: ssandler@ycst.com
*Attorneys for Defendants*

July 18, 2008

## TABLE OF CONTENTS

Page

**VOLUME 1:**

Alan Paul 1065 Tax form dated 2000 .......... A1

Alan Paul 1065 Tax form dated 2001 .......... A29

Memorandum of Understanding dated April 2, 2002 .......... A58

Barry Salzberg Letter to Alan Paul dated April 19, 2002 .......... A74

E-mails between Alan Paul and Mike Burton dated April 19, 2002 through April 29, 2002 .......... A79

Alan Paul Partnership Units and Capital .......... A80

Alan Paul Signed Agreement Page dated April 30, 2002 .......... A81

Letter to Alan Paul dated May 2, 2002 .......... A82

Memorandum of Agreement of Deloitte & Touche USA LLP dated December 28, 2003 .......... A88

Memorandum of Agreement of Deloitte & Touche LLP dated December 28, 2003 .......... A213

**VOLUME 2:**

Letter Agreement dated May 7, 2002 .......... A260

Fiscal 2004 Tax Earnings Group Criteria .......... A283

Memo from Chet Wood dated May 13, 2003 .......... A287

E-mails re: Partner Performance Process dates August 26, 2003 .......... A293

E-mail from Steve Severin to Frank Marcos dated September 4, 2003 .......... A297

FY 2003 Partner/Principal/Director Goal Setting and Evaluation .......... A300

Accounts Receivable By Billing Partner .......... A304

Chart, Boston LTS Partners FY 2003 .......... A307

E-mails between Patricia Horn, Frank Marcos, and Alan Paul dated February 8, 2004 through February 13, 2004 .......... A308

Managed Revenue By Partner, FY 2004 YTD Period 10 .................................................. A310

FY 2004 Partner/Principal/Director Goal Setting and Evaluation ......................................... A312

Email from Alan Paul to Vince DeGutis dated February 17, 2004......................................... A319

Memo from Vince DeGutis to Alan Paul dated February 25, 2004........................................ A320

Memo from Alan Paul to Vince DeGutis dated March 6, 2004 ............................................ A321

Emails between Vince DeGutis and Alan Paul dated March 8, 2004 ................................... A323

Memo from Alan Paul to Vince DeGutis dated March 15, 2004........................................... A324

Chart, Northeast AA Partners, Managed Revenue,
Goal versus Actual Results for FY 2003 and FY 2004 ........................................................ A326

Emails between Frank Marcos and Steve Severin dated March 26, 2004.............................. A327

Memo from Frank Marcos and Vince DeGutis to Steve Severin dated March 30, 2004......... A331

Emails re: Alan Levinson and Alan Paul dated April 7, 2004 .............................................. A334

Email from Steve Severin re: Committee of 6 dated April 7, 2004 ...................................... A335

Email from Barbara Van Bogart to Julie Salzman dated April 12, 2004 .............................. A336

Letter to Alan Paul dated April 22, 2004.............................................................................. A337

Letter from Alan Paul dated May 19, 2004 .......................................................................... A345

Boston Partners Revenue Goals and Hours Chart................................................................. A348

FY 2004 Partner Managed Revenue Details by Period Chart ............................................... A349

FY 2004 Revenues By Partner Chart ................................................................................... A350

Employee Data Chart............................................................................................................ A354

Excerpts from the Deposition Transcript of Mark Berkowitz
dated May 21, 2008 ............................................................................................................. A356

Excerpts from the Deposition Transcript of Michael Burton
dated April 15, 2008 ............................................................................................................. A361

Excerpts from the Deposition Transcript of Vincent M. DeGutis dated December 19, 2007 .......... A365

Excerpts from the Deposition Transcripts of Patricia Horn dated March 11, 2008 and May 21, 2008 .......... A418

Excerpts from the Deposition Transcript of Raymond L. Lewis dated December 11, 2007 .......... A424

Excerpts from the Deposition Transcript of Frank M. Marcos dated April 1, 2008 .......... A433

Excerpts from the Deposition Transcript of Alan D. Paul dated November 1, 2007 .......... A455

Excerpts from the Deposition Transcript of Bradley M. Seltzer dated December 14, 2007 .......... A499

Excerpts from the Deposition Transcript of Steven L. Severin dated March 11, 2008 .......... A516

Excerpts from the Deposition Transcript of Andrew N. Wells, Esquire dated March 13, 2008 .......... A530

Affidavit of Vincent DeGutis dated July 15, 2008 .......... A534

Affidavit of Steven L. Severin dated July 16, 2008 .......... A539

Affidavit of Patricia Horn dated July 17, 2008 .......... A540

DELOITTE & TOUCHE USA LLP
1633 Broadway
New York, NY 10019

May 7, 2002

Arthur Andersen LLP
33 West Monroe
Chicago, Illinois 60603

Ladies and Gentlemen:

This letter (the "Letter Agreement") sets forth the agreement by and between Deloitte & Touche USA LLP ("D&T USA") and Arthur Andersen LLP ("Arthur Andersen") with respect to certain business arrangements relating to the offer by D&T USA to certain personnel of Arthur Andersen engaged in Arthur Andersen's U.S. tax practice (the "Tax Practice") of either the opportunity to become a partner (a "Partner") or principal (a "Principal") of D&T USA and Deloitte & Touche LLP ("ATR") or the opportunity to be employed by ATR or to be a consultant to ATR.

D&T USA has offered (i) to each of the personnel of Arthur Andersen listed on Exhibit A hereof the position of Partner with both of D&T USA and ATR and (ii) to each of the personnel of Arthur Andersen listed on Exhibit B hereof the position of Principal with both of D&T USA and ATR. The persons listed on Exhibit A and Exhibit B hereof are collectively referred to herein as "Selected Tax Members." Each Selected Tax Member has, as of or prior to the date hereof, (i) resigned from his or her position as a partner, participating principal or director of Arthur Andersen and from any other position that such Selected Tax Member held with Arthur Andersen or any of its Affiliates (as defined below), in each case effective as of the date set forth on Exhibit A or Exhibit B hereto, as the case may be, (ii) accepted his or her offer to become a Partner or Principal of D&T USA and ATR and (iii) entered into one or more definitive agreements with D&T USA and ATR with respect to the admittance of such Selected Tax Member as a Partner or Principal of D&T USA and ATR. The anticipated date upon which each Selected Tax Member will become a Partner or Principal, as the case may be, of D&T USA and ATR is set forth on Exhibit A and Exhibit B, as applicable, the actual date of which will be the effective date on which such Selected Tax Member enters into the Memorandum of Agreement of D&T USA, as amended (the "MOA"). "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such Person. For purposes of the definition of Affiliate, a Person shall be deemed to control another Person if it owns or controls more than fifty percent (50%) of the voting equity of the other Person (or other comparable ownership if the Person is not a corporation); provided that (i) with respect to Arthur Andersen, an Affiliate shall also be deemed to include Andersen Worldwide Société Coopérative ("AWSC") and any Person that (a) has

entered into an interfirm, affiliate, nominee or exclusive representation agreement or other cooperative relationship with AWSC (or any successor thereto) (a "Member Firm") or (b) has entered into any such agreement or relationship with a Member Firm, in each case, to provide accounting, auditing, tax consulting, business systems consulting, corporate finance and other similar services, and such Person is authorized to advertise and promote its services as being part of or associated with the Arthur Andersen or Andersen Consulting Business Units of the Andersen Worldwide Organization, and (ii) with respect to D&T USA, an Affiliate shall be deemed to include ATR. "Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

ATR has offered (i) employment with ATR or one of its Affiliates to each of the Arthur Andersen personnel listed on Exhibit C-1 hereof and (ii) the opportunity to be a consultant to ATR or one of its Affiliates to each of the Arthur Andersen personnel listed on Exhibit C-2 (collectively, the "Selected Professionals"). Each Selected Professional has, as of or prior to the date hereof, (i) resigned from his or her position as an employee, partner, participating principal or director of Arthur Andersen effective as of the date set forth on Exhibit C-1 or Exhibit C-2, as the case may be, and (ii) accepted his or her offer to become an employee of or consultant to ATR or one of its Affiliates, with starting dates to be determined by ATR.

ATR has offered employment with ATR or one of its Affiliates to each of the Arthur Andersen administrative personnel listed on Exhibit D hereof (the "Selected Administrative Personnel").

Based upon the foregoing and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, D&T USA and Arthur Andersen hereby agree as follows:

1. Effective Date. This Letter Agreement is effective upon execution by each of the parties hereto.

2. Representations and Warranties of Arthur Andersen. Arthur Andersen represents and warrants to D&T USA as follows:

(a) Arthur Andersen is a registered limited liability partnership duly organized, validly existing and in good standing under the laws of the State of Illinois and has all requisite power and authority to carry on the operations of the Tax Practice as now being conducted by it and to own, lease and operate the assets related to the Tax Practice that it owns, leases and operates.

(b) Arthur Andersen has all requisite partnership power and authority to execute and deliver this Letter Agreement and the Related Agreements (as defined below) to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Letter Agreement and such Related Agreements by Arthur Andersen and the performance of its obligations hereunder and thereunder have been duly and validly authorized by the

Administrative Board of Arthur Andersen and AWSC and no other action on the part of Arthur Andersen, AWSC or any other Person is necessary to authorize the execution, delivery and performance of this Letter Agreement and such Related Agreements by Arthur Andersen. Each of this Letter Agreement and such Related Agreements has been duly executed and delivered by Arthur Andersen and constitutes, assuming due authorization, execution, delivery and binding effect of this Letter Agreement and such Related Agreements by and on the other parties thereto, a valid and binding obligation of Arthur Andersen, enforceable against Arthur Andersen in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles. The "Related Agreements" shall mean (i) the Member Releases (as defined in Paragraph 4 hereof), (ii) the Employee Releases (as defined in Paragraph 5 hereof), (iii) the Services Agreement, between Arthur Andersen and D&T USA, dated the date hereof and in the form attached hereto as Exhibit E (the "Services Agreement"), (iv) the Commercial Licenses (as defined in Paragraph 6 hereof), and (v) the Access Master Agreement, between Arthur Andersen and D&T USA, dated the date hereof and in the form attached hereto as Exhibit F (the "Access Master Agreement").

(c) Neither the execution and delivery by Arthur Andersen of this Letter Agreement or the Related Agreements to which it is a party nor the performance by Arthur Andersen of its obligations hereunder or thereunder will (i) conflict with or result in any breach of any provision of the partnership agreement, as amended and restated effective September 1, 2000, of Arthur Andersen, as subsequently amended and restated on April 22, 2002 (the "AA Partnership Agreement") or other similar governing documents or interfirm agreements of Arthur Andersen or AWSC (the "Other Governing Documents"), (ii) result in (with or without the giving of notice or lapse of time or both) a violation or breach of, or constitute a default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, mortgage, letter of credit, other evidence of indebtedness, guarantee, license, lease or any contract or similar instrument or obligation to which Arthur Andersen or any of its Affiliates may be bound or by which any of the Assets (as defined in Paragraph 6 hereof) may be bound, subject to receipt of the third party consents set forth in Schedule 6(a)(i)(B), or (iii) violate any order, injunction, decree, statute, rule or regulation of any Governmental Entity (as defined below) to which Arthur Andersen or any of its Affiliates is subject. Schedule 2(c) sets forth a true and complete list of any agreement or document containing a non-competition, non-solicitation or similar restrictive covenant pursuant to which any Selected Tax Member or Selected Professional is bound to Arthur Andersen or any of its Affiliates, including all amendments thereto. Arthur Andersen has made available to D&T USA copies (or forms) of all such

agreements and documents listed on Schedule 2(c), and such copies (or forms) are accurate and complete as of the date hereof. A "Governmental Entity" shall mean any foreign, United States, state or local governmental entity or subdivision thereof or court, tribunal, commission, board, bureau, agency or legislative, executive, governmental or regulatory authority or agency.

(d) Except as set forth on Schedule 2(d) (which filings, registrations, notifications, authorizations, consents and approvals have been made or received prior to the date hereof) and Schedule 6(a)(i)(B) (which filings, registrations, notifications, authorizations, consents and approvals have not been made or received prior to the date hereof), no filing or registration with, notification to, or authorization, consent or approval of, any Governmental Entity or third party is required in connection with the execution and delivery of this Letter Agreement or the applicable Related Agreements by Arthur Andersen or the performance by Arthur Andersen of its obligations hereunder or thereunder. Arthur Andersen has made available to D&T USA copies of all notes, mortgages, letters of credit, other evidences of indebtedness, guarantees, licenses, leases, contracts or other documents, with all amendments thereto, which require the notification to, or consent, approval or authorization of, any third party in connection with the execution and delivery of this Letter Agreement or the applicable Related Agreements by Arthur Andersen or the performance by Arthur Andersen of its obligations hereunder or thereunder and such copies are accurate and complete as of the date hereof.

(e) Subject to obtaining the consents set forth in Schedule 6(a)(i)(B), Arthur Andersen has all rights necessary to grant the licenses in the Assets granted herein. To Arthur Andersen's Knowledge, the Assets do not infringe or misappropriate the rights of any third party. For purposes of this Paragraph 2(e), "Arthur Andersen's Knowledge" shall mean the actual knowledge of the members of the Administrative Board of Arthur Andersen, Allan H. Cohen or Jim Shedivy.

(f) Arthur Andersen has provided to D&T USA accurate and complete copies of all offers and proposals made to Arthur Andersen or any members of its Administrative Board since December 31, 2001 relating to a possible transaction involving the possible hiring of 100 or more partners, participating principals or directors of Arthur Andersen engaged in the Tax Practice (each offer or proposal being, an "Alternative Offer") which were made in writing. Arthur Andersen has accurately described to D&T USA all material terms of any Alternative Offers made orally and any discussions or conversations with third parties with respect to any Alternative Offers.

(g) Arthur Andersen represents and warrants that it has no current intention to file a petition for bankruptcy protection.

(h) EXCEPT AS EXPRESSLY PROVIDED IN THIS LETTER AGREEMENT OR THE RELATED AGREEMENTS, (I) ARTHUR ANDERSEN IS MAKING NO REPRESENTATION OR WARRANTY AS TO ITSELF, THE ASSETS OR ANY OTHER MATTER AND (II) ARTHUR ANDERSEN IS LICENSING THE ASSETS ON AN "AS IS" BASIS. EXCEPT AS EXPRESSLY PROVIDED IN THIS LETTER AGREEMENT OR THE RELATED AGREEMENTS, ARTHUR ANDERSEN DISCLAIMS, AND D&T USA HEREBY WAIVES, ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, NON INFRINGEMENT OR ANY OTHER EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE ASSETS.

3. Representations and Warranties of D&T USA. D&T USA represents and warrants to Arthur Andersen as follows:

(a) D&T USA is a general partnership duly organized, validly existing and in good standing as a registered limited liability partnership under the laws of the State of Delaware.

(b) D&T USA has all requisite partnership power and authority to execute and deliver this Letter Agreement and the Related Agreements to which it is a party and to perform its obligations hereunder or thereunder. The execution and delivery of this Letter Agreement and such Related Agreements by D&T USA and the performance of its obligations hereunder and thereunder have been duly and validly authorized by the Board of Directors of D&T USA and no other action on the part of D&T USA or any other Person is necessary to authorize the execution, delivery and performance of this Letter Agreement and such Related Agreements by D&T USA. Each of this Letter Agreement and such Related Agreements has been duly executed and delivered by D&T USA and constitutes, assuming due authorization, execution, delivery and binding effect of this Letter Agreement and such Related Agreements by and on the other parties thereto, a valid and binding obligation of D&T USA enforceable against D&T USA in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles.

(c) Neither the execution and delivery by D&T USA of this Letter Agreement or the Related Agreements to which it is a party nor the performance by D&T USA of its obligations hereunder or thereunder will (i) conflict with or result in any breach of any provision of the MOA or other similar governing documents of D&T USA or its Affiliates, (ii) result in (with or without the giving of notice or lapse of time or both) a violation or breach of, or constitute a default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, mortgage, letter of credit, other evidence of indebtedness, guarantee, license, lease or any contract or similar

instrument or obligation to which D&T USA or any of its Affiliates may be bound or (iii) violate any order, injunction, decree, statute, rule or regulation of any Governmental Entity to which D&T USA or its Affiliates is subject.

(d) Except as set forth on Schedule 3(d) (which filings, registrations, notifications, authorizations, consents and approvals have been made or received prior to the date hereof), no filing or registration with, notification to, or authorization, consent or approval of, any Governmental Entity or third party is required in connection with the execution and delivery of this Letter Agreement or the applicable Related Agreements by D&T USA or the performance by D&T USA of its obligations hereunder or thereunder.

(e) Nothing in the agreements between D&T USA, ATR and the Selected Tax Members executed in connection with the transactions contemplated by this Letter Agreement preclude such Selected Tax Member from retaining an ownership interest in Arthur Andersen as contemplated by the Separation Agreements (as defined below).

(f) In making the decision to enter into this Letter Agreement and the Related Agreements to which D&T USA is a party and to consummate the transactions contemplated hereby and thereby, other than reliance on the representations, warranties, covenants and obligations of Arthur Andersen set forth in this Letter Agreement and in the Related Agreements to which D&T USA is a party, D&T USA has relied solely on its own independent investigation, analysis and evaluation. D&T USA confirms to Arthur Andersen that D&T USA is sophisticated and knowledgeable with respect to the subject matter of this Letter Agreement and the Related Agreements to which it is a party and is capable of evaluating on its own behalf the subject matter set forth herein and therein.

4. Member Releases. Each Selected Tax Member and each Selected Professional set forth on Exhibit C-2 and Exhibit C-3 is hereby fully, unconditionally and irrevocably released from (i) those restrictive covenants set forth in (x) Article 26(A)(2), Article 26(A)(3) and Article 26(A)(4) of the AA Partnership Agreement and (y) the corresponding restrictive covenants set forth in Sections 35.3.1, 35.4.1 and 35.5.1 of Andersen Worldwide Policies 12 and (ii) all other non-compete, non-solicitation and other restrictive covenants applicable to such Selected Tax Member or such Selected Professional in the AA Partnership Agreement or any other agreement or document by which such Selected Tax Member or such Selected Professional is bound to Arthur Andersen, AWSC or any of their respective affiliated firms. Concurrently with the execution hereof, Arthur Andersen waives for each Selected Tax Member and each Selected Professional set forth on Exhibit C-2 and Exhibit C-3 the ninety (90) day notice requirement set forth in Article 10(A) of the AA Partnership Agreement. In connection with the foregoing, Arthur Andersen and each such Selected Tax Member and each such Selected Professional set forth on Exhibit C-2 and Exhibit C-3 has entered into a Separation Agreement in the form attached hereto as Exhibit G (each, a "Separation Agreement"), which agreement contains, among other things, a release of the same

provisions referred to above. The foregoing releases and the releases contained in each Separation Agreement are referred to herein as the "Member Releases." Attached hereto as Exhibit H is a true and complete copy of the consent of AWSC to the transactions contemplated by this Letter Agreement and the Related Agreements.

5. Employee Releases. Each Selected Professional (other than those set forth on Exhibit C-2 and Exhibit C-3 who are the subject of paragraph 4 above) and each Selected Administrative Personnel who accepts Deloitte's offer (whether on, prior to or after the date hereof) is hereby fully, unconditionally and irrevocably released from (i) those restrictive covenants set forth in the first three bullet points of the Noncompete Provisions executed by such Selected Professional and such Selected Administrative Personnel, and (ii) all other non-compete, non-solicitation and other restrictive covenants applicable to such Selected Professional or such Selected Administrative Personnel, as the case may be, in any organizational document of Arthur Andersen, AWSC or any of their respective affiliated firms or in any other agreement or document by which such Selected Professional or such Selected Administrative Personnel, as the case may be, is bound to Arthur Andersen, AWSC or any of their respective affiliated firms. Concurrently with the execution hereof, Arthur Andersen waives any notice requirement with respect to such Selected Professional's and such Selected Administrative Personnel's resignation from Arthur Andersen, AWSC or any of their affiliated firms. In connection with the foregoing, Arthur Andersen and each such applicable Selected Professional and such applicable Selected Administrative Personnel has entered into a Termination of Non-Compete Agreement in the form attached hereto as Exhibit I (the "Termination of Non-Compete Agreement"), which agreement contains, among other things, a release of the same provisions referred to above. The foregoing releases and the releases contained in each Termination of Non-Compete Agreement are referred to herein as the "Employee Releases."

6. Certain Assets; Releases. (a) D&T USA hereby pays Arthur Andersen $39,325,000 in exchange for which Arthur Andersen does hereby, and has caused its Affiliates to:

(i) Grant to D&T USA and its Affiliates located in the United States ("U.S. Affiliates") a fully-paid, non-exclusive, non-transferable, irrevocable, perpetual license to use, make an unlimited number of copies of, install on an unlimited number of computers, deliver to an unlimited number of D&T USA offices, modify, and create derivative works based upon, the assets set forth on Schedule 6(a)(i)(A) (the "Tax Practice Assets") in the United States (other than incidental use outside the United States consistent with Arthur Andersen's past practice, such as a U.S. employee, principal, director or partner traveling outside of the United States with a laptop or personal computer containing any of the Tax Practice Assets) to provide tax return preparation and tax consulting services on engagements controlled and managed globally by the tax practice of D&T USA or any of its U.S. Affiliates (collectively, the "Tax Services"). The parties acknowledge that the Tax Practice Assets contain third party components

requiring third party consents as set forth in Schedule 6(a)(i)(B), as such schedule may be updated by Arthur Andersen upon written notice to D&T USA, provided that any such updates must occur within fourteen (14) days after the Effective Date. The parties further acknowledge that Arthur Andersen is not transferring any rights to any third party applications to D&T USA hereunder. Arthur Andersen and D&T USA shall use their respective reasonable efforts to obtain as promptly as possible after the Effective Date consents to any such third party components, provided that Arthur Andersen shall not be obligated to pay such third party any amounts in order to obtain such consents. Notwithstanding anything herein to the contrary and for the purpose of clarity, the use of the Tax Practice Assets on a server located in the United States to exchange data with computers and people located outside of the United States shall not be deemed use of the Tax Practice Assets outside of the United States for purposes of this Section 6(a)(i). Arthur Andersen shall have fourteen days after the Effective Date to determine whether Schedule 6(a)(1)(A) contains any commercially licensed products. For purposes of this Section, commercially licensed products shall mean a product that Arthur Andersen demonstrates was actively offered as part of Arthur Andersen's commercial product suite on or prior to the Effective Date. In such case, such item(s) shall be taken off of Schedule 6(a)(1)(A) and shall be licensed pursuant to Section 6(a)(ii) hereof to D&T USA and its US Affiliates on terms and conditions substantially similar to those contained in the Commercial Licenses, as such term is defined below, provided that neither D&T USA nor its US Affiliates shall be charged any license fee or, to the extent maintenance and support are provided to any other client, maintenance and support fee in connection with the use of such assets.

(ii) Grant to D&T USA and its U.S. Affiliates licenses in the forms attached as Exhibit J hereto (the "Commercial Licenses") for the computer software described therein (the "Commercially Licensed Software").

(iii) Grant to D&T USA and its U.S. Affiliates, a license to grant non-exclusive sublicenses to use the Tax Practice Assets only to their respective tax practice clients for the purpose of receiving Tax Services from D&T USA or one of its U.S. Affiliates, and only pursuant to a written sublicense consistent with the terms and conditions of this Paragraph 6 and requiring the sublicensee to preserve the confidentiality of the sublicensed Tax Practice Assets.

(iv) Provide Member Releases and the Employee Releases.

(b) The term "Assets" shall mean the Tax Practice Assets and the Commercially Licensed Software.

(c) To the extent that following the date hereof, D&T USA discovers that assets owned by Arthur Andersen of the type set forth on Schedule 6(a)(i)(A) are necessary for the provision of Tax Services to clients of the Tax Practice that are or have become clients of D&T USA or its U.S. Affiliates and have been omitted from the list of

Tax Practice Assets set forth on Schedule 6(a)(i)(A) ("Omitted Assets"), such Omitted Assets shall be deemed included in the definition of Tax Practice Assets and subject to the provisions of Paragraph 6(a), and Arthur Andersen shall use its reasonable efforts to promptly provide D&T USA and its U.S. Affiliates with access to and a copy of such Omitted Assets, if and to the extent that such Omitted Assets:

(i) are owned solely by Arthur Andersen;

(ii) were used within the past eighteen (18) months by Arthur Andersen to provide tax return preparation and tax consulting services in connection with the Tax Practice;

(iii) are not commercially licensed for tax return preparation and tax consulting services by Arthur Andersen or any of its Affiliates;

(iv) are not client information, client-specific, or confidential to a third party (except if the client or third party is a client of the Tax Practice that has become a client of D&T USA or any of its U.S. Affiliates); and

(v) are reasonably separable from materials that are not licensed to D&T USA and its U.S. Affiliates under this Letter Agreement.

D&T USA shall reimburse Arthur Andersen for any reasonable and actual expenses it incurs in providing such access and copies of any Omitted Assets.

(d) Neither party nor any of its Affiliates shall have any rights in any derivative works of the Assets created by the other party or any of its Affiliates. Anything to the contrary notwithstanding, Arthur Andersen retains all of its right, title and interest in the Assets and reserves all rights not expressly granted herein. Except as expressly set forth in the Commercial Licenses, Arthur Andersen shall have no obligation to provide maintenance, support, updates or upgrades for the Assets. No license is granted with respect to any trademark, service mark, trade dress or other indicia of source or origin.

(e) All rights and licenses granted under or pursuant to Paragraphs 6(a)(i), 6(a)(ii) and 6(a)(iii), the Commercial Licenses, and the Services Agreement by Arthur Andersen are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the Bankruptcy Code (11 U.S.C. Section 101 et seq., the "Code"), licenses of rights to "intellectual property" as defined therein. The parties hereto agree that D&T USA and its U.S. Affiliates, as licensee of such rights hereunder, including the licenses, shall retain and may fully exercise all of their rights and elections under the Code. The parties hereto further agree that, in the event of the commencement of bankruptcy proceedings by or against Arthur Andersen or any its Affiliates under the Code, D&T USA and its U.S. Affiliates shall be entitled to retain all of their licenses granted under or pursuant to Paragraphs 6(a)(i), 6(a)(ii) and 6(a)(iii), the Commercial Licenses and the Services Agreement.

(f) Arthur Andersen acknowledges that D&T USA and its U.S. Affiliates, while using the Assets, may acquire general experience, skills and knowledge in the unaided memory of their respective employees ("Residual Information"). Arthur Andersen acknowledges that this Letter Agreement does not prevent D&T USA and its U.S. Affiliates from using and disclosing the Residual Information in their respective businesses, including without limitation to create derivative works of D&T USA's and its Affiliates' products and services, and incorporate such derivative works into D&T USA and its Affiliates' products and services. The use of the Assets will not preclude, or in any way limit, D&T USA or its Affiliates as a result of use of Assets from (i) providing to any party products or services (including without limitation computer software products) or services which may be competitive with the products or services of Arthur Andersen, its Affiliates or their successors, or (ii) providing products (including without limitation computer software products) or services to any party, including without limitation, any entity that may be a competitor of Arthur Andersen, its Affiliates or their successors; provided, however, that this sentence alone is not intended as a license to any intellectual property rights.

(g) Arthur Andersen will cause any third party that acquires ownership of any of the materials described in Paragraph 6(a)(i) or 6(a)(ii), the Commercial Licenses, or the Services Agreement to agree to comply with all of the obligations, relating to such materials, that Arthur Andersen is subject to under this Paragraph 6, the Commercial Licenses or the Services Agreement, and to make the acknowledgement given in Section 6(f) above.

(h) In the event that a tax client of Arthur Andersen or its Affiliates that was served by a Selected Tax Member or Selected Professional notifies Arthur Andersen that such client no longer desires the tax services of Arthur Andersen or such Affiliate under a Client Agreement and that such client desires to have D&T USA or one of its Affiliates perform such services, then Arthur Andersen agrees that it will terminate, and will cause its applicable Affiliate to terminate, such Client Agreement with the consent of such client and at no additional cost to D&T USA or such client (other than in the case of such client, contractually obligated amounts owed by such client). A "Client Agreement" shall mean an agreement between Arthur Andersen or its Affiliates, on the one hand, and a client of Arthur Andersen or its Affiliates, on the other hand, which is not terminable by such client at any time or without prior notice, provided however, that a Client Agreement shall not include agreements by and between Arthur Andersen or its Affiliates, on the one hand, and Accenture Ltd. or its Affiliates, on the other hand.

(i) Notwithstanding anything contained herein to the contrary, the terms of the Confidentiality Agreement, dated as of April 3, 2002, by and between D&T USA and Arthur Andersen (the "Confidentiality Agreement") shall not apply to the Tax Practice Assets, Client Data (as defined in the Services Agreement), or the Commercial Licenses. D&T USA shall, and shall cause its U.S. Affiliates to, use reasonable efforts to maintain the confidentiality of the Tax Practice Assets, and in any event in accordance with the

confidential information practices used by D&T USA to protect its own confidential information of like character during the normal course of its business. The obligations of D&T USA under this Section 6(i) shall remain in effect in perpetuity.

7. Non-License. Notwithstanding anything in this Letter Agreement or the Related Agreements to the contrary, this Letter Agreement and the Related Agreements shall not constitute a license of, or an agreement to license any right, title or interest in or to any Asset, if an attempted license thereof, without the consent or waiver of a third party thereto (including a Governmental Entity) would constitute a breach thereof or a violation of any Legal Requirement (as defined below), or in any way adversely affect the rights of Arthur Andersen or D&T USA thereunder, unless and until such consent or waiver has been duly obtained or such license has otherwise become lawful. Arthur Andersen represents and warrants that all such consents and waivers have been obtained other than those consents and waivers set forth on Schedule 6(a)(i)(B). Arthur Andersen and D&T USA shall use their respective reasonable efforts to obtain as promptly as possible after the Effective Date all such consents and waivers which have not been obtained on or prior to the date hereof, provided that Arthur Andersen shall not be obligated to pay such third party any amounts in order to obtain such consents or waivers. In the event and to the extent that Arthur Andersen and D&T USA are unable to obtain any such required consent or waiver, Arthur Andersen shall use its commercially reasonable efforts to provide D&T USA the benefits contemplated by this Letter Agreement and the Related Agreements with respect to any such Assets. "Legal Requirement" means all applicable laws, statutes, ordinances, orders, rules or regulation.

8. Liabilities. Notwithstanding anything in this Letter Agreement or the Related Agreements to the contrary, Arthur Andersen acknowledges, covenants and agrees that neither D&T USA nor any of its Affiliates shall assume or shall be deemed to have assumed or be responsible for, and Arthur Andersen acknowledges, covenants and agrees that Arthur Andersen or its Affiliates, as the case may be, shall be solely and exclusively liable and responsible for, all debts, obligations, contracts or liabilities (known or unknown) of Arthur Andersen or its Affiliates, as the case may be, including, without limitation, those arising out of or relating to any of the businesses or practices of Arthur Andersen or any of its Affiliates, as the case may be, including the Tax Practice.

9. Deliveries by Arthur Andersen. Arthur Andersen has delivered or caused to be delivered on the date hereof to D&T USA the following: (i) the Member Releases, (ii) the Employee Releases, (iii) the Services Agreement, (iv) the Commercial Licenses, and (v) the Access Master Agreement..

10. Deliveries by D&T USA. D&T USA has delivered or caused to be delivered on the date hereof to Arthur Andersen the following: (i) the amounts to be paid to Arthur Andersen pursuant to Paragraph 6 hereof, (ii) the Services Agreement, (iii) the Commercial Licenses, and (iv) the Access Master Agreement.

11. Retained Receivables; Post Closing Assistance. The parties acknowledge and agree that all billed and unbilled accounts and notes receivable for services

performed as of the date hereof by Arthur Andersen in connection with the Tax Practice, including with respect to any work initiated by Arthur Andersen, work-in-progress and contingency and value based fee arrangements (collectively the "Retained Receivables") shall remain the property of Arthur Andersen and shall be collected by Arthur Andersen subsequent to the date hereof. From the date hereof until February 7, 2003, D&T USA shall provide reasonable assistance to, and shall instruct the Selected Tax Members and Selected Professionals (if such persons are then affiliated with D&T USA or its Affiliates) to provide reasonable assistance to, Arthur Andersen in Arthur Andersen's collection of Billed Retained Receivables (as defined below) owed by an obligor that becomes a client of D&T USA, transfers work from Arthur Andersen to D&T USA or that is or has been a client of a Selected Tax Member and is also a client of D&T USA. Such reasonable assistance shall include a Selected Tax Member who was the "billing" partner at Arthur Andersen with respect to a particular Billed Retained Receivable contacting the obligor of such Billed Retained Receivable in a manner consistent with Arthur Andersen's past custom and practice. Notwithstanding the foregoing, neither D&T USA, any Selected Tax Member nor any Selected Professional shall be obligated to provide any such assistance if, in the reasonable judgment of D&T USA, such assistance would reasonably be expected to subject D&T USA, a Selected Tax Member or a Selected Professional to any liability. The term "Billed Retained Receivable" shall mean a Retained Receivable with respect to which Arthur Andersen has billed the obligor thereof for such Retained Receivable prior to the date hereof.

12. Value Based Fee and Contingency Arrangements. Schedule H to each of the Separation Agreements contains a list of engagements of Arthur Andersen relating to the Tax Practice for which all or part of the consideration due thereunder is on a value or contingency basis (each such engagement, a "Contingency Engagement"). In the event that a client of Arthur Andersen replaces Arthur Andersen on a Contingency Engagement and engages D&T USA to perform the services contemplated by such Contingency Engagement (a "New Engagement"), D&T USA agrees that it will not be paid for its services under such New Engagement on a value or contingency basis.

13. Reasonable Access to Selected Tax Members and Selected Professionals. D&T USA shall, upon reasonable advance written notice to D&T USA, afford to Arthur Andersen reasonable access to the Selected Tax Members and Selected Professionals (if such persons are then affiliated with D&T USA or its Affiliates) for any reasonable business purpose relating to (i) litigation (including threatened litigation) involving Arthur Andersen and a third party (and not involving D&T USA or any of its Affiliates), (ii) compliance with requests to Arthur Andersen from Governmental Entities, (iii) insurance matters, (iv) consulting on Arthur Andersen billing matters, (v) preparation of Arthur Andersen's taxes or (vi) Arthur Andersen's financial reporting obligations. Until the first anniversary of the date hereof, D&T USA shall, upon reasonable advance written notice to D&T USA, afford to Arthur Andersen reasonable access to the Selected Tax Members and Selected Professionals (if such persons are then affiliated with D&T USA or its Affiliates) with respect to requests for information relating to clients of Arthur

Andersen who were clients of the Selected Tax Member or Selected Professional while at Arthur Andersen. Notwithstanding the foregoing, D&T USA shall not be obligated to provide any such access if it would unduly interfere with such Selected Tax Members or Selected Professionals responsibilities as a partner, principal, employee or consultant of D&T USA or ATR, as the case may be.

14. Arthur Andersen Name. D&T USA shall instruct each Selected Tax Member and each Selected Professional, promptly following such Selected Tax Member and Selected Professional joining D&T USA or ATR, as the case may be, to cease use of, and shall use its commercially reasonable efforts to cause such persons upon such person becoming affiliated with D&T USA or ATR to cease use of, any stationery, invoice, receipt or other similar document containing any reference to the Andersen Name or to only use such stationery, invoice, receipt or other similar document after having deleted, pasted over or placed a sticker over such references. "Andersen Name" means (i) "Andersen" and "Arthur Andersen," (ii) all the service marks and trademarks containing or derived from the names "Andersen" or "Arthur Andersen" and any and all derivatives thereof, (iii) Arthur Andersen's logo (consisting of an orange sphere) and (iv) all goodwill associated with any of the foregoing. Notwithstanding the foregoing, the internal use by D&T USA, its Affiliates or their respective personnel of any document which contains the Andersen Name as a result of an automatic generation of the Andersen Name by the Assets which cannot be reasonably prevented by D&T USA will not be considered a breach by D&T USA.

15. Arthur Andersen Residuals. Notwithstanding anything to the contrary set forth in this Letter Agreement, D&T USA acknowledges that Arthur Andersen and its Affiliates shall have the right to use in any manner all formulae, algorithms, processes, procedures, inventions, methodologies, technologies and know-how derived from its ownership and operation of the Tax Practice and the Assets. D&T USA further acknowledges that (a) one or more Persons have been and will be pursuing, initiating and otherwise facilitating inquiries, proposals and offers from Persons relating to multiple potential sales of assets of Arthur Andersen and its Affiliates and (b) the sales described in the preceding clause (a) may involve clients of the Tax Practice (because, among other things, clients of the Tax Practice may also be clients of Arthur Andersen's other practices) and such Persons will acquire knowledge of the business ideas and other work product of the Tax Practice.

16. Survival. The parties hereto agree that the representations and warranties contained herein shall survive until November 7, 2003, except that the representations and warranties set forth in Paragraphs 2(a), 2(b), the first sentence of 2(e), 3(a) and 3(b) shall survive indefinitely.

17. Fees and Expenses. Except as otherwise expressly provided in this Letter Agreement or the Related Agreements, all fees, costs and expenses of a party hereto incurred in connection with this Letter Agreement or the Related Agreements and the

transactions contemplated hereby and thereby shall be paid by the party incurring such fees, costs and expenses.

18. Publicity. No press release or announcement concerning the existence of this Letter Agreement or the transactions contemplated hereby shall be issued by a party hereto without the prior written consent of the other party hereto.

19. No Consequential Damages, Etc. With respect to any damages that any party may assert in connection with the transactions contemplated by this Letter Agreement for breach of any provision hereof or otherwise arising in tort, under statute, at common law or otherwise, no party shall have any liability to any other party hereunder for any consequential, incidental or punitive damages, attorneys fees and expenses or any other costs or expenses associated with any action, suit, demand, claim, investigation or legal, administrative, arbitration or other alternative dispute resolution proceeding.

20. Non-Recourse. Notwithstanding anything to the contrary contained herein, it is expressly acknowledged and agreed that (a) in no event shall the Administrator of Arthur Andersen, any member of the Administrative Board of Arthur Andersen or any directors, officers, managers, partners, participating principals, national directors, other employees, representatives, agents or similar persons of Arthur Andersen (collectively, the "Arthur Andersen Covered Persons") have any personal liability with respect to Arthur Andersen's obligations hereunder and (b) no Arthur Andersen Covered Person shall be obligated to make, and no Covered Person in fact will make, any capital contribution or other payment of any kind to Arthur Andersen in order for Arthur Andersen to satisfy its obligations hereunder. Notwithstanding anything to the contrary contained herein, it is expressly acknowledged and agreed that (a) in no event shall any member of the Board of Directors of D&T USA or ATR or any directors, officers, managers, partners, principals, other employees, representatives, agents or similar persons of D&T USA or ATR (collectively, the "D&T Covered Persons") have any personal liability with respect to D&T USA's obligations hereunder and (b) no D&T Covered Person shall be obligated to make, and no Covered Person in fact will make, any capital contribution or other payment of any kind to Arthur Andersen in order for D&T USA to satisfy its obligations hereunder.

21. Further Assurances. From time to time after the date hereof, at the request of either party hereto, the parties hereto shall execute and deliver to such requesting party such documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby and by the Related Agreements.

22. Notices. All notices, requests, demands, waivers and other communications required or permitted to be given under this Letter Agreement shall be in writing and may be given by any of the following methods: (a) personal delivery, (b) facsimile transmission, or (c) overnight delivery service. Notices shall be sent to the appropriate party at its address or facsimile number given below (or at such other address or facsimile number for such party as shall be specified by notice given hereunder):

Confidential

If to D&T USA to:

c/o
1633 Broadway
New York, NY 10019
Facsimile: 212-492-4288
Attention: Philip R. Rotner, Esq.

with a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Facsimile: 212-735-2000
Attention: Eileen T. Nugent, Esq.

If to Arthur Andersen, to:

Arthur Andersen LLP
33 West Monroe
Chicago, Illinois 60603
Facsimile: 312-462-3711
Attention: Administrator

with a copy to (which shall not constitute notice):

Mayer, Brown, Rowe & Maw
190 South LaSalle Street
Chicago, Illinois 60603
Facsimile: 312-701-7711
Attention: John Noell, Esq.

All such notices, requests, demands, waivers and communications shall be deemed received upon (i) actual receipt thereof by the addressee, (ii) actual delivery thereof to the appropriate address or (iii) in the case of a facsimile transmission, upon transmission thereof by the sender and issuance by the transmitting machine of a confirmation slip that the number of pages constituting the notice have been transmitted without error.

23. Severability. If any term or other provision of this Letter Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Letter Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Letter Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner.

24. Amendment, Modification and Waiver. This Letter Agreement may be amended, modified or supplemented only by a signed written agreement of the parties hereto. Any failure of a party hereto to comply with any term or provision of this Letter Agreement may be waived, with respect to D&T USA, by Arthur Andersen and, with respect to Arthur Andersen, by D&T USA, by an instrument in writing signed by or on behalf of the appropriate party or parties, but such waiver or failure to insist upon strict compliance with such term or provision shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply.

25. Assignment; Binding Effect. Neither this Letter Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, including, without limitation, by operation of law, by either party hereto without the prior written consent of the other party hereto, provided that D&T USA may assign its rights (but not its obligations) hereunder to any wholly-owned subsidiary of D&T USA or ATR. Subject to the preceding sentence, this Letter Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

26. No Third Party Beneficiaries. Except for paragraph 20 which shall also be for the benefit of the Arthur Andersen Covered Persons and D&T Covered Persons, this Letter Agreement is solely for the benefit of the parties hereto and their successors and permitted assigns and this Letter Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action or other right.

27. Interpretation. The paragraph headings contained in this Letter Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Letter Agreement.

28. Entire Agreement. This Letter Agreement, together with the exhibits, schedules and other documents referred to herein or delivered pursuant hereto that form a part hereof (including the Related Agreements) and the Confidentiality Agreement, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

29. Governing Law; Submission to Jurisdiction; Venue; No Jury Trial. This Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding any conflicts of law rule or principle that might otherwise refer construction or interpretation of this Letter Agreement to the substantive law of another jurisdiction, as to all matters related to or arising out this Letter Agreement, including, without limitation, matters of validity, construction, effect, performance and remedies. D&T USA and Arthur Andersen irrevocably submit to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan in the City of New York, New York in any action or proceeding with respect to any matters related to or arising out of this Letter Agreement and irrevocably waive, to the fullest extent permitted by law, any objection that they may now have or hereafter obtain to the laying

of venue for any of the aforesaid actions or proceedings in any such court and agree not to plead or claim in any such court that such action or proceeding has been brought in an inconvenient forum. **EACH PARTY TO THIS LETTER AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO A TRIAL BY JURY IN CONNECTION WITH ALL MATTERS RELATING TO OR ARISING OUT OF THIS LETTER AGREEMENT.**

30. Specific Performance. The parties acknowledge and agree that any breach of the terms of this Letter Agreement or the Related Agreements would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the parties agree that, in addition to any other remedies, each shall be entitled to enforce the terms of this Letter Agreement and the Related Agreements by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy, proving actual damages, or posting any bond or other security.

31. Counterparts. This Letter Agreement may be executed in any number of counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

Please confirm your agreement with the foregoing by signing and returning to the undersigned the duplicate copy of this Letter Agreement.

DELOITTE & TOUCHE USA LLP

By: ____________________

Name: Robert L. Page
Title: Partner

Accepted and agreed
as of the date first above written:

ARTHUR ANDERSEN LLP

By: ____________________

Name:
Title:

Please confirm your agreement with the foregoing by signing and returning to the undersigned the duplicate copy of this Letter Agreement.

DELOITTE & TOUCHE USA LLP

By: ____________________

Name:
Title:

Accepted and agreed
as of the date first above written:

ARTHUR ANDERSEN LLP

By: Stephen H Rogers
Name: Stephen H. Rogers
Title: U.S. Administrative Board Member

Exhibit A

**Selected Tax Members offered positions as Partners of D&T USA and ATR**

See Attached List

Exhibit A - Partner Schedule

| Partner | Effective Resignation Date | Anticipated Admission Date |
|---|---|---|
| Allegretti, Carl S | Date of the Letter Agreement | Date of the Letter Agreement |
| Astren, Steven F | Date of the Letter Agreement | Date of the Letter Agreement |
| Bakke, Dean E | Date of the Letter Agreement | 20-Jun-02 |
| Balestreire, Thomas J | Date of the Letter Agreement | Date of the Letter Agreement |
| Barnes, Mark A | Date of the Letter Agreement | Date of the Letter Agreement |
| Barr, Kim J | Date of the Letter Agreement | Date of the Letter Agreement |
| Barry, George J | Date of the Letter Agreement | Date of the Letter Agreement |
| Barth, Jeffrey M | Date of the Letter Agreement | Date of the Letter Agreement |
| Behrend, Todd E | Date of the Letter Agreement | Date of the Letter Agreement |
| Bergmann, Gregory A | Date of the Letter Agreement | Date of the Letter Agreement |
| Berkowitz, Mark E | Date of the Letter Agreement | Date of the Letter Agreement |
| Bohl, David J | Date of the Letter Agreement | Date of the Letter Agreement |
| Brennan, Timothy A | Date of the Letter Agreement | Date of the Letter Agreement |
| Britt, Barbara A | Date of the Letter Agreement | Date of the Letter Agreement |
| Brock, James H | Date of the Letter Agreement | Date of the Letter Agreement |
| Busch, Paul G | Date of the Letter Agreement | Date of the Letter Agreement |
| Byrne, Brian K | Date of the Letter Agreement | Date of the Letter Agreement |
| Calianese, Thomas J (NYC) | Date of the Letter Agreement | Date of the Letter Agreement |
| Carter, Donald B | Date of the Letter Agreement | Date of the Letter Agreement |
| Casey, Dennis R | Date of the Letter Agreement | Date of the Letter Agreement |
| Cederoth, Karen E | Date of the Letter Agreement | Date of the Letter Agreement |
| Clavero, Cesar A | Date of the Letter Agreement | Date of the Letter Agreement |
| Cloud, Julia A | Date of the Letter Agreement | Date of the Letter Agreement |
| Comstock, Jr, Richard H | Date of the Letter Agreement | Date of the Letter Agreement |
| Cordano, Kevin A | Date of the Letter Agreement | Date of the Letter Agreement |
| Crawford, Todd | Date of the Letter Agreement | Date of the Letter Agreement |
| Davis, Bruce H | Date of the Letter Agreement | Date of the Letter Agreement |
| Davis, Matthew F | Date of the Letter Agreement | Date of the Letter Agreement |
| De Trane, Joseph S | Date of the Letter Agreement | Date of the Letter Agreement |
| Dolan, Kevin P | Date of the Letter Agreement | Date of the Letter Agreement |
| Engle, Howard S | Date of the Letter Agreement | Date of the Letter Agreement |
| Ertmer, Brian R | Date of the Letter Agreement | Date of the Letter Agreement |
| Evans, John Nicolas NYC) | Date of the Letter Agreement | Date of the Letter Agreement |
| Fair, Lisa T | Date of the Letter Agreement | Date of the Letter Agreement |
| Falkenhayn, Carrie-Ann M | Date of the Letter Agreement | Date of the Letter Agreement |
| Fichera, Michael A | Date of the Letter Agreement | Date of the Letter Agreement |
| Flicker, Scott | 28-May-02 | 28-May -02 |
| Fritz, Bradley A | Date of the Letter Agreement | Date of the Letter Agreement |
| Gajek, Marion | Date of the Letter Agreement | Date of the Letter Agreement |
| Garrett, Ken P. | Date of the Letter Agreement | Date of the Letter Agreement |
| Garrett, William Todd | Date of the Letter Agreement | Date of the Letter Agreement |
| Gartland, Edward V | Date of the Letter Agreement | Date of the Letter Agreement |
| Gershman, Edward A | Date of the Letter Agreement | Date of the Letter Agreement |
| Giesemann, Gary L | Date of the Letter Agreement | Date of the Letter Agreement |
| Gold, Andrew D | Date of the Letter Agreement | Date of the Letter Agreement |
| Griffiths, Martin A. | Date of the Letter Agreement | Date of the Letter Agreement |
| Guarascio, Herbert J | Date of the Letter Agreement | Date of the Letter Agreement |
| Guinasso, Jr, Rinaldo L | Date of the Letter Agreement | Date of the Letter Agreement |
| Haleblian, Vicken M | Date of the Letter Agreement | Date of the Letter Agreement |
| Hassell, William P | Date of the Letter Agreement | Date of the Letter Agreement |
| Hempel, Jr, Gardiner (NYC) | Date of the Letter Agreement | Date of the Letter Agreement |
| Herbstman, David | Date of the Letter Agreement | Date of the Letter Agreement |

Confidential

D00967

Exhibit A - Partner Schedule

| | | |
|---|---|---|
| Huesing, Michael A | Date of the Letter Agreement | Date of the Letter Agreement |
| Johnson, Guy S | Date of the Letter Agreement | Date of the Letter Agreement |
| Kamasky, Ann L | Date of the Letter Agreement | Date of the Letter Agreement |
| Kayman, Brian A. | Date of the Letter Agreement | Date of the Letter Agreement |
| Kechik, Keith G | Date of the Letter Agreement | Date of the Letter Agreement |
| Kesner, Michael S | Date of the Letter Agreement | Date of the Letter Agreement |
| Kilinskis, Robert A | Date of the Letter Agreement | Date of the Letter Agreement |
| Klaus, Kenton J | Date of the Letter Agreement | Date of the Letter Agreement |
| Kohl, Russell J | Date of the Letter Agreement | Date of the Letter Agreement |
| Krock, Dennis G | Date of the Letter Agreement | Date of the Letter Agreement |
| Lamela, Jr, Jose S | Date of the Letter Agreement | Date of the Letter Agreement |
| Lange, Daniel S | Date of the Letter Agreement | Date of the Letter Agreement |
| Laughlin, Paul J | Date of the Letter Agreement | Date of the Letter Agreement |
| Leahy, Terrance C | Date of the Letter Agreement | Date of the Letter Agreement |
| Lloveras, Alan G | Date of the Letter Agreement | Date of the Letter Agreement |
| Loden, W L | Date of the Letter Agreement | Date of the Letter Agreement |
| Luebbers, Lawrence A. | May, 28 2002 | 28-May-02 |
| MacNeil, C E | Date of the Letter Agreement | Date of the Letter Agreement |
| Majewski, Raymond A | Date of the Letter Agreement | Date of the Letter Agreement |
| Malone, William P | Date of the Letter Agreement | Date of the Letter Agreement |
| Mann, Charles S | Date of the Letter Agreement | Date of the Letter Agreement |
| Marcheschi, John T | Date of the Letter Agreement | Date of the Letter Agreement |
| McCubbin, Douglas P | Date of the Letter Agreement | Date of the Letter Agreement |
| McElroy, Ted E | Date of the Letter Agreement | Date of the Letter Agreement |
| McGeorge, Anne M. | 16-May-02 | 16-May-02 |
| Mehigan, Patrick B | Date of the Letter Agreement | Date of the Letter Agreement |
| Michaels,Timothy B. | Date of the Letter Agreement | Date of the Letter Agreement |
| Michaletz, Russell V | Date of the Letter Agreement | Date of the Letter Agreement |
| Millett, Nancy S | Date of the Letter Agreement | Date of the Letter Agreement |
| Morrison, Scot A | Date of the Letter Agreement | Date of the Letter Agreement |
| Mott, John G (NYC) | Date of the Letter Agreement | Date of the Letter Agreement |
| Mund, R. S | Date of the Letter Agreement | Date of the Letter Agreement |
| Munger, Daniel H | Date of the Letter Agreement | Date of the Letter Agreement |
| Newman, Andrew C | Date of the Letter Agreement | Date of the Letter Agreement |
| Nosrat, Amin R | 28-May-02 | 28-May-02 |
| Overcash, Timothy G | Date of the Letter Agreement | Date of the Letter Agreement |
| Paul, Alan D | Date of the Letter Agreement | Date of the Letter Agreement |
| Pepin, Dorice E | Date of the Letter Agreement | Date of the Letter Agreement |
| Piazza, James M | Date of the Letter Agreement | Date of the Letter Agreement |
| Pimlott, Christopher J | Date of the Letter Agreement | Date of the Letter Agreement |
| Powers, Daniel A | Date of the Letter Agreement | Date of the Letter Agreement |
| Preston, Michael R | Date of the Letter Agreement | Date of the Letter Agreement |
| Raaf, James J | Date of the Letter Agreement | Date of the Letter Agreement |
| Rasmussen, Kurt D | Date of the Letter Agreement | Date of the Letter Agreement |
| Reid,Wayne D | Date of the Letter Agreement | Date of the Letter Agreement |
| Renner, Barbara L | Date of the Letter Agreement | Date of the Letter Agreement |
| Repetski, Mark S | Date of the Letter Agreement | Date of the Letter Agreement |
| Riordan, Lee A | Date of the Letter Agreement | Date of the Letter Agreement |
| Robeson, Denise B | Date of the Letter Agreement | Date of the Letter Agreement |
| Rosdahl, Vincent M | Date of the Letter Agreement | Date of the Letter Agreement |
| Rosen, Scott R | Date of the Letter Agreement | Date of the Letter Agreement |
| Saake, Ronald D | Date of the Letter Agreement | Date of the Letter Agreement |

Confidential

Exhibit A - Partner Schedule

| | | |
|---|---|---|
| Sabo, Monica M | Date of the Letter Agreement | Date of the Letter Agreement |
| Sash, Robert C (NYC) | Date of the Letter Agreement | Date of the Letter Agreement |
| Scardina, Anthony J | Date of the Letter Agreement | Date of the Letter Agreement |
| Schaar, Marvin B | Date of the Letter Agreement | Date of the Letter Agreement |
| Scheibel, Jr, Wesley G | Date of the Letter Agreement | Date of the Letter Agreement |
| Scherer, Katherine M | Date of the Letter Agreement | Date of the Letter Agreement |
| Serota, Michael J | Date of the Letter Agreement | Date of the Letter Agreement |
| Sharkey, David H | Date of the Letter Agreement | Date of the Letter Agreement |
| Shingledecker, Thomas R | Date of the Letter Agreement | Date of the Letter Agreement |
| Siegel, Robert S | Date of the Letter Agreement | Date of the Letter Agreement |
| Sinsheimer, Robert M | Date of the Letter Agreement | Date of the Letter Agreement |
| Slattery, Michael J | Date of the Letter Agreement | Date of the Letter Agreement |
| Smith, Tod B | Date of the Letter Agreement | Date of the Letter Agreement |
| Sonenthal, Ronald S | Date of the Letter Agreement | Date of the Letter Agreement |
| Sowar, James W. | Date of the Letter Agreement | Date of the Letter Agreement |
| Spudowski, Michael A | Date of the Letter Agreement | Date of the Letter Agreement |
| Stallings, David L | Date of the Letter Agreement | Date of the Letter Agreement |
| Stibich, Michael E | Date of the Letter Agreement | Date of the Letter Agreement |
| Stokke, Michael C | Date of the Letter Agreement | Date of the Letter Agreement |
| Stricof, Robert I (NYC) | Date of the Letter Agreement | Date of the Letter Agreement |
| Sullivan, Gerald P | Date of the Letter Agreement | Date of the Letter Agreement |
| Tache, Robert | Date of the Letter Agreement | Date of the Letter Agreement |
| Tapajna, Joseph J | Date of the Letter Agreement | Date of the Letter Agreement |
| Thomas, Denton N | Date of the Letter Agreement | Date of the Letter Agreement |
| Thompson, Mark C | Date of the Letter Agreement | Date of the Letter Agreement |
| Thorne, Steven A | Date of the Letter Agreement | Date of the Letter Agreement |
| Untermeyer, Brian A | Date of the Letter Agreement | Date of the Letter Agreement |
| Varellas, Lawrence P | Date of the Letter Agreement | Date of the Letter Agreement |
| Walker Jr,Frank W | Date of the Letter Agreement | Date of the Letter Agreement |
| Walker,David Michael | Date of the Letter Agreement | Date of the Letter Agreement |
| Walker,Jeff B. | Date of the Letter Agreement | Date of the Letter Agreement |
| Yankee, David J | Date of the Letter Agreement | Date of the Letter Agreement |

Confidential

# FISCAL 2004 TAX EARNINGS GROUP CRITERIA

## Assessment of Partner Responsibility and Capability

Note: It is expected that the time horizon for this assessment will include all periods for which significant trends can be determined. It is appropriate that the level a partner is performing at varies from category to category and in certain cases materially.

**Appraisal Factor**

| | | Earnings Group 1 | Earnings Group 2 & 3 | Earnings Group 4 & 5 | Earnings Group 6 |
|---|---|---|---|---|---|
| **CLIENTS** | | | | | |
| 1. | Technical and Consulting Skills | Serves our average client | Leads more complex & strategic clients | Provides significant amount of services to strategic clients of the Firm | Provides significant amount of services on at least one of the most important clients of the Firm |
| 2. | Level and Quality of Relationship | Effective relationship with clients | Valued business advisor to senior management of strategic clients and development of preferred tax provider status. | Valued business advisor to senior management of our more important strategic clients, development of preferred tax provider status and significantly higher than average fees and profitability. | Valued business advisor to senior management of most important PTP clients of the firm and/or the highest level of fees and profitability in the national practice. |
| 3. | Functional Specialization and Industry Practice | Practicing in one or more industry or functional specialty areas | A Firm resource practicing in one or more industry or functional specialty areas | Recognized eminence in one of the Firm's industry or functional specialty areas | Leading development of our top partners and has recognized eminence in one of the Firm's most strategic industry or functional specialty areas |
| 4. | Knowledge and Idea Transfer | Makes effective use of Firm databases to bring ideas to clients | Contributes ideas to Firm databases, shares knowledge of ideas with Function | Significant contributor to Firm databases and other communication avenues, consistently champions ideas and approaches that add value to client operations | Shapes and influences Firm culture around sharing of ideas and approaches, leverages personal knowledge of ideas and approaches to Firm and Function |
| 5. | Preferred tax provider | Demonstrated understanding | Demonstrated understanding | Demonstrated understanding | Demonstrate leadership through |

Confidential

D01051

A283

| | | | | | |
|---|---|---|---|---|---|
| | | and active participation in the program with clients and targets. | and active participation in the program with clients and targets and at least one client with significant fees (in the top 50% of their geography/service line) from multiple service lines. | and active participation in the program with clients and targets and several clients with significant fees (in the top 25% of their geography/service line) from multiple service lines | the number and size of PTP relationships and have significantly higher fees and profitability on those clients. Drive development of significant new PTP relationships. |
| 6. | Net Revenues Managed | | Meets average of the tax practice unit | Exceeds tax practice unit and function average | Substantially exceeds tax practice unit and function average |
| 7. | Project Management and Client Profitability | Meets average of the tax practice unit | Exceeds average of the tax practice unit | Exceeds tax practice unit and function average | Substantially exceeds tax practice unit and function average |
| **MARKET FOCUS**<br><br>***Level 1 Fees:**<br>**Gold >$1M, Silver >$500K, Blue Chip >$200K, Growth >$100K** | | | | | |
| 8. | Extended Services Initiated, Including Global Services | Consistently delivers projects and/or generates leads for specialists | Consistently delivers projects and/or generates leads for specialists | Significant volume of extended services to strategic clients in office | Significant volume of extended services to the Firm's most important strategic clients |
| 9. | New Business and Lead Generation | Effective in developing new clients and an active participant on target teams | Demonstrates ability to establish relationships with new targets, and also to generate Level 1* fees with existing targets. | Demonstrates ability to establish relationships with the highest priority targets (in GSC and/or ESC) and to generate fees well in excess of Level 1* with existing clients. | Strategic advisor to a number of GSC/ESC target teams and/or lead partner role on one or more of the Firm's most important targets, with fees well in excess of Level 1. |
| **PEOPLE** | | | | | |
| 10. | Role Model, Mentor, effective team player and develops Successors | Good role model and mentor to staff and team player. | Very good role model to staff and mentor to youngest partners in office and team player. | Our best role models, mentors and team players in the function. | Our best role models, mentors and team players throughout the Firm (in all functions) |
| 11. | Recruit and Develop the Best | Consistently attracts highly talented people | Generally leads a key office Human Resource program and | Generally leads a key Firm Human Resource program and | Consistently attracts highly talented people at the Director |

Confidential

| | | | | | |
|---|---|---|---|---|---|
| | | | develops successors | develops our top partners | and Partner level and mentors our most talented partners. |
| 12. | Ingrain diversity and WIN initiatives into our culture | Very good role model and participates and supports diversity and WIN initiatives | Very good role model and actively supports and leads local office initiative | Very good role model, actively supports and leads local office initiative and impacts culture of geography/service line. | Very good role model, actively supports and leads local office initiative and impacts culture of the firm. |
| 13. | Effective deployment of resources to meet strategic needs | Aware of needs and identifies appropriate resources. | Aware of needs, identifies appropriate resources and actively assists to deploy such resources. | Aware of needs, identifies appropriate resources, actively assists to deploy such resources and volunteers personally as appropriate to firm needs. | Aware of needs, identifies appropriate resources, actively assists to deploy such resources, volunteers personally as appropriate to firm needs and leads initiative to redeploy expertise. |
| **INNOVATION** | | | | | |
| 14. | Quickly bring to market new service lines and offerings. | Demonstrated awareness of full service offerings. | Identification/introduction of other service lines and significant revenue therefrom. | Identification/introduction of other service lines and significant revenue therefrom and recognized leader in marketplace delivering such services. | Identification/introduction of other service lines and significant revenue therefrom and nationally recognized leader in marketplace delivering such services. |
| 15. | Swiftly develop and deliver value added ideas, solutions and processes. | Demonstrated ability to develop and deliver value added ideas and solutions to existing clients and targets. | Demonstrated ability to develop and deliver value added ideas and solutions to existing clients and targets and identified contributions toward development of new ideas/solutions. | Demonstrated ability to develop and deliver value added ideas and solutions to existing clients and targets, identified contributions toward development of new ideas/solutions and recognized leader in their geography or service line. | Demonstrated ability to develop and deliver value added ideas and solutions to existing clients and targets, identified contributions toward development of new ideas/solutions, recognized firm leader in this area and has significant impact on the culture of the firm. |
| 16. | CSM process | Drive CSM process out to clients and targets and submit ideas to national group. | Drive CSM process out to clients and targets, submit ideas to national group and act as a role model for the geography or service line. | Drive CSM process out to clients and targets, submit ideas to national group, act as a role model for the geography or service line and significantly exceed the average amount of CSM ideas sold. | Drive CSM process out to clients and targets, submit ideas to national group, act as a role model for the geography or service line, significantly exceed the average amount of CSM ideas sold and impact the firm culture nationally. |
| 17. | Unleash and apply new | Demonstrate awareness and use | Demonstrate awareness and use | Demonstrate awareness and use | Demonstrate awareness and use |

| | technology/ E-enable service lines. | of firm technology in serving clients. | of firm technology in serving clients and in driving services to targets. | of firm technology in serving clients and in driving services to targets and recognized firm leader. | of firm technology in serving clients and in driving services to targets and lead firm initiative in this area. |
|---|---|---|---|---|---|
| 18. | Develop effective knowledge management processes and tools. | Demonstrated awareness, use of and contribution to firm knowledge management processes and tools. | Demonstrated awareness, use of and contribution to firm knowledge management processes and tools and active mentoring of staff and managers to utilize such processes/tools. | Demonstrated awareness, use of and contribution to firm knowledge management processes and tools, active mentoring of staff and managers to utilize such processes/tools and significant contributions toward development and improvement of new tools. | Demonstrated awareness, use of and contribution to firm knowledge management processes and tools, active mentoring of staff and managers to utilize such processes/tools, significant contributions toward development and improvement of new tools and recognized national leadership in this area. |
| **FIRM SUPPORT/OTHER DUTIES** | | | | | |
| 19. | Support, Participate or Lead Firm wide Programs | Generally supports and participates | Effectively leads firm wide programs and project teams | Effectively leads significant firm wide programs and project teams | Effectively leads significant firm wide programs and project teams |
| **PRACTICE LEADERSHIP** | | | | | |
| **20.** | **Leadership** | | **Positively impacts culture of tax practice unit** | **Positively impacts culture of tax practice beyond area of immediate responsibility** | **Positively impacts culture of firm wide tax practice** |
| **21.** | **Revenue Growth** | | **Average growth** | **Above average growth** | **Growth leader** |
| **22.** | **Profitability** | | **Average profitability** | **Above average profitability** | **Profitability leader** |

Confidential

D01054

A286

Deloitte & Touche LLP
Ten Westport Road
P.O. Box 820
Wilton, CT 06897-0820
USA

Tel: (203) 761-3311
Fax: (203) 423-6311
www.us.deloitte.com

# Memo

**Deloitte & Touche**

Date: May 13, 2003

To: Regional Tax Managing Partners
National Service Line Leaders
National Office Tax Group Leaders

From: Chet Wood

Subject: ***Tax Partner/Principal/Firm Director Appraisal and Earnings Group Review Processes***

The purpose of this memo is to outline this year's Tax Partner/Principal ("partner") and Firm Director ("director") year-end appraisal and earnings group review processes. While we are all very busy bringing FY03 to as successful a close as possible, I ask our leadership group to assist in effectively and efficiently conducting the activities necessary to provide our partners and directors with meaningful feedback on their performance this past fiscal year, and to set the stage for FY04 goal-setting.

**Process Description and Timing** ***(timeline and PSNWeb access instructions attached)***

***Partner/Principal Self-Assessments***

The first step in the Partner Appraisal and EG processes will be the requirement for **all partners** to complete the Tax Partner/Principal Profile Form on the PSNWeb, as well as an assessment of their goal achievements to the extent specific achievements are not captured in the profile form. **Both will be available starting May 14, and must be completed by May 31.** A national communication alerting Tax partners to this requirement, including access instructions and deadlines, is being distributed shortly after this memo. This year, the decision has been made to require the profile form of all partners. This decision was based on the importance of this data to an accurate and complete assessment of partner performance, 'holes' in historical information when not completed every year, and the need for the information when making decisions around partner development and deployment.

***Lead Goal Endorser and RTMP/NSLL/Other Group Leader Appraisals***

Appraisals for Tax Partners/Principals should be entered by the Lead Goal Endorsers (LGEs) in the Partner/Principal/Director Goal Setting & Performance Evaluation section of the PSNWeb ("goal site"). Once completed by partners/directors, Lead Goal Endorsers (LGEs) will have access to their endorsee's profile and goal self-assessment forms, as will RTMPs, NSLLs or Other Group Leaders for partners in their respective groups. It is expected that LGEs, RTMPs, NSLLs and Other Group Leaders will fully consider these forms when completing their appraisals on the PSNWeb. **LGEs must complete their appraisals by June 6, including an overall rating and supporting comments. (Please note that where RTMPs, NSLLs and Other Group Leaders are the assigned LGEs for partners in their constituencies, the deadline for completing the LGE appraisal is June 11 as described below. The June 6 'pre-deadline' for other LGEs is to facilitate RTMP/NSLL/Other Group Leader consideration of LGE ratings/input.)**

In cases where other LGEs are assigned to Tax partners, it is the RTMP's and NSLL's responsibility to consider the assigned LGE's rating/input, and consult with him/her as necessary to achieve consensus on the appropriate rating. Please remind your LGEs that ratings should not be communicated until national clearance has been given.

The goal site is the 'official' location for partner appraisals and the site ultimately accessed by partners to view their appraisals. However, we need to collect the same data in the Earnings Group Review section of PSN ("EG site") in order to test our appraisal results against the Partner/Principal expected distribution model. We have linked the two sites (goal and EG) to the extent feasible to improve efficiencies. LGE ratings will automatically flow to the EG site, where RTMPs and NSLLs are responsible for ensuring appropriate distributions across the rating scale as described below. RTMPs and NSLLs are expected to resolve any discrepancies between the LGE rating and their rating prior to the June 11 deadline further described below. The rating in the EG site will be considered the final rating, and will be reflected in the goal site after the approval process is complete.

RTMPs will enter appraisals for LTS partners in their region, after considering input from the region LTS leader. In light of the formation of the LTS service line this year, Mike Burton will review LTS results at a national level for parity and equity among all LTS partners. NSLLs and Other Group Leaders will enter appraisals for partners in their service line/group.

**RTMPs, NSLLs and Other Group Leaders must submit their ratings in the EG site by June 11. It is expected that the appropriate collaboration between geographies, service lines and market/industry channels will occur throughout this process.**

The Partner/Principal/Firm Director five-point scale, when appropriately applied to our Tax populations and considering the expectations we have of our partners and directors, is expected to result naturally in a distribution as follows:

| Rating | Distribution |
|---|---|
| Exceptional<br>Excellent | 10% – 25%<br>of population |
| Very Good | 60% - 80%<br>of population |
| Good<br>Not Achieved | 5% - 15%<br>of population |

Tax partners' performance should be assessed in relation to specific performance goals and to overall expectations for a specific earnings group – e.g., a partner in Earnings Group 1 would be assessed in relation to goals and expectations of Earnings Group 1 partners. However, in order to achiever population sizes sufficient for reasonable application of the model, the expected distribution will be tested by combining Earnings Groups 1 & 2; 3 & 4, and 5 & 6.

***Quartile Rankings***
RTMPs, NSLLs and Other Group Leaders are asked to provide quartile rankings on the EG site. RTMPs will provide quartile rankings for all Tax partners in their region (including specialists), while NSLLs and Other Group Leaders will provide quartile rankings for their constituencies only. Thus, we will have two views on service line partners, one from the RTMP and one from the NSLL. As with appraisal ratings, quartile rankings should be provided for combined Earnings Groups 1 & 2, 3 & 4, and 5 & 6. **Quartile rankings are due on June 15.**

***Firm Director Processes***
The Firm Director appraisal process runs parallel to the partner process (with the same goal self-assessment, same appraiser input (LGE, RTMP, NSLL, Other Group Leaders), same rating scale and expected distribution model, same approval process, and same deadlines) - with the following notable exceptions:

- Firm Directors will NOT be required to complete the Partner profile form.
- Quartile rankings are NOT required for Firm Directors.
- Firm Director compensation recommendations (base salary and bonus recommendations) are made through the **employee** Compensation Planning System (CPS) and MUST be included in the regional employee submissions **due July 8.**
- The Earnings Group Review process described below does NOT apply to Firm Directors, however there will be a national Director Compensation Committee formed to review director compensation recommendations for equity and parity across the function.

***Earnings Group Review Recommendations***
RTMPs, NSLLs, and appropriate National Office Group Leaders will identify Tax Partners/Principals for earnings group changes. As with appraisals, RTMPs will make recommendations for LTS partners in their region (with consultation with the region LTS leader), and NSLLs and Other Group Leaders will make recommendations for partners in their service lines/groups. The names of Tax partners recommended for an earnings group review, *along with a brief explanation* as to why that Tax partner should be considered for an earnings group change this year, will be submitted on the EG site. **RTMPs, NSLLs and National Office Group Leaders must submit their recommendations by June 11.**

We have attached the Tax Partner Earnings Group Criteria to guide you with parameters for an earnings group adjustment. Moving from one earnings group to another must be approved nationally by the Functional Earnings Group Committees and the Firm's Executive Committee. Review of Tax earnings group recommendations is also performed by Tax Leadership, and concurrence is gained from the market channel as well, to achieve fairness and congruity. Consultation and collaboration is expected early in the process so that individuals involved in the approval and review process from any channel are not surprised by the submissions.

The current earnings allocation system, by design, provides flexibility as to the frequency of consideration for earnings group changes. However, to make fair and consistent decisions across the functions, the Earnings Group Committees will review the status of each partner at least every five years. Tax partners requiring a mandatory five-year review will be identified on the EG site.

***RTMP/NSLL/Other Group Final Concurrence Period***
**From June 11-15, RTMPs, NSLLs and Other Group Leaders are expected to complete final concurrence of ratings (partner and director) and earnings group recommendations** across geographies, service lines and market/industry channels. There is an electronic

approval button in both the goal and EG sites that facilitates the approval process for appraisals, quartile rankings and earnings group review recommendations. **As stated previously, "3Cing" is expected to have occurred throughout the process, and as a result, changes at this stage should be relatively few in number, and will be processed nationally by email request to Peggy McNamara.**

***Tax Earnings Group Review Committee (TEGR)***

The Tax Earnings Group Review Committee (TEGR), chaired by Mark Edmunds, will once again play a key role by making recommendations for the assignment of earnings groups to partners being reviewed in the current year. Consistent with last year, TEGR will perform due diligence on all partners recommended for earnings group changes.

The **TEGR will perform its duties commencing on June 16**. During this process, the TEGR member will meet with partners in leadership positions, the relevant service line/market channel leader, and others who may be in a position to provide important insight into the partner's responsibilities and performance. I would expect that the results of this year's earnings group review process will be communicated to partners in early September after the paypoint process has been concluded.

***I appreciate your assistance and compliance with the indicated deadlines.*** In order to meet firmwide deadlines, I need your assistance in completing the various steps by the indicated dates. If you would like to provide earlier deadlines for your groups, it is up to you to communicate such to your constituents.

Should you have any questions, concerns or recommendations regarding this year's process, please call any of the following:

Kathy McEligot at 415.783.4540
Mark Edmunds at 415.247.5154
Peggy McNamara at 203.761.3311
Jim Orr at 212.492.3723
Chet Wood at 212.492.4065

cc: Regional Managing Partners
Tax Earnings Group Review Committee
National Tax HR Directors

Attachment: Earnings Group Criteria

FISCAL 2003 TAX PARTNER/PRINCIPAL APPRAISAL AND EARNINGS GROUP REVIEW PROCESSES CALENDAR

*PLEASE NOTE THAT THE APPROPRIATE '3CING' IS EXPECTED/REQUIRED THROUGHOUT THE PROCESS BETWEEN GEOGRAPHIES, SERVICE LINES, AND THE MARKET CHANNEL.*

| | |
|---|---|
| *May 13* | *Partner/Principal Appraisal and Earnings Group Review process memo and related attachments sent to RTMPs, NSLLs and National Office Group Leaders, detailing process, timing and deadlines* |
| *May 13* | *National communications to Partners/Principals and to Firm Directors, detailing process requirements, instructions and deadlines* |
| *May 14* | *Tax Partner/Principal Profile Forms, Goal Self-Assessments, and Earnings Group Review / Quartile Rankings / Appraisals are available on-line via PSNWeb.* |
| *May 31* | *Tax Partner/Principal/Firm Director Goal Self-Assessments and Profile Forms to be completed. Profile Forms REQUIRED from all Tax Partners/Principals, but NOT from Firm Directors. Goal Self-Assessments required from both.* |
| *June 6* | *Lead Goal Endorsers complete Partner/Principal and Firm Director appraisals on Goal Setting & Performance Evaluation section of PSN utilizing Profile Forms and Goal Self-Assessments. (Substantive input from other Partners considered in appraisal via Peer Evaluation mechanism on PSN.)* |
| *June 11* | *RTMPs, NSLLs and National Office Group Leaders complete earnings group recommendations and submit Partner/Principal and Firm Director appraisal ratings on Earnings Group Review section of PSNWeb.* |
| *June 11-15* | *RTMPs and NSLLs complete final concurrence of ratings and earnings group review recommendations across geographies, service lines and channels. (NOTE: Since '3Cing' is expected throughout the process, this final review and concurrence is not expected to yield any 'surprises'. '3Cing' will be facilitated prior to June 11 by providing RTMPs with 'read only' access for appraisal ratings of specialists within their geography.)* |
| *June 15* | *Partner Quartile Rankings due from RTMPs, NSLLs and National Office Group Leaders. (NOTE: RTMP quartiles INCLUDE specialists in their geography.)* |
| *June 16-July 11* | *TEGR Committee conducts due diligence and, together with Tax Leadership, develops final Tax Earnings Group recommendations.* |
| *July 8* | *Firm Director base salary and bonus recommendations due with employee data submission using Compensation Planning System (CPS).* |
| *July 11* | *Final Tax Earnings Group Recommendations due to Wilton.* |
| *July 14-17* | *Executive Committee Meeting to review Earnings Group 6 recommendations, overall Earnings Group results, and appraisal averages.* |
| *Aug 27* | *Communication of final appraisal, earnings group and paypoints to individual partners (subsequent to Board of Directors approval on August 29).* |

**Tax Partner/Principal/Firm Director Appraisal and Earnings Group Review Processes**
**Page 6**

***<u>Accessing Partner/Director Goal Setting & Performance Evaluation and Earnings Group Review sites on the PSN Web</u>***

Under *"You & the Firm"* column, go to the "Career" section:

- Select *"Partner/Director Goal Setting & Performance Evaluation"; or*
- Select *"Earnings Group Review"*

*For detailed instructions in each section, select blue "Help" box to view/print instructions.*

**If you experience technical problems, please contact the Personal Service Network at 1-800-335-6488 (1-800-DELOITT), and select Option 2 for Business & Technology.**

Confidential

D01050

A292

**From:** McEligot, Kathleen (US - San Francisco)
**Sent:** Tuesday, August 26, 2003 4:17 PM
**To:** Horn, Patricia (US - Boston); Andrews, Theresa (US - Cleveland); Jaffe, Ellen (US - San Francisco)
**Subject:** FW: Partner performance process

-----Original Message-----
**From:** Severin, Steve (US - Seattle)
**Sent:** Tuesday, August 26, 2003 7:55 AM
**To:** McEligot, Kathleen (US - San Francisco)
**Cc:** Gillon, Elizabeth (US - New York); Orr, Jim (US - Houston); Van Bogart, Barbara (US - Seattle)
**Subject:** FW: Partner performance process

AM forwarding what we have per Jim's request. Barbara has been very actively involved in drafting and monitoring so if you have any questions she can help. Hope this helps

Regards

Steve

Attached is a **sample PIP** which you should tailor to each individual being counseled. ***It is not intended as a template but rather is just an example. Each PIP should be individually tailored to the situation.***

Each PIP **must** include the following information:

A. **Performance issue/deficiency.** The sample PIP has two areas, Net Service Revenue and Business Generation, but you may be dealing with other issues such as billing, HR matters, etc. You must be specific about the performance issues warranting attention.

B. **Expectations.** The sample PIP clearly states the expectations for an individual being counseled. You must be clear about your expectations in **each** performance deficiency area.

C. **Action Plan.** You must work with the partner being counseled to develop a detailed action plan for correcting each deficiency. Action plans should begin immediately. Again, the sample PIP clearly outlines a plan to turn around performance, along with expected timelines for review of performance progress. The first follow up must take place no later than 12/31/03.

D. **Judging Performance.** The PIP should clearly indicate who will ultimately judge performance detailed in the action plan and when. Generally speaking, you will need to see significant and sustained improvement within 3 months.

E. **Consequences.** **Each PIP must contain** possible consequences for failure to improve performance, including loss of additional units and/or asking for resignation. ***There can be no exceptions to this.***

Once you have had the performance discussion with the partner being counseled, you must prepare a memo to the file summarizing the discussion, including the deficiencies, action plan and consequences.

If you have questions while preparing a PIP, please contact myself or Barbara Van Bogart (Seattle) for assistance. In order to provide some structure around this entire process, we will be following up with each of you as you move through the process.

***<<SamplePIP.doc>>***

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. [v.T.1]

Deloitte & Touche LLP
1111 Broadway, Suite 2100
Oakland, CA 94607
USA

Tel: 510-817-2133
Fax: 415-783-9851
www.deloitte.com

# Memo

Deloitte & Touche

Date: August 5, 2003

To:

From:

Subject: Performance Improvement Plan

**THIS IS A SAMPLE PERFORMANCE IMPROVEMENT PLAN AND IS FOR GUIDANCE PURPOSES ONLY. PLEASE DO NOT USE IT AS A TEMPLATE. YOU SHOULD IDENTIFY AND ADDRESS EACH PERFORMANCE ISSUE FOR THE PARTNER BEING COUNSELED SEPARATELY.**

On Monday, August 4, ______________ and ______________ met with you to discuss your performance for FY 03. You have been rated as "not achieved" for FY 03. As we discussed, the minimum expectations for tax partners in your SLIP is combined net service revenue and business generation from new engagements of $3,000,000. We of course would hope for performance in excess of that minimum. In addition, we would expect managed revenue commensurate with other partners in your area of practice, which at present is least $4 million.

In order to ramp up both your net service revenue and your business generation and managed revenues, we will implement the following program for the next three months. _______ will touch base with you at least _________ to follow-up and assist. You should also feel free to reach out to me as well. I will meet with you formally once a month to review your progress, and both ______ and I will meet with you formally at the end of 90 days.

**Net Service Revenue**

We will identify approximately six client service opportunities where we believe you can render meaningful assistance. We would also ask you to remain vigilant for client service opportunities, and for you to bring those to the attention of us so that we can be in a position to assist you in selecting the projects that will make best use of your skill set and maximize your exposure to clients.

**Business Generation**

As we made clear in our discussions, you will have to be the primary driver of your business generation efforts, but we will provide assistance to you in reaching your goal. From your side, you need to take inventory of all your relationships and potential opportunities, working with________ over the next two weeks to reduce this inventory to writing, with an action plan on how to play out these relationships and opportunities on an expedited basis. We will also develop a list of opportunities for you to pursue. ____________ will take the lead in identifying these opportunities and working with you to set up the

pursuit. We will work with you to try to match up your client service opportunities and your business generation opportunities so that you can accomplish both in serving your clients.

At the end of the three months, we would expect that you will have logged significant client service hours (at least ___ client service hours) and have credited sales in excess of $__________. In addition, we will review your workflow and sales pipeline to see if your trajectory is such that you are on target to meet your annual goals.

As we discussed in our meeting, it is our goal to help you through these performance issues and become successful with the Firm. However, if you are unable to make immediate and sustained improvement, you may be subject to further action up to and including unit reduction, request for resignation from the firm, or other appropriate actions.

We remain committed to your success.

cc: Jim Orr
Chet Wood

**From:** Severin, Steve (US - Seattle)
**Sent:** Thursday, September 04, 2003 7:05 PM
**To:** Marcos, Frank (US - New York)
**Cc:** Orr, Jim (US - New York); Wood, Chet (US - New York)
**Subject:** FW: Partner Performance Process-NE

<<Northeast short list.xls>> ***Frank on your protected people just copy their goals from PSNWEB as their PIPs.***

**From Jim Orr and Steve Severin**

**Attached is a list of those partners within your geographic/service line who have significant performance issues. Geographic partners will receive a list of all non-performing partners within their region while SLIP leaders will receive a list of partners within their SLIP.**

**As we communicate the results of our evaluation and compensation process to our partners, we need to address the issue of partners performing below our expectations. Our clear objective is to help the partner improve and contribute to the firm at a level where both the firm and the partner are satisfied. In the past, we have done this in an inconsistent manner. The purpose of this process going forward is to put structure and accountability around the process. This is not intended as "more meaningless forms" from national, but rather we must have a consistent and well-documented process.**

1. Any partner rated "Good" or "N/A" for FY03 is on this list.

2. Partners were categorized in 4 groups. A few may fall into more than one. Also, while we have tried to ensure 100% accuracy, please review and let us know of any additions, deletions or corrections.

A. Partner is on a short-term PIP. We will evaluate on 12/31/03 and decide on a course of action. Course of action may include asking the partner to resign. All former Andersen partners were placed in this category. The reason for this is that a decision must generally be made by December 31 as to whether the partner should be asked to resign. If you believe that the partner is clearly one which we should retain please advise and we will move to group B.

B. Partner is on a long-term PIP. We will touch base on a periodic basis, but generally no decisions will be made until next year's evaluation process.

C. We are actively working on obtaining the partner's resignation or should start that process now.

D. Partners who have told us they will not resign. We should have a PIP in place to maximize that partner's contribution.

3. For each partner on this list, we must have a written PIP in place by September 30. Attached is a **sample PIP which you should tailor to each individual being counseled.** Each PIP **must** include the following information:

A. **Performance issue/deficiency.** The sample PIP has two areas, Net Service Revenue and Business Generation, but you may be dealing with others such as billing, HR matters, etc. You must be specific about the performance issues warranting attention.

B. **Expectations**. The sample PIP clearly states the expectations for an individual being counseled. You must be clear about your expectations in each performance deficiency area.

C. **Action Plan**. You must work with the partner being counseled to develop a detailed action plan for correcting each deficiency. Action plans should begin immediately. Again, the sample PIP clearly outlines a plan to turn around performance, along with the expected timelines for review of performance progress. The first follow up must take place no later than 12/31/03.

D. **Judging Performance**. The PIP should clearly indicate who will ultimately judge performance detailed in the action plan and when. Generally speaking, you will need to see significant and sustained improvement within three months.

E. **Consequences**. **Each PIP must contain** possible consequences for failure to improve performance, including loss of additional units and/or asking for resignation. **There can be no exceptions to this.**

Once you have had the performance discussion with the partner being counseled, you must prepare a memo to the file summarizing the discussion, including the deficiencies, action plan and consequences.

If you have questions while preparing a PIP, please contact Steve Severin or Barbara Van Bogart (Seattle) for assistance. In order to provide some structure around this entire process, we will be following up with each of you as you move through the process.

4. If you have a PIP in place already or when you complete a new one, please forward a copy to Steve Severin.

5. For anyone in category A or C, you should review the file to ensure that we have appropriate documentation of the partner's performance, evaluations, etc.

Chet has promised the RMPs that he will let them know what is happening in their regions. He will be sending this list to them in about a week after this e-mail. In the event you have not completed your 3cs, this will give you a chance.

**About Deloitte**
Deloitte refers to one or more of Deloitte Touche Tohmatsu, a Swiss Verein, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.com/about for a detailed description of the legal structure of Deloitte Touche Tohmatsu and its member firms. Please see www.deloitte.com/us/about for a detailed description of the legal structure of Deloitte LLP and its subsidiaries. [v.I.1]

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message.

Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. [v.E.1]

| Name | Cluster | SLIP | Status | Geog. Leader | SLIP leader |
|---|---|---|---|---|---|
| CHAPMAN, DIANA B. | NEW ENGLAND TAX CLUSTER | IT LESS TP | B | marcos | lange |
| PAUL, ALAN | NEW ENGLAND TAX CLUSTER | LTS | A | marcos | |
| GARTLAND, EDWARD V. | NEW ENGLAND TAX CLUSTER | MS | A | marcos | leikam |
| AGNEW, JEFF | TS TAX CLUSTER | GEIS EB | D | marcos | zesk |
| HECHT, LISA | TS TAX CLUSTER | GEIS EB | C | marcos | zesk |
| ARONSON, PAUL | TS TAX CLUSTER | IT LESS TP | D | marcos | lange |
| CHIP, WILLIAM W | TS TAX CLUSTER | IT LESS TP | D | marcos | lange |
| POWELL, LAWRENCE D. | TS TAX CLUSTER | IT TP | B | marcos | dodge |
| CURRY, SUSAN | TS TAX CLUSTER | LTS | A | marcos | |
| FERRARA, JAMES | TS TAX CLUSTER | LTS | A | marcos | |
| FICHERA, MIKE | TS TAX CLUSTER | LTS | C | marcos | |
| KNOLL, MINA | TS TAX CLUSTER | LTS | D | marcos | |
| STEPHENSON, GREGORY L. | TS TAX CLUSTER | LTS | B | marcos | |
| GLEDHILL, BRIAN E | TS TAX CLUSTER | MS | C | marcos | leikam |
| WEISS, RICHARD | TS TAX CLUSTER | LTS | D | marcos | |
| HANRAHAN, BARBARA | TS TAX CLUSTER | LTS | D | marcos | |

# Deloitte & Touche
## Win As One
### FY 2003 Partner/Principal/Director Goal Setting and Evaluation

Partner/Principal/Director: **ALAN PAUL** Channel: **TOTAL TAX** Office: **NEW ENGLAND – TAX**

***Section I - Partner/Principal/Director Performance Goals***

**Goal Form**

**Use this form to enumerate 2 or 3 goals for each area of critical importance.**

**Market Focus**
**Please describe your goals as they pertain to Market Focus, with a special emphasis on selling services.**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Effectively transition as many Andersen clients as possible to D&T | Transition clients with audit and tax fees of at least $1 million | 1)Introduce clients to D&T team and make them comfortable with the choice to come to D&T |
| Actively pursue banking clients and develop D&T's credentials in the area of community banks | At least three new clients with total tax fees in excess of $200,000 | Work with audit on targeting and proposal activity.<br>Work with Tri state group to transition some tax work to Boston to build credentials |

| | Goal | Actual |
|---|---|---|
| Targeted A/R Week O/S | 12.0 | 12.4 |
| Estimated Aggregate Revenue Managed | $ 2,000k | $ 1,400k |
| Targeted Annual Client Service Hours | 900 | 860 |
| Personal Aggregate Sales Goal | $ 1,000k | $ 1,000k |

**Clients**
**Please describe your goals as they pertain to Clients (focusing on service excellence, sales to clients and receivable billing and collection).**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Work with Seacoast Financial to impress them with our industry knowledge and get a shot at their audit work | Opportunity to increase work at the company with eventually a propoasl for the audit | Show senior management that we will be better service providers for them than KPMG |
| Become the preferred provider for Chevron in the tax credit area. | Obtain multiple projects from them in the tax credit work | Provide timely excellent service to them as projects come up. Meet with client and their advisors on a regular basis. |

**People**
**Please describe your goals as they pertain to our People (with a focus on the 3 D's, the appropriate management of headcount, utilization, mentoring, and morale).**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Help the transition from Andersen for our new colleagues | Success in retaining and developing people | Open communication with employees |

**Innovation**
**Please describe your goals as they pertain to Innovation with an emphasis on innovative services, new business models, using technology and knowledge creation, and dissemination.**

Paul73

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|

**FY 2003 Partner/Principal/Director Goal Setting and Evaluation**

| Develop competency in tax credits associated with historic rehabilitation and New Markets Credit | At least three projects totalling $400,000 in fees | Training of people and publicity of our skills internally and externally. |
|---|---|---|

**Evaluation/Rating**

Goal Accomplishments/ Self-Evaluation

Lead Endorser's Evaluation of Accomplishments Above

| Goal Accomplishment Rating: | Good |
|---|---|

**Lead Goal Endorser**

VINCENT DEGUTIS

**Other Endorser Comment on Preliminary Goals**

No Other Assigned Goal Endorser/Appraiser(s) have been assigned at this time

**Goal-Setting Agreement between Partner/Principal/Director and Lead Goal-Endorser**

We confirm our agreement on the partner/principal/director goals set forth in this document. We also understand that the lead goal-endorser is charged with gaining the necessary approvals at the appropriate cluster and National levels before signing off on these goals.

| Please signify your agreement by checking the box next to your name and entering the date. | | Agreed | Date |
|---|---|---|---|
| Partner/Principal/Director: | ALAN PAUL | ☐ | |
| Lead Goal Endorser: | VINCENT DEGUTIS | ☑ | 7/31/2002 |

## FY 2003 Partner/Principal/Director Goal Setting and Evaluation

*Section II - Summary of Mid-Year Touch-Points*

| | On Track | Necessary Adjustments and Next Steps |
|---|---|---|
| Goal Form | ☑ | Work in community bank area is less active than hoped. Need to become more involved with new audit proposals. |

**Mid-Year Touch-Point Agreement**

I have reviewed the above summary information during a mid-year discussion and expect to pursue any unmet goals based on the recommended adjustments and next steps.

| | | Agreed | Date |
|---|---|---|---|
| Partner/Principal/Director: | ALAN PAUL | ☑ | 2/1/2003 |
| Lead Goal Endorser: | VINCENT DEGUTIS | ☑ | 2/1/2003 |

# FY 2003 Partner/Principal/Director Goal Setting and Evaluation

*Section III - Evaluation Summary*

**Performance Evaluation**

- The lead goal endorser is responsible for accumulating input from assigned endorsers and others
- Performance rating for each of the six strategic categories (completed in Goal Setting Section). Please assign the numeric rating which corresponds to the appropriate performance level:

| Rating | | Performance Rating |
|---|---|---|
| Exceptional | = | Results have significantly surpassed goals/contribution expectations. |
| Excellent | = | Results have more than achieved goals/contribution expectations. |
| Very Good | = | Results have achieved goals/contribution expectations. |
| Good | = | Results are mixed but have achieve some goals/contribution expectations. Further development is necessary. |
| Not Achieved | = | Results did not achieve a majority of goals/contribution expectations. |

| | | Recommended Rating |
|---|---|---|
| Goal Form/Evaluation | = | Good |

- **Other Strategic Accomplishments**

Please describe any other noteworthy accomplishments which are not identified in any formal goal category, but are consistent with the firm's strategic direction.

**Lead Endorser's Evaluation of Other Strategic Accomplishments**

| Other Accomplishments Rating |
|---|
| |

**Final Overall Appraisal Rating**

Please enter the final appraisal rating based on your judgement of all performance factors for the year:

Good

**Comments and Summary**

**Partner/Principal/Director Comments and Summary**

**Lead Goal Endorser Comments and Summary**

VINCENT DEGUTIS

Alan had a good year. He fell short of various financial metrics but has gained momentum as the year has progressed. He needs to continue to focus on teaming and working with other partners (all functions) to serve his clients and win in the marketplace. Alan did a very good job of working to integrate new professionals to the firm. He served on my partner/director admissions committee and performed well. Alan is very thoughtful. I would like him to continue to express his views and work towards solutions more aggressively.

**Other Endorser Comments and Summary**

No Other Assigned Goal Endorser/Appraiser(s) h

**Evaluation Summary Agreement**

I have reviewed the above evaluation and summary comments as part of the year-end evaluation process.

| | | Agreed | Date |
|---|---|---|---|
| Partner/Principal/Director: | ALAN PAUL | ☐ | |
| Lead Goal Endorser: | VINCENT DEGUTIS | ☐ | |
| | | ☐ | |

Paul76

Northeast Tax
ACCOUNTS RECEIVABLE SUMMARY BY BILLING PARTNER
*FINAL LIST FOR CAP*

| Partner/Director | Period 8 | | | | Trend in % Over 90 to Total Billed | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Outstanding | RE861 Over 90 | % | Current Reserve | 2004 - 07 | 2004 - 06 | 2004 - 05 | 2004 - 04 | 2004 - 03 | 2004 - 02 | 2004 - 01 | RC7 |
| HOLT, N | 1,459,869 | 315,032 | 22% | 76,194 | 28.9% | 27.7% | 42.0% | 69.1% | 68.6% | 4.0% | 2.4% | 6441 |
| SMOLENS, R | 373,834 | 298,500 | 80% | 5,800 | 61.2% | 75.0% | 26.8% | 22.3% | 28.8% | 34.0% | 20.0% | 6430 |
| SHAFIK, M | 385,125 | 280,200 | 73% | 60,095 | 86.4% | 86.7% | 74.1% | 71.6% | 82.0% | 86.6% | 23.7% | 6539 |
| CARNEVALE, M | 525,618 | 254,201 | 48% | 102,616 | 33.6% | 32.6% | 40.0% | 31.5% | 13.1% | 29.5% | 26.8% | 6430 |
| CATALANO, J | 512,975 | 212,090 | 41% | 40,018 | 30.5% | 52.5% | 51.9% | 35.4% | 30.3% | 45.4% | 48.3% | 6022 |
| NECZYPOR, F | 1,082,050 | 196,030 | 18% | 76,991 | 40.1% | 40.4% | 48.8% | 47.6% | 43.4% | 73.2% | 57.1% | 712 |
| OATES, K | 724,828 | 194,621 | 27% | 93,677 | 25.7% | 28.9% | 24.7% | 36.8% | 24.4% | 36.8% | 19.0% | 548 |
| DEJESUS, J | 471,901 | 185,683 | 39% | 38,537 | 0.7% | 36.9% | 0.3% | 0.4% | 0.2% | 0.4% | 0.4% | 6431 |
| MARIA III, M | 516,449 | 167,162 | 32% | 3,760 | 32.0% | 42.4% | 37.3% | 50.9% | 28.8% | 39.0% | 13.3% | 6452 |
| HARPER, J | 263,084 | 164,917 | 63% | 82,458 | 71.4% | 71.6% | 100.0% | 3.7% | 3.7% | 7.7% | 26.5% | 6467 |
| NIEMIEC, J | 437,020 | 159,625 | 37% | 31,138 | 31.6% | 23.0% | 23.6% | 41.1% | 23.3% | 28.4% | 28.5% | 6428 |
| DISCEPOLO, A | 579,780 | 155,833 | 27% | 53,989 | 27.8% | 33.8% | 27.3% | 22.6% | 24.9% | 35.0% | 38.0% | 6445 |
| DEGAND, M | 428,375 | 147,587 | 34% | 50,052 | 71.6% | 80.6% | 76.2% | 73.0% | 60.8% | 78.9% | 73.6% | 6441 |
| PIAZZA, J | 1,160,065 | 141,751 | 12% | 18,830 | 17.3% | 16.2% | 9.4% | 10.3% | 30.5% | 13.7% | 31.9% | 6431 |
| GALATI, D | 291,620 | 134,091 | 46% | 50,325 | 72.8% | 43.5% | 68.3% | 75.6% | 36.4% | 21.4% | 26.5% | 6296 |
| CALLENDER, J | 285,084 | 132,150 | 46% | 58,605 | 50.0% | 46.5% | 64.5% | 10.7% | 12.5% | 24.7% | 65.1% | 6429 |
| MACARTHUR, B | 736,822 | 131,272 | 18% | 35,073 | 9.7% | 16.9% | 15.5% | 17.7% | 31.8% | 22.7% | 35.0% | 712 |
| CHAPMAN, D | 189,140 | 130,550 | 69% | 47,550 | 69.0% | 29.8% | 44.5% | 33.7% | 16.1% | 100.0% | 100.0% | 777 |
| LOGAN, D | 617,850 | 122,850 | 20% | 24,570 | 1.5% | 1.9% | 0.0% | 37.7% | 24.9% | 58.6% | 8.3% | 6427 |
| PAUL, A | 328,125 | 119,425 | 36% | 41,210 | 20.3% | 30.0% | 27.8% | 54.5% | 24.2% | 18.3% | 19.7% | 712 |
| WICKHAM, R | 454,869 | 119,314 | 26% | 58,561 | 24.1% | 64.6% | 45.3% | 17.3% | 22.9% | 24.5% | 35.7% | 712 |
| GREEN, D | 720,307 | 119,267 | 17% | 18,098 | 23.5% | 19.2% | 11.1% | 3.0% | 26.7% | 2.9% | 0.0% | 6431 |
| OAS, D | 493,476 | 108,501 | 22% | 36,250 | 41.2% | 43.8% | 31.9% | 23.9% | 26.5% | 84.1% | 7.1% | 6441 |
| LIPSCHITZ, N | 299,736 | 107,631 | 36% | 55,091 | 32.8% | 41.9% | 40.3% | 54.2% | 27.9% | 27.1% | 26.0% | 6452 |
| GREENBLATT, P | 142,750 | 101,500 | 71% | 22,250 | 10.0% | 9.0% | 24.6% | 0.0% | 12.7% | 15.0% | 31.9% | 6452 |
| KLINE, M | 813,272 | 100,830 | 12% | 24,605 | 14.0% | 49.9% | 7.1% | 13.2% | 14.3% | 10.6% | 44.5% | 688 |
| KRAEMER, L | 599,264 | 98,195 | 16% | 3,026 | 20.0% | 17.8% | 17.5% | 23.1% | 28.7% | 24.5% | 24.0% | 6491 |
| COMSTOCK JR., R | 332,865 | 97,785 | 29% | 25,375 | 19.6% | 35.7% | 53.8% | 36.9% | 37.1% | 57.6% | 43.5% | 6452 |
| RIEGER, J | 241,660 | 94,300 | 39% | - | 32.2% | 0.0% | 12.7% | 10.2% | 18.1% | 8.7% | 5.8% | 6428 |
| DENNING, R | 101,715 | 91,615 | 90% | - | 35.3% | 80.2% | 50.0% | 52.1% | 40.4% | 86.6% | 62.8% | 528 |
| PIZZIMENTI, J | 96,242 | 89,500 | 93% | 45,500 | 36.8% | 36.9% | 36.9% | 83.5% | 83.3% | 71.7% | 100.0% | 6342 |
| CALVIN, J | 917,749 | 83,374 | 9% | 11,704 | 22.0% | 31.6% | 37.1% | 32.4% | 33.2% | 24.3% | 47.8% | 528 |
| FORLINI, C | 250,892 | 77,431 | 31% | 27,267 | 36.1% | 38.9% | 37.2% | 25.8% | 31.4% | 58.2% | 55.9% | 6441 |
| CABALLERO, J | 356,532 | 75,544 | 21% | 14,623 | 6.3% | 5.0% | 4.2% | 15.6% | 12.7% | 9.6% | 10.1% | 6431 |
| SIEGEL, C | 111,841 | 71,500 | 64% | 26,300 | 33.2% | 24.1% | 22.2% | 32.6% | 32.6% | 38.7% | 0.0% | 6435 |
| HEMPEL JR., G | 890,604 | 67,124 | 8% | 22,847 | 26.8% | 12.1% | 12.4% | 14.6% | 20.4% | 50.3% | 43.0% | 6441 |
| ACAMPORA, D | 383,269 | 66,600 | 17% | 16,020 | 17.4% | 22.8% | 23.4% | 19.6% | 29.8% | 25.2% | 27.6% | 6335 |
| ZWERLING, S | 301,300 | 65,500 | 22% | 6,100 | 15.2% | 52.1% | 17.2% | 13.7% | 19.8% | 17.9% | 73.1% | 6428 |

D00316

**Northeast Tax**
ACCOUNTS RECEIVABLE SUMMARY BY BILLING PARTNER
*FINAL LIST FOR CAP*

| | Period 8 | | | | Trend in % Over 90 to Total Billed | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Partner/Director | Outstanding | RE861 Over 90 | % | Current Reserve | 2004 - 07 | 2004 - 06 | 2004 - 05 | 2004 - 04 | 2004 - 03 | 2004 - 02 | 2004 - 01 | RC7 |
| PORTER, M | 102,122 | 63,809 | 62% | 17,991 | 26.6% | 42.8% | 42.8% | 72.1% | 100.0% | 89.8% | 74.2% | 778 |
| MONTAGUE, L | 295,443 | 62,503 | 21% | 33,993 | 12.4% | 23.6% | 54.0% | 44.4% | 51.0% | 25.7% | 41.0% | 6338 |
| DONADIO, A | 85,500 | 57,500 | 67% | - | 49.1% | 35.6% | 3.1% | 4.3% | 4.7% | 14.1% | 0.0% | 6430 |
| HATZIS, P | 74,660 | 54,900 | 74% | 43,525 | 76.0% | 67.0% | 55.8% | 67.3% | 66.5% | 53.8% | 39.5% | 5949 |
| MLYNARSKI, P | 300,905 | 54,331 | 18% | 21,059 | 25.9% | 22.5% | 13.8% | 21.8% | 13.6% | 11.6% | 27.1% | 6431 |
| TEICHER, A | 50,000 | 50,000 | 100% | 50,000 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 6438 |

D00317

Confidential

| | | | Collections | | | | Billings | | | | Combined | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Group # | Level 6 | % of Collection Goal Attained - Prd 6 | % of Collections Goal Attained Prd 7 | % of Collections Goal Attained Prd 8 | Collection Average | % of Billing Goal Attained - Prd 6 | % of Billings Goal Attained Prd 7 | % of Billing Goal Attained Prd 8 | Billing Average | % of Billing Goal Attained - Prd 6 | % of Billings Goal Attained Prd 7 | % of Billing Goal Attained Prd 8 | Combined Average | Combined Average |
| COFFEY, C | 3 | INTL | 0.00% | 63.39% | 2.22% | 21.87% | 0.00% | 9.96% | 0.00% | 3.32% | 0.00% | 36.67% | 1.11% | 12.60% | 12.60% |
| CHAPMAN, D | 7 | INTL - NE | 0.00% | 16.35% | 48.61% | 21.65% | 30.24% | 4.84% | 16.75% | 17.28% | 15.12% | 10.59% | 32.68% | 19.46% | 19.46% |
| KENNEDY, J | 1 | INTL | 0.00% | 82.85% | 0.00% | 27.62% | 0.00% | 30.64% | 8.95% | 13.20% | 0.00% | 58.75% | 4.48% | 20.41% | 20.41% |
| SHAFIK, M | 6 | MS | 62.95% | 3.72% | 30.81% | 32.50% | 13.39% | 0.00% | 25.98% | 13.11% | 38.17% | 1.86% | 28.39% | 22.81% | 22.81% |
| OAS, D | 6 | GEIS - IAS | 50.76% | 30.34% | 0.00% | 27.03% | -4.81% | 4.35% | 96.01% | 31.85% | 22.97% | 17.34% | 48.01% | 29.44% | 29.44% |
| GREENBLATT, P | 5 | LTS | 0.00% | 47.99% | 94.32% | 47.44% | 35.65% | 7.73% | 8.12% | 17.17% | 17.82% | 27.86% | 51.22% | 32.30% | 32.30% |
| HOLT, N | 6 | GEIS - IAS | 11.22% | 14.72% | 33.74% | 19.89% | 43.21% | 41.89% | 62.54% | 49.21% | 27.21% | 28.31% | 48.14% | 34.55% | 34.55% |
| CATALANO, J | 5 | INTL | 6.48% | 0.00% | 46.53% | 17.67% | 22.44% | 71.07% | 61.72% | 51.74% | 14.46% | 35.54% | 54.12% | 34.71% | 34.71% |
| CALLENDER, J | 4 | LTS | 0.00% | 26.87% | 27.93% | 18.27% | 65.71% | 38.81% | 55.69% | 53.40% | 32.86% | 32.84% | 41.81% | 35.84% | 35.84% |
| DEGUTIS, V | 7 | LTS - NE | 23.52% | 81.40% | 43.36% | 49.43% | 33.56% | 43.63% | -3.51% | 24.56% | 28.54% | 62.51% | 19.93% | 36.99% | 36.99% |
| NECZYPOR, F | 7 | LTS - NE | 41.34% | 60.01% | 49.41% | 50.25% | 48.69% | -32.44% | 59.91% | 25.39% | 45.02% | 13.78% | 54.66% | 37.82% | 37.82% |
| CABALLERO, J | 1 | LTS | 29.13% | 98.31% | 73.84% | 67.09% | 7.30% | 3.99% | 28.70% | 13.33% | 18.21% | 51.15% | 51.27% | 40.21% | 40.21% |
| WETZLER, J | 4 | MS | 165.29% | 0.00% | 54.55% | 73.28% | 0.00% | 34.43% | 0.00% | 11.48% | 82.64% | 17.21% | 27.27% | 42.38% | 42.38% |
| LANGER, A | 3 | GEIS - PCA | 83.67% | 57.45% | 60.90% | 67.34% | 36.54% | 29.50% | 13.31% | 26.45% | 60.10% | 43.47% | 37.11% | 46.89% | 46.89% |
| GALATI, D | 6 | PROP TAX | 17.82% | 78.56% | 27.77% | 41.32% | 108.47% | 49.72% | 4.78% | 54.32% | 63.05% | 64.14% | 16.28% | 47.82% | 47.82% |
| CARAMELLO JR., S | 7 | LTS - NE | 102.17% | 68.68% | 16.45% | 62.43% | 27.29% | 36.18% | 42.93% | 35.47% | 64.73% | 52.43% | 29.69% | 48.95% | 48.95% |
| WICKHAM, R | 7 | LTS - NE | 63.12% | 114.16% | 34.61% | 70.63% | 11.34% | 56.25% | 23.56% | 30.38% | 37.23% | 85.21% | 29.09% | 50.51% | 50.51% |
| NIEMIEC, J | 4 | LTS | 71.12% | 54.47% | 2.06% | 42.55% | 26.90% | 61.89% | 86.70% | 58.50% | 49.01% | 58.18% | 44.38% | 50.52% | 50.52% |
| HEMPEL JR., G | 8 | GEIS - IAS | 21.11% | 96.95% | 89.55% | 69.20% | 21.89% | 44.81% | 29.21% | 31.97% | 21.50% | 70.88% | 59.38% | 50.59% | 50.59% |
| MORROW, G | 2 | LTS | 57.77% | 140.86% | 26.34% | 74.99% | 47.13% | 7.14% | 29.06% | 27.78% | 52.45% | 74.00% | 27.70% | 51.38% | 51.38% |
| KAUPP, E | 7 | LTS - NE | 64.87% | 111.16% | 89.69% | 95.24% | 7.98% | 16.06% | 0.00% | 8.01% | 46.43% | 63.61% | 44.84% | 51.63% | 51.63% |
| FORLINI, C | 6 | GEIS - IAS | 36.80% | 58.05% | 27.05% | 40.63% | 37.21% | 58.10% | 104.08% | 66.46% | 37.01% | 58.07% | 65.57% | 53.55% | 53.55% |
| HUNT, N | 7 | LTS - NE | 27.03% | 120.86% | 91.88% | 79.92% | 39.35% | 3.40% | 38.92% | 27.22% | 33.19% | 62.13% | 65.40% | 53.57% | 53.57% |
| TRUDELL, L | 7 | LTS - NE | 117.45% | 134.51% | 34.87% | 95.61% | 10.08% | 27.27% | 3.82% | 13.72% | 63.76% | 80.89% | 19.34% | 54.67% | 54.67% |
| KIM, C | 5 | LTS | 42.81% | 138.17% | 60.02% | 80.33% | 0.00% | 50.34% | 42.83% | 31.06% | 21.40% | 94.26% | 51.42% | 55.69% | 55.69% |
| SCHWARTZ, B | 5 | LTS | 75.90% | 39.17% | 46.19% | 53.75% | 78.03% | 67.65% | 36.52% | 60.74% | 76.96% | 53.41% | 41.36% | 57.24% | 57.24% |
| STEIGER, M | 6 | LTS | 0.00% | 243.50% | 0.00% | 81.17% | 0.00% | 107.57% | 0.00% | 35.86% | 0.00% | 175.53% | 0.00% | 58.51% | 58.51% |
| KRAEMER, L | 5 | LTS | 65.88% | 64.95% | 36.12% | 55.65% | 112.72% | 32.62% | 43.18% | 62.84% | 89.30% | 48.78% | 39.65% | 59.24% | 59.24% |
| SMOLENS, R | 3 | LTS | 51.95% | 84.59% | 55.65% | 64.06% | 57.56% | 82.53% | 24.99% | 55.03% | 54.76% | 83.56% | 40.32% | 59.54% | 59.54% |
| PAUL, A | 7 | LTS - NE | 102.49% | 37.85% | 125.94% | 88.76% | 20.14% | 32.43% | 41.24% | 31.27% | 61.32% | 35.14% | 83.59% | 60.02% | 60.02% |
| STOCK, R | 1 | LTS | 98.55% | 72.25% | 83.63% | 84.81% | 67.82% | 34.18% | 4.62% | 35.54% | 83.18% | 53.22% | 44.12% | 60.17% | 60.17% |

BOSTON LTS PARTNERS
FY 2003

| Last Name | First Name | Units | Unit Earnings | Rating | Revenue Goal | Actual Total Revenue | Chargeable Hour Goals | Actuatl Chargeable Hours | |
|---|---|---|---|---|---|---|---|---|---|
| Berkowitz | Mark E | 860 | 800,626 | VG | 2,000,000 | 2,313,000 | 1,400 | 931 | |
| Caramello | Stephen J. | 370 | 344,455 | EXCL | 3,250,000 | 2,646,000 | 1,100 | 913 | |
| DeGutis | Vincent M. | 540 | 502,718 | VG | 1,750,000 | 1,600,000 | 400 | 401 | |
| Drake | Judeth | 360 | 335,146 | VG | 1,500,000 | 1,508,000 | 900 | 735 | |
| MacArthur | Brian P | 300 | 279,288 | EXCL | 2,750,000 | 3,068,000 | 1,000 | 1,008 | |
| Neczypor | Francis M. | 600 | 549,060 | VG | 3,500,000 | 3,715,000 | 1,450 | 1,220 | |
| Paul | Alan D. | 780 | 726,149 | Good | 2,000,000 | 1,515,000 | 900 | 860 | |
| Perrone | Jeffrey N. | 340 | 316,526 | VG | 2,800,000 | 2,712,000 | 1,400 | 1,177 | |
| Simmons | Bradford G. | 270 | 251,359 | VG | 2,250,000 | 1,974,000 | 1,400 | 731 | |
| Smith | Wayne E. | 410 | 388,196 | VG | 2,250,000 | 1,144,000 | 1,000 | 999 | |
| Trudell | Leonard D. | 390 | 363,074 | VG | 2,500,000 | 1,207,000 | 1,000 | 1,095 | |
| Wickham | Robert C. | 510 | 466,701 | VG | 3,500,000 | 2,450,000 | 1,100 | 1,044 | |

**From:** Paul, Alan D (US - Boston)
**Sent:** Friday, February 13, 2004 2:23 PM
**To:** Marcos, Frank (US - New York)
**Cc:** Horn, Patricia (US - New York)
**Subject:** FW: Response

At the time of my goal setting my understanding was that my function was to make introductions and generate legitimate opportunities for CTS projects. It was explained that the CTS specialists were much better equipped to handle the actual sales call, overcome objections, and finalize the engagement. I believe my introductions, both previously and currently have met my goal for performance and I do not have a shortfall to make up.
As a partner in the firm, my focus always includes opportunities to bring our services to bear on clients and prospects situations. In pursuing these opportunities I do not believe in specializing only in CTS or non CTS service lines. For example, I have been instrumental in securing a new client last month, Casual Male, that will generate annual tax fees of $250,000+, without including some potential CTS opportunities such as TS squared and ISIS.

In addition, since January 1 I have worked toward introducing the following CTS products and teams:

- ISIS at Brooks Pharmacy
- TCRS at Seacoast Financial Services - we have a signed engagement letter with Jim Ryan for $100,000
- TCRS at New Haven Savings Bank (nonclient)
- TS squared at Casual Male
- ISIS at Casual Male
- TS squared at Capital Crossing Bank (nonclient)
- NMTC at Sovereign Bank (nonclient)

I plan on remaining vigilant in bringing service opportunities to my clients and prospects. For example, I am joining the Citizen's Bank team with Dick Denning's retirement and I am now on the GSR team for Gilbane, a privately held large construction company.

-----Original Message-----
**From:** Horn, Patricia (US - New York)
**Sent:** Sunday, February 08, 2004 12:29 PM
**To:** Paul, Alan D (US - Boston)
**Subject:** CTS Revenues - FORWARDING ON BEHALF OF FRANK MARCOS

Alan

In connection with the annual goal setting process that occurred last summer/fall, your practice leader met with you to discuss and agree upon your FY 04 CTS revenue goal. Through Period 8, our reports indicate that you have

attained only 21% of this CTS revenue goal (83K versus a goal of 400K), despite the fact you have made a solid number of CTS introductions. While I appreciate the number of introductions you have made, we are well into our 3rd quarter, and I am concerned that little time remains for you to make up your shortfall. Therefore, I would ask that you place additional focus on this area. Additionally, I would like to hear back from you within the week with both (1) an explanation for the YTD results and (2) your action plan to meet your CTS revenue goal for the fiscal year. Please respond via email and copy Patty Horn on your response.

Given our off plan performance in CTS, it is critical that every Partner & Director do their part to attain their individual CTS goal.

If you believe the numbers are in error, please advise Harry Hurvitz immediately to resolve the issue. Otherwise, I look forward to your response.

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. [v.T.1]

*NEW ENGLAND LEAD TAX SERVICES*
*MANAGED REVENUE BY PARTNER (LESS CTS AND ALLOCATIONS)*
*FY 2004 YTD PERIOD 10*

| SA PARNTER | MANAGED REVENUE | CTS & ALLOC | TOTAL REVENUE | HOURS | COMMENTS |
|---|---|---|---|---|---|
| BERKOWITZ, MARK | 1,766,221 | | **1,766,221** | 10,987 | |
| CARAMELLO JR., STEPHEN | 1,731,921 | 858,175 | **2,590,095** | 9,900 | |
| MACARTHUR, BRIAN | 2,093,644 | 1,640,385 | **3,734,028** | 11,344 | |
| NECZYPOR, FRANCIS | 2,042,994 | | **2,042,994** | 9,566 | |
| PAUL, ALAN | 1,211,092 | 92,500 | **1,303,592** | 7,876 | |
| PERRONE, JEFFREY | 1,641,130 | | **1,641,130** | 8,840 | |
| SIMMONS, BRADFORD | 1,502,055 | | **1,502,055** | 7,447 | |
| SMITH, WAYNE | 1,031,320 | (4,625) | **1,026,695** | 7,837 | |
| TRUDELL, LEONARD | 1,206,868 | | **1,206,868** | | |
| WICKHAM, ROBERT | 1,717,936 | 2,775 | **1,720,711** | 9,299 | |
| | | | | | |
| DEGUTIS, VINCENT | 838,962 | 234,934 | **1,073,896** | 5,203 | TAX PIC |
| DRAKE, JUDETH | 1,099,180 | | **1,099,180** | 3,345 | 50% NATIONAL |

D00399

*NEW ENGLAND LEAD TAX SERVICES*
*STAFFED REVENUE BY PARTNER (LESS CTS AND ALLOCATIONS)*
*FY 2004 YTD PERIOD 10*

| SA PARNTER | STAFFED REVENUE | CTS | ALLOCATION | TOTAL REVENUE | HOURS | COMMENTS |
|---|---|---|---|---|---|---|
| BERKOWITZ, MARK | 1,666,612 | | 21,581 | **1,688,193** | 10,442 | |
| CARAMELLO JR., STEPHEN | 1,398,243 | 613,643 | 409,886 | **2,421,772** | 8,370 | |
| MACARTHUR, BRIAN | 1,574,355 | 1,640,385 | 126,771 | **3,341,510** | 8,808 | |
| NECZYPOR, FRANCIS | 1,594,196 | (23,361) | 320,416 | **1,891,250** | 8,118 | |
| PAUL, ALAN | 1,148,185 | 92,500 | 18 | **1,240,702** | 7,446 | |
| PERRONE, JEFFREY | 1,346,802 | | | **1,346,802** | 7,198 | |
| SIMMONS, BRADFORD | 1,419,394 | | 4,767 | **1,424,160** | 7,176 | |
| SMITH, WAYNE | 982,127 | (4,625) | (185) | **977,317** | 7,475 | |
| TRUDELL, LEONARD | 1,039,682 | | | **1,039,682** | 6,232 | |
| WICKHAM, ROBERT | 1,683,361 | 2,775 | 127,679 | **1,813,815** | 8,978 | |
| | | | | | | |
| DEGUTIS, VINCENT | 621,455 | 234,934 | 233,487 | **1,089,875** | 4,042 | TAX PIC |
| DRAKE, JUDETH | 1,071,031 | | | **1,071,031** | 3,265 | 50% NATIONAL |

D00400

Confidential

**Deloitte & Touche**
**Win As One**

**FY 2004 Partner/Principal/Director Goal Setting and Evaluation**

Partner/Principal/Director: **ALAN PAUL** Channel: **TOTAL TAX** Office: **NEW ENGLAND – TAX**

***Section I - Partner/Principal/Director Performance Goals***

**IMPORTANT NOTE for Audit Partners/Directors and other Partners/Directors with audit or attest responsibility:** Beginning in FY04, SEC independence rules limit the ways the firm compensates its Audit partners. As a result, your sales goals relating to publicly traded attest clients may only include the sale of audit, review, or Assurance Advisory services to such clients. Both the individual partner and the Lead Goal Endorser must ensure that the partner's goal statements are in full compliance with these restrictions and that the year-end evaluation should not consider or reference sales of non-audit services to a publicly traded attest client. If you are unsure whether or not these guidelines apply to you, please contact your local Audit PPD or National Office (Independence) in Wilton.

**1 Competitive Advantage Through Teaming**

**Please describe your goals as they pertain to teaming, focusing on contribution to the goals established for the Region, including GSR, SR program and GSA target revenues, Core revenue per client, conversion of single function clients to multi-function and revenue generated through Integrated Service Offering's (ISO's). AUDIT PARTNERS/DIRECTORS: In addition to the above, the Audit Services strategy is to grow the attest base among SA, Core, and Venture Capital targets. Please describe your goals that will implement this strategy.**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Preferred provider revenue from Gilbane of $400,000 | Fees generated<br>Activity level at least three contacts | Work with the project team. Cultivate relationships with key client personnel. Bring useful ideas to their attention. |
| Preferred provider revenue from Grand Circle Travel of $500,000 | Fees generated<br>Activity level-at least three contacts | Assist Sydney Australia office on special VAT tax refund opportunity. Meet with key client personnel to determine other areas of service needs. |
| Preferred provider revenue from Modern Continental of $100,000 | Fees generated<br>Activity level-at least three contacts | Determine information about the company and create an opportunity for a meeting |
| CTS revenue of $400,000 | Fees generated<br>Activity level- at least twelve introductions & at least four sales. | Introduce CTS personnel to opportunities<br>Stay on top of CTS offerings |

**Evaluation/Rating**

Goal Accomplishments

Lead Endorser's Evaluation

**Endorser Rating:**

D00445

Confidential

**FY 2004 Partner/Principal/Director Goal Setting and Evaluation**

**2 Quality Client Service**

**Please describe your goals as they relate to quality service to our clients, focusing on the retention of desired clients, strategic client assessments and helping to enhance our third party rankings. For non-client service partners/principals/directors, please focus on your "internal clients" to formulate goals for this area.**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Top quality technical work for our clients | Zero technical defects | Training, proper planning and follow through on engagements. |
| Periodic meetings with top executive at major clients such as Perini, Spaulding & Slye, Bingham McCutcheon, etc. | Number of meetings | Schedule meetings to discuss our overall service to client. Also cover top issues that they need to be aware of from a tax perspective. |
| Make sure the appropriate teams meet with clients periodically. | Meetings with International, multistate, idividual services scheduled. | Bring teams up to date on client factors and determine where needs could be better served. |

**Evaluation/Rating**

Goal Accomplishments

Lead Endorser's Evaluation

**Endorser Rating:**

D00446

FY 2004 Partner/Principal/Director Goal Setting and Evaluation

3 Employer of Choice/Partnership of Choice

**Please describe your goals related to our people and/or our partnership, focusing on diversity through gender and minority retention and women and minorities in leadership positions, ensuring the best for our people through the retention of top performers and our sense of partnership, enhancing GPCS results and supporting external recognition of the firm.**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Develop and motivate the Historic credit team of Blair Murphy and kelly Neill | Retention of personnel<br>New level of client activity | Training- going to the Park Service Conference |
| Assist in general retention efforts | Participation levels in events. | Boss of the Moss golf event in March.<br>Fallen Wod Bowling event in February<br>Assist Ober as appropriate in personnel matters. |
| Reinforce good professional skills and aid in professional advancement. Specifically with people with whom I have a lot of work such as Major, Lamothe, St.Germain, Murphy, Neill, and Woodman, | Continued development and retention of people | Timely and fair feedback on performance |

**Evaluation/Rating**

Goal Accomplishments

Lead Endorser's Evaluation

Endorser Rating:

D00447

FY 2004 Partner/Principal/Director Goal Setting and Evaluation

4 Public Trust & Firm Reputation

**Please describe your goals for this strategic initiative, emphasizing how you will build eminence, provide professional, market and community leadership, ensure personal independence compliance, reduce service failures impacting reputation and enhance our firm's reputation.**

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Create a CTS series of products dealing with Historic Tax Credits. | Acceptance of products by CTS steering committee | Presentation of ideas, development of technical support |
| Increase awareness outside the firm of our credentials in the historic credit area | Broader list of contacts and opportunities. | Be active in the Boston Society of Architects historic rehabilitation committee<br>Attend national conference on credits in October.<br>Reach out to attornies involved in this practice |

**Evaluation/Rating**

Goal Accomplishments

Lead Endorser's Evaluation

Endorser Rating:

D00448

Confidential

FY 2004 Partner/Principal/Director Goal Setting and Evaluation

## 5 Operational Excellence

Please describe your goals as they pertain to operational excellence, focusing on revenue and profit plans, controllable margin improvement, headcount management, and utilization.

| Goals | How we will measure results | Key Actions to Achieve |
|---|---|---|
| Increase revenue across my client list to meet the Managed revenue goal | Total Revenue | Actively seek out and solve client issues |
| Improve efficiency on jobs and raise SRRR's by 5% | Increase in overall SRRR | Proper planning, staffing, and oversite |

| | Goal | Actual |
|---|---|---|
| Targeted A/R Week O/S | 12.0 | 0.0 |
| Estimated Aggregate Managed Revenue | $ 2,500k | $ 0k |
| Personal Aggregate Sales | $ 1,000k | $ 0k |
| Personal Client Service Hours | 1,000 | 0 |

Lead Endorser's Evaluation

Endorser Rating:

D00449

**FY 2004 Partner/Principal/Director Goal Setting and Evaluation**

**Lead Goal Endorser**

VINCENT DEGUTIS

**Other Endorser Comment on Preliminary Goals**

No Other Assigned Goal Endorser/Appraiser(s) have been assigned at this time

**Goal-Setting Agreement between Partner/Principal/Director and Lead Goal-Endorser**

We confirm our agreement on the partner/principal/director goals set forth in this document. We also understand that the lead goal-endorser is charged with gaining the necessary approvals at the appropriate cluster and National levels before signing off on these goals.

| Please signify your agreement by checking the box next to your name and entering the date. | | Agreed | Date |
|---|---|---|---|
| Partner/Principal/Director: | ALAN PAUL | ☑ | |
| Lead Goal Endorser: | VINCENT DEGUTIS | ☑ | 10/11/2003 |

D00450

## FY 2004 Partner/Principal/Director Goal Setting and Evaluation

### *Section II - Summary of Mid-Year Touch-Points*

| Goal | | On Track | Necessary Adjustments and Next Steps |
|---|---|---|---|
| 1 Competitive Advantage Through Teaming | Lead: | ☑ | Cts and target efforts have improved (activity increased) continuously since the beginning of the fiscal year. Continue to focus on closing existing opportunities and making new introductions. |
| | Endorsee: | ☑ | 1) Gilbane team is just now getting started. Goal is likely unreachable this year, but efforts commencing.<br>2) CTS activity has been strong, several projects now begining (e.g. Seacoast), and many other leads in process. Worked closely with the New Markets Credit Team to sell and deliver projects. Continue to find opportunities.<br>3) New client activity includes Casual Male engagement - annual fees of $250K+ |
| 2 Quality Client Service | Lead: | ☑ | |
| | Endorsee: | ☑ | Utilizing various client service groups as appropriate for international (Perini, Bingham), multi-state(Perini, Casual Male, Capital Crossing, Bingham, Spaulding & Slye), compensation (Conn Bankshares. No technical defects on clients. |
| 3 Employer of Choice/Partnership of Choice | Lead: | ☑ | |
| | Endorsee: | ☑ | Continue to mentor people and help guide their careers. Working with managers new to me (Ladino, Jacoby). Working with Major on planning and promoting social events (Fallen Wood, Boss of the Moss) to occur during busy season. |
| 4 Public Trust & Firm Reputation | Lead: | ☑ | |
| | Endorsee: | ☑ | Presented historic credit idea to CTS committee. Need to continue followup.<br>Working with a number of offices and clients on historic credit issues, including the Seattle, Detroit, and Atlanta offices. Continue to expand reputation in the firm. |
| 5 Operational Excellence | Lead: | ☐ | Could miss revenue target by more than 20-30%. Must focus on closing large opportunities between now and the end of the fiscal year (see teaming comments above). Charge hours and total hours need to increase. Rec.'s management needs to improve as well. |
| | Endorsee: | ☑ | Need to continue focus on sales and delivery of projects, including increasing my client list. Recently added Casual Male, currently proposing on Capital Crossing Bank ($100K), and picking up several clients from partners who have left or are leaving (e.g. Citizen's, Brooks Pharmacy, Methods Machine Tools) |

**Mid-Year Touch-Point Agreement**

I have reviewed the above summary information during a mid-year discussion and expect to pursue any unmet goals based on the recommended adjustments and next steps.

| | | Agreed | Date |
|---|---|---|---|
| Partner/Principal/Director: | ALAN PAUL | ☑ | 2/13/2004 |
| Lead Goal Endorser: | VINCENT DEGUTIS | ☑ | 2/16/2004 |

D00451

Confidential

**DeGutis, Vince (US - Boston)**

**From:** Paul, Alan D (US - Boston)
**Sent:** Tuesday, February 17, 2004 8:58 PM
**To:** DeGutis, Vince (US - Boston)
**Subject:** Revenue Estimates

You asked for some revenue estimates for the remainder of the year through May 31, 2004. I would expect the following:

| | |
|---|---|
| Bingham | 75 K |
| Chevron | 65 K |
| Conn Bankshares | 50 K |
| Perini | 125 K |
| Seacoast | 150 K |
| Spaulding & Slye | 125 K |
| Casual Male | 125 K |
| Capital Crossing | 50 K |
| Brooks Pharmacy | 15 K |
| Miscellaneous | 20 K |
| | |
| Total | $ 800 K |

Confidential

Deloitte.

Deloitte & Touche LLP
200 Berkeley Street
Boston, Massachusetts
USA
Tel: (617) 437-2000
Fax: (617) 437-2111
www.deloitte.com

# Memo

Date: February 25, 2004

To: Alan Paul

From: Vince DeGutis

Subject: Performance Improvement Plan

This memorandum is a follow-up to our discussion on Monday, February 16, 2004, in which we met to discuss your performance. During this meeting you were told that the current assessment of your performance shows a need for you to demonstrate immediate and sustained improvement in the areas of:

(1) revenue generation, including sales of Comprehensive Tax Solutions services,
(2) targeting activities and sales,
(3) billings and collections, and
(4) client service charge hours.

We will periodically review your progress towards improving your fiscal year 2004 performance, with an emphasis on the areas noted above. We would like you to focus on demonstrating improvement in each of these areas and request that you initiate a follow-up meeting with me in 90 days.

You must be the primary driver for your business generation efforts, but we will provide assistance to you in meeting your goals. You should take inventory of your relationships and potential opportunities, and work with me to create an action plan to reach your goals in an expedited fashion.

It is our goal to help you be successful with the Firm. However, if you are unable to demonstrate immediate and sustained improvement towards reaching your goals, you may be subject to further action up to and including unit reduction, request to change to Firm Director status, request for resignation from the firm, or other appropriate actions.

We remain committed to your success.

cc: Frank Marcos

2

Member of
Deloitte Touche Tohmatsu

**Deloitte.**

Deloitte & Touche LLP
200 Berkeley Street
Boston, MA 02116
US

Tel: 617-437-3096
Fax: 617-437-5096
www.deloitte.com

# Memo

**Date:** March 6, 2004

**To:** Vince DeGutis

**From:** Alan Paul

**Subject:**

This memorandum will summarize the meeting we held on March 4, 2004 concerning the proposed implementation of a partner improvement plan concerning my performance.

As I indicated in our meeting, the receipt on February 25, 2004 by email of a "draft" partner improvement plan which was specifically not raised in my mid year touch point discussion with you on February 16, 2004 was quite a surprise. While we had discussed areas for me to work on and the need for increased sales results, at no time did you indicate that I might be subjected to a formal improvement plan that had potentially drastic consequences on my career with Deloitte. ("However, if you are unable to demonstrate immediate and sustained improvement towards reaching your goals, you may be subject to further action up to and including unit reduction, request to change to Firm Director status, request for resignation from the firm, or other appropriate actions.")

The plan as drafted was wholly inadequate as a useful document to assist me in my career. The thrust of the plan is that I should "demonstrate immediate and sustained improvement in the areas of:

1. revenue generation, including sales of Comprehensive Tax Solutions services,
2. targeting activities and sales,
3. billings and collections, and
4. client service charge hours."

The plan contained no objective standards as to what constitutes "immediate," "sustained," or "improvement" for any of the four items listed above, yet it clearly indicated that I had up to 90 days to meet these standards. As I pointed out in our meeting, the current version allows the firm to conclude whatever they choose after 90 days, regardless of my actual performance over that period.

You said that it is no secret that a number of the current tax partners in Boston will be gone from the firm within six months. It is a secret as to how many, why, and how they will be chosen. You also indicated that receiving a partner improvement plan at this time does not put me on a short list of those

Member of
Deloitte Touche Tohmatsu

3

who might be terminated. Yet considering terminating a partner without putting them on some notice to correct their shortcomings is hardly the spirit of partnership. The impact on partner morale and performance is quite negative. This is poor execution of a secret plan with unknown merits.

You have agreed to meet again on March 8, 2004 to transmit in writing your very specific goals for me to meet over the next three months. At the end of that meeting, my expectation is to have very clear, objective goals that are practical given the economy and time of year. The results of meeting those goals should also be clear. I would also like to understand the time frame involved in this plan, as the earlier version was labeled "draft" and the beginning of the 90 day period is not clear to me.

Vince, you stated that you want me to remain at Deloitte and that you have already seen a clear and substantial trend towards my being successful with the firm. Admonishing me to "work harder" will not translate to success for either of us.

**Forwarded Message**

**Subject:** RE: March 9 meeting
**Date:** Mon, 8 Mar 2004 14:39:02 -0400
**From:** "DeGutis, Vince (US - Boston)" <vdegutis@deloitte.com>
**To:** "Paul, Alan D (US - Boston)" <apaul@deloitte.com>

**HTML Attachment**

I have a meeting at Cabot at 2:30 which shouldn't last much longer than an hour. Lets say 4:30 Wed afternoon in my office.

Thx

vince

-----Original Message-----
**From:** Paul, Alan D (US - Boston)
**Sent:** Monday, March 08, 2004 12:32 PM
**To:** DeGutis, Vince (US - Boston)
**Subject:** RE: March 9 meeting

I am available anytime on Wednesday.

The purpose of the memo was to make sure I heard what you conveyed. I look forward to your clearing up any misconceptions I have.

-----Original Message-----
**From:** DeGutis, Vince (US - Boston)
**Sent:** Monday, March 08, 2004 11:52 AM
**To:** Paul, Alan D (US - Boston)
**Subject:** RE: March 9 meeting

I'm out tomorrow but can meet Wed to put together your specific action plan. Let me know what works.

Your memo does not correctly memorialize our conversations. We can disc Wed.

vince

-----Original Message-----
**From:** Paul, Alan D (US - Boston)
**Sent:** Monday, March 08, 2004 10:55 AM
**To:** DeGutis, Vince (US - Boston)
**Subject:** March 9 meeting

I have not heard from Carol about setting the time for this meeting. I am available any time after 11AM.

Attached is a memo concerning our prior meeting of March 4.

<< File: March 6 memo to Vince.doc >>

Paul111

**Deloitte.**

Deloitte & Touche LLP
200 Berkeley Street
Boston, MA 02116
US

Tel: 617-437-3096
Fax: 617-437-5096
www.deloitte.com

# Memo

**Date:** March 15, 2004

**To:** Vince DeGutis

**From:** Alan Paul

**Subject:** March 10, 2004 Meeting

This memorandum will summarize the meeting we held on March 10, 2004 concerning the proposed implementation of a partner improvement plan concerning my performance.

The meeting was held to discuss the Partner Improvement Plan (PIP) dated February 25, 2004, which was sent to me by email labeled "draft" on February 25, 2004. We have previously met to discuss this on March 4, which meeting was summarized in my memo of March 6. This second meeting was to clarify and attempt to put objective standards on as many of the points raised in the PIP as possible. The four main points are:

1. Revenue Generation – You indicated that the only way for this item to be completely eliminated was to reach my original goal of $2.5 million for the year ending May 31, 2004. Based on the previous periods and the estimates I had given you totaling $ 1.7 million this seems unlikely. You suggested that at a minimum being able to show a "run rate" for the last four periods that would equate to a $2.5 million annual level would be necessary to meet the standard of "immediate and sustained improvement". This equates to approximately $200,000 per period (2,500,000/13). Obviously the closer I come to the original goal, which would require a run rate of about $400,000 per period, the better. In addition, you indicated that certain revenue for the firm which may not be reflected in my direct charge numbers would be taken into account. In particular, these would include the fees being transferred from Australia on the Grand Circle Travel account, and work in China being done for Stride Rite.

2. Targeting Activities and Sales – The goal would be to come as close as possible to the original $400,000 CTS goal while also documenting other significant sales wins, such as Casual Male and Capital Crossing among others. While you indicated that I should become active in the target teams with BJ Wholesale Club and Gilbane Building Company, it is very unlikely that either will result in a significant engagement in the timeframe of the PIP and therefore I will not devote significant time in the short term to these initiatives.

3. Billings and Collections - Recently Frank Marcos instituted a new program to determine billing and collection success (memorandum from you dated February 5, 2004). You indicated that my coming off of the list of 'participants' in that program would be the measure of success on this point. In connection with this, you indicated that you would make sure adjustments were made in the ratios to take into account certain clients where the firm has a

Member of
Deloitte Touche Tohmatsu

billing or collection agreement with the client that may contribute to my failing these tests, even as the client's and my performance both conform exactly to the arrangement. This would include The New Bedford Oceanarium which has entered into a payment plan for their over due receivable; and three significant clients where we bill even amounts over the first 10 months of the calendar year, with a final billing in November, while the work occurs sporadically throughout the year. These include Perini Corporation, Casual Male, and Capital Crossing Bank with annual fees exceeding $600,000 in total.

4. Client Service Hours – Reaching my original goal of 1000 hours will be the measurement on this point.

I would like to point out that the Northeast region as a whole is more than 40% behind plan for CTS sales and revenue is more than 9% behind plan for the year through the 9th period. Therefore my meeting the targets in paragraphs 1 and 2 above would be significantly better than average partner performance as compared to their plan for this year.

I had also asked for clarification as to when the 90 day period began that was included in the PIP. You responded by email on March 9 that it began on February 25, 2004, notwithstanding the label of 'draft' in the earlier transmission.

Please acknowledge in writing that you agree with this summary of our meeting, or let me know immediately if this does not reflect our conversation accurately and completely, along with your suggested changes.

______________________________

## Northeast AA Partners - Managed Revenue - Goal versus Actual Results

| NAME | Term Date | FY03 | | | | | | FY04 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FY03 EG | FY03 Managed Revenue Goal Per Goal Form | FY03 Managed Revenue Actual (MR121 + CTS + Overhead) | FY03 Managed Revenue Goal Met? | $ Over(Under) | % Over(Under) | FY04 EG | FY04 Managed Revenue Goal Per Goal Form | FY04 Managed Revenue Actual (MR121 + CTS + Overhead) | FY04 Managed Revenue Goal Met? | $ Over(Under) | % Over(Under) |
| BERKOWITZ, MARK E. | NA | 6 | 2,000,000 | 2,664,301 | Yes | 664,301 | 33% | 6 | Specific # not noted on goal form but another schedule shows $2.5M, which is reasonable | 2,454,482 | No | (45,518) | -2% |
| COMSTOCK, RICHARD H | NA | 3 | 3,500,000 | 1,225,922 | No | (2,274,078) | -65% | 3 | 2,500,000 | 1,747,022 | No | (752,978) | -30% |
| EVANS, JOHN N | NA | 4 | 2,200,000 | 588,515 | No | (1,611,485) | -73% | 4 | 2,200,000 | 874,791 | No | (1,325,209) | -60% |
| FICHERA, MICHAEL A | 11/22/2003 | 1 | 1,600,000 | 427,973 | No | (1,172,027) | -73% | 1 | NA - no goal form available | 42,520 | NA - left during FY04 | NA - left during FY04 | NA - left during FY04 |
| GARTLAND, EDWARD V. | 1/19/2004 | 3 | NA - no goal form available | 643,855 | NA - no goal form available | NA - no goal form available | NA - no goal form available | 3 | NA - no goal form available | 105,427 | NA - left during FY04 | NA - left during FY04 | NA - left during FY04 |
| GOLDSMITH, MICHAEL H. | 2/14/2003 | 1 | 1,750,000 | 218,034 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 |
| HEMPEL, GARDINER | NA | 5 | 3,500,000 | 3,649,595 | Yes | 149,595 | 4% | 5 | 3,500,000 | 2,697,737 | No | (802,263) | -23% |
| HERBSTMAN, DAVID B | 1/12/2008 | 3 | 2,700,000 | 597,719 | No | (2,102,281) | -78% | 3 | 2,500,000 | 1,023,592 | No | (1,476,408) | -59% |
| HOLT, NICHOLA | NA | NA - Not partner in FY03 | NA - no goal form available | 3,494,158 | NA - no goal form available | NA - no goal form available | NA - no goal form available | 3 | NA - no goal form available | 2,830,163 | NA - no goal form available | NA - no goal form available | NA - no goal form available |
| PAUL, ALAN D. | 5/28/2004 | 5 | 2,000,000 | 1,658,921 | No | (341,079) | -17% | 5 | 2,500,000 | 1,585,718 | No | (914,282) | -37% |
| PIAZZA, JAMES M | NA | 3 | 2,500,000 | 3,742,012 | Yes | 1,242,012 | 50% | 4 | 4,200,000 | 4,197,334 | No | (2,666) | 0% |
| STINNER, MATT | 8/25/2002 | 1 | NA - no goal form available | 0 | NA - no goal form available | NA - no goal form available | NA - no goal form available | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 | NA - left during FY03 |
| STRICOF, ROBERT I. | NA | 6 | 3,000,000 | 4,813,251 | Yes | 1,813,251 | 60% | 6 | 3,000,000 | 2,827,358 | No | (172,642) | -6% |

**Siegel, Benjamin (US - New York)**

**From:** Severin, Steve (US - Seattle)
**Sent:** Friday, March 26, 2004 2:40 PM
**To:** Marcos, Frank (US - New York); DeGutis, Vince (US - Boston)
**Cc:** Orr, Jim (US - New York); Van Bogart, Barbara (US - Seattle)
**Subject:** FW: Alan Paul

Vin, Frank,

As I mentioned in our call yesterday, this one is going to be different from the others so I think we need to write a more comprehensive memo. Suggestions.

1. attach goals from psnweb for this year with his signoff indicated.

2. attach the letter from Frank discussed in the last paragraph on page 1.

3. indicate ytd numbers. Per the schedule I have through period 10 it is revenue of 1,207 w 663 hours.

4. Can we show a schedule of all other LTS partners with their revenue. We don't need names but want to demonstrate he really is at the bottom.

5. If he came in at 780 units, he must have been somewhat successful at AA. Can we explain why it worked there, and is not working here.

6. We need to discuss his market opportunities; is he out there and not closing or not even out there.

7. we need to specifically refute his points. Just saying his numbers are low I do not think will be enough.

8. need to say why you believe he will not succeed with more time. What attributes does he lack??

9. Also regardless of units, why he does not belong in the firm. I assume e.g. if you lowered his units, you still believe he does not belong.

Guys, I do not want to be a pain but I think we need to build a strong convincing case to overcome the late, weak PIP.

Steve

-----Original Message-----
**From:** Marcos, Frank (US - New York)
**Sent:** Friday, March 26, 2004 6:42 AM
**To:** Severin, Steve (US - Seattle)
**Cc:** DeGutis, Vince (US - Boston)
**Subject:** FW: Alan Paul

Steve...I just reviewed this, and with some minor editorial comments, am happy with it. Before we finalize, I'd like to get your input on it. It was drafted by vince degutis, the boston tax MP, who has been alan's LGE......awaiting your input

---

**Frank M. Marcos**
**Managing Partner - Tax**
**Northeast Region**

**Deloitte & Touche LLP**
**Two World Financial Center**
**New York, NY 10281 - 1414**

**Phone: (212) 436-6996**
**Fax: (212) 653-4115**
**Mobile: (201) 519-0397**
**Email: fmarcos@deloitte.com**

---

-----Original Message-----
**From:** DeGutis, Vince (US - Boston)
**Sent:** Friday, March 26, 2004 8:51 AM

**To:** Marcos, Frank (US - New York)
**Subject:** Alan Paul

paultermination.doc
(38 KB)

Frank-

This is a rough draft (no spell checks, etc.) of your request re: Alan Paul. I have not put it in "memo" form yet. Please see if it is directionally where you want it to go (I have never written such a document). I need to verify some of the numbers, etc. as well. I will work on it again this weekend.

Thx

vince

Vincent M. DeGutis
Tax Managing Partner
New England
Deloitte & Touche LLP

(617)437-3800
(617)437-3881 fax
vdegutis@deloitte.com

This memorandum supports our recommendation that Alan Paul, a tax partner in the Boston office, be terminated from the Firm.

Alan Paul became a tax partner at Deloitte in Boston May 2002. Based on his past experience, stature within the community, specific tax expertise, expected revenue generation, and other personal qualities, Alan was placed in EG 5 with 780 units. It was anticipated that Alan would quickly rise to the top of the tax partner group in Boston (and the Firm).

Alan was given a revenue goal of two million dollars his first year with the Firm (FY '03). This goal was one of the lowest goals given to a LTS partner in Boston. It was felt to be a conservative goal given the facts stated above. Additionally, Alan was assigned to several former "Andersen" clients that had been converted to Deloitte prior to his admittance (approximately 400,000 of annual revenue). It was felt that this should make attaining the revenue portion of his goals almost guaranteed.

Alan was unable to convert many of his clients and/or was unable to generate sufficient fees within his new client base to reach his goals in FY 03. In fact, his revenue shortfall was over 25%. He stated that a major part of the shortfall was due to us not having adequate audit support to help convert many of his former clients. Total fees of approximately one and half million easily put him in the bottom quartile of all LTS partners in Boston. The only other EG 5 LTS partner in Boston had more than double his fees in FY 03.

Based on his performance in FY 03, Alan was given a "good" rating. It was explained to him at that time that the primary reason for the rating was not meeting his revenue expectations. Further, it was discussed that he needed to team more with other partners (within and without the tax function) to be successful in the marketplace. Alan had no real success utilizing service lines (including CTS) other than multistate within his client base. Alan's compensation was reduced from 780 units to 760 units based on his performance rating in FY 03.

Alan was given a revenue goal of two and half million dollars this fiscal year (FY 04). Included in that amount was a revenue goal for CTS of 400,000. Additionally, he had a goal of one million dollars (included in the two and half million) to be generated from various targets assigned to him (several of these targets were former clients of his at Andersen). It was explained to him, and other partners, that a major part of their success in the current year would be directly related to their success with their targets.

On February 16 of this year, a mid year touchpoint discussion was had with Alan. Revenue shortfall was a major part of the discussion (based on this shortfall, Alan was asked to put together a projection of anticipated revenue for the remainder of the fiscal year). Alan had received a letter from Frank Marcos the previous week indicating that his CTS activity and success were not meeting expectations. The fact that he needed to improve in this area was discussed in this meeting as well. Additionally, Alan had received another message from Frank Marcos and me stating that his billing and

collection statistics at the end of period eight were at the bottom 20% of all the partners and directors in the Northeast Region. The fact that he needed to improve in this area was discussed as well.

As requested, Alan calculated an estimate of anticipated revenue for this fiscal year and submitted it to me on February 17. His estimate of one million seven hundred and fifty thousand was approximately 30% below his revenue goal for the current year. It is anticipated that this amount will put him in the bottom third of the LTS partners in Boston for FY 04. As such, on February 19 Alan was given a performance improvement notice which indicated that he needed to make substantial improvement in the areas of revenue generation, CTS introductions and sales, receivables performance, and charge hours over the next three months in order to meet his original goals.

In several discussions since that date, Alan has indicated that he will not be able to close the gap to reach his two and half million dollar revenue goal by year end. He feels the expectation is unreasonable given the market and his metric of success should be lowered. He feels that he has done his part regarding CTS introductions and the shortfall is related to CTS not closing the sales or the general receptivity in the market for those services.

In summary, Alan is not meeting the expectations the Firm had when he joined the partnership almost two years ago. His performance, particularly as it relates to revenue generation, continues to be at the lower end in comparison with the other LTS partners in Boston (eventhough he is at the top end in terms of compensation). He does not appear to be making up any ground and, in fact, strongly feels that factors outside of his control are solely to blame for any shortages in revenue production. As such, it is felt that he will not be successful as a partner in the Firm and should be terminated.

**Deloitte.**

Deloitte & Touche LLP
Two World Financial Center
New York, NY 10281-1414
USA

Tel: 212-436-6996
Fax: 212-653-4115
www.deloitte.com

# Memo

**Date:** March 30, 2004

**To:** Steve Severin

**From:** Frank Marcos & Vince DeGutis

**Subject:** Partner Termination Recommendation

This memorandum supports our recommendation that Alan Paul, a tax partner in the Boston office, be terminated as a partner in the Firm.

Alan Paul became a tax partner at Deloitte in Boston May 2002. He brought with him technical expertise in real estate, banking, and general corporate services (Sub-C). Along with his technical skills, Alan had/has very good client service skills. The "tax market" two plus years ago was very receptive to these attributes/skills (one did not need to be as proactive within and outside their client base to be successful); as such, he was successful at Andersen. Based on his past experience, stature within the community, specific tax expertise, expected revenue generation, and other personal qualities, Alan was placed in EG 5 with 780 units. It was anticipated that Alan would quickly rise to the top of the tax partner group in Boston (and the Firm).

Alan was given a revenue goal of two million dollars his first year with the Firm (FY '03). This goal was one of the lowest revenue goals given to a LTS partner in Boston. It was felt to be a conservative goal given the facts stated above. Additionally, Alan was assigned to several former "Andersen" clients that had been converted to Deloitte prior to his admittance (approximately 400,000 of annual revenue). It was felt that this should make attaining the revenue portion of his goals almost guaranteed.

Alan was unable to convert many of his clients and/or was unable to generate sufficient fees within his new client base to reach his goals in FY 03. In fact, his revenue shortfall was over 25%. He stated that a major part of the shortfall was due to us not having adequate audit support to help convert many of his former banking and real estate clients. Another former Andersen partner that joined the Boston tax practice was able to successfully convert many of his real estate clients, etc. and/or generate additional new work to help put him in the top half of all LTS partners in Boston in terms of revenue in FY 03. Total fees of approximately one and half million easily put him in the bottom quartile of all LTS partners in Boston (see schedule attached). The only other EG 5 LTS partner in Boston had more than double his fees in FY 03.

Based on his performance in FY 03, Alan was given a "good" rating. It was explained to him at that time that the primary reason for the rating was not meeting his revenue expectations. Further, it was discussed that he needed to team more with other partners (within and without the tax function) to be

successful in the marketplace. Alan had no real success utilizing service lines (including CTS) other than Multistate within his client base. Alan's compensation was reduced from 780 units to 760 units based on his performance rating in FY 03.

Alan was given a revenue goal of two and half million dollars this fiscal year (FY 04). Included in that amount was a revenue goal for CTS of 400,000. Additionally, he had a goal of one million dollars (included in the two and half million) to be generated from various targets assigned to him (several of these targets were former clients of his at Andersen). It was explained to him, and other partners, that a major part of their success in the current year would be directly related to their success with their targets. (See goals attached.)

On February 16 of this year, a mid year touch point discussion was had with Alan. Revenue shortfall was a major part of the discussion (based on this shortfall, Alan was asked to put together a projection of anticipated revenue for the remainder of the fiscal year). Alan had received an e-mail from Frank Marcos the previous week indicating that his CTS activity and success were not meeting expectations (copy attached). The fact that he needed to improve in this area was discussed in this meeting as well. Additionally, Alan had received another email message from Frank Marcos and me stating that his billing and collection statistics at the end of period eight were at the bottom 20% of all the partners and directors in the Northeast Region (copy attached). The fact that he needed to improve in this area was discussed as well.

As requested, Alan calculated an estimate of anticipated revenue for this fiscal year and submitted it to me on February 17. His estimate of one million seven hundred and fifty thousand was approximately 30% below his revenue goal for the current year. It is anticipated that this amount will put him in the bottom third of the LTS partners in Boston for FY 04. (See schedule detailing revenue for Boston LTS partners attached.) As such, on February 19 Alan was given a performance improvement plan (copy attached) that indicated that he needed to make substantial improvement in the areas of revenue generation, CTS introductions and sales, receivables performance, and charge hours in order to meet his original goals.

In several discussions since that date, Alan has indicated that he will not be able to close the gap to reach his two and half million dollar revenue goal by year-end. He feels the expectation is unreasonable given the market and his metric of success should be lowered even though it is the same market that all of our other partners are working to meet their/our revenue metrics which have not been altered since being set at the beginning of the year. He feels that he has done his part regarding CTS introductions and the shortfall is related to CTS not closing the sales or the general receptivity in the market for those services (see copy of Alan's response to Frank Marcos' memo attached). Additionally, he cites the fact that he has recently brought two new tax clients into the Firm (Casual Male and Capital Crossing Bank) as evidence of his market success. The truth is that he did a fine job helping to close these wins; however, he was brought into both opportunities by other tax partners leading their pursuit.

In summary, Alan is not meeting the expectations the Firm had when he joined the partnership almost two years ago and/or the expectations we have of our partners currently. His performance, particularly as it relates to revenue generation, continues to be at the lower end in comparison with the other LTS partners in Boston (even though he is at the top end in terms of compensation). He does not appear to be making up any ground and, in fact, strongly feels that factors outside of his control are solely to blame for any shortages in revenue production. He has not recognized, or has ignored, the fact that the

Page 3
Date:    March 30, 2004
To:      Steve Severin
Subject: Partner Termination Recommendation

"tax market" has changed and we can no longer be successful serving solely our clients and/or being reactive to needs in the market. He has not been aggressive in seeking out new opportunities with our targets. As such, it is felt that he will not be successful as a partner in the Firm given the "new" market that we are in and should be terminated.

D00342

Confidential

A333

**From:** Van Bogart, Barbara (US - Seattle) [bvanbogart@deloitte.com]
**Sent:** Wednesday, April 07, 2004 2:43 PM
**To:** Thomas, Allen (US - McLean)
**Subject:** RE: Alan Levenson
**Importance:** High

Hi Allen:

Another Alan I need to get your approval on - Alan Paul.

Alan is scheduled to go before the C6 next Monday. Frank Marcos says Alan will agree to resign voluntarily and here are terms they have discussed:

Notice date 4/29 - effective date 5/29.
4 months severance at $850 per unit.
Eligible for 2% pension (I confirmed w/Eli this morning). Alan P. is 54.
Complete release of covenant
Return of capital per MOA.
Confirming with Julie that he would not need to make profit sharing contribution for this FY, as his last day would be last day of FY.

Question for you - Steve and Frank believe $15K in outplacement will provide extra incentive. Do you approve?

Are you okay with other information above?

-----Original Message-----
**From:** Thomas, Allen (US - McLean)
**Sent:** Wednesday, April 07, 2004 11:39 AM
**To:** Salzman, Julie (US - New York); Severin, Steve (US - Seattle)
**Cc:** Van Bogart, Barbara (US - Seattle); Wells, Andrew (US - New York)
**Subject:** RE: Alan Levenson

julie,

please consult with andy on this. he and i talked about a strategy to accomplish this. as it relates to our internal personnel, that is a communication issue that i am sure we can figure out). thanks

allen

ps - sorry for making your life difficult at times :-)

-----Original Message-----
**From:** Salzman, Julie (US - New York)
**Sent:** Wednesday, April 07, 2004 11:48 AM
**To:** Severin, Steve (US - Seattle)
**Cc:** Thomas, Allen (US - McLean); Van Bogart, Barbara (US - Seattle)
**Subject:** RE: Alan Levenson

Steve and Allen,

I don't think this is going to work. We'd be calling him a retired partner in the intro paragraph, which is what every dept. at Deloitte will read (PSN, Hermitage, etc.) and then we'd have to write the agreement cancelling all his rights as a retired partner, starting with the first paragraph, and even then, he'd probably be treated as a retiring partner by

**From:** Severin, Steve (US - Seattle)
**Sent:** Wednesday, April 07, 2004 4:59 PM
**To:** Carrington, Glenn (US - Washington D.C.); Chapman, Bob (US - Dallas); Gajek, Marion (US - Chicago); Page, Roger (US - Washington D.C.); Seltzer, Brad (US - Washington D.C.); Tapajna, Joseph J. (US - Chicago); Marcos, Frank (US - New York); Trinta, John (US - Chicago); Allegretti, Carl S. (US - Chicago)

**Cc:** Thomas, Allen (US - McLean); Wood, Chet (US - New York); Orr, Jim (US - New York); Van Bogart, Barbara (US - Seattle)

**Subject:** FW: Committee of 6 - April 12, 2004

Partners:

We are again convening the Committee of 6 for **Monday, April 12 at 11:30 EDT**, and will ask the Committee to consider and deliberate over the following recommendations :

To ask for the resignation of Brian Kayman, a tax partner in the Chicago office.

To ask for the resignation of Alan Paul, a tax partner in the Boston office.

Attached is the supporting documentation for these recommendations.

## The dial in number is 1-888-487-6565, and the participant code is 23313.

**<<Kaymanpip.doc>> <<Kayman.doc>> <<PaulAlanFY04Goals.pdf>> <<Alan Paul Performance Plan.doc>> <<FW: Cash Accountability Program (respond by Tues Feb 3rd re: 'Part B' exclusions)>> <<CAP Part A - final list.xls>> <<CAP Part B - Final List .xls>> <<Partner Revenue YTD PD 10.xls>> <<FW: CTS Revenues - FORWARDING ON BEHALF OF FRANK MARCOS>> <<FW: Response>> <<Alan Paul - Recommendation Memo.doc>>**

**About Deloitte**
Deloitte refers to one or more of Deloitte Touche Tohmatsu, a Swiss Verein, its member firms and their respective subsidiaries and affiliates. As a Swiss Verein (association), neither Deloitte Touche Tohmatsu nor any of its member firms has any liability for each other's acts or omissions. Each of the member firms is a separate and independent legal entity operating under the names "Deloitte," "Deloitte & Touche," "Deloitte Touche Tohmatsu," or other related names. Services are provided by the member firms or their subsidiaries or affiliates and not by the Deloitte Touche Tohmatsu Verein. Deloitte & Touche USA LLP is the U.S. member firm of Deloitte Touche Tohmatsu. In the U.S., services are provided by the subsidiaries of Deloitte & Touche USA LLP (Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte Financial Advisory Services LLP, Deloitte Tax LLP and their subsidiaries), and not by Deloitte & Touche USA LLP. [v.I.1]

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message.

Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. [v.E.1]

**Salzman, Julie (US - New York)**

| | |
|---|---|
| **From:** | Van Bogart, Barbara (US - Seattle) |
| **Sent:** | Monday, April 12, 2004 12:13 PM |
| **To:** | Salzman, Julie (US - New York) |
| **Subject:** | Committee of 6 |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

May 28 — 2,484.62
~~May 29~~ ↓
June 17, 2004 – 34,784.62

Hi Julie:

Today the Committee met and voted to sever the relationship between the following individuals and the firm:

Alan Paul

Please let me know if you have any questions.

Regards

Barbara

PS - I will call you later today to talk about open partner items. Let me know if today doesn't work?

Barbara Van Bogart
Human Resources Manager, Tax

Tel: +1 206 716 7501
Fax: +1 206 965 7501
bvanbogart@deloitte.com
<www.deloitte.com>

925 Fourth Avenue
Suite 3300
Seattle, WA 98104-1126
USA

~~Per Steve & Barbara 4/16 — add $50,000 to severance, payable with 4 mos. severance over 4 mos.~~

Add $50,000, but per Frank Marcus, should be less. It was $50K if Notice was given on Apr. 12, but now that it's Apr. 27, it's

$50,000.00
~~-30,215.31~~
– 29,815.39 (1.2/26 x 850 x 760) ~~35,000~~
$ 20,184.61

760 Units

~~15,000 in lieu of out pl.~~
~~Eff. Date - $35,000 - comp.~~

~~760 x 850 x 1.5/26 = 37,269.24~~
760 x 850 x 1.4/26 = 34,784.62
~~(2,484.62) each day.~~

D00021

Deloitte.

Deloitte & Touche USA LLP
1633 Broadway
New York, NY 10019-6754
USA

Tel: +1 212 492 4000
Fax: +1 212 492 4201
www.deloitte.com

April 22, 2004

Mr. Alan D. Paul
135 Pine Street
Medfield, MA 02052

Dear Alan:

As you are aware, the committee contemplated by paragraph 5(b) of the agreement (the "Admission Agreement"), dated May 2, 2002, among you, Deloitte & Touche USA LLP ("D&T USA") and Deloitte & Touche LLP ("D&T", and collectively with D&T USA, the "Firms"), has determined that your association with each Firm will be severed, effective as of May 27, 2004.

This letter shall confirm the arrangements in connection with such severance.

1. **Unless you make a timely election by completing, signing and returning the attached election letter, the Firms shall pay you (a) 50% of your aggregate capital accounts on or before May 29, 2004, and (b) the then balance of your aggregate capital accounts plus unpaid interest on the amount paid on or before May 29, 2005.** A memorandum, dated April 22, 2002, from Bill Fowler which describes certain consequences of making such an election is enclosed for your information. A schedule of your aggregate capital accounts and the anticipated repayment of your aggregate capital accounts if you do not make such an election is set forth on Schedule A attached hereto. If you otherwise elect to receive your aggregate capital accounts in accordance with the election described above, your aggregate capital accounts shall be repaid in accordance with such election. The foregoing payments, together with the payments described in paragraphs 2 and 5 below, shall be in full payment for your interest in the Firms and in full satisfaction of all obligations of the Firms to you in accordance with the Memorandum of Agreement of each Firm and the Admission Agreement. The amount of your loan outstanding under the capital loan program plus accrued interest shall be deducted from the amounts otherwise payable to you pursuant to this paragraph and paid on your behalf to the applicable lender. The Firms may accelerate the repayment of your loan outstanding under the capital loan program, in which event the loan will be repaid out of your capital accounts upon such accelerated schedule. Any amounts owed by you to the Firms may be deducted, in whole or in part, from the amounts otherwise payable to you pursuant to this paragraph.

2. You will be compensated for the period from June 1, 2003 through May 27, 2004, inclusive, in an aggregate amount equal to

Member of
Deloitte Touche Tohmatsu

the product of (a) the actual earnings per unit (which will reflect any deductions of amounts for retirement payments) of the Firms for the fiscal year ending May 29, 2004, (b) 760 and (c) a fraction, the numerator of which is 25.9 and the denominator of which is 26 (such product, "Your 2004 Compensation"). You shall receive towards Your 2004 Compensation the aggregate amount of $429,550.75, of which (i) an aggregate of $269,230.75 shall be paid by means of your $10,769.23 draw on or before each of the 25 biweekly pay dates from June 13, 2003 through May 14, 2004, inclusive, (ii) $26,720 was paid to you on January 15, 2004, and (iii) $133,600 was paid to you on April 15, 2004. You will also be entitled to any additional distributions based on earnings per unit with respect to the fiscal year ending May 29, 2004 which the Firms may make to partners and principals generally during or after the end of such fiscal year in the same proportions and at the same times as made to such partners and principals of the Firms, based on your 760 units for such fiscal year, prorated for the portion of such fiscal year during which you are a partner of the Firms. The Firms shall pay you as promptly as practicable after the Firms make the final payments to partners and principals generally with respect to compensation for the fiscal year ending May 29, 2004, the excess, if any, of Your 2004 Compensation over the aggregate amount theretofore paid with respect thereto. To the extent the aggregate amount paid to you with respect to your compensation for the period from June 1, 2003 through May 27, 2004, inclusive, exceeds Your 2004 Compensation, you agree to pay such excess to the Firms promptly upon request. Any amounts owed by you to the Firms may be deducted, in whole or in part, from the amounts otherwise payable to you pursuant to this paragraph 2.

3. In accordance with the Admission Agreement, the Firms shall pay you severance payments in the aggregate amount of $215,333.37, which shall be paid in equal installments of $23,925.93 on or before each of the nine biweekly pay dates from May 28, 2004 through September 17, 2004, inclusive; provided that, any amounts owed by you to the Firms may be deducted, in whole or in part, from the amounts otherwise payable to you pursuant to this paragraph.

4. a. In accordance with the Admission Agreement, the Firms hereby release you from your obligations pursuant to Section 9.061(b) of the Memorandum of Agreement of each Firm.

b. The Firms hereby release you from your obligations pursuant to Section 9.032 of the Memorandum of Agreement of each Firm, so long as your actions do not result in a violation by you of any of the provisions of Section 9.02 of the Memorandum of Agreement of each Firm as made applicable to former partners by Section 9.031 of the Memorandum of Agreement of each Firm.

5. In accordance with the Admission Agreement, you are entitled to receive retirement benefits pursuant to Article 6 of the Memorandum of Agreement.

6. You will be advised by the Personal Service Network as to your rights, options and procedures to be followed with respect to group insurance plans, the Deloitte & Touche 401(k) Plan and any other plans of the Firms in which you participate.

7. You and the Firms shall settle your cash advance and expense amounts (including, without limitation, club dues and initiation fees) due to or from the Firms through May 27, 2004.

**In order for the Firms to address any independence issues, and without limiting the next paragraph of this letter, you will consult with National Office (Independence) in Wilton, Connecticut at (203) 761-3000 before becoming an employee or director of, or consultant to, any entity at any time when the Firms continue to owe you any money.**

All of the foregoing commitments by the Firms are, of course, dependent upon your not violating the applicable provisions of Article 9, Certain Activities, Conduct and Rights of Parties During and After Severing Association With The Partnership, of the Memorandum of Agreement of each Firm (giving effect to paragraphs 4(a) and 4(b) above), or otherwise damaging the Firms.

Very truly yours,

Allen S. Thomas, Jr.
National Managing Partner,
Partner Matters

SCHEDULE A

**ALAN D. PAUL**
**SCHEDULE OF CAPITAL ACCOUNTS AND ANTICIPATED REPAYMENT OF CAPITAL**

| | |
|---|---|
| **Unrestricted Capital Accounts at Effective Date of Retirement** | $665,000.00 |
| **Excess Capital at Effective Date of Retirement** | $ 0.00 |
| **Capital Loan at Effective Date of Retirement** | |
| Fleet Bank Capital Loan – Principal | $628,875.00 |

| **Payment Date On or Before** | **Unrestricted and Excess Capital** |
|---|---|
| May 29, 2004 | $332,500.00 |
| Less: Due to Fleet Bank | (314,437.50) |
| Net Due Partner | $ 18,062.50 |
| May 29, 2005 | $332,500.00 |
| Less: Due to Fleet Bank | (314,437.50) |
| Net Due Partner | $ 18,062.50 |

The above does not include interest earned on capital (payable quarterly), or interest charged on loans outstanding, if any, which interest payments will be computed at date of payment, or the MoA Retirement Enhancer Account, if any, or related loans, if any.

D00026

19-Apr-04

Alan Paul
Determination of Retirement Benefits

ESTIMATE

**SCHEDULE B**

| Year | | Total Annual Income | Retirement 5/27/04 Benefits Beginning 9/18/04 | Age 60 |
|---|---|---|---|---|
| 2002 | Annualized | $ 742,927 | $ 742,927 | |
| 2003 | | 726,149 | 726,149 | |
| 2004 | (A) | 646,000 | 646,000 | |
| | | | $ 2,115,076 | |
| Retirement Base Income | | | $ 705,025 | |
| Retirement Income Percentage (2 .0687 years x 1%) | | | 2.0687% | |
| | | | 14,585 | $ 14,585 |
| Early Retirement Reduction (100% - (35% - 7% ÷ 12 x 3 mos.) | | | 66.750% | N/A |
| Initial Retirement Income based on life, term certain (C) (E) | | | $ 9,735 | $ 14,585 |

FORMS OF PAYMENTS

| Payment Beginning September 18, 2004 | Life, Term Certain | Joint & Spousal Payment Options (D) (E) 50% | 75% | 100% |
|---|---|---|---|---|
| Initial Retirement Income based on Life Term Certain | $ 9,735 | $ 9,735 | $ 9,735 | $ 9,735 |
| Joint & Spousal Reduction Factor | N/A | 92.948% | 90.596% | 88.360% |
| Initial Retirement Income | $ 9,735 | $ 9,049 | $ 8,820 | $ 8,602 |

| Payment Beginning July 1, 2009 | Life, Term Certain | Joint & Spousal Payment Options (D) (E) 50% | 75% | 100% |
|---|---|---|---|---|
| Initial Retirement Income based on Life Term Certain | $ 14,585 | $ 14,585 | $ 14,585 | $ 14,585 |
| Joint & Spousal Reduction Factor | N/A | 91.164% | 88.076% | 85.190% |
| Initial Retirement Income | $ 14,585 | $ 13,296 | $ 12,846 | $ 12,425 |

(A) Estimated at FY2004 units at $850 per unit.
(B) The ten year partner service requirement has been waived per admission agreement.
(C) Initial retirement benefits will be paid for the longer of life or 150 months if benefits begin 9/18/04; 120 months if benefits begin at age 60.
(D) Initial Joint and Spousal income will be payable for the longer of term certain or the life of the partner and after the death of the partner, to the spouse, if then living, for the balance, if any, of the term certain period in an equal amount for so long as the spouse survives and after the term certain period payable for the life of such spouse in an amount equal to 100% (100% J & S), 75% (75% J & S) or 50% (50% J & S) the amount payable at the end of the term certain period.
(E) The initial retirement income will be:
   1. Adjusted annually for the cumulative change in cost of living for 120 months, after which the adjusted amount remains constant at the amount of retirement income paid for the 120th month. Any increase in the specified annual amount of retirement income arising out of the cost of living adjustment will be paid only to the extent earned each year by the firm (with a three year carryover period to recapture any reduction arising from the "if earned" limitation).
   2. Subject to the 17-1/2% limitation.

Birth Date: June 2, 1949
Spouse Birthdate: November 7,1948
Hire Date: May 8, 2002
Admit Date: May 8, 2002
Date of Retirement: May 27, 2004
Payments Begin: September 18, 2004; July 1, 2009
Term Certain Ends: March 17, 2017; June 30, 2019

D00027

Deloitte & Touche USA LLP
4022 Sells Drive
Hermitage, TN 37076
USA

Tel: 615-882-7600
Fax: 615-882-6665
www.us.deloitte.com

# Memo

Deloitte & Touche

Date: April 22, 2002

To: Partners Approaching Retirement and Retired Partners Who Retired on or after June 3, 2001 and Have Not Started Receiving Required Capital

From: Bill Fowler, Wilton

Subject: New Elections Available For The Distribution of Required Capital, and Deferral Of Excess Deferred Taxable Income ("Excess DTI") Of A Retiring Partner Until The Fiscal Year **Following** Retirement

## Payment of Required Capital

The Memorandum of Agreement ("MoA") provides for payment of a retiring partner's required capital in two installments (the first installment equal to 50% of the partner's required capital payable during the fiscal year of the partner's retirement, the second installment payable during the fiscal year following the partner's retirement) or upon the election of the partner, to defer payment of required capital in equal installments over either 5 or 10 years.

On April 4, 2002, the Board authorized alternative capital payment options for retiring partners to defer the payment of required capital and have it paid in equal annual installments over 2, 3, 4, 6, 7, 8, or 9 years, beginning on March 15 of the fiscal year following the fiscal year of retirement (in addition to the existing 2, 5 and 10 year options), provided that the partners of the Firm approve an amendment to the MoA to permit all retiring partners to make such an election.

I have enclosed an election form. The election form should be returned to Hermitage by May 15, 2002. If the election is not received at Hermitage by May 15, 2002 the balance of your required capital will be distributed in accordance with the MoA and any election that you previously made. Once the Firm has approved your election, it is IRREVOCABLE and cannot be changed unless the partners do not approve an amendment to the MoA to allow the alternative deferral options.

Please return the enclosed election to Hermitage by May 15, 2002 EVEN IF YOU ELECT NOT TO CHANGE your capital distribution election.

## ROI Rate

The Firm currently pays ROI for all active and those retired Partners who elect not to defer the payment of their required capital, using prime +1% for their required capital accounts retained in the Firm. Retired Partners who have elected to defer their required capital payments are paid ROI based on prime.

Deloitte Touche Tohmatsu

The Board has approved, effective June 2, 2002, that ROI for required capital for all partners who retired or are retiring on or after June 3, 2001, and have not yet received a return of any of their capital, be based on prime +1%.

**Payment of Bank Loans**

Under the provisions of the Firm-sponsored required capital financing program, loans of retiring partners mature in proportions designed to coincide with a capital repayment schedule specified in the MoA. At this time all of the banks have agreed to extend the loans so that the outstanding loan balance would be repaid in equal amounts coinciding with the annual distribution of required capital.

**Tax Considerations**

For the tax consequences of payments received on the return of required capital, please refer to the letter from Firm Taxes which accompanied your Analysis of Deferred Taxable Income. Deferred taxable income is generally recognized when a partner's capital is distributed. An exception to this principle is when deferred taxable income exceeds required capital. In that instance, the Excess DTI was included in the taxable income of the former partner for the Firm's fiscal year in which resignation or retirement was effective, whether or not any capital distributions were actually made at that time.

On April 12, 2002, the Board authorized a change in the Firm's tax treatment of Excess DTI such that partners retiring in fiscal 2002 or later will defer the taxation of Excess DTI until the fiscal year following retirement. This change will significantly reduce the taxable income in the year of retirement for most partners.

As shown in the income tax consequences section of your Analysis of Deferred Taxable Income, deferred taxable income (other than Excess DTI) is recognized beginning with the first distribution of required capital and taxed as ordinary income. When all deferred taxable income has been recognized, any subsequent payments will be a tax-free return of capital. If the election is made to defer the receipt of your required capital, the recognition of deferred taxable income (other than Excess DTI) will also be deferred until you receive payment.

In considering the deferral of your capital payments, you should be aware that in years subsequent to the year of retirement, your overall tax rate (federal, state, and self employment) is likely to be lower than your overall tax rate in the year of retirement.

***************

If you have any questions about your capital or bank loans, contact Jim Clyde at (615) 882-7625.

If you have any questions about tax matters relating to this election, contact your personal tax advisor.

If you have any questions regarding your Analysis of Deferred Taxable Income, contact Firm Taxes (Barbara Newman (615) 882-7214 or Mike Woods (615) 882-7665).

Sincerely,

Bill

Enclosure

D00029

To: Partner Financial Services, Hermitage

**ELECTION A**

________ I request that my aggregate capital (other than my MoA Retirement Enhancer Account) in Deloitte & Touche USA LLP and its subsidiaries ("My Required Capital") be paid to me in two equal installments, 50% in the fiscal year of my retirement and 50% in the fiscal year following my retirement. I will continue to receive ROI on the undistributed portion of My Required Capital at the rate of prime +1%.

**ELECTION B**

I request that the payment of My Required Capital be deferred. I understand that once this request is accepted by Deloitte & Touche USA LLP, it is irrevocable and cannot be changed. I will receive ROI on the undistributed portion of My Required Capital at the rate of prime +1%. Payment of My Required Capital is requested to be paid in equal annual installments each March 15th as follows:

________ 2 equal annual installments on March 15, 2005 - March 15, 2006

________ 3 equal annual installments on March 15, 2005 - March 15, 2007

________ 4 equal annual installments on March 15, 2005 - March 15, 2008

________ 5 equal annual installments on March 15, 2005 - March 15, 2009

________ 6 equal annual installments on March 15, 2005 - March 15, 2010

________ 7 equal annual installments on March 15, 2005 - March 15, 2011

________ 8 equal annual installments on March 15, 2005 - March 15, 2012

________ 9 equal annual installments on March 15, 2005 - March 15, 2013

________ 10 equal annual installments on March 15, 2005 - March 15, 2014

________________ (Date)

________________ (Print Name)

________________ (Signature)

From: Alan D. Paul

Date: May 19, 2004

Subject: Severance of D&T partnership interest

In connection with the proposed termination of my partnership interest in Deloitte & Touche effective in May 2004, there was forwarded to me on May 4, 2004 a draft of a release document. The covering e-mail from Julie Salzman requested that I review the document. The draft provided that I had 21 days to accept its terms. It was not at all clear when that 21 day period was to commence or end. This was sent to me only after I had called Julie to discuss issues in connection with the letter sent to me concerning my termination.

It should be noted that there had been no prior discussion with me of the plan to have me sign a release of any and all claims that I might have against Deloitte in connection with its or its partner's treatment of me. My understanding is that Deloitte has not requested such a release in other partner terminations dealing with former Andersen partners. I am reluctant to sign the release because:

- there is a potential issue of age discrimination given the careless treatment of me and my career, and my age at the time of the scheduled termination (four days shy of 55 years old), and
- I believe there is a serious question as to whether the termination was valid under the provisions of the various Andersen and Deloitte & Touche agreements concerning my admission. Specifically:
    - The terms of paragraph 5(b) of my admission agreement provides that I "shall be deemed to have severed your association with the each Firm (a) . . . , and (b) as of the date specified within two years after the Effective Date by a committee . . . ". The letter notifying me of my termination indicates that "the committee contemplated by paragraph 5(b) . . . has determined that your association with each firm will be severed, effective as of May 27, 2004."
    - The severance date is not within the timeframe provided in the admission agreement and is therefore not valid.
    - In the period since being told by Frank Marcos that I would be terminated and today various partners of the firm have contacted some of my clients concerning my termination. This has significantly impacted and damaged my potential career in public accounting and the prospects for further earnings.

In addition, I have the following comments about the release as sent to me:

1. The document provides "Paul hereby releases and forever discharges the Firms, Deloitte Consulting LLP, and their respective present and former parents, subsidiaries, affiliates, partners, principals, members, stockholders, owners, directors, officers, employees, agents, predecessors, successors and assigns (collectively, the "Releasees") from any and all claims, demands or causes of action of any kind or nature, known or unknown, . . . ". This is entirely too broad, and should be restricted to any claims that arise that are in any way connected with my performance as a partner at Deloitte. The release of course should exclude agreements and commitments arising from my departure.

2. Deloitte must also release me from any and all claims related to my time with the firm.

3. The reference to Article 10 of the Memorandum of Agreement is entirely unnecessary, since by its terms it applies and is not being changed by this agreement in any way.

4. The release provides that I receive a payment of $20,184.61. This amount is equal to the enhanced severance of $50,000 that was offered by Frank Marcos to me minus the earnings impact of delaying delivery of my termination notice by 14 days. ($50,000 – (760units * $850 per unit * 1.2 periods / 26 periods in a year = $20,184.61).

5. It further provides that "Paul acknowledges that, in exchange for this general release, Paul is being provided with consideration which exceeds what Paul would have received had he not given the general release contained in this paragraph." Since the $20,184.61 was already owed by Deloitte as a condition of my not challenging the termination, there is no additional consideration being provided.

6. At the time of my initial conversation with Frank Marcos and Vince Degutis on April 7, 2004 concerning their determination that I should leave Deloitte, it was suggested that the enhanced severance payment was to be for transition assistance in finding new employment. This was especially important given my age and salary history. Based on information I have received recently from an executive help firm, the fee that would be charged for someone in my status would be 18% of prior year's cash compensation, with a maximum of $ 75,000, which would be reached in my case. This is considerably in excess of what had been offered. The $20,184.61 certainly does not contain any extra consideration.

7. The release specifically eliminates any claims I may have for age or other discrimination. The process that the firm used by sending me a draft 90 day partner improvement plan (PIP) was clearly a farce. The phone call on April 8, 2004 telling me the firm had decided I had no future at D&T was only 30 days after Vince DeGutis had indicated that the draft PIP was in effect. This was prior

to the time it was possible for the firm to make any evaluation as to my progress towards meeting the goals set under the plan, all of which were being met, by the way. It is obvious that the firm had decided to terminate me prior to sending me the draft PIP. This was without regard to the obligation the firm had (repeated in the PIP) to help a partner succeed.

8. Mr. Marcos's explanation that I was being terminated because I was too highly compensated is clearly a code phrase for being too old. There were no other concerns raised about my work. My asking why he didn't merely suggest a unit adjustment if my compensation was out of line with Deloitte standards was rebuffed as not practical.

9. Since this is potentially a case of age discrimination, and since it appears that my termination was defective under the existing agreements, my release of the firm should entail an appropriate payment to me by the firm. Taking into account today's environment of turmoil in the public accounting profession, particularly at the Big Four firms, the likelihood that I could find a suitable comparable position is negligible. This payment therefore should be substantial.

BOSTON LTS PARTNERS
FY 2004

| Last Name | First Name | Units | Unit Earnings | Rating | Revenue Goal | Actual Total Revenue | Chargeable Hour Goals | Actual Cheargeable Hours |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Berkowitz | Mark E | 840 | 762,073 | VG | 2,500,000 | 2,403,961 | 1,200 | 1,081 |
| Caramello | Stephen J. | 440 | 399,181 | EXCL | 3,500,000 | 2,817,312 | 1,400 | 857 |
| DeGutis | Vincent M. | 620 | 562,483 | EXCL | 1,500,000 | 1,278,871 | 750 | 650 |
| Drake | Judeth | 410 | 371,964 | VG | 2,000,000 | 1,308,429 | 600 | 926 |
| MacArthur | Brian P | 360 | 326,603 | EXCL | 2,000,000 | 5,144,226 | 700 | 990 |
| Neczypor | Francis M. | 640 | 578,982 | EXCL | 3,250,000 | 2,377,851 | 1,450 | 948 |
| Paul | Alan D. | 760 | 687,599 | Good | 2,500,000 | 1,560,632 | 1,200 | 797 |
| Perrone | Jeffrey N. | 400 | 362,892 | VG | 3,500,000 | 2,804,443 | 1,400 | 1,191 |
| Simmons | Bradford G. | 310 | 281,241 | VG | 2,500,000 | 2,396,603 | 1,200 | 882 |
| Smith | Wayne E. | 440 | 400,312 | Good | 2,000,000 | 1,505,069 | 1,200 | 1,384 |
| Trudell | Leonard D. | 430 | 390,109 | Good | 2,500,000 | 1,214,977 | 1,280 | 1,039 |
| Wickhan | Robert C. | 550 | 497,563 | VG | 3,250,000 | 2,343,107 | 1,100 | 1,054 |

FY2004 Partner Managed Revenue details by Period (does not include 8% overhead allocation or CTS revenues)

| SA_PARTNER | REPORT_DATE | Period1 | Period2 | Period3 | Period4 | Period5 | Period6 | Period7 | Period8 | Period9 | Period10 | Period11 | Period12 | Period13 | Period13 YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BERKOWITZ, M | 20040529 | $166,837 | $178,074 | $181,273 | $221,395 | $154,279 | $139,656 | $28,113 | $36,864 | $124,391 | $222,574 | $246,849 | $109,057 | $146,688 | $1,956,050 |
| CARAMELLO JR., S | 20040529 | $125,316 | $145,995 | $186,424 | $235,678 | $197,081 | $218,796 | $110,124 | $36,118 | $159,598 | ($16,420) | $94,662 | $61,195 | $118,465 | $1,673,032 |
| DEGUTIS, V | 20040529 | $50,438 | $5,242 | $28,771 | $45,153 | $45,171 | $179,339 | $72 | $32,292 | $26,274 | $46,160 | $104,317 | $93,618 | $127,502 | $784,349 |
| DRAKE, J | 20040529 | $31,207 | $113,926 | $39,788 | $439,945 | $30,785 | $119,064 | $29,167 | $38,757 | $74,284 | $76,918 | $68,910 | $45,901 | $47,189 | $1,155,841 |
| MACARTHUR, B | 20040529 | $150,102 | $170,170 | $198,435 | $221,904 | $147,658 | $324,458 | $33,479 | $95,906 | $201,835 | $219,478 | $197,526 | $184,016 | $154,433 | $2,299,400 |
| NECZYPOR, F | 20040529 | $215,765 | $58,627 | $261,744 | $215,737 | $176,401 | $361,069 | $98,930 | $68,277 | $129,907 | $142,589 | $59,625 | $102,301 | $97,222 | $1,988,194 |
| PERRONE, J | 20040529 | $147,398 | $176,491 | $192,892 | $141,807 | $87,812 | $194,703 | $81,838 | $49,460 | $149,355 | $185,552 | $102,472 | ($5,763) | $2,799 | $1,506,816 |
| SIMMONS, B | 20040529 | $81,254 | $143,397 | $153,572 | $161,305 | $84,290 | $108,699 | $78,752 | $127,559 | $155,568 | $204,383 | $169,880 | $181,769 | $360,021 | $2,010,449 |
| SMITH, W | 20040529 | $61,340 | $69,129 | $146,237 | $147,451 | $14,115 | $54,774 | $72,276 | $18,586 | $59,132 | $154,466 | $73,473 | $176,741 | $122,572 | $1,170,292 |
| TRUDELL, L | 20040529 | $29,721 | $34,000 | $94,976 | $124,991 | $91,195 | $248,485 | ($77,645) | $66,423 | $71,756 | $127,814 | $110,969 | $46,805 | ($3,070) | $966,420 |
| WICKHAM, R | 20040529 | $90,862 | $103,860 | $113,309 | $287,428 | $594,989 | $21,627 | $59,014 | $45,746 | $36,365 | $96,991 | $90,310 | $91,824 | $377,886 | $2,010,211 |
| PAUL, A | 20040529 | $70,746 | $87,629 | $61,397 | $110,685 | $70,599 | $132,926 | $80,560 | $74,885 | $318,228 | $127,781 | $357,277 | $47,929 | ($319,085) | $1,221,557 |
| **Total** | | **$1,220,986** | **$1,286,540** | **$1,658,818** | **$2,353,479** | **$1,694,375** | **$2,103,596** | **$594,680** | **$690,873** | **$1,506,693** | **$1,588,286** | **$1,676,270** | **$1,135,393** | **$1,232,622** | **$18,742,811** |

**CTS Revenue by Partner**
**FY04**
**Period 13**

| Last Name | First Name | Group | CTS Revenue FY03 Actual | Revenue FY04 YTD | FY04 Goal | Variance Over/(Under) | CTS Intros YTD |
|---|---|---|---|---|---|---|---|
| Rogers | Bill | 4 | 6,963,609 | 2,211,350 | 5,000,000 | (2,788,650) | 25 |
| Gehring | George | 5 | 7,468,069 | 2,074,030 | 4,100,000 | (2,025,970) | 12 |
| Yaros | Neal | 4 | 3,852,164 | 2,907,744 | 4,000,000 | (1,092,256) | 19 |
| Fusco | Eileen | 0 | 290,927 | 250,070 | 1,300,000 | (1,049,930) | 9 |
| Stecker | Howard | 0 | 366,134 | 0 | 1,000,000 | (1,000,000) | 0 |
| Callender | Jeff | 4 | 89,424 | 1,099,900 | 2,000,000 | (900,100) | 10 |
| Green | David | 1 | 2,095,273 | 1,880,597 | 2,750,000 | (869,403) | 20 |
| Cahill | Matt | 4 | 18,500 | 269,995 | 1,000,000 | (730,005) | 17 |
| Carnevale | Mike | 3 | 85,312 | 72,844 | 800,000 | (727,156) | 19 |
| Diskin | Robert | 2 | 577,200 | 97,734 | 800,000 | (702,266) | 10 |
| Ober | Steve | 4 | 0 | 0 | 700,000 | (700,000) | 7 |
| Neczypor | Frank | 7 | 588,166 | 9,014 | 700,000 | (690,986) | 3 |
| Evans | John | 5 | 0 | 0 | 600,000 | (600,000) | 7 |
| Ferrara | Jim | 2 | 33,300 | 27,750 | 600,000 | (572,250) | 0 |
| Calvin | Jim | 4 | 0 | 0 | 550,000 | (550,000) | 0 |
| Greenblatt | Phil | 5 | 90,235 | 101,406 | 650,000 | (548,594) | 8 |
| Wickham | Robert | 7 | 46,250 | 4,163 | 550,000 | (545,837) | 1 |
| Stephenson | Greg | 0 | 0 | 0 | 500,000 | (500,000) | 2 |
| Byrnes | Eric | 4 | 0 | 0 | 500,000 | (500,000) | 0 |
| Curry | Sue | 4 | 0 | 0 | 500,000 | (500,000) | 0 |
| Logan | Dave | 4 | 0 | 0 | 500,000 | (500,000) | 0 |
| Mak | Ilene | 4 | 0 | 0 | 500,000 | (500,000) | 2 |
| Mourtil | Elana | 4 | 0 | 0 | 500,000 | (500,000) | 5 |
| Tannenbaum | Faye | 4 | 0 | 0 | 500,000 | (500,000) | 11 |
| Weiss | Richard | 4 | 0 | 0 | 500,000 | (500,000) | 0 |
| DeJesus | Jim | 1 | 140,176 | 111,085 | 600,000 | (488,915) | 7 |
| Denning | Richard | 4 | 0 | 92,500 | 550,000 | (457,500) | 2 |
| Mlynarski | Paul | 1 | 69,375 | 9,250 | 450,000 | (440,750) | 8 |
| Sullivan | Mike | 5 | 491,369 | 293,225 | 700,000 | (406,775) | 8 |
| Kennedy | John | 1 | 2,188,550 | 1,843,848 | 2,250,000 | (406,152) | 20 |
| Stricof | Bob | 5 | 0 | 99,438 | 500,000 | (400,562) | 2 |
| Crenshaw | Jim | 1 | 416,250 | 0 | 400,000 | (400,000) | 0 |
| Berkowitz | Mark | 7 | 0 | 0 | 400,000 | (400,000) | 3 |
| Peronne | Jeff | 7 | 115,625 | 0 | 400,000 | (400,000) | 8 |
| Simmons | Brad | 7 | 0 | 0 | 400,000 | (400,000) | 7 |
| Trudell | Len | 7 | 21,183 | 0 | 400,000 | (400,000) | 4 |
| Smith | Wayne | 7 | 23,493 | 5,735 | 400,000 | (394,265) | 8 |
| Rieger | John | 4 | 0 | 115,625 | 500,000 | (384,375) | 22 |
| Discepolo | Alex | 2 | 1,220,325 | 329,303 | 700,000 | (370,697) | 6 |
| Niemiec | John | 4 | 0 | 134,125 | 500,000 | (365,875) | 5 |
| Piazza | Jim | 1 | 177,370 | 190,391 | 550,000 | (359,609) | 36 |
| Kaupp | Evelyn | 7 | 0 | 41,625 | 400,000 | (358,375) | 2 |
| Ferraro | Vin | 2 | 667,454 | 794,223 | 1,150,000 | (355,777) | 4 |
| Hanrehan | Barbara | 1 | 0 | 0 | 350,000 | (350,000) | 0 |
| Fichera | Mike | 2 | 0 | 0 | 350,000 | (350,000) | 3 |
| Giordano | Phil | 2 | 0 | 0 | 350,000 | (350,000) | 0 |
| Smolens | Bob | 3 | 0 | 60,573 | 400,000 | (339,427) | 8 |

**CTS Revenue by Partner**
**FY04**
**Period 13**

| Last Name | First Name | Group | CTS Revenue FY03 Actual | Revenue FY04 YTD | FY04 Goal | Variance Over/(Under) | CTS Intros YTD |
|---|---|---|---|---|---|---|---|
| Clifford | Philip | 4 | 0 | 161,875 | 500,000 | (338,125) | 6 |
| Gelson | Elizabeth | 1 | 0 | 18,500 | 350,000 | (331,500) | 1 |
| Comstock | Richard | 5 | 0 | 280,076 | 600,000 | (319,924) | 6 |
| Jedrlinic | Judith | 5 | 0 | 0 | 300,000 | (300,000) | 5 |
| DeGutis | Vincent | 7 | 475,858 | 253,434 | 550,000 | (296,566) | 9 |
| Giuliante | Carin | 5 | 6,914 | 9,250 | 300,000 | (290,750) | 9 |
| Lipshitz | Neal | 5 | 0 | 23,125 | 300,000 | (276,875) | 5 |
| Hunt | Nancy | 7 | 0 | 0 | 275000 | (275,000) | 0 |
| Paul | Alan | 7 | 0 | 129,500 | 400,000 | (270,500) | 16 |
| Rollins | Tom | 2 | 124,875 | 79,550 | 350,000 | (270,450) | 9 |
| Herbstman | David | 5 | 0 | 348,450 | 600,000 | (251,550) | 4 |
| Imp | Steve | 1 | 545,750 | 369,075 | 600,000 | (230,925) | 11 |
| Daley | Ed | 3 | 0 | 28,574 | 250,000 | (221,426) | 13 |
| Burness | Rich | 0 | 59,983 | 298,513 | 500,000 | (201,487) | 4 |
| Gledhill | Brian | 1 | 0 | 0 | 200,000 | (200,000) | 0 |
| Palmer | Calvin | 3 | 0 | 0 | 200,000 | (200,000) | 13 |
| Enzu | Hiro | 5 | 0 | 0 | 200,000 | (200,000) | 0 |
| Fein | Brad | 5 | 0 | 0 | 200,000 | (200,000) | 0 |
| Hagiwara | Haruko | 5 | 0 | 0 | 200,000 | (200,000) | 0 |
| Hasegawa | Shawn | 5 | 0 | 0 | 200,000 | (200,000) | 0 |
| Ikuta | Hiromi | 5 | 0 | 0 | 200,000 | (200,000) | 0 |
| Kim | Paul | 5 | 0 | 0 | 200,000 | (200,000) | 0 |
| Paradiso | Joseph | 5 | 0 | 0 | 200,000 | (200,000) | 3 |
| Harper | Jason | 6 | 0 | 0 | 200,000 | (200,000) | 0 |
| Metcalfe | Yvonne | 6 | 0 | 0 | 200,000 | (200,000) | 0 |
| Michelman | Marvin | 6 | 0 | 0 | 200,000 | (200,000) | 0 |
| Seidel | Jeff | 5 | 0 | 427,350 | 600,000 | (172,650) | 7 |
| Dorsky | Stu | 5 | 0 | 37,000 | 200,000 | (163,000) | 5 |
| Scheschuck | Peter | 1 | 0 | 0 | 100,000 | (100,000) | 0 |
| Tatulli | Vito | 1 | 0 | 0 | 100,000 | (100,000) | 0 |
| Jewell | Ken | 2 | 0 | 0 | 100,000 | (100,000) | 3 |
| Montague | Larry | 2 | 0 | 0 | 100,000 | (100,000) | 0 |
| Orenstein | Larry | 2 | 0 | 0 | 100,000 | (100,000) | 0 |
| Aronsky | Lana | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Battaglia | John | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Coffey | Catherine | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Curley | Kevin | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Donadio | Anthony | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Dumont | Robert | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Gallagher | Terence | 3 | 0 | 0 | 100,000 | (100,000) | 2 |
| Herrara | Paul | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Jaffa | Thomas | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Langer | Alan | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Rosen | Jay | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Siegel | Mitchel | 3 | 0 | 0 | 100,000 | (100,000) | 0 |
| Agnew | Jeff | 4 | 0 | 0 | 100,000 | (100,000) | 0 |
| Banigan | Russ | 4 | 0 | 0 | 100,000 | (100,000) | 8 |

**CTS Revenue by Partner**
**FY04**
**Period 13**

| Last Name | First Name | Group | CTS Revenue FY03 Actual | Revenue FY04 YTD | FY04 Goal | Variance Over/(Under) | CTS Intros YTD |
|---|---|---|---|---|---|---|---|
| Breindel | Eileen | 4 | 0 | 0 | 100,000 | (100,000) | 0 |
| Chip | William | 4 | 0 | 0 | 100,000 | (100,000) | 0 |
| Cotty | Ken | 4 | 217,375 | 0 | 100,000 | (100,000) | 1 |
| Eisenhauer | Susan | 4 | 0 | 0 | 100,000 | (100,000) | 0 |
| Hall | Theresa | 4 | 0 | 0 | 100,000 | (100,000) | 0 |
| Bertollozi | Marco | 5 | 0 | 0 | 100,000 | (100,000) | 0 |
| Catalano | Joann | 5 | 0 | 0 | 100,000 | (100,000) | 1 |
| Kornfeld | Wendy | 5 | 0 | 0 | 100,000 | (100,000) | 0 |
| Ringle | Leonard | 5 | 0 | 0 | 100,000 | (100,000) | 0 |
| Schwartz | Brad | 5 | 0 | 0 | 100,000 | (100,000) | 0 |
| Teicher | Abe | 5 | 0 | 0 | 100,000 | (100,000) | 1 |
| Ault | Will | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Benjamin | Ari | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Degand | Margaret | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Forlini | Caroline | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Galati | Daniel | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Hempel | Gardiner | 6 | 0 | 0 | 100,000 | (100,000) | 2 |
| Klein | Jim | 6 | 0 | 0 | 100,000 | (100,000) | 1 |
| Mitas | Lou | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Oas | Doug | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Skiba | Gary | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Steward | Mark | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Vitucci | John | 6 | 0 | 0 | 100,000 | (100,000) | 0 |
| Kraemer | Larry | 5 | 0 | 108,188 | 200,000 | (91,812) | 2 |
| Holt | Nichola | 6 | 0 | 9,250 | 100,000 | (90,750) | 2 |
| Batelli | Mike | 1 | 0 | 15,000 | 100,000 | (85,000) | 2 |
| Demasi | Chris | 3 | 0 | 27,750 | 100,000 | (72,250) | 10 |
| Kligman | Charlie | 1 | 769,022 | 1,254,500 | 1,300,000 | (45,500) | 4 |
| Matarese | Mike | 2 | 0 | 55,500 | 100,000 | (44,500) | 4 |
| Walker | Paula | 5 | 0 | 208,125 | 250,000 | (41,875) | 2 |
| Stibich | Mike | 0 | 0 | (38,758) | 0 | (38,758) | 0 |
| Hatzis | Peter | 6 | 299,700 | 516,832 | 550,000 | (33,168) | 20 |
| Wright | Mark | 7 | 0 | (24,328) | 0 | (24,328) | 1 |
| Oricchio | Rick | 2 | 897,713 | 1,385,194 | 1,400,000 | (14,806) | 21 |
| Matza | Robin | 5 | 0 | 292,602 | 300,000 | (7,398) | 5 |
| Moran | Janet | 0 | 0 | (4,625) | 0 | (4,625) | 4 |
| Revault | Pierre | 0 | 397,288 | (4,163) | 0 | (4,163) | 0 |
| Carr | Vicky | 0 | 0 | 0 | 0 | 0 | 1 |
| Corcoran | Peter | 0 | 0 | 0 | 0 | 0 | 2 |
| Graham | George | 0 | 0 | 6,475 | 0 | 0 | 0 |
| Singer | | 0 | 0 | 0 | 0 | 0 | 0 |
| Spears | Rick | 0 | 0 | 0 | 0 | 0 | 1 |
| Poignant | Robert | 1 | 0 | 0 | 0 | 0 | 1 |
| Gelman | Craig | 2 | 0 | 0 | 0 | 0 | 7 |
| Zesk | Tom | 6 | 0 | 0 | 0 | 0 | 0 |
| Dean | Robert | 7 | 0 | 0 | 0 | 0 | 0 |
| Sloniker | Richard | 0 | 0 | 208 | 0 | 208 | 0 |

9/27/2007
11:39 AM

**CTS Revenue by Partner**
**FY04**
**Period 13**

| Last Name | First Name | Group | CTS Revenue FY03 Actual | Revenue FY04 YTD | FY04 Goal | Variance Over/(Under) | CTS Intros YTD |
|---|---|---|---|---|---|---|---|
| Robeson | | 0 | 0 | 750 | 0 | 750 | 0 |
| Jozefiak | Stan | 0 | 4,903 | 9,472 | 0 | 9,472 | 0 |
| Mott | John | 0 | 0 | 11,100 | 0 | 11,100 | 8 |
| Deriot | Doug | 0 | 0 | 23,999 | 0 | 23,999 | 0 |
| O'Toole | Jim | 1 | 0 | 129,500 | 100,000 | 29,500 | 6 |
| Reyer | | 0 | 275,000 | 31,070 | 0 | 31,070 | 0 |
| Oswald | Jim | 3 | 487,012 | 734,451 | 700,000 | 34,451 | 11 |
| Caramello | Steve | 7 | 825,100 | 743,143 | 700,000 | 43,143 | 12 |
| Pizzimenti | Joseph | 5 | 0 | 145,188 | 100,000 | 45,188 | 5 |
| Dougherty | Ted | 4 | 0 | 64,750 | 0 | 64,750 | 6 |
| Atkins | Kevin | 0 | 0 | 65,000 | 0 | 65,000 | 1 |
| Lowenthal | Sam | 4 | 0 | 101,750 | 0 | 101,750 | 21 |
| Acampora | David | 2 | 280,414 | 726,519 | 600,000 | 126,519 | 6 |
| Mungovan | Jim | 7 | 338,975 | 134,175 | 0 | 134,175 | 3 |
| Auster | Ellen | 0 | 133,337 | 142,929 | 0 | 142,929 | 4 |
| Steiger | Mark | 6 | 334,042 | 728,310 | 550,000 | 178,310 | 44 |
| Caballero | Jorge | 1 | 3,769,705 | 3,452,805 | 3,250,000 | 202,805 | 11 |
| Hurvitz | Harry | 6 | 440,445 | 1,019,045 | 750,000 | 269,045 | 10 |
| Maria | Mike | 5 | 1,198,284 | 1,437,507 | 1,150,000 | 287,507 | 6 |
| Zwerling | Stuart | 4 | 193,018 | 821,839 | 500,000 | 321,839 | 54 |
| Nason | Jim | 0 | 0 | 462,500 | 100,000 | 362,500 | 2 |
| Morrow | Greg | 2 | 302,189 | 2,096,262 | 1,700,000 | 396,262 | 19 |
| Stock | Bob | 1 | 428,778 | 995,701 | 550,000 | 445,701 | 32 |
| Aronson | Paul | 5 | 195,509 | 756,097 | 300,000 | 456,097 | 1 |
| Wertheim | Nancy | 7 | 123,259 | 910,128 | 0 | 910,128 | 10 |
| Shafik | Messiha | 6 | 0 | 1,550,300 | 200,000 | 1,350,300 | 6 |
| Choma | Donna | 5 | 323,843 | 2,034,415 | 650,000 | 1,384,415 | 12 |
| MacArthur | Brian | 7 | 500,105 | 2,419,235 | 700,000 | 1,719,235 | 36 |

| NAME | Date Joined Deloitte | Date Became Partner | Date of Birth | FY03PPT | FY04 UNIT | FY03 Rating as a Partner | FY04 Rating as a Partner | tblRC4_Description | SLIP | FACILITY | Term Date | PIP? | FY02 Revenue Managed Goal (Per Goal Form) | FY03 Revenue Managed Goal (Per Goal Form) | FY04 Revenue Managed Goal (Per Goal Form) | FY02 CTS Goal | FY03 CTS Goal | FY04 CTS Goal | FY02 Revenue Managed Actual (Per Goal Form) | FY03 Revenue Managed Actual (Per Goal Form Chart) | FY04 Revenue Managed Actual (Per Goal Form Chart) | FY02 CTS Revenue | FY03 CTS Revenue - Per CTS Schedule | FY04 CTS Revenue - Per CTS schedule | FY02 Revenue Generated per MR121 | FY03 Revenue Generated per MR121 | FY04 Revenue Generated per MR121 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BERKOWITZ, MARK E. | 08-May-02 | 08-May-02 | 1/11/53 | 860 | 840 | Very Good | Very Good | NORTHEAST TAX SUMMRY | LTS | BOSTON | | NO | NA - joined 5/02 | 2,000,000 | 0 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 400,000 | NA - joined 5/02 | 0 | 0 | NA - joined 5/02 | 0 | 0 | N/A | 2,144,861 | 1,556,050 |
| COMSTOCK, RICHARD H | 08-May-02 | 08-May-02 | 9/20/47 | 500 | 570 | Excellent | Very Good | NORTHEAST TAX SUMMRY | LTS | NY WORLD FIN CENTER | | NO | NA - joined 5/02 | 3,500,000 | 2,500,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 600,000 | NA - joined 5/02 | 0 per fy03 form; but his fy04 goal form says his fy03 mr121 was $2,425,000 | 2,900,000 | NA - joined 5/02 | 0 per this Source, but on his FY04 goal form he claimed he achieved $600k for keyspan in FY03 | 280,076 | N/A | 1,038,156 | 1,204,969 |
| EVANS, JOHN N | 08-May-02 | 08-May-02 | 4/8/54 | 700 | 700 | Very Good | Very Good | NORTHEAST TAX SUMMRY | LTS | JERICHO | | NO | NA - joined 5/02 | 2,200,000 | 2,200,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 600,000 | NA - joined 5/02 | 1,900,000 | 1,975,000 | NA - joined 5/02 | 0 | 0 | (899) | 477,673 | 669,786 |
| FICHERA, MICHAEL A | 08-May-02 | 08-May-02 | 7/8/64 | 280 | N/A - gone during FY04 (units never allocated, knew he would be gone) | Not Achieved | N/A - gone during FY04 | NORTHEAST TAX SUMMRY | LTS | STAMFORD | 11/22/2003 | NO - we have no record of a formal PIP | NA - joined 5/02 | 1,600,000 | NA | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 350,000 | NA - joined 5/02 | 344k (not on chart but pulled from text on pg4) | NA | NA - joined 5/02 | 0 | 0 | 3,801 | 344,684 | 34,390 |
| GARTLAND, EDWARD V. | 08-May-02 | 08-May-02 | 3/1/62 | 660 | 500 | Good | N/A - gone during FY04 | NORTHEAST TAX SUMMRY | MS | BOSTON | 1/19/2004 | NO - We tried to put him on a PIP but he refused to sign the document | NA - joined 5/02 | Nothing available | Nothing available | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | Ptr not listed on report | NA - joined 5/02 | Nothing available | Nothing available | NA - joined 5/02 | Ptr not listed on report | Ptr not listed on report | 8,395 | 518,303 | 91,998 |
| GOLDSMITH, MICHAEL H. | 08-May-02 | 08-May-02 | 3/19/1966 | 270 | N/A - gone during FY03 | N/A - gone during FY03 | N/A - gone during FY03 | NORTHEAST TAX SUMMRY | MS | NY WORLD FIN CENTER | 2/14/2003 | NO | NA - joined 5/02 | 1,750,000 | NA | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | Ptr not listed on report | NA - joined 5/02 | 0 (left during year so year end form never completed) | NA | NA - joined 5/02 | Ptr not listed on report | Ptr not listed on report | N/A | 194,270 | 0 |
| HEMPEL, GARDINER | 08-May-02 | 08-May-02 | 11/14/53 | 810 | 850 | Very Good | Excellent | NORTHEAST TAX SUMMRY | IAS | NY WORLD FIN CENTER | | NO | NA - joined 5/02 | 3,500,000 | 3,500,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 100,000 | NA - joined 5/02 | 0 | 3,598,000 | NA - joined 5/02 | 0 | 0 per Source#2; however per FY04 year end goal form, LTP notes he helped secure $350k cts project | N/A | 3,019,124 | 2,059,357 |
| HERBSTMAN, DAVID B | 08-May-02 | 08-May-02 | 9/7/61 | 550 | 530 | Very Good | Very Good | NORTHEAST TAX SUMMRY | LTS | NY WORLD FIN CENTER | 1/12/2008 | YES | NA - joined 5/02 | 2,700,000 | 2,500,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 600,000 | NA - joined 5/02 | 0 | 0 per Chart, but text notes that he was "slightly below is goal", so he must have some fees that aren't showing in chart | NA - joined 5/02 | 0 | 348,450 | N/A | 506,913 | 550,992 |

Legal - ADP Information

D01041

Confidential

| NAME | Date Joined Deloitte | Date Became Partner | Date of Birth | FY03PPT | FY04 UNIT | FY03 Rating as a Partner | FY04 Rating as a Partner | tblRC4_Description | SLIP | FACILITY | Term Date | PIP? | FY02 Revenue Managed Goal (Per Goal Form) | FY03 Revenue Managed Goal (Per Goal Form) | FY04 Revenue Managed Goal (Per Goal Form) | FY02 CTS Goal | FY03 CTS Goal | FY04 CTS Goal | FY02 Revenue Managed Actual (Per Goal Form) | FY03 Revenue Managed Actual (Per Goal Form Chart) | FY04 Revenue Managed Actual (Per Goal Form Chart) | FY02 CTS Revenue | FY03 CTS Revenue - Per CTS Schedule | FY04 CTS Revenue - Per CTS schedule | FY02 Revenue Generated per MR121 | FY03 Revenue Generated per MR121 | FY04 Revenue Generated per MR121 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HOLT, NICHOLA | 8/3/2002 | 8/10/2003 | 11/5/64 | N/A - Ptr FY04 | 510 | N/A - Ptr FY04 | Very Good | NORTHEAST TAX SUMMRY | IAS | NY WORLD FIN CENTER | | NO | NA - joined 5/02 | NA - was director | Not available | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 100,000 | NA - joined 5/02 | NA - was director | Not available | NA - joined 5/02 | 0 | 9,250 | N/A | 2,953,041 | 2,243,966 |
| PAUL, ALAN D. | 08-May-02 | 08-May-02 | 6/2/49 | 780 | 760 | Good | No final rating on file | NORTHEAST TAX SUMMRY | LTS | BOSTON | 5/28/2004 | YES | NA - joined 5/02 | 2,000,000 | 2,500,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 400,000 | NA - joined 5/02 | 1,400,000 | year end form never completed because he left before end of fy04 - but comments at midyear said he may miss rev target by 20-30% | NA - joined 5/02 | 0 | 129,500 | 12,380 | 1,307,777 | 1,221,557 |
| PIAZZA, JAMES M | 08-May-02 | 08-May-02 | 9/9/61 | 510 | 570 | Very Good | Very Good | NORTHEAST TAX SUMMRY | LTS | PARSIPPANY | | NO | NA - joined 5/02 | 2,500,000 | 4,200,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 550,000 | NA - joined 5/02 | 4,200,000 | 4,700,000 | NA - joined 5/02 | 177,370 | 190,391 | 1,086 | 2,892,482 | 3,279,085 |
| STINNER, MATT | 08-May-02 | 08-May-02 | 4/12/1967 | 270 | N/A - gone during FY03 | N/A - gone during FY03 | N/A - gone during FY03 | NEW ENGLAND | EB | BOSTON | 8/25/2002 | NO | NA - joined 5/02 | Nothing available | NA | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | Ptr not listed on report | NA - joined 5/02 | NA | NA | NA - joined 5/02 | Ptr not listed on report | Ptr not listed on report | N/A | (171) | 0 |
| STRICOF, ROBERT I. | 08-May-02 | 08-May-02 | 11/13/52 | 1000 | 1050 | Excellent | Very Good | NORTHEAST TAX SUMMRY | INT | NY WORLD FIN CENTER | | NO | NA - joined 5/02 | 3,000,000 | 3,000,000 | NA - joined 5/02 | Cannot find any CTS goal for legacy AA ptrs | 500,000 | NA - joined 5/02 | 4,200,000 | 2,500,000 | NA - joined 5/02 | 0 | 99,438 | 1,806 | 4,212,274 | 2,328,120 |

Legal - ADP Information

D01042

Confidential

Exhibits: None Volume 1, Pages 1-35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------

ALAN D. PAUL

Plaintiff

vs. Civil Action No. 06-225 (MPT)

DELOITTE & TOUCHE, LLP and

DELOITTE & TOUCHE, USA, LLP

Defendants

------------------------------

DEPOSITION OF MARK BERKOWITZ

Wednesday, May 21, 2008, 11:50 a.m.

Deloitte & Touche, LLP

200 Berkeley Street

Boston, Massachusetts

------- Reporter: David A. Arsenault, RPR -------

daa@fabreporters.com www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404 fax 617.728.4403

A. Yes.

Q. Was Mr. Paul part of that group that wanted to move together?

A. The entire tax practice was hoping to move in the largest group possible.

Q. Let me show you a document which has been marked in a previous deposition. It is an email from Mike Burton to Barry Salzberg. Do you know who they are?

A. I know who they are.

Q. The fourth sentence, fifth hash mark down there, referring to Alan Paul: He's Mark Berkowitz's closest friend in the partner group. Would that be an accurate description?

A. Probably Al Cohen; but certainly Al Paul, very close.

Q. Were there any discussions or intimations by anybody that you might not go to Deloitte if Alan Paul did not go also?

A. Not that I was a part of.

Q. You never suggested that?

A. Not that I recall.

Q. Let me hand you another document which has been marked previously, Wells Exhibit 1. I ask you

before .

A. This does not look familiar to me.

Q. Turn to the fourth page, Bates stamp Paul 181. Under Section 8, partner termination, there's a discussion of a process which during the first two years Andersen partners who moved over to Deloitte could be terminated. Read that paragraph.

A. The second full paragraph?

Q. Yes. It says: "As an added protection."

A. (Witness complies.) Okay.

Q. Do you remember that provision being discussed with you?

A. Yes, I do. I wouldn't have been able to recall. Reading that I do recall that they had that committee.

Q. When you were given a letter of offer of partnership that you had to sign, were you subject to that two-year provision?

A. My understanding is that I was. I don't recall if I knew about this special committee before or after I signed it. But I knew we had a two-year probation period.

Q. It says there as an added protection for Andersen partners admitted to Deloitte & Touche. Do

you remember any representation as to the purpose of that two-year period?

A. I didn't have a lot of discussion with people about it. It seemed obvious to me.

Q. What was obvious?

A. It was a probation period.

Q. The committee was made up of three Deloitte, original Deloitte partners, and three Andersen Deloitte partners?

A. That's right.

Q. The makeup of the committee was designed to protect the Andersen partners if any attempt was made to sever them?

MR. SANDLER: Objection.

MR. ABER: What's wrong?

MR. SANDLER: You are leading. You are suggesting the answer. You haven't told him that it is a Andersen document that you are referring to.

MR. ABER: I don't know that it is.

MR. SANDLER: Of course it is. It was produced by your client.

MR. ABER: We don't know the source of it yet. We have not been able to identify it.

Q. Did you ever have the impression that the

two-year provision was to benefit the Deloitte or Andersen partners who became Deloitte partners or both?

A. I guess I was under the impression that it was to benefit Deloitte.

Q. During the process of moving over from Andersen to Deloitte, who did you negotiate with, basically?

A. From Andersen to Deloitte?

Q. The Andersen transaction.

A. Mike Burton was the major contact.

Q. What was the nature of your client base at Andersen?

A. I don't know what you mean.

Q. Did you do tax returns, the average Joe who needed to file tax returns by April 15th?

A. Do you mean did I sit and prepare tax returns?

Q. I'm trying to understand what the nature of your practice was.

A. I'm sorry, I'm not sure what you mean by the nature of.

Q. As I understand, there are some people who do audit work.



WILCOX & FETZER LTD.

In the Matter Of:

# Paul
v.
# Deloitte & Touche, et al.

C.A. # 06-225 (MPT)

---

Transcript of:

Burton, Michael (4/15/2008)

April 15, 2008

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

partner in Deloitte, would he be expected to be as productive as other Deloitte tax partners or would there be a period of transition where he could work his way up?

A. As I recall, there was a period of transition anticipated in the first year for all Andersen partners coming in for year one.

Q. What about year two?

A. I don't recall if there was any discussion about relief from revenue production after year two. I don't think we would have done the transaction to hire the partners.

MR. SANDLER: After year two or after year one?

MR. ABER: Mr. Sandler, you can ask questions during your part of the deposition, not during my part of the deposition.

MR. SANDLER: I'm attempting to clarify what appears to have been a misstatement, a misspoken statement.

MR. ABER: Then that is what cross-examination is for. That is not to occur during my part of the deposition. You have continuously from deposition to deposition made

substantive statements. The only thing you are permitted to say is objection. If require more, I will ask more.

MR. SANDLER: I don't think that was a substantive statement nor have I done that at any other time. I have tried to clarify misspoken statements, including several by you today. And, apparently, you appreciated it.

MR. ABER: You can correct me. You are not to correct the witness. And you know better I think. And I can remember instances with Mr. DeGutis when you did it on several occasions.

MR. SANDLER: Let's not spend any more time on it.

BY MR. ABER:

Q. If Mr. Paul were to represent that you suggested that during the first couple of years that his production would not be expected to match other Deloitte partners, would you agree or suggest that Mr. Paul is not telling the truth?

A. Again, you have to clarify in your question what you mean by other Deloitte partners.

Electronically signed by Anne Adams (501-022-237-5311) 78c6dbbb-43e2-415c-8b9a-5cd2e7936447

Q. Other --

A. Deloitte partners.

Q. -- Deloitte partners.

A. And you've started your question with would I --

Q. Agree with that statement or would you say that Mr. Paul was lying if he said that?

A. I would say I would find that very surprising that I would have said that.

Q. Do you have any recollection of saying that?

A. No.

Q. Can you deny saying it?

A. If I don't have a recollection of saying it, I would have a hard time denying that I said it. But I said a moment ago I would find it very surprising because we did the transaction, hired the partners with an expectation that they produce after year one. There was an understanding during year one that there was a time that they had to get assimilated into our practice. Beyond that there was an expectation that they produce.

Q. Was the amount of his production to be

Electronically signed by Anne Adams (501-022-237-5311) 78c6dbbb-43e2-415c-8b9a-5cd2e7936447

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -x

ALAN D. PAUL,

Plaintiff,

-against-

C.A. No. 06-225(MPT)

DELOITTE & TOUCHE, LLP and DELOITTE & TOUCHE, USA, LLP

Defendants.

- - - - - - - - - - - - - - - - - - - - - - -x

1633 Broadway
New York, New York

December 19, 2007
10:00 a.m.

DEPOSITION of VINCENT M. DE GUTIS, pursuant to 30(B)(6) Notice, before ELIZABETH SANTAMARIA, a Notary Public of the State of New York.

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 86121

A. Yes.

Q. Did you get that before you got the master's degree?

A. Yes.

Q. And then after got your master's degree, where did you go to work?

A. I continued at KPMG. I started at KPMG in 1983, was there for approximately 13 years, joined Deloitte --

Q. Is that the name of the firm, KPMG, or is that short for something else?

A. Klynveld Peat Marwick & Goerdeler.

Q. And then you worked for Deloitte?

A. Came to Deloitte in 1997 as a partner, was in charge of the Mid-South practice for three years, which was Memphis and Jackson, Mississippi. Moved to Boston to be in charge of what was then called the New England cluster. Did that for two and a half, three years. The New England cluster became part of the New York practice, which was the Northeast region, and so I ran what was known as Group 7 within the Northeast practice for two years.

Q. Explain to me the relationship

DeGUTIS

between the New England practice and --

You said the New England practice became part of the New York practice?

A. Right. What happened, there were 13 clusters. That was the way the firm organized our practices, and approximately 2003 we went from 13 clusters down to 11 regions and so we merged two of the clusters in the Northeast and two of the clusters out on the West Coast, so New England and New York became one.

Q. Where was the head office the New York group?

A. In New York.

Q. And it supervised everybody else in the Northeast region?

A. Correct.

Q. So the Boston office reported to the New York office?

A. I reported to my boss who was in New York.

Q. And your actions as far as managing the Boston office was reviewable by the New York office?

A. Correct.

DeGUTIS

Q. And controlled by the New York office?

A. Correct.

Q. So the Boston office was not an independent entity, was it?

A. Correct.

Q. It was part of the New York Northeast region?

A. Correct.

Q. In the Boston -- how many partners were there in the New York region in 2003?

A. In New York?

Q. Yes.

A. I have no idea.

Q. Can you give me a ballpark?

A. I would guess 50, 60.

Q. And when you include partners, do you include principals in that?

A. Principals, yes.

Q. That would be included in that figure?

A. Yes. Not directors.

Q. How many partners were in the Boston office?

DeGUTIS

A. Approximately 12.

Q. In the pleadings in this matter there has been reference to 18 partners in the Boston office. Do you know what that figure refers to?

A. I have to see a list, but my answer is approximately 12 partners that I was responsible for.

MR. ABER: Mark this as DeGutis Exhibit 2, please.

(DeGutis Exhibit 2, Defendant's supplemental answers to interrogatories, marked for identification, as of this date.)

Q. Did you assist Mr. Sandler, your Deloitte's attorney, in preparing answers to interrogatories at one point?

Do you know what interrogatories are?

A. Yes.

Q. Did you help him prepare answers to a formal set of interrogatories?

A. No.

Q. What I am handing you is a letter

DeGUTIS

I looked at his evaluations, the PIP. No one saying he doesn't know how to be a CPA?

A. Correct.

Q. He performed his function as a CPA properly?

A. I never heard anything from a client that there were quality issues related to what Mr. Paul did.

Q. So he was qualified to do his job?

A. Correct.

Q. When was he given a notice that he was going to be terminated --

Actually, when was it first communicated to him?

A. I don't know the date exactly. It would have been a conversation with Frank, Alan and I approximately in April.

Q. And that would have been before he got the written letter notifying him of his termination?

A. I'm not sure.

Q. If Mr. Paul were to state he was told a week or so before he got the written letter would you have any reason to disagree with him?

him?

A. Yes.

Q. When did that occur?

A. The first year. After his first year as a partner he was evaluated a "good" and I recommended that his units be reduced.

Q. From what to what?

A. I mean, I would like to see a schedule to be sure, but I recall it to be 780 to 760.

Q. In the exhibits you referred to earlier it showed units of 760. How was that process done? Was that your decision or is there an administrative process to do that?

A. There is a big administrative process. We go through a process as a firm each year when we do end-of-the-year evaluations and rank the partners and directors based on criteria that the firm says Alan was rated a "good." I would have done that for all LTS partners. I would have submitted that information or I did submit that information to Frank Marcos.

Again, I was in charge of Group 7, LTS, which would imply that there are six other

groups that he got that information for. Frank would come back, have a discussion with us. We would finalize those recommendations. Then the comp system would start, and I would be allocated a number of units from Frank Marcos and the firm would have or set a criteria that said if you are a "good" rated person you should get -- and I don't recall the exact amounts, but you should get negative 40 to zero units. That was the recommended allocation.

However, it was up to me to decide what to do with that unit allocation that I got. I made the recommendation that it be minus 20, submitted that to Frank. Frank would review it along with all the other groups. Then it would go to a comp committee within Tax, then it would go to a comp committee for the firm, then it would be approved by the board.

Q. Maybe I misunderstood, but let me make sure I am correct. Was the reduction in units specifically limited to Mr. Paul? Or was the decision a group decision where you were given so many units for your people you supervised and you had to divvy them up as you thought?

DeGUTIS

A. I don't understand the distinction.

Q. One way you are going to be given 5,000 units to divvy up among your 12 partners, and you do it anyway -- recommend how you think it should be divided up.

A. Right.

Q. Or was the decision made individually, partner by partner, as to whether they should be reduced?

A. It's both. I would get the original allotment, I got the original allotment.

Q. To be divvied up?

A. To be divvied up. And then I would go through partner by partner looking at their performance, the number of units that they have and the recommended allocations based on their rating and putting all those factors together to come up with the final unit allocation that I sent to Frank to get his approval.

Q. And it was your recommendation that because Mr. Paul had a good rating, those units should be reduced from 760 to 740?

A. I think it was 780 to 760.

Q. Okay. Whatever it is.

DeGUTIS

A. And a good rating was the bottom 5 to 15 percent of our partners.

Q. It was a lower rating below "good" that you could get?

A. Right.

Q. If somebody had a "very good" rating, would that warrant a reduction of units?

A. Again, I would have to look at the recommended schedule at that time, but I would -- I think the range was like negative 20 to plus 20 for that range.

Q. But would you lower someone who had a "very good" rating?

A. Yes.

Q. Why?

A. Depending on the number of units that they had, the scale --

The way the scale worked, it was broken down -- if someone had 200 to 300 units, the recommended allocation was a higher range than if they had, you know, 900 units to 1,000 units. Basically we were trying to get more comp to -- higher percentage raises to some of the partners that were making a lot less.

evaluation process for Deloitte, how it works.

A. We set goals at the beginning of the year. I mean, you want me to go through the specifics of the goals?

Q. Generally. We will get into the evaluations individually.

A. The goal setting process is done electronically at first. The partners and directors fill out their goals and they submit it to whoever their lead goal endorser is. The lead goal endorser would review those goals at comments and then would set up a face-to-face meeting with their endorse see.

Q. So the manager is the endorser, the person being evaluated is the endorsee?

A. Correct.

Q. I just want my titles correct.

A. So they would get together face-to-face, agree on the goals, and then in your example the manager or the endorsee would go back into the system and sign off on it.

Q. Now I am confused. You said the manager or the endorsee. The manager is not the endorsee.

DeGUTIS

A. I thought that's the way you were referring to it.

Q. No. Let's try it again.

A. All right.

Q. The endorser is the manager or the employee being evaluated?

A. The endorser is the person doing the evaluation.

Q. So the endorsee --

A. Is the person being evaluated.

Q. I thought you were equating the manager to the endorsee.

A. So there is a face-to-face meeting, agree on the goals, and then the endorsee has to go back in and sign off electronically, and that's to signify that he or she agrees with the goals that are within the system.

At midyear we go through the same process. The endorsee goes in, makes comments regarding how they have performed against those goals for the first six or seven months of the year. Then the endorser goes into the system, makes comments.

Then they get together face-to-face

DeGUTIS

again, discuss the performance to date. If there is anything specifically that they need to work on, those kind of comments are included in that midyear evaluation. And then again the endorsee has to go back in, sign off on it, signifying that the meeting took place and the discussion took place.

Then at year end same process again. The endorsee goes in, describes how he performed against his or her goals for the year. The endorser goes in, makes the comment. They meet again face-to-face and then a final rating is set within the next month or so after that, and then a meeting takes place with the endorsee again to let him know what the rating is and the comp.

Q. And are you the gentleman -- if you are managing an employee and do the evaluation, do you set the rating as "good," "very good" or is that done by somebody else?

A. I would set it -- same process that we talked about with comp earlier, but I would set the rating, then --

And we're saying -- now we are getting real.

DeGUTIS

A. Yes.

Q. The goals are set in the left-hand column?

A. Yes.

Q. The first goal says, his first goal is to "Effectively transition as many Andersen clients as possible to D&T." Was that goal achieved?

A. I am reading the goal.

I would have to look at my reports. My recollection is that it was not.

Q. But you can't testify today to that?

A. I can say my recollection is that it was not.

Q. What do you base that recollection on?

A. Thinking through the clients in my head, the clients that he served when they came to Deloitte.

Q. Were there specific clients that you think he did not transition in Deloitte?

A. I mean his overall revenue is $1.4 million. Perini was probably 300,000 or 400,000 of it. That one had come to Deloitte

DeGUTIS

prior to Alan coming into the firm, thinking through some of -- there weren't many audit clients that were transitioned. There weren't banking clients, there weren't many real estate clients. And so to me it's logical that it wouldn't add up to $1 million.

Q. Do you know of any specific client that he had at Arthur Andersen who you concluded he did not transfer or transitioned to Deloitte?

A. I would -- I don't know all his clients at Andersen. There were a lot of them and so there is a lot of clients that were not transitioned to Deloitte.

Q. Do you know any specific client, any individual, one or two or three, clients he had at Andersen that he could not or did not transition to Deloitte?

A. Well, I mean I will go back to Perini. Perini transitioned before he got there.

Q. Is your answer that you can't remember any specific clients?

A. No, I can. Perini.

Q. That came over to Deloitte?

A. Yeah, prior to him getting it.

DeGUTIS

Q. My question is -- I will say it a third time. Can you give me any specific client that he had at Andersen that did not transition over to Deloitte?

A. Perini.

Q. That did transition to Deloitte.

A. Oh, from his actions. I understand now.

Q. I didn't include that. I just asked any client that he had at Andersen that did not transition to Deloitte.

A. I can't name a specific client. I know that he had a book of business at Andersen that was far in excess of $3 million. His revenue with Deloitte was $1.4 million the first year, approximately $1.8 million the second year. I can't name a specific client, but I've got to believe there is a lot of them.

Q. The second goal is "Actively pursue banking clients and develop D&T's credentials in the area of community banks." Was that goal met?

A. I would have to look at a report to be sure, which is easy enough to look at the revenue that we got from his banking clients. My

DeGUTIS

negotiations?

A. Yes.

Q. What about the other three?

A. Preferred provider for Chevron in the tax credit area, I would say yes. He hit that. He provided those services to Chevron over the two years he was with Deloitte.

Help the transition from Andersen for now colleagues, he was very active in that area.

Q. What about the last one, about developing competency in tax credits?

A. Where are you reading that?

Q. The top of Page 108.

A. Developing competency in tax credit -- did not get three projects totaling $400,000 in fees.

Q. At the bottom of pages 110, are those your comments?

A. That Alan had a good year?

Q. Yes.

A. Yes.

Q. What did you mean when you said he has gained momentum as the year progressed?

DeGUTIS

A. The expectation would be that people could not hit the ground, you know, running when they were making the transition from Andersen and that each month that the performance would be getting stronger and stronger. The integration within the practice, participation in, you know, whatever office wide events, firm type events were taking place from a financial perspective, making sure that they understood sort of the Deloitte structure, the national groups, the service line groups, any other groups that we had that could help them service their clients, starting to bring those resources to their clients. There were a lot of changes going on within the marketplace at that time and a lot of relationships with existing accounting firms was changing and obviously we had opportunities to build those relationships and generate revenue and people, some people could be real active in that area, some people weren't as active and over time Alan specifically was gaining momentum in that area as well.

Q. So when Alan first joined the firm, he didn't hit the floor running; is that what you are saying?

DeGUTIS

D19 -- D13 through D20, which we will remove to make it D5, one copy and complete.

MR. ABER: Off the record.

(Discussion off the record.)

MR. ABER: We will agree that D5 actually has two versions of the fiscal year 2004 evaluation of Mr. Paul, except that D10 does not have any check marks on it or D19 does.

Q. The document Bates stamped D00010 does not have the check marks where the similar page in the second version that is included in Paul 5, D00019 does have the check marks. Which would make it complete. Right?

A. Yes.

Q. Looking at the goals for the 2004 evaluation, it says one of the goals is preferred provider revenue from Gilbane, G-I-L-B-A-N-E, of $400,000. Was that goal met?

A. No.

Q. What do you base that on?

A. My memory.

Q. The next one is preferred provider

DeGUTIS

revenue from Grand Circle of $500,000. Was that met?

A. No.

Q. Were any fees generated at all from Grand Circle?

A. In 2004? No. There was a VAT refund project that was done by the Australian firm. There was a -- I would call it a finder's fee or participation fee that they were to pay back to the U.S. There was no refund that was received in 2004. There was a refund that was received in 2005 and I think the revenue was approximately $100,000 that was allocated to Boston so there was none in 2004.

Q. Would that $100,000 have been as a result -- whatever fees came back?

A. Yes.

RQ MR. ABER: And I will ask for the documents for that.

Q. Would that have been the result of what Mr. Paul did in selling the job?

A. Yes. So even if that $100,000 were to come in in 2004 we would not have hit $500,000 in 2004. We wouldn't have been close.

DeGUTIS

Q. The next one says preferred provider revenues from Modem Continental of $100,000. Was that met?

A. I don't know for sure. There was some multistate work that went on. I don't recall if it was $100,000 or not.

Q. Was Modem going out of business at the time?

A. I don't recall.

Q. And this CTS revenue of $400,000?

A. Not achieved.

Q. Explain to me what CTS revenue is.

A. CTS was Comprehensive Tax Solutions and it was a national group and there were eight or ten particular services that they provided to our clients and to the market and typically they were services that you wouldn't build up an infrastructure of people in every operating office because there wouldn't be enough work for that particular project to build up an infrastructure in every operating office.

I mean, you use research and development as an example. We had research and development experts, you know, probably 30 or 40

DeGUTIS

people at the time, and all they did were research and development projects. They became very adept at the process, the law, how to implement it, how the IRS -- how you worked it through the IRS.

It was a responsibility for the local office people to bring those groups into their clients. Obviously they were -- the eight or ten different services they provided were ones we thought as a firm we could market and the market wanted us to be out there doing that work.

Q. I gather the Boston office was one where they felt the work was there so it didn't have the people to man that project.

A. Say that again.

Q. Earlier you said not all offices had enough work -- I forget the phrase you used -- to justify manning that project in that office.

A. Right.

Q. That Boston did have enough work to justify that.

A. No. We didn't have -- we didn't have eight people within those eight or ten CTS groups in Boston. The R&D one that I used as an example, there were a couple of people in Boston

DeGUTIS

And just I guess a point of clarification. In the middle there were two or three partners that were included in that 12 that had roles that were outside of Boston and so, therefore, the amount of weight that we placed on what they did in CTS was very low and realistically you could almost take those three off.

Q. If you will turn to Page 8D0008 of DeGutis Exhibit 5.

A. D0008?

Q. Yes.

That has -- under number 5, it has operational excellence; is that correct?

A. Yes.

Q. And that's basically how much money you billed, correct? Or revenues you generated?

A. Well, I mean it's blank on D0008.

Q. One of the goals was to increase his revenues, correct?

A. Right. "Increase revenue across my clients list to meet" --

Q. Did he increase his revenues from 2003 to 2004?

DeGUTIS

A. Yes. It went from 1.4 million to 1.7 million, somewhere in that range.

Q. So he did increase it by --

A. But keep reading. To meet the managed revenue goal. He did not meet his managed revenue goal.

Q. But it did increase.

A. Yes, it increased, but it didn't increase to meet his managed revenue goal.

Q. In looking at DeGutis Exhibit 4, in a similar place we had the targets and then we had the results. We don't have that --

A. Where?

Q. Remember on the first page of DeGutis 4 we had the results next to the targets?

A. Uh-huh.

Q. And I don't see any similar measurement of that in DeGutis 5, looking at page D0008 or D0017.

A. That's what I was going back to look at.

Q. Now let me ask you a question.

The figures that you just gave me for Mr. Paul for 2004 fiscal year, that would not

                              DeGUTIS

Q. Robert Chapman, what did he do?

A. About every year he has had a different role, so at this time I think he may have been in charge of property tax and it's likely that he started -- had some sort of role in Region 10, where we have a lot of professionals in India.

Q. Where is Region 10?

A. India, Hyderabad.

Q. He wasn't even located in the United States?

A. No, no. He lived in Dallas.

Q. But he worked a lot in India?

A. Well, no. At this time I think he was in charge of property tax but he may have started a role with India.

Q. So he practiced in a different area than you or Mr. Paul did?

A. Correct.

Q. Steve Severin, who was he? S-E-V-E-R-I-N.

A. He was in Seattle. He was --

Partner matters was his role, and he would deal with a variety of issues in partner

                              matters. Some of them would be where people were hired or terminated. It could be where people were going through divorces or had other personal issues or whatever. At this time he probably had a bit of a client service role in Seattle still. He was the tax PIC there at one time.

PIC, partner in charge.

Q. Did he do the same kind of work as you and Mr. Paul?

A. Not a majority of the time, but probably.

Q. Where did you say he was located?

A. Seattle. And then I think he was in -- spent a significant amount of time in New York, but to my knowledge he never made New York his home.

Q. Based upon Mr. Seltzer's testimony which you reviewed, Mr. --

A. Scanned.

Q. You said earlier you reviewed it.

A. I scanned it.

Q. Your testimony at the beginning of the deposition was you reviewed it.

A. I scanned it.

DeGUTIS

had already been satisfied with respect to the many responses to requests for production that we have answered.

MR. ABER: You have produced over a thousand pages and I am just trying to determine which one of that thousand pages would be responsive to that request. We will discuss that at another forum.

Q. We mentioned earlier the Comprehensive Tax Solutions. That's for short "CTS."

A. Correct.

Q. And that was something that was important to meeting the Deloitte business goals?

A. Yes.

Q. Can you explain exactly what the Comprehensive Tax Solutions means?

A. Again?

MR. SANDLER: I thought he answered that before.

Q. What type of things are you selling when you sell CTS product?

DeGUTIS

A. What type services were involved?

Q. Yes.

A. Research and development credits were in there, transaction cost recovery studies were in there.

Q. Can you dumb that down for us laymen?

A. When company A acquires company B, they incur all sorts of transaction costs. The proper tax treatment is complicated.

We have a group that all they do is they go in and capture all those costs and analyze the costs, figure out which ones have to be capitalized, which ones can be deducted. TCRS, transaction cross recovery study, that's one of the groups.

There is a group that does research and development credits. They go in and analyze costs that a company incurs, figure out which ones qualify for current deductibility. They find out which ones have to be capitalized.

A lot of times a company may have already done that internally and they are in some sort of disagreement with the IRS. That group

DeGUTIS

will help them resolve those issues. They will help them put together documentation to support the credits that they have.

That's one of the groups. I mean there is eight or nine different groups.

Q. What was the responsibility of the lead tax service partner with regard to the CTS program?

A. Figure out which of those -- which of those services is needed within their client and target base; make sure they had meetings set up with the particular clients and targets and work with whoever the team was for that particular specialty area to sell the service.

And then as the lead tax partner, they would be responsible for the overall delivery, working with that team of the service.

Q. I have seen the term mentioned in some of the documents used -- that have been produced, rather, called "CTS introductions." What does "CTS introductions" mean?

A. We tracked at the time --

Because CTS was so important to us and felt like it was an area where Deloitte did

DeGUTIS

distinguish itself from the competition, we really wanted our partners and directors involved in selling those type services. And in order to make that happen, we put direct revenue goals in each partner's goals at the beginning of the year and we tracked the number of introductions that they made to their clients and to their targets.

Q. Once an introduction is made, who is responsible for closing the sale of the products?

A. Lead tax partner is responsible for all of the services to their client and target.

Q. So the person who makes the introduction, going back to my hypothetical, partner A, B and C --

A. Partner A.

Q. He would be responsible for making the introduction and also for selling the product?

A. Selling it and delivering it.

Q. And doing the work?

A. They don't have to do the work. They have to make sure that the work is done and the client is happy with the work that's done.

Q. Well, Mr. Paul, does CTS include things like auditing work?

DeGUTIS

Q. Sure.

A. Do you remember which one it was?

Q. You are looking at the telephone directory?

A. Yes.

Q. Which is DeGutis Exhibit what?

A. DeGutis Exhibit 3.

I don't think Evelyn Kaupp, K-A-U-P-P -- she had a very small client load in Boston. Most of her job was working with a software system we call Deloitte Online or Global Backbone.

Q. How did you spell her last name?

A. K-A-U-P-P.

I think the rest of them would have had some sort of CTS goal.

Q. Did each member of your group that you supervised have knowledge of the other partner's CTS goal?

A. The goal no, the revenue yes.

Q. So you would know if --

If I am a partner, I would know if my goal was more than or less than the guy sitting next to me?

DeGUTIS

A. Right.

Q. How were the goals set? CTS goals.

A. Well, I mean we explained -- it's kind of the goal setting process on the front end. Are you saying how --

Q. Were the CTS goals set like --

Because they worked for the full year, they were an intricate part of the full year's revenues.

A. Yeah. Well, I mean the goal that was set at the beginning of the year was for the full year. What we -- what I did was I would go through -- we would have an overall revenue goal, CTS goal for Boston and I would go through and take first pass and, you know, say, "Partner X, his client base is this, his target base is this. What piece of that goal should be his or hers?" and I would allocate out whatever the total goal was for Boston. We would discuss it in that goal-setting process, which was signed off on by both me and the partner or director that I was setting the goals for.

Q. Are there reports that set the amount of CTS production, either revenue or

introductions, for each individual period during fiscal year 2004? I believe there are 13 periods.

A. We had -- there were at the time. I don't know if they exist anymore because I am not sure how long we keep our records from an accounting system perspective. I mean I don't know. We published where people stood every period throughout the year, both from a total revenue standpoint and a CTS standpoint. It was in our monthly partner director meetings.

And while you're looking, at that time Harry Hurvitz, H-U-R-V-I-T-Z and Mark Steiger, S-T-E-I-G-E-R, they would publish reports periodically on introductions and revenue. I don't recall the frequency of those reports.

MR. ABER: Please mark this as Exhibit 6.

(DeGutis Exhibit 6, pages bearing Bates Nos. D00559 - D00562, marked for identification, as of this date.)

Q. DeGutis 6 is a document produced by your attorney. Do you recognize what it is?

A. I have never seen the document.

DeGUTIS

this document purports to do.

Q. It was presented by your firm to the Boston or to the Massachusetts Department of Labor and was used by Mr. Sandler in his deposition of Mr. Paul to try and measure his performance.

What I am saying is it doesn't reflect -- you agree with that statement what it was used for?

A. Yes.

Q. It does not accurately reflect what his performance would have been if he had worked a full 13 months?

A. Which maybe it would be higher, maybe not. Alan gave us a document at midyear in February that he surmised that that number would be 1.6 million or 1.7 million.

Q. That was before you told him that he'd better crank it up.

A. Correct.

Q. So if he cranked it up, he might have improved on those numbers?

A. All the way to 1.7 million.

Q. Or higher.

A. I'm just telling you what he told

DeGUTIS

me, that would be 1.7 million.

Q. The estimate he gave you was before you gave him the PIP and told him he'd better meet certain parameters?

A. Right.

Q. And if he had been given time to meet those parameters to the end of the 2004 fiscal year and worked the full 13 periods, the numbers might -- he might have improved.

MR. SANDLER: Objection for form.

Q. Might he not?

A. He might have, but the run rate didn't increase the first four to six weeks.

Q. I am curious as to the number of hours. The same thing would apply. His number of chargeable hours was less than his goals because he didn't really charge many hours the last two months -- the last two periods.

A. Are you asking me if that's the fact?

Q. Would that be a fair assumption, given the fact what his situation was?

A. It's -- his charge hours were not

information.

Maybe I'm doing this prematurely because we haven't gone --

In that, if you look at the first level of goals, Mr. Paul had the sixth highest goal than anybody in your group, didn't he?

A. Sixth highest what goal?

Q. Goal.

A. For what?

Q. Revenue.

A. Okay.

Q. Sixth or including the ones that he was equal to.

A. So another way, there is one, two, three people that have -- four people that have a lower goal and two of them don't work full-time providing client service.

Q. And that would be Drake and who?

A. DeGutis.

Q. There are other persons who have lower goals than him. Smith, MacArthur had lower goals, correct?

A. Correct.

Q. And Simmons and Trudell had the same

DeGUTIS

goal?

A. Yes.

Q. And if I go back a minute --

A. Is this for '04?

Q. Yes.

A. So he had one of the lowest goals and was one of the highest paid people.

Q. But some of the people who had lower goals than him actually had their goals reduced for this year, such as Mr. Smith. His revenue goal was less in 2004 than it was in 2003, wasn't it?

A. Is that a question?

Q. Do you agree or disagree with that? Take a look.

A. And so the first question is what? What is your question?

Q. Mr. Smith's goal was reduced from 2003 to 2004, wasn't it?

A. In 200 -- is this total revenue?

Q. This is the goal -- these goals are taken from Paul 8, the document Bates numbered 711.

A. Do we have Paul 8 somewhere?

DeGUTIS

A. I drafted the one that was put together.

Q. They would look to you to do that, wouldn't they?

A. Yes.

Q. Speaking of the PIP, let me hand you what has been marked Paul 12. Is that the performance improvement plan or PIP that was given to Mr. Paul?

A. Yes.

Q. In that plan can you describe for me what the areas were that you were concerned about?

A. Revenue generation. He was significantly behind at midyear in the amount of revenue that he had generated. He put together a listing of what he thought he was going to be able to generate for the remainder of the year. It was going to put him around 1,750,000, which would have been 35 percent shy of his goal he had missed the prior year by 25 percent. And he was one of the highest-ranking people, so that was a major concern.

Q. I am talking about the categories. I am not going to go into each one, we discussed

DeGUTIS

many of those already, but the categories that you were concerned about were his general revenues. He wasn't producing enough revenue?

A. Right.

Q. What do you mean by his targeting activities in sales?

A. All the partners had attest clients that they served and relationship clients, those companies that we wanted to do business with that we did not do their audits.

Q. Would targeting activities and sales include CTS introductions?

A. It would.

Q. And the category 3, billings and collections?

A. Correct.

Q. That's the cash accountability program we already discussed?

A. Yes.

Q. And number 4 is client service charges? Those are the hours shown on Paul 7 and 8, correct?

A. Correct.

Q. Were there any other areas of

DeGUTIS

concern that you told him in this program that he had to address?

A. That was everything.

Q. Those four items?

A. Yes.

Q. And you told him in this that he would have, it seems, 90 days in which to buck up or improve his performance, correct?

A. Hit the goals, the original goals.

MR. ABER: Let's mark this as the next exhibit, Exhibit 16.

(DeGutis Exhibit 16, page bearing Bates No. PAUL188, marked for identification, as of this date.)

Q. Do you recognize the e-mail that you sent to --

A. Yes.

Q. That was sent out on February 25th?

A. It appears to be, yes.

Q. And then you enclose the attachment I guess which is the same as Paul 12 dated February 19th, the PIP program?

A. Well, I mean I can't tell from the e-mail what is attached but I'm assuming that's

A. I had -- I made the first draft. I sent it to Frank and Steve Severin. Both Frank and Steve made some sort of comments, it was finalized. Frank would have been my main reviewer of the document.

Q. Were there any objective goals in the PIP plan itself?

A. Hitting -- hitting the goals that you set at the beginning of the year, that we agreed to at the beginning of the year.

Q. Where does it say that in Paul 12, which is the PIP?

A. I would say it's implied. It's "However, if you are unable to demonstrate immediate and sustained improvement towards reaching your goals" --

Q. It doesn't say "reaching your goals." "Demonstrate."

A. -- "towards reaching your goals, you may be subject to further action up to and including unit reduction, request to change to firm director status, request for resignation from the firm or other appropriate actions."

Q. It doesn't say he has to reach his

                              DeGUTIS

goals, he just has to make immediate sustained improvement towards reaching his goals. Correct?

A. But the threshold is reaching your goals.

Q. It doesn't say he has to reach the goals.

A. And he has three options down there depending on how far he gets towards reaching those goals.

Q. He doesn't have to reach his goals to sustain immediate improvement, does he?

A. There is three options.

Q. I am not talking about what his options are.

A. You are asking me to answer the question so I am answering the question.

Q. The objective standard that he had to meet, did he have to meet his goals in order to survive and remain a partner?

A. If he wanted no unit reduction, no decreased or no change of status to director or no resignation from the firm, he had to hit his goals.

Q. If he didn't hit his goals, then you

DeGUTIS

could consider a reduction in units or a change to status as director?

A. Right. Or resignation.

Q. It doesn't say he would be terminated, did it?

A. No.

Q. You didn't warn him that he could be involuntarily terminated, did you?

A. I think he knew what "request for resignation from the firm" meant.

Q. But if he didn't choose not to resign he didn't say, "And if you don't volunteer to resign we will terminate," did you?

A. No.

Q. In the PIP program you didn't list what his --

Who was his goal for CTS introductions?

A. I haven't have a number.

Q. So did you list an objective goal for that part or for number 2?

A. Number 2 is targeting activity of sales. That included CTS.

Q. Where is the objective goal for

that?

A. Hitting the original goals. He has his goals. $400,000.

Q. CTS sales?

A. Right.

Q. Not introductions?

A. Right.

Q. Is there any goal for number of CTS introductions?

A. There was not one on his goals. We went through his goals earlier.

MR. ABER: Mark this as the next exhibit.

(DeGutis Exhibit 18, pages bearing Bates Nos. PAUL140 - PAUL141, marked for identification, as of this date.)

Q. Did you ever receive the memo marked DeGutis 18 from Mr. Paul addressed to you of March 6, 2004?

A. Yes.

Q. In the second paragraph he states that "As I indicated in our meeting, the receipt on February 25, 2004, by e-mail of a 'draft'

that he needs to hit his goals in order for one of those things not to happen. If he fell short, then one of those things can happen.

Q. In the last paragraph on the first page, DeGutis 18, there is a statement he makes.

You said that it was no secret that the number of current tax partners in Boston will be gone from the firm within six months. Did he lie when he said you said that?

A. He did.

Q. So he made that up?

A. I didn't say it.

Q. So that's where you would disagree on that fact?

A. Totally.

Q. And then on the next page, the first full paragraph, he writes, "You have agreed to meet again on March 8th to transmit in writing your very specific goals." Would that be objective goals?

A. I don't know, but I didn't agree to change the standards that he needed to hit the goals that we set at the beginning of the year.

Q. But you agreed to meet on March 8th?

DeGUTIS

I've said this three times. In order for nothing bad to happen, in order for those three things not to happen down there, he had to hit his goals, the original goals that he set. Anything less than that would have been one of those three things.

Q. So when he states that you said that if he met his run rate, that would be necessary to meet a standard of immediate sustained improvement, is he lying again?

A. I didn't say that would meet the measure of immediate and sustained improvement, because it would go against what I have said three times already. He needed to hit those goals in order for nothing bad to happen.

Q. So when he stated that, when he quoted you as saying that, is he lying?

A. It's not true. I didn't say it.

Q. He then goes on to quote you as saying, "In addition, you indicated that certain revenues of the firm which may not be reflected in my direct charge numbers would be taken into account. In particular, they would include the fees being transferred from Australia on the Grand

DeGUTIS

to meet his goals?

A. To reach the charge hour goals?

Q. Any of his goals. Was he given 90 days, "yes" or "no"?

A. He told us that he was not going to reach any of those goals. Past performance indicated that he was not going to reach any of those goals. Therefore, the decision was made to terminate him.

Q. You did not give him 90 days to meet those goals, did you?

A. He was there for 90 days.

Q. Did you terminate him before the 90 days were over?

A. Yeah, but he was there for 90 days.

Q. But the days beyond the termination, if he had somehow met his goals in those extra days you weren't going to bring him back, were you?

A. It didn't happen. I don't know.

Q. But he was terminated before the 90 days was up?

A. He was told that he was going to be terminated and an effective date was right around

DeGUTIS

problems with it they could have contacted the partners.

Q. The provisions of the mechanism in Paragraph 5B of that -- his letter of hire that we discussed earlier, you recall that?

A. Yes.

Q. Is it your testimony that was in place to protect him?

A. I think it was just as much a protection for him as it was for Deloitte to have a chance to do more due diligence on our partners. I mean, we didn't have the opportunity --

We were bringing people in as partners within our organization. We had -- the only opportunity would be review documents and stuff that discussed where they would generate revenue from their targets.

Totally unlike when we admit someone to the partnership we have a full chance to know what they have done for eight or ten years, we had a two-year period in order to do that due diligence and then if people weren't working out we recommended -- could recommend that they be terminated contractually, and there was some

protection for them on the members of the group of six.

Q. Did you draft what had been marked DeGutis 19?

A. Did I draft DeGutis 19?

Q. Yes.

A. Yes.

Q. Just so we are clear, was Mr. Paul told the day of the committee meeting?

A. I don't recall.

MR. SANDLER: Let me see if I understand. Was he given the date that the committee meeting was going to be held? Is that what you mean?

MR. ABER: I will rephrase it.

Q. The committee had a telephone conference committee meeting on some date certain, correct?

A. Correct.

Q. And was Mr. Paul, to your knowledge, ever advised of that date of that meeting?

A. I don't know. I didn't say anything to him.

Q. Was Mr. Paul ever told that he could

you that shows that he was given those? I don't have a document.

Q. Can you tell me who gave him the names?

A. I don't know who gave him the names.

Q. You have made certain representations in this memorandum as to his performance, correct?

A. Correct.

Q. You state in the second paragraph that his goal was one of the lowest revenue goals given to an LTS partner in Boston.

A. Correct.

Q. When I went back and looked at Paul 7, I saw that his goal was greater than or equal to three of the partners.

A. He was the lowest one for a person that was full-time client service. Mine was 1,750,000 for a 25 percent client load, Judith Drake's was $1.5 million for a 50 percent client load and no one else was lower.

He had the lowest one for someone that was 100 percent client service. Mark Berkowitz, who came over from Andersen, had the

DeGUTIS

exact same goal.

Q. You said earlier that you did not think a $250,000 difference -- made much of a difference in goals. Do you remember that testimony?

A. Yeah. It was after a comment that you made that something was substantial and you asked me if 250 was substantial.

Q. There are two people who also had goals of $2,250,000.

A. Okay. So he still had one of the lowest goals.

Q. In 2004, how many people had goals greater than him?

You can use Paul 8 or DeGutis 10.

A. I will use Paul 8.

Q. Equal to or more than him.

A. Okay, I will go through. I had 1.5 million, 25 percent client load. Judith --

Excuse me.

Q. Go ahead.

A. Judith Drake, 2 million, 50 percent client load. Brian MacArthur, 2 million. Wayne Smith, 2 million.

DeGUTIS

relevant.

Q. It was relevant for 2003. Wasn't it relevant for 2004?

A. What is relevant is he missed it substantially in both years, which is why he was terminated.

Q. When you wrote this memo, the year wasn't over. So you didn't know he was going to miss it substantially.

A. No. He said was -- he gave me a revenue projection in March that told me he was going to have 1.7 million, which was going to be 35 percent off. That's pretty clear.

Q. Let's go back to my question. You thought it was relevant as to where his goal ranked in the Boston office for 2003.

A. Right.

Q. Did you think it was no longer relevant for 2004?

A. No.

Q. The average goal in 2003 by my calculation was $2.5 million. Would you disagree with that?

A. Are you including me in there as a

DeGUTIS

A. If the 1.5 is right, it's inaccurate. It's right in the ballpark, though. 1 percent is not going to change the outcome of this.

Q. You go on and state that he was in the bottom quartile of all LTS partners. What did you mean by that?

A. If you looked at the revenue for the -- the total revenue for each one and looked at how he compared to all the other LTS partners.

Q. There were other partners that prepared less well than he did?

A. He was in the bottom quartile. Were there some that were less? Let's look at the report and look at it.

We are talking '03 right now?

Q. Yes. Paul 7.

A. Judith Drake had 1.5 million actual revenue, but she spent 50 percent. I had 1.6 million, but I spent 25 percent. Wayne Smith 1.1 million less; Lynn Trudell, 1.2 million less.

So two people were less.

Q. As far as percentages go, by my calculation three other people were lower than him

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

------------------------------------

ALAN D. PAUL,

Plaintiff,

- against -

DELOITTE & TOUCHE, LLP, and
DELOITTE & TOUCHE, USA, LLP,

Defendants.

C.A. No. 06-225 (MPT)

------------------------------------x

1633 Broadway
New York, New York

March 11, 2008
1:35 p.m.

Deposition of PATRICIA HORN, before Marlene Lee, CSR, CRR, a Notary Public of the State of New York.

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 86983B

type of thing.

I stayed in that role until I joined Deloitte in 2000. When I joined Deloitte in 2000 I had a dual role. The major role I would say was working with Mike Burton who was the -- in charge of the East Sector tax practice. And I was -- for lack of a better term, I'd say I was his chief of staff, sort of supported him, however he needed it, to manage the East Sector. My other role was as the East Sector director of HR.

Q. What is East Sector?

A. East sector. We had three: West, Central, and East. I was director of HR for the East Sector. In that role I was more or less just rolling out national policies, programs, procedures to the clusters within the East Sector in accordance with the national program.

Q. Are we talking about accounting policies or HR policies?

A. HR. For example, the accreditation policy. What everybody needs for either CPA or attorney to get promoted to the next level.

HORN

than Mr. DeGutis who was his supervisor.

A. Based on this calculation, yes.

Q. In the billings department was Mr. Paul doing better than his manager, Mr. DeGutis?

A. Yes.

Q. In the third column Mr. Paul had an overall average of 60.02 percent.

A. Right.

Q. As I look at this chart, it looks like people are ranked from the lowest to the highest of the combined averages.

A. Right.

Q. So I'm correct that of the people in the program, Mr. Paul had the second-best combined percentages?

A. Of the people in the program.

Q. Right. Of this list here, he was the second-best performer.

A. Yes. But it's the bottom 20 percent, I think.

Q. I understand that. But Mr. DeGutis was in the bottom 10 percent. He doesn't even make the mid way point, does he?

Exhibits: 4-12 Volume 2, Pages 53-111

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------

ALAN D. PAUL

Plaintiff

vs. Civil Action No. 06-225 (MPT)

DELOITTE & TOUCHE, LLP and

DELOITTE & TOUCHE, USA, LLP

Defendants

-----------------------------

DEPOSITION OF PATRICIA HORN

Wednesday, May 21, 2008, 9:41 a.m.

Deloitte & Touche, LLP

200 Berkeley Street

Boston, Massachusetts

------- Reporter: David A. Arsenault, RPR -------

daa@fabreporters.com www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404 fax 617.728.4403

Q. Okay.

MR. ABER: Let me take a couple-minute break but let me hear it back.

EXAMINATION

BY MR. ABER:

Q. You said the beginning date for period 12? There are two numbers here.

A. Yes.

Q. Under 12 you have for April 17, '04 and May 10, '04?

A. May 1st.

Q. I have trouble reading it. The beginning date for the 12th period would be April 17?

A. No. It would be April 4th. What this chart shows is the end date for each biweekly. There are two biweeklies in each period. Period 12 FY '04 started April 4, 2004.

Q. That's a date --

A. -- after the close of the previous period. This shows period and biweekly endings.

Q. The first date of Number 12 would be April 4th?

A. Correct.

Q. And the first period of the 1st period

would be March 7th?

A. The first day of the 11th period would be March 7.

Q. So you take the last day of the preceding period and add one day to it to get the first day of the next period?

A. Yes.

MR. ABER: Let me take a couple minutes.

(Pause.)

Q. I'll give you back Horn 11 and Horn 12. Using Horn 12, period 9 would start when?

A. Which year?

Q. 2004.

A. Period 9, fiscal '04 would start January 11th.

Q. Period 10 would start when?

A. February 8th.

Q. Period 11 would start?

A. March 7th.

Q. And period 12?

A. April 4th.

Q. And period 13?

A. May 2nd.

Q. For period 9, which partner had the highest



W&F
WILCOX & FETZER LTD.

In the Matter Of:

# Paul
v.
# Deloitte & Touche, LLP, et al.

C.A. # 06-225 (MPT)

---

Transcript of:

Lewis, Raymond L. (12/11/2007)

December 11, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

about one or the other?

Q. Let's talk about direct first.

A. Generally there is a significant number of interviews they will go through. I'd say there is protocols set for a certain number of interviews with other partners that are already in the firm in leadership positions, certainly in the area in which they're interested. They talk to leadership from that area. They would typically speak to a board member during the interview process and I'd say on the average process takes a while, but it's typically six to ten partners that they will speak with.

Q. Then, how is it determined whether they will or will not become a partner after the interviews are done?

A. There is one person that would typically be considered their sponsor. That would be the person that would prepare the package or make sure the package is assembled on their behalf and make the recommendation and then once the interviews are over assuming the interviews were supportive and all of the documentation supports it, meaning background checks on the people, you know, discussing with them independence matters that they will have to adhere to

Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06

once they join the partnership the recommendation is made to admit the person to the partnership.

Q. To whom is the recommendation made?

A. The recommendation would be made to -- right now first it would be to an organization -- well, a group that we would call partner matters. That's a number of partners who handle admissions and matters for the partnership and then it would be made to the chairman and CEO. The chairman and CEO would act on behalf of the board in approving the package and the board would ratify at a board meeting.

Q. And then he becomes a partner?

A. Shortly thereafter if, you know, both agree that they want to move forward the approvals are in place. Sometimes the person decides not to join. Sometimes ultimately the firm decides to back off the offer.

Q. Who makes that decision to back off the offer?

A. Well, if it has gone through all the approvals it's normally the team negotiating. There is normally a partner that leads that charge that is trying to track the person to their business area.

Q. Would that happen before the CEO and chairman acted on the application? That's the second rule, we

Paul v. Deloitte & Touche, LLP, et al.
Raymond L. Lewis

Page 23

can't talk at the same time. I may make that mistake too.

A. Sure. Just protocol would be the package would come to the chairman and CEO. Obviously it wouldn't come to them if somebody has already decided they don't want them, okay?

Q. He goes through the interviews, his team interviews him, reviews the package, makes a recommendation, they negotiate with him as to the terms of it, I guess?

A. The terms are already in the package that the chairman and CEO see.

Q. Once the committee and the applicant agree then the CEO and the chairman of the board sort of just put their stamp of approval on it?

A. I wouldn't say stamp of approval. They review the package thoroughly.

Q. Can they unilaterally reject a proposed partner?

A. They could.

Q. Without consulting anybody else?

A. They wouldn't, but they could.

Q. They have the power to?

A. I believe they do.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06

A427

Section 3.039 talks about the approval of members of the nominating committee. The organization is governed by the board and there is a nominating committee that selects the board --

A. Recommends the board.

Q. And then there is I think -- does the nominating committee also recommend the managing partner?

A. Well, the CEO. Back in this year there was a managing partner. There is not one anymore. There is CEO and chairman.

Q. They have done away with the managing partner?

A. It's up to the CEO to decide whether he wants one or not.

Q. How are the members of the nominating committee picked?

A. In a year a nominating committee let's just assume -- the nominating committee will during the course of conducting their interviews with the partners will also solicit recommendations for the next year's nominating committee. They will provide a list of potential candidates to the chairman.

Q. The candidates for the next year?

A. The next year's nominating committee. If we

Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06

Paul v. Deloitte & Touche, LLP, et al.
Raymond L. Lewis

Page 53

are assuming this year, this year's nominating committee when they were completed with their work they would have solicited from the partners feedback as to who they think might be a good candidate for the nominating committee. They would submit that list to the chairman. The chairman would then ask the board's governance committee to utilize those candidates on that list to the extent possible to propose nominating committee members.

Q. Does the general partner population have any say in that process?

A. They provide the names.

Q. I thought you said there was a nominating committee -- this year's nominating --

A. But they solicit them from the partners. The nominating committee actually meets with as many partners that want to meet with them. Typically there will be 700, a 1,000 partners. They will ask not only can you provide us names for potential board members, but also for potential nominating committee members next year.

Q. That input by the individual partners is advisory only, isn't it?

A. Yes.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06

A429

Q. They don't have a right to vote, approve or disprove anybody that is selected for the nominating committee, do they?

A. No.

Q. So, if the chairman wants to put Mr. Smith on the nominating committee and 600 partners don't want him there, they don't have any authority to prevent that, do they?

A. No.

Q. Or any means of preventing it?

A. Not technically.

Q. Any time you need to take a break, let me know.

A. I'm fine.

MR. ABER: Do you need to take a break?

MR. SANDLER: No, keep going for a while, hanging in.

BY MR. ABER:

Q. I gather the process of selecting the CEO would follow that same advisory process going up to nominating committee who then nominates the next CEO?

A. The partners will certainly comment on the current CEO if that person is eligible to be reelected. They will be specifically asked to provide feedback on the current CEO.

Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06

Paul v. Deloitte & Touche, LLP, et al.
Raymond L. Lewis

Page 107

A. Yes.
Q. And do they know the range of all of them?
A. They know the range, yes.
Q. If the partnership has a very bad year, are the partner's personal assets at risk?
A. That would be calamitous year if your personal assets are at risk.
Q. And we have had various speculative --
A. Arthur Anderson, for example, that was pretty calamitous, yes, the personal assets were at risk.
Q. If Deloitte had a calamitous year, would the partners' personal assets be at risk?
A. Yes.
Q. And can you -- well, now the partners have certain capital that they posted, correct?
A. Yes.
Q. And if all that capital had to be put in to cover the debts, then in that situation it would be capital calls, is that how it would work?
A. It could go capital calls, sure.
Q. And that means what?
A. You would have to obviously liquidate some of your personal assets to meet the capital call.
Q. Do the partners have an opportunity to

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06

A431

Paul v. Deloitte & Touche, LLP, et al.
Raymond L. Lewis

Page 108

communicate their views about the partnership?

A. Yes.

Q. About suggestions they have?

A. Nominating committee doesn't only seek candidates for the board. They also seek input of the partners on the performance of leadership in the firm.

Q. How do they do that?

A. Personal interviews.

Q. And how does that work out?

A. The nominating committee tours the country and they offer to meet with any partners or principals that want to meet with them.

Q. And do partners take them up on that offer?

A. Last year 700 did, the year before 1200 did. The year before was an election year so that got a little more attention.

MR. SANDLER: Nothing further.

BY MR. ABER:

Q. The Deloitte & Touche, USA, LLP is a limited liability partnership?

A. Yes.

Q. Who is the general partner?

A. Beats me.

Q. Do you understand what a limited liability

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) 6f76208c-f9fd-4290-86fb-0b49fa665c06
A432



W&F
WILCOX & FETZER LTD.

In the Matter Of:

# Paul
v.
# Deloitte & Touche, et al.

C.A. # 06-225-MPT

---

Transcript of:

Marcos, Frank M. (4/1/2008)

April 1, 2008

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 4

Q. So you've never been employed by anybody other than Deloitte & Touche or it's predecessors?

A. Correct.

Q. When did you become a partner?

A. I became a partner in 1989, June of 1989.

Q. I gather now you have some management responsibilities?

A. Yes, I do.

Q. What is your title? Explain what those responsibilities are.

A. My title is regional tax managing partner of the northeast region of Deloitte & Touche. The responsibilities I have are for the tax operations in the northeast section or sector or region, I guess, of Deloitte & Touche, which covers from Boston to Philadelphia.

Q. As a managing partner, I guess -- is that a right term or --

A. Regional tax managing partner.

Q. Regional tax managing partner. What are your duties?

A. To oversee all the operations, the tax operations within the northeast region.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A434

Q. What do you mean by oversee the tax operations?

A. Be responsible for our operations. Be responsible for our clients in the marketplace. And be responsible for our people.

Q. When you say responsible for your people, what do you mean by that?

A. Having oversight for them.

Q. What kind of things do you do by oversight?

A. I make certain that we have the right complement of people working for us at any given point in time.

Q. First of all -- maybe I should have asked this before -- did you review any written materials to prepare yourself for this deposition?

A. Yes, I did.

Q. What did you review?

A. I reviewed some testimony from others. I reviewed some e-mails that were distributed several years ago.

Q. Whose depositions did you review?

A. I reviewed parts of Vince DeGutis'

Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A. That's what the document that Mr. Severin sent to me says, yes.

Q. Was Mr. Paul given three months to demonstrate sustained improvement?

A. He was not.

Q. And the reason he was not given three months to demonstrate that improvement was why?

A. Because we had made a decision that Mr. Paul would not be successful with our firm and a decision prior to that time was made to ask for his resignation.

Q. Was that decision in any way connected with the fact that there was a two-year window in which to sever him as a partner?

A. Yes, there was.

Q. So you chose not to give him the three months in part because you had to make a decision before two years was up?

A. Yes. In part because of that.

Q. If you had issued him a PIP as outlined in Marcos 3 back in September, he would have had then three months warning before a decision was made to sever him, wouldn't he?

A. Maybe not. Not necessarily.

Q. But you have no recollection of such a discussion?

A. I do not have a recollection of a specific discussion on Mr. Paul.

Q. What you're saying is you're assuming that there was such a discussion?

A. What I'm saying is I think it would be logical to assume that we had that discussion.

Q. So I'm clear, you have no recollection today of ever having that discussion?

A. I do not have that recollection.

Q. Why would you have waited beyond September 30th to have any such discussion if Mr. Severin said the PIPs must be in place by September 30th?

A. I am not really certain why we waited until February. It's perhaps that at the time -- just one plausible explanation would be that he was on the bubble, so to speak, at the time in December, and we said, let's work with him and see if we really have to do that. And then came February and said, no, his performance is such that a PIP is warranted.

Q. In Marcos 3 after paragraph 3 of the second page, it says, "Once you have had the

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 64

A. It's on the very last page.

Q. But that's not signed off on?

A. I think that's an electronic signature by the lead goal endorser.

Q. It doesn't show a date there, does it?

A. It does not.

Q. Should a date have been there?

A. I would presume there should be. Well, not necessarily.

Q. So we don't know whether this was done in a timely fashion or not, do we?

A. Not based upon this form.

Q. Is there any way of finding out if it was done timely?

A. Could ask Mr. DeGutis.

Q. How does Mr. DeGutis characterize Mr. Paul's 2003 year? Doesn't he state that Alan had a good year?

A. Good is not good at Deloitte. We have five ratings. Start out with exceptional going down to not meeting expectations. A good is a fourth of five ratings.

Q. There are two places where it says good. One is the rating of good, and then, in the

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A438

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 65

paragraph, it says he has had a good year?

A. I think he was paraphrasing his rating there.

Q. You think that. Do you know that?

A. I believe -- it appears that way when you read -- when you read further, "He fell short of various financial metrics. He needs to continue to focus on teaming." I would not view this as a very strong evaluation.

Q. If you go back to Marcos 6, that timeline we were looking at, where is the --

A. I have to find my 6. Excuse me.

Q. That's it.

Does it identify there when the mid year is done?

A. No, it does not because this is a year-end timeline.

Q. Let me show you what has been previously marked DeGutis 15. Do you recognize this document, which is an e-mail -- first e-mail is from Bogart to you of December 9th, 2003, followed by an e-mail from you to Bogart on December 10th, 2003. Do you recognize those e-mails?

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A439

he may have known. I think he may have known that his performance was lackluster. He should have known.

Q. How do you know that?

A. Just based upon his revenue generation. It was pathetic. I mean --

Q. Was he told it was pathetic?

A. I believe he was.

Q. By who?

A. By Mr. DeGutis.

Q. In writing?

A. Well, I looked at his goal form there. He had $1.4 million of revenue of a $2 million goal. That was 30 percent behind his goal, but I also believe that that amount was probably one of the lowest, but not the lowest of all the Boston partners, and clearly one of the lowest in the northeast region.

Q. Was he told that his performance was being monitored in order to determine whether he was going to be severed?

A. I am not --

MR. SANDLER: Can I -- I'm not sure that's a clear question.

MR. ABER: Want to make it 45 minutes?

MR. SANDLER: Let's make it 1:15.

(Luncheon recess taken.)

BY MR. ABER:

Q. Earlier you said that Mr. Paul's performance in 2003 -- I think the word you used was pathetic?

A. I may have, yes.

Q. Why did you say it was pathetic?

A. I say it's pathetic because, if you look at the revenues that he generated in that year as compared not only to his goals but in terms of absolute dollars, compared to also -- also compared to somebody with his experience level was very low, very, very low.

Q. Were there other partners in 2003 in Boston that had worse performance than he did?

A. There may have been one, and I think that partner was a 50 percent partner.

Q. Who was that?

A. Judith Drake.

Q. Okay.

A. And actually I think there might have been

Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

another one based on a recent review of that schedule.

Q. If somebody was producing less dollars than him, and was even further removed from their goals, what would that type of performance generate? Would that make them an excellent performer?

A. Still producing less dollars?

Q. Less dollars and a lower percentage than he was. What should their ratings be?

A. Be a very bad rating also.

Q. What would be a bad rating?

A. It would be either good rating, which is not good as we discussed earlier, or not meeting expectations.

Q. Could somebody like that have a very good rating?

A. It's possible because you have to take into account other factors.

Q. What other factors?

A. Well, years experience.

Q. Well, partners all have --

MR. SANDLER: Are you finished?

MR. ABER: I'm trying to deal with

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 84

A. May or may not. They could have had a local role where they were asked to do something locally. Mr. DeGutis didn't have a national role.

Q. Let me hand you a copy of what's been previously marked Paul 7. This is a chart that I believe was created by your firm. Are you familiar with this chart?

A. I'm familiar with this type of chart. I don't know if I looked at this one in particular. Probably have.

Q. This lists what I believe are the Boston LTS partners for fiscal year 2003.

A. Mm-hmm.

Q. There were two partners there, full-time partners that had less total revenue than Mr. Paul, aren't there?

A. I have to look. Mr. Paul had a million-five. Mr. Smith had a million-one. Mr. Trudell had a million-two. And Ms. Drake had a million-five, so --

Q. I'm not counting Ms. Drake because you said she was a 50 percent partner.

A. Right.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A443

Q. So that would not be fair.
A. Right. Mm-hmm.
Q. Now, for those two partners, Mr. Smith, by my calculation, billed only about a tad bit more than 50 percent of his revenue goal?
A. Mm-hmm.
Q. Correct?
A. That's correct.
Q. And Mr. Trudell billed less than 50 percent of his chargeable goals or revenue goals?
A. Mm-hmm.
Q. Correct? Mm-hmms and uh-huhs don't count?
A. I'm sorry. Say that again.
Q. Mm-hmms and uh-huhs don't count?
A. That was my third time too.
Yes. Correct.
Q. And Mr. Paul billed approximately a little more than 75 percent of his revenue goal, didn't he?
A. Yes. That's correct.
Q. So he out-performed both Mr. Smith and Mr. Trudell?
A. No. That's not correct.
Q. As far as revenue goes he did. He had

more actual revenue and greater percentage of his goal.

A. Right, but I don't agree with you by saying he out- performed them.

Q. As far as revenue production goes.

A. He had more revenues than them, yes, according to this schedule.

Q. And Mr. Smith and Mr. Trudell who had less actual revenue than Mr. Paul, and substantially less, smaller percentage of their goal, were both rated very good, weren't they?

A. They were.

Q. Do you have an explanation why they were rated very good given their worse performance of Mr. Paul as far as revenue?

A. They were both younger partners, for one, less seasoned. At least with respect to Mr. Smith. Mr. Trudell, still younger I believe. Less experience I should say.

Q. So because he was younger he was treated differently?

A. No. Because he had less years of experience as a partner.

Q. How many years of experience did each of

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 87

them have?

A. I don't recall exactly.

Q. So, other than the fact they were younger, you can't tell me with any precision how much less experience they had?

A. They made partner within the last several years. They were essentially our newer partners.

Q. Mr. Paul was a new partner to Deloitte too, wasn't he?

A. But Mr. Paul had previous experience where these other two did not.

Q. But he was transitioning over from Andersen to Deloitte, wasn't he?

A. He was.

Q. And Andersen had basically, for lack of a better word, imploded after the Enron fiasco, correct?

A. Mm-hmm.

Q. And some of Andersen's partners went to other firms rather than stick around and wait to see where the Andersen partners ended up, didn't they?

A. They did.

Q. So would you agree with me that some of

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A446

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 96

BY MR. ABER:

Q.    What was the question you're going to ask?

A.    The question you asked me before when you were making a comparison of Mr. Smith and Mr. Trudell to Mr. Paul, the one point that I should have brought up at that point in time was, if you take a look at their units, their units are almost half of his.  And that's a reflection of the fact that they are less seasoned partners?

Q.    No.  All you know is Mr. Paul's units were established by the formula when he came over from Andersen.  That was not something that he had earned while a Deloitte partner, were they?

MR. SANDLER:  Is that a question?

Q.    Yes.  His units were not something he earned while a Deloitte partner?

A.    In 2004 we went through a unit allocation process again where units were taken away from him.

Q.    As a non-performer?

A.    I mean, what we did in 2004 is -- I think in 2003 he had 780 units.  In 2004 he had 760.

Q.    The 780 was established by that formula

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477
Electronically signed by ann calligan (501-267-394-7784)                    23ade23e-d078-41df-b9dd-234af36556fa

A447

I did.

Assuming that to be true, if Mr. Paul was only 4 1/2 percent short. He was performing better than the average Boston partner, wasn't he, as far as chargeable hour goals?

A. Assuming that that's a meaningful calculation, which I don't believe it is.

Q. That's your judgment?

A. It is.

Q. That's for higher authority.

When somebody becomes a partner of Deloitte & Touche, about how long does it take them to develop a book of business to be actually productive?

A. Varies from partner to partner. Varies based on circumstances.

Q. Were you aware of how many of Mr. Paul's clients he had at Andersen had decided to take their business elsewhere before he moved over to Deloitte?

A. I do not have precise statistics on that.

Q. When you commented in the recommendation to terminate or sever Mr. Paul, one of the criticisms was his failure to convert?

Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber

Page 143

A. Yes.

Q. He could not have converted people, clients who had already decided to move on to other accounting firms, could he?

A. If he had strong relationships with his clients, he should have been able to convert them, as did other Andersen partners who came over.

Q. An Andersen client who did not want to wait to see where Mr. Paul ended up and moved to a different firm, is it proper for him to go over to that other firm and try to steal that client away?

A. I think that's very interesting what you're saying there. But other Andersen partners consistently were able to convert them over. Maybe it was because Alan didn't have strong relationships with his clients. I don't know the reason.

Q. Were there other Andersen partners who were unable to convert their clients for similar reasons?

A. I am certain there were other Andersen partners who were unable to convert their

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

A449

Paul v. Deloitte & Touche, et al.
Frank M. Marcos - Aber
Page 177

long before this memo was produced.

Q. Your conversation with Mr. DeGutis?

A. Mr. DeGutis with Mr. Paul.

Q. About performance improvement plan?

A. About performance. I believe it's not -- this memo should not have come as a surprise to Mr. Paul. I think he was aware that his --

Q. You don't know whether it was a surprise or not, do you?

A. I would surmise it was.

Q. Do you know for a fact whether his getting a performance improvement plan was a surprise or not?

A. I do not know for a fact.

Q. Between the date that he was given this memo on February 25th, which was the date that Mr. Sandler says he was given a draft version -- I say the final version was March 9th, but we'll use the February 25th -- and the time prior to March 30th when you decided to sever him, how would he demonstrate immediate sustained improvement in targeting and sales in that period of time?

A. I mean, focus first off.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa
A450

Q. Answer the question. Then you can explain it. Is there any way he could have --

A. Yes.

Q. How could he have done it in that 30-day period?

A. By showing focus, by showing being a team player, by having a positive attitude towards what he was doing, which I believe, based upon discussions with Mr. DeGutis, he did not show any of that.

Q. How would you measure immediate sustained improvement in client service charge hours in that 30-day period?

A. Same way. The answer is, yes, he could by showing a positive altitude, by being out and being more proactive at this point with his clients and working with his clients.

Q. Do you know of your own knowledge whether he was being proactive and out with his own clients?

A. Based on discussions with Mr. DeGutis --

Q. I said of your own knowledge.

A. No. I did not oversee his clients.

Q. How in that 30-day period would he show

Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa

BY MR. SANDLER:

Q. If he was in EG5, and some of the people that you were asked to compare him with were in a different EG group, what if any significance would that have in your assessment?

A. Have a major significance in my assessment of the different partners because there's a much, much, much, much greater expectation of an earning group 5 partner, one of our most senior partners, than there would be of an earnings group 1 or 2 partner, one of our junior partners.

Q. Prior to the final severance recommendation that you and Mr. DeGutis submitted to Steve Severin, was there a previous version prepared by the two of you?

A. Yes, there was.

Q. And approximately how long before the final version was that previous version?

A. A few days. I think it was March 26 or so.

Q. And was there any discussion about that previous version before the final version or --

A. As I recall, Vince provided me with a draft of what he proposed to be the final

version. I made some modifications and editing to them. I don't recall specifically what they were. But we finalized it, and I sent it off a few days later.

MR. SANDLER: All right. Nothing further.

EXAMINATION

BY MR. ABER:

Q. We had discussed earlier that Mr. Paul's unit assignment when he came over to Deloitte was based upon his income level at Arthur Andersen?

A. His initial conversion, yes.

Q. He was a well compensated partner at Arthur Andersen. Therefore, he became a well compensated partner at Deloitte, correct?

A. Initially, yes.

Q. I'm just trying to understand.

Would you agree or disagree that, in order to reach that level of compensation at Arthur Andersen, he had to be fairly successful over his long career there?

A. He would have had to have been successful and spent -- he would have had to have sustained performance there, yes.

Q. So you agree that while -- I'm sure how many years his career was over there, but it was a significant number -- that he had been a sustained and successful partner at Arthur Andersen?

A. Yes.

Q. Do you have an explanation why he was such a flop at Deloitte Touche?

A. I believe his inability to convert his clients was one of the reasons. I believe his inability to team and acclimate with the other partners in our office was another reason. And I also believe that he had a very bad attitude towards coming on board.

Q. His ability to team, is that his ability to get people to join him or his inability to enter onto other people's teams?

A. Both.

Q. Was there any knowledge among the Arthur Andersen partners generally about the level of compensation -- wrong word. Was there any knowledge among the Deloitte & Touche partners generally about the incomes of the -- I guess you call them legacy Arthur Andersen partners, those

Electronically signed by ann calligan (501-267-394-7784) 23ade23e-d078-41df-b9dd-234af36556fa



W&F
WILCOX & FETZER LTD.

In the Matter Of:

# Paul
v.
# Deloitte & Touche LLP, and Deloitte & Touche, USA LLP

C.A. # 06-225-MPT

---

Transcript of:

Paul, Alan D. (11/1/2007)

November 1, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

ALAN D. PAUL,

the witness herein, having first been duly sworn on oath, was examined and testified as follows:

BY MR. SANDLER:

Q. State your name, please.

A. Alan Paul.

Q. Spell Alan for Mr. Aber's benefit.

MR. ABER: He's drummed it into me.

A. A-L-A-N.

Q. Where do you live? What's your home address?

A. 135 pine street, in Medfield, Massachusetts.

Q. How long have you lived there?

A. 27 years.

Q. How old are you?

A. I am 58.

Q. What's your date of birth?

A. June 2nd, 1949.

Q. Now, I introduced myself. I'm Sheldon Sandler. I represent the defendants in this case, Deloitte & Touche LLP and Deloitte & Touche USA LLP. And I'll call them together "Deloitte," if I remember properly, just for shorthand purposes.

I want to explain a few things about the

Anderson? Again, roughly. I am not asking for every penny.

A. It was a little bit higher than a million dollars.

Q. And what year would you say that was?

A. That was probably 2000.

Q. And did things start to come apart after that at Arthur Andersen?

MR. ABER: Objection.

A. Actually, things were -- things started to come apart in the fall of 2001, I would say.

Q. Was that as a result, primarily, of the Enron situation?

A. Yes.

Q. How did you come to leave Arthur Andersen?

A. How did I come to leave?

Q. Yes. I'm looking for sort of the process of how you ended up leaving. Or did Arthur Andersen leave you, in a sense?

A. Well, the firm was indicted in a case, and I am going to guess, it was in January of 2002, but around that time.

Q. Mm-hmm.

A. And because of -- and I am not a lawyer, but

because of the issues surrounding that indictment, it meant that a number of clients couldn't stay with us or wouldn't stay with us. And over a period of, a fairly short period, eight or ten weeks, it became pretty clear the firm was not going to survive.

Q. So what did you do to find another position at that time?

A. I participated in discussions with three of the large accounting firms, the remaining accounting firms, Ernst & Young, KPMG, Peat Marwick and Deloitte & Touche.

Q. Did you reach out to them or were you contacted?

A. I would say it was a mixture.

Q. Let's say, with Deloitte.

A. Well, in all the cases, I think -- my understanding is that each of the other firms saw opportunities to pick up clients and quality people, and so they all made overtures to the Andersen management team about trying to hire certain people or certain groups of people, certain technical skills. And so there was a lot that went on behind the scene that I was not privy to. But there was discussions both at the firm level and at an individual level by

me with all three of those firms.

Q. Were you aware that there was a memorandum of understanding between Deloitte and Arthur Andersen relating to personnel of Arthur Andersen possibly joining Deloitte?

A. Yes.

Q. You were aware of it at the time?

A. I was aware such a document existed. I had not seen it until you produced it.

Q. What was your understanding of the purpose of that document?

A. The purpose of the document -- well, I wasn't involved in drafting it, so I don't know what the purpose was of the people that put it together.

Q. From your knowledge of its existence at the time, what was your understanding of its purpose?

A. The purpose was to allow Deloitte to make overtures to partners and employees with a lot of constraints on the numbers. My understanding was that there was constraints on where they would be, the types of skills they would have, and a primary consideration was to prevent any possible assertion of liability to Deloitte of any problems that Andersen might have had.

Q. So take me through the steps that you went through in joining Deloitte.

MR. ABER: Objection.

Q. My question is: How did you become a partner at Deloitte?

A. Well, the memorandum of understanding set up a process for Deloitte to interview people. And the approach was to interview and decide on and make offers to partners, and once that was decided, how many partners were going to accept the offers. There was going to be then a second round of offers to management and staff and other support personnel. So I went through that interview process.

Q. And by whom were you interviewed?

A. I had a number of conversations with Mike Burton, who at the time was the head of the Boston tax practice at Deloitte. And I also interviewed -- and I must admit I do not recall their names -- with two members of the board.

Q. The board of Deloitte?

A. The board of Deloitte. They had two of their -- I think their process was that they wanted two board members to agree before any offers were made to people.

Q. And then you received an offer?

A. Then I received an offer. I had some further conversation with Mike Burton and had conversations with people at Anderson, including managers and staff about what their thoughts were and where they were thinking of going and what this might mean to them if I did or didn't accept an offer, and talked with one of my other partners who also joined Deloitte.

Q. Who is that?

A. Mark Berkowitz.

Q. Okay.

A. And decided to accept the offer.

Q. Okay. And did you join Deloitte as a partner on May 8th, 2002?

A. I believe that's the date, yeah.

Q. And at or before that time you signed agreements with the two defendants in this case; is that right?

A. Correct.

Q. And was the official name of those documents memorandums of agreement?

A. I don't recall what the official names were.

Q. I am going to call them partnership agreements. Is that a fair description of them?

A. My understanding was that there was a committee that was established, including former Andersen partners, that was presented to the Andersen partners as further protection to them as opposed to further protection for Deloitte.

Q. Was the protection that Andersen partners would play a role in the determination of severance, former Andersen partners?

MR. ABER: Objection.

A. The protection was that there would be Andersen partners involved in the decision and that they would ensure that there was a level playing field.

Q. But that there would be a decision by the committee on whether or not a former Andersen partner could be severed; correct?

MR. ABER: Objection.

A. There was a committee that would make a decision, yes.

Q. On whether an Andersen partner could be severed?

A. Yes, although, again, it was put forth as an added protection, not one that took away protections.

Q. Now, in the case of a severance within that two-year period, you'd receive certain severance

benefits, would you not?

A. This agreement says that, yeah.

Q. And you did receive those severance benefits, didn't you?

A. I did.

Q. And the agreement also provided relief from some restrictive covenants that are contained in the two partnership agreements, did it not?

A. Yes.

Q. And you also received that accommodation, didn't you?

A. Yes.

(Paul Exhibit No. 4 was marked for identification.)

BY MR. SANDLER:

Q. Is that your signature on those two pages, Exhibit 4?

A. Yes, it is.

Q. Are those the two signature pages of the two partnership agreements?

A. Yes, they appear to be.

Q. By the way, did you receive these pages separate from the partnership agreements themselves or did you receive it as one package?

1200.

Q. About how many people worked in the tax group in any capacity, including partners and employees in the --

A. At Deloitte?

Q. -- lead tax services group? Yes, at Deloitte.

A. Again, I'd be guessing, but probably around 200. 175. Something like that.

Q. Now, when you became a Deloitte partner, you had to pay a capital requirement; correct?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. Was the amount of your capital requirement $741,000?

A. That sounds right.

Q. Where did you obtain the money to pay that capital requirement?

A. That was provided by a loan. The firm set up financing for that.

Q. Was that with an outside bank?

A. Yes.

Q. Do you recall which bank?

A. I believe it was with Fleet Bank, but I am not

positive.

Q. Okay. And were you personally liable to pay back the money you borrowed?

A. Yes.

Q. At Andersen, had there been a similar arrangement when you became a partner there?

A. When I became a partner at Andersen, it was not done that way. When I became a partner, the capital contribution was significantly less than that. And you were allowed to pay it in over, I believe, it was five years, and the firm, basically, financed it directly. There was no outside loan with me and a bank.

Q. I see.

A. Then after that -- not even after that -- starting with your first year as a partner, you left behind certain capital every year. So you would have earnings you would be taxed on, but you left the money in the firm as additional capital.

Q. In addition to the amount you paid, initially, or --

A. Correct.

Q. I see. So over time, you built up an amount of capital that you had left with the firm at Arthur

Andersen?

A. Correct.

Q. When you left Arthur Andersen, did you get that money back?

A. No.

Q. That was because the firm had gone under, essentially?

A. It's because of all of the litigation that was going on and the need to -- the need for the people running the firm to not be in a position where they distributed capital while the firm was subject to lawsuits.

Q. So you suffered a loss there?

A. Correct.

Q. What was your compensation arrangement when you joined Deloitte? Was it based on units?

A. Yes.

Q. You were assigned a certain number of units. And was that equivalent to your percentage of the partnership?

A. And the partners are assigned units, and the total number of units is -- your share of the total number of units is your share of the earnings, yes.

Q. And that wasn't a fixed dollar amount, was it;

it was a percentage of how well -- if the firm did well, you'd get more; if the firm didn't do as well, you'd get less?

A. Correct.

Q. And did you receive what were called distributions under the partnership agreements?

A. Yes.

Q. How often did you receive them? Was there a set --

A. There was a set schedule that you'd get a distribution every month, and then a few times a year, you'd get the rest of the money.

Q. On the assumption that the firm was doing well enough to make distributions?

A. Well, the monthly distributions are only 40 percent of what you expect to earn.

Q. Is that the draw?

A. Yes, the draw, right.

Q. That's the draw?

A. That's -- well --

Q. Against distributions, isn't it?

A. Well --

Q. A draw against your income, let's call it?

A. Yeah, as a tax person, there is no distinction

between draws and distributions. They're both distributions.

Q. Okay. Fair enough.

A. That's what I was referring to.

Q. All right.

A. There was a monthly draw and then there was periodic extra distributions after the earnings had been realized at the firm level and sorted out as to where they went.

Q. I hear you. Now, if there had been losses instead of earnings, then the partners would have been responsible for those losses, wouldn't they, under your partnership agreements?

A. Well, they're LLPs. If there are losses and the firm can't make good on liabilities, I don't believe the creditors could come after the partners, with some rare exceptions. If there was fraud or something involved, they could, obviously, but.

Q. Let me direct your attention -- why don't you look at No. 2, since it's smaller? Look at Section 4.03 on page 11.

MR. ABER: Bates number?

MR. SANDLER: D252 and 3.

BY MR. SANDLER:

Q. This discusses what happens in the event of deficits. Doesn't that indicate that partners are responsible at some point to -- personally for the deficits?

A. I don't read it that way.

Q. How do you read it?

A. I read it if there is deficits, then the deficit is allocated in several different steps and the result could be a negative capital account for a partner. But a negative capital account in a partnership doesn't, per se, make him personally liable.

Q. But wouldn't he lose some or all of his capital?

A. Well, to get to a deficit, he would have already exhausted his capital.

Q. Right. Maybe we're talking about the same thing and --

A. But you can loose your capital. The capital is at risk.

Q. Right.

A. So you can lose the capital. Once you have lost the capital, I don't believe creditors could come

after you for more than that.

Q. For personal assets?

A. Personal assets. Despite the fact, from a partnership accounting situation, if you were going to continue to operate, you have to balance your balance sheet so that deficit has to go someplace. So it wouldn't be allocated to the partners.

Q. Okay. All right.

A. So for the next year when we start off earning money, they may not give them distributions until things have been -- the ship had been righted.

Q. I see. Now, is it correct that employees of Deloitte were paid a fixed salary?

A. I certainly --

MR. ABER: Objection.

A. -- have no knowledge of all the arrangements of employees at Deloitte.

Q. How about any employee? Was it, in general, your understanding that employees were paid a salary?

MR. ABER: Objection.

A. Employees received a salary, yes. Whether they were also were involved bonuses or other arrangements, I have no idea.

Q. Their salaries didn't vary depending on how the

Q. So both?

A. Yes.

Q. By the way, did the lead tax services group have a practice leader?

A. I believe Vince DeGutis was the practice leader.

Q. During the entire time you were there?

A. I am not actually sure what the status was when I first got there. As I say, I was interviewed by Mike Burton under the hiring process, and I was under the impression he was charge of it then. But he transferred not too long after that.

Q. And Vince DeGutis became the practice leader?

A. Yes.

Q. What sort of things did he do as practice leader?

A. I am not sure. I would think you'd ask him.

Q. Well, I could ask him, but I am asking for your impression.

A. I am not sure I could tell you with any great detail.

Q. How about in general?

A. In general, I don't think he was doing much leading.

Q. What was he doing?
A. I don't know. You'd have to ask him.
Q. Did you serve on any internal committees at Deloitte?
A. I was involved in a committee involved in reviewing prospective partner candidates one year.
Q. Who appointed you to that committee?
A. Vince.
Q. And what was involved in that responsibility?
A. I was, basically, reviewing the files and discussing the characteristics of some of the candidates that were in the short-term list of people that might be considered for partner.
Q. How about for hiring of other employees, did you do any interviewing or recruiting? I think you said you did before.
A. I did some interviewing, yes.
Q. Did you do that at the office --
A. Yes.
Q. -- or did you go to the campuses of the --
A. No, at the office.
Q. At the office. Was there something called an advisory panel at the Boston office?
A. You would have to refresh my memory what that

was for.

Q. Well, do you recall being on any other committee or panel at the Boston office?

A. At the moment, I do not.

Q. Was there something called a partner/director admissions committee?

A. That's what I referred to before.

Q. Right. I see. And as part of that you would make recommendations as to who should be offered partnerships; is that right?

A. Well, the committee would make a recommendation.

Q. And you would be part of that committee?

A. Yes.

Q. I think you said you interviewed candidates for employment as well?

A. Mm-hmm, yes.

Q. And you would make recommendations on who should be hired and who shouldn't be; is that right?

A. Yes.

Q. Did you also evaluate the performance of existing Deloitte employees or at least some existing Deloitte employees?

A. Yes.

A. That's what Deloitte files.
Q. Right. Is that what it's called?
A. It's a partnership return form, is a 1065. I assume they file it. I have never seen it.
Q. You haven't heard from the IRS about it?
A. No.
Q. Deloitte didn't pay unemployment insurance taxes for you or your partners, did it?
A. I would have no knowledge of that.
Q. They didn't pay Social Security tax for you or your partners; correct?
A. I paid that.
MR. ABER: What was the answer? I didn't hear.
THE WITNESS: I paid that.
MR. ABER: No, her.
THE WITNESS: Sorry.
(The reporter read as requested.)
BY MR. SANDLER:
Q. Did partners pay into retirement, disability and death benefit plans that were different from the employees' plan?
A. Yes.
Q. At Deloitte were you expected to get new

clients?

A. Yes.

Q. How did you go about trying to do that?

A. I would use contacts that I had built up over the years and contact companies or people that I thought might be influencers and try to develop opportunities.

Q. What was CTS? What was that an acronym for?

A. I believe it's for comprehensive tax solutions.

Q. What is that?

A. It was a concept that was developed prior to my coming to Deloitte that, basically, involved coming up with tax solutions to issues and then going out and trying to find companies that needed that solution.

Q. What sorts of products were included within CTS?

A. My recollection is that there were dozens of separate products, but they -- and they involved a lot of different technical areas, so there would be some concerning merger and acquisition issues, some concerning employee benefit issues, compensation issues, multi-state tax issues, inventory depreciation, a number of different --

Q. Did you provide those kinds of services to some

of your clients?

A. Yes.

Q. Did you provide other services to your clients that weren't included in that CTS range of services?

A. Yes.

Q. Yes?

A. Yes.

Q. With respect to CTS sales, sales of CTS products, did you have a specific revenue goal?

A. I had a revenue goal, yes.

Q. In fiscal year 2004, was the revenue goal $400,000?

A. Yes.

Q. Are sales and revenue, CTS sales, CTS revenue, is that the same thing?

A. I did not think so. But with regard to the way the firm reports matters, apparently they think it is.

Q. What did you think was the difference?

A. Well, the way the CTS process was explained when I first joined the firm was that because these were some fairly esoteric areas that required a lot of experience to do them properly, my position was to go out and try and find companies that needed these solutions, and once I found that, to bring in these

of sales versus revenue first became more apparent to me. And we discussed two specific client situations where we were doing CTS work outside the U.S., for which I was supposed to get credit, which was not on this list. And --

Q. And who were they?

A. The two companies were Grand Circle Travel, some work done in Australia, and the Stride-Rite Companies, some work done in China. And I was assured both of those would be fixed.

Q. When did that discussion take place, approximately?

A. Before I wrote this response.

Q. And you wrote the response on February 13th?

A. Mm-hmm.

Q. Okay. According to the e-mail, your actual CTS revenue was $83,000 through February 8th; correct? That's what it says.

A. Right.

Q. And your revenue goal was $400,000; right?

A. Correct.

Q. And in your response of February 13th, did you set out your position on the issue?

A. I did not discuss those two specific situations

Q. What was your reaction to having your units reduced?

MR. ABER: Objection.

Q. What did you say in response to having your units reduced?

A. I asked for an explanation, and I already explained what was told to me. And I also discussed it with one of the other partners who, Mark Berkowitz, was an Andersen partner that joined with me, and he had a, I would say he got a better evaluation and he was also cut 20 units and given the same explanation.

MR. ABER: Who was that again?

A. Mark Berkowitz.

Q. You say he had a better evaluation than you did?

A. Well, I believe he did. I .... again, I didn't see his evaluation form.

Q. When was the first time that someone at Deloitte told you that they weren't happy with your performance?

A. I guess I'm not quite sure what you mean by "happy with your performance." The first time there was any serious discussion was the mid-year touch-point in February of '04.

Q. So serious discussion. Was there any comment made before that time about your performance being less than hoped?

A. Well, during the annual review for the period covering fiscal '03, and that annual review took place, as I recall in October, November of '04.

Q. '03?

A. '04. The fiscal --

Q. Well, you weren't there.

A. I'm sorry. Wait a second. I'm sorry. You are correct.

Q. Yeah.

A. October, November '03.

Q. Yeah.

A. So it's five or six months after the end of that year.

Q. Mm-hmm.

MR. ABER: I'm confused. If I can just interrupt. The evaluation was for what year?

THE WITNESS: It was for the year ending May of '03. It took place in the fall of '03.

We went over the issues of the need to increase revenue and the need to be more active in the CTS sales, over which I responded to increase both

revenue and CTS activity in sales over the following several months.

BY MR. SANDLER:

Q. Who communicated that to you?

A. That would have been Vince.

Q. Were there any subsequent discussions with Mr. DeGutis or anybody else before the touch-point meeting about your performance?

A. I had a conversation with Mark Steiger, who was one of the CTS partners down in New York, about some specific projects. I don't honestly know what his level of responsibility was for making Boston partners have more CTS sales, but he certainly seemed to take a strong interest in it. And he wanted -- he reiterated that it was important to get more involved in that.

Q. So he encouraged you to get more involved in CTS sales?

A. Yes. To the exclusion of regular sales.

MR. ABER: What sales?

A. Just --

Q. Regular?

A. -- regular services.

Q. When did that conversation take place, if you recall?

MR. SANDLER: '03.

BY MR. SANDLER:

Q. In that evaluation, they have various rating categories, did they not?

A. Mm-hmm.

Q. Yes?

A. Correct.

Q. Were there five of them?

A. If you say so. I don't remember how many there were exactly.

Q. And you were rated "good," is that right?

A. Correct.

Q. Is that the second lowest of the five categories?

A. It is the second lowest.

Q. Yeah. In fact, the only rating worse than that was "not achieved," isn't that right?

A. I don't recall what the title of that was.

Q. Were you happy to receive a good rating?

A. I was not aiming at the second lowest rating, no.

Q. So you were not happy?

A. No.

(Paul Exhibit No. 6 was marked for

identification.)

BY MR. SANDLER:

Q. You have been handed part of the 2004 goal-setting evaluation and summary. And looking at the ratings, could you just read into the record what the rating for good is defined as?

A. "Results are mixed but have achieved some goals/contribution expectations and further development is necessary."

Q. Do you recall if it was the same definition for fiscal year 2003?

A. It sounds like it.

Q. Do you know if any other partners in the lead tax group had received a good rating?

A. Did I know at the time?

Q. Yes.

A. No.

Q. Do you know now?

A. Yes.

Q. Do you know who else, if anybody, had received a good rating?

A. I don't actually recall the list, but it was in the document you sent us.

I might add that a good rating based on the

description that revenue wasn't as high as the plan seemed like a proper description. It was not -- that didn't set off any alarms with me. In other words, given that the revenue goal had not been met, I don't see based on these descriptions how it could be anything higher than that.

(Paul Exhibit No. 7 was marked for identification.)

BY MR. SANDLER:

Q. You have been handed the list of at least the persons in the LTS group that we both recalled, and this is fiscal year 2003, and this contains the -- some information about each one of them. Have you ever seen that before?

A. Only when you sent it to us.

MR. ABER: Can I ask the source of this document? I think I know what it is. But I want to know for the record.

MR. SANDLER: Let me ask my next question then.

BY MR. SANDLER:

Q. Wasn't it produced by Deloitte during the Massachusetts Commission investigation?

A. I honestly don't recall seeing it then.

that I generated in the banking industry, that was a real stumbling point.

Q. Why was that?

A. Because there wasn't an audit team that could handle a financial institution in Boston.

Q. Couldn't they have serviced that, somebody else from New York, just like they were servicing Citizens Bank?

A. That was not an acceptable approach to them. I think most clients would recognize that if you have a marquee client that's -- Citizens Bank is, I don't know, 25 or 50 billion dollars of capital, they get attention, and they get attention even if it means coming up from New York. If you are a two-billion-dollar bank, you are not going to get that attention.

Q. Looking at actual revenue on Paul Exhibit 7, only three people had less revenue than you; correct?

A. That looks correct.

Q. One of them was Judith Drake, who had $7 less; correct?

A. Well, it's 7,000, but.

Q. 7,000. I am not an accountant. Okay. The three people who had less revenue at far less units

than you; isn't that right?

A. Based on the schedule.

Q. So that meant their compensation was much lower; correct?

A. That would be correct.

Q. So one of the people was Leonard Trudell, he was lower than you in total revenue; right?

A. Mm-hmm.

Q. Do you know what happened to Leonard Trudell with respect to Deloitte?

A. I understand he ultimately resigned.

Q. If I represent to you that he was born September 8th, 1962, does that age sound about right to you for Mr. Trudell?

A. Yes.

Q. So he was about 20 years younger than you; correct?

A. About 13 years younger.

MR. SANDLER: Off the record.

(Discussion off the record.)

BY MR. SANDLER:

Q. How about Wayne Smith, he was also lower than you in revenue. Do you know what happened to Mr. Smith with respect to his relationship with

Q. Okay. Now, this is the fiscal year 2004 goal setting and evaluation form. And --

MR. ABER: What is this number?

MR. SANDLER: 9.

BY MR. SANDLER:

Q. Directing your attention to the second-to-the-last page, it's Bates numbered D18. There is a date October 11, '03.

A. Mm-hmm.

Q. Is that when you actually set the goals for the fiscal year -- you already said you were into the year before the goals were set; correct?

A. Correct.

Q. Is this when you set the goals?

A. That's my recollection.

Q. Yes.

A. It was in October.

Q. All right. Did you actually prepare these goals or at least participate in preparing them?

A. It was a joint effort, yes.

Q. You and Vince DeGutis?

A. Mm-hmm.

Q. And the CTS revenue goal was $400,000; correct?

A. Correct.

Q. And on D17, I see that one of the goals was "Increase revenue across my client list to meet the managed revenue goal." Do you see that?

A. Mm-hmm.

Q. Was that something you wrote?

A. It may well have been. I honestly don't recall which part of this was edited by whom.

Q. And there is a second phrase here, "How we will measure results." And under that particular goal, it says the total revenue will be used to measure results. Right?

A. Mm-hmm.

Q. Isn't that objective to determine whether you've met the number?

A. What is the question you are asking?

Q. I am just asking if that's an objective criterion.

A. Are you trying to tie this back into the earlier question about the performance improvement plan?

Q. I am just asking --

A. The two are different.

Q. So my question is: In this particular instance, is it an objective criterion to measure your

goal by determining the total revenue?

A. Yes.

Q. All right. What was manage revenue, what does that mean?

A. What was manage revenue? Manage revenue includes -- and I am not sure that's the technical term that was used at Deloitte, but what it referred to was to include all revenue, including CTS activity, including the foreign activity that I had mentioned earlier, and all activity done on clients where I was the lead partner, lead tax partner.

MR. SANDLER: Why don't we stop here for lunch? Off the record.

(Recess taken.)

BY MR. SANDLER:

Q. Was one of your clients at Deloitte a company called Perini?

A. Yes.

Q. Is that a construction company?

A. Yes.

Q. Had they been your client at Andersen?

A. Yes.

Q. And did they come over with you at the time you came to Deloitte?

A. They actually made a decision to leave Andersen as Andersen was falling apart before I went over to Deloitte, so they did not come over with me, no.

Q. And did they go to Deloitte at that time?

A. Yes.

Q. Who was responsible, if you know, for acquiring that client for Deloitte?

A. I actually don't know who that would have been.

Q. At some point after you arrived at Deloitte, was that client assigned to you, Perini?

A. Yes.

Q. Who assigned the client to you?

A. I believe Vince did.

Q. About how much revenue was generated for your account by Perini?

A. I would guess it was about 200,000 a year. Tax revenue.

Q. Pardon?

A. Tax revenue. LTS revenue. Not -- the revenue to Deloitte was significantly more than that.

Q. Did that go into -- whatever kind of revenue it was, did that go into your revenue column?

A. Only the tax piece of it.

Q. I see.

each other?

A. I do not recall anything like that.

Q. You mentioned a touch-point meeting. What is a touch-point meeting?

A. It's a -- it's supposed to be a midyear discussion of how you are doing relative to your goals.

Q. And you had a touch-point meeting on February 16th, 2004; is that right?

A. Correct.

Q. Was that attended by Mr. DeGutis and Frank Marcos?

A. My recollection was it was just Vince, but I could be wrong on that.

Q. Was there a meeting at which Frank Marcos was present?

A. I am trying to recall whether he was present or was just on the phone. I honestly don't remember.

Q. You mean the touch-point meeting?

A. I honestly don't remember whether he was at the meeting or not.

Q. Or on the phone?

A. I had a conversation with Frank, I believe it was after that, but I -- it was five years ago or

three years ago, whatever it was. I just don't recall.

Q. And the touch-point meeting was to determine how you were doing relative to your goals; correct?

A. Correct.

Q. And what were you told at that meeting?

A. Well, you have the touch-point evaluation form that basically said that my revenue number was off by 20 or 30 percent and that my CTS sales were behind goal, behind the plan as well, and I needed to work on those.

Q. What, if any, response did you make to those points?

A. You mean response in the meeting?

Q. At the meeting.

A. Acknowledged that I would try to refocus in effort and improve in those areas.

Q. At the meeting, did you ask that your revenue goals be lowered?

A. I don't recall that.

Q. Did you ask that at any other time, that your revenue goals be lowered?

A. After I was given a draft for an improvement plan, I spent time trying to understand it and what it

and it was not raised then. So how I would know that something is going on in December, I don't. I don't recall there being any other documents that you have presented that hinted this other than this one e-mail.

Q. Right. In addition to generating new business, were partners held accountable for producing a certain amount of revenue from all sources, including existing clients?

A. Yes.

Q. And --

A. Revenue goals were in total.

Q. At the touch-point meeting on February 16th, were you asked to prepare a projection of your earnings for the remainder of the fiscal year?

A. I believe that actually was requested in an e-mail right after that meeting.

Q. Okay. And did you prepare that projection?

A. I did.

(Paul Exhibit No. 11 was marked for identification.)

BY MR. SANDLER:

Q. Is Exhibit 11 the projection that you prepared?

A. It is.

Q. That was dated one day after the meeting of the

16th; correct?

A. Correct.

Q. And is this all revenue?

A. I was instructed to prepare a revenue estimate for the remainder of the year. And I was told that given the existing shortfall, I needed to make sure that I give an estimate that I would comfortably make; that it would be far worse for my position to have a shortfall in this estimate than what the actual number was. And so I was --

Q. Who said that?

A. Vince told me that. So I was told to make a conservative estimate.

Q. Is that a conservative estimate of all of the expected revenue for the remainder of the year?

A. Yes.

Q. Does that include CTS revenue?

A. It would.

Q. What was the amount of revenue you had generated before then for the year?

A. I don't have that figure available.

Q. After you submitted this revenue projection, were you put on a performance improvement plan?

A. Yes, that occurred afterwards.

Q. And it's your contention that you were doing that? I am not putting -- I am -- setting those numbers aside. But you are saying your monthly revenue was at the level that would have permitted you to achieve the revenue goal?

A. I have no doubt that it was. I also have no doubt that the firm didn't have the statistical measures to be able to tell whether it was or not when they made a decision.

Q. What causes you to believe that there wasn't information available?

A. Well, the discussion was on March 10th, the discussion, and the e-mails I've seen now about drafting the termination memo were started around two weeks later than that, despite the fact that the memo gives an indication that you have 90 days to improve.

Q. Were you told on April 8th that your partnership was going to be severed or at least a recommendation was going to be made to that effect?

A. I was told a recommendation was going to be made.

Q. And what was your response to that?

A. My immediate response was surprise because I thought the purpose of that meeting was to discuss how

I had been doing the previous month, seeing if I was making some progress.

Q. Once you realized that that was not the purpose of the meeting, did you respond in any way?

A. My recollection is I mostly listened. I asked a few questions.

Q. At some point, did you offer to have your units reduced?

A. At one point, I asked if the problem was my compensation versus the level of performance relative to other partners, and if so, had they considered a unit adjustment.

Q. Who was present at that time?

A. That was a discussion with Frank.

Q. In-person?

A. And Vince was -- I have to tell you I don't recall if it was in person. There was one in-person meeting with Frank and a couple on the phone. I don't recall which was which. That one I'm pretty sure was on the phone, actually.

Q. What was his response to your question?

A. Wasn't possible. And I asked why not, and he said, it wasn't.

Q. At some point, did you ask for the names of the

committee of six members?

A. I did.

Q. Did you do that in writing, orally?

A. I did it in that conversation.

Q. With Frank Marcos?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. And did he give those names to you?

A. Frank's response was he couldn't remember the names of the people on the committee.

Q. Did he get back to you or did anybody get back to you later --

A. No.

Q. -- and provide you with the names?

A. No.

Q. So you didn't know the names?

A. No.

Q. At some point, did you speak with somebody at Deloitte about possibly resigning rather than being severed?

A. Not that I recall. I don't know what the difference would be.

Q. Was there a discussion about submitting a

resignation in return for a certain sum of money?

A. No.

Q. Well, from the time of the conversation with Frank Marcos that you just testified about, what happened after that?

A. The next thing I heard was Vince handed me a letter about two weeks later saying -- and the letter said, "as you know, you have been terminated," but I had no conversations with Frank or Vince or anybody else in the meantime.

Q. Did you talk to Julie Salzman?

A. Afterwards.

Q. What did you talk -- who is she, first of all?

A. She is internal counsel with Deloitte's office in New York.

Q. What did you talk to her about?

A. I talked to her about the termination letter, and after a week or two, she also forwarded me a general release to sign. I talked to her just about termination matters. Nothing else.

Q. Were you supposed to be receiving something in return for signing the release?

A. Well, that's what the release said.

Q. What did it say?

Brooks Pharmacy, I have not done any work for.

There are a handful of other clients, smaller clients that I also did work for them and a handful of individual clients.

Q. As far as you know, was any new person brought in to replace you at Deloitte?

A. I don't know what they did. I believe, as a practical matter, within six months most of that work disappeared from Deloitte, so.

Q. And after leaving Deloitte, you joined another firm; is that right?

A. Mm-hmm.

Q. Yes?

A. Correct.

Q. What's the name of that firm?

A. Vitale Caturano.

Q. Are you a partner there?

A. It's actually a corporation. I'm a shareholder there.

Q. And what's been your yearly income there since you left Deloitte?

A. It has been 325,000.

Q. Are the benefits approximately equivalent to those at Deloitte?



WILCOX & FETZER LTD.

In the Matter Of:

# Paul

v.

# Deloitte & Touche LLP and Deloitte & Touche, USA, LLP

C.A. # 06-225 (MPT)

---

Transcript of:

Seltzer, Bradley M. (12/14/2007)

December 14, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 5

be found?

A. There were -- with respect to a given individual?

Q. Okay. Let's start off generically as to the organization itself.

A. The organization of the committee of six?

Q. Yes, once it was formed is there a file, a correspondence file, or something like that?

A. Maybe it's easier to explain the process. Is that what you are asking me?

Q. Go ahead.

THE WITNESS: Is that okay?

MR. SANDLER: That's fine.

A. Before the committee of six was convened with respect to any given individual a recommendation was made before the meeting was convened in the form of a recommendation memorandum and any prior documentation of the performance of the individual with respect to which the recommendation was being made. So, it could have prior PIPS, what we would call PIPS, performance improvement plans. It could have been mid-year touch point plans. It could have had final evaluations with the prior year in the case of those who came up in the second year of the two-year period.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477

Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

A500

So, it had documentation that it was felt would make the committee informed even before we had the deliberations.

Q. That's for each individual person who was subject to it?

A. Yes, for whom the process was recommended.

Q. And we'll get into that later. I understand this committee of six could only operate during the two years after --

A. The closing.

Q. After the closing?

A. Yes.

Q. After the closing or -- we'll get into that later. How many people have been submitted for consideration to the committee of six?

A. How many were submitted?

Q. Yes.

A. I don't know specifically. If you would like me to say do I think it was -- I believe it was fewer than 20.

Q. And was anybody submitted to that committee who was not terminated?

A. I don't believe so.

Q. Everybody who was considered by the committee

Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

what he said and if that's what you are asking then, yes, I agree with that. You have certainly been given lots of documentation as to the written material Mr. Paul received after the decision was made.

MR. ABER: And I was prepared to present them to this witness and ask him questions about it, but he has stated he doesn't know about those documents.

BY MR. ABER:

Q. Let's talk what you can testify to about the committee of six. Can you tell me what documents were used to inform the members of this committee that Mr. Paul's termination was being contemplated?

A. I can tell you at least some of them. I can't represent that I know that all of them. We had the letter of recommendation or the memo of recommendation, which would have come from the direct lines, which would have been Vince DeGutis and Frank Marcos. I believe we had a copy of the PIP. I believe we had the statistics regarding Mr. Paul's revenues and perhaps hours. I believe we had the E-mail that Mr. Paul wrote to I believe Mr. Marcos, but it could have been Mr. Marcos and/or Vince DeGutis, regarding his own performance and why or why not it was

Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 25

satisfactory. I don't believe we had his goals.

Q. I'm sorry?

A. I don't believe we had his goals, his goals for year one. We had at least those documents. I can't represent that that was the sum total unless you showed them to me.

Q. Did the committee ever meet together in one room?

A. The committee always met telephonically just because we were in multiple locations.

Q. Looking at document Bates stamped D946, which is a memo from Barry Salzberg to Jim Quigley and Sharon Allen, appointed members of the committee of six. First of all, who is Barry Salzberg?

A. Barry Salzberg is currently the CEO of Deloitte.

Q. Who is Sharon Allen?

A. Sharon Allen is and was the chairman of the board.

Q. What was Barry Salzberg's position on the date of the memo?

A. I believe Barry was CEO of tax.

Q. Who is Jim Quigley in June of 2003?

A. Jim Quigley at the time was CEO of Deloitte

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0
A503

showing Mr. Seltzer D320, which was part of a package of documents that I believe was submitted to the committee. That's what he is referring to.

MR. ABER: Let me go get my copies of the documents then.

MR. SANDLER: Off the record.

(Brief discussion off the record.)

MR. ABER: Let's mark this as Seltzer-8.

(Seltzer Deposition Exhibit No. 8 was marked for identification.)

BY MR. ABER:

Q. I'm handing you what has now been marked as Seltzer Exhibit 8 and it has been represented to me by Mr. Sandler that these documents that are in that exhibit, which are randomly Bates stamped, consist of the documents, all of the documents, which were considered by the committee of six in reaching their decision concerning Mr. Paul, is that correct?

A. All of the documents, yes.

Q. The first document really is an E-mail from Mr. Severin to I guess the committee and others such as Mr. Marcos, who is not a member of the committee, that they were going to convene the committee on April 12th at 11:30 to ask for the resignation of Brian Kayman

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 46

MR. ABER: With that understanding I am finished.

MR. SANDLER: Let me ask a few questions.

BY MR. SANDLER:

Q. Mr. Seltzer, was the age of Alan Paul mentioned during the committee of six discussions?

MR. ABER: Objection.

Q. You can answer.

A. No.

Q. Did you know Alan Paul personally?

A. No.

Q. Was there a discussion of the fact that he had failed to bring in as much business as was hoped?

A. Yes.

Q. Did that enter into the deliberations?

A. Significantly.

Q. Was the committee aware that Alan Paul was in the EG5 level?

A. Yes.

Q. What is that?

A. Earnings group.

Q. What is that?

A. At the time compensation for partners and principals was in a six tier system. The earnings

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

A505

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 47

group five was the second to the top earnings group. As a historical matter earnings group six represented less than nine percent of the Deloitte partners and principals and the grand bulk of partners it was somewhat of a bell curve. So, you anticipated most of your partners ultimately residing in earnings group three perhaps for their whole career.

Q. Earnings group five was quite high earnings?

A. High earnings and high expectations.

Q. Was the committee informed that Mr. Paul's points or units has been reduced from 780 his first year to 760 his second?

A. Yes.

Q. Was that unusual?

A. It was -- yes, particularly for somebody at that high an earnings group level.

Q. What message did that send, the reduction?

MR. ABER: Objection.

Q. To the extent you can answer.

A. Well, the message it sends is absent a significant change in performance some action, some adverse action, would occur.

Q. During the discussion of Alan Paul at the meeting was there any mention of his revenue goals

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

A506

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 48

having been two million and then two million five?

A. Yes.

Q. What was said about that?

A. Well, two million was correctly stated as a -- an almost guaranteed level of meeting for someone in earnings group five.

Q. Okay.

A. And was well below what would typically be set for earnings group five.

Q. Was there any mention made of Alan Paul's inability to convert his clients or to generate fees from new clients?

A. Certainly his lack of success in doing so.

Q. Was it mentioned that he claimed there was a lack of auditing from his former banking and real estate clients and that's why he wasn't successful in converting?

A. As I recall.

Q. Yes?

A. Yes, to the best of my knowledge.

Q. And what was said about that?

A. That others similarly situated had been able to meet comparable goals notwithstanding their lack of -- their receiving audit support.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

A507

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer
Page 49

Q. Was there any discussion of Mr. Paul's claim that he was falling short on CTS sales because after he made the introductions the CTS people weren't closing the sales?

A. Could you restate that question?

Q. Sure. Was it discussed at the committee --

MR. ABER: I'm going to object. Your question is leading rather than you are suggesting that there was a discussion.

MR. SANDLER: Okay.

BY MR. SANDLER:

Q. Was there a discussion of Mr. Paul's claim that he was falling short on CTS sales because after he made introductions to CTS that the people who were in CTS weren't closing the sale?

A. Yes.

Q. What was said about that?

A. Well, it was -- one, it was stated as a fact. Secondly, it was stated as Mr. Paul's response was related to the committee and comparables were presented to the committee as to others in the location regarding their ability to meet those CTS goals.

Q. Was the vote of the committee of six to sever

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0
A508

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer
Page 50

Alan Paul unanimous?

A. Yes.

MR. SANDLER: Nothing further.

BY MR. ABER:

Q. You have told me that earlier that approximately 20 people had been considered by the committee for termination as partners?

A. Yes.

Q. And that all 20 were terminated?

A. Some may have become directors.

Q. They were demoted?

A. If you view that, yes.

Q. Is moving from partner to director a promotion?

A. For those who would rather not have their capital at risk you can tell me.

Q. Is the pay level the same?

A. It can be.

Q. Do you know the ages of those 20 individuals?

A. No.

Q. Were any of them under 50?

A. I just testified that I don't know the ages.

Q. I thought you meant individually.

A. Generally, no, I do not know.

MR. ABER: Do you still have a copy of

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0
A509

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 54

A. From a pure timing perspective with respect to the activities of the committee of six, no.

Q. Because the committee met before 90 days had elapsed?

A. Correct.

Q. Was there a reason why the committee didn't wait for the end of 90 days to see --

A. What your question I think is is there a reason why the recommendation was made prior to the 90 days?

Q. No, I'm not interested in why the recommendation was made. Did the committee wait for the 90-day period represented in the PIP plan to conclude before it made its decision?

A. No.

Q. Was there a reason why it did not wait for that 90-day period?

A. Because the recommendation to consider termination was made prior to the 90-day period.

Q. Do you know why that recommendation was made prior to the 90-day period?

A. Yes.

Q. Why?

A. It was made because, number one, there was no immediate improvement, which was part of the

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0
A510

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 55

requirement. The way a PIP works is you have to show both immediate and sustained performance under the PIP. So, the fact that -- if it is clear that you are, number one, not taking the activities to produce -- you are not taking immediate activities to make progress towards the goals of the PIP or you make it clear that you don't accept the terms of the PIP or the expectations of the PIP or it becomes absolutely clear that you have no possibility of meeting the goals of the PIP, the 90-day period -- you don't wait for the 90-day period before you make a recommendation.

Q. And is that the only reason why the 90-day period wasn't allowed to complete itself before the committee made its decision?

A. I believe so.

Q. Were there any other time constraints for doing it that quickly?

A. Could you clarify that?

Q. Was there any other reason other than it did not appear that he met his goal of improvements for making a decision before the 90 days was up?

A. Well, I gave you the three-part mechanism for why you would not wait the 90-day period.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

A511

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer
Page 56

Q. It all had to do with he wasn't going to meet his goals?

A. No. It had to do with he wasn't going to meet his goals, but it could also have been that he was fighting the principle that the goals were attainable.

Q. Other than the achievability of the goals, either he was going to do it or he was fighting it, was there any other reason for not waiting the 90 days?

A. Not to my knowledge.

Q. And you are speaking as the committee on behalf of the entity, Deloitte & Touche?

A. Yes.

Q. Do you still have Seltzer-3 in front of you?

A. I don't believe so.

Q. Here it is. I got it. Let me hand you back Seltzer-3.

A. Would you like the original of Seltzer-8 back?

Q. Absolutely. In the section on the first page it talks about partnership units and it says in the last sentence, "Unit allotments, if any, beyond fiscal 2003 will be determined annually based on a process that assesses current and sustained performance." When did fiscal 2003 begin?

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0
A512

Q. You discussed under Mr. Sandler's questioning Mr. Paul's acknowledged inability to convert clients. What did you mean by that?

A. Mr. Paul had clients from his Andersen days that he was unable to convert into Deloitte clients.

Q. You then said that in response to Mr. Paul's statement that he couldn't do that because of lack of audit support and you stated others similarly situated could do it even without the audit support?

A. Correct.

Q. What did you mean by others similarly situated?

A. Other Andersen partners who joined Deloitte were able to take their Andersen clients and convert them into Deloitte clients even though they were not audit clients.

Q. For purposes of determining whether Mr. Paul's explanation for inability to convert clients you compared him to other Andersen partners who came over to Deloitte & Touche?

A. Principally.

Q. And you consider them similarly situated?

A. Yes. Where they were not -- let me clarify. Where they may not have been fully similarly situated was the fact that Mr. Paul was in earnings group five

Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer
Page 60

and one would have expected a higher likelihood of conversion.

Q. Did he have any say in what group he was being put in and the expectations that would result from being put in that group?

A. I don't know for certain.

MR. ABER: I think I'm done. Thank you, sir.

MR. SANDLER: Very quickly.

BY MR. SANDLER:

Q. Speaking of process and mechanism of the committee of six why was this committee set up in the first place?

MR. ABER: Objection, beyond the scope of direct.

Q. You can answer.

A. The Andersen transaction was very fast moving. Andersen had imploded and Andersen partners were scattering amongst the other members of the big four. So, a transaction had to be consummated quickly. This transaction was sort of two-fold. In many places we were able to target specific individuals to come to Deloitte. In other cases we didn't have the time to be that selective. That was typically the case where

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0
A514

Paul v. Deloitte & Touche LLP and Deloitte & Touche, USA, LLP
Bradley M. Seltzer

Page 61

we were in essence bringing in an entire office. In those cases it was recognized that we were effectively unable to do the traditional due diligence that you would want to do with respect to every individual. That was acknowledged by both Andersen and Deloitte.

So, the principle of the committee of six was that in essence over a two-year period the firm would be doing post transaction due diligence that could not otherwise have occurred before the transaction and two years was perceived to be more than a reasonable period in which to make that assessment and by having both Andersen partners -- equal numbers of Andersen partners and Deloitte partners it was viewed that the committee of six would be able to fairly make that -- assess any recommendation that came before it.

Q. One other question. Mr. Aber asked if Mr. Paul had had input into the grade level in which he was placed. Have you ever known anybody to come and say, Put me in a lower grade level so I can make less money?

MR. ABER: Objection.

MR. SANDLER: I'll withdraw. Nothing further.

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Christina Vitale (201-232-221-2474) d1903571-8600-40f9-bcba-b198e74f53f0

A515

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

-----------------------------------

ALAN D. PAUL,

Plaintiff,

- against -

DELOITTE & TOUCHE, LLP, and
DELOITTE & TOUCHE, USA, LLP,

Defendants.

C.A. No. 06-225 (MPT)

-----------------------------------x

1633 Broadway
New York, New York

March 11, 2008
10:30 a.m.

Deposition of STEVEN L. SEVERIN, before Marlene Lee, CSR, CRR, a Notary Public of the State of New York.

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 86983A

SEVERIN

Touche?

A. No.

Q. Did you ever meet Alan Paul?

A. To my best recollection, never.

Q. When was the first time you ever heard of him?

A. Sometime in 2003.

Q. When in 2003?

A. Best of my recollection, sometime in the fall of 2003.

Q. And how or why did you hear of him?

A. He was brought to my attention as a nonperforming partner.

Q. Who brought it to your attention?

A. I believe Mr. Marcos.

Q. Explain to me why -- as I understand it, Mr. Marcos is -- I'm not sure of his position. He's a manager-type person in the Northeast Region?

A. Mr. Marcos is responsible for the tax practice.

Q. In the Northeast Region?

A. At that time, yes, it included the Northeast.

SEVERIN

Q. And you work out of Washington, you said.

A. I'm based in Seattle.

Q. What region is that?

A. Pacific Northwest.

Q. Why would he have contacted you?

A. I had a role in our national tax function.

Q. What was that role?

A. I was the tax partner -- tax matters partner.

Q. Explain --

A. Partner matters for tax. Excuse me. Partner matters for tax.

Q. What's the function of that position?

A. Dealing with issues as they related to our tax partners.

Q. What did Mr. Marcos tell you about Mr. Paul?

A. Specifically?

Q. Yes.

A. I was told he was one of the nonperforming partners.

SEVERIN

Q. Is this before or after you were appointed to the Committee of Six?

A. After.

Q. Were you chairman of the Committee of Six?

A. I never served on the Committee of Six.

Q. But you were appointed to it.

A. Yes.

Q. And at some point you were taken off the Committee of Six.

A. Yes.

Q. But when you were appointed to it, were you the chairman of it?

A. No, I was not the chairman.

Q. Just one of the six persons?

A. Yes. At that time I was not in my national role. I was in a purely Seattle role at that time.

Q. When you say not national role, what do you mean?

A. The role I previously discussed. When I was appointed to the Committee of Six, I was a practicing tax partner in the Pacific

Northwest.

Q. As the partner for partners issues in the tax area -- I may not have stated the title right -- what does that function include?

A. I dealt with the admission of partners to the partnership, which can be either internally, where people have been in the firm for many years get admitted to the partnership, or, if we bring partners in from outside the firm, I would deal with transfers. I would deal -- I was responsible for our partners located overseas. Our expats.

I was responsible for issues as they arose, performance issues, behavior issues, illnesses, anything that can happen in a population of around 700 partners, whatever number of partners we had at that time. And lastly, with partners resigning or retiring from the firm.

Q. You were appointed to the Committee of Six in -- by my understanding, around June 23rd of 2003. Does that jog your memory?

A. About.

Q. Let me show you -- there is

SEVERIN

improvements in dealing with the issues that had been identified.

Q. And were you told whether Mr. Paul had been counseled?

A. Yes.

Q. And what were you told?

A. That he had been counseled.

Q. Had he been counseled?

A. I had been told he was counseled.

Q. But you had no idea how he was counseled?

A. I believe, my normal recollection -- normally we would meet with the partner and have those discussions.

Q. Would there be any record of those discussions?

A. Whether individual partners who met kept records, you'd have to ask them.

Q. When was it first discussed that Mr. Paul would be issued a PIP?

A. I think we need to understand, there are two parts of the process. A PIP is a documentation. The first issue of the partner is nonperforming and what are the issues. And

SEVERIN

the partner is told what those issues are and why the partner is not performing.

In Mr. Paul's case, in my mind, he clearly knew when he had a unit reduction that his performance was sub-par. We asked for a PIP as a means of documenting that a discussion took place.

Q. When would his units have been reduced?

A. We receive our unit allocation sometime -- I can't tell you in the year 2003, but generally in the last two weeks of August a partner is informed of his unit award for the year that began June 1st. And a very small minority of partners -- again, I can't speak for 2003, I can certainly speak for this year -- less than one percent of partners, would have a unit reduction.

Q. So sometime at the end of August -- go ahead.

A. Excuse me. Please finish.

Q. I don't want to interrupt your answer.

A. Go ahead.

me earlier and I told you --

Q. You said you wanted to break it down.

A. I said sometime between September and November. I can't be more specific. I don't recall.

Q. Was there discussion as to whether he should be issued a PIP? Or was it something else?

A. Our normal policies, especially in light of this, we were specifically giving him -- again, I may -- issuing a PIP, to me, sounds like it's -- the connotation, to me, is that it's a form of reprimand. And I really view it as a documentation of a process

Q. But sometime prior to December 9th, 2003, you said, either October or November, there was a discussion as to issuing Mr. Paul a PIP; am I correct?

A. Yes.

Q. Was that discussion one of "should he be issued one? Should he not be issued one?"

A. No. It would not be a "should."

SEVERIN

statement to be -- the information given to you to be incorrect?

A. No.

Q. Well, if he was in the top 50 percent, he wouldn't be one of the lowest.

A. You have to look at it not just in relationship to the absolute amount of revenue, but also in relationship to the units the partner had. If a partner is being paid $200,000, our expectations are very different than a partner who is being paid $700,000. So you need to correlate it. It's not an absolute measure. It's a measure. And as I think you know, we have various groups, earning groups, in the firm. And partners who are being paid more, obviously have an expectation to produce more.

When you say "lowest," it's not an absolute lowest. It also could be lowest as it relates to the units that the partner had.

Q. Is there any discussion here about -- does this language here say in relationship to the number of units?

A. That is assumed in our firm.

SEVERIN

Everybody in our firm would understand that as an absolute given.

Q. Does Deloitte & Touche make a judgment as to how many units to give Mr. Paul when he came aboard? Or was that a predetermined fact?

A. I do not know. Again, as you know, I was not involved -- and also, and the reason -- I make one other comment. In the Pacific Northwest where I was responsible, we did not bring any Arthur Andersen partners in, so I have no knowledge as to the process.

THE WITNESS: Could we take a five-minute break, if that's permissible?

(Discussion off the record.)

(A brief recess was taken.)

Q. Turning to the second page of the March 30 memo, in the bottom of the second paragraph there's mention that he was "in the bottom 20 percent of all partners and directors in the Northeast Region, copy attached."

I did not see that in these documents. Have you seen the document that that refers to?

SEVERIN

informed and had discussions as to his nonperformance, not the administrative issue of when the PIP was given to Mr. Paul.

Q. Then it goes on to state that "it indicated" -- referring to PIP. "It indicated he needed to make substantial improvement in the areas of" -- and it goes on. How, in your mind, does -- issuing this memo would Mr. Paul have demonstrated substantial improvement in revenue generation?

A. By generating additional revenue.

Q. How much more?

A. To meet the goals.

Q. Within the 90 days of the PIP plan?

A. To meet the goals at the end of the year.

Q. But determination was to terminate before the end of the year?

A. It was clear he was not going to reach the goals and had not made improvement.

Q. What would you have considered to be substantial improvement that might have indicated he was going to meet the goals?

A. An estimate from Mr. Paul that

SEVERIN

particularly as it relates to revenue generation, continues to be at the lower end in comparison with other LTS partners in Boston."

Now, it then adds parenthetically, "(even though at the top in compensation)." That seems to say he was at the low end of bringing in money, regardless of compensation. It separates out --

A. It appears to.

Q. One of the reasons given for his severance, compared to other LTS partners in Boston, he wasn't generating enough revenue.

A. That's what it says here.

Q. Is that what you meant when you wrote this memo?

A. I didn't write the memo. Mr. Marcos --

Q. But you're the one who sent it to the committee.

A. Yes.

Q. Did you intend that to be one of the reasons to sever him?

A. My job was to not -- my job was to send the memo out, which I did, and I had

discussions with Mr. Marcos. I again point out that, regardless of what this says, we judge partners by production in relation to compensation.

Q. That's what you're saying today.

A. No. I'm saying -- you can bring any of 800 partners in this room. These say the same thing.

Q. But that's not what it says here.

A. The memo says on an absolute basis it is low. That's true.

Q. And that's one of the reasons for severing him.

A. A reason, yes. Part of, yes.

Q. In the last sentence of that e-mail you state that "you need to overcome a weak PIP"; correct?

A. Yes.

Q. What about the PIP was weak?

A. It was not as specific as I would have preferred.

Q. What do you mean, "not as specific"?

A. It identifies the areas of

SEVERIN

deficiencies. For instance, revenue generation, but doesn't say, "Your goal was two and a half million and you've only produced one and a half million."

Q. So there were not enough objective standards in the PIP?

A. Yes. It was a general -- the documentation, the fact that Mr. Paul had goals, knew what the goals were, were distributed on a monthly basis, he clearly knew what the standards and what was expected of him. As I indicated, the PIP, in my mind, is more of a documentation issue.

Q. But it does not say the PIP -- what he has to do in the next 90 days to demonstrate --

A. It's not in front of me, but I thought it said demonstrate substantial improvement.

Q. I put in front of you Paul 12, which is the PIP itself.

A. "He needed to demonstrate immediate and sustained improvement in the areas," and it listed the areas.



W&F
WILCOX & FETZER LTD.

In the Matter Of:

Paul

v.

Deloitte & Touche, et al.

C.A. # 06-225-MPT

Transcript of:

Wells, Esq., Andrew N. (3/13/2008)

March 13, 2008

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Paul v. Deloitte & Touche, et al.
Andrew N. Wells, Esq.

Page 31

designated representative testifying on behalf of Deloitte & Touche, what is your understanding of paragraph 4?

A. It is a general rule of thumb for determining the number of units that a person who left Andersen and joined Deloitte as a partner would have, recognizing that, on a case-by-case basis, there might be adjustments, and further subject to the fact that all of this, as indicated in the first paragraph, applies only if the parties determine in their sole discretion to proceed with the transaction.

Q. Which they did decide to proceed with?

A. Yes.

Q. As I read this paragraph -- and I want you to correct me if I'm wrong -- it basically is stating, I think, that the partners coming over will receive sufficient units so that their compensation at Deloitte & Touche is equal to their compensation at Arthur Andersen. Am I correct?

A. Is there a question?

Q. Is that interpretation a fair way to interpret the position of paragraph 4?

A. I don't interpret it that way, no. First of all, as partners, partners receive a share of the

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477
Electronically signed by Lucinda Reeder (201-240-129-2951) 6b22072c-3d1b-4642-8b94-dbf8b20c6c1e

A531

profits; and therefore, the number of units only represents the proportionate share of the profits that any individual would receive. So there is no way to know that someone's future compensation is going to be anything; simply that anticipated compensation will be at certain levels if profits of the entity are what profits are expected to be. But it's not a salary, so there is no way that you could ever know what someone's future compensation will be.

Second, it does provide for certain reductions as part of the formula. I don't understand all of the terms having to do with Andersen's compensation system, so it's very difficult for me to translate Andersen's compensation system to ours. But there are certain reductions which seem to provide that even the anticipated compensation would be less than historic compensation.

Q. Say that again.

A. Where "Unit Factor" is defined.

Q. Yes.

A. It says, "Unit Factor" shall mean, with respect to a Selected Tax Member, such Selected Tax Member's 2001 base compensation, less two things.

And, again, this has to do with translating

MR. ABER: You continue to educate the witness with your questions.

THE WITNESS: Can I answer?

MR. SANDLER: Sure.

THE WITNESS: Paul 13, which, as I said, I drafted or it was prepared under my supervision, was designed to and does provide for Mr. Paul's severance in accordance with 5 (b) of Paul 3.

And in particular, going to the three points I mentioned a moment ago, it gives him one month's notice of the severance in that it was dated April 22nd and is effective May 27th. So it actually gave him more than a month's notice.

Second, it provides in paragraph 3 for four-months' severance; and third, it provides in paragraph 4 for a release of the restrictive covenants in the partnership agreements.

It also goes on in paragraph 5 to provide that he is entitled to retirement benefits in accordance with his admission agreement.

MR. SANDLER: Nothing further.

MR. ABER: I have no further questions.

(Deposition concluded at 11:56 a.m.)

-- -- -- --

Electronically signed by Lucinda Reeder (201-240-129-2951) 6b22072c-3d1b-4642-8b94-dbf8b20c6c1e

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALAN D. PAUL,

Plaintiff,

v.

DELOITTE & TOUCHE LLP, and DELOITTE & TOUCHE, USA LLP,

Defendants.

C.A. No. 06-225-MPT

Trial By Jury Demanded

**AFFIDAVIT OF VINCENT DEGUTIS**

STATE OF TENNESSEE :
: ss
COUNTY OF SHELBY :

Vincent DeGutis being duly sworn according to law did depose and say as follows:

1. I am a CPA and a partner in Defendants Deloitte & Touche LLP and Deloitte LLP, formerly known as Deloitte & Touche USA LLP ("Deloitte").

2. In 2000, I became the practice leader or partner in charge of Deloitte's Boston office Lead Tax Services ("LTS") group, and remained in that position through 2004. There were twelve partners in LTS during those years.

3. When Alan Paul and Mark Berkowitz joined Boston LTS in May 2002, it was recognized that they would need a period of adjustment. Therefore, for fiscal year 2003 they were given goals that were lower than other Deloitte partners in their earning groups.

4.   After fiscal year 2003, the first full fiscal year that Alan Paul was a Deloitte partner, I reviewed his performance and concluded that he had underperformed.  I gave him a "good" rating, which was the second lowest of the five ratings.  In the Fall of 2003, I met with Alan Paul and informed him of his rating and explained that since he was being highly compensated, his revenue production and other performance criteria would have to improve.

5.   In FY04, two other Boston LTS partners were given "good" ratings, Wayne Smith, who was 49, and Leonard Trudell, who was 41.

6.   During this litigation, I have been shown an email from December 2003 in which a performance improvement plan for Mr. Paul was discussed.  I was not aware of that discussion or email until I saw it in connection with this case.

7.   Every month, I gave Mr. Paul and all of the other Boston LTS partners written performance information showing each LTS partner's revenue production.  We had monthly partner meetings during which this information was distributed and discussed.

8.   As time passed, I continued to monitor Mr. Paul's performance and on February 16, 2004, held a mid-year touch point meeting with Mr. Paul.  During that meeting, I told Mr. Paul that he was again under-performing and might come up as much as 20 to 30 percent short of his revenue goal.  I asked him to prepare a projection of the probable revenue that he thought he would earn for the remainder of the fiscal year.

9.   After receiving Mr. Paul's projection, I decided to place him on a performance improvement plan ("PIP").  I prepared a PIP and because we had trouble arranging a face to face meeting on a mutually acceptable date, I emailed the PIP to Mr. Paul on February 25, 2004 and invited his comments.  In my cover email, I referred to the PIP as a draft.

10. On March 9, 2004 I sent Alan Paul another copy of the PIP, unchanged from the first one. As with the evaluation itself, I viewed the PIP as a collaboration between us, but my intent was that Mr. Paul would begin working under the PIP on February 25, when he received it.

11. During this period of time, Mr. Paul asked me more than once to lower his goals and each time, I responded that I would not lower his goals, since all of the partners were required to meet the goals on which they had agreed. I told him repeatedly that he needed to achieve his fiscal year 2004 goals.

12. Mr. Paul and I met several times in early March 2004 to talk about his performance and his PIP. During this same time period, Wayne Smith, another Boston LTS partner, was also placed on a PIP. Wayne Smith's attitude in response to being placed on the PIP was "let's work together" while Alan Paul's reaction was "this is wrong." Alan Paul never acknowledged that he needed to improve and instead kept blaming others for his lack of performance. Wayne Smith remained with Deloitte, but he was reduced from a partner to a Director, an employee position.

13. Frank Marcos, who was the partner in charge of the Northeast Region, participated with me in several of the March conversations with Alan Paul. When it became apparent to us that Alan Paul was not going to meet his goals, and he continued to be intransigent, we decided that it would be best to recommend his severance from the partnerships to the Committee of 6.

14. After we made that decision, I drafted a severance recommendation. This was the first time I had done that. I sent the severance recommendation to Mr. Marcos and to Steven Severin, who was one of the partners in charge of "Partner Matters." Mr. Severin responded that

more detail was needed in the severance recommendation. I revised it accordingly, and it was submitted to the Committee of 6. I did not participate in the Committee of Six meeting that resulted in Ms. Paul's severance.

15. After Mr. Paul was severed, no new partners were added to Boston LTS to take over his accounts.

VINCENT DEGUTIS

SWORN TO AND SUBSCRIBED BEFORE ME, a Notary Public for the State of TN, this 18 day of July, 2008.

HENRIETTA Y. VASKIN STATE OF TENNESSEE NOTARY PUBLIC COUNTY OF SHELBY
My Comm. Exp. 6-29-2010

Henrietta Y. Vaskin
Notary Public

My Commission Expires: June 29, 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALAN D. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-225-MPT |
| v. | ) | |
| | ) | |
| DELOITTE & TOUCHE LLP, | ) | |
| and DELOITTE & TOUCHE USA LLP, | ) | Trial By Jury Demanded |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF STEVEN L. SEVERIN**

STATE OF :
: ss
COUNTY OF :

Steven L. Severin, being duly sworn according to law, did depose and say as follows:

1. I am a Partner in Deloitte LLP, and at the times relevant to this lawsuit, was a partner in Defendants (collectively referred to herein as "Deloitte"). I am a CPA and also have a law degree. During calendar year 2003 and through July 2004, I was responsible for Partner Matters for the tax function, which involved dealing with issues relating to our tax partners. My responsibilities included dealing with the admission of partners to the partnerships, either internally or from outside, relocation of partners, performance issues, behavior issues, illnesses, resignations and retirements.

2. During the fiscal years 2003 and 2004, there were several ways of addressing problems with non-performing partners. Those who had joined Deloitte in 2002 in connection

with the May 7, 2002 agreement with Arthur Andersen could be severed by the so-called Committee of Six during a two year period. Otherwise, the traditional way of dealing with a non-performing partner was to ask for and obtain his or her resignation. During fiscal years 2003 and 2004, five Northeast Region tax partners and principals resigned at Deloitte's request, and three, including Alan Paul, were severed by the Committee of Six. One of those people was two years older than Alan Paul at the time of separation and all of the others were younger, with ages at the time ranging from 39 to 52 years old.

3. In September 2003, I sent Frank Marcos, the Partner in Charge of the Northeast Region Tax Group, a list of 16 people, including Alan Paul, who had "significant performance problems." Ten members of that group were younger than Alan Paul; two were in their thirties and six were in their forties.

[signature]
STEVEN L. SEVERIN

SWORN to and subscribed before me 16th day of July, 2008.

[signature]
Notary Public

LISA G. MALOUL
Notary Public, State of New York
No. 02MA6061087
Qualified in Nassau County
Commission Expires July 8, 20 11

My Commission Expires: ______

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALAN D. PAUL,<br><br>Plaintiff,<br><br>v.<br><br>DELOITTE & TOUCHE LLP, and DELOITTE & TOUCHE USA LLP,<br><br>Defendants. | ) | C.A. No. 06-225-MPT<br><br>Trial By Jury Demanded |

**AFFIDAVIT OF PATRICIA HORN**

COMMONWEALTH OF MASSACHUSETTS: :
: ss
COUNTY OF SUFFOLK :

Patricia Horn, being duly sworn according to law, did depose and say as follows:

1. I am an accountant and an employee of what is now Deloitte Tax LLP. During fiscal years 2002 to 2004, Deloitte & Touche LLP was my employer. My job title is Director. I have been a Deloitte employee since 2000. I am a CPA.

2. Since September 2003, I have functioned as the Chief of Staff to Frank Marcos, the Northeast Region Tax Managing Partner. I assist Mr. Marcos in all aspects of managing the operations of the Northeast Region Tax practice.

3. During the discovery phase of this case, I have been the person primarily responsible for obtaining numerical information. I sometimes have obtained the information directly and other times have obtained information from our Finance Group and/or our National HR Group.

4. During fiscal year 2004, in addition to Alan Paul, two other former Andersen partners in the Northeast Region Tax practice who were subject to severance by the Committee of Six were severed, namely Michael Fichera and Edward (Bud) Gartland. Mr. Fichera was 39 and Mr. Gartland was 41 at the time of their severance. In fiscal year 2003, Mr. Gartland had been rated "good" and Mr. Fichera had been rated "not achieved." Mr. Gartland's units had been reduced from 550 to 500, effective for fiscal year 2004.

5. In fiscal year 2003, in addition to Alan Paul, ten other Northeast Region Tax partners received "good" ratings. Their ages at the end of fiscal year 2003 were 36, 39 (2), 40, 41, 45 (2), 47, 52 and 58. Of that group, the oldest remained a partner and retired at the end of fiscal year 2008. Of the others, all of whom were younger than Alan Paul, one was severed by the Committee of Six, four were asked to resign and did so, and two resigned their partnerships, and remain with Deloitte as employees. The other two remain partners.

PATRICIA HORN

SWORN to and subscribed before me 17th day of July, 2008.

Notary Public

My Commission Expires: 2/6/09